**DECHERT LLP**
Marcus A. Helt (TX 24052187)
Debbie E. Green (TX 24059852)
Jack G. Haake (TX 24127704)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201
Telephone: (214) 453-4900
marcus.helt@dechert.com
debbie.green@dechert.com
jack.haake@dechert.com

**DECHERT LLP**
Jerry L. Hall (admitted *pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
jerry.hall@dechert.com

*Counsel for YSA Investments 1, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **In re:**<br><br>**LOUIS INVESTMENTS, LLC,**<br><br>**Debtor.** | **CASE NO. 26-33110-sgj**<br><br>**CHAPTER 11** |
| **LOUIS INVESTMENTS, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**YSA INVESTMENTS 1, LLC,**<br><br>**Defendant.** | **ADV. PRO. NO.: 26-03071** |

**APPENDIX IN SUPPORT OF DEFENDANT YSA INVESTMENTS 1, LLC'S RESPONSE TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

YSA Investments 1, LLC ("YSA") files this appendix (the "Appendix") in support of *Defendant YSA Investments 1, LLC's Response to Plaintiff's Emergency Motion for Temporary Restraining Order*.

## APPENDIX


| Exhibit No. | Document | Pages |
|---|---|---|
| 1. | Petition – Fairfax Investors, LLC (Case No. 26-11984) | APP 0001–0005 |
| 2. | Petition – Fairfax Best Living, LLC (Case No. 26- 11985) | APP 0006–0010 |
| 3. | Petition – Woodland Oaks Best Living, LLC (Case No. 26-11986) | APP 0011–0015 |
| 4. | Petition – Woodland Oaks Investors, LLC (Case No. 26-11987) | APP 0016–0020 |
| 5. | List of Equity Security Holders (Case No. 26-11984) | APP 0021–0022 |
| 6. | List of Equity Security Holders (Case No. 26-11985) | APP 0023–0024 |
| 7. | List of Equity Security Holders (Case No. 26-11986) | APP 0025–0026 |
| 8. | List of Equity Security Holders (Case No. 26-11987) | APP 0027–0028 |
| 9. | Post Trial Memorandum Opinion, Delaware Ct. of Chancery, C.A. No. 2025-1319-KSJM | APP 0029–0066 |
| 10. | Amended Agreed Order of Appointment Of A Receiver, *Saperean Capital IV Tb Note Lender ICD4, LLC v. Woodland Oaks Best Living, LLC*, No. CJ-2025-8499 (Okla. Cty. Dist. Ct. Feb. 4, 2026) | APP 0067–0086 |
| 11. | Verified Complaint, *Upperman v. Kulick*, No. 4:26-cv-00383 (N.D. Okla. Jun. 25, 2026) | APP 0087–0146 |
| 12. | Complaint, *Federal National Mortgage Association v. Kulick*, No. 5:26-cv-01400 (W.D. Okla. Jun. 12, 2026) | APP 0147–0169 |
| 13. | Order, *In re Jenk's Best Living, LLC*, No. 26-17758-MMH, Adv. No. 26-00176-MMH (Bankr. D. Md. July 24, 2026) | APP 0170–0179 |
| 14. | Kulick Feb. 5, 2026 Deposition Transcript | APP 0180–0334 |
| 15. | Kulick Dec. 30, 2025 Deposition Transcript | APP 0335–0627 |
| 16. | *Tulsa Apartment Residents Face Water Shut-Off over $117,000 Unpaid Bill*, KRMG (Mar. 23, 2026), https://krmg.com/2026/03/23/tulsa-apartment-residents-face-water-shut-off-over-117000-unpaid-bill/ | APP 0628–0637 |
| 17. | Stef Manchen, *Progress on Apartment Trash Clean-Up, but Residents Still Frustrated*, KJRH (Jan. 9, 2026), https://www.kjrh.com/news/local-news/progress-on-apartment-trash-clean-up-but-residents-still-frustrated | APP 0638–0646 |
| 18. | Special Warranty Deed for Riverpark | APP 0647–0649 |

| Exhibit No. | Document | Pages |
|---|---|---|
| 19. | Special Warranty Deed for Village Creek | APP 0650–0654 |
| 20. | Amended and Restated Operating Agreement of Louis Investments, LLC | APP 0655–0664 |
| 21. | Membership Interest Certificate for Louis Investments, LLC | APP 0665–0666 |
| 22. | State of Kansas UCC-1 Filing for Louis Investments, LLC | APP 0667–0669 |
| 23. | State of Kansas UCC-3 Filing for Louis Investments, LLC | APP 0670–0672 |

Dated: July 27, 2026
Dallas, Texas

Respectfully submitted,

**DECHERT LLP**

*/s/ Debbie E. Green*

Marcus A. Helt (TX 24052187)
Debbie E. Green (TX 24059852)
Jack G. Haake (TX 24127704)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201-1574
Telephone: (214) 453-4900
marcus.helt@dechert.com
debbie.green@dechert.com
jack.haake@dechert.com

- and -

Jerry L. Hall (admitted *pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
jerry.hall@dechert.com

*Counsel for YSA Investments 1, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a true and correct copy of the foregoing Appendix was served by the Court's CM/ECF system on all parties receiving electronic notification in this proceeding.

Dated: July 27, 2026
Dallas, Texas

*/s/ Debbie E. Green*
Debbie E. Green

# EXHIBIT 1

Fill in this information to identify the case:

United States Bankruptcy Court for the: **Western District of Oklahoma**

Case number (if known): ____________ Chapter 11

☐ Check if this is an amended filing

# Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/25

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

**1. Debtor's name**

**Fairfax Investors, LLC**

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as names*

**3. Debtor's federal Employer Identification Number (EIN)**

88-2332660

**4. Debtor's address**

**Principal place of business**

7801 NE 10th St.
Number Street

Tulsa, OK 73110
City State ZIP Code

Tulsa
County

**Mailing address, if different from principal place of business**

1422 E. 71st St., Suite J
Number Street

Tulsa, OK 74136
City State ZIP Code

**Location of principal assets, if different from principal place of business**

Number Street

City State ZIP Code

**5. Debtor's website (URL)**

**6. Type of debtor**

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☑ Other. Specify: ____________

Debtor **Fairfax Investors, LLC** Case number *(if known)*
Name

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. §101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. §781(3))
- ☑ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. §501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

___ ___ ___ ___

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11. *Check all that apply:*
  - ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).
  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
  - ☐ A plan is being filed with this petition.
  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☑ No
- ☐ Yes. District ________ When ________ (MM / DD / YYYY) Case number ________

  District ________ When ________ (MM / DD / YYYY) Case number ________

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

- ☑ No
- ☐ Yes. Debtor ________ Relationship ________

  District ________ When ________ (MM / DD / YYYY)

  Case number, if known ________

Debtor **Fairfax Investors, LLC** Case number *(if known)*
Name

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard?

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other

**Where is the property?**

Number Street

City State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency

Contact name

Phone

## Statistical and administrative information

**13. Debtor's estimation of available funds?**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | | |
|---|---|---|---|
| ☑ 1-49 | ☐ 50-99 | ☐ 1,000-5,000 | ☐ 5,001-10,000 |
| ☐ 100-199 | ☐ 200-999 | ☐ 10,001-25,000 | |
| ☐ 25,001-50,000 | ☐ 50,000-100,000 | ☐ More than 100,000 | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☑ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

Debtor **Fairfax Investors, LLC**
Name

Case number *(if known)*

**16. Estimated liabilities**

- ❑ $0-$50,000
- ❑ $50,001-$100,000
- ❑ $100,001-$500,000
- ❑ $500,001-$1 million
- ❑ $1,000,001-$10 million
- ☑ $10,000,001-$50 million
- ❑ $50,000,001-$100 million
- ❑ $100,000,001-$500 million
- ❑ $500,000,001-$1 billion
- ❑ $1,000,000,001-$10 billion
- ❑ $10,000,000,001-$50 billion
- ❑ More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- I have been authorized to file this petition on behalf of the debtor.
- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **06/12/2026**
MM/ DD/ YYYY

X **/s/ Marc Kulick**
Signature of authorized representative of debtor

**Marc Kulick**
Printed name

Title **Authorized Signator**

**18. Signature of attorney**

X **/s/ Joyce Lindauer**
Signature of attorney for debtor

Date **06/12/2026**
MM/ DD/ YYYY

**Joyce Lindauer**
Printed name

**Lindauer & Vaughn**
Firm name

**117 S. Dallas St.**
Number Street

**Ennis** **TX** **75119**
City State ZIP Code

**(972) 503-4033**
Contact phone

**joyce@joycelindauer.com**
Email address

**21555700** **TX**
Bar number State

# EXHIBIT 2

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:
**Western District of Oklahoma**

Case number (if known): ____________ Chapter **11**

☐ Check if this is an amended filing

# Official Form 201

## Voluntary Petition for Non-Individuals Filing for Bankruptcy

**04/25**

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

**1. Debtor's name**
**Fairfax Best Living, LLC**

**2. All other names debtor used in the last 8 years**
Include any assumed names, trade names, and *doing business as names*

**3. Debtor's federal Employer Identification Number (EIN)**
**88-1896874**

**4. Debtor's address**

**Principal place of business**
**7801 NE 10th St.**
Number Street
**Oklahoma City, OK 73110**
City State ZIP Code
**Oklahoma**
County

**Mailing address, if different from principal place of business**
**1422 E. 71st St., Suite J**
Number Street
**Tulsa, OK 74136**
City State ZIP Code

**Location of principal assets, if different from principal place of business**
Number Street
City State ZIP Code

**5. Debtor's website (URL)**

**6. Type of debtor**
☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
☐ Partnership (excluding LLP)
☑ Other. Specify: ____________

Debtor **Fairfax Best Living, LLC** Case number *(if known)*
Name

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
☐ Railroad (as defined in 11 U.S.C. §101(44))
☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
☐ Clearing Bank (as defined in 11 U.S.C. §781(3))
☑ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)
☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

___ ___ ___ ___

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7
☐ Chapter 9
☑ Chapter 11. *Check all that apply:*
- ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).
- ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
- ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
- ☐ A plan is being filed with this petition.
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
- ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
- ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☑ No
☐ Yes. District ______ When ______ (MM / DD / YYYY) Case number ______
District ______ When ______ (MM / DD / YYYY) Case number ______

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No
☐ Yes. Debtor ______ Relationship ______
District ______ When ______ (MM / DD / YYYY)
Case number, if known ______

Debtor **Fairfax Best Living, LLC** Case number *(if known)* ____________
Name

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
What is the hazard? ____________

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other ____________

**Where is the property?** ____________
Number Street
____________
City State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency ____________
Contact name ____________
Phone ____________

## Statistical and administrative information

**13. Debtor's estimation of available funds?**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | | |
|---|---|---|---|
| ☑ 1-49 | ☐ 50-99 | ☐ 1,000-5,000 | ☐ 5,001-10,000 |
| ☐ 25,001-50,000 | ☐ 50,000-100,000 | ☐ 100-199 | ☐ 200-999 |
| ☐ 10,001-25,000 | ☐ More than 100,000 | | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☑ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

Debtor **Fairfax Best Living, LLC**
Name

Case number *(if known)*

**16. Estimated liabilities**

- ☐ $0-$50,000
- ☐ $50,001-$100,000
- ☐ $100,001-$500,000
- ☐ $500,001-$1 million
- ☐ $1,000,001-$10 million
- ☑ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☐ $100,000,001-$500 million
- ☐ $500,000,001-$1 billion
- ☐ $1,000,000,001-$10 billion
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- I have been authorized to file this petition on behalf of the debtor.
- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **06/12/2026**
MM/ DD/ YYYY

✗ **/s/ Marc Kulick**
Signature of authorized representative of debtor

**Marc Kulick**
Printed name

Title **Authorized Signator**

**18. Signature of attorney**

✗ **/s/ Joyce Lindauer**
Signature of attorney for debtor

Date **06/12/2026**
MM/ DD/ YYYY

**Joyce Lindauer**
Printed name

**Lindauer & Vaughn**
Firm name

**117 S. Dallas St.**
Number Street

**Ennis** **TX** **75119**
City State ZIP Code

**(972) 503-4033**
Contact phone

**joyce@joycelindauer.com**
Email address

**21555700** **TX**
Bar number State

# EXHIBIT 3

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

**Western District of Oklahoma**

Case number (if known): ____________ Chapter **11**

☐ Check if this is an amended filing

# Official Form 201

## Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/25

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

**1. Debtor's name**

**Woodland Oaks Best Living, LLC**

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as names*

**3. Debtor's federal Employer Identification Number (EIN)**

**88 – 1882364**

**4. Debtor's address**

| **Principal place of business** | **Mailing address, if different from principal place of business** |
|---|---|
| **7142 S 92nd E Ave**<br>Number Street | **1422 E 71st St**<br>Number Street |
| **Tulsa, OK 74133**<br>City State ZIP Code | **Tulsa, OK 74136**<br>City State ZIP Code |
| **Tulsa**<br>County | **Location of principal assets, if different from principal place of business**<br>Number Street<br>City State ZIP Code |

**5. Debtor's website (URL)**

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: ____________

Debtor **Woodland Oaks Best Living, LLC** Case number *(if known)* ____________
Name

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. §101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. §781(3))
- ☑ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. §501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

___ ___ ___ ___

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11. *Check all that apply:*
  - ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).
  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
  - ☐ A plan is being filed with this petition.
  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☑ No
- ☐ Yes. District ____________ When ____________ Case number ____________
  MM / DD / YYYY
  District ____________ When ____________ Case number ____________
  MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

- ☑ No
- ☐ Yes. Debtor ____________ Relationship ____________
  District ____________ When ____________
  MM / DD / YYYY
  Case number, if known ____________

Debtor **Woodland Oaks Best Living, LLC** Case number *(if known)* ____________
Name

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? ____________

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other ____________

**Where is the property?** ____________
Number Street

____________

City State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency ____________

Contact name ____________

Phone ____________

## Statistical and administrative information

**13. Debtor's estimation of available funds?**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | | |
|---|---|---|---|
| ☑ 1-49 | ☐ 50-99 | ☐ 1,000-5,000 | ☐ 5,001-10,000 |
| ☐ 100-199 | ☐ 200-999 | ☐ 10,001-25,000 | |
| ☐ 25,001-50,000 | ☐ 50,000-100,000 | ☐ More than 100,000 | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☑ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

Debtor **Woodland Oaks Best Living, LLC** Case number *(if known)*
Name

**16. Estimated liabilities**

- ☐ $0-$50,000
- ☐ $50,001-$100,000
- ☐ $100,001-$500,000
- ☐ $500,001-$1 million
- ☐ $1,000,001-$10 million
- ☑ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☐ $100,000,001-$500 million
- ☐ $500,000,001-$1 billion
- ☐ $1,000,000,001-$10 billion
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- I have been authorized to file this petition on behalf of the debtor.
- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **06/12/2026**
MM/ DD/ YYYY

X **/s/ Marc Kulick**
Signature of authorized representative of debtor

**Marc Kulick**
Printed name

Title **Authorized Signer**

**18. Signature of attorney**

X **/s/ Joyce Lindauer**
Signature of attorney for debtor

Date **06/12/2026**
MM/ DD/ YYYY

**Joyce Lindauer**
Printed name

**Lindauer & Vaughn**
Firm name

**117 S. Dallas St.**
Number Street

**Ennis** **TX** **75119**
City State ZIP Code

**(972) 503-4033**
Contact phone

**joyce@joycelindauer.com**
Email address

**21555700** **TX**
Bar number State

# EXHIBIT 4

Fill in this information to identify the case:

United States Bankruptcy Court for the: **Western District of Oklahoma**

Case number (if known): ______________ Chapter **11**

☐ Check if this is an amended filing

# Official Form 201

## Voluntary Petition for Non-Individuals Filing for Bankruptcy

**04/25**

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

**1. Debtor's name** — **Woodland Oaks Investors, LLC**

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as names*

______________

**3. Debtor's federal Employer Identification Number (EIN)** — 88-1952303

**4. Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 7142 92nd E Ave (Number Street) | 1422 E 71st St (Number Street) |
| Tulsa, OK 74133 (City State ZIP Code) | Tulsa, OK 74136 (City State ZIP Code) |
| Tulsa (County) | **Location of principal assets, if different from principal place of business** |
| | ______________ Number Street |
| | ______________ City State ZIP Code |

**5. Debtor's website (URL)** ______________

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: ______________

Debtor **Woodland Oaks Investors, LLC** Case number *(if known)* ______
Name

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. §101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. §781(3))
- ☑ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. §501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

___ ___ ___ ___

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11. *Check all that apply:*
  - ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).
  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
  - ☐ A plan is being filed with this petition.
  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☑ No
- ☐ Yes. District ______ When ______ (MM / DD / YYYY) Case number ______
  District ______ When ______ (MM / DD / YYYY) Case number ______

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

- ☑ No
- ☐ Yes. Debtor ______ Relationship ______
  District ______ When ______ (MM / DD / YYYY)
  Case number, if known ______

Debtor **Woodland Oaks Investors, LLC** Case number *(if known)* ____________
Name

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? ____________

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other ____________

**Where is the property?** ____________
Number Street

____________

City ____ State ____ ZIP Code ____

**Is the property insured?**

☐ No

☐ Yes. Insurance agency ____________

Contact name ____________

Phone ____________

## Statistical and administrative information

**13. Debtor's estimation of available funds?**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | | |
|---|---|---|---|
| ☑ 1-49 | ☐ 50-99 | ☐ 1,000-5,000 | ☐ 5,001-10,000 |
| ☐ 100-199 | ☐ 200-999 | ☐ 10,001-25,000 | |
| ☐ 25,001-50,000 | ☐ 50,000-100,000 | ☐ More than 100,000 | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☑ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

Debtor **Woodland Oaks Investors, LLC** Case number *(if known)* ______
Name

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☑ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- I have been authorized to file this petition on behalf of the debtor.
- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **06/12/2026**
MM/ DD/ YYYY

✗ **/s/ Marc Kulick**
Signature of authorized representative of debtor

**Marc Kulick**
Printed name

Title **Authorized Signer**

**18. Signature of attorney**

✗ **/s/ Joyce Lindauer**
Signature of attorney for debtor

Date **06/12/2026**
MM/ DD/ YYYY

**Joyce Lindauer**
Printed name

**Lindauer & Vaughn**
Firm name

**117 S. Dallas St.**
Number Street

**Ennis** **TX** **75119**
City State ZIP Code

**(972) 503-4033**
Contact phone

**joyce@joycelindauer.com**
Email address

**21555700** **TX**
Bar number State

# EXHIBIT 5

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY DIVISION**

IN RE:
**Fairfax Investors, LLC**

CHAPTER **11**

DEBTOR(S)

CASE NO **26-11984**

**LIST OF EQUITY SECURITY HOLDERS**

| Registered Name of Holder of Security<br>Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|
| Vesta Fairfax, LLC - 100% ownership | | | |

**DECLARATION UNDER PENALTY OF PERJURY**
**ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the Authorized Representative of the Limited Liability Corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: 06/26/2026

Signature: [signature]

Marc L. Kulick
Authorized Agent of Vesta Capital, LLC, the Manager of Briarwood's Best Living, LLC, the Manager of Vesta Fairfax, LLC, the Manager of the Debtor

# EXHIBIT 6

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY DIVISION**

IN RE:
**Fairfax Best Living, LLC**

CHAPTER **11**

DEBTOR(S)

CASE NO **26-11985**

**LIST OF EQUITY SECURITY HOLDERS**

| Registered Name of Holder of Security<br>Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|

Fairfax Holding Company, LLC - 100% ownership

**DECLARATION UNDER PENALTY OF PERJURY**
**ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the Authorized Representative of the Limited Liability Company named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: 06/26/2026

Signature: [signature]

Marc L. Kulick
Manager of Louis Investments, LLC, the Manager of Fairfax Holding Company, LLC, the Manager of the Debtor

# EXHIBIT 7

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY DIVISION**

IN RE:
**Woodland Oaks Best Living, LLC**

DEBTOR(S)

CHAPTER **11**

CASE NO **26-11986**

**LIST OF EQUITY SECURITY HOLDERS**

| Registered Name of Holder of Security<br>Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|

W.O. Sole Member, LLC - 100% ownership

**DECLARATION UNDER PENALTY OF PERJURY**
**ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the Authorized Representative of the Limited Liability Corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: 06/26/2026

Signature: [signature]

Marc L. Kulick
Authorized Agent of Vesta Caspital, LLC, the Manager of Creek's Best Living, LLC, the Manager of W.O. Sole Member, LLC, the Manager of the Debtor

# EXHIBIT 8

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY DIVISION**

IN RE:
**Woodland Oaks Investors, LLC**

CHAPTER **11**

DEBTOR(S)

CASE NO **26-11987**

**LIST OF EQUITY SECURITY HOLDERS**

| Registered Name of Holder of Security<br>Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|

W.O. Holding Co., LLC - 100% ownership

**DECLARATION UNDER PENALTY OF PERJURY**
**ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the Authorized Representative of the Limited Liability Corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: 06/26/2026

Signature: ______________________

Marc L. Kulick
Manager of Louis Investments, LLC, the
Manager of W.O. Holding Company, LLC,
the Manager of the Debtor

# EXHIBIT 9

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MARC KULICK, VESTA HOLDINGS, LLC, and ASSET HOLDER, LLC<br><br>Plaintiffs,<br><br>v.<br><br>YSA INVESTMENTS 1, LLC,<br><br>Defendant. | ) | C.A. No. 2025-1319-KSJM |
| YSA INVESTMENTS 1, LLC,<br><br>Counterclaim-Plaintiff and Third-Party Plaintiff,<br><br>v.<br><br>MARC KULICK, VESTA HOLDINGS, LLC, et al.,<br><br>Counterclaim-Defendants and Third-Party Defendants. | ) | |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: April 9, 2026
Date Decided: June 9, 2026

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; Benjamin H. Brodsky, Michael Fisher, BRODSKY FOTIU-WOJTOWICZ, PLLC, Miami, Florida; *Counsel for Plaintiffs and Counterclaim-Defendants, Marc Kulick, Vesta Holdings, LLC, and Asset Holder, LLC.*

Sarah R. Martin, Samuel L. Moultrie, GREENBERG TRAURIG LLP, Wilmington, Delaware; Joel Tasca, Kerry Kleinman, GREENBERG TRAURIG LLP, Las Vegas, Nevada; *Counsel for Defendant and Counterclaim and Third-Party Plaintiff YSA Investments 1, LLC.*

**McCORMICK, C.**

Plaintiff Marc Kulick controls and manages a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas. Beginning in October 2024, Defendant YSA Investments 1, LLC loaned the Kulick-led plaintiff entities millions of dollars. In February 2025, Kulick asked YSA for another loan. Because the amount requested was twice as large as any previous loan, YSA demanded better terms and additional security. In response, cash-strapped Kulick proposed an extremely favorable interest rate and agreed to pledge his entire real estate portfolio. YSA accepted the terms. And Kulick signed a joinder committing all entities that he owned, in whole or part, or managed or controlled directly or indirectly, to the obligations in the loan agreements. Kulick later defaulted on four loans, including the February loan, and YSA placed second mortgages on properties in Kulick's portfolio. Kulick filed this litigation to require that YSA remove the second mortgages and to enjoin YSA from recording additional second mortgages. The case proceeded to trial.

The key issue is whether YSA had the right to record mortgages on the properties. Kulick argues that the loan agreements identified as collateral interests in the holding companies, and not the properties at issue. But this argument does not matter, because the loan documents granted YSA expansive rights to take actions against real property owned by the collateral, including the properties. YSA exercised that right by recording the second mortgages. Kulick also argues that the loans cannot be enforced because their terms were predatory, usurious, and against public policy. Setting aside the fact that Kulick proposed the loan terms about which

he now complains, this defense fails for a more basic reason—Delaware law does not extend usury defenses to limited liability companies like the plaintiff entities. This decision therefore enters judgment for YSA.

## I. FACTUAL BACKGROUND

The facts are drawn from the 222 joint trial exhibits, live testimony from four witnesses, deposition testimony from two fact witnesses, and 22 stipulations of fact. These are the facts as the court finds them after trial.[1]

### A. Marc Kulick And The Vesta Entities

Kulick controls and manages a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas (the "Properties").[2] The Properties are owned by

[1] This decision cites to: C.A. No. 2025-1319-KSJM docket entries (by "Dkt." number); trial exhibits (by "JX-" number); the trial transcript, Dkt. 98 (by "Trial Tr. at"); stipulated facts set forth in the parties' Joint Pre-Trial Order, Dkt. 88 ("PTO"); and the Transcript of the November 25, 2025 hearing on Plaintiffs' Motion for Expedited Proceedings and Motion for Expedited Preliminary and Permanent Injunction, Dkt. 25 ("11/25/25 Hr'g Tr."). The parties called the following fact witnesses: Marc Kulick (owner and controller of Plaintiffs Vesta and Asset Holder); Efraim Diveroli (YSA's principal); Robert Miley (YSA's Rule 30(b)(6) representative); John Hall (Defendant's expert). The parties submitted the deposition transcripts of the live witnesses, except for John Hall, and called the following witnesses by deposition only: Kara Thomas (Controller at Vesta Realty) and Courtney Merritt (Controller at Vesta Realty). The transcripts of the witnesses' respective depositions are cited using the witnesses' last name and "Dep. Tr." The decision notes in citation form where a witness was designated to testify under Rule 30(b)(6). This decision cites the following declaration by the declarant's last name: Christopher Rogers (Partner at Capital Fund Law Group), Dkt. 86 ("Rogers Decl.").

[2] JX-185; Trial Tr. at 6:23–7:4 (Kulick). Some of Kulick's 34 assets have a tenancy in common ("TIC") ownership structure that results in two or more entities serving as the ultimate owners of the TIC assets. Trial Tr. at 7:5–8:1 (Kulick).

34 separate, single-purpose limited liability companies (the "Title Owners").[3] Each Title Owner is owned by one or more holding company (the "Intermediate Holding Companies").[4] The Title Owners are capitalized by investments at the Intermediate Holding Company level.[5]

Plaintiffs Vesta Holdings, LLC and Asset Holder, LLC (with Kulick, the "Plaintiffs")[6] are Kulick's personal investment vehicles.[7] Kulick is the sole owner and manager of Vesta and Asset Holder.[8] Vesta and Asset Holder hold membership interests in several Intermediate Holding Companies.[9] Kulick also holds an interest in all the Title Owners.[10]

**B. Plaintiffs Seek Short-Term Loans From Defendant.**

In 2024, Kulick was in search of short-term financing for one of the Properties.[11] An acquaintance introduced Kulick to Efraim Diveroli. Diveroli is the

---

[3] Trial Tr. at 7:5–8:1, 115:22–116:17 (Kulick); JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803; *see* JX-221; JX-215; JX-11; JX-169 §§ 1–3, Ex. A; *compare* PTO ¶ 6 *with* JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803.

[4] Trial Tr. at 7:5–8:1 (Kulick); *see* JX-198.

[5] Trial Tr. at 7:5–8:1 (Kulick).

[6] *Id.* at 8:7–18 (Kulick).

[7] *Id.* at 8:7–24 (Kulick).

[8] *Id.* at 8:7–8:18 (Kulick).

[9] *Id.* at 9:2–9:14 (Kulick).

[10] *Id.* at 49:17–51:1 (Kulick).

[11] JX-3 at 1; Trial Tr. at 9:18–10:8 (Kulick); Trial Tr. at 146:21–147:22 (Diveroli).

principal of Defendant YSA Investments 1, LLC ("Defendant" or "YSA"),[12] a special purpose vehicle for Diveroli's commercial lending.[13] Kulick connected with Diveroli in September 2024. Kulick urged Diveroli to finance some of his loans, claiming "[i]t's the easiest money you'll ever make" and that Diveroli has no reason to worry about losing his investment.[14]

On September 7, 2024, Kulick provided YSA a form agreement for the proposed loan.[15] On September 29, Kulick and his counsel provided YSA's counsel and Diveroli the material loan terms.[16] The terms included: a loan of $775,000, an interest rate of 7% per month (84% annualized), a 2% closing fee for YSA, and a right of first refusal in favor of YSA.[17] Kulick, Diveroli, and YSA's counsel discussed the proposed loan.[18] After, YSA's counsel proposed more detailed descriptions of the material terms, and

---

[12] Dkt. 81 ¶ 12.

[13] Trial Tr. at 146:10–20 (Diveroli); *see* Dkt. 81 ¶ 12.

[14] JX-3 at 4; JX-4 (attaching a draft loan agreement). The initial draft of the loan document contemplated an interest rate of 20% per annum, compounding annually. JX-4 at 2. Kulick explained his goal for the interest rate was to provide Diveroli "10% over the 3-month term." JX-3 at 10.

[15] JX-4 (providing Diveroli initial versions of a promissory note and a collateral pledge and security agreement); JX-3 at 2–12; *see* JX-6 at 4. The "form agreement" Kulick provided the borrower would have "[n]o right of rescission, setoff, abatement, diminution, counterclaim, or defense . . . with respect to this Note or any other Loan Documents." JX-4 at 4.

[16] JX-6; Trial Tr. at 10:11–13 (Kulick).

[17] JX-5 at 1–2 ("Efraim and I have basically finished our deal for Parc 1010 EM."); JX-3 at 2–12.

[18] *See* JX-46.

the parties deferred to Kulick's counsel to revise the documents consistent with that proposal.[19]

Kulick agreed to the revised terms on October 2 and his attorney agreed to update the drafts.[20]

The parties closed the transaction on October 8, 2024 (the "October 8 Loan").[21] The October 8 Loan included a Promissory Note ("Note"), a Collateral Pledge and Security Agreement ("CPSA"), and a Personal Guaranty and Right of First Offer (the "Guaranty" and collectively, the "Loan Documents").[22]

The October 8 Loan made Asset Holder the Borrower, Vesta the Pledgor, and YSA as the Lender.[23] YSA loaned Asset Holder $775,000, maturing ninety days after closing.[24] Asset Holder and Pledgor secured the October 8 Loan with "Collateral" defined as "Unencumbered Interests" and "Encumbered Interests" in the form of membership interests that Kulick held in the Intermediate Holding Companies.[25]

---

[19] JX-5 at 1–2 (noting that Kulick's counsel "prefer[ed] to make the initial edits" to the documents Kulick previously provided); JX-46 at 7–8.

[20] JX-6.

[21] PTO ¶ 7; JX-10.

[22] Kulick Day 1 Dep. Tr. at 28:19–23.

[23] JX-10 at 1.

[24] *Id.*

[25] *Id.* at 9. For the October 8 Loan, the Unencumbered Interests were Kulick's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC, Remington Ranch Investors, LLC, Copperfield Investors, LLC, and Putnam Investors, LLC. *Id.* Kulick represented that Asset Holder, as borrower, "owns the Unencumbered Collateral absolutely and free of any . . . encumbrance" and Asset Holder "has the unencumbered and unrestricted right to pledge the Unencumbered Collateral." *Id.* at 11.

