**the rest would go to you to pay down your loans, right? And when -- when you refer to your loans or my -- my loans as you put it here, you're referring to Vesta Holdings' loans to the properties?**

A Yes, that is correct.

**Q Okay. Did you give any consideration to paying YSA or any of your other lenders before paying yourself?**

A Well, that's one of the many uses of funds that go into Vesta Holdings is to pay lenders.

**Q So what you're saying is once your loans were repaid pursuant to this transaction, you would use those loans to repay lenders?**

A Certainly, yes.

**Q Or use the proceeds to repay lenders. Did -- did you get some of your loans satisfied by the form that this transaction ultimately took?**

A At present, this transaction can't close secondary to a second mortgage that's currently placed by YSA.

**Q I thought you said it did close and you used the proceeds for operations?**

A The David Ruttenberg upsize closed.

**Q Okay. What's that?**

A The -- David Ruttenberg putting more money

into -- into the deal did close. The sale that contemplates $25 million going to Cohen, 1.7 going to David Ruttenberg's partnership and the rest going to me, Vesta -- slash Vesta Holdings, that has not yet closed.

**Q But David Ruttenberg did infuse some -- some money into the operation?**

A Yes, he did.

**Q Okay. How much?**

A My memory -- I'm not entirely sure. I think it was somewhere between 450- and $500,000.

**Q Okay. Did you use any of that money to pay back YSA?**

A That would be hard for me to say. I know I made two payments to YSA. I forget if they were September or October. I think I made two payments in September to -- to YSA, if I'm not mistaken. So some proceeds somewhere -- some -- something went to YSA in, you know, the short aftermath of this, but I, you know, can't say this loan went to YSA. I do know I made two payments to YSA.

**Q Did you use any of that 450 from David Ruttenberg to pay down your own loans?**

A I don't believe so. The loan balance as we've gone through with the -- with the senior

lender has fallen $200,000 in the last six -- in the last eight months, so I do not believe that any -- any of the proceeds from this would have gone down to pay my loans.

**Q And then one page before that, 7745, again I think the bold language appears to be yours. Tell me if that seems right to you.**

A Yeah, I believe that bold is me.

**Q Okay. One of the things you say there is, "Meanwhile investors have continually refused to put more money into the deal."**

**Do you see that?**

A Yes, I do.

**Q Were you talking about the investors in all the properties or were you just focused on Lofts?**

A This was specific to Lofts at North Penn.

**Q Okay. When did the investors stop putting more money into the deal, timeframe wise?**

A Day one.

**Q Day -- and when -- when was day one?**

A December 2021.

**Q So investors made an initial investment and then they kind of checked out?**

A Yes, in -- as I've found and one of the

flaws with syndications is investors have an expectation that money is going to go one way after the close, and then a down cycle and spiral like this, we would have never been in business with YSA if we could have gone to our investors and said we need $300,000 on this day or 1.5 million on this. That -- that -- we wouldn't have been in the borrowing world if that was reality.

**Q And even though you're just talking about Lofts here, did that happen across all of the properties with investors?**

A As we discussed last night with -- you know, for instance, with the Auerbach opportunity fund, no. When we need money, we -- the one-page sheet, we show some -- we show progress. We show -- you know, open the books. The books are open to them throughout the time anyway, but do whatever they want to see and then we get that -- get the money.

So, no, it's not across the portfolio. There are some deals and some partnerships that do support -- support the real estate after, but by and large in real estate syndications, capital calls are --

**Q Ignored?**

A Yes.
**Q Besides Auerbach, who was a good -- or is a good partner?**
MR. FISHER: Objection.
**Q (By Mr. Tasca) And when I say "good partner," I mean someone who pays when you request them to.**
A There was a group we did business with that -- that we don't have any current asset -- current holdings with, still in some communication with that was called -- I'm drawing a blank on the name right now -- owned by a guy named Jay Lobell. I forget -- forget the acronym that they went under and I think it's actually since changed in any event, but we had one deal with them. They were good partners, very good partners.
Group out of Baltimore that I still work with called Pratt Street Capital, very appreciative of their partnership and I think that they support their assets well.
There's a group called SMB Bradley that's actually in Lofts at North Penn. They are as upstanding as it gets, but they're also syndicators, so there's a limit to what they can do in a -- in a downward situation, but I believe that they are very

good partners and try to support the operations as best as they possibly can, and those would be my -- kind of my -- my good partners over the years.

**Q And besides Lofts, what properties are those individuals involved in, individuals or groups that you mentioned?**

A Thrive Jenks, Muntage, Lofts at North Penn, Capital on 28th, 23 East, Village Creek, One Eaton Square, Remington Ranch.

**Q Okay. Any -- any others or --**

A Potentially. I -- I --

**Q If we looked at the operating agreements and saw their names, we would -- we would know if they were involved?**

A Yes.

**Q Okay.**

A By and large, yes.

**Q And let me ask you this: With respect to the -- the other investors, the investors that you didn't define as -- as good investors, I mean, is it fair to say that one of the reasons you felt like you could move, you know, money around as -- as we saw that you did or offer second mortgages on properties because you felt like those other investors had kind of checked out and, you know,**

**relinquished whatever say they might have had in -- in operations?**

A I would disagree with the characterization a little bit, only insofar as what I think grants me the right to do the money movement or to search for ancillary financing is that I'm, you know, in these Vesta Holdings as a -- as an entity so deep into these loans and that it's very damaging to me, as we're seeing here, personally, in live time, what I've had to do, the people I've gotten into business with to fund these loans since investors wouldn't.

My view is that, look, had they funded up front, I wouldn't -- Vesta Holdings wouldn't have these loans. We wouldn't have these problems, so if I have to try and solve these problems, you know, the -- the way to do that is to put my -- you know, use the Vesta Holdings loans, pay them back, sell them, liquidate them, however -- however we can, because that's key to the enterprise succeeding as a whole.

**Q Because these investors had -- had, you know, checked out since the inception of each deal, did that play a factor of why you felt like you didn't need to go back to them to get permission to do every little thing, including, you know, find**

**ancillary financing, even if it required putting a second mortgage on the property or pledging the property's assets?**

MR. FISHER: Objection.

A You mention investors and -- and approvals quite frequently in our conversations. Our operating agreements are pretty clear that individual investors don't have much in the -- in the -- there aren't many things I need their approval for. As we've discussed, I'm trying to understand better, because it does seem to me that it's not as clear as I've -- but I also get mixed feedback.

You know, we looked at Gershon's texts with me yesterday. Gershon ultimately decided that he's never seen OAs that are so one sided in favor of the sponsor, but then, you know, someone else looks at them and says, no, Marc, you -- you can't do, you know, whatever you want. You need some approvals.

And then, you know, some of our OAs have wavers of fiduciary duty, because, quite frankly, fiduciary duties are -- you know, can -- can be difficult when you're with syndication because you're making the best decisions that you know how

to make. What if your investors think, you know, that's not the best decision? For instance, in a foreclosure scenario. We might say, "Hey, it's in the best interest of the partnership to not fight the lender," and the partners might say, "Well, we disagree. We want you to fight the lender because our -- we're not totally aligned in that," so I think -- I think it's -- it's difficult to say.

**Q Right, and I'm not so much asking about what the OAs say. I'm asking about you being in the trenches on the ground trying to make these properties run properly, and -- and, you know, my -- my question is that from your perspective, did you feel like, I haven't heard from these investors in three years, I'm not going to run back to them and ask them permission for ancillary financing.**

**Irrespective of what the OA said you did or didn't have to do, I'm asking about what your motivation was.**

A My motivation and thinking was that I had been very vocal to everybody. I had given people opportunities to participate, equity, loans, capital calls. I had spoken to my partners frequently and the feedback I got was there's not interest. Capital calls, people are getting so many capital

calls. They're not participating and the stats on industry -- industry-wide participation in capital calls and syndications is brutal. Syndicators are struggling to get five, 10 percent.

So, you know, at that point, you're diluting all your investors anyway, because then you have to bring up the dilutive equity to back up the capital call. So my view at the time was I'm -- I'm operating by far in investor best interest because I'm taking -- you'll never see one -- one time where interest from any of the loans I've taken hit the books of any of the properties. It hits Vesta Holdings' books, so my view was, I'm operating in every way, shape and form in my investors' best interest.

**Q Right. So it was a determination at some point you felt you could make on your own without checking with them on every little thing?**

A That's your characterization. I think I characterized it differently, but I'm not sure it's worth...

**Q You mentioned that those investors' interests were getting diluted and I saw some provisions in the operating agreements on that. So -- so that means if -- well, why don't you**

**explain that to me. How does that work generally? I know the operating agreements are all a bit different.**

A We make a capital call and investor A funds. Investor A is safe from dilution. Investor B, if he doesn't fund, when we go to the open market, there's -- we're allowed to take market pricing for -- for the dilution. So that might be two to one. That might be three to one. Conceptually, it could be 10 to one.

**Q And do you keep records of by how much various investors have been diluted at -- at this point over time when they've, you know, time and time again failed to make their capital calls?**

A Formally, we've only done two capital calls.

**Q Okay. When were they?**

A August of 2025 and December of 2025.

**Q Okay. And those -- after those two capital calls, investors that didn't respond with capital got diluted?**

A Yes, in one instance. In the December 2025 instance, we're still working through the dilutive equity.

**Q Okay. So they got diluted the -- the**

**first time and the second time they will be, but you're still calculating it, you're still figuring it out; is that fair?**

A Yes, they're separate properties. It's not --

**Q Understood. Okay. Which properties did you -- did you make the capital calls on?**

A We capital called what's generally known as the Oklahoma City 3 portfolio, which is Bryan Hill, Springdale Village, and Summer Oaks, and then separately -- those are all owned in one investment entity, and then we capital called WoodScape in December of 2025.

**Q Okay. Getting back to my question on -- on records, after the -- the first capital call, it sounds like you did calculate by how much investors were diluted; is that right?**

A Correct.

**Q Okay. And you have a record of that somewhere?**

A That is correct, yes.

**Q Okay. Let me try to ask you this without the records, and I realize you don't have them in front of you, but can you tell me what -- what the -- post dilution, what each investors' interest**

**is at this point or -- or even kind of give me a ballpark of what -- what they are? And maybe there's so many investors you can't tell me. I'm just trying to understand.**

A Yeah, it's physically impossible to do that.

**Q Okay.**

A The diluted equity that we ended up accepting was two to one dilution.

**Q Okay.**

A So if your capital was $15,000 you would have been diluted $30,000.

**Q And that was on which properties?**

A Bryan Hill, Springdale Village, and Summer Oaks.

**Q Okay. And will the dilution, once it's calculated on WoodScape, follow a similar formula or is it -- will that be different?**

A There are several factors up in the air.

**Q Okay.**

A We're still finding the dilutive equity, how they price it, and then there's a chance for us to refinance the asset, at which point we would not need to dilute any investors.

**Q Okay. So that's still in process?**

A That's correct.

**Q All right. We talked about General Holdings. Did you get another loan from General Holdings in September of 2025?**

A No.

**Q Yeah, okay. I just wanted to make that clear. Okay. I think we're up to 101.**

(Deposition Exhibit No. 101 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. Exhibit 101 appears to be a text string with you and Isaac from IBEX and it appears that he's not interested in giving you an MCA loan, but it appears that you are offering him a fully secured position with mortgages.**

**Do you see that?**

A We were saying -- I was giving him examples of what -- this was an ongoing negotiation taken a little bit out of context. For instance, I wouldn't -- it's a mischaracterization that he wasn't interested, but --

**Q Okay. Forget about that part, but in this text, you say, "I think the real estate deal gives you a huge amount of coverage," and later on, you say, "That would convert your semi secured MCA deal with me into a fully secured position with**

**mortgages?"**
A For sale rights, et cetera. I was throwing the different -- you know, the kind of different concepts we had been floating around.
**Q Right, and those concepts included giving IBEX fully secured mortgages, correct?**
A Yes.
**Q Which properties would that have been on?**
A I believe that we were discussing -- I could be wrong and maybe you have it in a future text message, but I believe we were discussing Lexington Commons, Seminole Ridge, and Villas at Midtown. That's my belief.
**Q Okay. This deal didn't happen, though?**
A No.
**Q Okay. Okay. 102.**
(Deposition Exhibit No. 102 was marked for identification and made part of the record.)
**Q (By Mr. Tasca) Okay. Can you tell me what 102 is discussing? It's an email string from August 2025.**
A This seems to be a thread between myself and Saperean Capital, or Kayne Anderson as they've -- they're also called, discussing Woodland Oaks and Fairfax loan modification extension.

Q **That was a senior lender, right?**
A Yes, this is a senior lender.
Q **Right. Okay. On Bates Page 23580.**
A 23580. Okay.
Q **The top of the page, you mention, "Green light on the recorded second mortgages. Should I tell them to push it through assuming that the 2nd works?"**
**Can you give me some context as to what you're talking about here?**
A Yeah, as I've discussed with you guys, my view was that second mortgages were something that I had to get approval from the lender on and this is an example of me going to a lender for approval. However, this was not just asking for tepid approval or for acceptance.
My bank was willing to give a letter of credit for two and a half million dollars, assuming that they could get a second -- fully recorded second mortgage and intercreditor agreement with Saperean Capital. Shawyan was obviously, as you can see on the thread, not opposed to the idea, however was not -- I can't tell you if he never got approval. It never ended up -- they -- they -- they never ended up coming up with an intercreditor

agreement. As discussed yesterday, that -- that ended up in a contention between myself and Saperean Capital.

**Q Right. So that -- this deal being discussed never happened and Saperean is now suing you in Oklahoma, right?**

A That's correct.

**Q Okay. Okay. Marking 103.**

(Deposition Exhibit No. 103 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) 103 is kind of a lengthy text string between you and Gibber, correct, dated 9-9-25? It's a lengthy thing -- take the time you need to look at it, but it seemed to me you were looking to get about $350,000 to pay the Amex bill.**

**Is that a fair characterization of this -- at least part of this conversation?**

A Yeah, I mean, this is a text thread between David Gibber and I.

**Q Right. You -- you're looking for financing to help pay down the -- an Amex bill, correct?**

A Seems like it.

**Q Okay. And you mention a few times here the possibility of providing second mortgages,**

**correct?**

A I'm not -- I mean, I've seen that mentioned in the text thread, but it doesn't seem to be the center point of the text thread. Seems to be referencing -- and as I testified to this yesterday, David was consistently interested in securing positions with second mortgages. So it's a concept we dance around, talk about, but I wouldn't say that's the focal point of the offer, and then what ultimately ended up having here did not involve a second mortgage.

**Q Well, I mean, but you're -- is it fair to say that you're enthusiastic about the possibility of giving him second mortgages? And the reason I say that is one of the things you say is, "I like tying things to Lofts or second mortgages."**

A Certainly --

MR. FISHER: Objection. You can answer.

A Certainly. I mean, I like -- yes, I mean, Lofts was a deal that -- with my large loan balance and the equity being wiped out already makes a lot of sense for a second mortgage for somebody. Absolutely.

**Q (By Mr. Tasca) Were you referring to second mortgages on any other properties or was this**

**limited to Lofts when you said -- said these things in this text string?**

A There's a lot here and I don't want to miss testify. I don't know. I mean, he seems to be talking about personal assets and we're discussing personal assets. I mean, it's hard for me to remember.

**Q Okay. Okay. Okay. 104.**

(Deposition Exhibit No. 104 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. Exhibit 104 is a 9-14-25 text string between you and Taylor from Maxus. Just briefly remind me again who Maxus is.**

A Maxus is a real estate and trust out of Kansas City.

**Q Okay.**

A Adam -- he's another guy in my phone, Adam Maxus.

**Q Right.**

A Taylor took -- took Adam's job when Adam started his own firm.

**Q Okay. And here again, it appears you're discussing the possibility of financing, and one of the things you say is, "On like Lex or Copperfield or anything like that we can do equity pledge,**

**confess judgment, 2nd mortgage."**
A That's correct.
**Q Okay. So that was an offer that you were making to provide second mortgages on Lex or Copperfield in the event of this financing, right?**
A That is correct.
**Q Had you talked to the senior lender at Lex or Copperfield about providing second mortgages at this point?**
A Specifically Lex, yes.
**Q Okay. How about Copperfield?**
A Same lender, so I mean, conceptually.
**Q Okay. Sorry if I asked this last time, but any time you talked to a senior lender about permission to offer a second mortgage, did that take place on the phone or were those conversations in writing?**
A I -- there's no way for me to -- to know. I mean, you've seen examples of in text and there's certainly -- you know, I'd jump in the car and make calls. I mean, I spoke to two senior lenders on the way to this deposition when I was driving this morning, so that's...
**Q Okay. But anything that is in writing where you might be talking to a senior lender about**

**permission to put -- to offer second mortgages, that would have been produced to us, correct, in the litigation?**

A Yeah, I can't see how it wouldn't have.

**Q Okay.**

MR. TASCA: 105?

THE REPORTER: Uh-huh.

(Deposition Exhibit No. 105 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) So 105 is a conversation between you and Rabbi Itkin. Who is Rabbi Itkin?**

A It's a rabbi out of Kansas City.

**Q Okay. All right. Again, you're talking to the rabbi about -- it looks like, you know, potential sources of -- of loans and the second to last page, he asks you secured or unsecured and you tell him, "I could likely secure it:**

**Were you referring to providing second mortgages here?**

A I'm not -- let me get there.

**Q Sure.**

A What's the Bates number? Is that 94?

MS. ALBERTO: 38 -- 38 -- 92? Are you on --

THE WITNESS: 92? I think mine cuts off

at -- oh.

MS. ALBERTO: 94, yeah, 94.

THE WITNESS: 94. Okay.

A Oh, "I could likely secure it," I have no idea what I'm saying there. I -- there's no specificity. You gotta -- a lot of these times when you're asking me are you offering specifically a second mortgage, certainly it's in the conversation of security, but a lot of these conversations are not meant as formal LOI offers. It's let's spitball. How can -- I've got a massive problem. How do I solve it?

**Q Right.**

A Second mortgages are an answer that comes up.

**Q Okay. Yeah, understood.**

(Sotto voce conversation)

(Deposition Exhibit No. 106 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. This is Exhibit 106. This guy I think was mentioned in your conversation with the rabbi, Michael Yodel. Who is he?**

A A gentleman from the Kansas City Jewish Community that started a fundraising platform.

**Q Okay. So you're talking to him about potential -- potential $2 million loan, right?**

A Yes.

**Q Okay. And then Michael says, "I'm talking with some today who has some level of interest, but it would need to be fully secured by a filed mortgage and second position on a property that has enough equity to cover." And you say, "No problem on that front."**

A Yeah.

**Q So that means you were willing to provide Michael Yodel a second mortgage, a filed second mortgage on the property that had equity, correct?**

A Yes.

**Q Same question here: Did you have a particular property in mind or was it just any of them had equity?**

A We never got that far.

**Q Okay. So you didn't have anything in your head one way or the other on that when you said, "No problem on that front?"**

A Oh, certainly. I mean, I would say the reverse. Right? I new broad strokes which assets I which could -- you know, which could -- it's going to be the same deals we're talking about ad

infinitum here, but you know, the deals that I had that I kept sending to people over and over again.

**Q Right, and I don't think we've done this yet. At this point, what deals were they?**

A Looking at Seminole Ridge. We're looking at Villas at Midtown. We're looking at Lexington Commons. We're looking at Lofts at North Penn. We're looking at probably a couple others, Ridge for sure. Probably a couple that we're looking at.

**Q Can you remember any others specifically?**

A Copperfield came up. There could be more.

**Q And were those properties that you didn't have -- I'll use -- I'll your terminology -- one of the good investors, the one like Auerbach or...**

A No, I mean, there -- it was -- it's more of a question not of good investors or bad investors. My loan balances of those properties, I mean, if I had a loan balance and Auerbach wasn't willing to fund, I certainly wouldn't mind -- now, any financing I took would be on my side of that equation. Another element to my ability to take debt is, you know, for instance, Peter and I's entities are separate from each other, so...

**Q So -- so is it the case, based on what you just said, that you felt like if a loan -- if a**

**property owed you money by way of a loan that that gave you the ability to offer a second mortgage because you would be the one paying it back?**

A Yes, I think that's fair.

**Q Okay. And do you have a record of how much each property has owed you over time? That's not a great question. Do you keep records on what each property owes you in loans? Let me ask that question.**

A Yes.

**Q Okay. And how much are you owed right now collectively in loans?**

A I don't have the number off the top of my head. It would be north -- Vesta Holdings as a whole is owed north of $40 million.

**Q Okay. And has that number remained relatively the same for all of 2025 or has it gone up, has it gone down?**

A No, it's increased substantially.

**Q Okay. What was it at the beginning of 2025?**

A 20 million.

**Q Okay.**

A 15 -- 15 million at the end of '24; 20 million early '25.

**Q And do you have records of which properties owed you what out of that 20 million or so from the beginning of 2025?**

A All loans are probably documented on balance sheets on a monthly basis, yes.

**Q Okay. So if we pulled a balance sheet from February of 2025, we could see what properties owed you what loans?**

A Yes, you could.

**Q Okay. And the amount of the loans owed?**

A Yes, you could.

**Q Okay. And then, you know, your position is, you had authority up to the amount of each loan to provide second mortgage, because that was your loan and you were going to be paying it back, right?**

A Certainly, yes.

**Q Okay.**

(Deposition Exhibit No. 107 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) This is 10 --**

MS. ALBERTO: 7.

**Q (By Mr. Tasca) So 107 appears to be a text between you and somebody. Maybe you could tell me who this is.**

A I -- I have no idea who this is. This is

clearly somebody that I got introduced to once.

**Q I guess is the -- is it this person who provides email here, lalterman@danskergroup?**

A Yeah, I have no memory of who this is.

**Q Okay. All right. It appears he's mentioning -- he or she is mentioning the need for a second position and a personal guarantee, equity pledge, and you say, "Of course 100%", correct?**

A Correct.

**Q So you were willing to provide that potentially, you know, I realize this is just a conversation, but you were willing to provide that to whoever this person is at the Dansker Group in exchange for a loan?**

A Yes.

(Deposition Exhibit No. 108 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. 108.**

MR. SEARCY: Can I get a copy?

MR. TASCA: Oh, sorry.

MR. SEARCY: That's all right.

MR. TASCA: What did I do with it?

MR. SEARCY: Thank you.

**Q (By Mr. Tasca) Okay. 108 is Duane Poker and I'm going to venture a guess that this is a guy**

**Duane that you know from playing poker; is that fair?**

A Yes. Yes, it is.

**Q The things we do to keep our contacts. I know.**

**Okay. Who is he?**

A Duane was somebody I met in 2017. He's in the real estate world. He's a developer. We've bought deals from him. He's been interested in buying deals from us and he's somebody that I know that has -- has liquidity sometimes.

**Q Right. Okay. So you looked -- looked to him for potential financing?**

A Yes. This was actually in particular a -- one of my personal residences, though. He was not needing -- he was not needing a property, a work property.

**Q Okay. So -- so when he says here, "How do we guarantee return collateral," you say, "2nd mortgage on one of my properties? I'd just ask that you not file unless I default." So you were talking about not one of the Vesta properties, but your personal property here?**

A Yes, and we did end up doing a loan and it was guaranteed with a quit claim deed on my house.

**Q Okay. Okay. Got it. And -- and so -- so he has a quit claim deed to your house now?**

A No.

**Q You -- you satisfied the loan?**

A Yes.

**Q Okay. And is there any other paper trail besides the quit claim deed itself and this text as to what that financing looked like?**

A I don't believe that Duane drafted an agreement, but I could be wrong.

**Q Okay. And did -- did he lend you -- you referenced 250,000 here. Was that the amount of the loan ultimately?**

A Yes, it was.

**Q Okay. Same question, did you tell Efraim about this loan before you entered into it?**

A No, although I would hope that by this point, we can all universally agree that Efraim knew how desperate I was for money on every single day of my life.

**Q Right, but no specific notification about this loan to Efraim?**

A No.

**Q Okay. And you said you repaid him already?**

A Yes.
**Q And did you repay -- so looking at the text here, the proposal that you make is $250,000 and then Duane says, "When can I get it back," and you say, "One week." (As read) I'll pay a hundred thousand for it, right?**
A Uh-huh.
**Q And that was your suggestion?**
A Yes.
**Q And are those the terms that you ultimately entered into a transaction with Duane on?**
A Yes.
**Q Okay. I mean, I don't have a calculator, but would you agree with me that that loan would be at a, like, 2,000-plus annual interest rate?**
A Certainly that's -- the comfort level I had in my understanding of my loans with YSA are the same as my understanding of the loans here. I was making offers for a loan with a fee. It was not -- I wasn't contemplating it as an annual interest rate that would say, Marc, you owe us 7,000 percent compounding even annually, but much less daily.
My -- my offers were strictly, I need -- you know, here's the money I need, here's the fee I'm willing to pay, and as evidenced with Duane and

with Efraim and David Gibber, when I missed those payments, I typically offer a $25,000 to get another week or something like that and that is acceptable to most lenders as a -- as a means of working through together in partnership.

**Q Right, but backing up, I mean, if we -- I understand your position on that, but backing up, if we look at the terms of this loan in your discussing with Duane, if you imputed an interest rate on that, would you agree with me that it would be over 2,000 percent, understanding you don't have a calculator if front of you either?**

A My testimony is, is that this was not an interest rate transaction.

**Q Okay.**

A And that would Duane have not -- my testimony is that Duane would not have tried to move that to make that play.

**Q But for the YSA loans, the documentation wasn't that prepared by AJ Jindal?**

A No, it was not.

**Q It was not, who prepared it?**

A After the October loan, it would have been Robert Miley, Christopher Rogers.

**Q But they were using your form; were they**

**not?**

A It was our form, but in our form, as you've seen through countless other loans, we describe these in terms of fees, not annual interest rates.

**Q Right, but I also saw thinking in a February 18h loan in particular a lot of back and forth between you and AJ Jindal and Robert Miley and counsel for YSA negotiating the terms of loans, correct -- of the loan documents, correct?**

A That is incorrect. AJ Jindal had nothing to do with February 18th loan.

**Q Okay. Well, I mean, we could get back -- get -- get out those emails again, but in any event, the forms that you were using for the YSA loan, AJ Jindal at some point had an opportunity to review them, correct?**

A Yes, on the October -- on the October 2024 loan, AJ Jindal had a -- had a -- had the ability to -- to review it and was confident that we had not pledged anything that's alleged that we pledged at this point. I was confident that we hadn't made those pledges and I remain confident in that.

**Q Was the promissory note on the October loan that AJ Jindal reviewed and that you signed,**

**did that contain an interest rate?**

A I could -- I don't know the answer to that question. It might very well have, but I would believe that that would have been something that YSA had edited, not AJ. I would -- based on my understanding of how AJ operated with loan docs at that time, I would have assumed it would have been described as a fee.

**Q Right, but you -- you went ahead and signed that document that had an interest rate in it; did you not?**

A Yes, I did.

**Q And subsequently signed, you know, nine or 10 more loans with YSA where the promissory note had an interest rate, correct?**

A Yes.

**Q Okay. And the interest rate was -- was based on these sort of payments like the one we saw in the Duane text, right, where he would pay a certain amount for getting the financing? Bless you.**

MR. SEARCY: Gesundheit.

THE WITNESS: Thank you.

A Yes, similar to the negotiations leading up to the July 31st loan with Efraim where I

offered -- said, you know, 317,000 and I'm offering a 10 percent fee and, you know, another 10 percent rush fee, that's the way that I conceptualize these loans. I'm not disagreeing with you on what was signed with YSA. I'm simply sharing my concepts and mindset behind the loan agreements.

**Q (By Mr. Tasca) Right, and separate and apart from the interest rate concept, the amount of the payments that you were willing to pay with respect to the Duane loan or the YSA loans, those were suggested by you; is that fair?**

A Yes.

**Q I don't think we have a copy of this, but probably just as well to keep us moving. I believe that there is another Capital Assist MCA that was entered into on September 21st, 2025. Does that sound right to you for a million dollars?**

A Oh, I certainly didn't get a million dollars from Capital Assist on -- in September, but it came have been some sort of refinance that netted me a hundred thousand or 200,000 or $300,000 or something --

**Q Okay.**

A -- possible.

**Q So we saw the August 2025 Capital Assist**

**MCA, so this one that I'm referring to that has a face amount of a million. That could have -- that was probably refinancing that and getting you some cash; is that --**

A That's -- if that document exists, that would be, yes.

**Q Okay. If that document exists in your production, again, just saying it so we don't have to pull it out and mark it --**

A Understood.

**Q -- you -- you don't disagree that that is a authentic MCA that you actually obtained from Capital Assist in September?**

A I can agree to that.

**Q Okay. Did you obtain another loan from Cardiff? We saw that you got one in November of 2024. Was there another one in 2025?**

A Yes.

**Q Okay. And what were the terms of that loan?**

A I believe Cardiff made two loans in 2025.

**Q Okay.**

A I don't -- I -- I -- at one point, Cardiff and I had a concept that we were going to try to do like a line of credit, but that had its own terms

and then -- and then they upsized -- they -- they -- they participated with David Ruttenberg in the upsize on Lofts at North Penn, so that's -- those would be the connections. Those would be the Cardiffs fund -- Cardiff funding, so I would say March and possibly later -- one later on in the fall.

**Q Okay. And the one later on in the fall, sorry if you just said this, how much was that for if you --**

A Couple hundred grand.

**Q Okay.**

A I don't remember. I think $183,000 or something.

**Q And was that secured by any other real property?**

A No, unsecured loan. I don't actually even know if it was documented.

**Q Okay. Yeah, I believe we saw some probably draft documents involving a $4 million deal with Cardiff that was going to be secured by Lofts. Does that -- was that something that was negotiated but didn't go through?**

A It was something they wanted.

**Q Right.**

A And I felt like I had -- I -- I went a different way with the Lofts collateral.

(Deposition Exhibit No. 109 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) All right. This is Exhibit 109. What is -- what is this document, Marc?**

A I think this is a document that David and Jai created themselves and that we did not end up signing.

**Q Okay. Why not? What happened?**

A There's a lot of cross section between David, Jai. You might remember that David is in my phone as David Ron Marks. There's a lot of cross section between multiple investment groups at play here and this was not a loan document or a structure that I wanted to pursue.

**Q Okay. So this one did not close in any form?**

A Under these loan documents, no.

**Q No. Okay. Okay. And there -- there was an email before that involving Kanye (sic) Capital. Would that have been the same deal that we just looked at that didn't close or not?**

A Kayne --

**Q Kayne --**
A Kayne.
**Q Kanye. Kayne.**
A Kayne is Woodland Oaks and Fairfax, senior mortgage lender.
**Q Okay. Got it. Just bear with me. Trying to eliminate some stuff here if I can.**
A Sure.
MR. FISHER: Joel, do you want to take a five-minute break? We've been going for a little bit more than an hour.
MR. TASCA: Yeah, that's -- that's fine.
THE VIDEOGRAPHER: Off the record. The time is 10:23.
(A recess was taken from 10:23 a.m. to 10:34 a.m)
THE VIDEOGRAPHER: We are back on record. The time is 10:34.
MR. TASCA: Let's mark that as the next exhibit. 110?
THE REPORTER: Uh-huh.
(Deposition Exhibit No. 110 was marked for identification and made part of the record.)
**Q (By Mr. Tasca) All right. Take a look at Exhibit 110. Now, 110 is not signed copy of the old documents, but I believe you told me you do have a**

**mortgage now or a loan from Lotor, right?**

A Yes.

**Q Okay. And is this a draft that was ultimately finalized and signed with Lotor -- Lotor, however you pronounce it?**

A As you guys have seen via my emails, I typically have my team sign documents on my behalf. I cannot testify whether this was what was signed -- ultimately signed or not, but this is -- I have no reason to believe that this is materially different than what would have been signed.

**Q Okay. So you got a loan from Lotor that was in the amount of 1.25 million; is that --**

A That is correct.

**Q Okay. And Lotor took a second mortgage on Lexington Commons and Villas at Midtown; is that right?**

A That -- that might be correct. I don't know if it's -- which combination of the three. I don't believe that they have one on all three, no. I believe that that is incorrect. I believe it's two of the three, although I'd have to research which two ended up with mortgages.

**Q Okay. Yeah, I mean, I think I only mentioned two, but two of three that are listed**

**here?**

A Yes, and that might be why this document was never signed. There might have been some negotiations that happened after this document.

**Q Okay. And this was in, what, September 2025?**

A Yes.

**Q Okay. Did you tell YSA about this specific transaction?**

A Same answer.

**Q Did you get permission from the senior lenders to provide this second mortgage to Lotor -- these second mortgages to Lotor?**

A Not -- not formal -- not formal permission, but not -- but, yes, it's not a default under any of the loans. I got a -- what we -- I don't know what the right word is. They -- they knew, not going to call a default, but no -- no, you know, co -- I'm drawing a blank on the -- on the name of the agreement now, but no -- no recognition agreement.