The CPSA included a Power of Attorney provision applicable in the event of a borrower breach proposed by YSA on October 3. That day, YSA's counsel asked Kulick to provide a list of suits filed against "Vesta and its affiliated entities" and to identify any UCC liens.[26] A UCC search precipitated YSA's request.[27] Kulick then identified nine civil actions and stated that "none of the entities that are a party to this loan have any UCCs filed against them[.]"[28] YSA proposed additional terms, including the Power of Attorney provision. The Power of Attorney provision, quoted more fully in the below legal analysis, gave YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests . . . includ[ing] but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral."[29] Kulick agreed to most of the proposed terms but noted that he would need a few hours to consider the Power of Attorney,[30] which Kulick later agreed to.[31]

[26] JX-7 at 4.

[27] *Id.*

[28] *Id.* at 3.

[29] JX-9 at 2–3.

[30] *Id.* at 2; JX-3 at 15; JX-46 (discussing representations and warranties of the loan). For instance, Kulick agreed to "waive any defense or asset protection mechanism that may be available in the event of a default." JX-9 at 2.

[31] Trial Tr. at 54:2–56:5 (Kulick); JX-46.

The October 8 Loan was due with interest on January 8, 2025,[32] when Kulick was obligated to remit payment of $829,250.[33] But Kulick requested a one-week extension on January 8,[34] when he informed Diveroli he was short over $500,000.[35] Diveroli agreed to a short extension on the condition that Kulick pay an additional $25,000.[36] Kulick paid the $829,250 and additional $25,000 on January 21.[37] And YSA continued loaning Kulick money.

### C. Defendants Provide Additional Loans Subject To A Joinder.

By February 2025, YSA had loaned Kulick $4,775,000 over six loans.[38] That month, Kulick approached YSA requesting a $1,500,000 loan, nearly twice the amount of any previous Loan.[39] Diveroli wanted to loan the money to Kulick. Diveroli considered Kulick "a fantastic salesman" and "very persist[ent]," noting that Kulick "presents as trustworthy."[40]

---

[32] *Id.* at 2; JX-3 at 22–23 ("If money doesn't come in as expected would you be open to a week extension for an additional 25k of interest paid today.").

[33] JX-10 at 2.

[34] JX-3 at 22–24.

[35] JX-3 at 23.

[36] *Id.* at 22–24.

[37] JX-58; JX-22.

[38] JX-10 at 1 (October 8 Loan for $775,000); JX-60 at 2 (loaning Plaintiffs $750,000 on January 21, 2025); JX-63 at 2 (loaning Plaintiffs $750,000 on January 24, 2025); JX-65 at 2 (loaning Plaintiffs $800,000 on January 30, 2025); JX-67 at 2 (loaning Plaintiffs $850,000 on February 4, 2025); JX-71 at 2 (loaning Plaintiffs $850,000 on February 10, 2025).

[39] Trial Tr. at 149:3–22 (Diveroli); Rogers Decl. ¶ 4; *compare* JX-16 at 1 *with* JX-71 at 2.

[40] Trial Tr. at 151:19–152:5 (Diveroli).

But given that Kulick repaid the October 8 Loan late, and the amount requested, YSA "made it crystal clear" it would need "significantly more collateral" before agreeing to Kulick's request.[41] Diveroli directed his office to "cease almost all other activities" to review Kulick's portfolio of assets prior to extending additional capital.[42] And YSA searched for a consultant "familiar with multi-family residential real estate" who could assist in "making sure [YSA] [is] as protected by the collateral" as it was made to believe.[43]

On February 13, YSA requested that Kulick provide preliminary diligence materials.[44] Kulick resisted YSA's requests initially,[45] expressing his desire to end the parties' relationship, and even requested that YSA "release all liens . . . from the [October 8 Loan]."[46]

Kulick then changed his tune. The next morning, Kulick offered to move forward if YSA would accept a subset of the requested materials.[47] YSA agreed based on Kulick's offer to provide: "[a]ll tax returns"; "[a]ll mortgage statements"; "a

---

[41] *Id.* at 149:23–152:5 (Diveroli).

[42] *Id.* at 149:23–151:10 (Diveroli); JX-73; *see* JX-222.

[43] JX-222; *see* JX-73.

[44] JX-76 at 2 (Defendant requested the following materials: (i) bank statements for the preceding six months for all entities; (ii) financial statements from the last three years; (iii) tax returns from the last three years; (iv) internal analytics for the properties Kulick developed; (v) "all Loan Documents related to loans currently encumbering one or multiple properties that will be securing the loan"; and (vi) "[a]ny and all active UCC filings related to any of the entities/properties.").

[45] JX-73.

[46] JX-76 at 1.

[47] *Id.*

portfolio p&l" statement; and "[c]onstant live access to data curated between [Kulick's] team and [YSA]."[48]

YSA's counsel reviewed the materials. Because the materials did not clearly identify the entity associated with each property, YSA's counsel requested additional information.[49] YSA also asked whether any encumbrances on the properties would be senior to the contemplated loan.[50] Kulick provided additional documentation, including a broker's valuation opinion for one property and operating agreements for five of the entities.[51]

The following morning, Kulick texted Diveroli and Robert Miley, YSA's counsel, to check on the status of the Loan.[52] Miley responded by sharing an image of the CPSA provision that defined "Unencumbered Interests" and "Encumbered Interests."[53] Miley asked Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, could you please send me a paragraph that I can copy into it with the other entities?"[54]

Kulick immediately responded stating: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole[.]"[55]

---

[48] *Id.*

[49] JX-77 at 2–3.

[50] *Id.*

[51] JX-77 at 1.

[52] JX-12.

[53] *Id.* at 2.

[54] *Id.*

[55] *Id.*

Miley then asked the group for "consensus on the entity language for the collateral agreement."[56] He noted that, given certain covenants in the CPSA, it was critical to keep the unencumbered and encumbered interests separate.[57] Kulick responded stating: "Yes the collateral needs to remain the same but does my idea for a joinder with any asset controlled by any affiliate of mine work?"[58]

Miley said that the joinder "may" work.[59] Miley then emailed Kulick updated drafts of the Confession of Judgment and Guaranty.[60] In the same email, Miley again flagged for the group Kulick's suggestion of adding a joinder to the CPSA. He noted that the CPSA does not clearly state which entities are intended to be "unencumbered vs encumbered."[61] Kulick responded: "No change to this document at all except to add a joinder that joins *any asset controlled by any affiliate of mine*."[62] YSA's counsel circulated a revised CPSA that included a one-paragraph joinder consistent with Kulick's proposal (the "February Joinder").[63]

On February 18, 2025, the parties entered the new loan agreement (the "February 2025 Loan").[64] The February 2025 Loan comprises: a promissory note (the

---

[56] *Id.* at 3.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] JX-13 at 1.

[61] *Id.*

[62] *Id.* (emphasis added).

[63] JX-15 at 1, 18, 32.

[64] PTO ¶ 7; *see generally* JX-16.

"February Note"); a collateral pledge and security agreement (the "February CPSA"), a Personal Guaranty and Right of First Offer (the "February Guaranty"); and a Joinder.[65] The February 2025 Loan is governed by Delaware law.[66]

Section 5(c) of the February Guaranty requires Kulick, as Guarantor, to "deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor. . . ."[67] Kulick delivered the required schedule of real estate owned, which identified the Title Owners.[68] Again, requiring a schedule of real estate owned by Kulick, the Guarantor, reinforces the terms and purpose of the February Joinder.

The February Guaranty, like the February CPSA, granted YSA a broad power of attorney (the "February Guaranty POA").[69] The February POA, in relevant part, provided: "Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests. . . ."[70]

---

65 JX-16

66 *Id.* at 6–7.

67 *Id.* at 26.

68 JX-27 at 39–40; JX-169 §§ 1–3, Ex. A (providing Louis Investments, LLC an entity solely owned and managed by Kulick "directly or indirectly, owns or controls" the entities listed on Exhibit A, which includes the Title Owners).

69 JX-16 at 28.

70 *Id.*

### D. Plaintiffs Default On Four Loans.

Plaintiffs ultimately defaulted on four loans (the "Defaulted Loans"): (1) the February 2025 Loan; (2) the "April 2025 Loan"; (3) the "July 16, 2025 Loan"; and (4) the "July 31, 2025 Loan."[71] Each Defaulted Loan followed the format of the February 2025 Loan,[72] in that each involved a Note, a CPSA, a Guaranty, and a Joinder.[73]

The principal amount of the February 2025 Loan is $1,500,000. Plaintiffs defaulted on May 19, 2025.[74] The interest rate is 133.333% per annum, compounded monthly.[75] Plaintiffs owe approximately $3.3 million under the February 2025 Loan.[76]

The principal amount of the April 2025 Loan is $300,000.[77] The purpose of the April 2025 Loan was to finance Kulick's closing costs related to the acquisition of Parc

---

[71] JX-16; JX-17; JX-20; JX-21; *see* JX-28.

[72] Trial Tr. at 14:2–8, 51:6–54:12 (Kulick).

[73] *See generally* JX-16; JX-17; JX-20; JX-21.The identity of the Borrower Entity providing the "Encumbered Interests" and the Pledgor Entity providing the "Unencumbered Interests" differ. JX-16 at 9 (identifying Vesta as Pledgor and Asset Holder as Borrower); JX-17 at 11 (identifying Kulick Manager, LLC as Pledgor and Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC as Borrowers); JX-20 at 9 (identifying Vesta as Pledgor and Borrower); JX-21 at 9 (identifying Vesta as Pledgor and Borrower). The April 2025 Loan included one bespoke feature, a membership interest pledge and assignment agreement ("MIPAA"). JX-17 at 34–42. The April 2025 Loan stands apart from the other Defaulted Loans in that regard. The MIPAA is not relevant to the resolution of this action.

[74] JX-94; JX-201; JX-28 at 2–4; *see* JX-104.

[75] JX-16 at 1.

[76] JX-28 at 2–4.

[77] PTO ¶ 17. The loan went to three entities owned by Kulick Manager, LLC—Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC. PTO ¶ 17.

1010, an apartment complex in Tulsa, Oklahoma.[78] It was a short-term loan, due to be repaid ten days after closing.[79] But the transaction never closed.[80] The interest rate of the April 2025 Loan was 1,500% per annum, compounded monthly.[81] Plaintiffs owe approximately $3 million on the loan.[82]

---

Kulick manages each of the entities. JX-17 at 8–9. Under the April 2025 Loan, Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC are each a "Borrower" and the "Pledgor" is Kulick Manager, LLC. *Id.* at 1.

[78] PTO ¶ 17.

[79] *Id.* at 1–2.

[80] Trial Tr. at 117:20–118:1 (Kulick).

[81] JX-17 at 1. Kulick proposed repaying YSA $425,000, inclusive of principal and interest, in exchange for April 2025 Loan with a face value of $300,000. JX-3 at 53.

[82] Diveroli consistently messaged Kulick seeking payment once Kulick defaulted on the April 2025 Loan. JX-3 at 56–82; *see* JX-99 at 1. On June 16, Diveroli contacted Kulick to work out a plan for the two defaulted Loans, Kulick responded asking for a new loan and stating that: "you already have way more secure loan docs than anything else I've ever used." JX-3 at 83; *see* JX-104 at 1. On June 15, Kulick requested a new loan of $315,000 from Diveroli (the "June 2025 Loan"). JX-104. Kulick proposed satisfying the June 2025 Loan by repaying Diveroli $515,000 by July 1. *Id.* Kulick acknowledged he was in default under the April 2025 Loan and that failure to satisfy that Loan "would be a default on this loan." *Id.* Kulick also proposed including a $1,000,000 penalty if the June 2025 Loan negatively impact either the February 2025 Loan or the April 2025 Loan. *Id.* On June 19, Kulick and YSA closed on the June 2025 Loan. JX-108; JX-109; JX-110; JX-111. The June 2025 Loan included a Note, an Affidavit of Confession of Judgment, a CPSA, and a Guaranty. JX-108; JX-109; JX-110; JX-111. The June 2025 Loan reflected the terms proposed by Kulick. *Compare* JX-104 *with* JX-108. The principal amount of the June 2025 Loan was $315,000 and Kulick was obligated to repay $515,000 by July 1. JX-108 at 1–2. The interest rate of the June 2025 Loan is for 1565% per annum, compounded daily. JX-108 at 1. Also on June 19, Kulick executed a Confidential Side Letter Related to the February 2025 Loan, April 2025 Loan, and June 2025 Loan granting YSA the right to seek repayment from reserves held by entities identified on Schedule 3. JX-112; Trial Tr. at 114:4–116:22 (Kulick). The properties on Schedule 3 appear to overlap significantly with properties owned by the Title Owners. *Compare* JX-112 at Schedule 3 *with* PTO ¶ 6. Exhibit C to the Confidential Side Letter does not provide the full names of the listed entities and, since the names of the Title Owner

The principal amount of the July 15, 2025 Loan is $365,000.[83] Plaintiffs defaulted on July 30, 2025.[84] The interest rate is 960% per year, compounded daily.[85] Plaintiffs owe approximately $5 million on the loan.[86]

The principal amount of the July 31, 2025 Loan is $317,000. Plaintiffs defaulted on August 5, 2025.[87] The interest rate is 7,000% per year, compounded daily.[88] Plaintiffs owe a staggering $921 million on the loan.[89]

Kulick testified that he proposed the interest rates on each loan by reverse engineering whatever payment he thought appropriate on the loan amount.[90] He calculated that payment amount assuming timely payment.[91] But he knew that YSA implied the interest rate that appeared in the Loan Documents from those amounts.[92]

When asked at trial about the interest rates of the Defaulted Loans, Kulick testified that "I'm not playing the victim on paying high interest rates on my loans. I

---

and Intermediate Holding Companies share some names, it is difficult to discern the exact identity of each entity provided on Exhibit C. Also around this time, Diveroli offered Kulick a $5 to $10 million payoff option, which Kulick declined. Trial Tr. at 188:17–189:13 (Diveroli).

[83] JX-20 at 1

[84] *Id.*

[85] *Id.*

[86] JX-28 at 2.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 3.

[90] Trial Tr. at 91:9–19 (Kulick).

[91] *Id.* at 29:9–18 (Kulick).

[92] *Id.* at 91:9–93:3 (Kulick).

understand that, you know, my cash position was bad, it was stressed. I was having trouble getting investors to fund pro rata capital calls."[93] He also acknowledged that he kept returning to YSA because he was "desperate" for funding.[94]

**E. Defendant Records Second Mortgages.**

By August 2025, Plaintiffs had defaulted on four loans and owed approximately $900 million under the Defaulted Loans.[95] (By trial, Plaintiffs owed $932,149,606.85 under the Defaulted Loans.)[96]

In October 2025, Diveroli and two YSA representatives visited Kulick in Tulsa, Oklahoma, to diligence the Properties in connection with a contemplated loan where YSA would provide Plaintiffs tranche financing.[97] Diveroli asked to see "the worst units at the worst properties" to evaluate whether it made sense to move forward

---

[93] *Id.* at 94:20–24 (Kulick).

[94] *Id.* at 29:11–17, 84:16–18, 122:24–123:1 (Kulick).

[95] JX-28 at 4; *see* JX-24 (informing Kulick he owed $897,744,576 under the Defaulted Loans on December 2, 2025). Kulick complained throughout this litigation about Defendant's delays in providing a payoff summary. He testified that he made multiple requests for a payoff summary as early as November 2025. Dkt. 22 ¶ 28 ("On December 2, 2025, Defendant informed Plaintiffs that it would "limit" the amount owed to approximately $900 million dollars. . . ."). At trial Kulick testified he did not receive a payoff from YSA until February 6, 2026. Trial Tr. at 45:15–46:5 (Kulick); Dkt. 103 at 11. But in the Amended Complaint Plaintiffs plead having received a payoff summary on December 2, 2025, which is supported by contemporaneous evidence. JX-24.

[96] JX-28 at 2.

[97] Trial Tr. at 29:22–35:7 (Kulick).

with the requested tranche financing.[98] After the tour, they asked Kulick to join for a meeting at their hotel conference room.[99]

During the meeting, Diveroli informed Kulick that he owed them "well over a billion dollars" due to the compounding interest rates.[100] Diveroli told Kulick that he could "either do this *the easy way or the hard way*[.]"[101] As Kulick recalled, "[t]hey told me that basically they *now own my entire portfolio*[.]"[102] Kulick understood the "easy way" would entail handing over to YSA the deeds to the Properties in lieu of YSA seeking to foreclose on the Properties.[103] Kulick claims YSA offered cash if he were to hand over the deeds.[104] Kulick understood the "hard way" as involving litigation, as YSA had brought a draft complaint to the meeting.[105] YSA also threatened to alert persons in Kulick's professional network, including his Rabi and wife.[106]

---

[98] *Id.* at 32:2–24 (Kulick).

[99] *Id.* at 33:1–20 (Kulick).

[100] *Id.* at 33:1–19 (Kulick).

[101] *Id.* at 33:13–33:19 (Kulick) (emphasis added).

[102] *Id.* (Kulick) (emphasis added).

[103] *Id.* at 34:6–35:6 (Kulick).

[104] *Id.* (Kulick).

[105] *Id.* at 34:6–37:14 (Kulick).

[106] *Id.* at 34:19–35:6 (Kulick); *see* JX-23 (providing Plaintiffs and Plaintiffs' counsel the Complaint YSA filed in Superior Court noting "YSA also intends to submit litigation preservation letters to various third parties, including but not limited to Vesta employees, investors, and lenders that are believed to have either benefited from or borne witness to Defendants' misconduct"). In addition to attaching the Superior Court Complaint, YSA shared with Plaintiffs and Plaintiffs' counsel drafts of an amended complaint and motion for a temporary restraining order and noted

Diveroli pursued the hard way.[107] On October 31, 2025, YSA recorded second mortgages against at least 25 Properties located in Oklahoma and Kansas.[108] The Properties are owned by the Title Owners.[109] Kulick identified the Properties in compliance with Section 5(c)'s requirement under the February Guaranty to provide YSA the "complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly)" by Kulick, in connection with the February

---

"YSA is willing to forego further litigation, including the filing of the amended complaint, in exchange for Mr. Kulick executing deeds-in-lieu of foreclosure voluntarily turning over ownership of each of the subject properties. . . ." *Id.*

[107] Diveroli testified that it was only because YSA "discovered the fraud and deceit" coupled with the poor conditions of the Properties that YSA decided to record the second mortgages. Trial Tr. at 188:21–189:13 (Diveroli). Kulick acknowledged at trial that he repeatedly recorded second mortgages on properties owned by Title Owners. *Id.* at 110:24–113:7 (Kulick). Kulick admitted that two weeks before commencing this action he granted a second mortgage on another property owned by a Title Owner. *Id.* at 112:1–20 (Kulick); JX-170 (granting second mortgage on Jenk's Best Living on October 30, 2025); JX-168 (granting second mortgage on Eaton Place Best Living, LLC on October 24, 2025); JX-155 (granting second mortgage on Bartlesville Best Living, LLC on September 24, 2025). Kulick explained that 32 of Vesta's 34 properties routinely need cash, and his solution was to have Vesta make a loan to the cash-strapped property, to allow the property to get their reserve funded, and then subsequently pay back to the loan to Vesta. Trial Tr. at 115:7–116:18 (Kulick). Kulick acknowledged comingling his personal funds with Vesta's to create a "lending pool" to move cash around to pay the debts of one property with proceeds from another. Trial Tr. at 128:15–18, 129:9–13, 131:6–22 (Kulick). YSA's forensic accountant confirmed as much, based on his limited review of Kulick's bank accounts. JX-198; JX-194 ("In summary, from November 2024-July 2025 $33.2 million was deposited from the associated real estate portfolio of Vesta and from the net operational flows of the Vesta accounts, and these $33.2 million were comingled and sent to unidentified entities controlled by the controller.").

[108] Dkt. 81 ¶ 21; JX-27; PTO ¶ 6.

[109] JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803; *see* JX-221; JX-215; JX-11; JX-169 §§ 1–3, Ex. A.

2025 Loan.[110] Kulick testified that he personally owns interests in each Title Owner.[111]

### F. Plaintiffs File This Litigation.

Plaintiffs were first to file litigation. On November 13, 2025, Plaintiffs filed their Complaint against YSA, seeking an order from this Court requiring Defendant to remove the second mortgages.[112] At the same time, Plaintiffs moved for expedition and separately moved for expedited preliminary and permanent injunctive relief.[113]

On November 25, 2025, the court heard argument on Plaintiffs' motions to expedite and for injunctive relief.[114] In seeking preliminary injunctive relief, Plaintiffs claimed "many of these properties are under contract or actively being marketed for sale" including one property set to close the next day.[115] At the

---

[110] JX-16 at 26 ("By February 28, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of February 28, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of provided as of [Date] remains true, correct and complete as of February 14, 2025, in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof."); JX-27 at 39–40.

[111] Trial Tr. at 8:2–9:11 (Kulick).

[112] Dkt. 1 ¶¶ 37–44.

[113] Dkt. 1 at Plaintiffs' Motion to Expedite; Dkt. 1 at Plaintiffs' Motion for Expedited Preliminary and Permanent Injunction.

[114] Dkt. 14.

[115] 11/25/25 Hr'g Tr. at 4:6–5:10.

preliminary stage, Plaintiffs also claimed Kulick lacked authority to record second mortgages directly on the Title Owners' properties.[116]

The court denied Plaintiffs' request for preliminary injunctive relief because the relief requested—ordering Defendant to lift the second mortgages—was mandatory in nature and thus foreclosed, absent discovery to resolve factual disputes.[117] But the court granted expedition. The court directed the parties to "take some targeted discovery" to allow the court to determine "whether the defendant has the authority to impose these mortgages on a full discovery record that reflects the parties' intent."[118] The court did enjoin YSA from imposing additional second mortgages.[119]

On December 5, Plaintiffs filed their Amended Complaint.[120] The Amended Complaint asserts one claim.[121] Plaintiffs claim that Defendant unlawfully recorded the second mortgages and seek a declaratory judgment that the second mortgages are void, coupled with an order from this court directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the second mortgages.[122]

---

[116] *Id.* at 15:24–17:5.

[117] *Id.* at 42:17–43:8.

[118] *Id.* at 44:1–8.

[119] *Id.* at 43:9–24.

[120] Dkt. 22.

[121] *Id.* ¶¶ 39–48 (alleging the second mortgages "are invalid" and seeking a "permanent injunction directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the invalid second mortgage[s].").

[122] *Id.* ¶¶ 42–48.

Plaintiffs again moved for Expedited Preliminary and Permanent Injunctive relief (the "Motion").[123] Defendant opposed the Motion.[124]

After the court preliminarily enjoined additional second mortgages, Defendants moved to set an injunction bond under Court of Chancery Rule 65 (the "Bond Motion").[125] On December 30, the court granted the Bond Motion, requiring Plaintiffs to post a bond in the amount of $22,368,257.93.[126] On January 7, 2026, Defendant informed the court that Plaintiffs were unable to post the bond.[127] Plaintiffs' failure to post bond caused the ordered injunction to dissolve by operation of law.[128]

On February 11, Defendant filed an Amended Answer and brought counterclaims and third-party claims.[129] Defendant asserted counterclaims against Kulick and Vesta and brought third-party claims against 46 named third-party defendants and Does 1-100 and Roe Entities 1-100.[130] On March 6, Plaintiffs

---

123 Dkt. 23.

124 Dkt. 32.

125 Dkt. 29; Ct. Ch. R. 65(c).

126 Dkt. 60 ("In connection with this Court's entry of a temporary restraining order [] in connection with the above-captioned action, within five (5) calendar days of the entry of this Order, Plaintiffs shall post with this Court a secured bond. . . .").

127 Dkt. 64.

128 Ct. Ch. R. 65(c).

129 Dkt. 81.

130 *Id.* ¶¶ 4–49.

answered the Counterclaims.[131] In May, Defendant began to effectuate service on the counterclaim/third-party defendants.[132]

The court held trial on March 5, 2026.[133] The parties completed post-trial briefing on March 26, 2026.[134]

## II. LEGAL ANALYSIS

Plaintiffs seek permanent injunctive relief, asking the court to order Defendant to immediately execute and record withdrawals, cancellations, or releases of the second mortgages.[135] To obtain a permanent injunction, "a party must show (i) actual success on the merits, (ii) the inadequacy of remedies at law, and (iii) a balancing of the equities that favors an injunction."[136] A party need not show imminent irreparable harm to obtain a permanent injunction.[137] There are other ways to demonstrate no adequate remedy at law.[138]

Permanent injunctive relief comes in one of two forms: prohibitive or mandatory. "A permanent injunction is a form of final relief that prohibits a party

---

[131] Dkt. 93.

[132] Dkt. 107; Dkt. 108; Dkt. 109; Dkt. 110; Dkt. 111; Dkt. 112; Dkt. 113.

[133] Dkt. 92.

[134] Dkt. 103.

[135] Dkt. 22 ¶ 48.

[136] *In re COVID-Related Restrictions on Religious Svcs.*, 285 A.3d 1205, 1232–33 (Del. Ch. 2022), *aff'd*, 326 A.3d 626 (Del. 2024).

[137] *Id.* at 1228–31; 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2944 (3d ed.) ("[I]rreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy.").

[138] *Id.* at 1230.

from taking action or compels a party to take action."[139] Its negative version serves as a prohibitive injunction, "whereby defendant is perpetually inhibited from the assertion of an assumed right, or perpetually restrained from the commission of an act which would be contrary to equity and good conscience."[140] Its affirmative or mandatory version compels a party to take specific action.[141]

An order directing YSA to undertake specific affirmative actions to remove the second mortgages is mandatory in nature.[142] Kulick bears the burden of proving that the second mortgages are "invalid" as a matter of law and that he has "clearly established" the legal right to have the court order YSA to cancel the second mortgages.[143] To show success on the merits, therefore, Plaintiffs must "clearly establish" the legal right they seek to enforce.[144] "The showing on the merits required

---

[139] *Glob. Cap. P'rs LLC v. Green Sapphire Hldgs., Inc.*, 2026 WL 709819, at *45 (Del. Ch. Mar. 13, 2026), *judgment entered*, (Del. Ch. 2026).

[140] *Id.* (quoting James L. High, *A Treatise on the Law of Injunctions as Administered in the Courts of the United States and England* § 3, at 4 (1879)); *see In re COVID*, 285 A.3d at 1228; *NEC Fund VI HE Lender, LLC v. Hecate Hldgs. LLC*, 2026 WL 527007, at *7 (Del. Ch. Feb. 25, 2026).

[141] *In re COVID*, 285 A.3d at 1226 n.4; 43A C.J.S. Injunctions § 19 ("A mandatory injunction is an equitable remedy that commands the subject of the order to perform an affirmative act to undo a wrongful act or injury."); *Hughes Tool Co. v. Fawcett Publications, Inc.*, 315 A.2d 577, 579 (Del. 1974); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.02[c] (2025) ("[A] mandatory injunction requires an individual to perform a specific act.").

[142] Dkt. 22 ¶ 48.

[143] *DeMarco v. Christiana Care Health Servs., Inc.*, 263 A.3d 423, 434 (Del. Ch. 2021).

[144] *DeMarco*, 263 A.3d at 434; *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *3 (Del. Ch. Aug. 7, 1989); *see Pomilio v. Caserta*, 215 A.2d 924, 925 (Del. 1965) ("There is no right to an injunction as a matter of course; and this is especially

by the 'clearly established' standard is 'more than a reasonable probability of success.'"[145] Satisfying the 'clearly established' standard requires "a showing that the petitioner is entitled as a matter of law to the relief" sought.[146]

Plaintiffs' claim flounders on the first element—Plaintiffs have not clearly established the right at issue. Plaintiffs' primary argument is that neither the CPSAs, nor the Joinders, nor the POAs, define Collateral to include properties held by the Title Owners. In the alternative, Plaintiffs argue that the CPSAs are usurious and cannot be enforced even if the CPSAs support Defendant's right to record the second mortgages.[147]

**A. Contractual Entitlement**

Plaintiffs argue that Defendant must remove the second mortgages because the definition of "Collateral" in the Loan Documents did not create a security interest

---

so as to the mandatory writ which is issuable only in the exercise of extraordinary judicial caution.").

[145] *DeMarco*, 263 A.3d at 423 (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 14.03[b][6], at 14-03.44 (2021)); *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1120 (Del. Ch. 1990) ("Upon an application for mandatory preliminary relief, however, plaintiff must show more than a reasonable probability of success on the merits; he must clearly establish the legal right he seeks to protect or the duty he seeks to enforce.").

[146] *Alpha Nat. Res., Inc. v. Cliff's Nat. Res., Inc.*, 2008 WL 4951060, at *2 (Del. Ch. Nov. 6, 2008); *Bertucci's Rest. Corp. v. New Castle Cnty.*, 836 A.2d 515, 519 (Del. Ch. 2003) ("[T]he Court of Chancery has consistently applied an exacting standard, requiring that an applicant seeking mandatory preliminary injunctive relief clearly establish the legal right he seeks to protect or the duty he seeks to enforce." (internal quotation omitted)).

[147] Dkt. 95 at 33.

in the Properties.[148] Defendant disputes Plaintiffs' interpretation of Collateral but says that it does not matter, because Defendant had the right to record the second mortgages even assuming Plaintiffs' interpretation.[149] This decision rules in Defendant's favor, concluding that Defendant had the right to record the mortgages even under Plaintiffs' interpretation.

The court's task is to interpret the Loan Documents in a way that carries out the parties' intent.[150] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[151] The contract terms will be given their "plain, ordinary meaning."[152] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[153] The court must "reconcile all the provisions of the instrument" if possible.[154] When a

[148] *Id.* at 19–21.

[149] Dkt. 100 at 23–24; Dkt. 106 at 45.

[150] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[151] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[152] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[153] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *accord HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *6 & n.40 (Del. Ch. July 2, 2020); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *50 & n.648 (Del. Ch. Dec. 3, 2018).

[154] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

transaction consists of multiple documents, Delaware courts will interpret the documents as one singular contract.[155]

Where language is unambiguous, courts "will give effect to the plain meaning of the contract's terms and provisions."[156] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[157] "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'"[158] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[159] "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[160] If ambiguity exists, then the court "may consider extrinsic evidence to resolve the ambiguity."[161]

---

[155] *See, e.g., E.I. du Pont de Nemours & Co.*, 498 A.2d at 1115 ("The specific provisions of these Agreements and the interrelationship thereof make it clear that the parties intended these two Agreements to operate as two halves of the same business transaction . . . Where two agreements are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such." (internal citations omitted)); *Karish v. SI Int'l, Inc.*, 2002 WL 1402303, at *3 (Del. Ch. June 24, 2002).

[156] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)).

[157] *Id.* (citing *Osborn*, 991 A.2d at 1160).

[158] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[159] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[160] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983)).

[161] *Salamone*, 106 A.3d at 374 (citation omitted).

Plaintiffs rest their contract claim on the definition of "Collateral" in the CPSAs. Under the CPSAs, Borrower[162] and Pledgor[163] agreed to "pledge, grant, and assign to Lender a security interest in and lien upon the Collateral . . . to secure the payment and the performance of the Obligations . . . ."[164] The CPSA defines "Collateral" to include "the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, . . ."[165] The CPSAs define "Interests" with reference to two other defined terms—"Unencumbered Interests" and "Encumbered Interests."[166] Those terms are defined as Borrower's and Pledgor's "membership interest[s]" in the Intermediate Holding Companies listed in the recitals of the CPSAs.[167] In Plaintiffs' view, the

---

[162] Asset Holder, Vesta, and Parc 1010 HoldCo., LLC are each a "Borrower" under one of the Defaulted Loans. JX-16 at 1; JX-17 at 1; JX-20 at 1; JX-21 at 1.