**Q Okay. So you informed the senior lenders about the second mortgages and they said "we're not going to make an issue out of it" basically?**

A Correct.

**Q Okay. At -- at this point in September, you've got second mortgages put on, like we said, maybe two of the three of the properties here. What other properties had second mortgages on them at this point since September 2025?**

A My belief is that it would have been the only other second mortgage -- I want to say this -- I want to clarify that I'm -- I could be missing something and if you have something that I'm missing, my under -- my belief off the top of my head is Putnam Greens, the Ridge Apartments, Woodland Manor and then some combination of two of the three of these and then that would be all the second mortgages that I'm aware of.

**Q Okay. And I think I know this, but just remind me. Who -- who had the second mortgages on the other properties, not the Lotor ones?**

A Toval Ventures.

**Q Toval. Okay. Was there a mortgage on WoodScape at this point?**

A No.

**Q Okay.**

A I don't believe there is a mortgage on WoodScape. There is a -- I think there is some UCC's on WoodScape.

**Q And -- and Domis didn't have any second mortgages because they ended up taking a mortgage on your home; is that -- do I have that right?**

A My -- I -- there was a lot of back and forth with the Domis deals. Where I believe that everything ended was they have second mortgages on two of my personal homes. They -- they filed a UCC financing statement against WoodScape.

I -- I argued that with them. It is my -- I haven't -- I don't actually know how this ended up, because I don't -- I don't pull UCCs. I believe they ended up removing the UCC from WoodScape because I believe they agreed with me that it wasn't proper, but I don't know off the top of my head and I would need to consult the documents before making a sworn statement.

**Q Okay. But leaving that UCC aside, there was no -- Domis didn't take a second mortgage on WoodScape?**

A At one point, it was part of the negotiations, and at one point, we were moving forward with documentation on a complex structure that involved multiple assets. I'm being careful with my words here, because Domis and I had certain agreements that I don't believe were upheld --

they -- they did -- whatever. They -- they did some things that I don't agree with.

So if you were to tell me that they did something further that I don't agree with, I -- but to my knowledge, the collateral that existed at the time of the Domis loan were my personal residences, a couple of UCCs against me personally, and my -- and some of my interests in the business. And I do know for a fact that they filed a UCC financing statement against one of the WoodScape entities.

**Q Going back to the properties you, you know, are certain that you provide second mortgages on, I believe you said you did at least get an oral sort of a -- maybe not approval is the right word, but the -- the -- the senior lender said that they wouldn't pursue it or make an issue of it, right?**

A They wouldn't -- correct.

**Q Okay. Were there any occasions where you went to a senior lender and they said that we will make an issue of it if you provide a second mortgage?**

A Yes, certainly.

**Q Okay. And how many times did that happen?**

A That's not a question I can answer time wise. It would be easier to go through a list of

lenders or conversations or whatever. I know, for instance, off the top of my head, I approached -- when -- when Bancorp still had the Riverpark and the Muntage loans, I approached -- in early '25 I approached Bancorp and Bancorp said under no stretch of the imagination are we okay with that.

Interestingly enough, Bancorp sold Riverpark at Kensington to Axonic Capital and Axonic has been open to the idea of a second mortgage, but unlike some of the other lenders, they won't do it under kind of -- they won't do it unofficially. It's got to be a certified intercreditor agreement. They want it in writing and we flirted with that a couple of times, but haven't had any success getting the intercreditor agreement across the finish line.

So it's going to differ based on lenders. I'm constantly having that conversation. I've approached multiple lenders about it and I've gone back to lenders a second time and said, can you reconsider this, this is why, this is the -- the pit, this is whatever and -- and different lenders have different -- different tolerances for it.

**Q Right. Besides -- I think you said banc -- Bancorp, have any others said, you know, hard no?**

A Cohen Company did not say hard no back

when we were on better terms, but they were certainly skeptical of their -- of getting their capital partner to sign off on it. I would say that my sworn testimony would be that Cohen was very open to it, but that they were concerned that their capital partner would not be as open to it as they were.

CMBS Loans are no -- there's just no one you can talk to. In CMB -- in -- in Lakeside Place and Shoreline were still actively having those negotiations with the special servicer, because we need capital and there's no one that special servicer could really go to to get that approval, so we're kind of stuck there.

**Q Right. Any others?**

A I mean, I've certainly spoken to Newmark and Northmarq about -- about second mortgages. Off the top of my head, that's a comprehensive list, but I --

**Q Sure. The CMBS loans, which properties do you have those on?**

A Lakeside Place and Shoreline Apartments.

**Q Okay. And -- and Special Servicer there, it's not -- it's not a hard no, they're just struggling to figure out who to get approval from**

**for it?**

A Yeah, in CMBS loans, the structure is it's owned by, like, there's, like, an A piece and a B piece and I don't know how long those tranches go and the approvals are all over the place and a lot of those ownership groups are just an LLC, institutional people that buy paper. And so CMBS loans are notoriously hard to negotiate any sort of modification or...

**Q Who is Adam Fletcher from 7Acre.**

A In my phone, he is Adam Maxus.

**Q Okay. So we don't necessarily have to mark this, but it looks like you had an email exchange with him in September where he -- he accused you of offering a second mortgage on WoodScape and you say, "I didn't offer a second on WoodScape to anyone."**

**Can you elaborate on this conversation? And we can mark the email if you want me to, but just trying to keep things moving.**

A No, I'm well aware of the email. Adam is -- as I testified earlier, Taylor, the guy who was in my phone as Taylor Maxus, took over Adam's position. Maxus and I have been enjoined in all sorts of negotiations for purchases, for sales, for

loans. Over the course of the last six months, they -- they're actively trying to buy properties from us today, and during that time period, we were more negotiating loans than we were purchases, but we were playing with different structures.

I was trying to entice or -- or interest Taylor with a reference to Adam. Adam has a -- what's called waterfall equity in WoodScape. He's not a mortgage holder. He's not a lienholder. It's not preferred equity, but it's their own -- what they -- they -- they call it their own capital that's kind of a mix between -- they would call it an elevated common position. That's what they would probably call it if they were -- something similar to that.

And so I was trying to explain to Taylor what Adam is doing and thought that that might be a way to structure something with Maxus. And what got back to Adam was not what had been offered to Taylor and I said to Adam that, "Here's my text with Taylor, here's my emails with Taylor, show me one place where I offered him a second mortgage on WoodScape."

**Q Right. I mean, you did say that -- in the discussions with Domis, there was at some point a**

**conversation about possibly providing a second mortgage on WoodScape. Could he have been referring to that?**

A No, no, he was directly referring to his conversations with Taylor.

**Q Okay. So he was just misinterpreting the conversations with Taylor or he was misinformed or something?**

A It's distinctly possible that either of those two things happened.

**Q Okay. Did you get a loan from Idan for 1.25 million?**

A Yeah.

**Q Okay. But you did request a loan from Idan for 1.25 million for a one-month time period and you offered to pay 300,000 of interest?**

A Not directly from Idan. Idan is a friend of mine. He knows -- he's a former professional basketball trainer. He knows lots of wealthy people and I went to him to see if anybody had an interest in.

MR. TASCA: This is --

MS. ALBERTO: 111.

MR. TASCA: -- 111.

(Deposition Exhibit No. 111 was marked for

identification and made part of the record.)

**Q (By Mr. Tasca) So you sent Idan the email we've marked as Exhibit 111 and you made that proposal?**

A That is correct.

**Q Okay. Did -- did this go anywhere?**

A No.

**Q Okay. It does -- here, you refer to 300,000 that you would pay as one month of interest, correct?**

A Certainly.

**Q But in your view, that's just a fee that you were paying for a one-month period where you would be borrowing that money?**

A That's correct.

**Q Okay. Why did you call it interest?**

A I think that's -- I don't -- I don't think that terming it interest is inconsistent with a fee.

**Q Okay.**

A I'm making an offer of the fee, the interest that I'm willing to pay a lender to make a loan.

**Q Okay. 112.**

(Deposition Exhibit No. 112 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. 112 is a text exchange with you and Jake from Tulsa. Who is Jake?**

A Jake is a -- was a reference of a friend of mine who, when I was looking for money, a gentleman I called, he said I should talk to my friend Jake.

**Q Okay. In this text message, you propose collateral which you say would be a property of mine. Were you referring to the real properties there, the Vesta real properties?**

A I think that's fair. I mean, I'm -- I'm responding. I'm talking about a second mortgage position on a property.

**Q Right. One of the Vesta properties, right?**

A Yes.

**Q Then you say, (As read) You/lender can file that mortgage if I'm in -- if I'm default. Would you characterize that as a -- I've seen this term -- pocket mortgage?**

MR. FISHER: Objection. You can answer.

A I've never used that term once in my life that I know of, but it -- it's a term that's come up in this litigation. Look, it's probably similar -- is that similar to a pocket judgment? I guess

that's the same concept.
**Q (By Mr. Tasca) Okay. 113.**
(Deposition Exhibit No. 113 was marked for identification and made part of the record.)
MR. TASCA: I think we got the wrong one. We'll do this one first.
MS. ALBERTO: It's the same. It just -- it -- we just skipped that one, so now we're here now.
MR. TASCA: Yeah, yeah. Okay.
MS. ALBERTO: And it starts a few pages earlier because that's the cover.
MR. TASCA: All right. I'm losing it. All right.
**Q (By Mr. Tasca) So yesterday I had mentioned this Canyon Stone Investments and I think you said you weren't familiar with it. Does this refresh your recollection?**
A Well, this is -- this is the group that I know as Lotor.
**Q Okay.**
A I didn't realize that -- that -- I think on the recording, they used Lotor, not Canyon Stone, which is why I was unaware of this. And as you can see, I had my team sign the documents on my behalf,

so I guess Canyon is Lotor and Lotor is Canyon.

**Q Okay. So these are the signed final signed documents with Lotor?**

A Correct.

**Q Okay. And does this refresh your recollection as to which properties you gave the mortgage on second mortgages on?**

A It seems to be Bartlesville -- obviously I see Bartlesville. I'm trying to find the second one. So it looks like -- it looks like they may have only done Villas and Bartlesville, but the confusion, if you're seeing the name Seminole here, is that Seminole and Villas are owned in the same LLC.

**Q Right, and then I think I know the answer to this, but it was only a total of 1.25 million, right, that you borrowed? It wasn't, like, 1.25 million per property?**

A That is correct.

**Q Okay. And before you -- and what were those loan proceeds used for?**

A I -- I don't have a specific sources and use off the top of my head, but for the -- for the -- for working capital.

**Q Right, for the operations of --**

A It might have been used to service debt. It might have been used to -- I couldn't tell you what I used it for on that day.

**Q Okay. Did it -- did it go toward benefiting these particular properties that were mortgaged?**

A Yes, but -- but not -- but both of those properties that were mortgaged had loans -- loan balances with me, so part of that benefit might have been to pay off my loans or would have been. I mean, I'm not -- yes, I believe I would have paid myself some loans back with this.

**Q Did any of the stakeholders in either of these properties ever complain to you that you had given these second mortgages on these properties?**

A Not to my knowledge.

**Q And you didn't go and talk to any of those stakeholders before you got those -- gave those second mortgages on those properties?**

A There -- I mean, certainly people that I talked to, but not in any formulaic or official capacity.

**Q Right. You didn't get, like, express permission from them to do it, right?**

A No, I did not.

**Q There was no vote held at the LLC level to permit you to provide those second mortgages?**

A No, there was not.

**Q What was Evolved?**

A Evolved.

**Q (Nods head in the affirmative.)?**

A Ido was a lender of mine. He had -- I don't understand Ido's structure. He had multiple different companies, Evolve, IB. There were a couple of others that were in his -- in -- in -- that he gave me loans on. He's an MCA lender, but then his MCA loans transitioned to Toval Ventures, which is not an MCA position.

(Deposition Exhibit No. 114 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. So looking at this Exhibit 114, this is a discussion, I guess, that -- that preceded the closing on the Toval -- this was before the Toval structure Evolved?**

A I guess so.

**Q No pun intended, but at that time, Evolved, you were thinking the MCA was going to get the collateral and then it ultimately turned into the -- the deal with Toval?**

A Yes and no. This never happened. Like,

Riverpark never got a second mortgage.
**Q Right. Okay. So there was no separate loan that was made here, this just eventually became a Toval transaction?**
A That's -- yeah, that's my belief and understanding, yes.
**Q Okay.**
A And certainly no new loan.
(Deposition Exhibit No. 115 was marked for identification and made part of the record.)
**Q (By Mr. Tasca) Okay. 115, what -- what's going on here, and as part of that, can you tell me who Ben Davis is?**
A Yeah, Ben Davis is a commercial sales broker for Northmarq Capital and he got very involved in trying to help me and -- yeah.
**Q Who was Forrest?**
A So -- so Ben -- Ben connected me to this guy Forrest. Forrest was all "I can fund in two days. I" -- you know, all -- you know, a lot of -- a lot of big talk and I think we reviewed some emails with Forrest in deposition number one with Altus Equities, so this is Ben and I having a personal, private conversation about how I felt about Forrest's behavior and requests during the

transaction.

**Q And on the second page here, one of the things you say is, "I'm open but my attorney isn't writing a fucking opinion letter on something that these clowns can review." What are you referring to there?**

A They were wanting a certified opinion letter from a legal firm. I don't know if it was enforceability or if it was -- if it was authority. I actually am not clear of what the opinion letter they were requesting was, but my attorney -- you know, my attorney at that point was not even a firm. He's general counsel. He's not insured to be writing opinion letters and -- and told me it was a ridiculous ask.

**Q Okay. You don't recall what the topic was specifically on what they wanted the opinion letter?**

A Again, it likely would have been authority or enforceability, but I can't -- I can't tell you which one. Those are the two standard opinion letters we would see in something like this.

**Q Authority for you to enter into a transaction with this guy Forrest and his company?**

A Quite frankly, I don't know what goes into an authority opinion and I don't know what goes into

an enforceability opinion, so I can't -- that's beyond my scope of knowledge. I brought this -- I brought that to my attorney and my attorney said it's a ridiculous ask.

**Q What was Forrest proposing? I know you said, you know fund, in two days. What were the other terms of the loan?**

A It was, like, 15 percent annual interest. I think there was some concept of -- of purchase and sale agreement in default. I don't remember the ins and outs, but it was some mixed combination of lighter -- you know, something that was much lower interest than what I'm, you know, normally paying or much lower fees than what I'm normally paying, however you want to look at it, and in that case, you know, I think they were couching it in terms of a 15 percent interest rate.

**Q Did his proposal involve a second mortgage?**

A My recollection is yes, but I'm not sure on that.

**Q Okay. Is there any other back and forth in writing with Forrest or concerning this proposal or was it all just by phone?**

A We did a lot of phone and I think there

were some emails. I -- I do think we reviewed the emails --

**Q Okay.**

A -- in the first deposition.

**Q But you produced to us everything you have on that?**

A Yes. Confident, yes.

(Deposition Exhibit No. 116 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. 116. Okay. You're -- on 116, you're talking to Dovi again, right?**

A Yes.

**Q And you're trying to get further financing from Dovi. He seems a little bit reluctant; is that fair?**

A Yes, this is in the lead up to Dovi's and I's relationship ending.

**Q And one of the things you say is, (As read) I could sign a second mortgage and leave you -- leave with you to file if 2 payments bounce in a row, correct?**

A Yeah.

**Q What property or properties were you talking about there?**

A I -- I -- we were not talking about properties in specific at this point. We're trying to figure -- I was trying to figure out how to make a deal work with Dovi. So basically Dovi had come up with a concept that I was going to send him money and then he was going to send me more money back, and that's ultimately what kills our relationship. And I, recognizing that that was a big risk for me, was trying to kind of restructure that with him, and say, "Hey, how about this, how about, you know, instead of me funding the money up front to you, why don't we restructure and make it safer for me?"

(Deposition Exhibit No. 117 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. 117 is a text exchange between you and Peter AC. Who is Peter AC?**

A Peter Auerbach.

**Q Okay. What's being discussed here with Peter, and as part of that, can you tell me who Dinesh is?**

A Dinesh is a lawyer -- Dinesh is a lender at Shelter Growth Capital. I like Dinesh. I don't agree with Peter's characterizations, for what it's worth.

**Q Who is SG?**

A Shelter Growth Capital.

**Q Oh, is that who you said Dinesh is with?**

A Yes. Okay. Yeah, it was a text thread between me and Peter Auerbach.

**Q And what's the content of the discussion you're having with him?**

A There's multiple. There's multiple different discussions going on here at the same time. Peter and I are discussing loans that are owed to me from the OKC-4 portfolio and that's the connection with Shelter Growth Capital. Shelter Growth is the senior lender and they are protective of us in a partnership dispute.

I was, you know, kind of talking to Peter about my -- my surety that SG is going to protect us and our loan position in that deal. We're talking about the -- what eventually will become the LPSA for Lofts at North Penn. Peter is focused on trying to limit the damage he's doing to me and instead my -- he feels, you know, more comfortable with damaging -- with -- with taking equity from my investors, because his belief is they should fund, and if they don't, it's on them. And I am pushing back on that in the thread saying, "Hey, look, this has got to come from me and my loans and that's how

we can structure this thing." There's some personal conversations about games I'm playing with Alicia and that's -- that's it.

**Q One of the things you say here is, "I'm filing a 2nd mortgage as soon as my resignation as manager is effective." What do you mean by that?**

A So the OKC-4 portfolio owes me money and the partnership wouldn't put it up. It was an odd -- it's a -- it was a uniquely structured deal and I decided that it was in our best interest to resign management. And I -- as manager, I felt like there was a conflict of interest with me protecting my loans, but as I got to know that the partnership's plan was to try to screw my loans over -- that's not the ride word choice for a deposition. I apologize.

When I got wind that the partnership was going to try to end run around my loans, I decided that I had to protect myself and that's the -- I'm working -- and still actually presently working with Shelter Growth to second mortgage, is it a lien. The partnership is actively in default because they have not paid my loans. And one of the things that SG had them sign in the extension document was all AP will be paid off, so I'm telling Peter, "Hey,

we're -- we're safe. We're going to find a way, including a second mortgage."

**Q Did you resign?**

A Yes.

**Q Okay. And -- and I'm interpreting what you just said. So -- so you haven't taken a second mortgage yet but you're working on it?**

A Shelter Growth asked me not to.

**Q Okay.**

A They have a different method that they prefer for me to secure my loans and they've been very good to me, so I am in turn doing what they're asking me to do.

**Q Okay. But you felt you had the ability to take the second mortgage based on your loans in the property?**

A Yes, I believe that is one of the ways that I could protect myself.

**Q Okay. Other than this, and I recognize you haven't actually gotten the second mortgage loan, have -- have you taken a second mortgage -- mortgage loan on any of the other properties?**

A No, it's a -- it's not something I would do.

**Q Okay. This is the only one where it's**

**under discussion and you've not ultimately pursued it yet because the senior lender is trying to work something else out to protect you?**

A I feel like I have the authority to sign it and the senior lender is open to supporting me in that, but they have a different method that they would like me to pursue right now.

(Deposition Exhibit No. 11 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. This one is a discussion between you and the rabbi, right? What are you discussing there?**

A This is not the rabbi.

**Q Oh, it's not the rabbi, I'm sorry. I gave you -- this is the one with Gibber, yeah.**

A Yes.

**Q Okay. So can you summarize what's being discussed here?**

A I mean, just a normal loan transaction between David Gibber and I talking about dynamics and properties and what's -- what's going on.

**Q Okay. One of the things you say is, "My loans are directly under the senior." You're referring to your loans that you made through Vesta Holdings to the property?**

A Yes, in the waterfall, my loans come under the senior lender.

**Q And then toward the end, second to last page you say, "Items for today 2nd mortgages on Eaton Place lofts Salem Mansion immediately record Eaton Place working on approval to record Lofts."**

**What -- what are you referring to there?**

A Approval from the senior lender.

**Q So did this proposal with Gibber go through?**

A The answer is, yes, the proposal went through. I don't know to the extent that I ever signed second mortgages, because David has been wanting me to sign second mortgages for months and months and months and I haven't done it. I don't know at some point, I -- I ended up signing second mortgages on his behalf on a few of those properties or not.

He certainly has never referenced them and so I'm covering myself, because it is my belief that I have never signed anything, but if you have evidence to the contrary, it -- it could just be that I didn't know what I was signing and wasn't paying any attention.

**Q Okay. So let's just back up. So he made**

**you a loan following this discussion?**

A I believe so.

**Q And how much was that loan for?**

A I couldn't tell you. David Gibber and I have done a lot of loans together.

**Q And he was -- was asking for security in the form of second mortgages on one of those properties you just list -- that we saw in your text we just read?**

A Yeah, this is the third or fourth text thread that you and I have gone over where David is asking about second mortgages.

**Q Right, and so what you're saying is you're not sure if he, on your behalf, has actually executed second mortgages?**

A No, no, I'm saying I don't believe I've ever executed second mortgages. If in your -- if in your papers you have -- you say, hey, Marc, I see that you signed a second mortgage, I -- I would be somewhat surprised, but I would also say, oh, well, I guess I just signed whatever he put in front of me and didn't pay attention to it because it's David and, you know, I'm -- I'm -- there is a possibility with how hard and persistent he's been about second mortgages. It is my memory and my -- with --

with -- with a high degree of certainty, I've never given in to that, but I don't know for sure.

(Deposition Exhibit No. 119 was marked for identification and made part of the record.)

MR. TASCA: 118?

THE REPORTER: 119.

MR. TASCA: 119.

**Q (By Mr. Tasca) 119. Okay. All right. Now, here is you and the rabbi, October 9th, 2025. I don't know that we've seen this particular rabbi. Maybe we have. I think we saw Rabbi Goldman.**

A This is a different rabbi.

**Q Okay. And -- and he's another one who's helping you find potential financing?**

A At this point, everyone in my network is trying to help me and nothing came of this, but actually, through Rabbi Tiectel's effort, a positive relationship did come and it's somebody who is very helpful today but it's somebody who is mortgage broker finding senior -- senior mortgages from us -- for us.

**Q Who is that?**

A A gentleman by the name of Adam Finkel.

**Q And one of the things you say here, "Would he be interested in a 2nd position," meaning a**

**second position mortgage?**

A In that instance, I believe my reference was actually to my loans.

**Q Okay. So underneath your loans which you -- your position is they were --**

A No, buying my loans. This is --

**Q Oh, buying.**

A -- in October, one of my focuses was LPSAs.

**Q For the record, what are LPSAs?**

A I don't know what the acronym stands for.

**Q Okay.**

A Loan purchase and sale -- I guess it's a loan purchase and sale agreement.

**Q Okay. Meaning that it's something -- something someone would enter into to purchase your loans that you had made to the properties?**

A Correct.

**Q Okay. So when you say second position, what you're talking about is the position right under the senior loan, which is what you contend your -- where your loans are in the -- in the waterfall, right?**

A Correct.

**Q And then you also propose this to be a "3**

**month loan at very high interest," right?**
A Yes.
**Q So you use the word "interest" again, correct?**
A Yes.
**Q Okay. We can probably skip this one, but there was another discussion with David Gibber on 9-29-25. Again, you're asking for 350,000. He's asking for second mortgages on a bunch of properties, but that, as far as you know, never happened, understanding you're not a hundred percent sure about that?**
A Correct. As you can see from these text chains, I'm still right about it at this point, because he's still just asking for it.
**Q Sure. Yeah, and I don't have any documentation in my pile. Just put your mind at ease you gave David a mortgage.**
A I was pretty confident, but it's one -- it was one of those -- my trust level with David Gibber is implicit, and I don't -- he's somebody that I don't particularly look over documents he sends me.
MS. ALBERTO: That's actually Exhibit 19 that we discussed.
MR. TASCA: Oh, okay. Forget it.

MS. ALBERTO: Yeah.

(Deposition Exhibit No. 120 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. Take a look at Exhibit 120.**

A Uh-huh.

**Q Now, this looks like -- it's -- it's a 10-20-2025 text string between you and David Gibber. It appears to me that he's wanting to perfect security on the loan that he made you. I guess not -- notwithstanding what we just exchanged about, I mean, this kind of suggests to me that maybe he did have some sort of quote, unquote pocket mortgage, but maybe not?**

A I don't know where you're seeing that.

MR. FISHER: Objection.

**Q (By Mr. Tasca) Well, I guess throughout the text, if you look on the -- maybe the fifth page, he talks about there being -- needing to perfect. Do you see that? And you say, "Perfecting your collateral will kill the sales."**

A Yeah, there's no -- yeah, that's -- I'm not giving him a second mortgage.

**Q Okay. So I just want to clarify, it's not like he had a mortgage and -- when I think of**

**perfecting, sometimes I think of filing, but that's not what you're talking about here, you're talking about actually giving him the second mortgage?**

A It's my understanding and belief, yes.

**Q Okay. Just -- again, I'm not trying to trap you or anything here, Marc, but it just seems like from the gist of this text message that, you know, he has something and he keeps sort of threatening to perfect it, but if you're -- if you're sure that there's not, that's fine.**

MR. FISHER: Objection.

A Please check Kulick Bates No. 9355.

**Q (By Mr. Tasca) Unfortunately, I don't have Bates on my. Can you tell me what Bates, like, three from the back or something?**

MR. FISHER: I believe it's Page 9, so I guess --

THE WITNESS: Which is -- which is -- actually is -- which actually is three from the back.

**Q (By Mr. Tasca) I guessed right. Okay.**

A At the very bottom of the page, David says, "You have offered mortgages in the past."

**Q Got it.**

A (As read) We need to have a -- to have a

comprehensive conversation.

**Q Fair enough.**

A What -- what's being discussed here when I'm getting defensive with David Gibber is my understanding that his investors are threatening to become litigious. That's what I was concerned with.

**Q Okay. There's another discussion in here with you and Judah from Greystone dated 10-31-25.**

(Deposition Exhibit No. 121 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Now, this -- this Exhibit 121 is dated 10-31-25, and I believe you testified yesterday that's the day that the YSA obtained its second mortgages, correct?**

A Yes, although I was not notified of YSA second mortgages until November the 7th.

**Q Okay. Had you hired Mr. Brodsky yet at this point to represent you in this case?**

A No.

**Q When did you hire Mr. Brodsky?**

A November 8th, I would say.

**Q Okay. So one of the things Judah says here in talking about, I presume, a potential secured loan is, "With the bridge loan, will you be able to cross the assets since there is different**

**ownership structures," and you say, "We've talked about that and yes."**

**What did you understand him to mean when he said "cross the assets since there is different ownership structures?"**

A This is not -- this is about a senior mortgage.

**Q Okay.**

A Judah is a senior mortgage lender and so Judah is trying -- Judah is trying to solve several different refinance options and he's -- which is still an ongoing conversation today is can -- it's advantageous to lenders sometimes to cross collateralize loans and it's easy to do that if you have uniform ownership. It is more complicated to do that if you do not have uniform ownership.

**Q Okay. So this conversation is exclusively about the senior loans?**

A Yes.

**Q Okay.**

(Deposition Exhibit No. 122 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) This is 122. Okay. What is this document, 122?**

A So this is a -- a loan agreement with my

partner at Pratt Street Capital from the end of October.

**Q Okay. And this was a loan that was actually entered into?**

A Yes, I didn't realize that there was a second mortgage component. I'm wondering if it was against Thrive Jenks.

**Q Well, that's what's referred to on?**

A Yes, Jenks Best Living on -- on Bates No. 13047.

**Q Okay. So -- so you gave a second mortgage on Jenks to Pratt Street?**

A Well, it's an -- that's an -- I'm sorry that I -- I didn't realize that there was -- that I -- that part of these loan documents were second mortgage. Pratt Street is my co-partner in Thrive Jenks. I'm quite -- I'm surprised that that was something that they -- that they wanted in this loan package, but I do recognize that I gave it to them.

**Q Okay. So -- so they were an equity investor, but then also made a loan to Jenks, Pratt Street?**

A They are the -- they are the co-managers of the entire investment entity and they are the primary shareholders of Thrive Jenks.

**Q Okay. And -- right, and so they made this loan. How much was this loan for?**

A My memory was two hundred and something thousand dollars, but I think they included a hundred thousand dollar loan they had given me previously into this. Yeah, the total that they're netting here is 370 -- 370,000.

**Q Okay. Did you speak with the senior lender about providing the second mortgage on Jenks?**

A I did not. I didn't -- did not realize that the mortgage was part of the documents that Pratt Street was requesting there.

**Q Okay. Has the senior mortgage -- senior lender ever complained about this mortgage to you? I mean --**

A No.

**Q -- I assume not since you didn't even know about it?**

A Correct, no.

**Q All right. Take a look back at page Kulick 13050.**

A 13 -- 13 -- okay.

**Q So if you look at that page, there's a Paragraph 3 that says Affiliates, right?**

A Uh-huh.

**Q And it says, "Louis," which would be Louis Investments, LLC, correct?**

A Correct.

**Q And we've established that you're the sole member and manager of Louis Investments, LLC at the last deposition, right?**

A That is correct, yes.

**Q Okay. And it says here, (As read) Louis, directly or indirectly, owns or controls those entities which are listed on Exhibit A attached hereto and made a part hereof, defined as the affiliates, and has full power and authority to bind the affiliates by the signature of the undersigned loan.**

**Do you see that?**

A I do.

**Q Okay. And then if you look down at Paragraph 8, sub a, Roman ii, it also describes the affiliates as guarantors of the loan. Do you see that?**

A I do.

**Q Okay. So was it your understanding that the affiliates were guaranteeing this loan to Pratt Street?**

A Yes.

**Q Okay. And then if you flip back a few more pages to Kulick 13052, you see the affiliates are listed on Exhibit A and there are a number of them, but would you agree with me that affiliates covers a number, if not all, of the real property owning entities?**

A Yeah, yes, there are some errors in this, though, and actually after this, I'll point that out to them. We're likely going to have to amend this.

**Q Okay. What are the errors?**

A Not all these affiliates are actually mine. There's a few of them that I have nothing to do with.

**Q Okay. Which ones?**

A I have no ownership or affiliation to NAE Canopy Apartments, LLC; Northboro QN, LLC; GAM Chestnut Properties, LLC. I don't know if I have -- I don't -- I don't -- I would have to look into my affiliation to One Eton Tic 1, LLC or Eaton Place Tic 1, LLC -- no, actually, I think Eaton Place Tic 1, LLC is mine, but Woodland Manor Tic 1, LLC I want to look and that -- that -- would be it -- that would be it.

**Q Okay. And then other than those, you stand by the statement that's made here that Louis**

**has the full power and authority to bind the affiliates by your signature on this document?**

A That's my understanding.

**Q Okay. Is this -- maybe you don't know this because you weren't even aware of the second mortgage, but do you know if this is recorded in the public records, these documents?**

A No.

**Q All right. Don't necessarily need to mark this, but you had a discussion with someone named Darren who you said was an investor?**

A Yes. By clarification, do you mean Darren Holland.

**Q It says Darren H on your text?**

A Okay. Yes.

**Q And he says in this text that -- let's just mark this quickly.**

(Deposition Exhibit No. 123 was marked for identification and made part of the record.)

MR. TASCA: Okay. I believe this is 115.

THE REPORTER: 125 -- 4 -- 3.

MS. ALBERTO: 113.

MR. TASCA: 113. Okay.

THE REPORTER: 123.

MS. ALBERTO: I mean, 123.

MR. TASCA: 123.

**Q (By Mr. Tasca) Exhibit 123, for the record, so this is the discussion with you and Darren. He said he -- "People have been positive on the collateral. Even though it is 2nd after primary lenders," and then you say, "There are 12 properties."**

**What are you guys talking about here?**

A The last sentence clarifies that, my loans being offered at a 25 percent discount.

**Q Right. Okay. So this isn't about second mortgages, it's about selling your loans to the properties?**

A Correct. This is my main -- that is my main focus at this point.

**Q Got it. Got it. Okay. There was another text between you and somebody from Capital Assist dated 11-3-25. Do you recall them wanting an unrecorded mezzanine in second lien position?**

A As we discussed yesterday, that was part of Capital Assists attempt to bridge to somebody in their network creating a buyout offer in the Vesta portfolio that ultimately didn't happen.

**Q Right. All right. And do you recall telling them that -- that unrecorded would -- could**

**work?**

A Yes.

(Deposition Exhibit No. 124 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. Exhibit 124 is a discussion between you and Jai and Ron and David, right?**

A Yes, seems to be.

**Q Okay. Now, you say to them, "You truly have no idea what we are going through right now. It didn't help that I fired AJ this week. We have been retraded on multiple deals and the sales market is full of false promises. Stephanie works for a big firm and isn't comfortable with some of the concepts that AJ was okay mainly the second mortgage/lien."**

**Who is Stephanie?**

A A new attorney -- an attorney in my orbit.

**Q Okay. At a firm?**

A Yes.