[163] Vesta and Kulick Manager, LLC are each a "Pledgor" under one or more of the Defaulted Loans. JX-16 at 1; JX-17 at 1; JX-20 at 1; JX-21 at 1.

[164] JX-16 at 10; JX-17 at 11–12; JX-20 at 10; JX-21 at 10.

[165] JX-16 at 10; JX-17 at 11–12; JX-20 at 10; JX-21 at 10.

[166] JX-16 at 9; JX-17 at 11; JX-20 at 9; JX-21 at 9.

[167] *See, e.g.*, JX-16 at 9 (defining the Unencumbered Interests as the Borrower's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC); *id.* (defining the Encumbered Interests as Pledgor's membership interest in the following Intermediate Holding Companies: Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investor, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living

definition of "Collateral" does not extend to the assets held by these entities, which include the Properties.[168] Rather, the CPSAs gave Defendant a security interest in Plaintiffs' *membership interests* in the entities, full stop.

Plaintiffs' argument is a red herring. Defendant concedes that the Loan Documents did not create a secured interest in the Properties.[169] Rather, they created a secured interest in the entities that own the Properties. The Loan Documents also gave Defendant the right to take action against real property owned by those entities, including the Properties.

Defendant's interpretation begins with the Joinder. The Joinder states that:

> [Marc Kulick], as a manager, member or other authorized person *of any and all Guarantor Entities* and *any other entities in which the undersigned does now own or control or may herein after own or control* during the term of that certain [February CPSA, April CPSA, and July CPSAs] hereby agrees *to jointly and severally assume all obligations of Pledgor* under the [February CPSA, April CPSA, and July CPSAs] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [February CPSA, April CPSA, and July CPSAs] as fully as if [Marc Kulick] had personally and individually executed

---

Investors, LLC; Muntage Vesta Investors, LLC); JX-20 at 9 (identifying the Unencumbered Interests as Borrower's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC); JX-21 at 9 (identifying the Encumbered Interests as Pledgor's membership interest in the following Intermediate Holding Companies: Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investor, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living Investors, LLC; Muntage Vesta Investors, LLC); *see* PTO ¶ 10.

[168] Dkt. 95 at 15–21.

[169] *See* Dkt. 100 at 18–24.

> and delivered the [February CPSA, April CPSA, and July CPSAs] as of the date thereof.[170]

Kulick admitted at trial that he signed the Joinder and that he did so "as manager, member or other authorized person of" two broad categories of entities, including "any and all Guarantor Entities" and "any other entities in which [Kulick] does now own or control or may here after own or control . . . ."[171]

Under the CPSA, "Guarantor Entities" includes the Title Owners.[172] The CPSA defined "Guarantor Entities" as "any entity directly or indirectly controlled or managed by [Kulick]," or "directly or indirectly owned by [Kulick] in whole or in part with respect to which Guarantor receives notices in the ordinary course of business[.]"[173]

This definition of Guarantor Entities sweeps in the Title Owners in multiple ways. First, the definition includes entities that Kulick owns in part. At trial, Kulick admitted that he had an investment in each of the Title Owners and Properties.[174]

---

[170] Trial Tr. at 20:2–21:6, 61:12–65:15 (Kulick); JX-16 at 22; JX-17 at 25; JX-20 at 22; JX-21 at 22. The Joinders are substantively identical. The only difference among the Joinders is the identity of the Kulick-affiliated entities named as Pledgor under the respective CPSA. *See* JX-16 at 1 (identifying Vesta as Pledgor); JX-17 at 1 (identifying Kulick Manager, LLC as Pledgor); JX-20 at 1 (identifying Vesta as Pledgor); JX-21 at 1 (identifying Vesta as Pledgor).

[171] Trial Tr. at 61:12–62:7 (Kulick).

[172] JX-169 ¶¶ 1–3, Ex. A (providing Kulick is the "sole Member" and "100%" owner of Louis Investments, LLC, and identifying the Title Owners as "directly or indirectly" owned by Louis Investments, LLC).

[173] JX-16 at 12; JX-20 at 12; JX-21 at 12.

[174] Trial Tr. at 69:1–2 (Kulick) ("I have an investment in each property."); JX-169 ¶¶ 1–3, Ex. A.

And Kulick identified every one of the Title Owners in response to a provision in his Guaranty requiring him to provide a "complete schedule of . . . entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor."[175] Thus, at a minimum, Kulick "indirectly own[s] . . . in part" each Title Owner. Second, Kulick controls or manages the Title Owners, as he testified at trial.[176] That too brings them within the scope of the Guarantor Entities.

Because each Title Owner is a Guarantor Entity, each Title Owner assumed "all obligations of Pledgor under the [CPSA] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [CPSA]" by operation of the Joinder.[177] Thus, the Joinder renders each Title Owner an additional Pledgor under the CPSA, subject to the Pledgor's obligations under the CPSA.

Each Pledgor has obligations under the Power of Attorney provision of the CPSA. The Power of Attorney states that:

> Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral.[178]

---

[175] JX-16 at 26; JX-27 at 39–40.

[176] Trial Tr. at 63:24–67:21 (Kulick); *see* JX-168 at Ex. A.

[177] JX-16 at 22; JX-20 at 22; JX-21 at 22.

[178] JX-16 at 13; JX-20 at 13; JX-21 at 13.

The first sentence of this provision gives YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests."[179] This expressly includes "doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender."[180] This power is not tied to or limited by the definition of Collateral. The second sentence does reference "taking action against the Collateral" but as a non-exclusive right. It reads: "This shall include *but not be limited to* taking any action against any of the Collateral. . . ."[181] By defining "action against the Collateral" as a non-exclusive right encompassed by the preceding sentence, the language and structure of the Power of Attorney indicate that the parties intended for YSA's rights to extend beyond the right to take "action against the Collateral."

Eliminating all doubt, the Power of Attorney provision uses the word "secure."[182] It gives YSA the right to take "whatever steps that it deems necessary in its sole discretion to *secure* and protect its interests[.]," including "whatever . . . is necessary to . . . collect all amounts due" to YSA.[183] The Power of Attorney thus grants YSA the right, if YSA deems it necessary, to "secure" its interests against those entities bound by the Joinder, including the Title Owners, to facilitate payment of

[179] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[180] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[181] JX-16 at 13; JX-20 at 13; JX-21 at 13 (emphasis added).

[182] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[183] JX-16 at 13; JX-20 at 13; JX-21 at 13. (emphasis added).

amounts due to YSA. YSA deemed the second mortgages necessary to protect its rights to collect amounts due to it.[184] Plaintiffs do not argue otherwise.

Plaintiffs instead argue that Defendant's interpretation runs afoul of Article Nine of the UCC.[185] According to Plaintiffs, the CPSAs had to describe the Collateral consistent with Article Nine of the UCC.[186] Under Article Nine, and a recent case interpreting it, that description must "reasonably identif[y] what is described."[187] The Loan Documents provided the full name and state of incorporation of each Intermediate Holding Companies entity comprising the Collateral.[188] But it did not list the details of the Properties. It does not so much as list: the Title Owners, the Properties, or the Properties' addresses.[189] Plaintiffs say that neither the CPSAs nor

---

[184] Trial Tr. at 190:15–191:13 (Diveroli); *id*. at 196:17–200:6 (Miley).

[185] Dkt. 95 at 20–21; Dkt. 103 at 3–6.

[186] Dkt. 103 at 3–6; *see Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch. 1995) ("Article 9 generally governs the creation, perfection, and enforcement of security interests in property and applies to 'any transaction (regardless of its form) which is intended to create a security interest in personal property.'" (quoting 6 *Del. C.* § 9-102(1)(a))).

[187] 6 *Del. C.* § 9-108(a) ("[A] description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described."); *Cannon v. Romeo Sys., Inc.*, 2025 WL 2848069, at *22 (Del. Ch. Oct. 7, 2025) ("[T]he description must objectively identify the collateral so that, at a minimum, it 'puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved.'" (quoting *Bishop v. All. Banking Co.*, 412 S.W.3d 217, 220 (Ct. App. KY, 2013))); *see* 6 *Del. C.* § 9-108, cmt. 2. ("The test of sufficiency of a description under this section . . . is that the description do the job assigned to it: make possible the identification of the collateral described. This section rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called 'serial number' test).").

[188] JX-16 at 9; JX-20 at 9; JX-21 at 9.

[189] *See generally* JX-16; *see also* Trial Tr. at 205:24–206:6 (Miley).

any of the Loan Documents reasonably identify the Properties consistent with Article Nine.[190] Plaintiffs, therefore, contend that Article Nine prevents a security interest from attaching to the Properties because the Properties are not mentioned, let alone described in the CPSAs.[191]

But again, Plaintiffs' argument is of no moment. Defendant admits that the Loan Documents standing alone did not create a secured interest in the Properties. Defendant argues that they did not have to, because the Loan Documents gave Defendant the right in its "sole discretion to secure and protect its interests" by "taking any action against . . . . any real or personal property owned by the Collateral," including the Properties. And the Loan Documents reasonably describe the Collateral by providing the full name and state of incorporation of each entity comprising the Collateral.

Contrary to Plaintiffs' contentions, the Loan Documents granted YSA expansive rights to take actions against real property owned by Collateral. YSA exercised that right by recording the second mortgages on real property owned by the Collateral, in this case Properties owned by the Intermediate Holding Companies.

Parol evidence confirms what the plain language of the Loan Documents requires. When Kulick requested a substantially larger loan from YSA, he had only

---

[190] Dkt. 95 at 20–21.

[191] *Id.* at 3, 20–21, 29–30.

just repaid the October 8 Loan three weeks late.[192] YSA required more protection than it had on previous loans.[193] In a February 10, 2025 email to his colleague, Miley explained that YSA needed to hire a lawyer or other professional to advise on "a loan whereby we would be providing funding to a multi-family real estate firm which would be secured by the firm's real estate portfolio."[194]

On February 18, 2025, Miley texted Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, can you please send me a paragraph that I can copy into it with the other entities?"[195] Kulick was in a rush to get funded,[196] and so Kulick told Miley to leave

---

[192] JX-10 at 2 (identifying January 8, 2025 as the maturity date of the October 8 Loan); JX-58 (informing Diveroli on January 13, 2025 the October 8 Loan would be repaid on January 20); JX-22 (providing the October 8 Loan was repaid on January 21, 2025); JX-3 at 35 (requesting a "longer term" Loan on January 31); JX-222 (searching for a real estate consultant on February 10 regarding a "loan to Vesta" and seeking expertise to ensure YSA is "as protected by the collateral as we think we are").

[193] Trial Tr. at 149:23–151:24 (Diveroli); JX-77 at 2 (requesting Kulick identify the owner of each Property); JX-76 (requesting Kulick submit to "due diligence" in connection with the February 2025 Loan); JX-73 at 2.

[194] JX-222 at 1.

[195] JX-12 at 2.

[196] JX-73 at 2. Shortly after Miley asked Kulick if he had a paragraph to use for the Joinder Kulick exclaimed, "[M]y biggest concern is as usual (lol) funding. Do we have enough time to get this done?" JX-12 at 2. Less than 15 minutes later, Kulick asked: "Efraim can we please get sign off so we can push ahead[.]" *Id.* at 3. Two hours later, Kulick again pled for the Loan to be funded that day. *Id.* at 3 ("Can we find a way to fund today still[?]").

it the same.[197] Kulick texted back: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole."[198]

Putting a fine point on it, in the preceding text message, Miley asked two questions: (1) "are we expanding to rest of portfolio"; and (2) "can you please send me a paragraph?" Kulick responded to each in turn: (1) "yes"; and (2) "no."[199] Yes, they were expanding to the rest of the portfolio. No, no language was necessary. Instead, Kulick suggested "a joinder to the portfolio as a whole."[200] Vesta's website refers to the word "portfolio" as individual real properties owned or controlled by Vesta,[201] supporting that Kulick intended "portfolio" to refer to real properties.[202]

Kulick also referred in the exchanges that day to "a joinder with any asset controlled by any affiliate of mine," and "a joinder that joins any asset controlled by any affiliate of mine."[203] If Kulick intended the Joinder to be limited to adding entities to stand behind the same Collateral in the CPSA, there would have been no reason to refer to joining "any asset of any affiliate."

---

197 JX-12; *see* JX-13 ("No change to [CPSA] at all except to add a joinder *that joins any asset controlled by any affiliate of mine*." (emphasis added)).

198 JX-12 at 2.

199 *Id.*

200 *Id.*

201 JX-185.

202 Trial Tr. at 149:23–151:9 (Diveroli); *id.* at 82:2–23 (Kulick).

203 JX-13.

Consistent with this contemporaneous evidence, both Diveroli and Miley testified that, prior to the February 2025 Loan, Kulick agreed to pledge his entire portfolio to support the next loan.[204]

Plaintiffs also argue that it does not make sense that Kulick would pledge $900 million worth of additional property to support a $1.5–2 million loan. But Kulick wanted the loans, YSA wanted greater protection, this is the compromise that Kulick proposed and ultimately the deal the parties struck.[205]

**B. Usury Defense**

Plaintiffs separately raise a usury defense, contending that the interest rates of the Loans are "facially unreasonable[.]"[206] But Section 2306 forecloses any defense based on the interest rate charged because here the borrower of each Loan was a limited liability company.[207] Section 2306 provides: "No corporation, limited partnership, statutory trust, business trust or *limited liability company*, . . . *shall interpose the defense of usury in any action*."[208] Delaware courts have consistently declined invitations to deviate from Section 2306's mandate, even where the

[204] Trial Tr. at 185:5–9 (Diveroli); *id.* at 196:17–197:7 (Miley).

[205] Trial Tr. at 29:9–17 (Kulick) (testifying that "[t]hroughout 2025 I was desperate for access to money to come into my business"); *id.* at 84:13–18 (Kulick) ("I was not of the opinion that they needed additional collateral. . . . But this was meant to solve an issue that was stopping us from getting the loan done that I desperately needed.").

[206] Dkt. 95 at 32–34.

[207] 6 *Del. C.* § 2306.

[208] *Id.* (emphasis added).

individual indorser or guarantor is a natural person.[209] Because the defense of usury would not be available to the entity Borrowers under the Loan Documents, the defense is not available to Kulick.[210]

## III. CONCLUSION

Because Plaintiffs have not demonstrated clear legal entitlement to the mandatory injunctive relief they seek, this decision need not reach the other elements of the claim or the other arguments raised by Defendant.[211] Plaintiffs' failure to prove an essential element of their claim warrants judgment for Defendant.

[209] *Bank of Delaware v. NMD Realty Co.,* 325 A.2d 108, 111 (Del. Super. 1974) (holding that "individual defendants as accommodation indorsers are not entitled to assert the defense of usury inasmuch as it was not an available defense for the corporate maker of the notes"); *MacNeil v. Cusato*, 1998 WL 1029267, at *4 (Del. Super. Nov. 30, 1998) ("Whether Defendant's position is termed privy, guarantor, or accommodation party, the result consistently is estoppel from asserting usury where such defense was not available to the original debtor. . . . Defendant, as guarantor, was no stranger to the corporation's preclusion from the defense of usury. Upon the Corporation's expiration, the Defendant-guarantor was not transformed into an individual-debtor who could then assert the defense of usury."); *River Bank Am. v. Tally-Ho Assocs., L.P.*, 1991 WL 35719, at *6 (Del. Super. Feb. 22, 1991) ("Under Delaware law, an individual who is surety or guarantor of the corporate obligation is under the same disability to assert the defense of usury as the corporation.").

[210] *NMD Realty Co.,* 325 A.2d at 111.

[211] YSA raised other arguments including that Kulick, Vesta, and Asset Holder lacked standing because none hold title to the Properties subject to the second mortgages. Dkt. 100 at 12. Having found that Plaintiffs failed to establish a right to have the second mortgages removed, the court need not reach any other argument.

# EXHIBIT 10

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

FEB -4 2026

RICK WARREN
COURT CLERK
136 ______________

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

SAPEREAN CAPITAL IV TB NOTE LENDER KD4, LLC, a Delaware limited liability company,

Plaintiff,

v.

WOODLAND OAKS BEST LIVING, LLC, a Delaware limited liability company; WOODLAND OAKS INVESTORS, LLC, a Delaware limited liability company; FAIRFAX BEST LIVING, LLC, a Delaware limited liability company; FAIRFAX INVESTORS, LLC, a Delaware limited liability company; WESTLAKE HARDWARE, INC., a Delaware corporation; PLATINUM P, LLC F/K/A ALERT PLUMBING & DRAIN, LLC, an Oklahoma limited liability company; RASA FLOORS & CARPET CLEANING, LLC, a Texas limited liability company; EMPIRE PROTECTION SERVICES, LLC, an Oklahoma limited liability company; PRISTINE PEST CONTROL, LLC, an Oklahoma limited liability company; TRES PALM SUPPLY, LLC d/b/a MAINTENANCE SUPPLY SOLUTIONS, a Texas limited liability company; JETZ SERVICE CO., INC., a Kansas Corporation; REGIONAL GROUNDWORK, LLC, an Oklahoma limited liability company; THE BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY; THE BOARD OF COUNTY COMMISSIONERS OF TULSA COUNTY; THE OKLAHOMA COUNTY TREASURER; and THE TULSA COUNTY TREASURER,

Defendants.

Case No.: CJ-2025-8499

**AMENDED AGREED ORDER OF APPOINTMENT OF A RECEIVER**

On this 4 of Feb. 2026 comes before the Court, the Motion of Plaintiff Saperean Capital IV Originator, LLC ("**Plaintiff**"), for Appointment of a Receiver (the "**Motion**") in which Plaintiff seeks the appointment of a receiver for certain real and personal property identified in the Motion owned by Defendants Woodland Oaks Best Living, LLC, Woodland Oaks Investors, LLC, Fairfax Best Living, LLC, and Fairfax Investors, LLC (collectively, "**Borrowers**")

and consisting of multi-family apartment buildings located at 7142 South 92nd East Avenue, Tulsa, OK 74133 (the "**Woodland Property**") and 7801 NE 10th Street, Midwest City, Oklahoma (the "**Fairfax Property**" and together with the Woodland Property, as more fully described in the Mortgage, the "**Property**"). The Plaintiff and Borrowers have agreed that the relief requested in the Motion should be granted as set forth herein. This Order shall amend the previous Order entered on January 22, 2026.

Having examined the pleadings and papers filed in this case, and having determined that jurisdiction and venue are proper in this Court and sufficient notice has been given, and being otherwise fully advised, and having fully considered the matter, the Court, for good cause shown, hereby finds and orders as follows:

NOW THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

(a) The Court finds that the Appointment of a Receiver for the Property is proper for good cause shown. Accordingly, Scott Shefman with Friedman Real Estate Management ("**Receiver**") is hereby appointed as the receiver for the Property. Receiver possesses the necessary qualifications and experiences and is not an attorney or related to any party to this action;

(b) Upon the entry of this Order and the posting of a bond, if required by the Receiver (referred to as the "**Effective Date**"), the Receiver is appointed to act and serve as receiver with respect to the Property and with respect to the income therefrom, whether now existing or hereafter collected, including the rents, profits and income from the Property;

(c) As of the Effective Date, the Receiver is authorized to take and have complete and exclusive control, possession and custody of the Property, together with any and all bank accounts, credit card receipts, demand deposits, reimbursement rights, bank deposits and security deposits related thereto, including accounts titled in the name of Borrowers, all without offset by Borrowers

or by any property manager or third party, including, without limitation the property manager at the Property, and all financial institutions are directed to deliver to the Receiver any such deposits and all records relating thereto, and, with this authority, the Receiver is allowed to transfer all deposit accounts to another financial institution insured by the federal government in the name of the Borrowers or Receiver and to write checks and make withdrawal on such accounts, provided that only the Receiver (and its designated management company or operator) shall have deposit, check-writing and other authority to conduct transactions in such accounts;

(d) As of the Effective Date, the Receiver is authorized to take any and all actions the Receiver deems reasonable and appropriate to prevent waste to and to preserve, secure, manage, maintain and safeguard the Property;

(e) As of the Effective Date, Borrowers, and all persons acting under their direction, and any current or past manager of the Property, shall deliver to the Receiver possession of the Property, without any right of offset or recoupment, including: (1) all keys; (2) all leases and communication and correspondence files relating thereto; (3) all security deposits, rent, prepaid rent, other sums relating to the use, enjoyment, possession, improvement or occupancy of all or any part of the Property, and any accountings of any of the foregoing; (4) a current rent roll for the Property; (5) any and all accounts receivable and accounts payable reports; (6) any and all documents pertaining to any ongoing litigation; (7) any and all documents pertinent to any licenses maintained in connection with the Property, and all communications and correspondence pertinent thereto; (8) any and all documents pertinent to any agreements entered into in connection with the Property, and all communications and correspondence pertinent thereto; (9) any and all contracts in effect with respect to any of the Property, and all communications and correspondence pertinent thereto; (10) any and all contracts, bids or other materials relating to any contractor work at the

Property; (11) any and all payroll records, employee files, applications and other materials relevant to those persons employed by or at the Property; (12) all such other records pertaining to the management of the Property; (13) all documents pertaining to any ongoing litigation (excluding the instant action); (14) all documents pertinent to any licenses maintained in connection with the Property together with all communications and correspondence relating thereto; (15) all contracts or agreements entered into in connection with the Property, including service contracts, together with all documents, communications and correspondence relating thereto; (16) all contracts, bids or other materials relating to any contractor work at the Property; (17) all payroll records, employee files, applications and other materials relevant to those persons employed by Borrowers; (18) a list of all bank accounts in the name of or relating to the Property, including the name of the institution where each account is located, the account number for each such account and the monthly statements for each such account for the 12 month period preceding the date of this Order; (19) all third party reports, including environmental condition reports, audits and studies relating to the Property; and (20) all such other records relating to the management of the Property or otherwise relating to the Property; provided, however, that neither Borrowers nor any other third party shall be required to provide any documents, communications, correspondence and other information that is subject to an attorney-client privilege or other confidentiality obligations that prohibits such disclosure;

(f) As of the Effective Date, all persons and entities, including Borrowers and all persons acting through Borrowers, including any current or past manager of the Property, any owner of Borrowers, or any person or entity with an interest in any owner of Borrowers, are enjoined from in any manner disturbing the Receiver's possession of the Property or any other property of the receivership estate created by this Order, and are prohibited and restrained from

disposing of, dissipating, mishandling or misappropriating any such property, and are prohibited and restrained from collecting any rents or other sums due to Borrowers, unless otherwise directed by the Court;

(g) As of the Effective Date, the Receiver is vested with (and Borrowers and their respective agents and any property manager shall immediately deliver to the Receiver) exclusive possession, custody and control of all books and records with respect to the operation of the Property and all information necessary for the Receiver to carry out its duties under this Order and otherwise, including any and all information relating to: (1) rent rolls, occupancy reports and leases affecting the Property; (2) amounts paid by lessees and other obligors of Borrowers; (3) liens, encumbrances and other interests against or affecting the Property; (4) real estate and other property taxes owed by Borrowers; (5) all types of insurance affecting the Property (which Borrowers shall not act to terminate or modify); (6) plans, specifications, surveys and drawings of the Property; (7) access codes to the Property and any units therein; (8) all operating statements and other financial statements relating to the Property; (9) all maintenance manuals for any equipment located at the Property; (10) all licenses, permits or other government issued documents necessary for the continued operation of the Property; and (11) all other aspects of the Property and the operation and management thereof (including the items set forth in Paragraph (e) above);

(h) As of the Effective Date, the Receiver is authorized to manage, operate and lease the Property, and, upon further approval of the Court, sell the Property;

(i) As of the Effective Date, the Receiver is authorized to retain, hire or discharge employees of the Borrowers, if any, and to hire or retain any employees, agents, representatives, consultants, contractors, property managers, leasing brokers, accountants and attorneys, including Plaintiff's attorneys, as necessary or appropriate to perform its duties under this Order or as

otherwise directed by the Court, provided, however, that the Receiver shall have no obligation to employ or pay any current employees of Borrowers but shall not be limited from doing so if the Receiver elects to do so;

(j) As of the Effective Date, the Receiver shall have the right to continue to operate under all existing licenses and permits issued with respect to the Property whether or not in the name of Borrowers.

(k) As of the Effective Date, the Receiver is authorized to enter into a franchise agreement with respect to the operation of the Property with the consent of Plaintiff;

(l) As of the Effective Date, the Receiver is authorized to make payments and disbursements, in the ordinary course of business, as may be needed and proper for the preservation of the Property and the Receiver has no obligation to pay pre-receivership expenses of any kind unless the Receiver determines that such payments may benefit the Property and then only upon approval of Plaintiff or the Court;

(m) As of the Effective Date, the Receiver is authorized to receive and collect any and all sums held by and due and owing to Borrowers relating to the Property, whether the same are now due or hereafter become due and owing, and to deposit such sums into an account in the name Borrowers or otherwise using Borrowers' FEINs (which sums shall not be commingled with any other funds) established and maintained by the Receiver;

(n) As of the Effective Date, the Receiver is authorized to continue any current insurance policies in place and pay any related invoices or policy premiums for such policies and is authorized to purchase further insurance as the Receiver deems appropriate to the extent such insurance is required under the relevant Loan Documents (as defined in the Petition) or is approved by Plaintiff or the Court. Borrowers shall cooperate in all reasonable respects with Receiver to

obtain, renew or re-document all insurance required under the Loan Documents, and to modify any existing or new insurance policies if deemed appropriate by Receiver. All insurance policies shall name the Plaintiff and Receiver and any property manager retained by Receiver, as an additional named insured, as mortgagee, and as loss payee with respect to all casualty policies. The Receiver may cancel any existing insurance policy, and Borrowers and their employees and agents are prohibited from cancelling, reducing or modifying any and all insurance coverage in existence with respect to the Property until Receiver has notified Borrowers that the above-described coverage has been obtained by Receiver. Any refunds received by Borrowers arising from the cancellation of its insurance coverage on the Property shall be turned over to the Receiver. No insurance company shall be permitted to terminate coverage or refuse coverage for the Property based upon prior unpaid premiums, claims history or because of the appointment of Receiver pursuant to this Order;

(o) As of the Effective Date, the Receiver is authorized to pay all current and past due real estate taxes, personal property taxes and any other taxes and assessments against any of the Property;

(p) As of the Effective Date, the Receiver is authorized to open and review mail and faxes received at the Property or elsewhere directed to Borrowers or their manager relating to the Property and may issue demand that the U.S. Postal service grant exclusive possession and control of all mail including postal boxes as may have been used by Borrowers and may direct that such mail relating to the Property be re-directed to the Receiver;

(q) As of the Effective Date, the Receiver is not required to prepare and file tax returns with respect to the Property, and the Receiver is not responsible for the preparation of any tax returns for Borrowers, provided, however, that the Receiver shall furnish any information

reasonably requested by Borrowers to allow Borrowers, or their agents, to prepare any tax returns of Borrowers;

(r) As of the Effective Date, the Receiver is authorized to: (1) negotiate and enter into new leases, occupancy agreements and other contracts in the ordinary course of the business of the Property; (2) modify existing leases, occupancy agreements and other contracts in the ordinary course of the business of the Property; (3) terminate existing agreements and contracts pertaining to the Property as Receiver determines is reasonably necessary with no further obligations or liability, including the liability to pay any termination fee under such terminated contract; (4) pay all utilities, expenses and other obligations secured by, or which may give rise to, liens, and all other outstanding obligations to suppliers and servicers in the ordinary course of business, including obligations incurred prior to the commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership; (5) make repairs necessary to the maintenance of the Property, including but not limited to all repairs necessary to remediate any environmental conditions present at the Property, in order to preserve the Property in the ordinary course of business, provided, however, that the Receiver shall not make any improvements, repairs or remediation having a cost of $5,000.00 or more without first obtaining approval of either Plaintiff or the Court unless Receiver reasonably determines that such repairs must be made prior to obtaining approval to address any life safety issues arising at the Property; and (6) take all steps necessary to comply with all requirements, regulations and laws, including but not limited to environmental or health requirements, regulations and laws, applicable to the Property, and to deal with all regulatory authorities in connection with the same, and the Receiver shall have no liability

for any environmental claims or other municipal code violations existing as of the date of this Order;

(s) As of the Effective Date, the Receiver is authorized through itself or by an agent, upon request of Lender, to lease, market for lease and/or sale and, upon further Court order, and with the consent of Lender, negotiate and sell the Property (including free and clear of liens, encumbrances and other interests in the Property);

(t) As of the Effective Date, the Receiver is authorized to take possession of and receive from all depositories, banks, brokerages and otherwise (collectively, the "**Financial Institutions**") any money on deposit in all such Financial Institutions belonging to Borrowers or arising from the operation of the Property, whether such funds be in accounts titled in the name of Borrowers or not (but excluding any monies paid to or held by Lender). All Financial Institutions are directed to deliver such deposits to Receiver and such records as Receiver may reasonably request with respect to such accounts. Receiver may, in its sole discretion, choose to indemnify any Financial Institution(s) upon whom such demand is made, and is empowered to open any new accounts using a new EIN, or close any such accounts. Receiver shall deposit monies and funds collected and received in connection with the Property at a federally insured banking institution or savings association with offices in the State of Oklahoma. Borrowers shall assist and cooperate with Receiver to have all funds from the Financial Institutions turned over to Receiver as soon as possible. Borrowers understand that time is of the essence in effectuating the turn-over of these funds to Receiver;

(u) As of the Effective Date, the Receiver is authorized to, in its discretion, institute, prosecute, defend, compromise and/or intervene in or become a party to such actions or proceedings in state or federal courts which may in the Receiver's opinion be necessary for the

protection, maintenance and preservation of the Property, for the carrying out of the terms of any order of the Court affecting the Property, to collect rent and otherwise enforce the terms and provisions of any tenant leases with respect to the Property, to remove tenants or other persons or entities from the Property, and/or to defend against any action brought against the Receiver acting in such capacity, and the Receiver is authorized to utilize counsel for Plaintiff and/or retain other counsel in connection with the foregoing and to seek reimbursement of any reasonable and customary fees or costs incurred by Receiver or its property manager in connection with the utilization of such counsel, provided, however, that Receiver must first obtain approval from Plaintiff or the Court with respect to any financial terms of such engagement. This Order shall act as notice to all tenants of the Property that the Property is now under the control of the Receiver;

(v) As of the Effective Date, the Receiver is authorized to enter into further lending transactions by which Plaintiff may in its sole discretion, but has no obligation to, lend monies to the Receiver (on a nonrecourse basis as to Receiver) to enable the Receiver to perform its duties hereunder, in which case any monies loaned shall be deemed protective advances for the benefit of the Property and shall be secured by a first and prior lien and security interest on the Property in favor of Plaintiff, to the extent permitted in the Loan Documents;