**Q What firm?**

A Haynes Boone.

**Q Where is that located?**

A Stephanie is located in Texas. I don't know -- I mean, I think Haynes Boone is a national

firm.

**Q And what's her last name?**

A Stephanie Spell.

**Q Spell, can you spell that?**

A S-P-E-L-L.

**Q Okay. When you say that she's not comfortable with some of the concepts that AJ was okay, what are you talking about there?**

A Look, I know that you've kind of smirked -- I don't know if this is a fair characterization, but I know that you haven't taken seriously that I'm trying to understand my -- my -- my rights better, but as you can tell in this text thread, I consulted with Stephanie over their proposal and I'm telling them at this point, I'm not so sure that the second mortgages are okay and I'm not ready to agree to that.

**Q Okay. So AJ it sounds like was telling you that -- that the second mortgages were okay and Stephanie is -- is expressing at this point some skepticism at least?**

A I would characterize it AJ told me that a manager managed LLCs. With the authority that I have, I had basic --

MR. FISHER: Marc, Marc, to the extent

that this is attorney-client information that's not reflected in this text message.

THE WITNESS: Oh, okay. I'm sorry about that.

**Q (By Mr. Tasca) Fair enough. I mean, you've explained multiple times what your understanding was at that time of your authority, so I don't need you to tell me what your counsel told you.**

**When did you hire Stephanie? In case it helps, just a reminder, this is dated November 10th, 2025, this text.**

A That's a very difficult question, because Stephanie was brought in to help AJ with his workload, but as I wanted to kind of change my legal team, I started using her for more advice and transactional stuff that wasn't associated directly with an ongoing sale.

**Q Right. Okay. So when did you initially bring her on, though, to have her help out AJ roughly?**

A I believe it would have been the fall of 2025, but I could be mistaken on that.

**Q So, Marc, one of the things that happens in litigation is you get, you know, documents up to**

**a certain point, which today you produced them and we're going to make a subsequent request to follow up for anything that's relevant that's been generated since the date of your production, but in the meantime, can you tell me since mid November what other loans you or any of the Vesta properties or your affiliates have obtained?**

MR. FISHER: Objection. You can respond.

A There have been a couple with Peter Auerbach or affiliate friends that are lend groups of his. There have been a couple with David Gibber. I have a gentleman that's worked -- that's now working for me that has brought in a couple of lenders, but they were way smaller amounts than you might see here.

**Q (By Mr. Tasca) Who is that?**

A Gentleman named Rohan Joseph has brought in some investors of his to make loans.

**Q And who were the actual lenders on those?**

A I don't have their names. They operate through Rohan.

**Q Okay. So Auerbach, Gibber, these folks through Rohan. Who else?**

A I am -- I am not sure there is anything else.

**Q Have you gotten additional MCA loans since mid November?**

A No, I have not. To the best of my knowledge, no.

**Q Have you gotten any other financing for yourself personally since mid November?**

A Can you clarify the question?

**Q Sure. Well, let me -- let me change the question.**

**Who did Auerbach lend to?**

MR. FISHER: Objection.

A Vesta Holdings.

MR. FISHER: You can answer.

**Q (By Mr. Tasca) Okay. And how much -- was it just one loan or was it multiple loans?**

A Probably around a million dollars, multiple loans.

**Q Okay. So multiple loans totaling about a million since the -- since mid November of 2025. How about Gibber? Who did he lend to?**

A Vesta Holdings, it's my belief. Actually, with David -- you know what, with David, I don't know. I -- I don't know if I'm correct on who the lenders are.

**Q Okay. How -- how much did David lend**

**total --**

A He --

**Q -- since that time?**

A He's made probably several loans, paid them off, put more out, made several loans and paid them off.

**Q Okay.**

A At present, I believe I owe David $500,000 --

**Q Okay.**

A -- in addition since November.

**Q So the net with all the loans back and forth paid back, it's about 500,000 currently that you owe Gibber?**

A (Nods head in the affirmative.)

**Q How about the loans you got through Rohan?**

A I would say, in total, it's probably a pay back of around $350,000 right now with the majority of that being one person.

**Q And who are those loans to?**

A Vesta Holdings guaranteed by myself and Rohan.

**Q Are there -- is there documentation of these loans? And when I say "documentation," I mean either formal documentation or a text message or**

**email exchanges, whatever you have?**

A Some there are and some there aren't.

**Q Okay. Are any of these loans secured by anything?**

A The loans from Rohan are secured by some of his personal residences. Apparently he owns a portfolio of single family houses. To the best of my knowledge, no further collateral.

**Q What's Rohan's incentive to help you out with this?**

MR. FISHER: Objection.

A You mean -- I mean, I'm impressed by his willingness to jump in. He's a -- he's our director of asset management and I think he wants to earn his relatively high salary and keep, you know, keep -- keep moving forward.

**Q (By Mr. Tasca) Right. He works for Vesta. I think you said that. I forgot. Okay.**

**Now, you had mentioned earlier in passing that you had talked to two senior lenders on the way here, but are you actively seeking other loans right now? Like, this week, have you solicited any additional loans, putting aside the three categories you just talked about?**

A I had a conversation with somebody at

American Funding about an MCA, non MCA. They made an offer and I don't think it's worth the risk.

**Q Okay. When was that conversation?**

A Most recently two days ago.

**Q Let me just kind of expand the scope of the timeframe a little bit. I guess, like, since the new year 2026, who have you talked to besides American Funding, if anyone, about potential other financing?**

A Oh, yeah, Gibber, Auerbach, Rohan.

**Q Sure. Leaving those aside, because I understand those.**

A I don't -- I don't know if -- well, David Ruttenberg, but less of a loan, more of selling my -- David and I have been talking about selling loans I've made to various properties. That's mainly still the focus -- I would tell you that the main focus has not been loans right now. It's been liquidating my loan -- my loan values. That -- that's the main focus.

**Q Okay. So American Funding, Ruttenberg, understanding that the focus is a little bit different there. Anybody else since January that you've been talking to about potential financing?**

A No, not to my knowledge.

**Q Okay. So with regard to your loans and Vesta Holdings' loans, do you understand that in the loan documents that you entered into with YSA, there's a provision in there that talks about you being a trustee in certain circumstances for YSA?**

MR. FISHER: Objection. You can answer.

A No, I'm not aware of that.

**Q (By Mr. Tasca) Okay. Did you have a chance to review the motion for leave for counterclaim that YSA filed, I think it was last week?**

A Not in totality, but yes, I've reviewed it.

**Q Okay. Did you see in there that there was a breach of fiduciary duty claim?**

A Yes, I did.

**Q Okay. So you don't understand that you have an obligation under the guarantee to collect as trustee for YSA amounts that the properties owe to you personally or to Vesta Holdings?**

MR. FISHER: Objection.

A That is not my understanding.

**Q (By Mr. Tasca) That's not your understanding. Is this the first you're hearing about that?**

MR. FISHER: Objection.
A First I heard about it would have been on the counterclaims.
**Q (By Mr. Tasca) Okay. So when you saw the -- the counterclaims, I mean, did -- did that -- did that register with you that there was that provision in the -- in the loan documents that required you to do that?**
MR. FISHER: Objection.
A No.
**Q (By Mr. Tasca) It didn't register?**
A It's probably another fundamental disagreement we're going to have.
**Q Okay. Let me put it a different way: Did it register with you when you read the counterclaim that that is YSA's position?**
A Oh, yes, I believe I -- I understand that is YSA's position.
**Q Have you or Vesta Holdings collected any money from the properties that you've held in trust for YSA?**
A No.
**Q But you have collected money -- you and Vesta Holdings have collected money on loans made to the properties for -- and you used it for other**

**purposes, correct?**

A Yes, that is correct.

**Q I want to go back to -- just check my notes on something.**

THE WITNESS: While you're doing that, can I check my blood sugars very quickly?

MR. TASCA: Yes, absolutely.

THE VIDEOGRAPHER: Off the record?

THE WITNESS: Oh, I just need to actually scroll and check it. It's 120.

MR. TASCA: I mean, I wouldn't mind taking a quick bathroom break, if that's all right. It's about six minutes until noon. I think I can wrap up within 15 minutes; is that fair?

THE WITNESS: Okay.

MR. TASCA: Michael, is that fair?

MR. FISHER: Yeah, that's great.

MR. TASCA: Okay.

MR. FISHER: Bathroom break is good.

THE VIDEOGRAPHER: Off the record at 11:54.

(A recess was taken from 11:54 a.m. to 12:02 p.m.)

THE VIDEOGRAPHER: We are back on record. The time is 12:02.

**Q (By Mr. Tasca) Okay. I just wanted to**

**ask you a few follow-up questions, Marc, about a topic we discussed yesterday, which is the funding of the litigation. And when I'm talking about litigation, I want to just focus on -- on this particular case that -- that you brought against YSA.**

**It seems to me that you've hired Mr. Brodsky's firm. You've hired Sean Bellew's firm and you've hired the local firm here in Tulsa, correct, for -- for this case?**

A That's correct.

**Q Okay. Any other firms that I'm missing or lawyers?**

A At present, no.

**Q Have you hired any expert witnesses for this case?**

A Not to my knowledge.

**Q And since this case has started, can you give me the total amount you've paid to the various firms or at least give me an estimate?**

A I would --

MR. FISHER: Objection. You can answer.

A I would estimate somewhere in the vicinity of 400- to $500,000.

**Q (By Mr. Tasca) Okay. And do you know the**

**allocation among the various counsel?**
A I --
MR. FISHER: Objection. You can answer.
A I don't.
**Q (By Mr. Tasca) Okay. So 4- to 500,000 total between the three firms since the inception, and we may have done a little bit of this yesterday, but refresh my memory. What account do those fees get paid out of?**
A Primarily Vesta Capital.
**Q Vesta Capital. Okay. And where does Vesta Capital get its -- its revenue?**
A I don't know if it's acceptable for me to point this out, but we had this exact conversation yesterday.
**Q I understand that. So let me try to summarize and you can tell me if I have it wrong, but it seems to me that rents are collected by the properties, right, and they flow up to Vesta Capital at Vesta Holdings and Vesta Realty?**
A No, that's incorrect.
**Q Okay. Well, can you help me out then?**
A To the extent that rents on the property are involved, the only involvement would be properties paying back my loans to the properties

and that would be the -- that would be one level of the property's involvement. The properties also get -- get fees, asset management, property management fees, which are fresh income, not loan reimbursements.

**Q And they go to --**

A They could go to any of those three entities.

**Q What's the determining factor for where it goes?**

A Each deal is done differently. It just depends on the partnership of those deals.

**Q Okay. So -- so the rents -- it's coming back to me. They -- they -- they stay in the property owning entities, some of them go into a separate account that the lender -- senior lender controls, right?**

A Yes.

**Q And then what goes up to Vesta Capital Vesta Holdings, Vesta Realty are the AM fees and the management fees, right?**

A Correct.

**Q And payment on your loans also flows up to the extent you cause a payment to be made, right?**

A That is correct.

**Q And those are the sources of revenue for those three entities, correct?**

A Correct.

**Q Now, the AM fees, the management fees, and the payments for your loans, that amount of money, those amounts ultimately come out of the rents, right, that the properties are -- are generating?**

A Yes.

**Q Okay. What's the -- let's just take a recent period, January to -- to the present, or if -- if it's easier to go back to December since that was a full month, we can do that, whatever is easier.**

**What's the total amount that flowed up to Vesta Capital, Vesta Holdings, and Vesta Realty in the form of those fees or -- or payment on your loans?**

A I wouldn't have the answer to that and then also Vesta Holdings gets loans in. There's -- I mean, there's no way for me to -- you know, as you guys know, Vesta Holdings is the recipient of all the loans as well, so there -- there's no way for me to track a this.

**Q When you say "recipient of all the loans, you mean loans from third parties that are -- like,**

**for example, a loan from Auerbach that you mentioned --**
A Yes.
**Q -- is that what you're talking about correct, not your loans.**
A Correct.
**Q Okay.**
A There's no way for me to answer that question.
**Q So -- so but -- I'm glad you mentioned that, because I'm just trying to complete the picture here. So the loans from the three buckets that we talked about before the break, those go into Vesta Holdings and then the fees, payments on your loans come up to Vesta Capital, Vesta Holdings, Vesta Realty. And then what happens to the loan proceeds that go into Vesta Holdings? When I say loan proceeds, I mean like the -- the Auerbach loans, whatever loans you might get from third parties. Where does that money flow to?**
A It gets utilized.
**Q Okay. And how is it that you -- you pay back Auerbach, the others that you mentioned? Would that be payments from the fees and the loan payments that Vesta Holdings receives from the properties?**

A Sales, refinances, LPSAs, all of that.

**Q Okay. But included what I said as well, right?**

A Yes, included what you said as well.

**Q Okay. Is there any documentation of the -- the allocation of where the source of funds is that -- that repays those folks, those third-party lenders?**

A No.

**Q It all just kind of goes into one bucket into Vesta Holdings and then whether it's from a sale -- a sale of your loans, whether it's from the fees, it's all just sort of put in one bucket and then it gets used, correct?**

A Yeah, you're going to have like a day like today where I wake up and there's utility disconnects that need to be paid for or -- I guess, I say that, this is litigation, so I need to be more careful with my word choice. Potential, you know, if you don't pay this, there's going to be a disconnect so I have to pay that or, you know, $51,000 needed for a plumbing operation at a property, which happened this morning as well.

So all of that goes into the picture of that day's financials and makes -- informs decisions

on how I'm -- what I'm going to pay or what loans I can service or who I can -- you know, what ground I can cover in that -- in that given day.

**Q And the repayment of -- of your loans by the properties, does that -- I think you said this, but I just want to be clear, that goes to any of Vesta Capital, Vesta Holdings, or Vesta Realty depending on the structure?**

A The repayment of my loans?

**Q Yeah.**

A No, that can go anywhere I direct it to go.

**Q Okay. So -- so the -- the -- Okay. And where do you direct that to go?**

A That also depends on ins and outs on various accounts. There might be a day where we want, you know, for our -- you know, for our purposes to direct it through Vesta Capital. It's not -- there's no rhyme or reason to that.

**Q Okay. You said yesterday, like, one of these companies is the -- the in company and one is the out company. Can you explain that again now that I understand this a little better?**

A Vesta Holdings has two accounts. One is ins and one is outs.

**Q Okay. And both of those are Vesta Holdings accounts?**

A (Nods head in the affirmative.)

**Q Just look at my notes here. When a lawyer says he's looking at his notes, it means you're almost done, so it's a good sign.**

**I asked this at the last deposition and I've been neglecting to ask at this time, but I do have an obligation to ask it. At any of the breaks during these depositions the last few days, two days, have you had any discussions with your counsel?**

THE WITNESS: Michael, are you -- is it okay if I ask him if I'm --

MR. FISHER: Yeah, you have to answer that.

A Oh, I didn't -- I apologize. I didn't know that that was ever settled.

Easiest one would be to start with today. Just telling me I'm doing a good job and keep going and stay strong, some, you know, basic encouragement.

Andy Shanks' commentary, only things he's said about during breaks, we've talked about other cases we're dealing with. We've talked about

personal stuff. The advice he's given me -- is the question only pertaining to this -- like, if I'm talking to Andy about something unrelated to this, doesn't matter to you?

**Q Yeah, yeah, I guess what I'm more concerned about is conversations you had about the deposition or the substance of the testimony you've given.**

A Okay. Andy has been -- has given me advice on my -- kind of the cornerstones to depositions in his mind, which is listen carefully, answer narrowly, pause -- listen carefully, pause, answer narrowly and he has repeated that more times than I care to -- care to count.

**Q It's good -- it's good advice.**

A And it's difficult for me, because I talk and sometimes over the course of the last -- of these depositions, I've forgotten I was in a deposition and I feel like I'm having a conversation. So that's obviously something that I've had to remember and keep in mind, but to the extent of my memory, that's the only thing that we've talked about the case.

And I think -- I think yesterday we talked a little bit about timing and what we were going to

offer you in terms of, you know, some -- you know --
MR. FISHER: Marc, to the extent that was after the deposition yesterday, after the --
THE WITNESS: That was during -- it was during.
MR. FISHER: -- it was during a break. Okay.
THE WITNESS: It was during a break.
MR. FISHER: Okay.
A We talked about how we could bridge your need for more time and our desire for me to get back to my life.
**Q (By Mr. Tasca) Sure.**
A So we crafted an offer that I think, you know, ultimately ended up with us here.
**Q Okay. And so have you exhaustively told me everything you talked about in the categories that I defined for you with respect to the Tulsa lawyers that have been here over the last two days?**
A I believe so, yes.
**Q Okay. Now, separate and apart from those guys, did you have any conversations with Mr. Fisher or Mr. Brodsky during breaks falling within the categories that I mentioned?**
A Certainly not Mr. Fisher. I haven't

spoken to him at all during the depos.

I mean, I've called Ben for -- I had actually -- I will tell you I didn't understand why and I was a little bit offset by it. I've called Ben to discuss what's going on and he was very, "Yeah, just keep going, keep -- keep -- keep hammering away, you're doing fine." And I didn't really understand until you asked the question in the first deposition why they were doing that, but I guess it's what they're supposed to do or something to that effect.

**Q Right. Okay. So that was the sum total of what you discussed with -- with Ben over -- not just the last two days, but even during that first deposition?**

A Yeah, during the last two days, we've had almost virtually no communication.

**Q Okay. Just a couple of clean-up things here. I think you said there's no rhyme or reason to whether money goes into holdings, realty or capital. Is that what you said?**

A Well, realty might be separate, because holdings and capital are -- are holdings companies. They don't have -- they're -- they're not operating companies. Vesta Realty is an operating company, so

if I move money into Vesta Realty, there's a reason. It's paying something. It's loaning some money to Vesta Realty. Holdings and Vesta Capital are holdings companies at my discretion.

**Q Got it. Okay. Have you, besides your lawyers, discussed your testimony or this case with any other people?**

A Absolutely.

**Q All right. Who have you discussed it with?**

A Any investor who's asked questions, heard about it, read about it, asked questions. Investors that are directly impacted by it. I mean, you have to remember, the second mortgages are blocking multiple transactions. People want to know why and what we're doing about it and how we're handling it.

**Q Okay. And I want to come back to that, just figure out who that is exactly, but besides those folks, anybody else you've talked to about the case or your deposition? Your wife maybe?**

A My wife has a relatively low tolerance for all of this, so less -- least of all her.

**Q Okay. All right. Anybody other than the investors and other lenders?**

A I mean, sure. I've -- I've probably

discussed with some of my friends. I don't know off -- I mean, I can't tell you a list of names that I've discussed the case with. I mean, it's part -- it's something going on in my life and, you know, people have asked, you know, what's going on with this.

They see -- there was a -- one of the business legal websites posted something after the telephonic hearing in November. Lot of people sent that to me and, you know, I can't track down who sent that to me or what conversations that have been.

**Q Right. Okay. Why don't you just tell me the specific people that you can remember that you talked to about the case.**

A A lot of -- I mean, that's a -- it's a high number. I don't -- I can't -- there's no way I can come up with a list of people that I've spoken to on this -- in this venue.

**Q It doesn't need to be comprehensive. I'm just trying to understand who you had discussions with.**

A Peter Auerbach, David Ruttenberg, David Gibber, David -- David and Jai. I mean, Ben Davis, every single one of my senior lenders, sales --

investment sales team at Newmark, buyers on the potential -- on the -- on the prospective assets, mortgage broker who is working on getting us new loans, lenders who are working on doing refinance loans with us, investors, Marc Fish, Mike Rushmore, Steve Miller, a group of investors that they invest with. Quite frankly, I couldn't come up with the names if I tried? Alex Zupperman, some of Alex's investors whose names I don't know. Company called Oro Capital that's working to partner with us.

**Q Who -- who is the mortgage broker trying to get you more loans?**

A Adam Finkel. We discussed that.

**Q Oh, you mentioned that, Adam Finkel. Okay. And where is he what company?**

A Marcus & Millichap.

**Q Can you spell that for the court reporter?**

A I don't know how to spell Millichap.

**Q Okay.**

A They're a big -- they're a big --

**Q Okay.**

A -- investment sales and brokerage firm.

**Q Got it. And when you've talked to these folks, do you just give them the status? Do you give them what your position in the case is? What**

**do you tell them? Both of those things?**
A Both of those things. Yeah, that's fair.
**Q Anything beyond that?**
A I -- are -- are you meaning, like, my personal feelings about Efraim Diveroli?
**Q Sure.**
A No, I -- I stay clear of that. I think that, you know, it's not super important to people right now.
**Q Have you discussed with any of them what you believe your chances are of prevailing?**
A People ask me that question consistently.
**Q What do you tell them?**
A Well, what I've told them is I -- I don't believe I signed anything that would have allowed the second mortgages. And, furthermore, going through the deposition process, I'm very clear with people. I've been pretty clear with people what I'm offering and I sincerely -- you know, at -- at one point in April, I did in a particular loan transaction offer Efraim Diveroli a second mortgage. It didn't end up happening, but it was a clear, concise conversation.
I'm resolute that I -- I did not offer the collateral. I think that that's -- you know, but I

always tell people that when you're in front of a judge or a jury or anything like that, ball is out of your hands and it's -- what are the odds? It's 50/50. Right? It's -- there's two outcomes.

**Q Got it.**

MR. TASCA: All right. I don't think I have anything else, Marc. I really appreciate your time.

Any questions from you guys?

MR. SEARCY: No, we'll -- we'll reserve any questions for trial.

MR. FISHER: No questions from me. I'm not sure of other counsel that's there, but we're going to Marc this deposition -- today's deposition as confidential as well.

MR. TASCA: Okay. Thanks very much.

THE VIDEOGRAPHER: That concludes the deposition. The time is 12:23.

(Deposition concluded at 12:23 p.m.)

JURAT

MARC KULICK, VESTA, ET AL VS. YSA INVESTMENTS

JOB FILE NO. 179432

STATE OF OKLAHOMA

SS

COUNTY OF TULSA

I, MARC KULICK, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place, except for the corrections noted.

_______________________

Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, MARC KULICK, on this ______ day of ______________, 2026.

_________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES: ____

ERRATA SHEET

MARC KULICK, VEST ET AL VS. YSA INVESTMENTS

DEPOSITION OF MARC KULICK

REPORTED BY: SHANNON S. HARWOOD, CSR, RPR, CRR

DATE OF DEPOSITION TAKEN: FEBRUARY 5, 2026

JOB FILE NO. 179432

| PAGE | LINE | IS | SHOULD BE |
|---|---|---|---|

# C E R T I F I C A T E

STATE OF OKLAHOMA )
)
COUNTY OF TULSA )

I, Shannon S. Harwood, a Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that the foregoing is a true and correct transcription of my shorthand notes of proceedings had in Case No. N25C-10-309 heard on the 5th day of February, 2026, and is only valid with my stamped seal and my original signature.

I further certify that I am not related to nor attorney for either of said parties nor otherwise interested in said action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 6TH day of FEBRUARY, 2026.

______________________________
Shannon S. Harwood, CSR, RPR, CRR

**WORD INDEX**


< $ >
**$15,000** 580:11
**$183,000** 603:13
**$2** 590:2
**$200,000** 570:1
**$25** 569:2
**$25,000** 598:2
**$250,000** 597:3
**$30,000** 580:12
**$300,000** 571:6 601:21
**$350,000** 584:15 651:18
**$4** 603:20
**$40** 592:15
**$500,000** 569:11 651:9 657:24
**$51,000** 662:22

< 0 >
**000001** 554:3
**0034482** 554:2
**022474** 554:3
**02956555** 554:4
**02958446** 554:5
**02958447** 554:5
**02958493** 554:5

< 1 >
**1** 548:6 643:19, 20, 21
**1.25** 606:13 615:12, 15 619:16, 17
**1.5** 571:6
**1.7** 569:2
**1.8** 567:25
**10** 555:10, 13, 14, 19 577:4 578:10 593:20 600:14 601:2
**10/20/25** 551:16
**10/31/25** 551:19, 20
**10/9/25** 551:16
**10:23** 605:14, 15
**10:34** 605:15, 17
**100** 550:9 551:23 566:3, 4, 7 594:8
**101** 550:11 581:7, 8, 10
**102** 550:12 582:16, 17, 20
**10-20-2025** 636:8
**103** 550:15 584:8, 9, 11
**10-31-25** 638:8, 12
**104** 550:17 586:8, 9, 11
**105** 550:18 588:6, 8, 10
**106** 550:18 589:18, 21
**107** 550:21 593:18, 22
**108** 550:21 594:16, 18, 24
**10845** 549:13
**109** 550:24 604:3, 6
**10th** 648:11
**11** 555:14 630:8
**11/1/25** 551:22
**11/10/25** 551:23
**11:54** 656:21, 22
**110** 551:1 552:8 605:19, 21, 24
**111** 551:3 615:23, 24, 25 616:3
**112** 551:5 616:23, 24 617:1
**113** 551:7 618:2, 3 644:22, 23
**11-3-25** 645:18
**114** 551:9 621:14, 17
**115** 551:9 622:9, 11 644:20
**116** 551:12 625:8, 10, 11
**117** 551:13 626:13, 15
**118** 551:13 633:5
**119** 551:16 633:3, 6, 7, 8
**12** 645:6
**12:02** 656:22, 24
**12:23** 672:18, 19
**120** 551:16 636:2, 5 656:10
**121** 551:19 638:9, 12
**122** 551:20 639:21, 23, 24
**123** 551:22 644:18, 24, 25 645:1, 2
**124** 551:23 646:3, 5
**125** 644:21
**13** 641:22
**13047** 640:10
**13050** 641:21
**13052** 643:2
**15** 592:24 624:8, 17 656:14
**179432** 673:3 674:6
**18h** 599:7
**18th** 599:12
**19** 635:23

< 2 >
**2** 625:21
**2,000** 598:10
**2,000-plus** 597:15
**20** 592:22, 24 593:2
**200** 549:5
**200,000** 601:21
**2017** 595:7
**2021** 570:22
**2023** 558:14
**2024** 558:15 599:18 602:17
**2025** 553:7 554:24 556:2 558:17 561:22 567:16 578:18, 23 579:13 581:4 582:21 592:17, 21 593:3, 7 601:16, 25 602:17, 21 607:6 608:5 633:9 648:12, 23 650:19
**2025-1319-MTZ** 548:5 553:6
**2026** 548:12 552:7 653:7 673:20 674:5 675:12, 18
**20th** 565:10
**21st** 549:4 561:22 601:16
**2200** 548:18
**23** 573:8
**23580** 583:3, 4
**24** 592:24
**25** 567:24 592:25 611:4 645:10
**250,000** 596:12
**2727** 549:4
**28** 567:16
**28th** 573:8
**294553** 554:5
**2949552** 554:2
**2950238** 554:6
**2955371** 554:3
**2956554** 554:4
**2nd** 583:7 587:1 595:19 628:5 631:4 633:25 645:5

< 3 >
**3** 579:9 634:25 641:24 644:21
**300,000** 615:16 616:9
**305.303.5054** 548:19
**317,000** 601:1
**31st** 600:25
**33130** 548:19
**350,000** 635:8
**370** 641:7
**370,000** 641:7
**38** 588:23

< 4 >
**4** 644:21 658:5

Case 26-03071-sgj Doc 25-1 Filed 07/27/26 Entered 07/27/26 00:13:09 Desc
Appendix in Support (part 2) Page 110 of 200

**400** 657:24
**44** 548:18
**450** 569:11, 22

< 5 >
**5** 548:12 552:7 553:7 557:18, 25 558:9 674:5
**50/50** 672:4
**500,000** 651:13 658:5
**555** 550:3
**562** 550:6
**567** 550:9
**58** 550:24
**582** 550:11
**583** 550:12
**585** 550:15
**587** 550:17
**589** 550:18
**59** 551:1
**590** 550:18
**594** 550:21
**595** 550:21
**5th** 675:11

< 6 >
**600** 549:13
**6TH** 675:18

< 7 >
**7** 593:21
**7,000** 597:21
**7:04** 567:17
**70** 551:3
**702.792.3773** 549:14
**71** 551:5
**72** 551:7
**74114** 549:6
**75** 551:9
**76** 551:9
**7745** 570:5
**7746** 567:14
**79** 551:12
**7Acre** 613:10
**7th** 638:16

< 8 >
**8** 642:18
**8/21/25** 550:6
**8/26/25** 550:12
**8/28/25** 550:9
**80** 551:13
**84** 551:13
**8459** 561:25
**8466** 564:17
**8474** 564:7
**87** 551:16
**89135** 549:14
**8th** 638:21

< 9 >
**9** 637:16
**9/1/25** 550:24
**9/14/25** 550:17
**9/15/25** 551:3
**9/16/25** 550:18
**9/17/25** 550:21
**9/21/25** 551:5
**9/24/25** 551:7, 9
**9/26/25** 551:12
**9/27/25** 551:13
**9/29/25** 551:13
**9/9/25** 550:11, 15, 21
**9:03** 548:12
**9:04** 553:7
**90** 551:16
**9-14-25** 550:18 586:12
**918.747.8900** 549:7
**92** 551:19 588:23, 25
**9-29-25** 635:8
**93** 551:20
**9355** 637:12
**94** 588:22 589:2, 3
**98** 551:22
**99** 550:6 561:17, 18
**9-9-25** 584:13
**9th** 633:9

< A >
**A.M** 548:12 553:8 567:17 605:15 656:22
**abilities** 557:12
**ability** 591:21 592:2 599:19 629:14
**able** 562:9 638:25
**Absolutely** 585:23 656:7 668:8
**AC** 626:16
**acceptable** 598:3 658:13
**acceptance** 562:19 583:16
**accepting** 580:9
**account** 658:8 659:16
**accounts** 663:16, 24 664:2
**accused** 613:15
**acronym** 572:13 634:11
**acted** 558:6
**action** 675:16
**actions** 558:5 559:22 562:17
**actively** 562:11 612:10 614:2 628:22 652:21
**actual** 649:19
**ad** 590:25
**Adam** 586:17, 20 613:10, 11, 21 614:7, 17, 19, 20 633:23 670:13, 14
**Adam's** 586:20 613:23
**added** 567:17
**addition** 651:11
**Additional** 564:6 650:1 652:23
**Advances** 562:24
**advantageous** 639:13
**advice** 562:12 648:16 665:1, 10, 15
**affiliate** 649:10
**affiliated** 560:19
**Affiliates** 641:24 642:12, 13, 19, 23 643:2, 4, 11 644:2 649:7
**affiliation** 643:15, 19
**affirmative** 621:6 651:15 664:3
**aftermath** 569:19
**aggressive** 558:15
**ago** 653:4
**agree** 555:4 560:13 562:5, 22 565:19 567:1 596:18 597:14 598:10 602:14 610:2, 4 626:23 643:4 647:17
**agreed** 552:2 609:13
**agreement** 550:6 552:5 561:20 562:23 563:1, 6, 7, 9, 14, 18 564:20 565:11 567:4 583:20 584:1 596:10 607:20, 21 611:12, 15 624:10 634:14 639:25
**agreements** 562:25 564:24 573:12 575:7 577:24 578:2 601:6 609:25
**ahead** 600:9
**air** 580:19
**AJ** 598:20 599:8, 11, 15, 19, 25 600:5, 6 646:11, 15 647:7, 18, 22 648:14, 20
**AL** 673:2 674:2
**Alberto** 549:17 566:11, 13, 16 588:23 589:2 593:21 615:23