(w) As of the Effective Date, the Receiver may apply any funds received from the operation of the Property, subject to the lien rights of Plaintiff, as follows: (1) to the Receiver's approved fees and expenses; (2) to current operating expenses of the receivership incurred by the Receiver in the ordinary course of business; and (3) to the monetary obligations owed to Plaintiff under the Loan Documents or otherwise;

(x) As of the Effective Date, the Receiver is authorized to maintain sufficient cash on hand to enable the Receiver to meet expenses, in an amount to be agreed to between the Receiver and Plaintiff;

(y) As of the Effective Date, the Receiver shall allow Plaintiff and its agents access to the Property at all reasonable times;

(z) As of the Effective Date, the Receiver is directed to file with the Court and serve on parties of record, within 60 calendar days of entry of the order of the Court, and not less than monthly thereafter, and within 45 calendar days after termination of the receivership, full and complete reports, under oath, detailing all receipts, disbursements and transactions, including a budget for all future expenses, if required by Plaintiff, affecting the Property and that, at the option of Plaintiff, may be submitted to the Clerk of the Court under seal and shall not be available for public inspection without further order of the Court;

(aa) No person or entity may file suit against the Receiver, in its capacity as Receiver, unless otherwise authorized in advance by this Court;

(bb) The Receiver, and those agents acting under Receiver's control, shall have no personal liability in connection with any obligations owed by Borrowers to their creditors, and no person or entity, including any creditor of the Borrowers, other than Plaintiff, shall have the right to seize or attempt to seize any property delivered to the Receiver hereunder, and no person, entity or creditor, including any utility company, shall act to terminate any existing service, either as a means of attempting to collect an obligation of Borrowers or on account of an obligation of Borrowers, and the Receiver shall have no obligation to pay for services incurred prior to its appointment;

(cc) Any utility company providing services to the Property, including gas, electricity, water, sewer, trash collection, telephone, communications or similar service, is prohibited from discontinuing service to the Property based upon unpaid bills incurred by Borrowers prior to this Order or demanding that the Receiver deposit funds in advance to secure such services;

(dd) The Receiver, and those agents acting under Receiver's control, shall have no personal liability in connection with their conduct in the course of this receivership, except for claims due to their gross negligence, gross or willful misconduct, or malicious acts;

(ee) As of the Effective Date, the Receiver is authorized to undertake all actions specifically set forth in this Order, as well as to exercise the usual and customary powers accorded to a receiver under Oklahoma law;

(ff) The Receiver may be removed upon 15 days written notice by Plaintiff that Plaintiff desires such removal, provided that Receiver shall be entitled to any compensation or reimbursements owed under the terms of this Order as of the date of such removal, with a copy of such notice lodged with the Court, or upon an order of the Court, in which event the Court shall appoint a substitute receiver to be recommended by Plaintiff;

(gg) Upon the transfer of title of the Property to Plaintiff or its assignee by judicial foreclosure or by means of a deed in lieu of foreclosure, the Property shall cease to be part of the receivership estate created by this Order, the Receiver's rights, duties and responsibilities with respect to the Property pursuant to this Order shall automatically terminate without further Order of this Court, and Plaintiff or the Receiver may move the Court for the immediate discharge of the Receiver;

(hh) Nothing contained in this Order shall be construed as obligating the Receiver to advance its own funds in order to pay the costs and expenses of the receivership that have been approved by the Plaintiff and the Court;

(ii) The Receiver may apply at any time to the Court, with notice to all other parties in this case, for further instruction and for further power necessary to enable the Receiver to properly fulfill its duties;

(jj) The Receiver shall be paid as provided for in the Fee Schedule set forth in Exhibit A attached hereto, and is hereby authorized to retain a property management company, which property management company shall be paid in an amount consistent with current management rates and subject to approval by Plaintiff;

(kk) Any action of the Receiver authorized in this Order shall require the consent of Plaintiff if and when such action, if undertaken by Borrowers, would require Plaintiff's consent or authorization under any Loan Document. If the Plaintiff's written consent is required under any of the Loan Documents or under this Order, consent via e-mail is sufficient and approved;

(ll) Plaintiff shall not become a mortgagee in possession as a result of this Order, and neither Plaintiff nor the Receiver shall become responsible for any debts or obligations relating to the Property incurred prior to the date of this Order, including assessments, real estate taxes, environmental obligations or any other obligations and neither the Plaintiff nor the Receiver is required to advance monies to cover operating deficiencies;

(mm) Any individual or entity receiving a copy of this Order is hereby enjoined and restrained from discontinuing service to Receiver or the Property based upon the non-payment of such taxes, assessments, goods or services, and/or utilities provided prior to the date of this Order and from attempting to collect taxes, assessments, invoices and utility charges from Receiver for

any payment obligations whatsoever that arose prior to the date of this Order. Each utility company or entity providing service to the Property shall forthwith transfer any deposits which it holds to the exclusive control of Receiver and any utility company providing services to the Property, including gas, electricity, water, sewer, trash collection, telephone, communications, or similar services, is prohibited from discontinuing service to the Property based upon unpaid bills incurred by Borrowers. Further, such utilities are prohibited from demanding that the Receiver deposit funds in advance to secure such services.

(nn) The entry of this Order shall not in any manner prejudice any of the other rights and remedies of Plaintiff under its Loan Documents and/or under applicable law nor shall it preclude Plaintiff from exercising such other rights and remedies, including the judicial foreclosure of the Property, and the Receiver shall cooperate with Plaintiff in any such proceedings;

(oo) The entry of this Order shall not in any manner preclude any consensual resolution that may be reached between Plaintiff and Borrowers, and the Receiver shall abide by the terms of any such consensual resolution;

(pp) The Receiver shall post a surety bond in the amount of $200,000.00, and the cost of securing and maintaining such bond shall be an expense of the receivership. This Order is made conditional on the posting of this bond which may also be made in cash or check payable to the Clerk of Court;

(qq) The Receiver shall file with the clerk of this Court the oath to the effect that the Receiver will faithfully discharge its duties and obey the orders of this Court;

(rr) Upon receipt of a copy of this Order, and upon Receiver's request, any law enforcement officials shall take any and all actions necessary to preserve the peace, protect the Property and enforce and effectuate the terms and provisions of this Order; and

(ss) Any duties of the Receiver described herein may be fulfilled by Plaintiff or its counsel and shall thereupon be deemed to have been fulfilled by the Receiver.

IT IS SO ORDERED this 4 day of Feb. 2026.

Judge of the District Court

Agreed to:

______________________________
Kiran A. Phansalkar, OBA #11470
Preston M. Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
Conner & Winters, LLP
1700 One Leadership Square
211 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone: (405) 272-5711
Facsimile: (405) 232-2695
Email: kphansalkar@cwlaw.com
psullivan@cwlaw.com
battaway@cwlaw.com
***Counsel for Plaintiff Saperean Capital IV TB Note Lender KD4, LLC***

______________________________
Andrew A. Shank, OBA #22298
Lacy B. Williamson, OBA #34004
Eller & Detrich, P.C.
2727 East 21st Street, Suite 200
Tulsa, Oklahoma, 74114
(918) 747-8900 – telephone
(918) 747-2665 – facsimile
ashank@ellerdetrich.com
lwilliamson@ellerdetrich.com
***Attorneys for Defendants***
***Woodland Oaks Best Living, LLC***
***Woodland Oaks Investors, LLC***
***Fairfax Best Living, LLC***
***Fairfax Investors, LLC***

## EXHIBIT A
## RECEIVERSHIP AND PROPERTY MANAGEMENT FEE SCHEDULE
## RECEIVERSHIP FEE

Receiver will receive a fee of Three Hundred Fifty Dollars ($350.00) per hour not to exceed $6,000.00 per month for the following Receivership functions associated with the Property:

- Assume custody and control of the Property as well as all personal property, books, records and documents associated with the Property;
- Assume custody and control of all existing bank operating accounts regarding the Property and open additional bank operating accounts as and when needed;
- Demand, receive and collect all rents, profits and other amounts arising with respect to the Property;
- Pay expenses incurred with the Property in the normal and ordinary course of business;
- Modify, reject or terminate agreements, contracts, or commitments related to the Property;
- Hire and monitor vendors to manage, lease and maintain the Property;
- Purchase inventory, supplies and equipment that may be necessary to manage, lease and maintain the Property;
- Undertake renovations, repairs and replacements as may be necessary to manage, lease and maintain the Property;
- Hire and monitor other professionals (attorneys, accountants, etc.) as and when the Receiver and/or the Court may deem them necessary to implement and effectuate the performance of its duties;
- Procure and maintain appropriate utility services and insurance coverage for the Property;
- Address life safe issues and code violations affecting the Property;
- Maintain records regarding its oversight and operation of the Property and file periodic reports regarding its oversight of the Property with the Court;
- Make court appearances as and when necessary;
- Other functions and duties as may be appropriate.

## PROPERTY MANAGEMENT FEE PROPOSAL

**Property Management Fee**

- Woodland Oaks: A fee equal to the greater of i. Four Percent (4.00%) of the monthly gross revenue or ii. Fourteen thousand and nine hundred and eighty dollars ($14,980.00) per month.
- Fairfax Apartment: A fee equal to the greater of i. Four Percent (4.00%) of the monthly gross revenue or ii. Eight thousand and eight hundred and twenty dollars ($8,820.00) per month.

Start-up Fee

- Property manager will receive a start-up fee of Ten Thousand Dollars ($10,000.00) per property for costs incurred in setting up the properties in our accounting system, handling all of the HR related transitions, etc.

**Termination Fee**

- Property manager will receive a termination fee equal to one month's minimum management fee if the assignment lasts less than a year and property manager is terminated for other than cause. If the properties are sold, no termination fee will apply.

**Transition Fee**
- Property manager will receive a transition fee equal to one month's minimum management fee for time related to transitioning the properties to a 3rd party.

**Personnel Costs**
- All personnel costs (including but not limited to salary and benefits) for all employees working directly for the benefit of the properties, with the exception of corporate accounting and Executive level oversight, will be property expenses.

**Expense Reimbursements**
Property manager shall be reimbursed for marketing, training, and IT expenses for the benefit of the properties as set out in the schedule below:
- Marketing $10.00 per unit per month until 90% occupancy is achieved, thereafter $2.60 per unit per month
- Training $2.35 per unit per month
- IT For a property with fewer than five computers, a monthly fee of one hundred twenty-five dollars ($125.00) per computer. For a property with five or more computers, an as-utilized fee of one hundred-fifty dollars ($150.00) per hour. Additionally, property manager will receive one hundred-fifty dollars ($150.00) per hour for the time to set-up computers and other hardware at the site level for this assignment. This may include hardware set-up, networking, telecommunications, cable, surveillance cameras, smart locks, electronic entry systems, etc.

**Network Security**
- Property manager will be reimbursed $0.55 per unit per month for fraud and network security.
- In addition to the above, property manager will also be reimbursed for all software, licensing, and technology access costs used in association with the site level operations of the properties.

**Human Resources Administration Fee**
- In addition to all direct costs associated with compensation, including wages, benefits, employer taxes, workman's compensation, etc., property manager shall receive a fee of Five Percent (5.00%) of the on-site payroll cost for costs associated with hiring, onboarding, and offboarding on-site employees, as well as costs associated with administering all benefit programs, payroll, and employee engagement due to discipline and claims.

**Insurance Claims Fee**
- If there is an event requiring an insurance claim relating to damage to the property, including but not limited to fire restoration, storm damage and general liability, then property manager shall receive an administrative fee of Five Percent (5.00%) of the total

claim. In addition, property manager shall receive all agreed upon reimbursable expenses (actual out-of-pocket costs for scheduled items). If property manager procures insurance or renews insurance, it shall receive a fee of Ten Percent (10.00%) of the premium.

**Major Repairs/Capital Improvements Oversight**

- For any major repair or capital improvement cost, property manager shall receive an oversight fee equal to Five Percent (5.00%) of the cost of the project. "Major Repairs/Capital Improvements" shall mean any repair or replacement to any portion of the property where the cost of the project is more than ten thousand and 00/100 dollars ($10,000.00). In addition, property manager shall receive all agreed upon reimbursable expenses (actual out-of-pocket costs for scheduled items).

**Real Estate Tax Appeals**

- If a real estate tax appeal is filed, property manager shall receive a fee as set out in the schedule below:
    - If property manager handles appeal directly—1/3 of the first year's tax savings
    - If property manager engages a third-party—$2,500.00 flat fee per tax year appeal, plus $250/hour (hourly fees capped at $2,500.00 per tax year appealed)
- Plus any out-of-pocket costs associated with the tax appeal

**Disposition Fee**

- Property manager shall receive a disposition fee of One-Quarter Percent (0.25%) should the property be sold during the receivership and property manager is not selected as the investment sales broker.

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| [1] JOHN ALEX UPPERMAN, individually;<br>[2] ILLINI HOLDINGS, LLC;<br>[3] THRIVE REALESTATE, LLC;<br>[4] WILDWOOD ASSETS, LLC;<br>[5] TU PROPERTIES, LLC;<br>[6] OAK STREET<br>[7] CAPITAL, LLC; and<br>[8] 12 OAK LENDING, LLC<br><br>Plaintiffs,<br>v.<br><br>[9} MARC KULICK, individually;<br>[10] VESTA REALTY, LLC;<br>[11] VESTA HOLDINGS, LLC;<br>[12] LOUIS INVESTMENTS, LLC; and<br>[13] ASSET HOLDER, LLC<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 26-cv-00383-SH |

**<u>VERIFIED COMPLAINT</u>**

Plaintiffs John Alex Upperman ("Upperman"), individually, and Illini Holdings, LLC, Thrive Real Estate, LLC, Wildwood Assets, LLC, TU Properties, LLC, Oak Street Capital, LLC, and 12 Oak Lending, LLC (collectively, "Plaintiffs"), bring this civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and applicable state law, against Defendant Marc Kulick ("Kulick"), Vesta Realty, LLC ("Vesta Realty"), Louis Investments, LLC ("Louis Investments"), Vesta Holdings LLC ("Vesta Holdings"), and Asset Holder, LLC ("Asset Holder," and together with the foregoing defendants, "Defendants") for injuries to Plaintiffs' business and property caused by Kulick's pattern of racketeering activity conducted through an association of fact of at least four enterprises engaged in interstate commerce, Vesta Realty, Louis Investments, Vesta Holdings, and Asset Holder.

## INTRODUCTION

1. This action arises from a years'-long scheme by Kulick to exploit his position as the sole manager of a vertically integrated real estate enterprise—comprising more than 30 projects and over 9,600 residential units historically valued at approximately $925 million—to systematically loot investor capital, divert rent revenues, make unauthorized borrowings at usurious rates, grant unauthorized liens on portfolio assets, sell debt positions at fire-sale prices, falsify or obstruct access to books and records, and conceal the resulting financial collapse from investors, lenders, and co-owners. Kulick utilized the various legal entities through which the venture conducts business as his personal piggy bank, diverting funds to finance his lifestyle. For years, Kulick successfully concealed his misconduct by moving cash from entity to entity akin to check kiting, by ignoring required accounting practices and controls, and by meeting investor information requests with blandishments, bluster, and bullying. One disaffected investor described Kulick's management as "a rat's nest of fraud and deceit."

2. A forensic accounting report commissioned by an unauthorized lender has identified "Ponzi-like indicia" in accounts controlled by Kulick, including $3.1 million in payments of Kulick's personal American Express bills and automobile loans in a two-month period, $1.2 million in cash transfers to Kulick's personal bank accounts, $58.7 million in outflows from an account with an average daily balance of only $82,288, and 98 overdraft fees, reflecting extraordinary account velocity inconsistent with legitimate operations. A copy of the Report is attached as **Exhibit A** and incorporated by reference.

3. In a desperate Hail Mary attempt to keep the scheme afloat, Kulick made a deal-with convicted fraudster Efraim Diveroli,[1] with Kulick secretly taking out loan shark loans of

[1] The name Diveroli is familiar because his multi-million-dollar fraud of the United States Department of Defense is described in a film called "War Dogs." He received a sentence of four years in federal prison for his crimes, including

millions of dollars at interest rates hundreds of times that which is considered to be usurious in nearly every state in the country.[2] Kulick pledged interests he did not own and upon which Diveroli has filed claims.

4. The predicate acts alleged herein—wire fraud, mail fraud, diversion of rents, falsification of books and records, unauthorized loans and liens, fire-sale loan transfers, and obstruction of contractual information rights—constitute a pattern of racketeering activity that has directly and proximately caused Plaintiffs to suffer: (a) loss of approximately $1.369 million in equity investments; (b) non-repayment of approximately $2.525 million in outstanding loans; (c) triggering of personal guaranty liability on loans exceeding $490 million in the aggregate; (d) loss of distributions and promote fees; and (e) litigation costs imposed by Kulick's past and ongoing misconduct. These losses are also being suffered by hundreds of innocent investors that put money into Vesta Realty projects based on Kulick's representations concerning his honesty, integrity, and ability to manage a large, sophisticated real estate enterprise.

5. By this Complaint, Plaintiffs seek treble damages under 18 U.S.C. § 1964(c), equitable relief including the appointment of a federal equity receiver, an accounting, imposition of a constructive trust, and such other relief as this Court deems just and proper.

---

additional time for violating his release terms by attempting an illegal arms deal. Kulick never disclosed the Diveroli loan transactions to the Plaintiffs or any of the investors that are now victims of Kulick's past, and ongoing frauds.

[2] The interest rates varied between 1,500 percent compounded monthly to 7,000 percent compounded daily. Only six states do not prohibit usurious loans: (1) Delaware; (2) South Dakota, (3) Nevada; (4) Utah; (5) Wisconsin and (6) Idaho. The most common upper limit in the other 44 states is 15%. Diveroli's rate even exceeded criminal Loan Shark rates in Las Vegas which range from 200 to 2,000 percent compounded annually. Diveroli chose the laws of Delaware to control the contract with Kulick in an effort to evade Oklahoma's and Kansas' usury laws. It was a game of spy vs spy as to who could out defraud the other. The ultimate victims were every investor and every mortgage holder and every renter of the underlying apartment buildings in Oklahoma.

## JURISDICTION AND VENUE

6. This Court has original federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the civil RICO statute, 18 U.S.C. §§ 1961–1968.

7. Venue is proper in this District under 28 U.S.C. § 1965(a) because Defendant Kulick resides in Oklahoma, and most of the physical properties are located in Tulsa, Oklahoma. Moreover, the ends of justice require that other parties residing in other districts be brought before this Court pursuant to 28 U.S.C. § 1965(b), because the RICO enterprise operates across multiple states—including Delaware, Kansas, Oklahoma, and Arkansas—and effective adjudication of the pattern of racketeering activity and appointment of a federal equity receiver require consolidation of all claims in a single forum.

8. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the RICO claims and form part of the same case or controversy.

9. This Court has personal jurisdiction over Defendant Kulick because he resides in the Northern District of Oklahoma. He directed the racketeering activity at issue into this District, organized and controlled entities operating in this District.

10. This Court has the inherent equitable power to appoint a federal equity receiver under Federal Rule of Civil Procedure 66 and 28 U.S.C. §§ 754, 959, and 1692.

## PARTIES

### A. Plaintiffs

11. Plaintiff John Alex Upperman is a sophisticated real estate investor residing in Prairie Village, Kansas. Upperman was one of the original members of Vesta Capital, holding a 29.05% economic interest, and holds a 5% economic interest and 5% voting percentage in Vesta

Realty. Through his controlled entities – Plaintiffs Illini Holdings, LLC; Thrive Real Estate, LLC; Wildwood Assets, LLC; TU Properties, LLC; and Oak Street Capital, LLC, Upperman invested approximately $1,369,488 of personal capital across multiple Vesta Realty deals and has current loans outstanding to Vesta Holdings of approximately $2,525,000. Additionally, because Upperman trusted Kulick, Upperman signed as a personal guarantor on almost every property-level loan in the portfolio, exposing him to substantial recourse liability as a result of Kulick's fraudulent conduct.

**B. Defendants**

12. Defendant Kulick is an individual residing in Tulsa, Oklahoma. Kulick is the RICO *"person"* within the meaning of 18 U.S.C. § 1961(3) who conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity. Kulick serves as the sole Manager of Vesta Realty, the sole Member and Manager of Louis Investments, the sole Manager of Vesta Holdings, and the sole Manager of Asset Holder, and exercises complete operational control over day-to-day management, banking, books and records, accounting, investor communications, financial statements, and property operations across the entire Vesta enterprise, consisting of approximately thirty (30) multi-family rental properties located in Oklahoma, Kansas, and Arkansas. Kulick oversees all aspects of the businesses, including asset management, operations, and acquisitions. Kulick is the RICO defendant and a joint defendant in the other causes of action.

13. Defendant Vesta Realty is a Kansas limited liability company that functions as the operational hub of the enterprise. Vesta Realty is the sole employer of all employees within the enterprise and maintains custody and control of the enterprise's books and records. Through Vesta Realty, Kulick exercises pervasive control over the venture, from the day-to-day management and

operation of individual portfolio properties to all corporate-level functions, including cash management, financial reporting, and investor relations. Upperman holds a 5% economic interest and 5% voting percentage in Vesta Realty.

14. Defendant Louis Investments is a Kansas limited liability company of which Kulick is the sole Member and Manager. Louis Investments serves as the Manager of each of the limited liability companies that hold the underlying portfolio properties. Through Louis Investments, Kulick controls the property-level entities and directs the disposition of rents, the incurrence of debt, and the grant of liens on portfolio assets.

15. Defendant Vesta Holdings is an Oklahoma limited liability company and may be served c/o Vesta Realty, LLC 6911 S. 66th E Avenue, Suite 100, Tulsa Oklahoma, 74133. On information and belief, Defendant Kulick is Vesta Holdings' sole Member and Manager. On information and belief, Vesta Holdings was created by Kulick to replace Vesta Capital as the entity to raise capital, thereby denying Plaintiffs, and other investors, visibility into the enterprise's finances that would reveal fraudulent transactions and his use of Vesta Holdings as an instrumentality of his schemes.

16. Defendant Asset Holder is an Oklahoma limited liability company, created and controlled by Defendant Kulick, that has an interest in the underlying properties. Kulick is the Manger of Asset Holder. In the transactions with YSA discussed below, Asset Holder is designated as the "Borrower" under the Loan and Security Agreement. As borrower, Asset Holder allegedly holds the right, title, and interest (the "Unencumbered Interests") in membership interests in several of the property-level entities, including Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; and Putnam Investors, LLC.

## FACTUAL ALLEGATIONS

**A. Upperman's Introduction to Kulick**

17. Upperman first became involved with Marc Kulick in 2017 after being introduced by Josef Loeffler, a Kansas City investor. Together Loeffler, Upperman, and Kulick created what would become the Vesta enterprise, with operations managed solely by Kulick. At the time, Kulick presented as a gifted communicator with a compelling background. He had spent his entire adult life in multifamily real estate, beginning as an assistant leasing manager and working his way up to a vice president role at a large real estate firm. To Upperman, Kulick appeared to have a rare combination of financial fluency and true operational experience. Unlike many real estate sponsors who primarily understood underwriting and spreadsheets, Kulick seemed to deeply understand the day-to-day property management function that actually drives value in multifamily assets.

18. Upperman's early trust in Kulick was based on observed performance, third-party validation, and visible execution. In the first Vesta transaction, Marquis on Memorial, Upperman invested his own capital and helped introduce the opportunity to several close friends and family members. Those investors had direct access to Kulick and spoke with him before investing. Kulick moved to Tulsa and lived on the property for several years after acquisition, which reinforced the impression that he was unusually hands-on, scrappy, and committed to execution.

19. In the early years, Vesta's growth appeared to be methodical. Kulick slowly built out the team and acquired additional properties, but he did not appear to be moving faster than the organization could handle. Distributions were consistent. Investors were happy. Many investors reinvested in follow-on deals and referred additional investors. When Upperman visited Vesta properties in Oklahoma, the properties appeared well maintained, and the level of detail appeared

strong. Property reviews were often significantly better than competing properties in the same submarkets. To Upperman, this confirmed that Kulick's operational thesis was working.

20. Loeffler's involvement also added credibility. Loeffler and his family had been successful in real estate, and they appeared to be active and sophisticated participants in the early Vesta deals. Upperman understood Loeffler to be a significant supporter of Kulick, and Loeffler's involvement gave Upperman additional comfort that the platform had experienced oversight.

21. Upperman is not and was not the manager of any of the properties acquired and managed by Vesta. He did not and does not control Vesta's bank accounts. He did not and does not control property operations, accounting, accounts payable, lender communications, debt service, distributions, books and records, or employee decisions. Those functions were controlled by Kulick through Vesta Realty, Louis Investments, Vesta Holdings, and the property-level entities. Upperman's role was based on capital relationships, investor communication, personal investment, and, in many cases, guaranties.

22. Beginning in 2023, Upperman became increasingly concerned about Kulick's communication and follow-through. Vesta had previously paid consistent monthly or quarterly distributions on certain properties. But after Copperfield was acquired, distributions became inconsistent almost immediately. Kulick attributed the delays to banking transitions, heavy capital improvement projects, lender reimbursement delays, unit turns, and other market forces. These explanations were plausible because capital expenditures are capitalized rather than expensed, meaning a property could show positive net income on a trailing 12-month income statement (known in the industry as a "T12") while still consuming cash through capital expenditures. Kulick and his team provided capital expenditure information that appeared to support the explanations.

23. In late 2024, Upperman began lending money directly to Vesta Holdings or specific Vesta deals. Upperman did so not because he was expanding the relationship, but because he believed he had an obligation to help protect existing deals in which investors he introduced to Vesta transactions were already exposed. The multifamily market was extremely challenging, particularly for properties acquired in 2021 and 2022 with floating-rate debt, expensive rate caps, and near-term maturities. Many multifamily operators across the country were dealing with the same pressures Kulick described. Upperman was making similar loans outside of Vesta, so Vesta's need for bridge capital did not initially appear unique or inherently suspicious. Kulick always had an explanation – however now with the benefit of hindsight and some transparency obtained by others through litigation, it is clear that Kulick's explanations were never the full truth.

24. The turning point came in March 2026. Fannie Mae foreclosures were filed against properties that Upperman believed were among the healthiest in the portfolio from a debt service coverage perspective. This was extremely confusing and frustrating because those foreclosures did not fit the property-level financial picture Upperman had been seeing. Around the same time, Kulick disclosed a $3.25 million account receivable at Lexington Commons. His only explanation was that funds had been transferred to Vesta Holdings. He did not provide a satisfactory explanation for why those funds had been transferred or how they would be repaid in connection with a potential sale of Lexington.

25. In March 2026, Upperman also learned from a former employee disturbing information about Kulick's personal conduct, including reports that Kulick had lost nearly $1 million in a single night gambling in Las Vegas, details about lavish personal spending, and claims that construction funds were not being used for construction and insurance proceeds were not being used to repair property damage. At that point, Upperman began to understand that the problems

were not merely a difficult market, poor communication, or liquidity stress. It was a web of deception by Kulick.

**B. The Enterprise Structure and Kulick's Control**

26. Beginning in approximately 2017, Kulick and investor Josef Loeffler[3] formed Vesta Capital, LLC ("Vesta Capital") and Vesta Realty as the primary vehicles for acquiring, financing, and managing a portfolio of multifamily residential properties. Day-to-day control was vested fully in Kulick as Vesta Realty's sole Manager.

27. Shortly thereafter, Loeffler solicited Upperman's investment in Vesta Realty property acquisitions and to be a member of Vesta Realty and Vesta Capital. Initially, this relationship was profitable for Upperman; Kulick appeared to be responsibly managing the properties under his control, in fact lived at one of the properties so that he could give it his full personal attention and succeeded in selling several properties which resulted in investors earning a significant return on their investments. Because of the initial successes of the Vesta enterprise, Upperman agreed to tap into his vast network and introduce investors to future Vesta acquisitions using Vesta-prepared materials, with investors subscribing directly with Vesta. Unfortunately, as set forth below, Kulick's behavior changed dramatically – and for the worse – as the Vesta empire grew larger.

---

[3] Loeffler has filed a civil fraud action against Kulick in the Johnson County, Kansas District Court, case number JO-2026-CV-000792. "This action arises from a systematic scheme by Kulick to exploit the trust of his business partner, Loeffler, and dozens of passive investors by operating a network of real estate investment entities for Kulick's personal enrichment while concealing the true financial condition of those entities from the very people whose money he was spending. Kulick cultivated a public image of philanthropic generosity and professional achievement, while simultaneously presiding over a collapsing portfolio, concealing financial distress from investors, and diverting entity funds for personal expenditures." (Id. at p. 1.)

28. Each multifamily property acquired by Vesta Capital/Vesta Realty was placed in a separate, project-specific LLC (each, a "Property Entity"),[4] each with its own distinct investor group and ownership structure. This structure required strict financial controls, separate bank accounts, transparent reporting, and entity-level financial segregation. Through Louis Investments, which serves as Manager of each Property Entity, Kulick exercised complete, unchecked control over the entire enterprise.

29. The enterprise currently comprises more than 30 projects and over 9,600 residential units across Oklahoma, Kansas, and Arkansas, with properties historically valued at approximately $925 million. Kulick controlled all cash management, financial reporting, property management, accounting, books and records, and investor communications.

30. The Second Amended and Restated Vesta Realty Operating Agreement (the "Operating Agreement") required Member consent for: (a) loans or advances to or investments in any other Person; (b) acquisition of real property interests; (c) sale or disposition of real property; and (d) borrowing funds or granting any mortgage, deed of trust, security interest, or similar lien on Company property. Transparent Collaboration LLC (controlled by Loeffler) held 54.5% of Vesta Realty's voting power, meaning no act requiring Member consent could be validly authorized without supermajority approval.

**C. The Manager's Memorandum and Failed Internal Controls**

31. In January 2018, after Loeffler discovered that Kulick had diverted approximately $200,000 of company funds to personal expenses, Loeffler, Upperman, and Kulick executed a Manager's Memorandum requiring Kulick to: hold weekly budget meetings; hire an independent CFO/controller; produce all credit card statements; maintain segregated bank accounts and credit

[4] Each of the known Property Entities is set forth on **Exhibit F** to this Complaint.

cards for each entity; make distributions only in accordance with operating agreements; and use transparency tools for accountability.

32. While it appears Kulick initially complied with the Manager's Memorandum, over time, his actions have strayed farther and farther away from what it requires. Kulick did retain an independent controller, but he either failed to recognize or ignored Kulick's continued diversions. Kulick subsequently fired the independent controller – the very person whose oversight was supposed to prevent the misconduct now alleged.

**D. Misappropriation of Funds – The Forensic Report**

33. As time has gone on, the situation at Vesta has gone from troubling to absolutely dire. As the Vesta Realty empire grew to approximately 30 properties, Kulick discovered additional opportunities to misappropriate rents for personal gain. As he has continued to misappropriate rents, he has left the properties in a vulnerable position in which insufficient cash is remaining to meet essential property-level obligations, including debt service, utilities, and maintenance. The failure to meet these obligations has had a snowball effect, where tenants fed up with frequent utility interruptions, overflowing trash bins, non-functioning amenities, and unresponded-to maintenance requests have broken their leases or elected not to renew, and new tenants who have learned of Kulick's mismanagement have not taken the former tenants' places. Declining occupancy at many of the properties has exacerbated the Vesta Realty liquidity crisis and has forced Kulick to desperately rely on increasingly costly borrowings and capital call schemes to fill in the gaps.