618:*7*, *11* 635:*23* 636:*1* 644:*22*, *25*
**Alex** 670:*8*
**Alex's** 670:*8*
**Alicia** 628:*2*
**aligned** 576:*7*
**alleged** 599:*21*
**allocation** 658:*1* 662:*6*
**allowed** 578:*7* 671:*15*
**Altus** 622:*23*
**amend** 643:*9*
**American** 556:*12* 560:*23* 561:*4* 653:*1*, *8*, *21*
**Amex** 584:*15*, *21*
**amount** 555:*7* 557:*22* 559:*12* 560:*14* 581:*23* 593:*10*, *13* 596:*12* 600:*20* 601:*8* 602:*2* 606:*13* 657:*19* 660:*5*, *14*
**amounts** 559:*24* 649:*14* 654:*19* 660:*6*
**ancillary** 574:*6* 575:*1* 576:*16*
**Anderson** 582:*23*
**Andy** 664:*23* 665:*3*, *9*
**annual** 597:*15*, *20* 599:*4* 624:*8*
**annually** 597:*22*
**answer** 555:*1*, *7*, *19*, *20* 560:*5*, *9* 562:*17* 563:*2* 585:*18* 589:*14* 600:*2* 607:*10* 610:*24* 617:*21* 619:*15* 631:*11* 650:*13* 654:*6* 657:*22* 658:*3* 660:*18* 661:*8* 664:*15* 665:*12*, *13*
**anti-stacking** 562:*3*
**anybody** 615:*20* 653:*23* 668:*19*, *23*
**anymore** 559:*6*
**anyway** 571:*17* 577:*6*
**AP** 628:*25*
**apart** 562:*21* 601:*8* 666:*21*
**Apartments** 608:*11* 612:*22* 643:*16*
**Apollo** 556:*13*
**apologize** 561:*13* 628:*16* 664:*17*
**Apparently** 652:*6*
**appearance** 554:*11*
**APPEARANCES** 548:*15*, *25* 549:*1* 553:*10*
**appears** 561:*23* 570:*6* 581:*10*, *12*, *13* 586:*22* 593:*22* 594:*5* 636:*9*
**appreciate** 672:*7*
**appreciative** 572:*18*
**approached** 611:*2*, *4*, *5*, *18*
**approval** 575:*10* 583:*13*, *14*, *15*, *24* 610:*14* 612:*13*, *25* 631:*6*, *8*
**approvals** 575:*5*, *20* 613:*5*
**April** 671:*20*
**argued** 609:*9*
**aside** 609:*17* 652:*23* 653:*11*
**asked** 587:*13* 629:*8* 664:*7* 667:*8* 668:*11*, *12* 669:*5*
**asking** 576:*9*, *10*, *18* 583:*15* 589:*7* 629:*13* 632:*6*, *12* 635:*8*, *9*, *15*
**asks** 588:*16*
**ASSET** 548:*3* 553:*4* 572:*9* 580:*23* 652:*14* 659:*3*
**assets** 572:*20* 575:*3* 586:*5*, *6* 590:*23* 609:*23* 638:*25* 639:*4* 670:*2*
**Assist** 550:*7* 555:*17*, *18* 556:*8* 560:*22* 561:*8*, *11*, *21* 562:*9* 601:*15*, *19*, *25* 602:*13* 645:*17*
**Assists** 645:*21*
**associated** 648:*17*
**assume** 559:*9* 641:*17*
**assumed** 600:*7*
**assuming** 583:*7*, *18*
**attached** 642:*10*
**attachments** 550:*24* 551:*7*, *20*
**attempt** 645:*21*
**attention** 631:*24* 632:*22*
**attorney** 623:*3*, *11*, *12* 624:*3* 646:*18* 675:*15*
**attorney-client** 648:*1*
**attorneys** 552:*4*
**Auerbach** 571:*13* 572:*2* 591:*14*, *18* 626:*17* 627:*4* 649:*10*, *22* 650:*10* 653:*10* 661:*1*, *18*, *23* 669:*23*
**August** 554:*24* 556:*2*, *4* 561:*22* 567:*16* 578:*18* 582:*21* 601:*25*
**authentic** 602:*12*
**authority** 563:*8*, *25* 593:*13* 623:*9*, *18*, *22*, *25* 630:*4* 642:*12* 644:*1* 647:*23* 648:*7*
**authorized** 563:*10*, *17*
**Avenue** 552:*8*
**aware** 608:*14* 613:*21* 644:*5* 654:*7*
**Axonic** 611:*8*

**< B >**
**back** 560:*2* 569:*13* 574:*17*, *24* 576:*15* 577:*7* 579:*14* 592:*3* 593:*15* 597:*4* 599:*7*, *13* 605:*16* 609:*4* 610:*11* 611:*19*, *25* 614:*19* 620:*12* 624:*22* 626:*6* 627:*24* 631:*25* 637:*15*, *20* 641:*20* 643:*1* 651:*12*, *13*, *18* 656:*3*, *23* 658:*25* 659:*14* 660:*11* 661:*23* 666:*11* 668:*17*
**Backd** 555:*23* 556:*3*, *6* 560:*19* 564:*25*
**backing** 598:*6*, *7*
**bad** 591:*16*
**balance** 560:*2* 569:*24* 585:*20* 591:*18* 593:*5*, *6*
**balances** 591:*17* 620:*9*
**ball** 672:*2*
**ballpark** 557:*14* 580:*2*
**Baltimore** 572:*17*
**banc** 611:*23*
**Bancorp** 611:*3*, *5*, *7*, *24*
**bank** 583:*17*
**Bartlesville** 619:*8*, *9*, *11*

**based** 591:24 600:5, 18 611:16 629:15
**basic** 647:24 664:21
**basically** 607:24 626:4
**basis** 593:5
**basketball** 615:19
**Bates** 561:24 564:8, 16, 17 583:3 588:22 637:12, 14 640:9
**bathroom** 656:12, 19
**bbrodsky@bfwlegal.com** 548:20
**bear** 605:6
**bearing** 554:7
**BEGINNING** 548:12 592:20 593:3
**BEHALF** 548:11, 16 549:10 553:20 554:13 563:17, 25 564:9 606:7 618:25 631:17 632:14
**behavior** 622:25
**belief** 582:13 608:6, 10 622:5 627:22 631:20 637:4 650:21
**believe** 553:13 558:4 566:12 569:24 570:2, 8 572:25 582:9, 11 596:9 600:4 601:14 602:21 603:19 605:25 606:10, 20, 21 608:23 609:5, 11, 13, 25 610:13 620:11 629:17 632:2, 16 634:2 637:16 638:12 644:20 648:22 651:8 655:17 666:20 671:11, 15
**believed** 563:21
**Bellew's** 657:8
**Ben** 622:13, 14, 18, 23 667:2, 5, 13 669:24
**benefit** 620:9
**benefiting** 620:5
**best** 557:12 558:17 573:2 575:25 576:2, 4 577:9, 14 628:10 640:9 650:3 652:7
**better** 565:3 575:11 612:1 647:13 663:23
**beyond** 624:2 671:3
**BH** 556:22, 23 557:1, 2, 25 559:11, 14, 23 560:6, 13
**big** 622:21 626:8 646:14 670:20
**bill** 584:15, 21
**bind** 642:12 644:1
**bit** 574:4 578:2 581:18 605:11 625:15 653:6, 22 658:7 665:25 667:4
**blank** 556:11 572:11 607:19
**Bless** 600:20
**blocking** 668:14
**blood** 656:6
**bold** 567:17, 20 570:6, 8
**books** 571:16 577:12, 13
**Boone** 646:22, 25
**borrowed** 619:17
**borrower** 558:2
**borrowing** 571:8 616:14
**bottom** 637:22
**bought** 595:9
**bounce** 625:21
**Bradley** 572:21
**breach** 654:15
**break** 605:10 656:12, 19 661:13 666:6, 8
**breaks** 664:9, 24 666:23
**bridge** 638:24 645:21 666:10
**briefly** 586:13
**bring** 577:7 648:20
**broad** 590:23
**BRODSKY** 548:17 638:17, 20 666:23
**Brodsky's** 657:8
**broker** 622:15 633:20 670:3, 11
**brokerage** 670:22
**brought** 624:2, 3 648:14 649:13, 17 657:5
**brutal** 577:3
**Bryan** 579:9 580:14
**bucket** 662:10, 13
**buckets** 661:12
**bunch** 635:9
**business** 556:5 560:2 571:4 572:8 574:10 610:8 669:8
**buy** 613:7 614:2
**buyers** 670:1
**buying** 595:10 634:6, 7
**buyout** 645:22

**< C >**
**calculate** 579:16
**calculated** 580:17
**calculating** 579:2
**calculator** 597:13 598:11
**call** 564:19 565:16, 22 577:8 578:4 579:15 607:18 614:11, 12, 14 616:16
**called** 556:20 562:16 564:3 572:11, 18, 21 579:8, 12 582:24 614:8 617:5 667:2, 4 670:9
**calls** 571:23 576:23, 25 577:1, 3 578:14, 16, 20 579:7 587:21
**Canopy** 643:16
**Canyon** 618:16, 23 619:1
**capability** 562:16
**capacity** 620:22
**Capital** 550:6 555:17, 18 556:8, 9, 20, 22, 23 557:1, 2, 6, 25 559:12, 14, 23 560:6, 13, 22 561:8, 11, 21 562:9 571:23 572:18 573:8 576:22, 25 577:2, 8 578:4, 14, 15, 20, 21 579:7, 8, 12, 15 580:11 582:23 583:21 584:3 601:15, 19, 25 602:13 604:22 611:8 612:3, 6, 12 614:11 619:24 622:15 626:22 627:1, 11 640:1 645:17, 21 658:10, 11, 12, 19 659:19 660:15 661:15 663:7, 18 667:21, 23 668:3 670:10
**car** 587:20
**Cardiff** 602:16, 21, 23 603:5, 21
**Cardiffs** 603:5
**care** 665:14
**careful** 609:23 662:19

**carefully** 665:*11*, *12*
**Case** 548:*5* 553:*6*, *13* 591:*24* 624:*15* 638:*18* 648:*10* 657:*5*, *10*, *16*, *18* 665:*23* 668:*6*, *20* 669:*3*, *15* 670:*25* 675:*11*
**cases** 664:*25*
**Cash** 562:*24* 602:*4*
**categories** 652:*23* 666:*17*, *24*
**cause** 659:*24*
**caused** 558:*19*
**ceased** 557:*7*
**center** 585:*4*
**CEO** 561:*1*
**certain** 563:*25* 600:*20* 609:*24* 610:*12* 649:*1* 654:*5*
**certainly** 556:*3* 558:*7* 560:*6* 562:*10* 568:*14* 585:*17*, *19* 587:*20* 589:*8* 590:*22* 591:*19* 593:*16* 597:*16* 601:*18* 610:*22* 612:*2*, *16* 616:*11* 620:*20* 622:*8* 631:*19* 666:*25*
**certainty** 633:*1*
**certified** 611:*12* 623:*7* 675:*7*
**certify** 675:*9*, *14*
**cetera** 560:*23* 582:*2*
**chains** 635:*14*
**chance** 580:*22* 654:*9*
**CHANCERY** 548:*1* 553:*5*
**chances** 671:*11*
**change** 648:*15* 650:*8*
**changed** 562:*18* 572:*14*
**channel** 561:*12*
**characterization** 574:*3* 577:*19* 584:*16* 647:*11*
**characterizations** 626:*23*
**characterize** 617:*19* 647:*22*
**characterized** 577:*20*
**check** 637:*12* 656:*3*, *6*, *10*
**checked** 570:*24* 573:*25* 574:*22*
**checking** 577:*18*
**Chestnut** 643:*17*
**choice** 628:*15* 662:*19*
**Christopher** 598:*24*
**circumstances** 654:*5*
**City** 579:*9* 586:*15* 588:*12* 589:*24*
**Civil** 552:*6*
**claim** 595:*25* 596:*2*, *7* 654:*15*
**clarification** 555:*15* 560:*24* 644:*12*
**clarifies** 645:*9*
**clarify** 560:*11* 608:*8* 636:*24* 650:*7*
**clean-up** 667:*18*
**clear** 565:*19*, *22* 566:*1* 575:*7*, *12* 581:*7* 623:*10* 663:*6* 671:*7*, *17*, *18*, *22*
**clearly** 594:*1*
**close** 568:*18*, *21* 569:*1* 571:*3* 604:*18*, *24*
**closed** 568:*23* 569:*5*
**closing** 621:*18*
**clowns** 623:*5*
**CMB** 612:*9*
**CMBS** 612:*8*, *20* 613:*2*, *7*
**Cohen** 567:*1*, *24* 569:*2* 611:*25* 612:*4*
**collateral** 595:*19* 604:*2* 610:*5* 617:*8* 621:*23* 636:*21* 645:*5* 652:*8* 671:*25*
**collateralize** 639:*14*
**collect** 558:*4*, *11* 559:*12* 654:*18*
**collected** 655:*19*, *23*, *24* 658:*18*
**collectively** 592:*12*
**co-managers** 640:*23*
**combination** 606:*19* 608:*12* 624:*11*
**come** 559:*17* 560:*3* 564:*11* 565:*8* 617:*23* 626:*4* 627:*25* 631:*1* 633:*18* 660:*6* 661:*15* 668:*17* 669:*18* 670:*7*
**comes** 589:*14*
**comfort** 597:*16*
**comfortable** 627:*20* 646:*14* 647:*7*
**coming** 583:*25* 659:*13*
**commentary** 664:*23*
**commercial** 622:*14*
**COMMISSION** 673:*25*
**common** 614:*13*
**Commons** 582:*12* 591:*7* 606:*16*
**communication** 572:*10* 667:*17*
**Community** 589:*25*
**companies** 621:*9* 663:*21* 667:*23*, *25* 668:*4*
**Company** 611:*25* 623:*23* 663:*21*, *22* 667:*25* 670:*9*, *15*
**complain** 620:*14*
**complained** 641:*14*
**complete** 661:*11*
**completely** 556:*4*
**complex** 609:*22*
**complicated** 639:*15*
**component** 640:*6*
**compounding** 597:*22*
**comprehensive** 612:*18* 638:*1* 669:*20*
**concept** 585:*7* 601:*8* 602:*24* 618:*1* 624:*9* 626:*5*
**concepts** 582:*4*, *5* 601:*5* 646:*15* 647:*7*
**conceptualize** 601:*3*
**Conceptually** 578:*10* 587:*12*
**concerned** 612:*5* 638:*6* 665:*6*
**concerning** 624:*23*
**concise** 671:*23*
**concluded** 672:*19*
**concludes** 672:*17*
**conduit** 561:*7*
**confess** 587:*1*
**confident** 599:*20*, *22*, *23* 625:*7* 635:*19*

**CONFIDENTIAL** 548:9 553:23, 25 672:15
**confirm** 553:23
**conflict** 628:12
**confused** 553:15
**confusion** 619:12
**connected** 622:18
**connection** 627:11
**connections** 603:4
**consider** 559:8
**consideration** 568:6
**consistently** 565:16 585:6 671:12
**constantly** 611:17
**consult** 609:15
**consulted** 647:14
**consummated** 566:24 567:2
**contact** 561:6
**contacts** 595:4
**contain** 600:1
**CONTAINS** 548:9
**contemplates** 569:2
**contemplating** 597:20
**contend** 565:21 634:21
**content** 627:5
**contention** 584:2
**context** 567:18 581:18 583:9
**continually** 570:10
**CONTINUED** 548:10, 25 549:1 553:2
**contrary** 631:22
**controls** 642:9 659:17
**conversation** 584:17 588:10 589:8, 17, 22 594:12 611:17 613:18 615:1 622:24 638:1 639:12, 17 652:25 653:3 658:14 665:20 671:23
**conversations** 560:1 562:22 575:6 587:16 589:9 611:1 615:5, 7 628:2 665:6 666:22 669:11
**convert** 581:24
**co-partner** 640:16
**Copperfield** 586:24 587:5, 8, 11 591:11
**copy** 594:19 601:13 605:24
**cornerstones** 665:10
**correct** 555:20 562:3 564:9, 16 566:1 568:5 579:18, 21 581:1 582:6 584:7, 12, 22 585:1 587:2, 6 588:2 590:13 594:8, 9 599:10, 17 600:15 606:14, 18 607:25 610:17 616:5, 10, 15 619:4, 19 625:22 634:18, 24 635:4, 13 638:14 641:19 642:2, 3, 7 645:14 650:23 656:1, 2 657:9, 11 659:22, 25 660:2, 3 661:5, 6 662:14 673:10 675:9
**corrections** 673:11
**couching** 624:16
**counsel** 553:9 564:20, 23 565:1 599:9 623:13 648:8 658:1 664:12 672:13
**count** 555:17 665:14
**counterclaim** 654:10 655:15
**counterclaims** 655:3, 5
**countless** 599:3
**COUNTY** 673:6 675:5
**couple** 561:14 591:8, 9 603:11 610:7 611:14 621:10 649:9, 11, 13 667:18
**course** 594:8 614:1 665:17
**COURT** 548:1 553:5 554:9, 15 670:17
**cover** 590:8 618:12 663:3
**coverage** 581:23
**covering** 631:20
**covers** 643:5
**crafted** 666:14
**created** 604:9
**creating** 645:22
**credit** 583:18 602:25
**Creek** 573:8
**crises** 558:18
**cross** 604:12, 14 638:25 639:4, 13
**CRR** 548:23 552:9 674:4 675:25
**CSR** 548:23 552:9 674:4 675:25
**current** 572:9, 10
**currently** 568:19 651:13
**cut** 559:17
**cuts** 588:25
**cycle** 571:3

**< D >**
**daily** 597:22
**damage** 627:19
**damaging** 574:8 627:21
**dance** 585:8
**Dansker** 594:13
**Darren** 644:11, 12, 14 645:4
**date** 553:6 649:4 674:5
**dated** 567:16 584:12 638:8, 12 645:18 648:11
**David** 567:11, 12, 13, 21, 24 568:23, 25 569:3, 6, 22 584:19 585:6 598:1 603:2 604:8, 13, 14 630:20 631:13 632:4, 11, 22 635:7, 18, 20 636:8 637:22 638:4 646:6 649:11 650:22, 25 651:8 653:13, 15 669:23, 24
**Davis** 622:13, 14 669:24
**Day** 570:20, 21 571:6 596:19 620:3 638:13 662:15 663:3, 16 673:20 675:11, 18
**days** 561:14 622:20 624:6 653:4 664:10, 11 666:19 667:14, 16
**day's** 662:25
**deal** 569:1 570:11, 19 572:15 574:22 581:22, 24 582:14 584:4 585:20 603:20 604:23 621:24 626:4 627:16 628:9 659:11
**dealing** 664:25
**deals** 571:21 590:25 591:1, 4 595:9, 10 609:5 646:12 659:12
**debt** 558:3, 19 559:18 591:22 620:1

**December** 570:22 578:18, 23 579:13 660:11
**decided** 575:15 628:10, 18
**decision** 576:2
**decisions** 575:25 662:25
**deed** 595:25 596:2, 7
**deep** 574:7
**default** 595:21 607:15, 18 617:18 624:10 628:22
**Defendant** 548:7, 11 549:10 553:18
**defensive** 638:4
**define** 573:20
**defined** 563:1 642:11 666:18
**definitely** 563:21
**degree** 633:1
**DELAWARE** 548:1 552:6 553:6
**depending** 663:8
**depends** 659:12 663:15
**depos** 667:1
**deposes** 554:20
**DEPOSITION** 548:10 552:4 553:2, 22 561:18 564:11 566:4 581:8 582:17 584:9 586:9 587:22 588:8 589:18 593:18 594:16 604:3 605:21 615:25 616:24 618:3 621:14 622:9, 22 625:4, 8 626:13 628:16 630:8 633:3 636:2 638:9 639:21 642:6 644:18 646:3 664:7 665:7, 19 666:3 667:9, 15 668:20 671:17 672:14, 18, 19 673:8 674:3, 5
**depositions** 664:10 665:11, 18
**describe** 599:4
**described** 565:11 566:19 600:8
**describes** 642:18
**Description** 550:5
**designate** 553:22
**desire** 666:11
**desperate** 596:19
**determination** 577:16
**determining** 659:9
**DETRICH** 549:3 554:12
**Detweiler** 549:18
**developed** 563:23
**developer** 595:8
**differ** 611:16
**different** 555:6 578:3 580:18 582:3, 4 604:2 606:10 611:21, 22 614:5 621:9 627:8 629:10 630:6 633:12 638:25 639:4, 11 653:23 655:14
**differently** 577:20 659:11
**difficult** 555:6 575:24 576:8 648:13 665:16
**dilute** 580:24
**diluted** 577:23 578:12, 21, 25 579:17 580:8, 12
**diluting** 577:6
**dilution** 578:5, 8 579:25 580:9, 16
**dilutive** 577:7 578:24 580:21
**Dinesh** 626:20, 21, 22 627:2
**Direct** 550:3 554:22 663:11, 14, 18
**directly** 615:4, 17 630:23 642:9 648:17 668:13
**director** 652:13
**disagree** 574:3 576:6 602:11
**disagreeing** 601:4
**disagreement** 655:13
**disappear** 559:4
**disconnect** 662:21
**disconnects** 662:17
**discount** 645:10
**discretion** 668:4
**discuss** 667:5
**discussed** 561:10 564:1, 10 565:14 566:24 571:12 575:10 583:11 584:1, 5 626:18 630:18 635:24 638:3 645:20 657:2 667:13 668:6, 9 669:1, 3 670:13 671:10
**discussing** 582:9, 11, 20, 24 586:5, 23 598:8 627:9 630:12
**discussion** 621:17 627:5 630:1, 11 632:1 635:7 638:7 644:10 645:3 646:6
**discussions** 614:25 627:8 664:11 669:21
**dispute** 627:13
**distinctly** 615:9
**Diveroli** 549:17 671:5, 21
**docs** 600:6
**document** 564:7 600:10 602:5, 7 604:6, 8, 16 607:2, 4 628:24 639:24 644:2
**documentation** 598:19 609:22 635:17 651:23, 24, 25 662:5
**documented** 593:4 603:18
**documents** 551:1 560:15 599:10 603:20 604:20 605:25 606:7 609:15 618:25 619:3 635:22 640:15 641:11 644:7 648:25 654:3 655:7
**doing** 595:24 614:17 627:19 629:12 656:5 664:20 667:7, 9 668:16 670:4
**dollar** 641:5
**dollars** 583:18 601:17, 19 641:4 650:16
**Domis** 609:1, 5, 18, 24 610:6 614:25
**Dovi** 560:18, 22 561:1, 6, 9 625:11, 15 626:4
**Dovi's** 625:17
**downward** 572:25
**draft** 603:20 606:3
**drafted** 596:9
**drawing** 556:10 572:11 607:19
**Drive** 549:13
**driving** 587:22
**Duane** 594:24 595:1, 7 596:9 597:4, 11, 25 598:9, 16, 17 600:19 601:10
**duly** 554:20 563:9, 17
**duties** 575:23

**duty** 575:*22* 654:*15*
**dynamics** 630:*20*

< E >
**earlier** 613:*22* 618:*12* 652:*19*
**early** 554:*1* 592:*25* 611:*4*
**earn** 652:*14*
**ease** 635:*18*
**easier** 610:*25* 660:*11*, *13*
**Easiest** 664:*19*
**East** 549:*4* 573:*8*
**easy** 639:*14*
**Eaton** 573:*9* 631:*5*, *6* 643:*19*, *20*
**edited** 600:*5*
**effect** 667:*11*
**effective** 628:*6*
**effort** 633:*17*
**Efraim** 549:*17* 596:*15*, *18*, *22* 598:*1* 600:*25* 671:*5*, *21*
**eight** 555:*14* 570:*2*
**either** 564:*19* 598:*12* 615:*9* 620:*13* 651:*25* 675:*15*
**elaborate** 613:*18*
**element** 591:*21*
**elevated** 614:*13*
**Elgin** 552:*8*
**eliminate** 605:*7*
**ELLER** 549:*3* 554:*12*
**email** 550:*9*, *12*, *21*, *24* 551:*3*, *7*, *20* 566:*17*, *19* 567:*16* 582:*20* 594:*3* 604:*22* 613:*13*, *19*, *21* 616:*2* 652:*1*
**emailed** 566:*13*
**emails** 558:*14* 565:*15* 599:*14* 606:*6* 614:*21* 622:*22* 625:*1*, *2*
**encouragement** 664:*22*
**encumbered** 562:*25*
**ended** 580:*8* 583:*24*, *25* 584:*2* 585:*10* 606:*23* 609:*2*, *6*, *10*, *12* 631:*16* 666:*15*
**enforceability** 623:*9*, *19* 624:*1*
**enjoined** 613:*24*
**enter** 554:*11* 623:*22* 634:*16*
**entered** 561:*21* 562:*24* 596:*16* 597:*11* 601:*16* 640:*4* 654:*3*
**enterprise** 574:*19*
**enthusiastic** 585:*13*
**entice** 614:*6*
**entire** 640:*24*
**entirely** 569:*10*
**entirety** 673:*9*
**entities** 563:*17*, *25* 564:*6*, *8* 591:*23* 610:*10* 642:*10* 643:*6* 659:*8*, *15* 660:*2*
**entitled** 560:*15*
**entity** 574:*7* 579:*12* 640:*24*
**equation** 591:*21*
**Equities** 622:*23*
**equity** 576:*22* 577:*7* 578:*24* 580:*8*, *21* 585:*21* 586:*25* 590:*8*, *13*, *17* 594:*7* 614:*8*, *10* 627:*21* 640:*20*
**ERRATA** 674:*1*
**errors** 643:*7*, *10*
**established** 642:*4*
**estate** 557:*9* 571:*22*, *23* 581:*22* 586:*14* 595:*8* 643:*3* 644:*18* 645:*2* 646:*3*, *5*
**estimate** 555:*13* 657:*20*, *23*
**et** 560:*23* 582:*2* 673:*2* 674:*2*
**Eton** 643:*19*
**event** 572:*15* 587:*5* 599:*14*
**eventually** 622:*3* 627:*17*
**everybody** 576:*21*
**evidence** 631:*22*
**evidenced** 597:*25*
**Evolve** 621:*9*
**Evolved** 557:*5* 621:*4*, *5*, *19*, *22*
**exact** 658:*14*
**exactly** 566:*1* 668:*18*
**Examination** 550:*3* 554:*22*
**example** 583:*14* 661:*1*
**examples** 581:*17* 587:*19*
**exchange** 594:*14* 613:*14* 617:*2* 626:*16*
**exchanged** 636:*11*
**exchanges** 652:*1*
**exclusively** 639:*17*
**executed** 632:*15*, *17*
**exhaustively** 666:*16*
**Exhibit** 550:*5* 561:*17*, *18* 566:*3*, *4*, *7* 581:*8*, *10* 582:*17* 584:*9* 586:*9*, *11* 588:*8* 589:*18*, *20* 593:*18* 594:*16* 604:*3*, *6* 605:*19*, *21*, *24* 615:*25* 616:*3*, *24* 618:*3* 621:*14*, *17* 622:*9* 625:*8* 626:*13* 630:*8* 633:*3* 635:*23* 636:*2*, *5* 638:*9*, *11* 639:*21* 642:*10*
**EXHIBITS** 550:*4*
**existed** 610:*5*
**exists** 602:*5*, *7*
**expand** 653:*5*
**expectation** 571:*2*
**experience** 558:*10*, *22*
**experiencing** 558:*20*
**expert** 657:*15*
**EXPIRES** 673:*25*
**explain** 559:*5* 578:*1* 614:*16* 663:*22*
**explained** 560:*18* 648:*6*
**express** 620:*23*
**expressing** 647:*20*
**extension** 582:*25* 628:*24*
**extent** 631:*12* 647:*25* 658:*23* 659:*24* 665:*22* 666:*2*
**extreme** 558:*3*

< F >
**face** 558:*12* 559:*12* 602:*2*
**facial** 558:*8* 560:*4*
**fact** 559:*5* 610:*9*
**factor** 574:*23* 659:*9*
**factors** 580:*19*
**failed** 578:*14*
**Fair** 565:*23* 566:*2* 573:*21* 579:*3* 584:*16* 585:*12* 592:*4* 595:*2* 601:*11* 617:*11* 625:*16* 638:*2* 647:*10* 648:*5* 656:*14*, *16* 671:*2*
**Fairfax** 582:*25* 605:*4*
**faith** 559:*20*

**fall** 603:*7, 8* 648:*22*
**fallen** 570:*1*
**falling** 560:*20* 666:*23*
**false** 646:*13*
**familiar** 618:*17*
**family** 652:*7*
**far** 577:*9* 590:*18* 635:*10*
**favor** 575:*16*
**FEBRUARY** 548:*12* 552:*7* 553:*7* 593:*7* 599:*7, 12* 674:*5* 675:*12, 18*
**fee** 597:*19, 24* 600:*8* 601:*2, 3* 616:*12, 18, 20*
**feedback** 575:*13* 576:*24*
**feel** 576:*14* 630:*4* 665:*19*
**feelings** 671:*5*
**feels** 627:*20*
**fees** 599:*4* 624:*14* 658:*8* 659:*3, 4, 20, 21* 660:*4, 16* 661:*14, 24* 662:*13*
**felt** 573:*21, 24* 574:*23* 577:*17* 591:*25* 604:*1* 622:*24* 628:*11* 629:*14*
**fiduciary** 575:*22, 23* 654:*15*
**fifth** 636:*18*
**fight** 576:*4, 6*
**figure** 612:*25* 626:*3* 668:*18*
**figuring** 579:*2*
**file** 595:*21* 617:*18* 625:*21* 673:*3* 674:*6*
**filed** 553:*5* 563:*24* 590:*6, 12* 609:*7* 610:*9* 654:*10*
**filing** 628:*5* 637:*1*
**filling** 564:*13*
**final** 619:*2*
**finalized** 606:*4*
**financials** 662:*25*
**financing** 562:*19* 574:*6* 575:*1* 576:*16* 584:*21* 586:*23* 587:*5* 591:*20* 595:*13* 596:*8* 600:*20* 609:*8* 610:*9* 625:*14* 633:*14* 650:*5* 653:*9, 24*
**find** 559:*9* 574:*25* 619:*9* 629:*1* 633:*14*
**finding** 580:*21* 633:*20*
**fine** 605:*12* 637:*10* 667:*7*
**finish** 611:*15*
**Finkel** 633:*23* 670:*13, 14*
**fired** 646:*11*
**Firm** 554:*13* 586:*21* 623:*8, 12* 646:*14, 19, 21* 647:*1* 657:*8, 9* 670:*22*
**firms** 657:*12, 20* 658:*6*
**first** 554:*20* 556:*14* 564:*11* 567:*24* 579:*1, 15* 618:*6* 625:*4* 654:*24* 655:*2* 667:*9, 14*
**Fish** 670:*5*
**Fisher** 548:*17* 553:*12, 16, 19* 560:*9, 16* 562:*7* 563:*2, 19* 565:*5* 566:*9, 12, 15* 572:*4* 575:*4* 585:*18* 605:*9* 617:*21* 636:*16* 637:*11, 16* 647:*25* 649:*8* 650:*11, 13* 652:*11* 654:*6, 21* 655:*1, 9* 656:*17, 19* 657:*22* 658:*3* 664:*15* 666:*2, 6, 9, 22, 25* 672:*12*
**five** 577:*4*
**five-minute** 605:*10*
**fix** 565:*4*
**Flagler** 548:*18*
**flaws** 571:*1*
**Fletcher** 613:*10*
**flip** 563:*5* 643:*1*
**flirted** 611:*13*
**floating** 582:*4*
**Florida** 548:*19*
**flow** 658:*19* 661:*20*
**flowed** 660:*14*
**flows** 659:*23*
**focal** 585:*9*
**focus** 645:*15* 653:*17, 18, 20, 22* 657:*4*
**focused** 570:*15* 627:*18*
**focuses** 634:*8*
**folks** 649:*22* 662:*7* 668:*19* 670:*24*
**follow** 580:*17* 649:*2*
**following** 632:*1*
**follows** 554:*21*
**follow-up** 657:*1*
**forbearance** 567:*1, 4*
**foreclosure** 576:*3*
**foregoing** 673:*8* 675:*9*
**forget** 569:*15* 572:*13* 581:*21* 635:*25*
**forgot** 652:*18*
**forgotten** 665:*18*
**form** 568:*17* 577:*14* 598:*25* 599:*2* 604:*19* 632:*7* 660:*16*
**formal** 589:*10* 607:*14* 651:*25*
**Formally** 578:*15*
**Formenterra** 556:*12, 15*
**former** 615:*18*
**forms** 599:*15*
**formula** 580:*17*
**formulaic** 620:*21*
**Forrest** 622:*17, 19, 22* 623:*23* 624:*5, 23*
**Forrest's** 622:*25*
**forth** 599:*8* 609:*5* 624:*22* 651:*13*
**forward** 609:*22* 652:*16*
**FOTIU-WORROWICZ** 548:*17*
**found** 570:*25*
**fourth** 632:*10*
**frankly** 575:*22* 623:*24* 670:*7*
**frequently** 559:*15* 575:*6* 576:*23*
**fresh** 659:*4*
**friend** 615:*17* 617:*3, 6*
**friends** 649:*10* 669:*1*
**front** 574:*13* 579:*24* 590:*9, 21* 598:*12* 626:*11* 632:*21* 672:*1*
**fucking** 623:*4*
**full** 559:*12* 563:*7* 642:*12* 644:*1* 646:*13* 660:*12* 673:*9*
**fully** 581:*14, 25* 582:*6* 583:*19* 590:*6*
**fund** 571:*14* 574:*11* 578:*6* 591:*19* 603:*5* 622:*19* 624:*6* 627:*22*

**fundamental** 655:12
**funded** 574:12
**Funding** 556:11 557:2 560:23 603:5 626:11 653:1, 8, 21 657:2
**fundraising** 589:25
**funds** 568:9 578:5 662:6
**further** 610:4 625:14 652:8 675:14
**furthermore** 671:16
**future** 562:25 582:10