34. A forensic accounting report prepared by American Fiduciary Services (the "AFS Report") reviewed bank activity across Vesta Realty and Vesta Holdings accounts and found

account activity "highly correlated with classic Ponzi-like schemes and highly demonstrative of commingled sources and uses of funds." **(Exhibit A)**. Key findings include:

a. During January and February 2025, Vesta Realty fraudulently paid Kulick's personal American Express bills and various automobile loans totaling $3.1 million—activity characterized as "unusual and inconsistent with the normal business operations";

b. Cash payments totaling $1.2 million were made from the same account into Kulick's personal bank accounts;

c. In March 2025, an additional $1.3 million disbursement was made to pay Kulick's personal American Express bill;

d. The Vesta Realty account incurred 98 separate overdraft fees during the first several months of 2025;

e. The Vesta Holdings account had an average daily balance of only $82,288, despite having $58.7 million in outflows in January and February 2025 alone—reflecting extraordinary account velocity inconsistent with legitimate operations;

f. Total sources of funds across both accounts were $62.76 million, including $30.66 million in wires from approximately 43 unknown third parties and $7.96 million in transfers from approximately 53 unknown controlled accounts;

g. Total uses of funds were $62.10 million, including $32.05 million in bank transfers to unknown controlled accounts and $3.18 million in Vesta Realty American Express charges;

h. The Vesta Realty account had a zero or negative balance 43% of the days reviewed; the Vesta Holdings account had a zero or negative balance 30% of the days reviewed.

35. Beyond the AFS Report, additional investigation identified: up to $37,473,988 in credit-card charges with no apparent business purpose; $10,241,940 in net transfers to Kulick-

controlled accounts through 93 transactions; and $4,406,608 in disbursements to Raymond James & Associates, Kulick's barber ($25,000), high-stakes poker player Kane Kalas ($225,000), and unidentified individuals and entities. Kulick failed to provide supporting documentation for any of these transactions despite repeated demands.

36. During the same period in which Kulick claimed the enterprise lacked sufficient funds to repay investors, he acquired high-value personal real estate, including two residences each costing approximately $1.5 million. Kulick cultivated a public image of philanthropic generosity and professional achievement while simultaneously presiding over a collapsing portfolio, concealing financial distress from investors, and diverting entity funds for personal expenditures.

37. Kulick is a known high-stakes poker player who appeared on six episodes of High Stakes Poker on PokerGO in 2024 (around the same time that Kulick started taking millions of dollars of merchant cash advances, as otherwise described below). Plaintiffs are informed and believe that Kulick has utilized property funds to subsidize his gambling activities. An employee of Vesta reported that Kulick lost over $1 million gambling in Las Vegas during the Vesta annual office retreat in 2023.

**E. Fraudulent Capital Calls**

38. Plaintiffs are aware of at least one fraudulent capital call orchestrated by Kulick, and do not believe this was an isolated event. On December 12, 2025, Kulick, acting through Vesta Capital's investor relations function, issued a capital call notice to a subset of investors in Woodscape Apartments – a multifamily property located in Oklahoma City, Oklahoma – requesting $1,750,000, representing 7.92% of each notified investor's original investment. The stated purpose was to fund a Fannie Mae-mandated repair escrow with a non-negotiable deadline of December 23, 2025. The capital call was materially fraudulent in at least four respects:

39. First, the capital call was selectively issued. Andover Partners, which contributed $7,000,000 of equity to the Woodscape transaction, was never sent the December 12, 2025 capital call notice. Had the capital call been applied to Andover's investment at the stated 7.92% rate, Andover's pro-rata share would have been approximately $554,400.[5] A capital call on an equity syndication must be issued to all equity investors on a pro-rata basis; selectively excluding one or more investors distorts each investor's dilution exposure and ownership rights, and potentially allows the sponsor to manipulate the funding outcome. There is no legitimate basis for excluding any equity holder from a pro-rata capital call.

40. Second, the "lender scope of work" distributed with the capital call notice to justify the $1,750,000 request was not an actual Fannie Mae repair directive but rather an unfilled Newmark-prepared property condition assessment template. The document's header states explicitly: "EXHIBIT A – (Example; Replace with Actual Schedule of Needed Repairs)." The total immediate repair estimate shown in the template was $1,485,305, which broadly aligned with the $1,500,000 escrow figure cited in the capital call, suggesting the template was deliberately used to lend credibility to the repair narrative without disclosure of its placeholder status. No actual lender-issued scope of work or escrow demand letter was provided to investors.

41. Third, Kulick misrepresented the disposition of capital call proceeds. On January 20, 2026, when Plaintiff Upperman inquired about the approximately $1,000,000 balance in the Accounts Receivable – Other account (GL 1211-0000), Kulick responded in writing: "It is a catch all. But the December financials had a 500k increase from November due to people who had

[5] At the time, Andover Partners had already sued Louis Investments and Kulick in the U.S. District Court for the Northern District of Oklahoma (Case No. 25-cv-00599-SH), alleging breaches of the Woodscape Investors operating agreement, and breaches of fiduciary duty, by improperly creating a new class of preferred equity, soliciting an unauthorized investment from 7Acre Investment, and giving 7Acre complete control over the disposition of the Woodscape property. This may explain why Kulick intentionally avoided issuing the capital call to Andover.

Case 4:26-cv-00383-SH Document 2 Filed in USDC ND/OK on 06/25/26 Page 16 of 59

confirmed capital call participation but hadn't funded yet." This explanation is directly contradicted by the December 2025 General Ledger, which shows that the approximately $460,500 increase in that account during December 2025 was driven entirely by seven journal entries totaling $460,500, each explicitly labeled "to Repay Loan VH [Vesta Holdings].". These entries represent capital call proceeds being diverted to repay Vesta Holdings-related loans rather than being directed to the Fannie Mae repair escrow as represented to investors. Capital call proceeds appear in the GL under account 1120-0001 as credits labeled "to record Capital Call," offset by debits in the same account labeled "to Repay Loan VH"—confirming that capital call funds were being simultaneously received and redirected to Vesta Holdings loan repayments. Meanwhile, Kulick did not disclose to Upperman or the other investors that Kulick had not at that time paid the mortgage for two months.

42. Fourth, Woodscape was foreclosed upon in approximately March 2026 – fewer than three months after the capital call deadline – with no evidence that any of the repairs itemized in the scope of work document were ever performed. The capital call notice represented that funds were urgently needed to fund a lender-required repair escrow by December 23, 2025, to maintain loan compliance and preserve the asset, and that failure to fund would increase the likelihood of dilution or "less favorable alternatives." The property's swift foreclosure following the capital call, combined with the diversion of proceeds to Vesta Holdings loan repayments, strongly confirms that the repairs were never the actual destination of the funds and that the escrow-repair narrative was pretextual.

43. The Woodscape capital call constitutes an additional predicate act of wire fraud within the meaning of 18 U.S.C. § 1343. Kulick transmitted the capital call notice by electronic mail across state lines on December 12, 2025, containing materially false representations about the

purpose and necessity of the capital call, inducing investors to wire funds interstate based on the false premise that such funds would be deposited into a Fannie Mae-controlled escrow account for property repairs. The capital call further demonstrates Kulick's ongoing pattern of soliciting investor capital under false pretenses while diverting the proceeds to undisclosed purposes for his personal benefit.

44. The Woodscape capital call also constitutes an additional predicate act of money laundering within the meaning of 18 U.S.C. § 1956. Kulick transferred money from the capital call to Vesta Holdings, as shown in the general ledger of Woodscape, contrary to the false premise that such funds would be deposited into a Fannie Mae-controlled escrow account for property repairs. The capital call further demonstrates Kulick's ongoing pattern of soliciting investor capital under false pretenses while diverting the proceeds to undisclosed purposes for his personal benefit.

**F. Unauthorized Borrowings and Collateralizations**

45. As noted above, Kulick has had to resort to increasingly risky and expensive cash sources in order to maintain his grip on the Vesta Realty portfolio. Kulick's recent borrowing transactions, none of which have been approved at the corporate level, can only be described as reckless, irresponsible, and highly damaging.

46. For instance, in 2025, Kulick and his entities borrowed approximately $7.338 million from YSA – a lending entity owned and controlled by Efraim Diveroli, a former arms dealer and convicted felon – at interest rates alleged to have started at 100% per annum, thereafter, increasing to 7,000% per annum, compounded daily. Diveroli was charged in an 84-count indictment charging wire fraud and conspiracy to defraud the U.S. Department of Defense. In January 2011 Diveroli was sentenced to 48 months in federal prison. While out on bond awaiting

sentencing Diveroli violated the terms of release by contacting a firearms dealer attempting to sell weapons. This led to an additional charge and more time in prison.

47. The loans taken by Kulick demonstrate how desperate he was, and continues to be, to keep the house of cards and misapplication of funds ongoing, as is common in a Ponzi scheme. The following description comes directly from a brief filed by Kulick in the Court of Chancery of the State of Delaware, CA No. 2025-1319-KSJM, in a retaliatory suit he filed against YSA after YSA sued him for breach of contract:

> The first loan was made on October 8, 2024, for a principal sum of $775,000 at an annual interest rate of **85%**. The collateral for this loan, set forth in a Collateral Pledge and Security Agreement (the "October 2024 CPSA"), consisted of (1) Vesta Holdings' already-encumbered membership interests in thirteen Delaware LLCs, (2) Asset Holder's unencumbered membership interests in four other Delaware LLCs, and (3) the rights inhering in those interests, such as distribution and other membership rights. None of the Title Owners (the entities that actually own the underlying real property) were borrowers, pledgors, or guarantors under this loan.
>
> Five additional short-term loans followed over the next several months—on January 22, January 24, January 30, February 4, and February 10, 2025—using the same form of documents and the same listed collateral, for similar amounts and at similar interest rates. All six of these initial loans were repaid by the Plaintiffs and are not in dispute.
>
> On February 18, 2025, the parties entered into a seventh loan, using documents essentially identical to the prior six, with one key difference: the addition of a "Joinder of Borrower-Affiliated Entities" annexed to the last page of the CPSA. The February CPSA listed the same two categories of membership interests in seventeen Delaware LLCs—unencumbered interests owned by Asset Holder in four companies and encumbered interests owned by Vesta Holdings in thirteen companies. "Collateral" was defined in Section 1.1(a) as those membership interests and any other interests in the defined entities now owned or later acquired by the Borrower or Pledgor; the collateral was limited to membership interests and never included any real estate.

The February Promissory Note was for a principal sum of $1,500,000, with a maturity date of May 19, 2025, and a stated annual interest rate of **133.333%**. The note contained a full integration clause superseding any prior agreements and barring oral modifications. The CPSA also contained a Power of Attorney clause (Section 4.6) granting the lender broad authority to act in the borrower's and pledgor's name, though only upon an event of default.

In April 2025, Plaintiffs received an additional loan from YSA to finance the acquisition of Parc 1010, an apartment complex in Tulsa, Oklahoma. YSA loaned $300,000 to three entities owned by Kulick Manager, LLC—Parc 1010 Holdco., LLC; Parc 1010 GP, LLC; and Parc 1010 Investors, LLC—with a maturity date of April 9, 2025, and an annual interest rate of **1,500%.**

The April CPSA listed two categories of pledged interests: encumbered limited partnership interests in Wellsford Oaks LP (an Oklahoma LP) and unencumbered membership interests owned by Kulick Manager, LLC in the three Parc 1010 entities. The definition of collateral, Power of Attorney clause, and Joinder language were all identical to the February CPSA. This transaction also included an additional document—a Membership Interest Pledge and Assignment Agreement (the "MIPAA")—under which Mr. Kulick pledged all his membership interests in Kulick Manager, LLC to secure the obligations of the three Parc 1010 borrower entities, representing those interests were free and clear of liens.

Two additional working capital loans were made on July 16 and July 31, 2025, to Vesta Holdings, using the same form of documents as the February transaction.

July 16, 2025 loan: $365,000 principal, maturity date of July 30, 2025, with an annual interest rate of **960%, compounding daily on a 360-day year**.

July 31, 2025 loan: $317,000 principal, maturity date of August 5, 2025, with an annual interest rate of **7,000%, also compounding daily on a 360-day year**.

(Plaintiffs' Corrected Post-Trial Brief in Support of Their Motion for Permanent Injunction, pp. 2-10.)(**Exhibit B**.)

48. Kulick was so desperate for liquidity to support the Vesta Realty Ponzi scheme that he signed paperwork mandating astronomical interest rates that would be criminal, except that Kulick agreed to application of Delaware law. Kulick lives in Oklahoma, and most of the Vesta Realty properties are located in Oklahoma, which has a commercial interest rate cap of 45% per annum under its usury laws. Delaware, on the other hand, does not prohibit usurious loans. Plaintiffs were not aware of Kulick's transactions with Diveroli or the fact that Diveroli was claiming ownership interests in the various real estate projects, nor were other investors warned of Kulick's use of funds from a convicted felon. Kulick's agreement to the astronomical interest rates proposed by YSA have been disastrous to the Vesta enterprise, as the amounts alleged to be due by YSA – on outstanding loans in the aggregate principal amount of approximately $2.7 million – has ballooned to over ***$930 million***.

49. Kulick was fully aware that what he was doing violated his commitments, obligations, and promises to Fannie Mae. In an exchange of text messages admitted in evidence in the YSA litigation, Kulick made the following admissions regarding the loan and his desperation:




50. This notwithstanding, Kulick agreed to collateralizations of most of the Vesta portfolio to secure repayment of the YSA loans, despite express prohibitions against doing so in all of the subject loan documents with the properties' lenders, and despite not even seeking – let alone obtaining – the appropriate corporate consents. In February 2025, Kulick executed Collateral Pledge and Security Agreements ("CPSAs") collateralizing LLC interests in seventeen property-level entities. The seventeen entities whose interests were pledged are: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC; Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors,

LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investors, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classen Best Living Investors, LLC; and Muntage Vesta Investors, LLC.

51. YSA relied upon the CPSAs and powers of attorney granted by Kulick to file second mortgages on substantially all portfolio properties for payment of the loans and the usurious interest. These borrowings and collateralizations violated: (a) each property-level loan agreement prohibiting incurrence of secured indebtedness without lender consent; (b) the Vesta Realty Operating Agreement requiring supermajority Member consent for borrowings outside the ordinary course; and (c) each property-level operating agreement requiring Member consent for encumbrances.

52. The YSA loans violated the terms of every property-level loan and security agreement, which prohibited additional loans or liens against the properties without prior approval. Neither the subject lenders, Plaintiff Upperman, nor any of the various investors were told of Kulick's agreement for extortionate loans from Diveroli, nor were they asked to approve the broad collateral grants Kulick agreed to with YSA.

53. In a March 26, 2026 report emailed to investors explaining the Fannie Mae foreclosure filings Kulick falsely represented that all interest on the short-term loans "was, and remains, my responsibility." **(Exhibit C)** The agreements Kulick executed with Diveroli state the opposite. Kulick knew on March 26, 2026 that his assurance that only he was responsible for the interest was false and misleading to the investors, constituting wire fraud under 18 U.S.C. §1343.

54. A trial was conducted in the Delaware Chancery Court on Kulick's motion for injunction, in which he sought an order requiring YSA remove the second mortgages it filed on

many of the Vesta properties. During this trial, "*Kulick acknowledged comingling his personal funds with Vesta's to create a 'lending pool' to move cash around to pay the debts of one property with proceeds from another . . . In summary, from November 2024-July 2025 $33.2 million was deposited from the associated real estate portfolio of Vesta and from the next operational flows of the Vesta accounts, and these $33.2 million were comingled and sent to unidentified entities controlled by the controller.*" (6/9/2026 Court ruling, p. 17, fn. 107, quoting trial testimony, **Exhibit D**) The irony in the dealings between Diveroli, a convicted fraudster, and Kulick is the testimony by Diveroli that "it was only because YSA 'discovered the fraud and deceit' coupled with the poor conditions of the Properties that YSA decided to record the second mortgages." (Id.)

55. Ultimately, on June 9, 2026, the Delaware Chancery Court denied Kulick's request for an injunction, holding that the broad grant of authority in favor of YSA under the CPSAs authorized YSA to file the second mortgages on the Properties, and further holding that under Delaware law, Kulick was foreclosed from raising a usury defense to the YSA loans.

56. In addition to the YSA loans, Kulick caused the enterprise to incur additional unauthorized merchant cash advances and other loans, in many cases at usurious effective interest rates. Defendants have defaulted in nearly every one of these loans and advances, inviting litigation in multiple states, including:

(a) On December 2, 2025, Lend Bug LLC sued Vesta Realty, Kulick (as guarantor) and numerous Property Entities in the Vesta Realty portfolio in the Supreme Court of New York, Kings County (Index No. 542083/2025) on account of a so-called "future receivables sale and purchase agreement" pursuant to which Kulick caused to be sold $412,225 of the properties' rent receivables to Lend Bug for an upfront purchase price of $275,000. The

defendants were thereafter required to repay $13,741.00 per day for 44 days, for a total of $704,604 (representing an effective interest rate of approximately 1,800%).

(b) On March 18, 2026, another MCA, Apollo Funding Co., filed suit against Vesta Holdings, LLC, Vesta Realty, Kulick, and what appears to be each of the Property Entities in the Supreme Court of New York, Clinton County (Index No. 2026-00026129), for confirmation of an arbitration award in the amount of $289,064.20 (obtained by default due to Kulick's failure to participate) based on a receivables purchase agreement in which the defendants "sold" to Apollo $449,700 of receivables for $300,000.

(c) On March 18, 2026, another MCA, American Funding Services Inc. filed suit against Vesta Capital, Vesta Realty, Kulick, and numerous Property Entities in the Supreme Court of New York, Erie County (Index No. 805312/2026), seeking judgment in the amount of $1,295,931.25 based on two future receivables sale agreements whereby defendants "sold," in the aggregate, $2,086,600 of future rents, and a subsequent settlement agreement in the amount of $1,490,431.25, which defendants defaulted on. Kulick has filed a motion to compel arbitration of this dispute.

(d) On March 20, 2026, another MCA, Dover Capital LLC, filed suit against Vesta Realty LLC, Kulick, and what appears to be each of the property-level LLCs in the Supreme Court of New York, Monroe County (Index No. E2026006970), on account of two future receivables sale and purchase agreements pursuant to which Kulick caused to be sold $1,061,504.50 of

the properties' rent receivables to Dover for an upfront purchase price of $725,500. Even after remitting $323,358.40 to Dover, Dover seeks a judgment in the amount of $981,734.31. The effective interest rate of the first agreement was 360.26% and the effective interest rate of the second agreement was 459.33%.

(e) On December 16, 2025, Seaview 525, LLC commenced an action against Vesta Capital, Vesta Holdings, and Kulick in the District Court of Tulsa County, Oklahoma (CJ-2025-05836), asserting a claim for breach of a promissory note and seeking an award of damages in the principal amount of $2,500,000, plus $500,000 in contractual fees, plus accrued and unpaid interest based on the contract rate of 40% per annum.

(f) On August 22, 2025, Austin Business Finance, LLC commenced an action against Vesta Realty, Vesta Holdings, Louis Investments, Kulick, and several property-holding entities in the 395th Judicial District Court, Williamson County, Texas (Cause No. 25-2371-C395), asserting breach of a future receivables sale agreement, and seeking damages of not less than $571,790.25, plus court costs.

(g) On December 12, 2025, General Holding, LLC commenced an action against Vesta Holdings and Kulick in the District Court of Tulsa County, Oklahoma (Case No. CJ-2025-05786), alleging that Vesta Holdings and Kulick executed a promissory note in the principal amount of $500,000, and that Vesta Holdings gave General Holding a collateral pledge of membership interests in approximately thirteen (13) property-holding

entities. General Holding sought and obtained a money judgment in the amount of $789,941.09, plus accrued interest, costs, and fees.

(h) Based on a review of certain Vesta Capital and Vesta Realty account statements, substantial payments were made to several other merchant cash advance lenders, including Harper Advance LLC, Modo, LLC, and Logiq Advance LLC. Plaintiffs are not in possession of the underlying merchant cash advance agreements, but believe that payments to these MCAs aggregated to approximately $2,780,500, with those payments being made through 2025.

(i) On May 18, 2026, Ronald Marks, Tibor L. Nagy, and Anna Nagy commenced an action against Kulick and Vesta Holdings in the District Court of Tulsa County, Oklahoma (Case No. CJ-2026-2190), seeking judgment by confession on account of Kulick's breach of a settlement agreement related to loans made by the plaintiffs having a balance of $4,000,000 as of March 17, 2026. On May 21, 2026, an agreed judgment was entered in the full amount sought, plus interest, fees, and court costs.

(j) An entity called LOTOR LLC filed a second lien on the Lexington Commons property in September 2025 based on a $1,250,000 obligation. To Upperman's knowledge, Defendants did not obtain the necessary consents – including from the lender – to have this lien placed. This lien was released in March 2026.

57. Similarly, Kulick took a $3 million loan in April 2023 from David Levine and Presidio Mortgage Holdings LP to make up Kulick's share of the purchase of the Woodscape

property. The borrowers were Woodscape Investors, LLC, Louis Investments, and Marc Kulick. Kulick did not have authority to bind Woodscape Investors, LLC for the loan. Kulick never disclosed the Presidio loan to Plaintiffs.

58. The original maturity date for the Presidio loan was seven months after the execution of the loan documents. Kulick defaulted on the loan which created exposure for Woodscape Investors, LLC and all of its investors, including Plaintiff Upperman. On September 11, 2025, Kulick sent Presidio a check for $120,000 and asked that Presidio treat the payment as monthly interest despite the loan's maturity. When Presidio attempted to cash the check, it was rejected due to insufficient funds. The knowing submittal of a check on an account with insufficient funds was act of mail fraud, in violation of 18 U.S.C. § 1341. Presidio sued Woodscape LLC, Kulick and Louis Investments on November 3, 2025 in the Tulsa County, Oklahoma District Court (Case No. CJ-2025-05089).

59. The Woodscape project is now in foreclosure proceedings brought by Fannie Mae, Case No. CJ-2026-1969, in the Oklahoma County, Oklahoma District Court, on various grounds, not the least of which is that Kulick has ceased making mortgage payments.

**G. Unauthorized Debt Sales at Fire-Sale Prices**

60. Kulick also engaged in a pattern of unauthorized dilution of investors' equity interests across the enterprise. The Vesta Capital Operating Agreement requires written consent from existing Members for the admission of new Members. Notwithstanding this requirement, Kulick unilaterally admitted new Members and caused Property Entities to issue additional equity without obtaining the required consents. For example, Josef Loeffler's economic interest in Vesta Capital was improperly reduced from 44.55% to approximately 1.79%—a dilution that Kulick never sought nor obtained consent to effectuate. When investors questioned the changes, Kulick

Case 4:26-cv-00133-SH Document 2 Filed in USDC ND/OK on 06/25/26 Page 28 of 59

confirmed he brought in new investors but refused to provide details about why the entities required additional cash, refused to identify the new investors, refused to state the consideration paid for the equity, and refused to disclose the uses of the new capital. On information and belief, the equity sales were not justified by the business needs of the issuing entities but were used to cover Kulick's defalcations and mismanagement, and in Loeffler's case, to divest him of what little authority he had to limit Kulick's activities and prevent his removal as manager. At least one investor has challenged such dilution in Andover Woodscape LLC v. Louis Investments, LLC, pending in the United States District Court for the Northern District of Oklahoma (Case No. 25-cv-00599-SH).

61. With the properties desperate for cash due to Kulick's looting of rental income, Kulick, through Vesta Holdings, allegedly loaned approximately $22 million to numerous property-level entities using funds sourced from: Upperman ($2.525 million); YSA; the MCA lenders; Worcester Lending ($2.5 million); Marks and Nagy ($4 million); Presidio Mortgage Holdings ($3 million); Austin Business Finance ($1.3 million); and cash flow from profitable properties. Kulick did not seek consent from the members of any lending or borrowing entity before making these loans.

62. In late 2025, Kulick then sold approximately $13.4 million of these loans for a deeply discounted aggregate price of approximately $3.4 million, including: (a) $1.5 million in Ridge Best Living loans for $700,000; (b) $1.4 million in Lofts at North Penn loans for $700,000; (c) $4.6 million in Lofts at North Penn loans for $1,415,385; and (d) $5,999,902.49 in Lofts at North Penn and Woodland Oaks loans for $600,000. None of these sales were disclosed to investors or lenders, nor were required consents obtained. The purchasers, and whether the

transactions were at arm's-length, remain unknown. While this (temporarily) put more cash in Kulick's hands, it was grossly inequitable for all of the investors.

63. The only reasonable explanation is that the loans and the sales of the loans were a device used by Kulick to move cash from entity to entity to conceal his thefts and the consequences of his mismanagement. Kulick has never disclosed – despite being repeatedly asked – why the loans (or their sale) were needed in the first place, what uses were made of the proceeds, the identity of the loan purchasers, and the uses made of the cash generated by the loan sales.

**H. Deterioration of Properties and Nonpayment of Operating Expenses**

64. Kulick's diversion of funds has caused widespread deterioration of portfolio properties and nonpayment of critical operating expenses, including:

a. Failure to make debt service payments on nearly every property-level secured loan, including each of the nine (9) loans held by Federal National Mortgage Association (Fannie Mae);

b. Failure to timely pay water and utility bills at multiple properties, resulting in frequent shutoff notices at Barcelona, One Eton Square, Remington Ranch, Villas at Midtown, Woodscape, Village Creek, Drexel Flats, Riverpark, and other properties;

c. Failure to maintain hot water and heating service at Remington Ranch (declared unfit for human occupancy by the Stillwater City Council and subject of a public nuisance petition by the City of Stillwater alleging approximately $200,000 in unpaid utility bills), One Eton Square (declared a public nuisance by the City of Tulsa), and other properties;

d. At the Tuscany Village property, the City of Oklahoma City, Oklahoma determined that one of the structures is "Dilapidated" due to fire damage, danger of collapse, and other issues;

e. Failure to address work orders, resulting in insect infestations, mold, mildew, and standing water at multiple properties;

f. Failure to collect trash at Tuscany Village, Wedgewood Village, Village Creek, Drexel Flats, and Riverpark, among other properties;

g. Failure to maintain property insurance coverage at multiple properties, which constitutes an event of default under applicable loan agreements and places properties at risk of catastrophic loss from, for instance, weather events (which is an acute possibility in the region in which the properties are located, which are prone to considerable tornado activity);

h. Non-functioning tenant amenities, including pools and fitness centers, which have been left unusable for months;

i. Allowing mechanics' and materialmen's liens to be filed on substantially all portfolio properties; and

j. Life-safety failures including missing smoke and carbon monoxide detectors, broken stair railings, and broken security cameras.

**I. Misappropriation of Proceeds from Property Sales**

65. Kulick also misappropriated distributions to which investors were entitled when portfolio properties were sold. When a property is sold, the Manager is required to distribute the net proceeds to investors. In numerous instances, Kulick failed to distribute the proceeds, often with unfulfilled promises that the withheld funds were being invested in new property through IRC section 1031 like-kind exchanges (which allow investors to defer capital gains on the sale of an investment property by reinvesting the proceeds into a qualifying new property). The IRS's rules concerning 1031 exchanges include strict deadlines for (i) the identification of a replacement property and (ii) the closing of the new purchase. Despite representations that proceeds would be returned if a replacement property was not pursued, distributions were made only after certain investors individually inquired, resulting in preferential treatment of some investors over others.

In multiple instances, Kulick failed to follow the procedures required to perfect valid section 1031 exchanges, including failing to direct sale proceeds to a Qualified Intermediary upon closing – establishing that proceeds had already passed through Kulick's control before any exchange mechanics were initiated. This sequence disqualified the purported exchanges and demonstrates that Kulick's invocation of section 1031 was knowingly improper and used as a pretext to retain control of investor funds.

**J. Proliferation of Defaults, Foreclosures, and Receiverships**

66. The consequences of Kulick's misconduct are manifest in the cascade of defaults, foreclosure actions, and receivership proceedings engulfing the enterprise, on top of the numerous litigations filed against the Defendants and the property-holding entities described above. As of the filing of this Complaint:

a. Federal National Mortgage Association ("Fannie Mae") initiated foreclosure proceedings against nine apartment complex properties operated by Kulick and/or entities under his control, including Barcelona (CJ-2026-1187, Tulsa County, Oklahoma District Court), Villas at Midtown (CJ-2026-1188, Tulsa County, Oklahoma District Court), One Eton Square (CJ-2026-1215, Tulsa County, Oklahoma District Court), Lexington Commons (CJ-2026-00088, Washington County, Oklahoma District Court), Remington Ranch (CJ-2026-77, Payne County, Oklahoma District Court), Copperfield (CJ-2026-1970, Oklahoma County, Oklahoma District Court), Woodscape (CJ-2026-1969, Oklahoma County, Oklahoma District Court), The Canopy Apartments (60CV-26-3320, Pulaski County, Arkansas District Court), and The Capitol on 28th (CJ-2026-1968, Oklahoma County, Oklahoma District Court), located across Tulsa, Bartlesville, Stillwater, and Oklahoma City, Oklahoma. The principal balance of the loans subject to these foreclosure actions totals approximately $174,352,000. Fannie Mae initiated these foreclosure

proceedings based on Kulick's failure to make required loan payments for an extended period of time, and the improper recording of the YSA second mortgages, both of which constitute a material default under the applicable loan agreements, as well as failure to disclose other pending litigation affecting the subject properties as required under applicable loan covenants;

b. Additional foreclosure actions have been filed by several other property-level lenders;[6]

c. State courts have appointed receivers over Lofts at North Penn, Village Creek, Drexel Flats, Woodland Oaks, Fairfax, Lexington Commons, Remington Ranch, and One Eton Square, though most of these receiverships have been suspended by Kulick's systematic exploitation of the state-law bonding mechanism which stays the receiverships while the court's orders are appealed[7]; and

d. Non-judicial foreclosure sales have been noticed up, and have or will be conducted imminently, by several lenders, including Saperean Capital (related to the Woodland Oaks and Fairfax properties) and Acre (related to the 727 Lofts property).[8]

---

[6] *See, e.g.*, Acre Q018 Retention Holder LLC v. 727 Lofts Best Living, LLC, Case No. CJ-2026-02188 (Tulsa County, Oklahoma District Court) (related to the 727 Lofts property); CREO QRS NP LLC v. Lofts at North Penn Best Living, LLC, Case No. CJ-2025-7426 (Oklahoma County, Oklahoma District Court) (related to the Lofts at North Penn property); CREO QRS VC LLC v. A-V Village Creek Owner LLC, Case No. CJ-2025-4684 (Tulsa County, Oklahoma District Court) (related to the Village Creek property); Ready Capital Mortgage Financing 2023-FL12, LLC v. Drexel Flats Acquisition LLC, Case No. CJ-2026-1275 (Oklahoma County, Oklahoma District Court) (related to the Drexel Flats property); Saperean Capital IV TB Note Lender KD4, LLC v. Woodland Oaks Best Living, LLC, Case No. CJ-2025-8499 (Oklahoma County, Oklahoma District Court) (related to the Woodland Oaks property); Saperean Capital IV TV Note Lender KD4, LLC v. Fairfax Best Living, LLC, Case No. CJ-2025-8499 (Oklahoma County, Oklahoma District Court) (related to the Fairfax property); and Term Fund III MRA Seller LLC v. A-V Classen Owner LLC, *et al.*, Case No. CJ-2026-4901 (Oklahoma County, Oklahoma District Court) (related to The Classen property).