< G >
**GableGotwals** 552:8
**GAM** 643:16
**games** 628:2
**General** 581:2, 3 623:13
**generally** 566:7 578:1 579:8
**generated** 649:4
**generating** 660:7
**gentleman** 589:24 617:5 633:23 649:12, 17
**Gershon** 575:15
**Gershon's** 575:14
**Gesundheit** 600:22
**getting** 560:2 576:25 577:23 579:14 600:20 602:3 611:14 612:2 638:4 670:3
**Gibber** 584:12, 19 598:1 630:15, 20 631:9 632:4 635:7, 20 636:8 638:4 649:11, 22 650:20 651:14 653:10 669:24
**gist** 637:7
**give** 568:6 580:1 583:9, 17 657:19, 20 670:24, 25
**given** 576:21 620:15 633:2 641:5 663:3 665:1, 8, 9 673:10
**gives** 581:22
**giving** 581:12, 16 582:5 585:14 636:23 637:3
**glad** 661:10
**go** 558:25 567:24 568:1, 10 571:2 574:24 578:6 603:23 610:25 612:13 613:4 616:6 620:4, 17 631:9 656:3 659:6, 7, 15 660:11 661:13, 17 663:11, 12, 14
**goes** 565:6 623:24, 25 659:10, 19 662:10, 24 663:6 667:20
**going** 553:22, 24 555:1 557:9 559:9, 12 565:6 566:9 569:2, 3 571:2 576:15 583:14 590:24 593:15 594:25 602:24 603:21 605:10 607:18, 24 610:11 611:16 621:22 622:12 626:5, 6 627:8, 15 628:18 629:1 630:21 643:9 646:10 649:2 655:13 662:15, 20 663:1 664:20 665:25 667:5, 6 669:4, 5 671:16 672:14
**Goldman** 633:11
**gonna** 555:21
**good** 559:16 572:2, 3, 5, 16 573:1, 3, 20 591:14, 16 629:12 656:19 664:6, 20 665:15
**Gosh** 556:22
**gotta** 589:6
**gotten** 574:10 629:20 650:1, 5
**GP** 564:3
**grand** 603:11
**grants** 574:4
**great** 592:7 656:17
**Green** 583:5
**GREENBERG** 549:12
**Greens** 608:11
**Greystone** 638:8
**Griffith** 549:13
**ground** 576:11 663:2
**group** 556:20 566:20 567:12, 25 572:8, 17, 21 594:13 618:19 670:6
**groups** 573:5 604:15 613:6 649:10
**growing** 558:18
**Growth** 626:22 627:1, 11, 12 628:21 629:8
**guarantee** 594:7 595:19 654:18
**guaranteed** 595:25 651:21
**guaranteeing** 642:23
**guarantors** 642:19
**guess** 594:2, 25 617:25 619:1 621:17, 20 632:21 634:13 636:10, 17 637:17 653:6 662:17 665:5 667:10
**guessed** 637:21
**guy** 572:12 586:17 589:21 594:25 613:22 622:19 623:23
**guys** 583:11 606:6 645:8 660:21 666:22 672:9

< H >
**half** 583:18
**hammering** 667:7
**hand** 675:17
**handling** 668:16
**hands** 672:3
**happen** 571:10 582:14 610:23 645:23
**happened** 556:21 584:5 604:11 607:4 615:10 621:25 635:11 662:23
**happening** 671:22
**happens** 648:24 661:16
**hard** 569:14 586:6 611:24, 25 612:24 613:8 632:24
**Harper** 555:24 556:5 560:19 561:1
**Harwood** 548:23 552:9 674:4 675:7, 25
**Haynes** 646:22, 25
**head** 555:12 557:5 590:20 592:14 608:11 609:14 611:2 612:18 619:23 621:6 651:15 664:3

**heard** 576:14 655:2 668:11 675:11
**hearing** 559:6 654:24 669:9
**held** 621:1 655:20
**help** 584:21 622:16 633:16 646:11 648:14, 20 652:9 658:22
**helpful** 633:19
**helping** 633:14
**helps** 648:11
**hereof** 642:11
**hereto** 552:3 642:11
**hereunto** 675:17
**Hey** 565:1 576:3 626:10 627:24 628:25 632:18
**hide** 556:18
**high** 633:1 635:1 652:15 669:17
**higher** 558:9
**Hilaria** 549:17
**Hill** 579:10 580:14
**hire** 638:20 648:10
**hired** 638:17 657:7, 8, 9, 15
**hit** 577:11
**hits** 577:12
**hold** 555:21
**HOLDER** 548:3 553:4 614:9
**HOLDINGS** 548:3 553:4 568:4, 10 569:4 572:10 574:7, 13, 17 577:13 581:3, 4 592:14 630:25 650:12, 21 651:21 654:2, 20 655:19, 24 658:20 659:20 660:15, 19, 21 661:14, 15, 17, 25 662:11 663:7, 24 664:2 667:20, 23 668:3, 4
**Holland** 644:13
**home** 609:3
**homes** 609:7
**hope** 596:17
**hour** 605:11
**house** 595:25 596:2
**houses** 652:7
**huge** 581:23
**hundred** 597:5 601:21 603:11 635:11 641:3, 5

**< I >**
**IB** 621:9
**Ibex** 556:12 560:19 581:11 582:6
**Idan** 615:11, 15, 17 616:2
**idea** 583:22 589:5 593:25 611:9 646:10
**identification** 561:19 566:5 581:9 582:18 584:10 586:10 588:9 589:19 593:19 594:17 604:4 605:22 616:1, 25 618:4 621:15 622:10 625:9 626:14 630:9 633:4 636:3 638:10 639:22 644:19 646:4
**Ido** 621:7
**Ido's** 621:8
**Ignored** 571:25
**ii** 642:18
**imagination** 611:6
**immediately** 631:5
**impacted** 668:13
**implicit** 635:21
**important** 671:8
**impossible** 580:5
**impressed** 652:12
**imputed** 598:9
**incentive** 652:9
**inception** 574:22 658:6
**included** 582:5 641:4 662:2, 4
**including** 557:20 565:16 574:25 629:2
**income** 659:4
**inconsistent** 616:18
**incorrect** 599:11 606:21 658:21
**increased** 592:19
**incur** 563:8
**INDEX** 550:1
**indirectly** 642:9
**individual** 575:8
**individuals** 573:5
**industry** 577:2
**industry-wide** 577:2
**infinitum** 591:1
**Infinity** 556:25
**INFORMATION** 548:9 648:1
**informed** 607:22
**informs** 662:25
**infuse** 569:6
**initial** 570:23
**initially** 648:19
**ins** 624:10 663:15, 25
**insofar** 574:4
**instance** 571:13 576:2 578:22, 23 581:18 591:22 611:2 634:2
**institutional** 613:7
**instruct** 565:6
**insured** 623:13
**intended** 558:4 621:21
**intercreditor** 583:20, 25 611:12, 15
**interest** 557:21, 23 559:24 576:4, 24 577:9, 11, 15 579:25 590:5 597:15, 20 598:9, 14 599:4 600:1, 10, 15, 17 601:8 614:6 615:16, 20 616:9, 16, 18, 21 624:8, 13, 17 628:10, 12 635:1, 3
**interested** 581:12, 20 585:6 595:9 633:25 675:16
**interestingly** 564:15 611:7
**interests** 577:23 610:8
**interpreting** 629:5
**introduced** 594:1
**invest** 670:6
**investment** 570:23 579:11 604:15 640:24 670:1, 22
**INVESTMENTS** 548:6 553:4 618:16 642:2, 5 673:2 674:2
**investor** 577:9 578:4, 5 640:21 644:11 668:11
**investors** 566:20 570:10, 14, 18, 23 571:1, 5, 11 573:19, 20, 25 574:11, 21 575:5, 8 576:1, 14 577:6, 14, 22 578:12, 20 579:16, 25 580:3, 24 591:14, 16, 17 627:22 638:5 649:18 668:12, 24 670:5, 6, 9
**involve** 585:10 624:18
**involved** 560:22 561:3 573:5, 14

609:23 622:16 658:24
**involvement** 658:24 659:2
**involving** 603:20 604:22
**Irrespective** 576:17
**I's** 591:22 625:18
**Isaac** 581:11
**issue** 607:24 610:16, 20
**Items** 631:4
**Itkin** 588:11
**its** 602:25 638:13 658:12 673:9

**< J >**
**Jai** 604:9, 13 646:6 669:24
**Jake** 617:2, 3, 6
**January** 554:2 653:23 660:10
**Jay** 572:12
**Jenks** 573:7 640:7, 9, 12, 17, 21, 25 641:9
**Jewish** 589:24
**Jindal** 598:20 599:8, 11, 16, 19, 25
**job** 586:20 664:20 673:3 674:6
**Joel** 549:11 553:11, 17 605:9
**joel.tasca@gtlaw.com** 549:15
**Joseph** 649:17
**Judah** 638:8, 22 639:9, 10
**judge** 672:2
**judgment** 562:8 587:1 617:25
**July** 600:25
**jump** 587:20 652:13
**JURAT** 673:1
**jury** 672:2

**< K >**
**Kansas** 586:15 588:12 589:24
**Kanye** 604:22 605:3
**Kayne** 582:23 604:25 605:1, 2, 3, 4
**keep** 578:11 592:7 595:4 601:14 613:20 652:15, 16 664:20 665:21 667:6
**keeps** 637:8
**Kensington** 611:8
**kept** 591:2
**key** 574:19
**kill** 636:21
**kills** 626:7
**kind** 556:18 557:8 558:2, 6, 20 559:19, 21 570:24 573:3, 25 580:1 582:3 584:11 611:11 612:14 614:12 626:9 627:14 636:12 647:9 648:15 653:5 662:10 665:10
**knew** 562:10 566:21 596:18 607:18
**know** 553:25 555:2, 14, 18 556:17 557:17 558:2, 5, 13, 20, 21 559:9, 15, 19, 25 560:4 562:15, 18, 20 564:18 565:9 567:11 569:14, 19, 20, 21 571:13, 16 573:13, 22, 25 574:6, 15, 16, 22, 25 575:14, 17, 19, 21, 23, 25 576:1, 12 577:5 578:2, 13 582:3 586:4 587:18, 20 588:14 590:24 591:1, 22 593:12 594:11 595:1, 5, 10 597:24 600:2, 13 601:1, 2 603:18 606:19 607:17, 19 608:15 609:10, 14 610:9, 12 611:1, 24 613:4 617:23 618:20 619:15 622:20 623:8, 12, 24, 25 624:5, 6, 12, 13, 16 626:10 627:14, 20 628:13 631:12, 16, 23 632:23 633:2, 10 634:11 635:10 636:15 637:8 641:17 643:17 644:4, 6 646:25 647:9, 10, 11 648:25 650:22, 23 652:15 653:13 657:25 658:13 660:20, 21 662:19, 21 663:2, 17 664:18, 21 666:1, 15 668:15 669:1, 4, 5, 10 670:9, 18 671:8, 19, 25
**knowledge** 610:5 620:16 624:2 650:4 652:8 653:25 657:17
**known** 579:8
**knows** 615:18, 19
**KULICK** 548:3, 10 550:10, 13 551:4, 7, 20 552:4 553:3 554:2, 3, 4, 19 637:12 641:21 643:2 673:2, 7, 19 674:2, 3
**Kulick00007744-48** 550:10
**Kulick0036762-63** 551:9
**Kulick0036903** 551:19
**Kulick0037528** 551:22
**Kulick0037595-99** 551:11
**Kulick0038527-28** 550:17
**Kulick0038536-37** 550:21
**Kulick0038545-47** 550:23
**Kulick0038560-61** 551:5
**Kulick0038727** 551:23
**Kulick0038791-95** 550:18
**Kulick0039044-45** 551:16
**Kulick0039308-327** 550:16
**Kulick0039333-339** 551:15
**Kulick0039347-57** 551:18
**Kulick0039930-31** 550:20
**Kulick007620-7743** 550:24
**Kulick008456-477** 550:7
**Kulick012356-477** 551:8
**Kulick013018-56** 551:21
**Kulick022476-77** 551:12
**Kulick022482-22493** 551:13
**Kulick023344** 551:4
**Kulick023495-503** 551:1
**Kulick023578-87** 550:13

**< L >**

**label** 561:*24*
**Lakeside** 612:*9*, *22*
**lalterman@danske rgroup** 594:*3*
**language** 567:*17* 570:*6*
**large** 559:*24* 571:*23* 573:*17* 585:*20*
**larger** 556:*21* 557:*25*
**Las** 549:*14*
**Law** 554:*13*
**lawyer** 626:*21* 664:*4*
**lawyers** 657:*13* 666:*19* 668:*6*
**lead** 556:*21* 625:*17*
**leading** 600:*24*
**leave** 625:*20*, *21* 654:*9*
**leaving** 609:*17* 653:*11*
**led** 567:*12*, *25*
**legal** 562:*14* 623:*8* 648:*15* 669:*8*
**Lend** 556:*3* 596:*11* 649:*10* 650:*10*, *20*, *25*
**lender** 555:*5* 556:*16* 558:*23* 566:*22* 567:*9* 570:*1* 576:*5*, *6* 583:*1*, *2*, *13*, *14* 587:*7*, *12*, *14*, *25* 605:*5* 610:*15*, *19* 616:*21* 621:*7*, *11* 626:*21* 627:*12* 630:*2*, *5* 631:*2*, *8* 639:*9* 641:*9*, *14* 659:*16*
**lenders** 555:*5* 558:*11*, *23* 559:*1* 568:*7*, *10*, *13*, *15* 587:*21* 598:*4* 607:*12*, *22* 611:*1*, *10*, *16*, *18*, *19*, *21* 639:*13* 645:*6* 649:*14*, *19* 650:*24* 652:*20* 662:*8* 668:*24* 669:*25* 670:*4*
**LendSpark** 555:*23* 556:*3*, *6* 560:*19* 564:*25*
**lengthy** 584:*11*, *13*
**lesser** 560:*14*
**letter** 583:*17* 623:*4*, *8*, *10*, *17*
**letters** 623:*14*, *21*
**level** 590:*5* 597:*16* 621:*1* 635:*20* 659:*1*
**Lex** 586:*24* 587:*4*, *7*, *10*
**Lexington** 582:*12* 591:*6* 606:*16*
**lien** 628:*21* 645:*19*
**lienholder** 614:*9*
**life** 558:*15* 596:*20* 617:*22* 666:*12* 669:*4*
**light** 583:*6*
**lighter** 624:*12*
**limit** 572:*24* 627:*19*
**limited** 586:*1*
**line** 565:*3*, *12* 602:*25* 611:*15* 674:*7*
**liquidate** 574:*18*
**liquidating** 653:*19*
**liquidity** 595:*11*
**list** 555:*2* 610:*25* 612:*18* 632:*8* 669:*2*, *18*
**listed** 563:*18* 606:*25* 642:*10* 643:*3*
**listen** 665:*11*, *12*
**litigation** 559:*7* 563:*24* 588:*3* 617:*24* 648:*25* 657:*3*, *4* 662:*18*
**litigious** 638:*6*
**little** 558:*15*, *16* 574:*4*, *25* 577:*18* 581:*18* 605:*10* 625:*15* 653:*6*, *22* 658:*7* 663:*23* 665:*25* 667:*4*
**live** 574:*9*
**Living** 640:*9*
**LLC** 548:*3*, *6* 613:*6* 619:*14* 621:*1* 642:*2*, *5* 643:*16*, *17*, *19*, *20*, *21*
**LLCs** 647:*23*
**LLP** 549:*12*
**Loan** 551:*1* 560:*15* 562:*25* 567:*3* 569:*20*, *24* 581:*3*, *13* 582:*25* 585:*20* 590:*2* 591:*17*, *18*, *25* 592:*1* 593:*13*, *15* 594:*14* 595:*24* 596:*4*, *13*, *16*, *22* 597:*14*, *19* 598:*8*, *23* 599:*7*, *10*, *12*, *15*, *19*, *25* 600:*6*, *25* 601:*6*, *10* 602:*15*, *20* 603:*17* 604:*16*, *20* 606:*1*, *12* 610:*6* 615:*11*, *14* 616:*22* 619:*21* 620:*8* 622:*3*, *8* 624:*7* 627:*16* 629:*21*, *22* 630:*19* 632:*1*, *3* 634:*13*, *14*, *21* 635:*1* 636:*10* 638:*24* 639:*25* 640:*3*, *15*, *18*, *21* 641:*2*, *5* 642:*14*, *19*, *23* 650:*15* 653:*14*, *19* 654:*3* 655:*7* 659:*4* 661:*1*, *16*, *18*, *24* 671:*20*
**loaning** 668:*2*
**loans** 554:*25* 555:*8*, *9* 556:*1* 557:*15* 560:*4* 568:*1*, *2*, *3*, *4*, *11*, *13*, *16* 569:*23* 570:*4* 574:*8*, *11*, *14*, *17* 576:*22* 577:*11* 588:*15* 592:*8*, *12* 593:*4*, *8*, *10* 597:*17*, *18* 598:*19* 599:*3*, *9* 600:*14* 601:*4*, *10* 602:*21* 607:*16* 611:*4* 612:*8*, *20* 613:*2*, *8* 614:*1*, *4* 620:*8*, *10*, *12* 621:*11*, *12* 627:*9*, *25* 628:*13*, *14*, *18*, *23* 629:*11*, *15* 630:*23*, *24* 631:*1* 632:*5* 634:*3*, *4*, *6*, *17*, *22* 639:*14*, *18* 645:*9*, *12* 649:*6*, *18* 650:*1*, *15*, *17*, *18* 651:*4*, *5*, *12*, *16*, *20*, *24* 652:*3*, *5*, *21*, *23* 653:*16*, *18* 654:*1*, *2* 655:*24* 658:*25* 659:*23* 660:*5*, *17*, *19*, *22*, *24*, *25* 661:*5*, *12*, *15*, *19* 662:*12* 663:*1*, *4*, *9* 670:*4*, *5*, *12*
**Lobell** 572:*12*
**local** 657:*9*
**locally** 554:*13*
**located** 646:*23*, *24*
**Lofts** 566:*21* 570:*16*, *17* 571:*10* 572:*22* 573:*4*, *7* 585:*16*, *20* 586:*1* 591:*7* 603:*3*, *21* 604:*2* 627:*18* 631:*5*, *6*
**LOI** 589:*10*
**long** 561:*14* 613:*4*
**longer** 559:*3*
**look** 557:*12* 561:*16*, *24* 566:*6* 574:*12* 584:*14* 598:*8* 605:*23*

617:24 624:15 627:24 635:22 636:4, 18 641:20, 23 642:17 643:18, 22 647:9 664:4
**looked** 573:12 575:14 595:12 596:8 604:24
**looking** 562:23 584:15, 20 591:5, 6, 7, 8, 9 597:2 617:4 621:16 664:5
**looks** 575:18 588:14 613:13 619:10 636:7
**losing** 618:13
**lot** 555:4, 8 558:25 585:21 586:3 589:6, 9 599:7 604:12, 14 609:4 613:5 622:20, 21 624:25 632:5 669:9, 16
**Lotor** 606:1, 4, 12, 15 607:12, 13 608:17 618:20, 23 619:1, 3
**lots** 615:19
**louder** 559:23
**Louis** 642:1, 5, 8 643:25
**low** 668:21
**lower** 624:12, 14
**LPSA** 627:17
**LPSAs** 634:9, 10 662:1

< M >
**main** 645:14, 15 653:18, 20
**majority** 651:18
**making** 575:25 587:4 597:19 609:15 616:20
**managed** 567:12 647:23
**management** 628:11 652:14 659:3, 4, 21 660:4
**manager** 628:6, 11 642:5 647:23
**Manor** 608:12 643:21
**Mansion** 631:5
**MARC** 548:3, 10 550:9, 12 551:3, 7, 20 552:4 553:3 554:13, 19, 24 565:2 566:7 575:18 597:21 604:7 632:18 637:6 647:25 648:24 657:1 666:2 670:5 672:7, 14 673:2, 7, 19 674:2, 3
**March** 603:6
**Marcus** 670:16
**mark** 602:9 605:18 613:13, 19 644:9, 17
**marked** 561:16, 18 566:4 581:8 582:17 584:9 586:9 588:8 589:18 593:18 594:16 604:3 605:21 615:25 616:3, 24 618:3 621:14 622:9 625:8 626:13 630:8 633:3 636:2 638:9 639:21 644:18 646:3
**market** 578:7 646:12
**Marking** 584:8
**Marks** 604:14
**massive** 589:11
**materially** 606:10
**matter** 553:3 559:8 565:17 665:4
**Maxus** 586:13, 14, 18 613:11, 23, 24 614:18
**MCA** 550:6 554:25 555:4, 8 556:1 557:8, 15 558:25 561:20 562:23 563:1 564:20, 23 565:10 581:13, 24 601:15 602:1, 12 621:11, 12, 13, 22 650:1 653:1
**mean** 553:14 555:10 557:3, 10, 18 558:7, 14, 23 559:7 564:5 572:6 573:20 584:18 585:2, 12, 19 586:4, 6 587:12, 19, 21 590:22 591:15, 18 597:13 598:6 599:13 606:24 612:16 614:24 617:11 620:11, 20 628:6 630:19 636:12 639:3 641:15 644:12, 25 646:25 648:5 651:24 652:12 655:5 656:11 660:20, 25 661:18 667:2 668:13, 25 669:2, 3, 16, 24
**meaning** 633:25 634:15 671:4
**means** 559:5 577:25 590:11 598:4 664:5
**meant** 589:10
**member** 642:5
**memory** 569:10 594:4 632:25 641:3 658:8 665:22
**mention** 575:5 583:5 584:24
**mentioned** 560:22 573:6 577:22 585:3 589:21 606:25 618:16 652:19 661:2, 10, 23 666:24 670:14
**mentioning** 594:6
**Merchant** 562:24
**message** 582:11 617:7 637:7 648:2 651:25
**met** 561:7 595:7
**method** 558:1 629:10 630:6
**mezzanine** 645:19
**Miami** 548:19
**Michael** 548:17 553:12, 15, 19 566:14 589:22 590:4, 12 656:16 664:13
**mid** 649:5 650:2, 6, 19
**middle** 567:16
**Midtown** 582:13 591:6 606:16
**Mike** 670:5
**Miley** 549:17 598:24 599:8
**Miller** 670:6
**Millichap** 670:16, 18
**million** 557:19, 25 558:9 567:24, 25 569:2 571:6 583:18 590:2 592:15, 22, 24, 25 593:2 601:17, 18 602:2 603:20 606:13 615:12, 15 619:16, 18 650:16, 19
**mind** 590:16 591:19 635:17 656:11 665:11, 21
**mindset** 601:6
**mine** 588:25 615:18 617:4, 9 621:7 643:12, 21

**minutes** 656:*13*, *14*
**mischaracterization** 581:*19*
**misinformed** 615:*7*
**misinterpreting** 615:*6*
**missed** 598:*1*
**missing** 608:*8*, *10* 657:*12*
**mistaken** 569:*17* 648:*23*
**mix** 614:*12*
**mixed** 575:*12* 624:*11*
**modification** 582:*25* 613:*9*
**moment** 556:*11*
**money** 559:*25* 568:*25* 569:*7*, *12* 570:*11*, *19* 571:*2*, *14*, *19* 573:*22* 574:*5* 592:*1* 596:*19* 597:*24* 616:*14* 617:*4* 626:*5*, *6*, *11* 628:*7* 655:*20*, *23*, *24* 660:*5* 661:*20* 667:*20* 668:*1*, *2*
**month** 616:*9* 635:*1* 660:*12*
**monthly** 593:*5*
**months** 559:*10* 570:*2* 614:*1* 631:*14*, *15*
**morning** 587:*23* 662:*23*
**mortgage** 568:*19* 575:*2* 583:*20* 585:*11*, *22* 587:*1*, *15* 589:*8* 590:*7*, *12*, *13* 592:*2* 593:*14* 595:*20* 605:*5* 606:*1*, *15* 607:*12* 608:*7*, *19*, *23* 609:*2*, *18* 610:*21* 611:*9* 613:*15* 614:*9*, *22* 615:*2* 617:*12*, *18*, *20* 619:*7* 622:*1* 624:*19* 625:*20* 628:*5*, *21* 629:*2*, *7*, *15*, *20*, *21*, *22* 632:*19* 633:*19* 634:*1* 635:*18* 636:*14*, *23*, *25* 637:*3* 639:*7*, *9* 640:*6*, *11*, *16* 641:*9*, *11*, *13*, *14* 644:*6* 670:*3*, *11* 671:*21*
**mortgage/lien** 646:*16*
**mortgaged** 620:*6*, *8*
**mortgages** 573:*23* 581:*14* 582:*1*, *6* 583:*6*, *12* 584:*25* 585:*7*, *14*, *16*, *25* 587:*4*, *8* 588:*1*, *19* 589:*14* 606:*23* 607:*13*, *23* 608:*2*, *4*, *14*, *16* 609:*2*, *6* 610:*12* 612:*17* 619:*7* 620:*15*, *19* 621:*2* 631:*4*, *13*, *14*, *17* 632:*7*, *12*, *15*, *17*, *25* 633:*20* 635:*9* 637:*23* 638:*14*, *16* 645:*12* 647:*16*, *19* 668:*14* 671:*16*
**motion** 654:*9*
**motivation** 576:*19*, *20*
**move** 573:*22* 598:*17* 668:*1*
**movement** 574:*5*
**moving** 601:*14* 609:*21* 613:*20* 652:*16*
**multiple** 604:*15* 609:*23* 611:*18* 621:*8* 627:*7* 646:*12* 648:*6* 650:*15*, *17*, *18* 668:*15*
**Muntage** 573:*7* 611:*4*

< N >
**N25C-10-309** 675:*11*
**NAE** 643:*15*
**name** 554:*12* 556:*10* 557:*1* 567:*11* 572:*12* 607:*20* 619:*12* 633:*23* 647:*2*
**named** 572:*12* 644:*10* 649:*17*
**names** 555:*6* 556:*23*, *24* 573:*13* 649:*20* 669:*2* 670:*8*, *9*
**narrowly** 665:*12*, *13*
**national** 646:*25*
**necessarily** 560:*5* 613:*12* 644:*9*
**need** 571:*6*, *14* 574:*24* 575:*9*, *19* 580:*24* 584:*14* 590:*6* 594:*6* 597:*23*, *24* 609:*15* 612:*12* 637:*25* 644:*9* 648:*8* 656:*9* 662:*17*, *18* 666:*11* 669:*20*
**needed** 662:*22*
**needing** 595:*16* 636:*19*
**neglecting** 664:*8*
**negotiate** 613:*8*
**negotiated** 603:*22*
**negotiating** 599:*9* 614:*4*
**negotiation** 581:*17*
**negotiations** 559:*14* 600:*24* 607:*4* 609:*21* 612:*11* 613:*25*
**net** 651:*12*
**netted** 601:*20*
**netting** 641:*7*
**network** 633:*15* 645:*22*
**Nevada** 549:*14*
**never** 556:*21* 559:*20* 561:*7* 565:*1* 571:*4* 575:*16* 577:*10* 583:*23*, *24*, *25* 584:*5* 590:*18* 607:*3* 617:*22* 621:*25* 622:*1* 631:*19*, *21* 633:*1* 635:*10*
**new** 590:*23* 622:*8* 646:*18* 653:*7* 670:*3*
**Newco** 556:*12*
**Newmark** 612:*16* 670:*1*
**night** 561:*10* 571:*12*
**nine** 555:*14* 600:*13*
**nobody's** 555:*21*
**Nods** 621:*6* 651:*15* 664:*3*
**non** 653:*1*
**non-MCA** 561:*11*
**noon** 656:*13*
**normal** 630:*19*
**normally** 624:*13*, *14*
**North** 552:*8* 566:*21* 570:*17* 572:*22* 573:*7* 591:*7* 592:*14*, *15* 603:*3* 627:*18*
**Northboro** 643:*16*
**Northmarq** 612:*17* 622:*15*
**Notary** 673:*18*, *24*
**note** 599:*24* 600:*14*
**noted** 673:*12*
**notes** 656:*4* 664:*4*, *5* 675:*10*
**notice** 552:*5*
**notification**

596:*21*
**notified** 638:*15*
**notoriously** 613:*8*
**notwithstanding** 636:*11*
**November** 602:*16* 638:*16, 21* 648:*11* 649:*5* 650:*2, 6, 19* 651:*11* 669:*9*
**number** 555:*12, 22* 558:*7, 18* 564:*8, 16* 588:*22* 592:*13, 16* 622:*22* 643:*3, 5* 669:*17*
**numbers** 558:*8* 559:*20*

< O >
**OA** 576:*17*
**Oaks** 579:*10* 580:*15* 582:*25* 605:*4*
**OAs** 575:*16, 21* 576:*10*
**oath** 673:*7*
**Objection** 560:*9, 16* 562:*7* 563:*2, 19* 565:*5* 572:*4* 575:*4* 585:*18* 617:*21* 636:*16* 637:*11* 649:*8* 650:*11* 652:*11* 654:*6, 21* 655:*1, 9* 657:*22* 658:*3*
**obligation** 654:*18* 664:*9*
**obligations** 563:*8* 564:*4*
**obtain** 602:*15*
**obtained** 602:*12* 638:*13* 649:*7*
**obviously** 583:*21* 619:*8* 665:*20*
**occasions** 610:*18*
**Ocean** 556:*11* 560:*22* 561:*7*
**October** 569:*16* 598:*23* 599:*18, 24* 633:*9* 634:*8* 640:*2*
**odd** 628:*9*
**odds** 672:*3*
**offer** 573:*23* 585:*9* 587:*3, 15* 588:*1* 592:*2* 598:*2* 613:*16* 616:*20* 645:*22* 653:*2* 666:*1, 14* 671:*21, 24*
**offered** 601:*1* 614:*19, 22* 615:*16* 637:*23* 645:*10*
**offering** 581:*13* 589:*7* 601:*1* 613:*15* 671:*19*
**offers** 589:*10* 597:*19, 23*
**offices** 552:*7*
**official** 620:*21*
**offset** 667:*4*
**oftentimes** 559:*22*
**Oh** 561:*5* 589:*1, 4* 590:*22* 594:*20* 601:*18* 627:*2* 630:*14* 632:*20* 634:*7* 635:*25* 648:*3* 653:*10* 655:*17* 656:*9* 664:*17* 670:*14*
**Okay** 555:*10, 21* 556:*6* 557:*4* 561:*2, 5, 8, 13, 16, 24* 562:*21* 563:*4, 16, 22* 565:*23* 566:*3, 23* 567:*14, 22* 568:*6, 24* 569:*9, 12* 570:*9, 18* 573:*10, 16* 578:*17, 19, 25* 579:*6, 14, 19, 22* 580:*7, 10, 16, 20, 25* 581:*6, 7, 10, 21* 582:*14, 16, 19* 583:*3, 4* 584:*8, 24* 586:*8, 11, 16, 22* 587:*3, 11, 13, 24* 588:*5, 13* 589:*3, 16, 20* 590:*1, 4, 19* 592:*5, 11, 16, 20, 23* 593:*6, 10, 12, 17* 594:*5, 18, 24* 595:*6, 12, 18* 596:*1, 6, 11, 15, 24* 597:*13* 598:*15* 599:*13* 600:*17* 601:*23* 602:*7, 15, 19, 22* 603:*8, 12, 19* 604:*11, 18, 21* 605:*6* 606:*3, 12, 15, 24* 607:*5, 8, 22* 608:*1, 15, 19, 22* 609:*17* 610:*18, 23* 611:*6* 612:*23* 613:*12* 615:*6, 11, 14* 616:*6, 8, 16, 19, 23* 617:*1, 7* 618:*2, 10, 21* 619:*2, 5, 20* 620:*4* 621:*16* 622:*2, 7, 11* 623:*16* 624:*22* 625:*3, 10* 626:*15, 18* 627:*3* 629:*5, 9, 14, 19, 25* 630:*10, 17, 22* 631:*25* 633:*8, 13* 634:*4, 12, 15, 19* 635:*6, 25* 636:*4, 24* 637:*5, 21* 638:*7, 17, 22* 639:*8, 17, 20, 23* 640:*3, 11, 20* 641:*1, 8, 13, 22* 642:*8, 17, 22* 643:*1, 10, 14, 24* 644:*4, 15, 20, 23* 645:*11, 16* 646:*5, 9, 15, 19* 647:*6, 8, 16, 18, 19* 648:*3, 19* 649:*22* 650:*14, 18, 25* 651:*7, 10* 652:*3, 18* 653:*3, 21* 654:*1, 8, 14, 17* 655:*4, 14* 656:*15, 18, 25* 657:*12, 25* 658:*5, 11, 22* 659:*13* 660:*9* 661:*7, 22* 662:*2, 5* 663:*13, 20* 664:*1, 14* 665:*9* 666:*7, 9, 16, 21* 667:*12, 18* 668:*5, 17, 23* 669:*13* 670:*15, 19, 21* 672:*16*
**OKC-4** 627:*10* 628:*7*
**OKLAHOMA** 548:*13* 549:*6* 552:*9* 579:*9* 584:*6* 673:*4, 19* 675:*3, 8*
**old** 605:*24*
**once** 568:*11* 580:*16* 594:*1* 617:*22*
**one-month** 615:*15* 616:*13*
**one-page** 571:*14*
**ones** 553:*25* 560:*21* 608:*17* 643:*14*
**ongoing** 581:*17* 639:*12* 648:*18*
**open** 558:*24* 571:*16* 578:*6* 611:*9* 612:*4, 6* 623:*3* 630:*5*
**operate** 649:*20*
**operated** 556:*10* 600:*6*
**operating** 573:*12* 575:*7* 577:*9, 13, 24* 578:*2* 667:*24, 25*
**operation** 569:*7* 662:*22*
**operations** 567:*6* 568:*22* 573:*1* 574:*2* 619:*25*
**opinion** 563:*23* 623:*4, 7, 10, 14, 17, 20, 25* 624:*1*
**opportunities** 576:*22*
**opportunity** 571:*13* 599:*16*