[7] "If a receiver shall be or has been appointed, upon the appellant filing an appeal bond . . . the authority of the receiver shall be suspended until the final determination of the appeal . . . . 12 O.S. § 993(C)" (*Truett v Freedom Leaf* (2021) 495 P.3d 153, 162.)

[8] On the eve of a scheduled June 12, 2026 foreclosure sale of the Woodland Oaks and Fairfax properties, the respective borrowers each filed chapter 11 petitions for relief in the U.S. Bankruptcy Court for the Western District of Oklahoma, thereby staying such sales. *See In re Fairfax Best Living, LLC*, Case No. 26-11985 (Bankr. W.D. Okla.) and *In re Woodland Oaks Best Living, LLC*, Case No. 26-11986 (Bankr. W.D. Okla.)

67. The bonding over of Oklahoma receivers is of particular concern, given Kulick's express acknowledgement that he is highly unlikely to prevail on the appeal of the state court receivership orders:

> In our loan documents with Fannie Mae we consent to a receiver being appointed in event of default. We have credible arguments about the defaults but there is less than a 5% chance in any receivership hearing that we will win. The difference between winning and losing is minimal because the borrower has protections in Oklahoma. One such protection is the ability to 'bond over' the appointment.
>
> So, in our last hearing the judge appointed a receiver and Vesta posted the bond and offset the appointment. I said above, the difference in winning or losing is minimal and quite frankly for reasons I shouldn't get into on an adversarial thread it may even be better to post the bond than to win outright. But that's litigation strategy.

E-mail from Marc Kulick to certain Vesta investors dated June 6, 2026, attached hereto as **Exhibit E**. Continuing to bond over receiver appointments notwithstanding the *de minimis* likelihood of success suggests that the strategy is not being guided by protecting investors such as Plaintiffs, but rather, by Kulick's desire to maintain control of property rents for personal purposes.

**K. Obstruction of Books and Records Requests from Investors**

68. Kulick has engaged in a systematic pattern of obstruction designed to prevent investors from discovering the scope of his misconduct, including:

a. Responding to a formal August 2025 demand for inspection of 23 categories of Vesta Realty documents by stating that "a member is not entitled to reporting from a company" and that reporting requirements are "minimal to non-existent";

b. Characterizing legitimate information requests as a "smear campaign" and "unfounded accusations of criminal activity";

c. Refusing to provide bank account statements for Vesta Holdings or access to affiliated accounts;

d. Closing a bank account on which Loeffler was a signatory and refusing to disclose where funds were moved;

e. Causing UMB Bank to close accounts due to alleged abuse of the ACH payment network—a serious and relatively rare sanction that banks impose only after documented patterns of problematic activity, which may include excessive payment failures, returned transactions, suspected fraud, or violations of banking compliance requirements;

f. Firing the enterprise's independent accountant and controller—whose employment was required under the Manager's Memorandum;

g. Meeting Upperman's parallel requests with incomplete, hostile, or evasive responses; and

h. Deploying multiple law firms at entity expense to oppose legitimate investor inquiries.

69. Kulick's communications, both through counsel and directly, exhibit a pattern commonly associated with financial fraud and embezzlement: deflection, intimidation, reversal of victimhood, and escalating hostility, all designed to deter inquiry into conduct warranting investigation. Rather than engaging with legitimate investor concerns, Kulick's counsel dismissed them as a "smear campaign" and claimed that investor information requests were a "pretext for personal issues." Kulick also closed bank accounts to which investors had signatory access, terminated accounting personnel, and used company funds to retain multiple law firms to oppose investor inquiries—forcing investors to bear their own litigation costs while Kulick funded his obstruction with other people's money.

### L. Kulick's Exploitation of Oklahoma Law to Block Lender-Initiated Receiver Appointments

70. The Defendants, as well as all or substantially all of the property-holding entities, are defendants in civil actions in Delaware, Oklahoma, Kansas, and Arkansas, all related to the conduct alleged herein. Based on evidence provided and after full briefing, the following courts have seen fit to appoint receiver to take control of the following properties:

a. One Eton Square, Tulsa, Oklahoma – on motion of the lender, Federal National Mortgage Association (Fannie Mae), a receiver was appointed on May 20, 2026 by the Tulsa County, Oklahoma District Court; however, such appointment has been suspended due to the borrower's appeal (at Kulick's direction) of the receivership order and the payment of a $100,000 cash bond.

b. Lexington Commons, Bartlesville, Oklahoma – on motion of the lender, Fannie Mae, a receiver was appointed on June 10, 2026 by the Washington County, Oklahoma District Court. That same day, Kulick posted a $100,000 cash bond which suspended the receiver's appointment.

c. Remington Ranch Apartments, Stillwater, Oklahoma – on motion of the lender, Fannie Mae, a receiver was appointed on May 20, 2026 by the Payne County, Oklahoma District Court; however, the receivership has not yet taken effect due to a pending dispute concerning the amount of the receiver's bond.

d. The Lofts at North Penn, Edmond, Oklahoma – on motion of the lender, CREO QRS NP LLC, a receiver was appointed on November 25, 2025 by the Oklahoma County, Oklahoma District Court; however, after the borrower appealed and suspended the appointment by paying a cash bond, the lender dismissed the foreclosure action and is pursuing a non-judicial foreclosure.

e. Village Creek, Tulsa, Oklahoma – on motion of the lender, CREO QRS VC LLC, a receiver was appointed on January 22, 2026 by the Tulsa County, Oklahoma District Court; however, after the borrower appealed and suspended the appointment by paying a cash bond, the lender dismissed the foreclosure action and is pursuing a non-judicial foreclosure.

f. Drexel Flats, Oklahoma City, Oklahoma – on motion of the lender, Ready Capital Mortgage Financing 2023-FL12, LLC, a receiver was appointed on May 28, 2026 by the Oklahoma County, Oklahoma District Court; however, such appointment has been suspended due to the borrower's appeal (at Kulick's direction) of the receivership order and the payment of a $200,000 cash bond.

g. Woodland Oaks, Tulsa, Oklahoma – on motion of the lender, Saperean Capital IV TB Note Lender KD4, LLC, a receiver (Scott Shefman of Friedman Real Estate Management) was appointed over the property. Kulick – likely as a result of the lender's assertion that challenging the receiver's appointment would constitute a recourse trigger resulting in full liability by both him (and incidentally, Upperman) under his guaranty – has refrained from appealing the appointment. However, in order to prevent a foreclosure sale by the lender originally scheduled for June 12, 2026, Kulick caused to be filed in the U.S. Bankruptcy Court for the Western District of Oklahoma a chapter 11 bankruptcy case on behalf of the borrower, Woodland Oaks Best Living, LLC.

h. Fairfax, Midwest City, Oklahoma - on motion of the lender, Saperean Capital IV TB Note Lender KD4, LLC, a receiver (Scott Shefman of Friedman Real Estate Management) was appointed over the property. Kulick – likely as a result of the lender's assertion that challenging the receiver's appointment would constitute a recourse trigger resulting in full liability by both him (and incidentally, Upperman) under his guaranty – has refrained from appealing the

appointment. However, in order to prevent a foreclosure sale by the lender originally scheduled for June 12, 2026, Kulick caused to be filed in the U.S. Bankruptcy Court for the Western District of Oklahoma a chapter 11 bankruptcy case on behalf of the borrower, Fairfax Best Living, LLC.

71. Kulick has systematically exploited state-law procedural mechanisms in Oklahoma, pursuant to 12 Okl. St. § 993(C), to bond over and suspend court-ordered property-level receiverships, maintaining control of rental income during appeals while continuing to divert funds. A federal receivership, governed by Federal Rule 66, would not be subject to these state-law circumvention mechanisms and would provide immediate, enterprise-wide relief.

72. The Defendants, through the Property Entities, are receiving over $4 million a month in rental income across the entire portfolio while failing to make debt service payments, as well as necessary operating expenses such as utilities, insurance, payroll, and maintenance expenses. Upon information and belief, the Defendants have ceased making debt service payments on most of the Vesta properties for months, with the only properties paying debt service being those for which the lender has lockbox arrangements in place. A federal receivership will halt any further misappropriation of funds, provide for maintenance of the properties in the interest of the rent-paying residents and establish a status quo that will terminate Kulick's ability to further siphon money for his own personal interest.

**M. Upperman's Injuries and Guaranty Exposure**

73. Upperman invested approximately $1,369,488 of personal capital across multiple Vesta deals through his controlled entities. All or substantially all of these investments have been impaired or rendered worthless by Kulick's misconduct.

74. Upperman has current loans outstanding to Vesta Holdings of approximately $2,525,000, which remain unpaid despite having matured on January 1, 2026.

75. Upperman's experience parallels that of other investors. Josef Loeffler, who brought this enterprise's misconduct to light in a related state-court action (Case No. JO-2026-CV-000792, Johnson County, Kansas), advanced $2.47 million to Vesta Holdings from May 2024 through January 2025 after Kulick periodically called to ask for short-term loans purportedly to cover expenses such as closing costs, fees to lock in interest rates, and earnest money. Kulick assured Loeffler the loans would be repaid in a matter of days. When Loeffler asked for repayment, Kulick claimed the business lacked sufficient funds—while simultaneously using company funds to pay personal obligations and acquiring two residences each costing approximately $1.5 million. Kulick's pattern of soliciting emergency capital from investors under false pretenses while diverting the proceeds to personal use constitutes a core component of the racketeering scheme that has injured Plaintiffs.

76. Upperman serves as a personal guarantor on 28 property-level loans. Due to Kulick's misconduct – including unauthorized second mortgages, diversion of rents, failure to make debt service payments, and actively interfering with the lenders' contractual remedies (including appealing or threatening to appeal receiver appointments at the property level) – multiple lenders have already called or threatened to call Upperman's guaranties, including: Eaton Place (Legacy Bank, $12,161,000 – full recourse triggered); 727 Lofts (Acre, $19,719,864 – guaranty called); Lofts at North Penn (CREO, $27,273,758 – sued personally); Village Creek (CREO, $12,223,041 – sued personally); OKC3 Bryan Hill (Oceanview, $11,798,946 – recourse notice); OKC3 Summer Oaks (Oceanview, $10,321,740 – recourse notice); OKC3 Springdale Village (Oceanview, $5,925,000 – recourse notice); Tuscany Village (Silver Hill Capital, LLC, $16,000,000 – recourse notice); Woodland Oaks and Fairfax (Saperean Capital, $60,800,000 – sued personally); and The Classen (Term Fund III MRA Seller, $15,409,883.23 – sued personally);

Barcelona (Fannie Mae, $13,132,000 – sued personally); Remington Ranch (Fannie Mae, $13,470,000 – sued personally); Woodscape (Fannie Mae, $33,800,000 – sued personally); Villas at Midtown (Fannie Mae, $24,868,000 – sued personally); Capitol on 28th (Fannie Mae, $21,408,000 – sued personally); Canopy (Fannie Mae, $13,565,000 – sued personally); One Eton Square (Fannie Mae, $35,027,000 – sued personally); and Copperfield (Fannie Mae, $17,641,000 – sued personally).

77. Upperman's current aggregate guaranty exposure across the portfolio, based on those guaranties that have already been called, exceeds $352 million, and could exceed $490 million if his other guaranties are triggered. Each triggering of guaranty liability constitutes a separate, direct injury to Upperman's business and property proximately caused by Kulick's racketeering activity.

**COUNT I**

**(Violation of RICO by Defendant Marc Kulick)**

**THE RICO ENTERPRISE**

78. The RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4) consists of two alternative theories, either of which independently satisfies the enterprise element.

**A. Legal Entity Enterprises**

79. Vesta Realty constitutes an enterprise – a legal entity – engaged in, and the activities of which affect, interstate commerce. Vesta Realty manages a portfolio of residential properties across Oklahoma, Kansas, Arkansas, and other states; collects rents through interstate bank wires and ACH transfers; communicates with investors across state lines by electronic mail and wire; and engages in interstate financial transactions involving lenders, investors, and vendors in multiple states.

80. Louis Investments constitutes a separate enterprise – a legal entity – engaged in, and the activities of which affect, interstate commerce. Louis Investments serves as the Manager of each property-level LLC and directs the receipt and disbursement of funds through interstate banking channels.

81. Vesta Holdings constitutes another separate enterprise – a legal entity – engaged in, and the activities of which affect, interstate commerce. On information and belief, Vesta Holdings was created by Kulick to replace Vesta Capital as the entity to raise capital, thereby denying Plaintiffs, and other investors, visibility into the enterprise's finances that would reveal fraudulent transactions and his use of Vesta Holdings as an instrumentality of his schemes. As noted above, Vesta Holdings was the enterprise Kulick used to take a $4 million loan from Marks and Nagy for which Judgement has been entered against Vesta Holdings and Marc Kulick.

82. Asset Holder is also a stand-alone enterprise corrupted by Kulick.

**B. Association-in-Fact Enterprise**

83. In the alternative, Vesta Realty, Vesta Holdings, Louis Investments, Asset Holder, and the Property Entities constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). This association-in-fact enterprise has: (a) a common purpose—to acquire, finance, manage, and operate multifamily residential properties for profit; (b) an ongoing organization—a vertically integrated management structure with Kulick at its apex, Vesta Realty as the operational hub, Louis Investments as the property-level manager, and the Property Entities as the asset-holding entities; and (c) relationships among the participants sufficient to permit them to function as a continuing unit.

84. The association-in-fact enterprise functioned as a continuing unit through which Kulick: raised investor capital through interstate solicitations; acquired properties using pooled

investor funds wired across state lines; managed properties through a centralized platform; collected rents through interstate banking networks; disbursed funds among dozens of accounts through interstate wire transfers; communicated with investors, lenders, and vendors through interstate wires and mails; and concealed the true financial condition of the enterprise from investors and lenders.

85. Kulick is a "person" distinct from the enterprise. Although Kulick controls Vesta Realty, Vesta Holdings, Louis Investments and Asset Holder, he is legally distinct from those entities and conducted their affairs through his pattern of racketeering activity. Kulick used the enterprise as a vehicle for his racketeering—the enterprise did not exist solely to commit the predicate acts but had a legitimate business purpose (property acquisition and management) that Kulick corrupted through his fraudulent conduct.

**PATTERN OF RACKETEERING ACTIVITY—PREDICATE ACTS**

86. Kulick committed at least two acts of racketeering activity within a ten-year period, as defined in 18 U.S.C. § 1961(1) and (5), constituting a pattern of racketeering activity. The predicate acts are related to one another through the common participants, common victims, common methods, and common purpose of the scheme, and posed a threat of continued criminal activity.

87. The predicate acts are not actionable as fraud in the purchase or sale of securities. Rather, the predicate acts involve the operational diversion of rents and entity funds, lender fraud, vendor-payment fraud, falsification of operating-entity books and records, unauthorized loan transactions, and misappropriation of property-level operating revenues—none of which arises in connection with the purchase or sale of a security within the meaning of the Private Securities Litigation Reform Act, 18 U.S.C. § 1964(c).

**A. Wire Fraud (18 U.S.C. § 1343)**

88. Kulick devised and participated in a scheme to defraud investors, lenders, and co-owners of money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing that scheme, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, and pictures. Specific instances of wire fraud include, but are not limited to:

a. Causing interstate wire transfers of investor capital contributions based on false representations that funds would be used for property operations, debt service, and capital improvements, when in fact funds were diverted to Kulick's personal expenses;

b. Causing interstate wire transfers from Vesta Realty and Vesta Holdings accounts to Kulick's personal bank accounts totaling at least $1.2 million in January-February 2025 alone;

c. Causing interstate wire transfers totaling $3.1 million to pay Kulick's personal American Express bills and automobile loans in January-February 2025;

d. Causing an interstate wire transfer of $1.3 million to pay Kulick's personal American Express bill in March 2025;

e. Causing interstate wire transfers in connection with the YSA borrowings of $7.338 million without authorization or disclosure;

f. Causing interstate wire transfers in connection with the fire-sale loan transfers of $13.4 million in loans for $3.4 million;

g. Transmitting false financial reports, investor communications, and account information by electronic mail across state lines to induce investors to refrain from exercising contractual remedies;

h. Causing interstate ACH transfers of rent revenues to accounts from which funds were diverted rather than applied to debt service and property operations;

i. Causing interstate wire transfers in connection with merchant cash advances at usurious rates, pledging future rent receivables without authorization;

j. Transmitting by interstate wire false assurances to lenders concerning the financial condition of borrower entities, including false representations regarding compliance with loan covenants.

k. Transmitting by email the false representation to investors with respect to the short term loans Kulick took with Diveroli loans that "all interest on those loans was, and remains my responsibility."

**B. Mail Fraud (18 U.S.C. § 1341)**

89. Kulick devised and participated in a scheme to defraud investors, lenders, and co-owners of money and property, and for the purpose of executing that scheme, placed and caused to be placed in authorized depositories for mail matter, and caused to be delivered by the United States Postal Service or private interstate carriers, letters, documents, and communications. Specific instances of mail fraud include, but are not limited to:

a. Mailing or causing to be mailed Private Placement Memoranda and investor solicitation materials containing materially false representations about the enterprise's financial controls, operational discipline, and use of investor funds;

b. Mailing or causing to be mailed K-1 tax forms, investor communications, and financial reports that concealed the true financial condition of the enterprise;

c. Mailing or causing to be mailed loan documents, including the CPSAs and second mortgages, in furtherance of the unauthorized borrowing scheme;

Case 4:26-cv-00383-SH Document 2 Filed in USDC ND/OK on 06/25/26 Page 44 of 59

d. Mailing or causing to be mailed responses to books-and-records demands that were knowingly false, incomplete, or designed to obstruct discovery of the fraud.

**C. Money Laundering (18 U.S.C. § 1956)**

90. Kulick devised and participated in a scheme to defraud investors, lenders, and co-owners of money and property, and for the purpose of executing that scheme, conducted financial transactions with the proceeds of such specified unlawful activity, as defined in 18 U.S.C. §1956(c)(7)(B)(iii). Specific instances of money laundering include, but are not limited to:

a. Causing interstate wire transfers of investor capital contributions based on false representations that funds would be used for property operations, debt service, and capital improvements, when in fact funds were diverted to Kulick's personal expenses;

b. Causing interstate wire transfers from Vesta Realty and Vesta Holdings accounts to Kulick's personal bank accounts totaling at least $1.2 million in January-February 2025 alone;

c. Causing interstate wire transfers totaling $3.1 million to pay Kulick's personal American Express bills and automobile loans in January-February 2025;

d. Causing an interstate wire transfer of $1.3 million to pay Kulick's personal American Express bill in March 2025.

e. Causing seven transfers of funds from Woodscape's bank account to Vesta Holdings; from December 1, 2025 to December 31, 2025; funds that were obtained from a capital call falsely promised to for required repairs to the Woodscape project.

**D. Pattern: Relatedness and Continuity**

91. The predicate acts are related because they share a common scheme: Kulick's exploitation of his managerial control over the enterprise to divert funds for personal use while concealing the diversions from investors and lenders. The acts are connected by common

participants (Kulick, Vesta Realty, Louis Investments), common victims (Upperman, other investors, lenders), common methods (interstate wire transfers, false representations, obstruction of access to books and records), and a common purpose (Kulick's personal enrichment at the expense of the enterprise and its stakeholders).

92. The pattern has both open-ended and closed-ended continuity. Closed-ended continuity exists because the predicate acts span a period from at least 2018 through the present – more than eight years – and involve a multitude of separate fraudulent transactions. Open-ended continuity exists because the scheme is ongoing: Kulick continues to control the enterprise's funds, continues to divert rents, continues to obstruct access to books and records, and continues to exploit state-law procedural mechanisms to avoid accountability.

**Violation of 18 U.S.C. § 1962(c) — Conduct of Enterprise Affairs Through a Pattern of Racketeering Activity**

93. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

94. At all relevant times, Kulick was a "person" within the meaning of 18 U.S.C. § 1961(3) who was employed by or associated with an enterprise engaged in, and the activities of which affect, interstate commerce.

95. Kulick conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

96. The enterprise – whether defined as Vesta Realty, Vesta Holdings, Louis Investments, Asset Holder, or the association-in-fact described above – is an entity or group of entities engaged in, and the activities of which affect, interstate commerce. The enterprise collects

rents, receives investor capital, services debt, communicates with investors and lenders, and transfers funds through interstate wire and mail.

97. Kulick's pattern of racketeering activity, as described in detail above, includes multiple acts of wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341) committed over a period of more than eight years and involving hundreds of millions of dollars in mismanaged and diverted funds.

98. As a direct and proximate result of Kulick's violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property, including: (a) loss of approximately $1.369 million in equity investments; (b) non-repayment of $2.525 million in loans; (c) triggering of personal guaranty liability exceeding $490 million in aggregate; (d) loss of distributions and promote fees; and (e) litigation costs imposed by Kulick's misconduct.

99. Plaintiffs' injuries were directly and proximately caused by the predicate acts of racketeering. But for Kulick's wire fraud, mail fraud and money laundering, including his diversion of entity funds, unauthorized borrowings, fire-sale loan transfers, and fraudulent concealment of the enterprise's true financial condition, Plaintiffs would not have suffered the losses described herein.

100. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold the damages they have sustained, together with costs of suit and reasonable attorneys' fees.

**COUNT II**

**(State Law Conversion Against All Defendants)**

101. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

102. Plaintiffs and the Property Entities had ownership of or the right to possess specific, identifiable funds—including investor capital contributions, rent revenues, loan proceeds, and distribution proceeds—that were held in designated entity accounts for the specific purposes of debt service, property operations, investor distributions, and capital improvements.

103. The Defendants wrongfully exercised dominion and control over those funds by diverting them to his personal American Express accounts, personal bank accounts, automobile loans, payments to personal associates (including Kane Kalas and Kandice Dawn Kochell), and other non-business purposes, without authorization and in derogation of Plaintiffs' and the entities' property rights.

104. As a direct and proximate result of the Defendants' conversion, Plaintiffs have suffered damages including loss of invested capital, non-payment of loans, loss of distributions, and triggering of guaranty liability, in an amount to be proven at trial.

**COUNT III**

**(State Law Breach of Fiduciary Duty Against All Defendants)**

105. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

106. The Defendants owed fiduciary duties to Plaintiffs and the Property Entities. The Vesta Realty Operating Agreement confirms that the Manager is liable for acts constituting bad faith, fraud, gross negligence, willful misconduct, or breach of fiduciary duty.

107. The Defendants breached their fiduciary duties by, inter alia: (a) self-dealing through diversion of entity funds to personal expenses; (b) commingling entity funds; (c) unauthorized borrowings at usurious rates; (d) unauthorized grants of liens on entity assets; (e) unauthorized fire-sale transfers of entity loans; (f) unauthorized equity dilutions; (g) failure to

maintain books and records; (h) failure to provide financial statements; (i) failure to pay vendors and maintain properties; (j) waste of enterprise assets; and (k) obstruction of investor information rights.

108. As a direct and proximate result of the Defendants' breaches of fiduciary duty, Plaintiffs have suffered damages in an amount to be proven at trial, but not less than the aggregate of their lost investments, unpaid loans, lost distributions, and guaranty exposure.

**COUNT IV**

**(State Law Accounting Against All Defendants)**

109. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

110. A fiduciary and confidential relationship exists between Defendants and Plaintiffs by virtue of Kulick's role as Manager and his control over all entity finances. The financial dealings among the parties are so complex—involving dozens of entities, property-level accounts, intercompany transfers, investor capital accounts, unauthorized debt, and "Ponzi-like" commingling—that Plaintiffs cannot determine their losses without a full accounting.

111. Kulick and the entity Defendants control the relevant books, accounts, and cash flows, and have obstructed Plaintiffs' access to the information necessary to calculate their damages.

112. Plaintiffs are entitled to a judicially supervised accounting of: all Vesta Realty, Vesta Holdings, Louis Investments, and property-level accounts; all investor capital accounts; all distributions; all property sales and refinancings; all intercompany transfers; all debt issuances and loan sales; all payments to or for Kulick; all payments to insiders; and all funds retained for 1031 exchanges or reinvestment.

**COUNT V**

**(State Law Constructive Trust Against All Defendants)**

113. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

114. Kulick obtained identifiable property and proceeds – including personal credit-card payments, cash transfers to personal accounts, automobile-loan payments, fire-sale loan proceeds, and withheld distributions – through fraud, breach of fiduciary duty, and conversion.

115. Equity requires that Kulick and the other Defendants be declared a constructive trustee of all funds and property traceable to misappropriated entity assets, investor distributions, loan proceeds, unauthorized debt proceeds, equity-sale proceeds, and property-sale proceeds, for the benefit of Plaintiffs and the Property Entities.

116. The funds and assets can be traced or should be traced through the accounting and receiver investigation sought herein.

**COUNT VI**

**(State Law Fraud Against All Defendants)**

117. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

118. At all relevant times, Kulick and the other Defendants owed contractual and fiduciary duties to Plaintiffs to implement and comply with adequate financial controls, to maintain segregated accounts for each entity, and to report financial information fully and accurately. Given those explicit obligations, which included the retention of an independent accountant/controller to prepare the enterprise's financial records and report its results, Plaintiffs reasonably relied on the

integrity and accuracy of the enterprise's financial reporting and Defendants' representations concerning the use of investor funds.

119. Kulick, on behalf of the entity Defendants, made materially false and misleading statements and omissions to Plaintiffs, including but not limited to: (a) false representations that investor capital contributions would be used for property operations, debt service, and capital improvements, when in fact funds were being diverted to Kulick's personal expenses, including personal American Express bills, automobile loans, cash transfers to personal accounts, and payments to personal associates; (b) false assurances that adequate financial controls were in place and that entity funds were properly segregated, when in fact Kulick was commingling funds across dozens of entities in a manner the forensic report characterized as exhibiting "Ponzi-like indicia"; (c) false representations that refinancings or short-term capital needs were for legitimate business purposes, when in fact Kulick was using the proceeds to conceal prior diversions and fund his personal lifestyle; (d) concealment of unauthorized borrowings at usurious rates from YSA and other lenders; (e) concealment of unauthorized grants of liens and second mortgages on portfolio properties; (f) concealment of fire-sale transfers of approximately $13.4 million in enterprise loans for approximately $3.4 million; (g) transmission of false or misleading investor communications, financial reports, and K-1 forms that concealed the true financial condition of the enterprise; and (h) false assurances of compliance with the Manager's Memorandum and operating agreement requirements.

120. Kulick knew that his representations were false and misleading when made, or made them with reckless disregard for their truth or falsity. Kulick had actual knowledge that he was diverting entity funds to personal expenses, that financial controls had not been implemented as represented, that entity accounts were not properly segregated, and that the enterprise's financial

Case 4:26-cv-00383-SH Document 2 Filed in USDC ND/OK on 06/25/26

condition was materially worse than disclosed to investors. The forensic evidence, including $3.1 million in payments of Kulick's personal American Express bills and automobile loans in a single two-month period, $1.2 million in cash transfers to personal bank accounts, and account activity "highly correlated with classic Ponzi-like schemes," demonstrates that Kulick's simultaneous assurances to investors were knowingly false.

121. Kulick made the foregoing false representations and omissions with the intent to deceive Plaintiffs and to induce them to: (a) continue investing capital in the enterprise; (b) refrain from exercising contractual remedies, including removal of Kulick as Manager; (c) remain exposed on personal guaranties; (d) extend additional loans to enterprise entities; and (e) permit Kulick to continue managing the properties and controlling the enterprise's funds without interference.

122. Plaintiffs reasonably relied to their detriment on Kulick's materially false and misleading statements and omissions. Specifically, in reliance on Kulick's representations, Plaintiffs continued to invest approximately $1,369,488 in capital across multiple Vesta deals, extended approximately $2,525,000 in loans to Vesta-affiliated entities, remained exposed as personal guarantors on 28 property-level loans exceeding $490 million in the aggregate, refrained from exercising contractual remedies during the period of concealment, and permitted Kulick to continue managing the properties. Plaintiffs' reliance was reasonable given Kulick's fiduciary position, his control over all books and records, and the presence of an independent controller whose oversight was designed to prevent the very misconduct now alleged.

123. As a direct and proximate result of Kulick's fraud, Plaintiffs have suffered damages including, but not limited to: (a) loss of approximately $1,369,488 in equity investments; (b) non-repayment of approximately $2,525,000 in outstanding loans; (c) triggering of personal guaranty

liability on loans exceeding $490 million in aggregate; (d) loss of distributions and promote fees; and (e) litigation costs imposed by Kulick's misconduct, in an amount to be proven at trial. Kulick, Vesta Realty, and Louis Investments are jointly and severally liable for all such damages, together with punitive damages warranted by Kulick's intentional, malicious, and egregious conduct.

**COUNT VII**

**(State Law Fraudulent Inducement Against All Defendants)**

124. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

125. Prior to and at the time Plaintiffs made their equity investments, extended loans, and executed personal guaranties in connection with the Vesta enterprise, Kulick, on behalf of the entity Defendants, made material misrepresentations and failed to disclose material facts for the purpose of inducing Plaintiffs to enter into those transactions. Specifically, Kulick represented to Plaintiffs that: (a) investor capital would be used exclusively for property acquisitions, operations, debt service, and capital improvements; (b) each property-level entity maintained separate, segregated bank accounts and financial controls; (c) Vesta Realty employed an independent controller to ensure compliance with the Manager's Memorandum and fiduciary obligations; (d) the enterprise maintained strong operational discipline, in-house property management, and a strong lending network; and (e) the enterprise was generating adequate cash flow to service its debt and provide returns to investors.

126. Each of the foregoing representations was materially false when made. At the time Kulick induced Plaintiffs to invest capital, extend loans, and execute guaranties, Kulick was already diverting entity funds for personal use, commingling funds across entities, failing to maintain segregated accounts, failing to implement the financial controls required by the

Manager's Memorandum, and concealing the enterprise's deteriorating financial condition. The independent controller either failed to recognize or was prevented from reporting Kulick's ongoing misconduct, and Kulick subsequently fired the controller: the very person whose oversight was supposed to prevent the fraud.

127. Kulick knew that his representations were false and intended them to induce Plaintiffs to invest additional capital, extend loans, execute guaranties, and refrain from exercising contractual remedies. Kulick concealed from Plaintiffs that the enterprise's cash flow shortages were the result of his own diversions and mismanagement, and affirmatively misrepresented that funds were needed to cover legitimate short-term needs such as closing costs, fees to lock in interest rates, and earnest money. Kulick promised that loans would be repaid within a matter of days. These representations were false when made and were intended to prevent Plaintiffs from discovering the full scope of Kulick's misconduct and from exercising contractual remedies, including removal.