**opposed** 583:22
**options** 639:11
**oral** 610:13
**orbit** 646:18
**original** 675:13
**Oro** 670:10
**outcomes** 672:4
**outs** 624:11 663:15, 25
**outside** 565:18, 25
**outstanding** 554:25 557:15
**owe** 597:21 651:8, 14 654:19
**owed** 559:13 560:7 592:1, 6, 11, 15 593:2, 8, 10 627:10
**owes** 592:8 628:7
**owned** 572:12 579:11 613:3 619:13
**owner** 564:3, 9, 13 565:3
**owner/manager/agent** 564:17
**ownership** 613:6 639:1, 5, 15, 16 643:15
**owning** 643:6 659:15
**owns** 642:9 652:6

**< P >**
**p.m** 656:22 672:19
**package** 640:19
**page** 548:25 550:2, 5 558:8 561:25 563:5 564:6 567:14 570:5 583:3, 5 588:16 623:2 631:4 636:19 637:16, 22 641:20, 23 674:7
**pages** 564:7 618:11 643:2
**paid** 620:11 628:23, 25 651:4, 5, 13 657:19 658:9 662:17
**Panthers** 557:1
**pants** 559:19
**paper** 596:6 613:7
**papers** 632:18
**Paragraph** 641:24 642:18
**Paralegal** 549:17
**Parker** 549:17
**part** 561:19 566:5 581:9, 21 582:18 584:10, 17 586:10 588:9 589:19 593:19 594:17 604:4 605:22 609:20 616:1, 25 618:4 620:9 621:15 622:10, 12 625:9 626:14, 19 630:9 633:4 636:3 638:10 639:22 640:15 641:11 642:11 644:19 645:20 646:4 669:3
**participate** 576:22
**participated** 603:2
**participating** 577:1
**participation** 577:2
**particular** 590:16 595:14 599:7 620:5 633:10 657:5 671:20
**particularly** 635:22
**parties** 552:3 660:25 661:20 675:15
**partner** 572:3, 6 612:3, 6 640:1 670:10
**partners** 572:16 573:1, 3 576:5, 23
**partnership** 569:3 572:19 576:4 598:5 627:13 628:8, 17, 22 659:12
**partnerships** 571:21
**partnership's** 628:14
**passing** 652:19
**pause** 665:12
**pay** 567:3 568:1, 10 569:13, 23 570:4 574:17 584:15, 21 597:5, 25 600:19 601:9 615:16 616:9, 21 620:10 632:22 651:17 661:22 662:20, 21 663:1
**paying** 568:7, 8 592:3 593:15 616:13 624:13, 14 631:24 658:25 668:2
**payment** 659:23, 24 660:16
**payments** 569:15, 16, 21 598:2 600:18 601:9 625:21 660:5 661:14, 24
**pays** 572:6
**Peak** 549:13
**Penn** 566:21 570:17 572:22 573:8 591:7 603:3 627:18
**People** 565:14, 15 574:10 576:21, 25 591:2 613:7 615:19 620:20 645:4 668:7, 15 669:5, 9, 14, 18 671:8, 12, 18 672:1
**percent** 577:4 597:21 598:11 601:2 624:8, 17 635:11 645:10
**perfect** 636:9, 20 637:9
**Perfecting** 636:20 637:1
**perform** 563:8
**period** 614:3 615:15 616:13 660:10
**permission** 574:24 576:16 587:15 588:1 607:11, 15 620:24
**permit** 621:2
**persistent** 632:24
**person** 563:7 594:2, 13 651:19
**personal** 586:5, 6 594:7 595:15, 23 609:7 610:6 622:24 628:1 652:6 665:1 671:5
**personally** 574:9 610:7 650:6 654:20
**perspective** 562:15 576:13
**pertaining** 665:2
**Peter** 591:22 626:16, 17, 19 627:4, 9, 14, 18 628:25 649:9 669:23
**Peter's** 626:23
**phone** 586:17 587:16 604:14 613:11, 23 624:24, 25
**physically** 580:5
**picture** 661:12 662:24
**piece** 613:3, 4
**pile** 635:17
**pit** 611:21

**place** 587:*16* 612:9, *22* 613:*5* 614:*22* 631:*5*, *6* 643:*19*, *20* 673:*11*
**placed** 568:*20*
**plaintiff** 553:*11* 554:*14*
**Plaintiffs** 548:*4*, *16* 553:*13*, *20*
**plan** 628:*14*
**platform** 589:*25*
**play** 574:*23* 598:*18* 604:*15*
**playing** 595:*1* 614:*5* 628:*2*
**please** 553:*9* 637:*12*
**pledge** 586:*25* 594:*8*
**pledged** 599:*21*
**pledges** 599:*23*
**pledging** 575:*2*
**PLLC** 548:*17*
**plumbing** 662:*22*
**pocket** 617:*20*, *25* 636:*13*
**point** 555:*11* 565:*10* 567:*7*, *22* 577:*5*, *17* 578:*13* 580:*1*, *23* 585:*4*, *9* 587:*9* 591:*4* 596:*18* 599:*16*, *22* 602:*23* 608:*1*, *5*, *20* 609:*20*, *21* 614:*25* 623:*12* 626:*2* 631:*16* 633:*15* 635:*14* 638:*18* 643:*8* 645:*15* 647:*15*, *20* 649:*1* 658:*14* 671:*20*
**Poker** 594:*24* 595:*1*
**populated** 565:*2*
**portfolio** 571:*20* 579:*9* 627:*10* 628:*7* 645:*23* 652:*7*
**position** 555:*17* 556:*19* 565:*12*, *20*, *21* 566:*20* 581:*14*, *25* 590:*7* 593:*12* 594:*7* 598:*7* 613:*24* 614:*13* 617:*13* 621:*13* 627:*16* 633:*25* 634:*1*, *5*, *19*, *20* 645:*19* 655:*16*, *18* 670:*25*
**positions** 555:*4*, *18* 562:*10*, *11*, *12* 585:*7*
**positive** 633:*17* 645:*4*
**possibility** 584:*25* 585:*13* 586:*23* 632:*23*
**possible** 601:*24* 615:*9*
**possibly** 573:*2* 603:*6* 615:*1*
**post** 579:*25*
**posted** 669:*8*
**potential** 588:*15* 590:*2* 595:*13* 633:*14* 638:*23* 653:*8*, *24* 662:*19* 670:*2*
**Potentially** 573:*11* 594:*11*
**power** 563:*7* 642:*12* 644:*1*
**Pratt** 572:*18* 640:*1*, *12*, *16*, *21* 641:*12* 642:*23*
**preceded** 621:*18*
**prefer** 629:*11*
**preferred** 614:*10*
**prefilled** 564:*12*
**prepared** 598:*20*, *22*
**PRESENT** 549:*17* 568:*18* 651:*8* 657:*14* 660:*10*
**presently** 628:*20*
**presume** 638:*23*
**pretty** 558:*2* 575:*7* 635:*19* 671:*18*
**prevailing** 671:*11*
**previously** 641:*6*
**price** 580:*22*
**pricing** 578:*8*
**Primarily** 658:*10*
**primary** 640:*25* 645:*5*
**principal** 557:*21*, *23*
**private** 622:*24*
**privilege** 565:*6*
**probably** 555:*1* 591:*8*, *9* 593:*4* 601:*14* 602:*3* 603:*20* 614:*14* 617:*24* 635:*6* 650:*16* 651:*4*, *17* 655:*12* 668:*25*
**problem** 589:*11* 590:*8*, *21*
**problems** 574:*14*, *15*
**Procedures** 552:*7*
**proceed** 558:*11*
**proceedings** 675:*10*
**proceeds** 566:*23* 567:*3*, *5*, *23* 568:*15*, *22* 569:*18* 570:*3* 619:*21* 661:*17*, *18*
**process** 580:*25* 671:*17*
**produced** 554:*1* 588:*2* 625:*5* 649:*1*
**production** 553:*24* 554:*1* 602:*8* 649:*4*
**professional** 615:*18*
**progress** 564:*2* 571:*15*
**promises** 646:*13*
**promissory** 599:*24* 600:*14*
**pronounce** 606:*5*
**proper** 609:*14*
**properly** 565:*12* 576:*12*
**properties** 568:*4* 570:*15* 571:*11* 573:*4*, *24* 576:*12* 577:*12* 579:*4*, *6* 580:*13* 582:*8* 585:*25* 591:*12*, *17* 593:*2*, *7* 595:*20*, *22* 608:*3*, *4*, *17* 610:*11* 612:*20* 614:*2* 617:*9*, *10*, *14* 619:*6* 620:*5*, *8*, *14*, *15*, *19* 625:*24* 626:*2* 629:*22* 630:*21* 631:*17* 632:*8* 634:*17* 635:*10* 643:*17* 645:*7*, *13* 649:*6* 653:*16* 654:*19* 655:*20*, *25* 658:*19*, *25* 659:*2* 660:*7* 661:*25* 663:*5*
**property** 575:*2* 590:*7*, *13*, *16* 592:*1*, *6*, *8* 595:*16*, *17*, *23* 603:*16* 617:*8*, *13* 619:*18* 625:*24* 629:*16* 630:*25* 643:*5* 658:*23* 659:*3*, *15* 662:*23*
**property's** 575:*3* 659:*2*
**proposal** 597:*3* 616:*4* 624:*18*, *23* 631:*9*, *11* 647:*15*
**propose** 617:*7* 634:*25*
**proposing** 567:*23* 624:*5*
**propounded** 554:*21*
**prospective** 670:*2*

**protect** 627:*15* 628:*19* 629:*18* 630:*3*
**protecting** 628:*12*
**protective** 627:*12*
**provide** 587:*4* 590:*11* 593:*14* 594:*10, 12* 607:*12* 610:*12, 20* 621:*2*
**provides** 594:*3*
**providing** 584:*25* 587:*8* 588:*18* 615:*1* 641:*9*
**provision** 562:*3, 6, 18* 563:*6* 654:*4* 655:*7*
**provisions** 577:*24*
**public** 644:*7* 673:*18, 24*
**pull** 602:*9* 609:*11*
**pulled** 593:*6*
**pun** 621:*21*
**purchase** 624:*9* 634:*13, 14, 16*
**purchases** 613:*25* 614:*4*
**purposes** 656:*1* 663:*18*
**pursuant** 552:*5* 568:*12*
**pursue** 560:*7, 14* 604:*17* 610:*16* 630:*7*
**pursued** 630:*1*
**pursuing** 559:*7* 560:*3*
**push** 583:*7*
**pushing** 627:*23*
**put** 558:*1* 559:*20* 566:*9* 567:*5* 568:*3* 570:*10* 574:*16* 588:*1* 608:*2* 628:*8* 632:*21* 635:*17* 651:*5* 655:*14* 662:*13*
**Putnam** 608:*11*
**putting** 568:*25* 570:*18* 575:*1* 652:*23*

**< Q >**
**QN** 643:*16*
**question** 555:*7* 560:*10* 576:*13* 579:*14* 590:*15* 591:*16* 592:*7, 9* 596:*15* 600:*3* 610:*24* 648:*13* 650:*7, 9* 661:*9* 665:*2* 667:*8* 671:*12*
**questions** 554:*21* 555:*15* 657:*1* 668:*11, 12* 672:*9, 11, 12*
**quick** 656:*12*
**quickly** 644:*17* 656:*6*
**quit** 595:*25* 596:*2, 7*
**quite** 559:*15* 575:*6, 22* 623:*24* 640:*17* 670:*7*
**quote** 636:*13*

**< R >**
**Rabbi** 588:*11, 12, 14* 589:*22* 630:*11, 13, 14* 633:*9, 10, 11, 12, 17*
**Ranch** 573:*9*
**rate** 597:*15, 20* 598:*9, 14* 600:*1, 10, 15, 17* 601:*8* 624:*17*
**rates** 599:*5*
**reactions** 559:*20*
**read** 597:*5* 617:*17* 625:*20* 632:*9* 637:*25* 642:*8* 655:*15* 668:*12* 673:*8*
**ready** 647:*17*
**real** 557:*9* 571:*22, 23* 581:*22* 586:*14* 595:*8* 603:*15* 617:*9, 10* 643:*5*
**reality** 571:*8*
**realization** 565:*9*
**realize** 579:*23* 594:*11* 618:*22* 640:*5, 14* 641:*10*
**really** 564:*5* 565:*19* 612:*13* 667:*8* 672:*7*
**Realty** 658:*20* 659:*20* 660:*15* 661:*16* 663:*7* 667:*20, 22, 25* 668:*1, 3*
**reason** 585:*14* 606:*10* 663:*19* 667:*19* 668:*1*
**reasons** 573:*21*
**recall** 557:*4* 623:*16* 645:*18, 24*
**receipts** 563:*1*
**receives** 661:*25*
**recess** 605:*15* 656:*22*
**recipient** 660:*21, 24*
**recognition** 607:*20*
**recognize** 629:*19* 640:*19*
**recognizing** 626:*8*
**recollection** 618:*18* 619:*6* 624:*20*
**reconsider** 611:*20*
**record** 553:*1, 7, 10, 21* 555:*16* 561:*19* 566:*5* 579:*19* 581:*9* 582:*18* 584:*10* 586:*10* 588:*9* 589:*19* 592:*5* 593:*19* 594:*17* 604:*4* 605:*13, 16, 22* 616:*1, 25* 618:*4* 621:*15* 622:*10* 625:*9* 626:*14* 630:*9* 631:*5, 6* 633:*4* 634:*10* 636:*3* 638:*10* 639:*22* 644:*19* 645:*3* 646:*4* 656:*8, 20, 23*
**RECORDED** 548:*10* 553:*2* 583:*6, 19* 644:*6*
**recording** 618:*23*
**records** 578:*11* 579:*15, 23* 592:*7* 593:*1* 644:*7*
**recover** 559:*24*
**red** 567:*20*
**refer** 568:*2* 616:*8*
**reference** 614:*7* 617:*3* 634:*2*
**referenced** 596:*12* 631:*19*
**referencing** 585:*5*
**referred** 640:*8*
**referring** 563:*22* 568:*3* 585:*24* 588:*18* 602:*1* 615:*2, 4* 617:*9* 623:*5* 630:*24* 631:*7*
**refinance** 580:*23* 601:*20* 639:*11* 670:*4*
**refinances** 662:*1*
**refinancing** 602:*3*
**reflected** 648:*2*
**refresh** 618:*18* 619:*5* 658:*8*
**refused** 570:*10*
**regard** 654:*1*
**register** 655:*6, 11, 15*
**reimbursements** 659:*5*
**related** 561:*11* 675:*14*
**relationship** 625:*18* 626:*7* 633:*18*
**relationships** 559:*3*

**relatively** 592:17 652:15 668:21
**relevant** 649:3
**relinquished** 574:1
**reluctant** 625:15
**remain** 599:23
**remained** 592:16
**remember** 556:24, 25 567:8 586:7 591:10 603:13 604:13 624:10 665:21 668:14 669:14
**remind** 586:13 608:16
**reminder** 648:11
**Remington** 573:9
**removing** 609:12
**rents** 658:18, 23 659:13 660:6
**repaid** 568:12 596:24
**repay** 557:22 568:13, 15 597:2
**repayment** 663:4, 9
**repays** 662:7
**repeated** 665:13
**rephrase** 560:10
**reply** 554:21
**REPORTED** 548:23 674:4
**reporter** 554:9, 15 588:7 605:20 633:6 644:21, 24 670:17 675:8
**represent** 638:18
**represented** 563:16
**request** 572:6 615:14 649:2
**requesting** 623:11 641:12
**requests** 622:25
**required** 575:1 655:8
**research** 606:22
**reserve** 672:10
**residences** 595:15 610:6 652:6
**resign** 628:11 629:3
**resignation** 628:5
**resolute** 671:24
**respect** 573:18 601:10 666:18
**respective** 552:3
**respond** 565:7 578:20 649:8
**responding** 617:12
**rest** 568:1 569:3
**restructure** 626:9, 12
**retraded** 646:12
**return** 595:19
**revenue** 658:12 660:1
**reverse** 590:23
**review** 564:20, 23 599:16, 20 623:5 654:9
**reviewed** 599:25 622:21 625:1 654:12
**rhyme** 663:19 667:19
**ride** 628:15
**Ridge** 582:12 591:5, 8 608:11
**ridiculous** 623:15 624:4
**right** 554:24 555:16, 19, 24 556:4 557:12, 14 558:10 559:11 560:6, 8, 13 562:2, 21 564:6, 14 565:18 566:18 567:19 568:2 570:7 572:12 574:5 576:9 577:16 579:17 581:2 582:5 583:1, 3 584:4, 6, 20 586:19 587:5 588:13 589:13 590:2, 23 591:3 592:11 593:15 594:5, 21 595:12 596:21 597:6 598:6 599:6 600:9, 19 601:7, 17 603:25 604:5 605:23 606:1, 17 607:17 609:3 610:14, 16 611:23 612:15 614:24 617:14, 15 618:13, 14 619:15, 17, 25 620:23, 24 622:2 625:12 630:7, 11 632:13 633:8 634:20, 23 635:1, 14 637:21 641:1, 20, 24 642:6 644:9 645:11, 24 646:7, 10 648:19 651:18 652:17, 21 653:18 656:12 658:19 659:17, 21, 24 660:7 662:3 667:12 668:9, 23 669:13 671:9 672:4, 6
**rights** 564:4 582:2 647:13
**risk** 626:8 653:2
**Riverpark** 611:3, 8 622:1
**Robert** 549:17 598:24 599:8
**Rogers** 598:24
**Rohan** 649:17, 21, 23 651:16, 22 652:5 653:10
**Rohan's** 652:9
**Roman** 642:18
**Ron** 604:14 646:6
**roughly** 648:21
**row** 625:22
**RPR** 548:23 552:9 674:4 675:25
**Rules** 552:6
**run** 576:12, 15 628:18
**rush** 601:3
**Rushmore** 670:5
**Ruttenberg** 567:12, 13, 21, 25 568:23, 25 569:6, 23 603:2 653:14, 21 669:23
**Ruttenberg's** 569:3

**< S >**
**safe** 578:5 629:1
**safer** 626:12
**salary** 652:15
**sale** 569:1 582:2 624:10 634:13, 14 648:18 662:12
**Salem** 631:5
**sales** 613:25 622:14 636:21 646:12 662:1 669:25 670:1, 22
**Saperean** 582:23 583:21 584:2, 5
**satisfied** 568:16 596:4
**satisfy** 567:24
**saw** 573:13, 23 577:23 599:6 600:18 601:25 602:16 603:19 632:8 633:11 655:4
**saying** 557:20, 21 560:11 568:11 581:16 589:5 602:8 627:24 632:13, 16
**says** 554:20 563:6 575:18 590:4 595:18 597:4 637:23 638:22 641:24 642:1, 8 644:14, 16 664:5
**scenario** 576:3
**scope** 624:2 653:5

**screen** 566:*10*
**screw** 628:*14*
**scroll** 656:*10*
**seal** 675:*13, 18*
**Sean** 657:*8*
**search** 574:*5*
**Searcy** 549:*2* 554:*11, 12* 594:*19, 21, 23* 600:*22* 672:*10*
**seat** 559:*19*
**second** 568:*19* 573:*23* 575:*2* 579:*1* 583:*6, 12, 19, 20* 584:*25* 585:*7, 11, 14, 16, 22, 25* 587:*4, 8, 15* 588:*1, 15, 18* 589:*8, 14* 590:*7, 12* 592:*2* 593:*14* 594:*7* 606:*15* 607:*12, 13, 23* 608:*2, 4, 7, 14, 16* 609:*1, 6, 18* 610:*12, 20* 611:*9, 19* 612:*17* 613:*15, 16* 614:*22* 615:*1* 617:*12* 619:*7, 9* 620:*15, 19* 621:*2* 622:*1* 623:*2* 624:*18* 625:*20* 628:*21* 629:*2, 6, 15, 20, 21* 631:*3, 13, 14, 16* 632:*7, 12, 15, 17, 19, 24* 634:*1, 19* 635:*9* 636:*23* 637:*3* 638:*14, 16* 640:*6, 11, 15* 641:*9* 644:*5* 645:*11, 19* 646:*15* 647:*16, 19* 668:*14* 671:*16, 21*
**secondary** 568:*19*
**section** 604:*12, 15*
**Secure** 556:*9* 588:*17* 589:*4* 629:*11*
**secured** 557:*9* 581:*14, 24, 25* 582:*6* 588:*16* 590:*6* 603:*15, 21* 638:*24* 652:*3, 5*
**securing** 585:*6*
**security** 589:*9* 632:*6* 636:*10*
**see** 559:*1* 561:*5* 563:*5, 11* 570:*12* 571:*18* 577:*10* 581:*15* 583:*22* 588:*4* 593:*7* 615:*20* 618:*25* 619:*9* 623:*21* 632:*18* 635:*13* 636:*20* 642:*15, 19* 643:*2* 649:*15* 654:*14* 669:*7*
**seeing** 574:*9* 619:*12* 636:*15*
**seeking** 562:*19* 652:*21*
**seen** 558:*14* 565:*15* 575:*16* 585:*2* 587:*19* 599:*3* 606:*6* 617:*19* 633:*10*
**sell** 574:*17*
**selling** 645:*12* 653:*14, 15*
**semi** 581:*24*
**Seminole** 582:*12* 591:*5* 619:*12, 13*
**send** 626:*5, 6*
**sending** 591:*2*
**sends** 635:*22*
**senior** 569:*25* 583:*1, 2* 587:*7, 14, 21, 25* 605:*4* 607:*11, 22* 610:*15, 19* 627:*12* 630:*2, 5, 23* 631:*2, 8* 633:*20* 634:*21* 639:*6, 9, 18* 641:*8, 13* 652:*20* 659:*16* 669:*25*
**sense** 585:*22*
**sent** 616:*2* 669:*9, 11*
**sentence** 645:*9*
**Separate** 562:*21* 579:*4* 591:*23* 601:*7* 622:*2* 659:*16* 666:*21* 667:*22*
**separately** 579:*11*
**September** 569:*16, 17* 581:*4* 601:*16, 19* 602:*13* 607:*6* 608:*1, 5* 613:*14*
**September-ish** 556:*4*
**seriously** 647:*12*
**service** 620:*1* 663:*2*
**servicer** 612:*11, 13, 23*
**set** 675:*17*
**settle** 558:*23*
**settled** 664:*18*
**settlements** 558:*24*
**settling** 560:*1*
**SG** 626:*25* 627:*15* 628:*24*
**shakes** 558:*21*
**Shanks** 664:*23*
**Shannon** 548:*23* 552:*9* 674:*4* 675:*7, 25*
**shape** 577:*14*
**shareholders** 640:*25*
**sharing** 601:*5*
**Shawyan** 583:*21*
**sheet** 571:*15* 593:*6* 674:*1*
**sheets** 593:*5*
**Shelter** 626:*22* 627:*1, 11* 628:*21* 629:*8*
**Shoreline** 612:*10, 22*
**short** 569:*19*
**Shorthand** 675:*7, 10*
**show** 559:*10* 571:*15* 614:*21*
**shown** 559:*24*
**shows** 558:*6*
**sic** 604:*22*
**side** 591:*20*
**sided** 575:*16*
**sign** 559:*16* 563:*17, 25* 606:*7* 612:*3* 618:*25* 625:*20* 628:*24* 630:*4* 631:*14* 664:*6*
**signatory** 563:*13*
**signature** 565:*3, 12* 642:*13* 644:*2* 673:*15* 675:*13*
**signed** 564:*8, 9, 21, 24* 567:*4* 599:*25* 600:*10, 13* 601:*5* 605:*24* 606:*4, 8, 9, 11* 607:*3* 619:*2, 3* 631:*13, 21* 632:*19, 21* 671:*15*
**signing** 563:*6, 7* 565:*9* 604:*10* 631:*16, 23*
**similar** 580:*17* 600:*24* 614:*14* 617:*24, 25*
**simply** 601:*5*
**sincerely** 671:*19*
**single** 596:*19* 652:*7* 669:*25*
**situation** 572:*25*
**situations** 556:*16*
**six** 559:*10* 570:*1* 614:*1* 656:*13*
**skeptical** 612:*2*
**skepticism** 647:*21*
**skip** 635:*6*
**skipped** 618:*8*
**slash** 569:*4*
**small** 556:*19*
**smaller** 649:*14*
**SMB** 572:*21*
**smirked** 647:*10*
**sold** 611:*7*
**sole** 642:*4*
**solicited** 652:*22*

**solve** 558:*17* 566:*22* 574:*15* 589:*12* 639:*10*
**somebody** 585:*22* 593:*23* 594:*1* 595:*7, 10* 633:*18, 19* 635:*21* 645:*17, 21* 652:*25*
**somewhat** 632:*20*
**soon** 628:*5*
**sorry** 553:*14* 587:*13* 594:*20* 603:*9* 630:*14* 640:*13* 648:*3*
**sort** 600:*18* 601:*20* 610:*14* 613:*8* 636:*13* 637:*8* 662:*13*
**sorts** 613:*25*
**Sotto** 589:*17*
**sound** 601:*17*
**sounds** 560:*20* 579:*16* 647:*18*
**source** 662:*6*
**sources** 588:*15* 619:*22* 660:*1*
**speak** 559:*23* 641:*8*
**special** 612:*11, 12, 23*
**specific** 555:*22* 570:*17* 596:*21* 607:*9* 619:*22* 626:*2* 669:*14*
**Specifically** 587:*10* 589:*7* 591:*10* 623:*17*
**specificity** 589:*6*
**Spell** 647:*3, 4* 670:*17, 18*
**S-P-E-L-L** 647:*5*
**spiral** 571:*3*
**spitball** 589:*11*
**spoke** 587:*21*
**spoken** 576:*23* 612:*16* 667:*1* 669:*18*
**sponsor** 564:*3* 575:*17*
**Springdale** 579:*10* 580:*14*
**Square** 573:*9*
**SS** 673:*5*
**stacking** 558:*1* 562:*18*
**stakeholders** 620:*13, 18*
**stamped** 675:*12*
**stand** 643:*25*
**standard** 623:*20*
**stands** 634:*11*
**start** 664:*19*
**started** 553:*21* 586:*21* 589:*25* 648:*16* 657:*18*
**starting** 564:*7*
**starts** 618:*11*
**STATE** 548:*1* 553:*5, 9* 673:*4, 7, 18* 675:*3, 8*
**statement** 609:*8, 16* 610:*10* 643:*25*
**stats** 577:*1*
**status** 670:*24*
**stay** 559:*1* 659:*14* 664:*21* 671:*7*
**Stephanie** 646:*13, 17, 24* 647:*3, 14, 20* 648:*10, 14*
**Steve** 670:*6*
**stipulated** 552:*2*
**STIPULATIONS** 552:*1*
**Stone** 618:*16, 23*
**stop** 570:*18*
**Street** 548:*18* 549:*4* 572:*18* 640:*1, 12, 16, 22* 641:*12* 642:*24*
**stretch** 611:*5*
**strictly** 597:*23*
**string** 550:*9, 12, 15, 17, 18, 21* 551:*3, 5, 7, 9, 12, 13, 16, 19, 20, 22, 23* 581:*11* 582:*20* 584:*12* 586:*2, 12* 636:*8*
**string,Kulick00373 79-80** 550:*11*
**strokes** 590:*23*
**strong** 664:*21*
**structure** 604:*16* 609:*22* 613:*2* 614:*18* 621:*8, 19* 628:*1* 663:*8*
**structured** 628:*9*
**structures** 614:*5* 639:*1, 5*
**struggle** 565:*15*
**struggling** 577:*4* 612:*25*
**stuck** 612:*14*
**stuff** 567:*17* 605:*7* 648:*17* 665:*1*
**sub** 642:*18*
**Subscribed** 673:*17*
**subsequent** 562:*23* 649:*2*
**subsequently** 562:*6* 600:*13*
**substance** 665:*7*
**substantially** 592:*19*
**succeeding** 574:*19*
**success** 611:*14*
**sufficient** 555:*7*
**sugars** 656:*6*
**suggested** 601:*11*
**suggestion** 597:*8*
**suggests** 636:*12*
**suing** 584:*5*
**Suite** 548:*18* 549:*5, 13*
**sum** 667:*12*
**summarize** 630:*17* 658:*17*
**Summer** 579:*10* 580:*14*
**super** 671:*8*
**supplemental** 553:*24* 554:*1*
**support** 571:*22* 572:*19* 573:*1*
**supporting** 630:*5*
**supposed** 556:*20* 667:*10*
**Sure** 557:*11* 558:*23* 560:*12, 25* 561:*15* 569:*10* 577:*20* 588:*21* 591:*9* 605:*8* 612:*20* 624:*20* 632:*14* 633:*2* 635:*12, 16* 637:*10* 647:*16* 649:*24* 650:*8* 653:*11* 666:*13* 668:*25* 671:*6* 672:*13*
**surety** 627:*15*
**surprised** 632:*20* 640:*17*
**swear** 554:*16*
**Swiss** 557:*2*
**sworn** 554:*17, 20* 555:*16* 609:*16* 612:*4* 673:*17*
**syndicated** 556:*17*
**syndication** 575:*24*
**syndications** 571:*1, 23* 577:*3*
**syndicators** 572:*23* 577:*3*

**< T >**
**take** 561:*16* 566:*6* 578:*7* 584:*13* 587:*15* 591:*21* 605:*9, 23* 609:*18* 629:*15* 636:*4* 641:*20* 660:*9*
**TAKEN** 548:*11* 552:*5* 553:*3* 577:*11* 581:*18* 605:*15* 629:*6, 21* 647:*11* 656:*22* 674:*5*
**talk** 585:*8* 612:*9* 617:*5* 620:*17* 622:*21* 665:*16*