128. In reliance on Kulick's false representations and material omissions, Plaintiffs were induced to: (a) make equity investments totaling approximately $1,369,488 across multiple Vesta deals through their controlled entities; (b) extend loans totaling approximately $2,525,000 to Vesta-affiliated entities; (c) execute personal guaranties on 28 property-level loans with aggregate exposure exceeding $490 million; and (d) refrain from exercising contractual removal and termination rights that would have stopped Kulick's scheme at an earlier stage, when losses could have been mitigated. But for Kulick's fraudulent inducement, Plaintiffs would not have entered into these transactions or remained exposed to the resulting liabilities.

129. Plaintiffs' reliance was reasonable. Kulick occupied a position of trust and confidence as the sole Manager of the enterprise, with exclusive control over all books, records,

bank accounts, financial reporting, and investor communications. Plaintiffs had no independent means of verifying Kulick's representations, particularly after Kulick restricted access to financial records, terminated accounting personnel, and met information requests with hostility, deflection, and obstruction. The presence of an independent controller further reinforced Plaintiffs' reasonable belief that appropriate oversight was being exercised.

130. As a direct and proximate result of Kulick's fraudulent inducement, Plaintiffs have suffered damages including, but not limited to: (a) loss of approximately $1,369,488 in equity investments that Plaintiffs would not have made but for the fraud; (b) non-repayment of approximately $2,525,000 in loans that Plaintiffs would not have extended but for the fraud; (c) triggering of personal guaranty liability on loans exceeding $490 million in the aggregate that Plaintiffs would not have guaranteed but for the fraud; (d) loss of distributions and promote fees; and (e) litigation costs imposed by Kulick's misconduct, in an amount to be proven at trial. Kulick, Vesta Realty, and Louis Investments are jointly and severally liable for all such damages, together with punitive damages warranted by Kulick's intentional and egregious conduct.

**COUNT VIII**

**Appointment of Federal Equity Receiver**

131. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

132. Plaintiffs are entitled to the appointment of a federal equity receiver over Vesta Realty, Vesta Holdings, Louis Investments, Asset Holder and the Property Entities (collectively, the "Receivership Entities") pursuant to Federal Rule of Civil Procedure 66 and this Court's inherent equitable powers.

133. The appointment of a receiver is warranted because: (a) Plaintiffs have demonstrated a valid claim and a probability of success on the merits; (b) Kulick has engaged in ongoing fraud and mismanagement; (c) the portfolio assets are in imminent danger of further loss, waste, dissipation, and diminution in value; (d) legal remedies are inadequate because Kulick controls all books, accounts, and management platforms; (e) the balance of harms overwhelmingly favors receivership; and (f) less drastic remedies, including the Manager's Memorandum, independent controller, and state-court receivership proceedings, have all proven inadequate.

134. Kulick has systematically exploited state-law procedural mechanisms in Oklahoma (12 Okl. St. § 993(C)) to bond over and suspend court-ordered property-level receiverships, maintaining control of rental income during appeals while continuing to divert funds. A federal receivership, governed by Federal Rule 66, would not be subject to these state-law circumvention mechanisms and would provide immediate, enterprise-wide relief.

135. Kulick and the Property Entities are receiving over $4 million a month in rent across the entire portfolio while failing in almost every case (with the exception of the handful of properties for which the lenders have taken control of inbound rents through a lockbox arrangement) to make debt service payments. Many of the lenders, including Fannie Mae, have complained that they have not received debt service payments in months. A receiver is needed to ensure that inbound rents are being appropriately utilized for necessary property-level expenses (including utilities, maintenance, and insurance) and debt service.

136. The receiver should be empowered to: (a) take control of all books, records, bank accounts, accounting systems, and property-management operations; (b) collect rents and revenues; (c) pay necessary operating expenses including debt service and utilities; (d) preserve, maintain, and where appropriate improve properties; (e) investigate intercompany transfers and

trace diverted funds; (f) employ professionals; (g) communicate with lenders, vendors, investors, and regulators; (h) market and sell portfolio properties in value-maximizing transactions; (i) defend or resolve pending foreclosure actions; (j) report to this Court; and (k) seek further authority as needed.

137. Concurrently with this Complaint, a motion has been filed with this Court seeking appointment of a federal equity receiver on an expedited basis, consistent with this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment in their favor and against Defendants, and grant the following relief:

A. On Count I (RICO), award Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit and reasonable attorneys' fees;

B. On Count II (Conversion), award Plaintiffs compensatory damages in an amount to be proven at trial;

C. On Count III (Breach of Fiduciary Duty), award Plaintiffs compensatory and, where applicable, punitive damages in an amount to be proven at trial;

D. On Count IV (Accounting), order a full and complete accounting of all funds received, held, transferred, or disbursed by Defendants and all entities within the enterprise;

E. On Count V (Constructive Trust), impose a constructive trust on all funds and property traceable to Defendants' wrongful conduct for the benefit of Plaintiffs and the Property Entities;

F. On Count VI (Fraud), award Plaintiffs compensatory and punitive damages in an amount to be proven at trial;

G. On Count VII (Fraudulent Inducement), award Plaintiffs compensatory and punitive damages, including rescissory damages, in an amount to be proven at trial;

H. On Count VIII, and pursuant to the Motion for Appointment of Receiver being filed concurrently herewith, immediately appoint a neutral federal equity receiver over Vesta Realty, Vesta Holdings, Louis Investments, Asset Holder, and the Property Entities, with full powers to take control of operations, preserve assets, investigate transactions, employ professionals, and pursue value-maximizing dispositions;

I. Enter an injunction prohibiting Kulick from: (i) transferring, encumbering, or dissipating any assets of the enterprise; (ii) destroying, altering, or concealing books and records; (iii) acting in any managerial capacity with respect to any entity within the enterprise; or (iv) communicating with investors, lenders, or vendors on behalf of the enterprise;

J. Award Plaintiffs prejudgment and post judgment interest at the maximum rate allowed by law;

K. Award Plaintiffs their reasonable costs of suit and attorneys' fees to the extent permitted by statute, contract, or equity; and

L. Grant such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

DATED: June 25, 2026

Respectfully submitted,

/s/Stephen Q. Peters
Stephen Q. Peters, OBA #11469
Jason A. McVicker, OBA #31150
Thomas M. Askew, OBA #13568
Sharon K. Parker, OBA #19010
**JPM LAW** | JAYNE PETERS MCVICKER
BURKE ASKEW & PARKER
401 S. Boston Avenue, Suite 2000
Tulsa, Oklahoma 74103
Telephone: 918/938.7944
Facsimile: 918/938.7966
speters@jpmlawgroup.com
jmcvicker@jpmlawgroup.com
taskew@jpmlawgroup.com

sparker@jpmlawgroup.com

and

Marc R. Greenberg (*pro hac vice* pending)
TUCKER ELLIS LLP
515 South Flower Street, 42nd Floor
Los Angeles, CA 90071-2223
Phone: 213-430-3400
Fax: 213-430-3409
E-mail: marc.greenberg@tuckerellis.com

and

Thomas R. Fawkes (*pro hac vice* pending)
TUCKER ELLIS LLP
233 S. Wacker Dr., Suite 6950
Chicago, IL 60606
Phone: 312-624-6300
Fax: 312-624-6309
E-mail: thomas.fawkes@tuckerellis.com

**ATTORNEYS FOR JOHN ALEX UPPERMAN, ILLINI HOLDINGS, LLC; THRIVE REALESTATE, LLC; WILDWOOD ASSETS, LLC; TU PROPERTIES, LLC;OAK STREET CAPITAL, LLC; and 12 OAK LENDING, LLC**

## VERIFICATION

I, John Alex Upperman, the above-named Plaintiff, hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on June 24, 2026.

John Alex Upperman

# EXHIBIT 12

**UNITED STAES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1. FEDERAL NATIONAL MORTGAGE ASSOCIATION | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| 1. MARC KULICK | ) | |
| 2. JOHN ALEXANDER UPPERMAN | ) | |
| 3. IRA MONDRY | ) | |
| 4. KEVIN D. MOORE | ) | |
| 5. VESTA REALTY, LLC | ) | |
| Defendants. | ) | |

**COMPLAINT**

**COMES NOW** Plaintiff Federal National Mortgage Association ("Fannie Mae"), by and through its counsel of record, McAfee & Taft, a Professional Corporation, and for its Complaint against Defendants Marc Kulick, John Alexander Upperman, Ira Mondry, Kevin D. Moore, and Vesta Realty, LLC, states, alleges and avers as follows:

**Parties**

1. Plaintiff Fannie Mae is a government-sponsored enterprise and a federally chartered entity that Congress created to enhance the nation's housing-finance market. Under its federal statutory charter, Fannie Mae has a public mission to provide liquidity, stability, and affordability to the U.S. housing market, including the market for quality, affordable rental house. Fannie Mae is operating under the conservatorship of the Federal Housing Finance Agency ("FHFA"), which is an independent agency of the United States created in 2008 to supervise certain

Government Sponsored Enterprises including Fannie Mae. *See* 12 U.S.C. § 4511 et seq. Among other powers Congress granted the Director of FHFA the authority to place Fannie Mae into conservatorship under certain, statutorily defined conditions, which the Director did in 2008. As Conservator, FHFA has broad statutory powers, including the powers to preserve and conserve Fannie Mae's assets and property, and to collect obligations due Fannie Mae. FHFA's ability to exercise its statutory powers and functions as Conservator is protected by federal law. *See, e.g.,* 12 U.S.C. § 4617(f). For diversity purposes, Fannie Mae is a citizen of Washington, D.C.

2. Defendant Marc Kulick is a resident of Johnson County, Kansas, and can be served at 6500 W. 110th Street, Suite 201, Overland Park, Kansas 66211.

3. Defendant John Alexander Upperman is a resident of Jackson County, Missouri, and can be served at 511 Oak Street, Kansas City, MO 64106.

4. Defendant Ira Mondry is a resident of Oakland County, Michigan, and can be served at 187 South Old Woodward Avenue, Suite 200, Birmingham, Michigan 48009.

5. Defendant Kevin D. Moore is a resident of Boulder County, Colorado, and can be served at 510 30th Street, #7522, Boulder, Colorado 80310.

6. Defendant Vesta Realty LLC is a Kansas limited liability company with a principal place of business in Tulsa, Oklahoma, and, upon information and belief, none of its members are residents of Washington D.C.

7. Collectively, Kulick, Upperman, Mondry, and Moore are referred to as the "Guarantor Defendants."

## Jurisdiction and Venue

8. Pursuant to 28 U.S.C. § 1332, jurisdiction is proper in this Court because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and it is

between citizens of different States.

9. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial portion of the events giving rise to the claim occurred in—and several of the mortgaged properties are located in—the Western District of Oklahoma.

**Factual Background**

10. This action relates to nine Loan Agreements Fannie Mae entered into for multi-family apartment complexes located in Oklahoma:

a. Remington Ranch Apartments, located at 1815 North Boomer Road, Stillwater, OK 74075;

b. The Capitol on 28th Apartments, located at 215 Northeast 28th Street, Oklahoma City, OK 73105;

c. Woodscape Apartments, located at 4200 North Meridian Avenue, Oklahoma City, OK 73112;

d. Copperfield Apartments, located at 2400 NW 30th Street, Oklahoma City, Ok 73112;

e. One Eton Square Apartments, located at 8111 East 60th Street, Tulsa, OK 74145;

f. Villas at Midtown Apartments, located at 2001 East Skelly Drive, Tulsa, OK 74105;

g. Barcelona Apartments, located at 5160 South Yale Avenue, Tulsa, OK 74135;

h. Canopy Apartments, located at 9201 Kanis Road, Little Rock, AR 72205; and

i. Lexington Commons Apartments, located at 5530 Colony Way, Bartlesville, OK 74006.

Collectively, Remington Ranch Apartments, The Capitol on 28th, Woodscape Apartments, Copperfield Apartments, One Eton Square, Villas at Midtown, Barcelona Apartments, Canopy Apartments, and Lexington Commons Apartments are referred to herein as "The Apartment Complexes."

11. Each of the Apartment Complexes is owned by an LLC that is a special purpose entity, or SPE, meaning that each LLC's only tangible asset is the apartment complex it owns and each LLC's only business asset is the operation of that apartment complex.

12. Defendant Marc Kulick is an owner in each of the SPEs that own the Apartment Complexes. He is designated in all of the relevant loan documents as the "Key Principal" for each of the Apartment Complexes, and he is a guarantor on each of the loans except the Lexington Commons loan.

13. Mr. Kulick is also the founder and Chief Executive Officer of Vesta Realty, an Oklahoma-based multifamily real estate investment firm. Vesta Realty is, by contract, the property manager for each of the Apartment Complexes. Thus, as a practical matter, Mr. Kulick and Vesta Realty control the operation of the Apartment Complexes, including, *inter alia*, their use of the rent money they receive from tenants.

14. Fannie Mae entered into nine separate loan agreements for the SPEs to purchase the Apartment complexes. In total, Fannie Mae loaned Mr. Kulick and his entities more than $187 million.

15. Defendants Upperman, Mondry, and Moore are each guarantors on some of the loans. The following chart indicates which guarantors guaranteed which loans:

| Borrowing Entity | Kulick | Upperman | Mondry | Moore |
|---|---|---|---|---|
| Barcelona | Yes | Yes | No | Yes |
| Woodscape | Yes | Yes | No | No |
| Villas at Midtown | Yes | Yes | Yes | No |
| Capitol on 28th | Yes | Yes | No | No |
| Canopy | Yes | Yes | No | No |
| Remington Ranch | Yes | Yes | No | No |
| One Eton | Yes | Yes | No | No |
| Copperfield | Yes | Yes | No | No |
| Lexington Commons | No | No | No | No |

16. The Loans are non-recourse, meaning that in a normal event of default, Fannie Mae's primary remedy is against the collateral. However, under the Loan Agreements, there are certain acts that the SPE Borrowers can take that trigger additional liability. And because the guaranties obligate the Guarantor Defendants to the full extent of the respective SPE Borrowers' liabilities, those same acts create liability for the Guarantor Defendants.

17. Among the acts that can trigger personal liability under the guaranties are:

a. Failure to pay as directed by Lender upon demand after an Event of Default all Rents to which Lender is entitled under the Loan Documents; and the amount of all security deposits then held or thereafter collected by Borrower from tenants and not properly applied pursuant to the applicable Leases;

b. Failure to maintain all insurance policies required by the Loan Documents;

c. Failure to apply all insurance proceeds received by Borrower;

d. Failure to apply Rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts; and

e. Waste or abandonment of the Mortgaged Property.

**Defaults and Triggering of Personal Liability**

18. All of the loans are in payment default. Each of the loan agreements requires the SPE Borrowers to make monthly payments to Fannie Mae. While some entities have made payments more recently than others, none of them has made any monthly mortgage payments to Fannie Mae that are attributable to the calendar year 2026. And because the loans are still in their "interest only" period, Fannie Mae is still owed the full unpaid principal balance of more than $187 million (in addition to accruing interest).

19. Under the Mortgages for the Apartment Complexes, the SPE Borrowers are given a revocable license to collect rents, but are required to "to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the Monthly Debt Service Payments and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property."

20. Furthermore, the Loan Agreements require that when there is a default, the SPE Borrowers' revocable license to collect rents is terminated, and rents must be assigned directly to Fannie Mae. The Borrowers were notified of the termination of their right to collect rents and directed to pay the proceeds to Fannie Mae.

21. Vesta Realty, as the property manager for each of the Borrowers, is (according to the most recent rent rolls prepared by Vesta Realty and submitted to Fannie Mae) collecting more than $1.9 million a month in rents for the 9 Apartment Complexes. Not one dollar in rent has been assigned to Fannie Mae.

Case 4:26-cv-01405-HE Document 1 Filed 07/17/26 Page 9 of 22

22. What's more, it does not appear that the monies collected in rents are being spent on the Apartment Complexes.

23. Indeed, occupancy at each of the Apartment Complexes is dropping rapidly. The rent rolls for the Apartment Complexes indicate that this drop is almost entirely (if not entirely) attributable to one fact: When tenants move out, the units those tenants occupied aren't being "turned over" to be ready for new tenants to move in.

24. Apartments not being "turned" for new tenants are described in the rent rolls prepared by Vesta Realty as units that are "Vacant Unrented Not Ready." The March 2026 rent rolls for the properties—which, again, are prepared by Vesta Realty and submitted to Fannie Mae—show the following information regarding the proportion of units that have the "Vacant Unrented Not Ready" designation:

| **Property** | **Percent of Units Vacant Unrented Not Ready** |
|---|---|
| Villas at Midtown | 38.32%. |
| Remington Ranch | 33.79% |
| Woodscape | 27.99% |
| One Eton Square | 27.63% |
| Canopy | 26.47% |
| Capitol on 28th | 15.15% |
| Barcelona | 13.54% |
| Copperfield | 9.92% |
| Lexington Commons | 9.27% |

25. The rent money collected is also not being paid to contractors who do work on the properties, as each of the properties has at least one (most have several) mechanics and materialmen's liens filed against them.

26. The rent money is also not being used to pay for property insurance. In February 2026, the insurance for all 9 Apartment Complexes was set to lapse, and Fannie Mae had to force place policies to ensure the Apartment Complexes have continuous coverage.

27. The rent money is also not being used to pay taxes on the property. Under the loan documents, the SPE Borrowers are required to pay property taxes. They have not done so, and Fannie Mae has had to come out-of-pocket to pay property taxes as to each of the properties.

28. In addition to all this, there was a sizable property insurance claim made as to the One Eton Square Apartments in early 2025. Upon information and belief, Vesta Realty, as property manager for One Eton Square Apartments, collected more than $500,000 in connection with this insurance claim and diverted those funds as well. As noted above, failure to apply insurance policies is a basis for personal liability under the guaranties. It is also a breach under the loan agreements, which require assignment of insurance proceeds to Fannie Mae.

29. Fannie Mae submits that all this paints a clear picture as to what is going on. Kulick and his company Vesta Realty are (according to the rent rolls prepared by Vesta Realty and submitted to Fannie Mae) collecting almost $2 million in rents every month. That money is not being used to maintain the property, make repairs, protect the tenants, or pay off liens (among other items) but presumably is being diverted for undisclosed purposes.[1]

---

[1] Fannie Mae does not have access to the Borrowers' financials. However, there is significant evidence in the public record of allegations that Mr. Kulick is, at a minimum, mismanaging significant amounts of funds. He and Vesta Realty are currently defending more than 15 lawsuits that, in the aggregate, allege he owes the various plaintiffs more than $100 million (in addition to what is owed to Fannie Mae). A forensic accounting filed in one suit, in Delaware, notes that, in

30. Upon information and belief, at least some of the rent money received is being taken by Kulick personally and/or being used to fund his personal obligations.

**COUNT I – BREACH OF GUARANTY AGREEMENTS**
**(Guarantor Defendants)**

31. Fannie Mae incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

***Remington Ranch Apartment Loan***

32. Fannie Mae's loan to the borrower, is evidenced by a Multifamily Note dated April 29, 2024, in the original principal amount of $13,470,000.00.

33. Mr. Kulick and Mr. Upperman personally guaranteed the Remington Ranch Loan.

34. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

35. Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

36. The borrower defaulted by failing to pay required debt service in January 2026.

37. The borrower further defaulted by failing to maintain the property, including failing to provide heat and hot water and allowing unsafe conditions to persist.

38. The borrower was also subject to municipal nuisance findings and failed to comply with required repairs and notices.

---

certain months, he was paying more than $1 million a month in personal expenses using money from Vesta Realty's bank accounts. Mr. Kulick is also featured in online videos gambling hands of poker worth more than $500,000.



Fannie Mae Confidential

39. The unpaid indebtedness includes $13,470,000.00 plus accrued interest, default interest, and contractual charges.

40. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters, the failure to repair and maintain the property, and allowing unsafe conditions at the property to persist, all of which have contributed to a decline in the occupancy of the property).

41. Fannie Mae is the owner and holder of the Guaranty.

***Capitol on 28th Loan***

42. The Capitol on 28th Loan is evidenced by a Multifamily Note dated February 15, 2024, in the original principal amount of $21,408,000.00.

43. Mr. Kulick and Mr. Upperman personally guaranteed the loan.

44. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

45. Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

46. The borrower defaulted by failing to make required debt service payments during late 2025 and early 2026.

47. The borrower also failed to provide notice of extensive litigation involving key principals and permitted unauthorized liens and a second mortgage.

48. The unpaid indebtedness includes $21,408,000.00 in principal together with accrued and default interest.

49. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

50. Fannie Mae is the owner and holder of the Guaranty.

***Woodscape Apartments Loan***

51. The Woodscape loan is evidenced by a Multifamily Note dated April 21, 2023, in the original principal amount of $33,800,000.00.

52. Mr. Kulick and Mr. Upperman personally guaranteed the loan.

53. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

54. Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

55. The borrower defaulted by failing to make debt service payments from October 2025 through February 2026.

56. The borrower further defaulted by failing to provide notice of litigation involving key principals.

57. The borrower also permitted unauthorized liens and a second mortgage while failing to complete required life-safety repairs identified in a Property Condition Assessment demand.

58. Fannie Mae accelerated the loan on January 9, 2026, and the unpaid balance includes $33,800,000.00 in principal plus interest and charges.

59. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters, the failure to repair and maintain the property, and allowing unsafe conditions to persist, all of which have contributed to a decline in the occupancy of the property).

60. Fannie Mae is the owner and holder of the Guaranty.

***Copperfield Apartments Loan***

61. The Copperfield loan transaction is evidenced by a Multifamily Note dated July 14, 2023, in the original principal amount of $17,641,000.00.

62. The Copperfield Loan is further governed by a corresponding Multifamily Loan and Security Agreement and secured by a Multifamily Mortgage encumbering the Copperfield Property.

63. The Note incorporates the terms of the Loan Agreement and provides that, upon an Event of Default, the entire unpaid balance may be accelerated and become immediately due and payable.

64. Mr. Kulick and Mr. Upperman personally guaranteed the loan.

65. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

66. Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

67. The borrower defaulted by failing to make required monthly debt service payments in February and March 2026.

68. The borrower further defaulted by failing to provide required notice of multiple lawsuits involving key principals as required by the Loan Agreement.

69. The borrower also defaulted by allowing unpermitted liens and a second mortgage to encumber the property without timely notice to the lender.

70. Fannie Mae provided written notice of default and accelerated the indebtedness on January 9, 2026. The outstanding indebtedness includes the unpaid principal balance of $17,641,000.00, together with accrued interest, default interest, fees, and continuing contractual charges.

71. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt

Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

72. Fannie Mae is the owner and holder of the Guaranty.

***One Eton Square Loan***

73. The One Eton Square loan is evidenced by a Multifamily Note dated September 21, 2022, in the original principal amount of $35,027,000.00.

74. The Note is governed by a Loan Agreement and secured by a Mortgage encumbering the One Eton Square Property.

75. Mr. Kulick and Mr. Upperman personally guaranteed the loan.

76. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

77. Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

78. The borrower defaulted by failing to make required debt service payments from November 2025 through February 2026.

79. The borrower further defaulted by failing to maintain and repair the property following a fire loss.

80. The borrower also defaulted by failing to comply with municipal safety requirements and abatement orders.

81. The borrower additionally failed to provide required notice of litigation involving key principals.



Fannie Mae Confidential

82. Fannie Mae accelerated the loan by written notice on December 23, 2025.

83. The unpaid indebtedness includes the principal amount of $35,027,000.00 plus accrued interest, default interest, and contractual charges.

84. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, failure to apply all insurance proceeds received by Borrower, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters, the failure to repair and maintain the property, allowing unsafe conditions at the property to persist, and causing insurance proceeds to not be directed to repairs at the property, all of which have contributed to a decline in the occupancy of the property).

85. Fannie Mae is the owner and holder of the Guaranty.

***Villas at Midtown Loan***

86. The Villas loan is evidenced by a Multifamily Note dated February 14, 2023, in the original principal amount of $24,868,000.00.

87. Mr. Kulick, Mr. Upperman, and Mr. Mondry personally guaranteed the loan.

88. By executing a guaranty agreement in connection with the loans, Mr. Kulick, Mr. Upperman, and Mr. Mondry each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

89. Fannie Mae relied on the Guaranty of Mr. Kulick, Mr. Upperman, and Mr. Mondry in extending credit to borrower.



Fannie Mae Confidential

90. The borrower defaulted by failing to make multiple required debt service payments during 2025 and 2026.

91. The borrower further defaulted by allowing unauthorized liens and additional mortgages to encumber the property.

92. The borrower also failed to comply with municipal violations and to complete required repairs.

93. The unpaid indebtedness includes $24,868,000.00 in principal plus accrued and default interest and other contractual amounts.

94. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

95. Fannie Mae is the owner and holder of the Guaranty.

***Barcelona Apartments Loan***

96. The Barcelona loan is evidenced by a Multifamily Note dated May 28, 2021, in the original principal amount of $13,132,000.00.

97. Mr. Kulick, Mr. Upperman, and Mr. Moore personally guaranteed the loan.

98. By executing a guaranty agreement in connection with the loans, Mr. Kulick, Mr. Upperman, and Mr. Moore agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

99. Fannie Mae relied on the Guaranty of Mr. Kulick, Mr. Upperman, and Mr. Moore in extending credit to borrower.

100. The borrower defaulted by failing to pay required debt service in February 2026.

101. The borrower further failed to disclose litigation involving key principals and allowed unauthorized liens and a second mortgage.

102. The unpaid indebtedness includes $13,132,000.00 plus accrued interest, default interest, and fees.

103. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such have harmed Fannie Mae and triggering events include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

104. Fannie Mae is the owner and holder of the Guaranty.

***Canopy Apartments***

105. The Canopy Loan is evidenced by a Multifamily Note dated December 14, 2020, in the original principal amount of $13,565,000.00.

106. Mr. Kulick and Mr. Upperman personally guaranteed the loan.

107. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

108. Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

109. The borrower defaulted by failing to make required debt service payments during late 2025 and early 2026.

110. The borrower also failed to provide notice of extensive litigation involving key principals and permitted unauthorized liens and a second mortgage.

111. The unpaid indebtedness includes $13,565,000.00 in principal together with accrued and default interest.

112. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

113. Fannie Mae is the owner and holder of the Guaranty.

**COUNT II – TORTIOUS INTERFERENCE**
**(Vesta Realty and Marc Kulick)**

114. Fannie Mae realleges and incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

115. Vesta Realty is, by contract with the Borrowers, the property manager for each of the Apartment Complexes. It handles, *inter alia*, all of Borrowers' finances, and it directs how they use all monies they receive.

Case 3:26-cv-01400-E Document 1 Filed 06/12/26 Page 19 of 22

116. On December 23, 2025 for the Remington Ranch Loan and on January 9, 2026 for the remaining eight loans, Fannie Mae delivered to the Borrowers, Key Principals, Guarantors, and Vesta Realty for each of the loans on the Apartment Complexes a Notice of Acceleration (the "Notices"). Each of the Notices included a paragraph stating:

> UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER IN FAVOR OF FANNIE MAE, BORROWER'S LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID. UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED AFTER THE OCCURRENCE OF THE EVENT OF DEFAULT SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE. UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN CONNECTION WITH THE OPERATION OF THE PROPERTY WITH EXCESS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

117. Since that time, Borrowers have had a contractual obligation to assign all rents they receive to Fannie Mae. They also have an obligation to assign insurance proceeds they receive.

118. Vesta Realty and Mr. Kulick are causing Borrowers to breach those contractual obligations.

119. Specifically, Vesta Realty, as the property manager for each of the Borrowers, and its CEO, Mr. Kulick have, since the date of the Notices—according to the rent rolls they prepared—continued to collect more than $1.9 million each month in rents for the 9 Apartment Complexes. Not one dollar in rent has been assigned to Fannie Mae.

120. The rents and insurance money received by Vesta Realty and Mr. Kulick have not been applied solely to bona fide current operating expenses to third parties in connection with the operation of the Apartment Complexes. Based on the information available, it appears the rents



Fannie Mae Confidential

and insurance money have been improperly diverted to serve Vesta Realty's and Mr. Kulick's separate interests, contrary to the interests of the SPE Borrower's.

121. Vesta Realty and Mr. Kulick knew of the various loan agreements entered into by Fannie Mae and the Borrowers. Indeed, Mr. Kulick, Vesta Realty's CEO, signed all of the loan agreements on behalf of the Borrowers.

122. Vesta Realty and Mr. Kulick intentionally, wrongfully, and maliciously interfered with Fannie Mae's loan agreements with the Borrowers by facilitating, encouraging, or assisting the Borrowers' continued acceptance of rents at the Apartment Complexes and the Borrowers' failure to deliver such to Fannie Mae.

123. Vesta Realty's and Mr. Kulick's malicious interference with Fannie Mae's loan agreements was not justified, privileged, or excusable.

124. The acts of Vesta Realty and Mr. Kulick described above were in their own interests and contrary to the interests of the SPE Borrowers. They were not in good faith.

125. As a direct and proximate result of Vesta Realty's and Mr. Kulick's tortious interference with Fannie Mae's loan agreements, Fannie Mae has suffered, and continues to suffer, damages in an amount in excess of $75,000, to be determined at trial.

126. Vesta Realty and Mr. Kulick have acted with reckless disregard for the rights of Fannie Mae such that it should be subjected to an award of punitive damages in an amount to be determined at trial.

## COUNT III: CONSTRUCTIVE TRUST
## (Vesta Realty and Marc Kulick)

127. In the alternative, as a result of the foregoing conduct, Vesta Realty and Mr. Kulick have been unjustly enriched in an amount to be proven at trial, including the full amount of rents received at each of the Apartment Complexes since the date each of the Notices were submitted.

128. It would be inequitable for Vesta Realty and Mr. Kulick to retain these benefits without restoring to Fannie Mae the value of the rents Vesta Realty wrongfully accepted and retained following the termination of the Borrowers' licenses to collect rents.

129. Fannie Mae seeks the imposition of a constructive trust over all amounts wrongfully retained by Vesta Realty and Mr. Kulick, together with pre- and post- judgment interest and attorneys' fees.

**COUNT IV: UNJUST ENRICHMENT**
**(Vesta Realty and Marc Kulick)**

130. In the alternative, as a result of the foregoing conduct, Vesta Realty and Mr. Kulick have been unjustly enriched in an amount to be proven at trial, including the full amount of rents received at each of the Apartment Complexes since the date each of the Notices were submitted.

131. Justice and equity require that Vesta Realty and Mr. Kulick return to Fannie Mae the value of the rents Vesta Realty wrongfully accepted and retained following the termination of the Borrowers' licenses to collect rents.

**COUNT V: MONEY HAD AND RECEIVED**
**(Vesta Realty and Marc Kulick)**

132. In the alternative, as a result of the foregoing conduct, Vesta Realty and Mr. Kulick have received money that in equity and good conscience should belong to Plaintiffs. They should be required to return the funds received.