**talked** 555:22 581:2 587:7, 14 620:21 639:1 652:20, 24 653:7 661:13 664:24, 25 665:23, 24 666:10, 17 668:19 669:15 670:23
**talking** 570:14 571:9 583:10 586:5 587:25 588:13 590:1, 4, 25 595:21 617:12 625:11, 25 626:1 627:14, 16 630:20 634:20 637:2 638:23 645:8 647:8 653:15, 24 657:3 661:4 665:3
**talks** 636:19 654:4
**Tasca** 549:11 550:3 553:11, 14, 17 554:23 560:12, 18 561:20 562:13 563:4, 22 565:8 566:6, 18 572:5 581:10 582:19 584:11 585:24 586:11 588:6, 10 589:20 593:20, 22 594:18, 20, 22, 24 601:7 604:5 605:12, 18, 23 615:22, 24 616:2 617:1 618:2, 5, 10, 13, 15 621:16 622:11 625:10 626:15 630:10 633:5, 7, 8 635:25 636:4, 17 637:13, 21 638:11 639:23 644:20, 23 645:1, 2 646:5 648:5 649:16 650:14 652:17 654:8, 23 655:4, 11 656:7, 11, 16, 18, 25 657:25 658:5 666:13 672:6, 16
**Taylor** 586:12, 20 613:22, 23 614:7, 16, 19, 21 615:5, 7
**team** 606:7 618:25 648:16 670:1
**telephonic** 669:9
**tell** 557:16 559:13 566:7 567:15, 18 570:6 579:24 580:3 582:19 583:7, 23 588:17 593:23 596:15 607:8 610:3 620:2 622:12 623:19 626:19 632:4 637:14 647:13 648:8 649:5 653:17 658:17 667:3 669:2, 13 671:1, 13 672:1
**telling** 628:25 645:25 647:15, 18 664:20
**tepid** 583:15
**term** 559:3 617:20, 22, 23
**terming** 616:18
**terminology** 591:13
**terms** 597:10 598:8 599:4, 9 602:19, 25 612:1 624:7, 16 666:1
**testified** 585:5 613:22 638:12
**testify** 586:4 606:8
**testimony** 598:13, 17 612:4 665:7 668:6 673:10
**Texas** 646:24
**Text** 550:11, 15, 17, 18, 21 551:5, 9, 12, 13, 16, 19, 22, 23 581:11, 22 582:11 584:12, 18 585:3, 4 586:2, 12 587:19 593:23 596:7 597:3 600:19 614:20 617:1, 7 626:15 627:3 632:8, 10 635:13 636:8, 18 637:7 644:14, 16 645:17 647:13 648:2, 12 651:25
**texts** 575:14
**Thank** 566:15 594:23 600:23
**Thanks** 554:7, 8 672:16
**theirs** 557:3
**thing** 574:25 577:18 584:13 628:1 665:22
**things** 553:21 558:25 559:15 570:9 575:9 585:15, 16 586:1, 24 595:4 610:2 613:20 615:10 623:3 625:19 628:4, 23 630:22 633:24 638:22 648:24 664:23 667:18 671:1, 2
**think** 555:3, 15, 19 556:9, 15, 22, 24 557:10 558:5, 6, 23, 24 559:22 561:10 562:8, 15, 16 565:13 566:2 567:15 569:11, 16 570:6 572:14, 19 574:4 576:1, 8 577:19 581:7, 22 588:25 589:21 591:3 592:4 601:13 603:13 604:8 606:24 608:15, 24 611:23 616:17 617:11 618:5, 16, 22 619:15 622:21 624:9, 16, 25 625:1 633:11 636:25 637:1 641:4 643:20 646:25 652:14, 18 653:2 654:10 656:13 663:5 665:24 666:14 667:19 671:7, 25 672:6
**thinking** 576:20 599:6 621:22
**third** 632:10 660:25 661:19
**third-party** 662:8
**thought** 568:21 614:17
**thousand** 597:6 601:21 641:4, 5
**thread** 566:17, 19 582:22 583:22 584:18 585:3, 4 627:3, 24 632:11 647:14
**threatening** 637:9 638:5
**three** 556:1 576:15 578:9 606:19, 20, 22, 25 608:3, 13 637:15, 19 652:23 658:6 659:7 660:2 661:12
**Thrive** 573:7 640:7, 16, 25
**throwing** 582:3
**Tic** 643:19, 20, 21
**Tiectel's** 633:17
**time** 557:15 558:10, 11 560:20 563:21 567:7 571:17 574:9 577:8, 10 578:13, 14 579:1 584:13 587:13, 14 592:6 600:7 605:14, 17 610:6, 24 611:19 614:3 615:15 621:21 627:9

648:7 651:3 656:24 664:8 666:11 672:8, 18 673:11
**timeframe** 570:19 653:6
**times** 584:24 589:6 610:23 611:14 648:6 665:13
**timing** 665:25
**title** 565:25
**today** 590:5 614:3 631:4 633:19 639:12 649:1 662:16 664:19
**Today's** 553:6 672:14
**told** 605:25 623:14 647:22 648:8 666:16 671:14
**tolerance** 668:21
**tolerances** 611:22
**top** 555:12 557:5 583:5 592:13 608:10 609:14 611:2 612:18 619:23
**topic** 623:16 657:2
**total** 557:22 619:16 641:6 651:1, 17 657:19 658:6 660:14 667:12
**totaling** 650:18
**totality** 654:12
**totally** 576:7
**tougher** 558:16
**Toval** 557:7 608:18, 19 621:12, 18, 19, 24 622:4
**to-wit** 554:21
**track** 660:23 669:10
**trail** 596:6
**trainer** 615:19
**tranches** 613:4
**transaction** 557:8 567:1, 10, 23 568:12, 17, 18 597:11 598:14 607:9 622:4 623:1, 23 630:19 671:21
**transactional** 648:17
**transactions** 668:15
**transcription** 673:10 675:10
**transitioned** 621:12
**trap** 637:6
**TRAURIG** 549:12
**trenches** 576:11
**trial** 672:11
**tried** 598:17 670:8
**trouble** 566:21
**true** 673:9 675:9
**truly** 646:9
**trust** 586:14 635:20 655:20
**trustee** 654:5, 19
**truthfully** 565:13
**try** 573:1 574:15 579:22 602:24 628:14, 18 658:16
**trying** 559:24 566:22 575:10 576:11 580:4 605:6 613:20 614:2, 6, 16 619:9 622:16 625:14 626:2, 3, 9 627:18 630:2 633:16 637:5 639:10 647:12 661:11 669:21 670:11
**TULSA** 548:13 549:6 552:8 617:2 657:9 666:18 673:6 675:5
**turn** 561:25 629:12
**turned** 621:23
**two** 555:17 569:15, 16, 21 578:9, 15, 19 580:9 583:18 587:21 602:21 606:22, 23, 25 608:3, 12 609:7 615:10 622:19 623:20 624:6 641:3 652:20 653:4 663:24 664:10 666:19 667:14, 16 672:4
**tying** 585:16
**typically** 598:2 606:7

< U >
**UCC** 609:7, 12, 17 610:9
**UCCs** 609:11 610:7
**UCC's** 608:25
**Uh-huh** 555:25 588:7 597:7 605:20 636:6 641:25
**ultimately** 566:24 568:17 575:15 585:10 596:13 597:11 606:4, 9 621:23 626:7 630:1 645:23 660:6 666:15
**unaware** 618:24
**underneath** 634:4
**undersigned** 642:13 673:18
**understand** 575:11 580:4 598:7 621:8 639:3 647:12 653:12 654:2, 17 655:17 658:16 663:23 667:3, 8 669:21
**understanding** 564:2, 18 597:17, 18 598:11 600:6 622:6 635:11 637:4 638:5 642:22 644:3 648:7 653:22 654:22, 24
**Understood** 579:6 589:16 602:10
**Unfortunately** 637:13
**uniform** 639:15, 16
**uniquely** 628:9
**universally** 596:18
**unofficially** 611:11
**unquestionably** 563:20
**unquote** 636:13
**unrecorded** 645:19, 25
**unrelated** 665:3
**unsecured** 588:16 603:17
**upheld** 609:25
**upsize** 568:23 603:3
**upsized** 603:1
**upstanding** 572:23
**use** 568:13, 15 569:12, 22 574:17 591:13 619:23 635:3
**uses** 568:9
**utility** 662:16
**utilized** 661:21

< V >
**valid** 675:12
**value** 558:12 560:4
**values** 653:19
**various** 578:12 653:16 657:19 658:1 663:16
**Vegas** 549:14
**venture** 594:25

**Ventures** 557:7 608:18 621:12
**venue** 669:19
**versus** 553:4
**VEST** 674:2
**VESTA** 548:3 553:4 568:4, 10 569:4 574:7, 13, 17 577:12 592:14 595:22 617:10, 14 630:24 645:22 649:6 650:12, 21 651:21 652:18 654:2, 20 655:19, 24 658:10, 11, 12, 19, 20 659:19, 20 660:15, 19, 21 661:14, 15, 16, 17, 25 662:11 663:7, 18, 24 664:1 667:25 668:1, 3 673:2
**vicinity** 657:23
**VIDEO** 548:10 553:2
**VIDEOGRAPHER** 553:1 554:9, 15 605:13, 16 656:8, 20, 23 672:17
**view** 574:12 577:8, 13 583:12 616:12
**Village** 573:8 579:10 580:14
**Villas** 582:12 591:6 606:16 619:11, 13
**violated** 562:6
**violation** 562:20
**virtually** 667:17
**vocal** 576:21
**voce** 589:17
**vote** 621:1
**vs** 548:5 673:2 674:2

**< W >**
**wake** 662:16
**want** 553:21 559:1, 2 571:18 575:19 576:6 586:3 605:9 608:7, 8 611:13 613:19 624:15 636:24 643:21 656:3 657:4 663:6, 17 668:15, 17
**wanted** 581:6 603:24 604:17 623:17 640:18 648:15 656:25
**wanting** 623:7 631:14 636:9 645:18
**wants** 652:14
**waterfall** 614:8 631:1 634:23
**wavers** 575:22
**way** 571:2 574:16 577:14 587:18, 22 590:20 592:1 601:3 604:2 614:18 629:1 649:14 652:20 655:14 660:20, 22 661:8 669:17
**ways** 629:17
**wealthy** 615:19
**websites** 669:8
**week** 597:5 598:3 646:11 652:22 654:11
**welcome** 566:16
**Well** 553:12 556:23 557:24 562:13 566:14 568:9 572:20 576:5 577:25 585:12 599:13 600:3 601:14 613:21 618:19 632:20 636:17 640:8, 13 650:8 653:13 658:22 660:22 662:2, 4, 23 667:22 671:14 672:15
**Wellen** 556:20
**went** 556:8, 23 557:8 569:18, 20 572:13 600:9 604:1 610:19 615:20 631:11
**we're** 553:13, 22 562:23 574:9 576:7 578:7, 23 580:21 581:7 586:5 590:25 591:5, 6, 7, 8, 9 607:23 612:14 618:8 626:2 627:16 629:1 643:9 649:2 655:13 664:25 668:16 672:13
**West** 548:18
**we've** 564:1 565:14 569:25 575:10 578:15 591:3 595:8 605:10 616:3 633:10 639:1 642:4 664:24, 25 665:23 667:16
**WHEREOF** 675:17
**wife** 668:20, 21
**William** 549:2 554:12
**willing** 583:17 590:11 591:19 594:10, 12 597:25 601:9 616:21
**willingness** 652:13
**wind** 628:17
**wiped** 585:21
**wise** 570:19 610:25
**witness** 554:16, 17 588:25 589:3 600:23 637:18 648:3 656:5, 9, 15 664:13 666:4, 8 673:15, 19 675:17
**witnesses** 657:15
**wondering** 640:6
**Woodland** 582:24 605:4 608:12 643:21
**WoodScape** 579:12 580:17 608:20, 24, 25 609:8, 12, 19 610:10 613:16, 17 614:8, 23 615:2
**word** 556:14 607:17 610:14 628:15 635:3 662:19
**words** 559:23 609:24
**work** 559:2 572:17 578:1 595:16 626:4 630:2 646:1
**worked** 649:12
**working** 578:23 598:4 619:24 628:20 629:7 631:6 649:13 670:3, 4, 10
**workload** 648:15
**works** 556:18 583:8 646:13 652:17
**world** 556:18 559:1 565:18, 25 571:8 595:8
**worries** 553:16
**worth** 577:21 626:24 653:2
**wrap** 656:13
**writing** 564:12 587:17, 24 611:13 623:4, 14 624:23
**wrong** 567:15 582:10 596:10 618:5 658:17
**wsearcy@ellerdetrich.com** 549:8

**< Y >**

**Yeah** 553:*19* 554:*8* 555:*25* 557:*22* 558:*7* 559:*21* 561:*13* 564:*10* 567:*7*, *8*, *20* 570:*8* 580:*5* 581:*6* 583:*11* 584:*18* 588:*4* 589:*2*, *16* 590:*10* 594:*4* 603:*19* 605:*12* 606:*24* 613:*2* 615:*13* 618:*10* 622:*5*, *14*, *16* 625:*23* 627:*3* 630:*15* 632:*10* 635:*16* 636:*1*, *22* 641:*6* 643:*7* 653:*10* 656:*17* 662:*15* 663:*10* 664:*15* 665:*5* 667:*6*, *16* 671:*2*
**year** 653:*7*
**years** 573:*3* 576:*15*
**yesterday** 555:*22* 575:*15* 584:*1* 585:*5* 618:*15* 638:*13* 645:*20* 657:*2* 658:*7*, *15* 663:*20* 665:*24* 666:*3*
**yesterday's** 553:*22*
**Yodel** 589:*22* 590:*12*
**You/lender** 617:*17*
**YSA** 548:*6* 553:*4*, *18* 568:*7*, *20* 569:*13*, *15*, *17*, *19*, *20*, *21* 571:*4* 597:*17* 598:*19* 599:*9*, *15* 600:*4*, *14* 601:*5*, *10* 607:*8* 638:*13*, *15* 654:*3*, *5*, *10*, *19* 655:*21* 657:*6* 673:*2* 674:*2*
**YSA's** 655:*16*, *18*

**< Z >**

**Zoom** 548:*17* 549:*17*, *18*
**Zupperman** 670:*8*

# EXHIBIT 15

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MARC KULICK, VESTA HOLDINGS LLC, and ASSET HOLDER, LLC,
Plaintiffs,

-vs- Case No. 2025-1319-MTZ

YSA INVESTMENTS 1, LLC,

Defendant.

VIDEO RECORDED DEPOSITION OF MARC KULICK

TAKEN ON BEHALF OF THE DEFENDANT

ON DECEMBER 30, 2025, BEGINNING AT 8:17 A.M.

IN TULSA, OKLAHOMA

APPEARANCES:

on behalf of the PLAINTIFFS

Benjamin H. Brodsky, Esq. (Via Zoom)
BRODSKY FOTIU-WORROWICZ, PLLC
44 West Flagler Street
Suite 2200
Miami, Florida 33130
305.303.5054
bbrodsky@bfwlegal.com

REPORTED BY: Shannon S. Harwood, CSR, RPR, CRR

(Appearances continued on next page.)

(Appearances continued.)

Andrew Shank
ELLER & DETRICH
2727 East 21st Street
Suite 200
Tulsa, Oklahoma 74114
918.747.8900
ashank@ellerdetrich.com

on behalf of the DEFENDANT

Joel E. Tasca
Kerry E. Kleiman (Via Zoom
GREENBERGTRAURIG
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
702.792.3773
joel.tasca@gtlaw.com
kerry.kleiman@gtlaw.com

ALSO PRESENT: Hilary Alberta, Paralegal; Jonathan Berney (Via Zoom); Robert Miley (Via Zoom); Efraim Diveroli (Via Zoom); Parker Detweiler (Via zoom); Jim Langlois, Videographer

# INDEX


| | Page |
|---|---|
| Direct Examination by Mr. Tasca | 8 |


## EXHIBITS


| Exhibit | Description | Page |
|---|---|---|
| No. 2 | Vesta entity amended complaint | 19 |
| No. 3 | Text thread document | 21 |
| No. 6 | 10/2/24 email string from AJ Jindal | 29 |
| No. 7 | Organizational charts | 32 |
| No. 9 | 1/13/25 email string from Efraim Diveroli | 51 |
| No. 10 | 1/21/25 loan documents | 53 |
| No. 11 | 1/24/25 loan documents | 54 |
| No. 12 | 1/30/25 loan documents | 54 |
| No. 13 | 2/4/25 loan documents | 54 |
| No. 14 | 2/10/25 loan documents | 55 |
| No. 15 | 2/18/25 loan documents | 57 |
| No. 16 | Text message string | 58 |
| No. 17 | 8/21/25 email string from Marc Kulick | 78 |
| No. 18 | 6/23/25 email string from Moishe Gubin | 80 |
| No. 19 | 9/29/25 email string from Yishai Cohen | 85 |
| No. 20 | 2/18/25 email chain from Marc Kulick | 93 |
| No. 21 | 3/19/25 loan documents | 105 |

| Exhibit | Description | Page |
| --- | --- | --- |
| No. 22 | 4/9/25 loan documents | 105 |
| No. 23 | 6/19/25 loan documents | 106 |
| No. 24 | 7/16/25 loan documents | 106 |
| No. 25 | 7/31/25 loan documents | 106 |
| No. 26 | 8/6/25 email string from Efraim Diveroli | 114 |
| No. 27 | Declaration of Marc Kulick | 130 |
| No. 28 | 11/20/25 email string from Michael Fisher | 131 |
| No. 29 | November 20, 2025 email string from Michael Fisher | 131 |
| No. 30 | 11/5/25 email string from Marc Kulick | 160 |
| No. 31 | 2/2/25 email string from Marc Kulick | 160 |
| No. 32 | Vesta Capital real estate investment portfolio | 179 |
| No. 33 | Marc Kulick Founder and CEO Biography Pages | 179 |
| No. 34 | 10/11/24 email string from Marc Kulick | 187 |
| No. 35 | 9/8/25 email string from Marc Kulick | 195 |
| No. 36 | 11/6/24 application to Fast Business Financial | 199 |
| No. 37 | 4/4/25 application to Harper Advance | 202 |
| No. 38 | 4/23/25 application from Coldwater Capital | 208 |
| No. 39 | 5/22/25 application to BH Capital Group | 211 |

| Exhibit | Description | Page |
|---|---|---|
| No. 40 | 5/23/25 application from American Funding | 218 |
| No. 41 | Text message string | 224 |
| No. 42 | 12/18/24 UCC filing | 228 |
| No. 43 | 6/6/25 email string from David Ruttenberg | 229 |
| No. 44 | 10/5/25 email string from Marc Kulick | 231 |
| No. 45 | 6/23/25 email string from Tamie Semler | 233 |
| No. 46 | 6/18/25 application to BH Capital Group | 238 |
| No. 47 | 8/7/25 email string from Marc Kulick | 239 |
| No. 48 | 7/23/25 email string from Michael Shabsels | 241 |
| No. 49 | 7/25/25 second mortgage in favor of Damis | 242 |

# STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of MARC KULICK may be taken pursuant to agreement and notice and in accordance with the Delaware Rules of Civil Procedures on December 30, 2025, at the offices of GableGotwals, 110 North Elgin Avenue, Tulsa, Oklahoma, before Shannon S. Harwood, CSR, RPR, CRR.

THE VIDEOGRAPHER: We are now on the record. This is the videotaped deposition taken of Marc Kulick. It is Tuesday. It's December 30th. The year is 2025 and our time is approximately 8:17 Central Standard Time.

And will the parties present please state their names for the record?

MR. TASCA: This is Joel Tasca for the defendant, YSA.

MR. SHANK: This is Andrew Shank for plaintiffs.

MR. BRODSKY: You got Ben Brodsky on the Zoom for plaintiffs. I'd also ask, Joel, if you could identify which of your clients are on the Zoom for the record.

MR. TASCA: Sure, I believe that's Efraim Diveroli and Jon Berney. Hey, guys, shout out if anybody else is on there.

MR. BRODSKY: I see a PD. I see a Hilario Alberto --

MR. TASCA: Sure --

MR. BRODSKY: -- I see Efraim. I see a Jonathan Berney and a Robert Miley. I don't know who PD and Hilario Alberto are.

MR. TASCA: Okay. So Hilary Alberto is my

paralegal. She's here present in the -- in the room and Robert Miley, as you know, is a YSA representative and PD would be Parker Detweiler, an associate of YSA.

THE VIDEOGRAPHER: Okay. Is that everybody then? Okay. Thank you.

You may swear in the witness.

(Witness sworn.)

WHEREUPON,

MARC KULICK,

after having been first duly sworn, deposes and says in reply to questions propounded as follows, to-wit;

DIRECT EXAMINATION

BY MR. TASCA:

**Q Marc, can I call you Marc? Is that all right?**

A Please.

**Q Call me Joel. So I am counsel for YSA Investments in this action that you've brought. Have you ever given your deposition before?**

A No, I have not.

**Q Okay. So I'm sure you talked about it some with your attorneys, but basically I want to ask you a series of questions. Your job is to answer them truthfully and as accurately as you**

possibly can.

Probably be going awhile today, so we'll take some breaks. If you need a break, bathroom break, anything, water or coffee, just let us know.

When I ask you a question, if you don't understand my question, just let me know and I'll try to rephrase it. I'll sometimes ask incomprehensible questions and that's fine and you -- you can tell me you don't get it and I'll -- I'll try to rephrase it for you.

When you're giving your answers, it's good for you to give, like, "yes" and "no" as opposed to head shakes and nods and "uh-huh, huh-uh," that's a little hard for the court reporter to take down too, so if I prompt you on that, I'm not trying to be a jerk. I'm just trying to get -- make sure we get a clear record on things.

Have you taken any medications or anything that might affect your ability to testify truthfully and accurately today?

A No.

Q Okay. So, Marc, you're in the business of managing and operating a series of apartment complexes in Oklahoma, Kansas and Arkansas; is that true?

A Yeah, that's true.

**Q Okay. Can we agree that just as a shorthand today -- and I know there's some issues about separation between corporations and things like that. I'm not going to hold you to anything, but I'm going to refer to the Vesta properties generally as the properties that you and your companies manage in Oklahoma, Kansas and Arkansas; is that fair?**

A Yeah, that's fair.

**Q Now, the plaintiffs in this case are you, Vesta Holdings, LLC and Asset Holder, LLC; is that right?**

A That is correct, yes.

**Q Okay. Now, Vesta Holdings, LLC, can you tell me who the members of that LLC are?**

A Yeah, Vesta Holdings is solely owned by Louis Investments and Louis Investments is solely owned by me.

**Q Okay. So -- so Vesta Holdings is totally owned, controlled by you through your company, Louis Investments?**

A That is correct, yes.

**Q Okay. Okay. How about Asset Holder? Do you know who the members are of that?**

A Again, Asset Holder is where some of the personal investments that I've made into deals are housed, so the member is me.

**Q Okay. Not through Louis Investments, just you, you're the member personally?**

A I actually don't know how AJ set that up.

**Q Okay.**

A It was used as an investment vehicle.

**Q All right. So it's either you're a member or a company like Louis, for example, that you own and control entirely on your own?**

A Yes, that is correct.

**Q And is that the same for the -- the manager as well is -- would be either you or somebody like Louis that completely is -- is you, not just a member, so the manager?**

A Do you mean in regards to those entities?

**Q Well, I -- I was talking about Asset Holder in particular.**

A Yes.

**Q Okay. So that's managed by either you or Louis Investments; is that fair?**

A Yes.

**Q Okay. And going back to Vesta Holdings, LLC for a second, is that the ultimate parent of all**

**of the various companies that you're affiliated with?**

MR. BRODSKY: Objection to the form. You can answer.

**Q (By Mr. Tasca) You can answer.**

A No, there is no parent company.

**Q Okay. Got it. And then Asset Holder, how does that fit into sort of the corporate family?**

A Asset Holder is a vehicle for my personal investments.

**Q Okay. So that -- that's just -- that's out on its own, it's not -- in other words, there's not like an ultimate parent there, it would just be you personally are the only member?**

A That's correct, yes.

**Q Okay. Let's go to the chart if you have it.**

(Deposition Exhibit No. 1 was marked for identification and made part of the record.)?

MR. BRODSKY: Joel, would your paralegal happen to have electronic versions of these to put in the chat?

MR. TASCA: You know, I -- I meant to say, Ben, that we had a little snafu with our documents, which about half of them didn't show up. So we're

scrambling a little bit to print copies and things like that.

I know that's not what you're asking me, but I did just want to mention that. I think in terms of getting the documents up, can we do that, Hilary?

MS. ALBERTO: I can share them, like screen share, but unfortunately our securities don't allow us to drag and drop into the Zoom. So I can -- as you go through the document, I can share it on the screen.

MR. TASCA: So they -- they'll be able to see it?

MS. ALBERTO: Yeah.

MR. TASCA: Okay. Does that work, Ben?

MR. BRODSKY: I -- I didn't hear that.

MR. TASCA: Oh, she's going to be able to put the documents up so you can -- you can see them basically.

MR. BRODSKY: Is it possible to put them in the chat too so I can download them?

MR. TASCA: No, I don't think we can do that. Is that -- is that what you're saying, Hilary?

MS. ALBERTO: Yeah, unfortunately,

security, we're not able to.

MR. TASCA: But we'll -- we'll get you obviously copies of everything afterwards.

MR. BRODSKY: Okay. Perhaps you could just tell me the Bates label so I could --

MR. TASCA: Sure, we could do that.

**Q (By Mr. Tasca) So Exhibit 1 that we've just marked, it's Kulick 9557 to 9570.**

MS. ALBERTO: And I'm sharing it on the screen right now.

**Q (By Mr. Tasca) Okay. Marc, have you had a chance to look at Exhibit 1?**

A I've -- I've started looking at it.

**Q Okay. And you don't have to necessarily read every line. I just want to know if you're familiar with it, if you can identify it in a general way.**

A Yeah, this is an email thread for due diligence for YSA's potential larger investment into Vesta.

**Q And that was occurring in summer of 2025, right?**

A Yes, that is correct.

**Q Okay. And then I want you to just focus on the -- the very top email on the first page,**

**9557. This is the -- this is an email from Maranda Morales. Who was Maranda Morales?**
A Maranda Morales was an employee of mine who had been with me for -- since 2017. She, at that point, was our chief investment officer.
**Q Okay. And she says in this email, "Please see the Word document attached with all of our answers in blue." So I take it from that statement that YSA had asked you some questions and you responded to them in this chart at the end that we'll look at and your answers are in blue; is that fair?**
A I -- I would have to take a look at that.
**Q Sure.**
A Also --
**Q Go ahead. Take a look.**
A -- Maranda's -- you know, those would have been answers from my team.
**Q I guess as you're looking through that, I'll just ask you, who prepared those answers in blue?**
A It's difficult for me to say. Somebody on my team.
**Q Okay. Somebody on your team with your input and at your direction?**

A At my direction, yes. Input, no.

**Q Okay. Well, getting down to it here, in the responses, there are a number of entities -- well, before we get to the responses, there a number of entities listed here, again, which I -- not -- just for shorthand, not for any connotation that anybody is going to be held to, but I'll just call them entities in the Vesta family; is that fair, all these entities listed here?**

A All these entities --

MR. BRODSKY: I'm going to object to the form. You can answer.

A All of these entities have some affiliation to Vesta.

**Q (By Mr. Tasca) Okay. Now, there are a number that say, "Marc is a hundred percent manager and sole decision maker." Do you see that?**

A Yes.

**Q And then, you know, there were other ones that say, "Marc is the main decision maker," I'm looking at Column 3, for example, "SMB Bradley has major decision approval rights." So in the ones that say, "Marc is a hundred percent manager and sole decision maker," there are no qualifications like that, are there, that somebody else has input**

**or approval rights or major decisions?**

MR. BRODSKY: Objection to the form.

A From my teams responses, no.

**Q (By Mr. Tasca) Okay. Well, where it says, "Marc is a hundred percent manager and sole decision maker," do you agree that that's true?**

MR. BRODSKY: Objection to the form.

A No. As I've gotten more -- as I've gotten to know my operating agreements more and more, there are limitations on the manager, which I don't think my team made clear on this, but in terms of major decision rights, I think it would be more appropriate to say a hundred percent major decision approval rights.

**Q (By Mr. Tasca) So what you're saying is that you would -- if you had to write this again today, you would say, "Marc is a hundred percent manager and sole decision maker on major decisions," is that...**

A If I had to write this over again today?

**Q Yeah.**

A I would have my attorneys do it, not people in my business development team.

**Q Okay. But this is what Vesta and you were representing to YSA at the time you sent this, that**

**Marc is a hundred percent manager and sole decision-maker, correct?**

A Yes, which was consistent with our understanding.

**Q When did that understanding change?**

A We've been -- I have been diving more and more into my operating agreements and trying to understand the ins and outs of the limitations on power and what my obligations are. And as we've gotten a better understanding of that, I think that there's, you know, more clarity that's needed on those statements.

**Q And that deeper dive you did into your operating agreements, did that occur after litigation between YSA and you and some of your entities began?**

A I don't know exactly cause and effect. I don't -- I know we were trying -- we've been trying to understand -- we've been trying to understand how we can be the best sponsor we can be for awhile. The cause and effect is not directly related to YSA, more to just how to -- how to run the best shop we can.

**Q Yeah, and I'm not so much asking about cause and effect. More timing. So August -- this**

**is in August, these exchanges, right? So when did your sort of deeper dive into the OAs and your understanding as to, you know, your authority change?**

A As I said, that's been a process. I don't have a date for you.

**Q Okay. But sometime between August when this was sent and now?**

A Yes.

**Q Is it fair to say that you control the entities that have this statement that Marc is a hundred percent manager and sole decision-maker?**

MR. BRODSKY: Objection to the form.

A To the best of my understanding, yes.

**Q (By Mr. Tasca) All right. Let's mark this as Exhibit 2.**

(Deposition Exhibit No. 2 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Do you recognize Exhibit 2? And take your -- take your time. Not rushing you. I'm going to prompt you, just because I don't want to be the holdup, but if you need more time to look at stuff, just let me know.**

A Yes.

**Q Okay. What do you understand that**

**document to be?**

A This is our -- the -- the Vesta entity amended complaint in this matter.

**Q Okay. Now, if you flip to Paragraph 34, there are references to a joinder. Do you see that?**

A Yes, I do.

**Q Okay. And you understand that will be -- that's an issue in the case that we're going to talk about later, but do you know what that's referring to?**

A Yes, I do.

**Q Okay. So the second sentence says, "The joinder extends to power of attorney clauses to entities which Kulick individually owns or controls."**

**Do you see that?**

A Yes.

**Q Okay. Is that your position in this case?**

A Yes.

**Q Okay. And I assume it's the position of the other two plaintiffs as well; is that fair?**

A Oh, I didn't realize there was a question there.

**Q Oh, yeah. I just said, I assume that's the position of the other two plaintiffs in the case**

**as well, correct?**
A You mean that the joinder extends the power of attorney clauses to entities which I own or control?
**Q Correct --**
MR. BRODSKY: Hi, I'm on a Zoom.
MR. TASCA: Excuse me.
MR. BRODSKY: Go ahead, Marc. I'm sorry.
A Yes.
**Q (By Mr. Tasca) Okay. Answer is yes?**
A Yes.
**Q All right. Now, did there come a time in 2024 when you approached YSA for financing?**
A At the time I didn't know them as YSA. I approached Efraim Diveroli for financing.
**Q Okay. Fair enough. So I'll show you what's marked as Exhibit 3.**
(Deposition Exhibit No. 3 was marked for identification and made part of the record.)
**Q (By Mr. Tasca) Do you recognize this? I realize it's lengthy, so I'm just asking you if you can tell me generally what this is?**
A Without going through every page, I can't tell you if anything was edited, but this is a text -- this seems to be a text thread between

myself and Efraim Diveroli.

**Q Okay. So on the first page there at the very top, it says, "Hey Efraim. My name is Marc. I got your number from David Ruttenberg and Hannah Howard. Hope it's okay to text you." Then you say after that -- and that was on April 24th, 2024.**

**So based on that, is it fair to say that you approached Efraim Diveroli initially?**

A Yes.

**Q Okay. And is it also fair to say based on this series of text messages as a whole reflected by Paragraph 3 that you and Efraim engaged in business negotiations via text as well as other means?**

A Yes.

**Q That was a common course of conduct, in other words, in the dealings that you had with Efraim?**

A Yes.

**Q Okay. And if you kind of fast forward here to 9924, the text, and that's Bates page YSA 4. Now, at this point, you still haven't done any loans with YSA, Efraim, correct, as of that date?**

A No, I had not.

**Q Okay. And you say to him on 9-9-24, (As read) Separately man. You should do some of my**

**loans. It's the easiest money you'll ever make and if you ask about -- if you ask around about me, you'll know I'd cut my eyes out before losing any more money.**

**Okay. Did you say that?**

A I don't remember saying that, but I'm sure I did.

**Q Okay. No reason to doubt that that's what you said --**

A Correct.

**Q -- if it's in the text message, right?**

A That's correct.

**Q Okay. Okay. The first loan you got from YSA was on October 8th, correct?**

A I don't know the exact date, but that sounds about right.

**Q All right. I'll represent to you that that's the date, and we're going to look at documents in a minute that will confirm that. So flip ahead to YSA 16. You know what I'm talking about there, the Bates labels in the bottom?**

A Yeah, I see that.

**Q Yeah. In about the middle of the page, you say to him -- you say to Efraim, "No worries. I got the loan!!!! Great job!" Then Efraim says, "All**

**good brother. Looking forward to a long and prosperous relationship for us you." You respond, "Me too. Thanks for getting through the negotiations. You are a mensch."**

**Did that exchange occur?**

A Again, I don't specifically remember it, but I -- I'm sure it did.

**Q Okay. At that point, did you feel like you were being subjected to loan sharking by Mr. Diveroli?**

A The market for lenders who will take on -- you know, take on loans with collateral like -- like membership interest is expensive. I was very much at peace with that and had no issues with Efraim's -- with the interest rate on that loan.

**Q Okay. Didn't you tell Mr. Diveroli as recently as October of this year that you believe that a restructuring of your operation involving YSA and Mr. Diveroli would make a lot of sense?**

A Yes.

**Q And did you also discuss at that time potentially even working for YSA's associate Parker Detweiler?**

A No.

**Q You didn't say that?**

A No.

**Q Okay. Let's take a look at the October 8th loan documents themselves we'll mark as Exhibit 4.**

(Deposition Exhibit No. 4 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) I going to mark another one for you to look at, which I -- I actually did this out of order, but we can look at them at the same time. We'll mark this as Exhibit 5.**

(Deposition Exhibit No. 5 was marked for identification and made part of the record.)?

MR. BRODSKY: What are the Bates labels?

MR. TASCA: It's 3437 to 3448 Kulick.

**Q (By Mr. Tasca) Take -- take a look at that one first?**

A Which one?

**Q Exhibit 5.**

A Okay.

**Q And, again, you know, you don't have to read every line, but just tell me generally if you are familiar with that -- that document.**

A Yes, this seems to be an email thread between myself and YSA.