**PRAYER**

Fannie Mae requests that the Court grant the following relief:

a) All legal and equitable relief to which Fannie Mae is entitled, to include compensatory and consequential damages in an amount in excess of $100,000, punitive damages, and all other relief to which Fannie Mae is entitled in law or in equity;

b) An award of Fannie Mae's costs, including a reasonable attorneys' fees;

c) That Plaintiffs be awarded such other relief as the Court may deem just, proper and equitable under the circumstances.

Respectfully submitted,

/s/ Christopher S. Scaperlanda
Christopher M. Scaperlanda, OBA #31703
Gatlin C. Squires, OBA #34795
McAfee & Taft A Professional Corporation
8th Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
Christopher.scaperlanda@mcafeetaft.com
gatlin.squires@mcafeetaft.com

***Attorneys for Plaintiff Federal National Mortgage Association***



Fannie Mae Confidential

# EXHIBIT 13

Entered: July 24th, 2026
Signed: July 24th, 2026

**SO ORDERED**

MICHELLE M. HARNER
U.S. BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Baltimore**

In re: *
*
Jenk's Best Living, LLC, * Case No. 26-17758-MMH
*
Debtor. *
*
* * * * * * *
Jenk's Best Living, LLC, *
*
Plaintiff, *
v. * Adv. Pro. No. 26-00176-MMH
*
Marc Kulick, et al., *
*
Defendants. *
*
* * * * * * * * * * * * *

**PRELIMINARY ORDER ADDRESSING MOTION FOR TEMPORARY RESTRAINING ORDER**

A chapter 11 bankruptcy case allows a financially distressed entity an opportunity to reorganize its business operations and financial obligations. Often, the affairs of the debtor are complicated and in disarray, and the Court and the parties need time to work through the issues and ensure a fair and just result for all. The U.S. Bankruptcy Code[1] helps to facilitate this methodical review with the imposition of the automatic stay under section 362 of the Code. In addition, in certain circumstances, the Court may impose protections or temporary injunctions to

[1] 11 U.S.C. §§ 101 et seq. (the "Code").

maintain the status quo and preserve all parties' respective rights and interests pending resolution of disputed matters affecting the bankruptcy estate. As here, multiple parties often are affected by property disputes and the Court's resolution of those matters.

The Court has considered, on a very preliminary basis, the papers filed by the parties and the record of this proceeding to date. The Court understands the dramatically different positions of the debtor/plaintiff and at least one of the defendants. The Court also must evaluate any interests of the debtor/plaintiff's bankruptcy estate. Considering all that, the Court will impose certain restrictions and requirements on the subject defendant's actions with respect to the disputed property pending the parties having a full and fair opportunity to present the issues raised by this proceeding to the Court.

I. Relevant Background

Jenk's Best Living, LLC (the "Plaintiff") filed a chapter 11 case on July 19, 2026. Immediately thereafter, on July 20, 2026, the Plaintiff commenced this adversary proceeding against Marc Kulick, certain of his investment entities, YSA Investments 1, LLC ("YSA"), and Bocaire Tulsa Lender, LLC. ECF 1. The Plaintiff also filed a Motion for Temporary Restraining Order, Preliminary Injunction, and for Expedited Hearing (the "Motion") and requested an emergency hearing on the Motion. ECF 2, 3. YSA filed an opposition to the Motion. ECF 11. The Court held an emergency hearing on the Motion and all related papers on July 22, 2026 (the "Hearing"). ECF 4.

II. Analysis

The immediate issue before the Court is whether the Plaintiff has demonstrated adequate grounds for the Court to impose a temporary injunction or other interim protections pending resolution of the claims and causes of action asserted in this proceeding. The Court must evaluate this issue under Federal Rule of Civil Procedure 65, made applicable to this proceeding by Federal

Rule of Bankruptcy Rule 7065. In that context, the Plaintiff bears the heavy burden of establishing that it is likely to succeed on the merits, likely to suffer irreparable harm absent relief, that the balance of equities favors an injunction, and that the injunction serves the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009).[2]

At this very early stage of this proceeding, the Court endeavors to evaluate what has been presented thus far and determine whether protections are needed to maintain the status quo pending a resolution on the merits. As the Court and the parties discussed at the Hearing, one challenge in this proceeding is exactly what is meant by the term "status quo" and how the Court best preserves that status quo for all parties in interest. The Court addresses this issue, among others, below.

The Court acknowledges that it is not the first or the only court confronting at least some of the basic facts underlying the dispute before it. Mr. Kulick and YSA were (and, with the Plaintiff, still may be) involved in litigation before the Delaware Chancery Court, and Mr. Kulick and certain of his investment entities are involved in bankruptcy cases in other districts. Moreover, the Delaware Chancery Court has issued an opinion addressing certain issues that may impact those before the Court.

The Plaintiff argues that it and its creditors have been harmed by the conduct of Mr. Kulick and YSA. More specifically with respect to the Motion, the Plaintiff asserts that YSA has taken,

---

[2] According to the U.S. Supreme Court, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also In re Chicora Life Ctr., LC*, 553 B.R. 61, 64 (D.S.C. 2016); *Moore v. Kempthorne*, 464 F. Supp.2d 519, 525 (E.D. Va. 2006). Courts considering preliminary injunctions in the context of bankruptcy cases generally rely on case law and a bankruptcy court's equitable powers under section 105 of the Code.[2] Notably, the Court's section 105 powers are not unlimited but may be used in furtherance of the Code's statutory provisions. *See, e.g., Law v. Siegel*, 571 U.S. 415, 421 (2014).[2] In addition, Rule 65 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7065, provides that "[t]he court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65; Fed. R. Bankr. P. 7065.

and is taking, actions directly adverse and prejudicial to its interests, which in turn are property interests of the bankruptcy estate. The Plaintiff relies heavily on the provisions of its Operating Agreement, declarations by Mr. Kulick and Mr. Spatz, and the recent actions of YSA affecting the subject property. YSA counters that the Delaware Chancery Court already determined its rights and interests in, among other things, the subject property, leaving nothing for this Court to resolve.

As the Court noted at the Hearing, the Court has great respect for the decisions and the jurisdiction of the state (and other federal) courts and must have appropriate time to review the relevant facts and circumstances underlying their decisions or the matters currently pending before them. The Court also is focused on, as it must be, the bankruptcy estate before it and the impact of this proceeding on the estate and its creditors. For present purposes, however, the Court considers whether any of the Plaintiff's claims or causes of action warrant temporary protections for the estate.[3]

The Court has reviewed the papers filed by the parties and their statements at the Hearing. These papers include documents that describe the incurrence of obligations and the transfer of interests in property, some of which purport to impact the Plaintiff or its asserted property interests within the two years prior to the filing of the Plaintiff's bankruptcy case. ECF 10, 12. The Plaintiff, for example, references an October 2025, Mortgage, Assignment of Rents and Leases, Security Agreement, and Fixture Filing (the "Mortgage"), and a June 2026 Special Warranty Deed (together with the Mortgage, the "Mortgage Documents") that appear to affect property in which the Plaintiff asserts an interest. ECF 1, 10. The Plaintiff focuses on the loss of this property and asserts that it received no loan proceeds or other value from these transfers and that, if given effect, they rendered

[3] Because the Court finds, on a preliminary basis, adequate grounds to support some relief for the bankruptcy estate under the Motion in the context of the fraudulent transfer claims under section 548 of the Code, it does not address herein the other claims and causes of action. The Court will consider all claims and causes of action and further (and more fully) consider the fraudulent transfer claims in due course in this adversary proceeding.

the Plaintiff insolvent. The Defendant posits certain defenses to these claims but again, for purposes of the Motion, the Court focuses on the papers submitted by the parties and the applicable law.[4]

Without addressing the parties' other respective arguments, the Court finds that the foregoing basic facts show that the Plaintiff has demonstrated a likelihood of prevailing on its fraudulent transfer claims under section 548 of the Code.[5] The Plaintiff's lack of control over the property, moreover, subjects the Plaintiff and its bankruptcy estate to irreparable harm. Indeed, to the extent that YSA further transfers the property or takes action that negatively impacts the value of the property, the Plaintiff may be unable to fully recoup the value of its lost business operations

---

[4] The parties agreed that the Court could consider their respective exhibits for purposes of the Motion, reserving all rights concerning whether those exhibits ultimately would be admissible at a further evidentiary hearing or trial.

[5] Section 548 of the Code allows a debtor in possession or trustee to seek to avoid certain obligations incurred, or property transferred, within the two years prior to the bankruptcy petition date. *See* 11 U.S.C. § 548(a) provides in relevant part that:

> (1)The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548. *See also In re Ballantyne Brands, LLC*, 656 B.R. 117, 141 (Bankr. W.D.N.C. 2023) ("The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors. *Harman v. First Am. Bank of Md. (In re Jeffery Bigelow Design Grp., Inc.)*, 956 F.2d 479, 484 (4th Cir. 1992) (emphasis removed) (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J. 55, 80 (1991)). Accordingly, our focus is on 'the consideration received by the debtor, not on the value given by the transferee.' *Id.* Thus, the question of reasonably equivalent value is essentially, '"whether, as a result of the transaction, the debtor's estate was unfairly diminished."'") (some internal citations omitted); *see also In re Morris Comm's NC, Inc.*, 914 F.2d 458, 466–467 (4th Cir. 1990) (discussing, in detail, the requisite analysis under section 548(a)).

(which are premised on the subject property) should this proceeding be resolved in its favor. The record thus supports the first two factors of the Civil Rule 65 analysis.

The third and fourth factors are a closer matter for the Court, given the yet unresolved meaning of the Delaware Chancery Court's decision and potential grounds for YSA's actions under that decision. The Court notes that the Delaware Chancery Court decision may not, in the end, affect the merits of a fraudulent transfer action under section 548 of the Code, but at this early stage and on an interim basis, the Court feels compelled to recognize and respect a decision of that Court.

As such, the Court finds that the Plaintiff has met the last two factors of the Civil Rule 65 analysis, but on a limited basis. The purpose of a chapter 11 case and the objectives of chapter 5 of the Code support balancing the equities in favor of the Plaintiff. Likewise, ensuring that parties respect the Code and the breathing spell of section 362 and the other protections provided to a debtor and its creditors are key policies of the Code that benefit not only the debtor and its creditors but also the general public. Indeed, bankruptcy itself serves important public policies, and the integrity of the system must be preserved.

That said, and again balancing the rights and interests of the Plaintiff and YSA given the record currently before the Court, the Court will tailor the protections it provides the Plaintiff (and in turn the bankruptcy estate) pending resolution of the requested relief. This brings the Court back to the earlier point concerning what it means to maintain the status quo.

The Court acknowledges the Plaintiff's argument that the status quo should reflect the state of the Debtor's organizational structure and property management as of the petition date. The Court also, however, strives to balance that with YSA's arguments under the Delaware Chancery Court's decision and to preserve the value of the real property to the greatest extent possible—for the benefit of all parties. The Court thus will focus on maintaining the status quo condition of the

property by, among other things, requiring YSA to invest all rents and proceeds derived from the property to the operation, upkeep, and maintenance of the property; provide accountings on a regular basis with respect thereto; and to otherwise take no actions affecting the property or any limited liability entity (or whatever entity) that currently owns the property, including no transfers, assignments, sales, encumbrances, or any other action or agreement that could in any way affect the subject property or the status quo in this proceeding, without first seeking and obtaining relief from this Court.

Accordingly, it is, by the United States Bankruptcy Court for the District of Maryland,

**ORDERED**, that the Motion is granted on a limited basis on the terms and subject to the conditions set forth herein; and it is further

**ORDERED**, that YSA shall take all steps reasonably necessary to maintain the property commonly known as 204 S. Riverfront Drive, Jenks, OK 74037 and including that described in the Mortgage Documents (the "Property"), as well as preserve the interests in any entity that asserts an ownership interest in all or part of the Property (an "Owner Entity"); and it is further

**ORDERED**, that YSA shall collect in accordance with applicable law and use/apply/reinvest all rents and other proceeds and value derived from or in any way relating to the Property to the ongoing maintenance, upkeep, operation, and preservation of the Property; to the extent that excess proceeds exist, YSA shall hold those proceeds in a separate reserve account pending further Order of this Court; and it is further

**ORDERED**, that YSA shall file an accounting of all proceeds or value derived from or related to the Property and a summary of the condition of the Property with the Court on or before July 30, 2026, August 13, 2026, August 27, 2026, and September 10, 2026; YSA may request that the Court restrict access to such documents to the extent they contain confidential or proprietary information; and it is further

**ORDERED**, that YSA shall not take any actions or enter into any agreements that may affect the Property or an Owner Entity; this restriction includes (without limitation) that YSA shall not sell, assign, transfer, encumber, pledge, or destroy the Property, an Owner Entity, or any property or assets in any way related thereto (and shall not allow or authorize any person subject to its control or acting on its behalf to do the same); and it is further

**ORDERED**, that YSA shall not agree to the Property or an Owner Entity becoming subject to any voluntary or involuntary action or proceeding—whether through contract, document, instrument, or possession, or before a court, agency, administrative body, tribunal, similar forum, or other entity or person—and shall immediately notify the Plaintiff, the other Defendants, and the Court within one business day of any such attempted action or proceeding against the Property or an Owner Entity; and it is further

**ORDERED**, that YSA may for good cause seek relief from, or modification to, the terms of this Preliminary Order by filing a motion requesting such relief, which the Court will endeavor to hear on an expedited basis; and it is further

**ORDERED**, that the Court will hold a status hearing on the documents filed in accordance with this Preliminary Order **on September 24, 2026, at 11:00 a.m., ET, by videoconference**; the Court will enter the protocols governing the hearing separately on the docket; and it is further

**ORDERED**, that the Court will by separate Order set an appropriate schedule for any further hearings and/or the trial in this proceeding; and it is further

**ORDERED**, that the Plaintiff, YSA, or any Defendant may file a Line with the Court requesting an expedited hearing on any matter addressed by this Preliminary Order and the Court will set such matter for hearing as soon as reasonably practicable; and it is further

**ORDERED**, that, pursuant to Federal Rule of Bankruptcy Procedure 7065, the Plaintiff is relieved from posting a security pursuant to Federal Rule of Civil Procedure 65(c); and it is further

**ORDERED**, that the Plaintiff shall be responsible for providing notice of this Preliminary Order under Federal Rule of Civil Procedure 65(d)(2) which is incorporated by Federal Rule of Bankruptcy Procedure 7065.

cc: All parties
All counsel

**END OF ORDER**

# EXHIBIT 14

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MARC KULICK, VESTA HOLDINGS LLC, and ASSET HOLDER, LLC,
Plaintiffs,

-vs- Case No. 2025-1319-MTZ

YSA INVESTMENTS 1, LLC,

Defendant.

*********CONTAINS CONFIDENTIAL INFORMATION********

CONTINUED VIDEO RECORDED DEPOSITION OF MARC KULICK

TAKEN ON BEHALF OF THE DEFENDANT

ON FEBRUARY 5, 2026, BEGINNING AT 9:03 A.M.

IN TULSA, OKLAHOMA

APPEARANCES:

on behalf of the PLAINTIFFS

Michael Fisher, (Via Zoom)
BRODSKY FOTIU-WORROWICZ, PLLC
44 West Flagler Street
Suite 2200
Miami, Florida 33130
305.303.5054
bbrodsky@bfwlegal.com

REPORTED BY: Shannon S. Harwood, CSR, RPR, CRR

(Appearances continued on next page.)

(Appearances continued.)

William C. Searcy
ELLER & DETRICH
2727 East 21st Street
Suite 200
Tulsa, Oklahoma 74114
918.747.8900
wsearcy@ellerdetrich.com

on behalf of the DEFENDANT
Joel E. Tasca
GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
702.792.3773
joel.tasca@gtlaw.com

ALSO PRESENT: Hilaria Alberto, Paralegal; Robert Miley (Via Zoom); Efraim Diveroli (Via Zoom); Parker Detweiler (Via zoom)

INDEX


| | Page |
|---|---|
| Direct Examination by Mr. Tasca | 555 |


EXHIBITS


| Exhibit | Description | Page |
|---|---|---|
| No. 99 | 8/21/25 MCA agreement with Capital Assist, Kulick008456-477 | 562 |
| No. 100 | 8/28/25 email string from Marc Kulick, Kulick00007744-48 | 567 |
| No. 101 | 9/9/25 Text string,Kulick0037379-80 | 582 |
| No. 102 | 8/26/25 email string from Marc Kulick, Kulick023578-87 | 583 |
| No. 103 | 9/9/25 text string, Kulick0039308-327 | 585 |
| No. 104 | 9/14/25 text string Kulick0038527-28 | 587 |
| No. 105 | 9-14-25 text string, Kulick0038791-95 | 589 |
| No. 106 | 9/16/25 text string, Kulick0039930-31 | 590 |
| No. 107 | 9/17/25 text string, Kulick0038536-37 | 594 |
| No. 108 | 9/9/25 email string, Kulick0038545-47 | 595 |
| No. 109 | 9/1/25 email with attachments, Kulick007620-7743 | 58 |

No. 110 Loan documents, Kulick023495-503 59

No. 111 9/15/25 email string from Marc Kulick, Kulick023344 70

No. 112 9/21/25 text string, Kulick0038560-61 71

No. 113 9/24/25 email string from Marc Kulick with attachments, Kulick012356-477 72

No. 114 9/24/25 text string, Kulick0036762-63 75

No. 115 9/24/25 text string, Kulick0037595-99 76

No. 116 9/26/25 text string, Kulick022476-77 79

No. 117 9/27/25 text string, Kulick022482-22493 80

No. 118 9/29/25 text string, Kulick0039333-339 84

No. 119 10/9/25 text string, Kulick0039044-45 87

No. 120 10/20/25 text string, Kulick0039347-57 90

No. 121 10/31/25 text string, Kulick0036903 92

No. 122 10/31/25 email string from Marc Kulick with attachments, Kulick013018-56 93

No. 123 11/1/25 text string, Kulick0037528 98

No. 124 11/10/25 text string, Kulick0038727 100

STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of MARC KULICK may be taken pursuant to agreement and notice and in accordance with the Delaware Rules of Civil Procedures on February 5, 2026, at the offices of GableGotwals, 110 North Elgin Avenue, Tulsa, Oklahoma, before Shannon S. Harwood, CSR, RPR, CRR.

THE VIDEOGRAPHER: We are now on record. This is the continued video recorded deposition of Marc Kulick taken in the matter of Marc Kulick, Vesta Holdings, Asset Holder versus YSA Investments. This is filed in the Court of Chancery of the State of Delaware, Case No. 2025-1319-MTZ. Today's date is February 5, 2025. We are on the record at 9:04 a.m.

Will all counsel please state their appearances for the record?

MR. TASCA: Joel Tasca for the plaintiff.

MR. FISHER: Well, michael Fisher for -- I believe we're the plaintiffs in this case.

MR. TASCA: I mean, for the -- sorry, Michael, I got confused --

MR. FISHER: No worries --

MR. TASCA: -- Joel Tasca for the -- for the defendant, YSA.

MR. FISHER: Yeah, Michael Fisher on behalf of the plaintiffs. Just before we get started a few things I want to get on the record. We're going to designate yesterday's deposition as confidential, and just to confirm that our supplemental production at -- are also going to be, you know, confidential, the ones that -- the

supplemental production that we produced early in January; Kulick 0034482 through Kulick 2949552; Kulick 000001 through Kulick 022474; Kulick 2955371 through Kulick 2956554; Kulick 02956555 through 02958446; 02958447 through 02958493; and 294553 through 2950238.

Thanks for bearing with me on that and -- yeah, thanks.

THE VIDEOGRAPHER: And the court reporter --

MR. SEARCY: Should I enter appearance? My name is William Searcy. I'm from Eller & Detrich Law Firm. I'm here locally on behalf of Marc, plaintiff.

THE VIDEOGRAPHER: And the court reporter will now swear in the witness.

(Witness sworn.)

WHEREUPON,

MARC KULICK,

after having been first duly sworn, deposes and says in reply to questions propounded as follows, to-wit;

DIRECT EXAMINATION

BY MR. TASCA:

**Q All right. Marc, in August of 2025, what MCA loans did you have outstanding?**

A The answer is going to be probably more than I can -- I don't know that I can list them off one by one, but -- but I think that we can all -- I can agree that there's a lot of MCA positions. There's lenders that are the same lender that are using different names, so it's a -- it's a difficult question to answer, but there's a sufficient amount of MCA loans -- there's a -- there's a lot of MCA loans.

**Q Okay. I mean, is there more than 10 at this point?**

A Off the top of my head, that's the number that I would estimate, like 10, around 10, is it eight, is it nine, is it 10, is it 11, I don't know. Also, I think we get into clarification questions where I'm on the record, right, sworn in, of do you count one position with Capital Assist as -- or two positions with Capital Assist as one, I don't know. I -- I think for -- for the answer, right around 10 is the correct answer.

**Q Okay. And nobody's gonna hold you to the specific number, but so we talked about yesterday, there was -- there was LendSpark, there was Backd, there was Harper, right?**

A Uh-huh, yeah.

**Q So did you have MCA loans with those three August 2025?**

A Lend -- LendSpark and Backd certainly. Right around August, September-ish I was completely out of business with Harper.

**Q Okay. So besides LendSpark, Backd, who else?**

A Capital Assist and they -- they also went by Secure Capital and I think there was one other name that they operated under that I'm drawing a blank on at the moment. There was Ocean Funding, Ibex, American, Newco, which Newco had Formenterra and Apollo.

**Q What was the first word?**

A Formenterra, but I think, again, that's one of those situations where it's one lender and -- and, you know, or syndicated -- I don't know how that world works. They kind of hide that from you.

There was a very small position with a group called Wellen Capital that was supposed to be a lead up to something larger that never happened. Gosh, I think that that's -- BH Capital was in there and then BH Capital went by other names as well, but I can't remember the other names. I think it's, like, Infinity or something. I can't remember the

other name that BH Capital used. Panthers, they used. BH Capital used -- Swiss Funding was one of theirs, so those are -- I mean...

**Q Okay. Any others that you can recall?**

A Off the top of my head, no. Evolved Capital and one other one became the -- became the Toval Ventures, but that actually ceased to be an -- that kind of transaction went from MCA to more secured real estate. That's going to be it. I think -- I mean, to the --

**Q Sure.**

A -- look, to the best of my abilities right now, that's -- that's it.

**Q Right, and then ballpark, how much outstanding in MCA loans did you have at that time?**

A I can't -- I can't tell you that. I don't know.

**Q I mean, was it more or less than 5 million?**

A Are you including -- are you saying principal and interest or are you saying principal?

**Q Yeah, total amount that you had to repay, principal and interest.**

A It -- well, it -- it would have been larger than -- than 5 million, because BH Capital by

themselves did the stacking method where they put the borrower into, you know, kind of some pretty extreme debt. I don't -- it's -- but I don't believe that they ever intended to collect that much and I think there's, you know, actions that I think -- that that shows how they've kind of acted since, but yeah, I mean certainly, the -- the number on the page, the facial numbers would have been higher than 5 million.

**Q Right, and in your experience from time to time, lenders won't proceed to collect as much as the face value?**

A I would -- I would -- I don't know. I mean, as you've seen through my emails, 2023, this wasn't my life. 2024 got a little more aggressive and a little tougher, but still not anything like 2025. And in 2025, I did the best I could to solve a growing number of crises, some of which were caused by -- by debt. And so there wasn't -- I -- I don't know -- I'm kind of still experiencing what all this -- you know, how all this shakes out.

So when you say in my experience does lender settle, sure, I mean, I think lenders are -- can be open to settlements, but I think there's a lot of things that go behind that, and in the MCA

world, I can see some of these lenders want to stay with me and they want to work with me and they want longer term relationships.

Some of them seem to disappear and I can't explain what that means other than the fact that I'm not hearing from them anymore and they're not pursuing litigation against me. So does that mean that they consider the matter done or what, I -- I don't know and I'm still going to find -- I assume the next six months will show that.

**Q Right. So why did -- why do you say BH Capital wasn't going to collect the full face amount that you owed? Did they tell you that?**

A Yes, in negotiations, he -- BH Capital quite frequently would say things like, you know, let's sign this up and if you're good, if you -- if you -- if you come -- if you come through, we'll cut the debt by this much or that much. And it always seemed like, you know, kind of seat of the pants numbers and reactions and I never put too much faith in them, because it's kind of like -- but yeah, I don't -- as I said, I think that actions oftentimes speak louder than words and BH Capital has -- has shown no interest in trying to recover large amounts of money or -- or, you know, they -- they've had

some conversations with me about settling the balance or about getting back into business. Both of those have come up, but they are not pursuing, you know, the facial value of the loans and I can't necessarily answer why.

**Q Right. Certainly BH Capital has the right to pursue less than it's actually owed from you, right?**

MR. FISHER: Objection. You can answer.

A Can you rephrase the question -- you're saying to clarify?

**Q (By Mr. Tasca) Sure. I said would you agree with me that BH Capital will has the right to pursue a lesser amount than they are actually entitled to under the loan documents?**

MR. FISHER: Objection.

A Yes.

**Q (By Mr. Tasca) Now, Dovi you explained was affiliated with Ibex, LendSpark, Backd, Harper at one time, but then sounds like he had a falling out with them. Any of these other ones that you mentioned was Dovi involved; Capital Assist, Ocean Funding, American, et cetera?**

A One clarification.

**Q Sure.**

A Dovi was the CEO of Harper.

**Q Okay.**

A That -- the one he used to be involved in was American.

**Q Oh, I see. Okay.**

A And Dovi also, through another contact of his who I never met, was the conduit to Ocean.

**Q Okay. And Capital Assist, though, didn't have anything to do with Dovi?**

A I think we discussed this last night. Capital Assist came through a non-MCA related channel.

**Q Yeah, okay. And I apologize, it's been a long couple of days.**

A Sure, sure.

**Q Okay. So take a look at what I've marked as Exhibit 99.**

(Deposition Exhibit No. 99 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Is this the MCA agreement that you entered into with Capital Assist on August 21st, 2025?**

A It appears to be.

**Q Okay. And if you look at the Bates label, so if you turn down to Page 8459.**

A I am there.

**Q All right. This -- this had an anti-stacking provision, correct?**

A It does.

**Q Would you agree with me that you subsequently violated that provision?**

MR. FISHER: Objection.

A I think that's a judgment that I'm not able to make since I would say that Capital Assist certainly knew I had other positions and were actively taking other positions and actually gave me advice on taking other positions, so --

**Q (By Mr. Tasca) Well --**

A -- I don't -- I don't -- from a legal perspective, I don't know if that -- I don't think I'm called -- I don't think I have the capability to answer if that's -- if that -- if their actions, you know, changed that stacking provision or if their acceptance of my seeking other financing is still a violation. I don't -- I don't know that.

**Q Right. Okay. Separate and apart from those conversations, though, would you agree with me that subsequent to this MCA agreement we're looking at that you entered into Merchant Cash Advances and other loan agreements that encumbered the future**

**receipts as defined in this MCA agreement?**

MR. FISHER: Objection. You can answer.

A Yes.

**Q (By Mr. Tasca) Okay. And then if you just flip the page there, do you see there's a provision that says signing this agreement or the person signing this agreement has full power and authority to incur and perform the obligations under this agreement, all of which has been duly authorized.**

**Do you see that?**

A Yes, I do.

**Q And were you the signatory on this agreement?**

A Yes, I -- yes, I am.

**Q Okay. Were you, as you represented here, duly authorized to sign on behalf of the entities listed on this agreement?**

MR. FISHER: Objection.

A Some of them unquestionably yes, and some of them, at the time, I definitely believed so.

**Q (By Mr. Tasca) Okay. You're referring to your -- the -- the opinion you developed after this litigation was filed that perhaps you didn't have authority to sign on behalf of certain entities?**

A As we've discussed, I -- I am still -- I'm still -- still in progress of understanding as the sponsor, owner, GP, whatever I'm called, where -- where my rights and obligations are and what they -- what they really mean.

**Q Right, and on the Additional Entities page on this -- pages on this document, starting at 8474, the Bates number, all the entities you've signed on behalf of you signed as owner, correct?**

A Yeah, yes, and as we discussed in the first deposition, those are actually -- those come prefilled, so it was not me writing that I'm the owner. It's them filling that in.

**Q Right.**

A And, interestingly enough, they do have it more correct on Bates number -- where is it -- on Bates No. 8466, owner/manager/agent seemed to be understanding that I'm -- they don't know what to call me either.

**Q Did your counsel review this MCA agreement before you signed it?**

A No, he did not.

**Q Did your counsel review any of your MCA agreements before you signed them?**

A Yes, Backd and LendSpark.

**Q And your counsel never said to you, "Hey, Marc, they've got this populated on here on the signature line that you're an owner, maybe we better fix that?"**

MR. FISHER: Objection. That's -- that goes into privilege. I'm going to instruct you not to respond.

**Q (By Mr. Tasca) Did you ever come to the realization yourself after signing, you know, what might have been at this point your 20th MCA agreement, that perhaps you weren't being described properly on the signature line as to your position?**

A I didn't think much of it truthfully. People -- as I -- as I -- as we've discussed and as you've seen in my emails, people struggle with what to call me, including myself, consistently. It didn't seem to me to matter much.

**Q Right. So to the outside world, would you agree with me it wasn't really clear what your position was?**

A I would contend that my position is rather clear. It's what to call me.

**Q Okay. Fair enough.**

A That's --

**Q To the outside world, your title wasn't**

**exactly clear; is that correct?**
A I think yes, that's fair.
**Q Okay. This is Exhibit 100.**
(Deposition Exhibit No. 100 was marked for identification and made part of the record.)
**Q (By Mr. Tasca) Can you take a look at Exhibit 100, Marc, and just tell me generally, what -- what this is?**
MR. FISHER: Is someone going to put it up on the screen?
MS. ALBERTO: Yes.
MR. FISHER: I don't believe I have it.
MS. ALBERTO: And I emailed it to you as well, Michael.
MR. FISHER: Thank you.
MS. ALBERTO: You're welcome.
A This is an email thread.
**Q (By Mr. Tasca) Right, and what's being described in the email thread?**
A A group of investors have a position in Lofts at North Penn. We knew we were in trouble with the lender and we were trying to solve that.
**Q Okay. And is the proceeds all being discussed here, was that ultimately consummated?**
A It was and it wasn't. We couldn't get

Cohen to agree to forbearance. The transcription was consummated, but it didn't -- we did not end up using the proceeds to pay down the loan where we couldn't get a forbearance agreement signed.

**Q What did you do with the proceeds? Put it in operations?**

A Yeah, at this point in time, I can't remember, but it would have been somewhere, yeah.

**Q And who was the lender on this transaction?**

A I don't know the name that David used, but it was a group led by David Ruttenberg and managed by David Ruttenberg.

**Q Okay. Okay. And then on Page 7746, I think, but you can tell me if I'm wrong, I think that that middle email there dated August 28, 2025, 7:04 a.m., the bold language is stuff that you added it seemed to me from context, but you tell me if that's right.**

A Yeah, the bold seems to be me and the red is David Ruttenberg.

**Q Okay. And at this point, what you're proposing is that the proceeds from this transaction go to satisfy Cohen first, 25 million, the David Ruttenberg led group would get 1.8 million, and then**