**Q Okay. And is it fair to say that this**

**is -- it's an email string but among you, your lawyer, Mr. Jindal, YSA representatives and YSA's lawyer negotiating the terms of the loan documents for the first loan?**

A Correct.

**Q Okay. All right. So both you and your counsel had a chance to review the language that ultimately went into the loan documents, correct?**

A Yes.

**Q And then if you flip back to Pages 34 -- 3438 go to, and then you see the sort of bold and all caps there?**

A Uh-huh.

**Q And then it picks up again on 3439 to 3440, on to 3441, and my question about that, from context, it seemed to me that those were your comments; is that correct?**

A It's hard for me to say if I was responding to -- it's hard for me to say that. It's either myself or AJ.

**Q Okay. So either you or your representative, AJ Jindal, made those comments?**

A That's correct.

**Q And and you commented on several terms, including the interest rate, the collateral**

**language, the reps and warranties, the power of attorney language, among other provisions. When I say you, I meant subject to your qualification that it could be you or Mr. Jindal.**

A On which day?

**Q On any of the days --**

A Oh.

**Q -- where there's that bold, underlined, all caps comments.**

MR. BRODSKY: Form.

A Yes.

**Q (By Mr. Tasca) Okay. Other than this email exchange that we're looking at here in Exhibit 5, what other discussions did you have or Mr. Jindal have with the YSA team?**

A It's hard to say. We had phone calls, text messages. It would have been -- we would have been interacting consistently throughout the -- the negotiation period.

**Q Okay. So in addition to the emails that we're looking at here in Exhibit 5, there were phone calls that you had talking about the terms?**

A Yes.

**Q Maybe text messages?**

A Yes.

**Q Okay. All right. So then let's look at the other exhibit that we marked, which is Exhibit 4. And this is YSA 1434 to -- actually, this is sort of a compilation of the documents, so the Bates numbers won't be consecutive, but I'll say generally that this appears to be -- and I'll confirm this with Mr. Kulick -- the promissory note, collateral pledge and security agreement, the guarantee and ROFO, and then just to save a little paper, as part of this package of loan documents, there was also a confession of judgment.**
**Do you recall that?**
A Yes.
**Q Okay. But that's not included in this packet. Is what I said true? Is this -- are these the final documents for the October 8th loan that YSA made?**
A It looks that way, yes.
**Q And with some variations that we'll discuss later, were the same four types of documents plus the confession of judgment used on every loan you did with YSA? Is that your recollection?**
A Yes.
**Q And did you have counsel review the final documents before you signed them?**

A No.

**Q You did not?**

A No.

**Q Okay. Did anything prevent you from having Mr. Jindal or other counsel review the final documents before you signed them?**

A Typically time.

**Q Okay. Time because you were in a hurry to finish the documents to get the money, right?**

A Yes.

**Q Okay. So, I mean, is it fair to say your side was the source of the time pressure?**

A Yes.

**Q Okay. All right. So -- and we're going to get back to 4 and kind of go through some of the terms of those documents, but first I would like to look at what we'll mark as Exhibit 6, which is Kulick 10188 to 10226.**

(Deposition Exhibit No. 6 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Really I just wanted to focus on the portion of this document -- do you recognize this document?**

A Seems to be a continuation of email thread on one of other documents.

**Q In which you're negotiating that October 8th loan, correct?**

A That is correct.

**Q Okay. And do you understand the statements in blue to be Mr. Jindal's statements or maybe your statements?**

A Statements in blue are going to be AJ's statements.

**Q Okay. So one of the things AJ says here is, it's toward of the top of the page when you're talking about the identity of the borrower, he says, (As read) Because ya'll require first and sole priority on the collateral, the borrower -- borrower will be Asset Holder, LLC. It holds unencumbered membership interest.**

**Do you see that?**

A Yes.

**Q Okay. Now, if we go back to Exhibit 4, the loan documents, if we go to the CPSA, Bates -- Bates Page 1442, the recital, which I presume came from information that you and/or Mr. Jindal supplied, but you can correct me if I'm wrong, says, "Borrower holds the right, title and interest," and it goes on to discuss membership interest in four different entities.**

**Do you see that?**
A Under B, yes, I do.
**Q Okay. When did Asset Holder receive those membership interests?**
A In the lead-up to -- during the negotiations to this loan document.
**Q Okay. When was Asset Holder formed?**
A During these loan negotiations.
**Q Okay. And given that, how did it acquire these interests in these four entities?**
MR. BRODSKY: I'm going to object to the form.
A I don't know that I know legally. I'm not a lawyer, so I don't know the -- the answer to that from a legal perspective, but from a practical business perspective, I own membership interest and it's my choice what vehicle those membership interests are in and we put them into Asset Holder so that there would be unencumbered collateral.
**Q So who had these four interests before Asset Holder had them?**
A Marc Kulick.
**Q Personally?**
A Correct.
**Q Okay. And is there documentation of you**

**transferring those interests to Asset Holder?**
A It is my belief there is, but I'm not a hundred percent sure.
**Q Okay. You also supplied some org charts for the entities listed in Recital B here to YSA at some point, correct?**
A I believe that I might have, but I don't remember doing so specifically, but --
**Q Okay.**
A -- I believe that I'm -- I believe it's the normal course of business.
**Q This --**
MR. TASCA: Do we have those?
MS. ALBERTO: Yeah.
MR. TASCA: Thank you. Can you just mark them collectively?
MS. ALBERTO: Yes, that's what I'm doing.
**Q (By Mr. Tasca) So this will be Exhibit 7.**
(Deposition Exhibit No. 7 was marked for identification and made part of the record.)
**Q (By Mr. Tasca) And this, subject to Mr. Kulick's, confirmation appears to be the org charts for the various entities --**
MR. BRODSKY: Object to the form.
**Q -- (By Mr. Tasca) -- that are listed in**

**Recital B.**

MR. TASCA: What's the objection? I can rephrase.

MR. BRODSKY: The org charts are the -- the title owner org charts. They're not org charts of the intermediate holding companies.

MR. TASCA: The ones I'm looking at are.

MR. BRODSKY: I mean, they're on -- they are on this org chart. I don't think they're the org charts of those entities, though.

**Q (By Mr. Tasca) All right. So what -- what are these org charts, Marc?**

A These are the organizational -- this is the base level organizational structure of four different deals.

**Q Okay. Why is Asset Holder not on any of these org charts?**

A Because Asset Holder would sit in one of the investor entities.

**Q So there's sort of a catchall for investor entities and that's where Asset Holder's interest would be?**

MR. BRODSKY: Objection to the form.

A That is correct.

**Q (By Mr. Tasca) For example, on 60 -- on**

**65418, it says "various other members." So that's -- your testimony is that's where Asset Holder's interest is covered?**

A That is correct.

**Q Okay. And then you've signed all these documents -- well, just sticking with the CPSA, you signed this document on behalf of the borrower, Asset Holder, LLC, and the pledge of Vesta Holdings, LLC, correct?**

A Yes, that is correct.

**Q And were all of your reps and warranties true and correct in this CPSA?**

A I'd have to review them.

**Q All right. Go ahead.**

MR. BRODSKY: Joel, could you repeat that question? I'm sorry.

MR. TASCA: Sure. I asked if the reps and warranties in this document by the pledgor and borrower were accurate and true.

A At the time, all those were true, yes.

**Q (By Mr. Tasca) Okay. So there wasn't another litigation out there that wasn't disclosed, looking at the rep and warranty at 3.5?**

A I don't know what case number 22-CV-00392-JFCDL is. I do know that -- that Efraim

and I -- that I had disclosed to all litigation to Efraim and there was nothing left out.

**Q Okay. And then there is some covenants here and one of the covenants is in 4.3. And it says, (As read) So long as the payoff amount remains outstanding, borrower and pledgor shall -- shall alert lender of any debt in excess of $50,000 that is taken by borrower, guarantor or any entity directly or indirectly controlled by guarantor, and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt."**

**Did you ever breach that obligation?**

A Yes.

**Q Okay. And then flipping to the power of attorney provision, which is 4.6, and as part of this provision, it says, "Through exercise of this irrevocable power of attorney, lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interest, including but not limited to, filing any action and doing whatever else is necessary to protect this interest, enforce its rights, and collect all amounts due to lender. This shall include, but not be limited to, taking any action against any of the**

**collateral or any real or personal property owned by the collateral."**

**What was your understanding of that -- that very last part, "taking any action against any of the collateral or any real or personal property owned by the collateral"?**

MR. BRODSKY: Objection to the form.

A From my understanding and from the documents that I signed, the collateral was my membership interest in particular deals. I was comfortable granting the power of attorney as it pertained to my membership interests in the selected deals that were pledged as part of this CPSA.

**Q (By Mr. Tasca) Right, and you had a chance to review and comment on the power of attorney before it was finalized as we saw earlier, correct?**

A Yes.

**Q So what did you think in your mind when it said "real or personal property owned by the collateral"?**

MR. BRODSKY: Objection to the form.

A To my understanding, the collateral owns no -- no -- no real or personal property.

**Q (By Mr. Tasca) So -- so why say it?**

A I mean, it -- it -- it seemed to me to be something that lawyers put into contracts. I think there's a lot -- from business -- from a business perspective not, everything that's in a contract is directly applicable, but I was comfortable that I pledged my membership interests in particular deals and I was comfortable with the consequences thereof.

**Q Is it possible that there was contemplation that in the future, the collateral could be expanded to collateral that did own real property?**

A No.

MR. BRODSKY: Objection -- I'm going to -- I'm going to object to form, but let -- let me -- give a second so I can object, okay, Marc?

THE WITNESS: Sure. Sorry about that.

A No, at that time, there was no consideration of future -- of what future transactions would look like.

**Q (By Mr. Tasca) Just bear with me a second here. This is a result of me not having my working copies where -- which I had flagged and highlighted, so I'm just looking for some other -- okay. So go to Section 5.2, remedies upon default. And it says here, (As read) While -- while an event of default**

**exists, lender may, without notice or demand to borrower or pledgor, enforce payment of the obligations then due, whether due by acceleration in whole or in part or otherwise, and may exercise any rights under the UCC rights and remedies of lender under these -- this agreement or otherwise including, but not limited to taking any action against the collateral or any of the collateral's real or personal property."**

**Same question there. What did that last phrase mean to you in terms of what rights YSA would have upon the event of default?**

MR. BRODSKY: Objection to the form.

A To my understanding, they could file UCCs, which I believe they did, and they could -- they could -- they could take whatever necessary steps to -- to protect their collateral, which I was okay with, because I pledged what I intentionally meant to pledge.

**Q (By Mr. Tasca) Let's just go back to Section 1.1?**

A Of which document?

**Q The CPSA.**

A 1,1. For clarification, that's Page 1443?

**Q Yes. All right. And see the definition**

**of security interest there? And security interest contains the definition of collateral, right?**

A Yes.

**Q Okay. If you look at Romanette IV, part of the collateral includes all other claims the borrower or pledgor, as applicable, now has or may in the future acquire of its capacity as member, partner, shareholder, or other equity holder of any entity against such entity and its property."**

**What did you understand that last phrase to mean, "and it's property"?**

MR. BRODSKY: Objection to the form.

A The pledgor and the guarantor were Vesta Holdings and Asset Holder, so it was my understanding that I was pledging the membership interest as defined by the CPSA for -- for Asset Holder and Vesta Holdings.

**Q (By Mr. Tasca) Okay. So your position is the "and its property" phrase just didn't add anything to that?**

A That is correct, to my understanding.

**Q Okay. Okay. Then going to -- jumping around a little bit here, Section 4.5, the last sentence of that section says, "Until lender elects to exercise such rights, borrower/pledgor as**

**trustees for the benefit of lender shall collect and enforce all payments owed on the collateral pledged by borrower and pledgor."**

**So did -- did you understand that to mean that once there was an event of default, the borrower and pledgor assumed the role of trustee for the benefit of the lender in collecting payments owed on the collateral?**

MR. BRODSKY: Objection to the form.

A My understanding of that is that these membership interests come with distribution value and if any distributions were made or if any assets were liquidated, the collateral -- the collateral that I had pledged would be enforceable under that -- under Section 4.5.

**Q (By Mr. Tasca) Right, and -- and borrower and pledgor would be -- act as trustees for the benefit of the lender as it says here, correct, in that circumstance?**

A In the circumstance that there were any distributions or liquidation events, yes.

**Q Okay. Okay. Then go -- go to Section 7.5, and if you're there, the -- the very first sentence I just want to focus on, "This agreement shall in all respects be governed by and enforced in**

**accordance with the laws of the State of Delaware."**

**Do you agree that's true?**

MR. BRODSKY: Objection to the form.

A Yes.

**Q (By Mr. Tasca) Okay. Let's go to that. If you could flip to the -- to the guarantee, guarantee and ROFO and go to Bates Page 1429. Okay. We will mark this as Exhibit 8.**

(Deposition Exhibit No. 8 was marked for identification and made part of the record.)

MR. TASCA: But it appears our copying people lost their minds and made the world's biggest copy. Hilary, maybe could you hold it up for him.

MS. ALBERTO: Yeah.

MR. TASCA: Ben, this is the Vesta REO, just so you know.

MR. BRODSKY: What Bates label is it?

MS. ALBERTO: 337, 338.

THE WITNESS: Yes, that would be.

MR. BRODSKY: Looks like you're reading the New York times.

MS. ALBERTO: It's YSA 337 and 338. The 338 is an Excel native, which is what we're showing him.

**Q (By Mr. Tasca) Yeah, I think that really**

**all I want to focus on are the last few pages, the pages that list all these properties.**

MS. ALBERTO: This is going to be -- what if I lay this flat right here?

THE WITNESS: Sure.

MR. SHANK: Is there any marked, like, numbering?

MS. ALBERTO: It's an Excel, so it was produced as one Bate number.

**Q (By Mr. Tasca) Okay. And is this the SREO that you provided pursuant to Section 5C of the first SREO, albeit in jumbo form?**

A I'll tell you there is almost no way for me to know that, but -- no, it can't be.

**Q That's not the SREO?**

A It can't be, because the date on this is 5-9-2025.

**Q Okay. I saw some documents earlier that said the SREO would be a subsequent deliverable, so could -- could it be that you delivered it after the initial loan?**

MR. BRODSKY: Objection to the form.

A I have no recollection of when it was delivered. SREOs are documents that are routinely kept by real estate sponsors, so it would have been

accessible at any time.

**Q (By Mr. Tasca) Okay. Then we'll -- we'll try to find the right SREO if you don't think that's right, but I guess just as a general question, did the SREO include all of the real estate that you owned whether directly or indirectly or whether wholly or partly?**

MR. BRODSKY: Objection to form.

A It's -- it's very hard for me to know if this -- if -- if my team had all my various investments covered under the current equity column, but it looks like the minimum amounts that were required by lenders were covered on this.

**Q (By Mr. Tasca) So you say that could be under inclusive, there may have been other properties?**

A Not other properties, no. This looks like a complete list of properties.

**Q Okay. And, again, my -- my question was those properties that you owned at least partially and even indirectly, is that the complete list as of that time?**

A Yes.

**Q Okay. And are those the properties that you would consider to be in your portfolio?**

MR. BRODSKY: I'm going to object to the form.

A Can you explain what you mean by my portfolio?

**Q (By Mr. Tasca) Well, the -- when you refer to your portfolio, are you referring to those properties?**

A These -- this is a accurate list of the properties that I own, operate, sponsor, cosponsor, et cetera.

**Q Okay. And -- and just to be clear, when you say "sponsor," that -- you're not backtracking from the fact that you own either directly or indirectly, in whole or in part, some amount of each of those properties listed?**

A That is -- in -- I own some amount of the entities that -- that are downstream in the org chart. The ownership structure is not as simple as you're making -- as -- as that question would lead it to be.

**Q Right, but -- but what I'm talking about are the properties, and if you have an interest in an entity that owns a piece of that property, would you agree with me that that would constitute indirect partial ownership on your part?**

MR. BRODSKY: I'm going to object to the form.

A I don't -- I don't know the answer to that question.

**Q (By Mr. Tasca) Okay. You -- you don't necessarily disagree with me that that's a form of indirect, partial ownership when you own a piece of a company that owns a piece of that property?**

MR. BRODSKY: Objection to the form.

A I just don't believe that I have -- that -- without knowing the -- how you define indirect or direct, what I know is that I have, you know, as we looked at in the org chart previously, an ownership interest in an entity like Capital on 28th Investors, LLC, and that Capital on 28th Investors, LLC, is -- is a member of the upstream organizational.

**Q Well, look, you submitted that document, and I realize that that could be a later version of the document, but what was called for is that -- is it true and correct and complete schedule of real estate and entities owned, whether directly or indirectly and whether wholly or partly by guarantor, which is you.**

**So did you provide accurate information**

**that complied with the directive in that paragraph I just read --**

A My belief is yes.

MR. BRODSKY: I'm going to object to the form.

**Q (By Mr. Tasca) Just so that it doesn't get muddled, your belief is yes?**

A My belief is yes.

**Q Okay. And would you consider the entities that actually owned the properties to be your affiliates?**

A Would I consider the --

MR. BRODSKY: I'm going to object to the form.

A Would I --

MR. BRODSKY: You can answer.

A Can you rephrase? Can you --

**Q (By Mr. Tasca) Sure. There are various entities in the ownership structure and the actual entity that owns the real property, I think we've been referring to them in the litigation as the title owners.**

A Okay.

**Q And my question is, are those title owners through indirect ownership by you through**

**intermediate companies your affiliates?**

MR. BRODSKY: Objection to the form.

A Can you do me a favor and define affiliates? I just want to make sure I'm answering the question properly.

**Q (By Mr. Tasca) Well, I'm more interested in how you view affiliates.**

MR. BRODSKY: I'm going to -- I'm going to object.

A I do not feel like I have a -- I don't -- I'm not the person using that word. I don't know the -- I don't -- I don't feel comfortable making a judgment on what is an affiliate or not.

**Q (By Mr. Tasca) Okay. So just take an example, Barcelona Best Living, LLC, is that an affiliate of Marc Kulick?**

MR. BRODSKY: Objection to the form.

A I -- i don't know the answer to the question. I don't believe so. It doesn't -- it doesn't sound right, but I don't know.

**Q (By Mr. Tasca) All right. We're going to come back to that, because there are -- yeah, okay. We're going to come back to that.**

**So would you agree with me that those entities listed on the SREO are entities directly or**

**indirectly controlled or managed by you?**

A Nothing on the SREO is actually an entity. These are -- the SREO tracks the names of the individual properties, not any of the entity information.

**Q Okay. Fair enough. So the -- the property, would you say you directly or indirectly control or manage those properties?**

A We are the property manager on these properties. We are in the ownership structure on each of these properties, although that ownership varies according -- accordingly and I have a personal investment in every one.

**Q Right, but my question is, do you or Vesta Holdings directly or indirectly control or manage the properties -- the affiliates that own the properties?**

MR. BRODSKY: I'm going to object to the form.

A You're asking if Vesta Holdings or myself owns --

**Q (By Mr. Tasca) No.**

A -- the title owners?

**Q Okay. Title owners. So -- so do you and/or Vesta Holdings directly or indirectly control**

**or manage the title owners?**

MR. BRODSKY: I'm going to object to the form.

A In some -- in -- we are the -- we are the authorized representative in most cases on behalf of the title owner, but I think that there are restrictions and guidelines in place on -- on those -- on the management from a day-to-day perspective and each deal is actually completely separately structured.

So we would have to dive in on a deal-by-deal basis to isolate who the manager is, do I have a co-manager, is there a different manager. There's a lot of differences between how these things are structured.

**Q Okay. Well, is it fair to say, then, that you and/or Vesta directly or indirectly control or manage at least, in part, the title owners?**

MR. BRODSKY: Objection to the form.

A We don't -- the first time that we -- we -- we don't review things in terms of title owner, downsize entity, outside of what we're investing in. Vesta and myself are the property managers. We control what happens from a property management perspective.

Outside of that, I don't purport to control property owners or -- I don't know -- I don't know the answer to that question.

**Q (By Mr. Tasca) Okay. All right. We'll -- we'll come back to that.**

MR. SHANK: Counsel, we've been going about an hour.

MR. TASCA: Want to take a break? Sure.

MR. SHANK: Sure.

THE VIDEOGRAPHER: Off the record. The time is 9:26.

(A recess was taken from 9:26 a.m. to 9:46 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 9:46.

**Q (By Mr. Tasca) Marc, during the break, did you have any conversations with your counsel about your testimony?**

A Yes.

**Q Okay. What did you talk about?**

MR. BRODSKY: I'm instructing him not to answer that.

MR. TASCA: That's not privileged. There's clear Delaware law on that. Are you still going to instruct him not to answer?

MR. BRODSKY: Yeah, if you want to send me

the case, I'll be happy to look at it.
MR. TASCA: All right. We'll do that.
**Q (By Mr. Tasca) Okay. We'll come back to that. One of the payments on that first October 8th loan was due in January, correct?**
A Yes.
**Q Okay. And you were late on that payment?**
A That is correct.
**Q Okay. This email that we're looking at, Exhibit 10, do you recall that email?**
MS. ALBERTO: Exhibit 9.
**Q (By Mr. Tasca) Exhibit 9, sorry.**
MR. BRODSKY: Can you put it up on the screen?
MS. ALBERTO: Sure. It's up.
(Deposition Exhibit No. 9 was marked for identification and made part of the record.)
A What was --
**Q (By Mr. Tasca) Do you recognize that email?**
A Yes.
**Q Okay. So does this email reflect YSA giving you an extension on the amount that you were required to pay in January on the October 8th loan?**
A I wasn't actually required to pay an

additional $25,000 per the loan documents. There was a 10-day grace period and I added the additional 25,000 to be kind to Efraim, but yes, that is correct.

**Q Were there other times when you were late on payments on any of your loans to YSA where they worked with you and allowed you to make the payments late?**

A Yes.

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) Now, after that initial October 8, 2024, loan, you came back to YSA for more loans, correct?**

A Yes, that is correct.

**Q If you flip to page -- in Exhibit 3, if you flip to Page YSA 29?**

MR. BRODSKY: Can you put it up on the screen?

**Q (By Mr. Tasca) You say here to Efraim, "I'm on a call but where did we land on another short term." So you're talking about another short-term loan that you wanted to get from YSA, correct?**

A Yes.

**Q So that's you coming back to YSA for**

**another loan; is that fair?**

A Yes.

**Q Okay. And, ultimately, you went -- ended up getting three more loans from YSA in January and then a February 4th loan?**

MR. BRODSKY: Objection to the form.

MR. TASCA: Do we have it?

MS. ALBERTO: Yeah. Do you want to do a compilation exhibit of all of them or do you want to --

MR. TASCA: Let's just do them one at a time.

MS. ALBERTO: So we'll start with January 21st.

MR. TASCA: Yeah.

MS. ALBERTO: Okay.

MR. TASCA: That's 10.

MS. ALBERTO: Yeah.

(Deposition Exhibit No. 10 was marked for identification and made part of the record.)

MR. TASCA: Can we do all at once?

MS. ALBERTO: We can do all -- you want to admit all of the loans?

MR. TASCA: Yeah.

MS. ALBERTO: Okay.

MR. TASCA: 21-24.

MS. ALBERTO: Mark them all as Exhibit 10?

MR. TASCA: No, I think they should be separate.

(Deposition Exhibit No. 11 was marked for identification and made part of the record.)

(Deposition Exhibit No. 12 was marked for identification and made part of the record.)

(Deposition Exhibit No. 13 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. And I'm not going to have any specific questions about these loans, Marc. I just want to authenticate them essentially. Do those appear to be the January 21st, January 24th, January 30th, 2025, loan documents as well as the February 4th, 2025, loan documents?**

A Yeah, this is -- appears to be a series of loan documents.

**Q Okay. And for each of those loans, you came back to YSA, right, they didn't come to you and offer to make the loan?**

A That's absolutely true.

**Q Okay. And then the next loan after that, we're going to slow down a little bit on this one and go through it, it was the February 10th, 2025,**

**loan.**

MS. ALBERTO: Do you want me to pull it up?

MR. TASCA: Oh, did you give me that one?

MS. ALBERTO: Yeah. Oh, I'm sorry.

MR. TASCA: Yeah, you gave me the one that was February 4th.

MS. ALBERTO: So this will be 14.

(Deposition Exhibit No. 14 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. So those appear to be true and correct copies of the February 10th loan documents?**

A Yeah, they do.

**Q Okay. And this loan was for $850,000?**

A That is correct.

**Q And did your counsel review these loan documents before you signed them?**

A No, he did not.

**Q Okay. Did anything prevent you from having counsel review them before you signed them or was it just time again?**

A They were identical to the docs from October.

**Q So you didn't feel it was necessary?**

A That's correct.

**Q Okay. Now, if we go to the CPSA on this loan, on the first page there, Recital B, we've looked at this earlier, describes certain membership interests that Asset Holder, LLC has in various other LLCs, right?**

A Yes.

**Q And then Recital C describes certain membership interest that Vesta Holdings, LLC has in various other LLCs?**

A Yes, that is correct.

**Q So in total there were 17 entities, right?**

A Yes.

**Q Okay. And then February 18th, then you came back for another loan in a greater amount, correct, just eight days later?**

A That had been the plan.

**Q Okay.**

A I had been wanting a longer term loan since the -- since I paid off the January loan.

**Q And while we're getting that February 18th loan document distributed, I'll just ask you a few questions.**

(Deposition Exhibit No. 15 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) So that loan was almost twice as much, right, the February 18th loan was 1.5 million, correct?**

A The -- the principal balance was 1.5 million. The net funding amount to me was something in the vicinity of 1.25.

**Q Understood. After whatever fee was taken?**

A That's correct, yes.

**Q Now, did anyone from the YSA side express, in connection with the February 18, 2025, loan that those 17 entities as the foundation for the collateral wouldn't be enough at that point because you were asking for more money?**

A The February 18th, loan had a lot of negotiations behind it. There's text messages that I both remember and reviewed as part of -- as part of this case. There's emails that are the same. We were covering a lot of ground.

Would I say that I -- I do believe that YSA had an interest in getting additional collateral. Several times, both in email and in text and certainly over the phone, I said that there would be no additional collateral. So I think it's fair to say that there was an ongoing negotiation that went throughout the lead up to the

February 18th loan.

**Q So you told YSA that there would be no additional collateral?**

A Yes, I did.

**Q Is that documented anywhere?**

A Yes, it is.

**Q Where?**

A Do you have the text thread between myself, Efraim, and Robert Miley as part of your evidence?

**Q I do. Was going to show it to you next.**

MS. ALBERTO: As soon as she brings it.

MR. TASCA: Okay. Just try to be efficient here, because that -- that is what I want to get into next. Are the subsequent loans coming next too?

MS. ALBERTO: We have those.

MR. TASCA: We have those. Okay.

MS. ALBERTO: Yeah, do you want to mark that next?

MR. TASCA: Yes, what number is this?

MS. ALBERTO: 16.

(Deposition Exhibit No. 16 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) So is Exhibit 16 the text**

**exchange you were talking about?**

A Sorry. Yes, this is one of the -- the text exchanges.

**Q Okay. This is a text exchange that involved you and Robert Miley and Efraim Diveroli of YSA, correct?**

A That is correct.

**Q And Robert says to you, "Where this had previously included 17 entities (4 unencumbered) are we expanding to rest of portfolio? If so, can you please send me a paragraph that I can copy into it with the other entities. If just names, it's easier if we want to include the capital contribution for each. As in prior version though, that's more tedious and I need the exact numbers. Thanks, guys."**

**Do you see that?**

A I do.

**Q And then you say back to him, "The answer is yes and no. I suggest we keep that the same, but maybe add a joinder to the portfolio as a whole."**

**So when you say "keep that the same," are you talking about keeping Recitals B and C the same as to the 17 entities?**

A So --

MR. BRODSKY: Objection to the form. Go ahead.

A There are multiple conversations going on at the same time here. The -- in the -- there's an email that you might show me later, you might not, where Robert -- Robert Miley of YSA was discussing his -- his lack of ability to track the unencumbered versus the encumbered and that is on the -- the first time where I propose the joinder.

The purpose of the joinder as I understood it and as the documents ultimately reflected was that YSA had developed a concern that they couldn't track if I was having liens on entities anymore and they were trying to guard against me taking collateral, conveying it to other people, selling it, liquidating it, zeroing it out, losing it, you know, any of the -- any of those type of concepts and they wanted security.

The joinder that I proposed and the joinder that we signed did not alter or increase the scope of the collateral. All it did was stop me from hiding YSA's collateral, losing YSA's collateral, selling YSA's collateral.

**Q (By Mr. Tasca) So I appreciate that explanation, but my question is -- was I suggest --**

**when you say "suggest we keep that the same," you're talking about the 17 entities in B and C, right?**

A Correct, that --

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) Okay. And then you say, "But maybe add a joinder to the portfolio as a whole."**

**Do you see that?**

A Yes.

**Q And when you say "portfolio as a whole," what are you talking about?**

MR. BRODSKY: Objection to the form.

A Again, what I just described is what we're talking about.

**Q (By Mr. Tasca) Just -- I want to know what you're talking about --**

A Sure.

**Q -- when you say joint -- what are you talking about when you say "the portfolio as a whole"?**

A Sure. What we were trying to accomplish was that there was nowhere to hide for the collateral in my portfolio. Their concern was that my portfolio was expansive with lots of entities, with lots of investors. How could they be sure that

I wasn't doing something behind the scenes to change their collateral, sell their collateral, hurt their collateral by means of using my expansive universe and portfolio to do so.

The joinder was created to stop that from happening saying if it's in Marc's universe and it's part of this collateral, it belongs to YSA.

**Q All right. So if I understand you, what you're saying is that if some of the interests that are described in the Recital B and C were moved from the entities listed in B and C, then the -- the collateral would follow that to those entities.**

**Is that what you're saying?**

MR. BRODSKY: I'm going to object to the form. You can answer.

A Yes, that is correct, and that was further clarified in a text message on the next page of your exhibit.

**Q (By Mr. Tasca) Okay. So what you're saying is that, for example, Vesta Holdings owned a membership interest in Fairfax Holding Company, LLC, right, and if Vesta Holdings transferred that membership interest in Fairfax Holding Company, LLC to Vesta company ABC, then it would still serve as collateral. Is that what you're saying?**

A That is correct, or if I sold my membership interest in Fairfax to a third party and that third -- you know, and it was done to -- you know, no matter what -- no matter where it went, this is their collateral.

**Q You said in this text message chain that you made clear that the collateral was not going to be expanded. Where is that?**

A If you go to the next page of your exhibit, the text message that is time stamped 2025,02,18, 19:45:29, "Yes, the collateral needs to remain the same." And I bring up the -- again, the idea for the joinder to -- to keep them satisfied that I can't -- that I can't abscond with or convey or hurt their collateral for any of the means we've already discussed.

**Q So you're not saying there in response to Robert's question the collateral needs to remain the same as articulated in recitals B and C, but those -- that's what you're saying, isn't it?**

A I'm saying --

MR. BRODSKY: Objection to the form.

A Sorry. I am saying that I offered no additional collateral on this loan.

**Q (By Mr. Tasca) You -- you're telling me**

**that by you saying, "Yes, the collateral needs to remain the same," what you really meant was what you just explained to me that if the collateral was transferred from Vesta Holdings to somebody else, it would still serve as collateral? That's not what you say here.**

MR. BRODSKY: Objection to the form. Don't argue with the witness.

MR. TASCA: Don't tell me not to argue with the witness.

MR. BRODSKY: Yeah, I -- I will, just like you told me not to argue with the witness. You may not like the answer he's giving, but your tone of voice --

MR. TASCA: You can -- you can -- you can --

MR. BRODSKY: -- and your approach is argumentative.

MR. TASCA: -- you can object -- just like you told me, you can object as to form and then shut your mouth. No more speaking objections.

MR. BRODSKY: I don't think I told you shut your mouth and don't appreciate that comment, but again, don't argue with the witness.

**Q (By Mr. Tasca) So you don't say that**

**here, do you, what you just said --**

MR. BRODSKY: Objection.

**Q (By Mr. Tasca) -- the explanation you just gave me in this -- in this deposition, that's nowhere in here. You say, "The collateral needs to remain the same." That's in response to Robert saying, "Can ya'll give me consent on the entity language for collateral agreement?" He's talking about the language of the agreement, isn't he? And you're telling me --**

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) -- and you're telling me you're responding to him with this elaborate situation where -- elaborate scenario where the collateral gets transferred internally and it remains the same, you just say, "Yes, the collateral needs to remain the same," is that your testimony?**

A My testimony is --

MR. BRODSKY: I'm going to object to the form.

A Yes, my testimony is that there's multiple conversations happening at the same time. There was an email thread where Robert brings up his concerns over tracking the collateral- tracking the collateral and I was very clear in my mind, I cannot