testify to what YSA intended to do, what they thought, how they perceived that message, but very clearly I had no intention of adding additional collateral to this loan.

**Q (By Mr. Tasca) So the -- and where is that articulated other than these five words, "The collateral needs to remain the same," in response to a question about how the collateral is currently described in the CPSA in Recitals B and C? Where is that? Anywhere else?**

MR. BRODSKY: I'm going to object to the form.

**Q (By Mr. Tasca) It's -- its --**

A I don't know if there were emails that said the same. There might have been, but we -- you gotta remember, we're also having phone calls during this time period. We're trying to work through the loan docs and what we agreed on. As I understood their concern, I came up with a method to -- to fix their concern. There is a written record of that concern via email. I came up with a sensible way, in my opinion, to -- to fix that concern and I believed we were all on the same page.

**Q We're going to look at that email, but you're saying you had phone conversations as well**

**where you described that elaborate scenario you just talked about?**

MR. BRODSKY: I'm going to -- I'm going to the form. Move to strike. You can answer.

MR. TASCA: Move to strike on what basis? I'm asking a question.

MR. SHANK: Your characterization of it as an elaborate scenario --

MR. TASCA: So you object to form. So you object to form. It's not a basis for it to move to strike.

MR. BRODSKY: No, I'll move -- I'll move to strike if I think it's an inappropriate question.

MR. TASCA: Okay. Good -- good luck with that at the -- at the court.

MR. BRODSKY: Okay. You don't have to get --

**Q (By Mr. Tasca) Can you answer my question?**

MR. BRODSKY: You don't have to get frustrated or upset. Let's -- everyone is trying to be professional here, so please try to do the same.

A Can you remind me of the question where we were at.

**Q (By Mr. Tasca) My question is --**

MR. TASCA: Can you read the question back.

(The reporter read back the requested question at Page 64, Lines 24 and 25, and Page 65, Lines 1 and 2.)

A Yes, we had multiple phone conversations. Even that email thread does -- you know, Robert references that Marc and I just had a phone call.

In the phone call, what my understanding was via email, what my understanding was and to -- to a larger extent this text thread as well, my understanding was YSA had an interest in expanding the collateral, which I said no to. YSA also had a concern that they were not properly protected because of the expansiveness of my holdings and my universe and they -- they wanted more control, more ability to track, but instead of doing that, which would have been an onerous task, which we all designated would have been an onerous task, we agreed to the joinder.

**Q (By Mr. Tasca) So that's what you said to Robert on the phone, words to those effects?**

A It's certainly not exactly those words, but yes.

**Q So you did say that? That's your**

**testimony?**
A That is my testimony.
**Q Okay. So you had a conversation -- aside from this conversation with Robert, when else did you articulate this scenario?**
MR. BRODSKY: I'm going to object to the form.
A When we have a chance to review the joinder, will say exactly what I'm saying, so I -- I -- I'm comfortable with how I'm describing this. This is exactly the negotiation. I'm -- I don't -- I don't have another answer for you.
**Q (By Mr. Tasca) So when you say "for joinder with any asset controlled by any affiliate of mine," in that -- in that statement, you're not proposing that any asset controlled by any affiliate of yours would be added?**
A No. And as more evidence of that, as we get -- as I'm sure we'll get into later, some of the negotiations in future loans, including the April loan, we were trying to add collateral and I was very explicit and very clear.
**Q So going back to the other text message, why did you say "maybe add a joinder to the portfolio as a whole?" Why would -- why would you**

**use the word portfolio?**

MR. BRODSKY: I'm going to object to the form.

**Q (By Mr. Tasca) You -- you're talking -- the scenario you just described to me means that it would be the same membership interest, but if they were transferred to another Vesta entity, that would still serve as the collateral, so why use the word portfolio?**

A For the same reason that you asked for permission to use that word earlier today.

**Q I don't understand the answer. What do you mean by that?**

A When we started this deposition, you asked for permission to refer to the Vesta universe as a portfolio --

**Q Okay.**

A -- for ease of -- for ease of discussion and what we wrote in the joinder was exactly what I intended to sign.

**Q On the Vesta website, do you have a webpage that talks about the Vesta portfolio?**

A Yes.

**Q And -- and when you talk about portfolio, you then list the properties themselves, don't you?**

A Yes, that is the portfolio.

**Q Right. So when you were referring to portfolio here, you're talking about the properties. No?**

MR. BRODSKY: Objection -- objection to the form.

A No.

**Q (By Mr. Tasca) So you use -- you use portfolio to talk about properties, real properties, and you talk about portfolio to refer to what? Other entities that you own or control?**

MR. BRODSKY: Objection to the form.

A The idea behind the word portfolio was the same as everything else in this text thread. It was the Vesta universe. Might have been a better way to say it, but that's what we were talking about.

**Q (By Mr. Tasca) But you didn't say if membership interests are transferred to other entities that I own or control. You said my portfolio. That's --**

MR. BRODSKY: Objection.

**Q (By Mr. Tasca) -- those are the words you used, correct?**

MR. BRODSKY: Objection to the form.

A Yes.

**Q (By Mr. Tasca) Okay. Let's take a look at 8448 to 8449.**

MR. TASCA: Do we have that?

A Where -- where am I?

**Q (By Mr. Tasca) I'm going to give it to you in a second.**

MR. BRODSKY: And, Ms. Alberto, if you wouldn't mind putting it on the screen, please?

MS. ALBERTO: Sure. Was this added last night?

MR. TASCA: Can you get it up on the screen while I'm looking for hard copy? Sorry. All right. Why don't you put it on the screen --

MS. ALBERTO: I don't have all of them. I need to scan them. Was this just added last night?

MR. TASCA: Yeah, so you can't get it from the -- why don't we take just a quick break just because we've got to -- we've document issues here.

MR. SHANK: No objection.

THE VIDEOGRAPHER: Off the record. The time is 10:20.

(A recess was taken from 10:20 a.m. to 10:52 a.m.)

THE VIDEOGRAPHER: Back on the record. The time is 10:52.

**Q (By Mr. Tasca) So, Marc, we were talking**

**about your interpretation of the joinder and your articulation of what you thought it was meant to achieve to Robert on the phone. Have you ever expressed that theory in any of your litigation papers in this action?**

A I'm not -- I mean, my -- my lawyers have drafted the litigation I think to their understanding of the case. I know that I watched two of the depositions and that was a central theme of the depositions, but this is -- you know, I can't tell you what my lawyers have drafted or not drafted or planning to draft or...

**Q Okay. So the litigation record will speak for itself on that. The other thing that I wanted to ask you, do you think that it made sense for YSA to loan you double the amount they had loaned you 10 days before without needing more collateral? Does that seem logical to you?**

MR. BRODSKY: Objection to the form.

A Well, first of all, I can't speak to YSA's motives or whatever --

**Q (By Mr. Tasca) I'm asking if it seems logical to you?**

A -- but yes, because the collateral was still greater than the loan amount.

**Q The -- the collateral that was in the 17 entities was still greater than the loan amount?**

A Correct.

**Q But you still -- you had other outstanding loans, didn't you, with YSA at that time?**

A No.

**Q You -- you had not? You had paid them all off at that point?**

A Correct.

**Q Okay. The notion that YSA would be concerned that you could transfer -- that Vesta or Asset Holder could transfer those interests to other companies would be ameliorated by the fact that they filed UCCs, right, on -- on their interest?**

MR. BRODSKY: Objection to the form.

A I have no -- I can't testify to what YSA had done by -- I have no knowledge of that.

**Q (By Mr. Tasca) If Vesta Holdings or Asset Holder transferred one of those interests to another entity of yours, wouldn't YSA's interest still be protected by the UCC that it filed?**

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) You've been doing this awhile. You lend money -- you borrow money all the time. You deal with UCCs. What's your**

**understanding what a UCC does?**

MR. BRODSKY: Objection to the form.

A My understanding of a UCC is that it places a line in the sand and says that I exist as a lender and this is the amount that I exist for. I -- I certainly understand your question. I just don't know.

**Q (By Mr. Tasca) And you understand my question that their interest would be protected regardless of whether Vesta Holdings or Asset Holder transferred its membership interest to another one of your entities, but that they were -- that was their concern as articulated in these emails.**

**Does that make any --**

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) Does that make sense to you?**

A What makes sense to me is --

MR. BRODSKY: Objection to the form.

A What makes sense to me is exactly what we discussed, what we were discussing, the problems we were trying to solve and exactly what the joinder says.

**Q (By Mr. Tasca) If you were in YSA's shoes, if roles were reversed, would you have a**

**concern if you had a secured interest that's represented by UCC filing that holds -- holds their -- holds their place in line, would you -- would you be concerned about some intercompany transfer of that interest?**

MR. BRODSKY: I'm going to object to the form.

A I certainly understand the concern, certainly, yeah. You know, again, I think if I -- I don't know the ins and out of UCC rules. I'm not a lawyer, but I certainly understood the concern that I could take, you know, the most valuable asset, zero it out, get around the UCC or get around any sort of structuring and whoops, so you know, a friend of mine, somebody I know now owns that position and YSA's collateral would have been in bad shape. And I certainly understood that concern and I think I addressed it in a meaningful way and, again, I think the joinder -- the -- the joinder that I signed says exactly what I meant for it to sign.

**Q (By Mr. Tasca) And you've testified to that several times and that's not my question. How could they get zeroed out --**

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) -- if they have a UCC filing?**

A If the membership interest didn't exist anymore, there wouldn't be anything to collect on a UCC.

**Q So if the membership interest didn't exist anymore, why would it not exist anymore?**

MR. BRODSKY: I'm going to object to the form.

A If there's any -- you know, think about -- think about something that's totally outside of my control, right? What would happen to YSA's collateral if a deal was sold at a -- at a loss or at no more than the -- at no more than the senior debt. There -- despite a UCC, there's no money available to pay them.

My understanding of their concern was that if I -- if I -- if I robbed the collateral blind, they would be left with no collateral and they would be chasing me down for money that they -- that wasn't secured. What we were solving was to solve for that issue.

**Q (By Mr. Tasca) So -- so you think it was to protect against you from committing fraud and conversion?**

A Yes, or protect them in any manner applicable, yes.

**Q All right. Let's take a look at what has been marked as -- what we will mark as Exhibit 844 -- it's Bates labeled 8448 to 8449.**

MS. ALBERTO: Thank you. These will be 17.

MR. BRODSKY: Ms. Alberto, if you can kindly put it on the screen.

MS. ALBERTO: Sure.

(Deposition Exhibit No. 17 was marked for identification and made part of the record.)

MR. TASCA: What exhibit is this?

MS. ALBERTO: 17.

**Q (By Mr. Tasca) Okay. So Exhibit 17, Marc, is an email from you to Efraim. "This is what I'm starting with. We can obviously add more detail from here," and then there's an attached chart.**

**Do you see that?**

A Uh-huh.

**Q On Item 8, you say, "We have outstanding cash requests for vendors and work needed across the portfolio. This is like parts, flooring, construction, vendors, roofers, etc."**

**When you were talking about portfolio**

**here, you're talking about your real properties; were you not?**

MR. BRODSKY: Objection to the form.

A Again --

MR. TASCA: What's the objection?

MR. BRODSKY: Where are you referring to the portfolio? Like, where is portfolio? Is that in the email?

MR. TASCA: It's on the -- it's on the exhibit we're looking at.

MR. BRODSKY: Okay. Can I see it?

MR. TASCA: Sure.

MR. BRODSKY: It got scrolled past. I don't have a copy of it, but I didn't see it when I read it, so that's the problem, if you put it in the chat to be able to -- to read it a little closer, but I'm preserving the objection.

MR. TASCA: Okay. Well, will you withdraw your objection? It's not an objectionable question?

MR. BRODSKY: Can I -- may I see the first page? Where is the word portfolio here?

MS. ALBERTO: It's on the second.

MR. TASCA: It's on the second page, Item 8.

MR. BRODSKY: Okay. Well, your -- if you

want to know the nature of my objection --

MR. TASCA: I don't actually.

MR. BRODSKY: Okay. Then I'm maintaining the objection.

MR. TASCA: Fine.

**Q (By Mr. Tasca) "We have outstanding cash request for vendors and work needed across the portfolio." Marc, you're talking about your portfolio of real properties here, correct?**

A Yeah, portfolio is a word, as -- you know, as we talked about earlier, that we use to discuss the expansiveness of the Vesta universe when I used it, but much like a lot of words, context matters.

In this particular context, we're talking about not -- we're not talking about title owners. We're not talking about organizational charts. What I was saying here is that throughout my -- my -- my real estate universe, there are vendors that need to be paid and roofs that need to be fixed.

**Q Okay. Let's talk about the next exhibit, which will be 18, which is Kulick 1113 to 1114.**

(Deposition Exhibit No. 18 was marked for identification and made part of the record.)

MR. BRODSKY: Ms. Alberto, if you could

put it up on the screen, please?

**Q (By Mr. Tasca) All right. So, Marc, this is an email string involving you and somebody named Moishe Gubin, right?**

A Uh-huh.

**Q And this is one of the countless emails, communications that were in your production where you're trying to get money from people; is that right?**

A Yes, that is correct.

**Q Okay. Now, at the bottom it says, "Hello, my name is Marc Kulick and I was referred to you by Choni Wineberg. He told me to email you with a request. I'm basically drowning in between being the only person responsible for funding shortfalls across a one billion real estate portfolio in debt I've taken out thus far."**

**When you used the word portfolio there, you were talking about real estate, right?**

A Again --

**Q It's a yes-or-no question. Is that what you're talking about here?**

MR. BRODSKY: Well, I mean, let -- let the witness answer.

A In this email, I'm actually talking more

globally. As I referenced, it's not just properties. It's the -- it's the debt that I was under. I mean, when I used portfolio there, it's the context of that usage of the word portfolio.

Again, I think if you substitute universe for portfolio, it's the exact same meaning. I was struggling and I described my universe as a portfolio and, you know, was -- was trying to find a funding mechanism that would work that would both be accretive and long term and -- and help me.

**Q (By Mr. Tasca) Before the word portfolio in the sentence I just read, you actually use the adjective real estate. So my question is, are you talking about your real estate portfolio when you talk about portfolio there?**

A What I'm talking about when I reference real estate is that when people would get on -- on conversations like this, they wanted to know what business I'm in. I identify myself as a real estate professional. We're a real estate service.

**Q My question is, when you use the word portfolio there, were you talking about real estate?**

A Again, I was talking about the entirety of the Vesta universe. It's not -- no, that -- the -- the funding I was requesting was not just for real

estate and I solidified that in talking about that as well. I was talking about more than real estate here.

**Q Okay. So when you said real estate portfolio, you were talking about more than real estate?**

A I was talking about my entire universe, yes.

**Q But the real estate was included in that --**

A Absolutely.

**Q -- was it not?**

A Absolutely. I'm a real estate professional.

**Q Right. So when you say portfolio, you were talking about at -- at least your real estate and maybe your real estate and your -- the other Vesta entities in the universe, correct?**

A I was talking about the universe, yeah.

**Q Does the universe always include, when you use the word portfolio, the real estate?**

A Again --

MR. BRODSKY: I'm going to object.

THE WITNESS: Sorry.

MR. BRODSKY: You can answer.

A Again, I mean, the word -- when I'm using the word portfolio, I'm describing everything that I -- that I built, which does include multifamily properties that are real property, but I have to relate it back to -- to YSA, which was a pledge of membership interest and those are separate things.

**Q (By Mr. Tasca) So when -- outside of the CPSA itself you talk about the entire portfolio, does that include your real estate?**

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) As used in -- as used in the text messages, were -- were you not -- strictly within the CPSA now, you're talking about an expansion of that, and we can argue about that what that expansion is, but when you use the word portfolio, does that include your real estate?**

MR. BRODSKY: Are you referring to the Miley text specifically?

MR. TASCA: Yes.

A In the Miley text specifically, we were discussing portfolio in the realm of the ownership structures.

**Q (By Mr. Tasca) Okay. You were not talking about real estate? That's your testimony?**

A Absolutely not talking about real estate.

**Q Okay. Let's look at the next exhibit, which is 19 --**

THE REPORTER: 18 -- 19.

MR. TASCA: 19.

(Deposition Exhibit No. 19 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) So this is another email where you're seeking money from someone. And on the Page 22587, you talk about $336,000 needed for portfolio level insurance.**

**What kind of insurance are you talking about here?**

A So we have a master portfolio, a master insurance across the portfolio. It's a towered system and so our insurance is not done on an asset-by-asset basis.

**Q So is it like -- I'm not an insurance expert, but is it like property, casualty insurance? Like, what kind of insurance is it?**

A We have two distinct types of insurance. We have property, casualty and then general liability insurance.

**Q Okay. Which are you talking about here?**

A It's all -- it runs together. There's not a bifurcation when we're paying our bills.

**Q So what did you need the 336,000 for here, which type of insurance?**

A Again, we needed to get it to the layers of our insurance. So the policy is a tower. There's multiple layers to the policy and some deals are escrowed, right, with a -- with the monthly mortgage payment. Other deals are not, and so for the deals that are not, when it comes time to pay their annual insurance premium, we had a financing agreement with a group called IPFS and I needed $336,000 to remain current with my IPFS financing contract. Again, there's no -- it's not -- there isn't -- you know, they lent on the entire needs of the insurance portfolio. It's not bifurcated.

**Q Right. Understood. When you use the word portfolio there, are you talking about real property?**

A I use the word portfolio quite a bit and, again, I don't have a different answer. I use it to describe my universe, because what I have is very complicated and hard to describe and the word portfolio seems like a -- something that people understand and that's -- that's the word I've used, so I don't have a different answer for you.

It's used to describe my universe, my

holdings, and that includes my membership interests. That includes LLCs. That includes properties. I mean, I -- that's how I use that word.

**Q Right, and when you use it in this document specifically, what was your intent? What you just said or talking about the real estate?**

MR. BRODSKY: Objection to the form.

A I mean, again, in this document, I'm -- I'm talking about the portfolio as a -- as a means to describe -- what I'm trying to solve for is that I have needs that are amongst a number of different entities, properties, et cetera. So when I say portfolio, it's to show people that I'm not -- there's not an exact use.

There might be money that needs to go here, here, here and, you know, we're trying to describe in an honest way that there is many -- that there were, you know, many, many things we were trying to solve for. The word portfolio was helpful because it says, hey, this could go -- there's needs in a lot of different places.

**Q (By Mr. Tasca) When you use the word portfolio here, given that expansive way in which you use it, does it cover the real property at issue in this case?**

MR. BRODSKY: I'm going to object to the form.

A You know, I don't -- I don't honestly know, because I know how I -- how I use the word portfolio. I'm comfortable with it. I know exactly what we were describing in the -- in the joinder, which is where your line of questioning is coming from --

**Q (By Mr. Tasca) I'm asking about this document, Marc.**

A I'm talking about --

MR. BRODSKY: No, no. Let him finish. Let him finish.

A In regards --

MR. BRODSKY: Go on.

A Yeah, in regards -- in regards to -- there -- there's two things at play. I used the word portfolio in that text with Robert and I felt comfortable that I was understood, because the joinder says what I intended it to say.

When I'm talking about my portfolio in the solicitation of a potential loan, I'm trying to describe my holdings in a way that somebody else could understand. I -- that's how I used the word.

**Q (By Mr. Tasca) Did you intend it in this**

**document to include your real estate?**

A I used the word portfolio several time, so for instance, I'm owed over $22 million personally for my portfolio, right. I'm using that to describe entities that owe me money.

Again, there's not a hard and fast rule. If you want to go through every -- every use of the word portfolio, it's going to be different across different -- you know, different statements because we're talking about different things.

**Q Let's go back to Exhibit 16, and let's go to page -- Bates page Kulick 266. When you go on to say, "My idea for a joinder with any asset controlled by any affiliate of mine," Marc, how do you reconcile that with the theory you spun out about what you meant?**

MR. BRODSKY: I'm going to object to the form.

**Q (By Mr. Tasca) Why -- no, strike the question.**

**Why wouldn't you just say a joinder with all of my affiliates? You say "a joinder with any asset controlled by any affiliate of mine." When you're talking about asset, you're talking about real property; are you not?**

A I -- I don't know if -- if at -- I mean, asset was certainly not intended to be real property, but we're talking about assets, we're talking about the assets of me, and what we were -- what we were -- what we were saying is exactly what ended up in the joinder, which is that all these obligations that -- that -- what I was joining, the -- you know, any asset controlled by any affiliate of mine, what I was joining was the obligations to uphold the security pledge and collateral agreement.

The security pledge and collateral agreement is what I intended to give YSA as collateral. That is evidenced further by future negotiations where we offered different things on different loans. This is what I intended to give them. The joinder, which was drafted by YSA, said it in my opinion very clearly and I signed it.

**Q Yeah, look, you're doing a great job articulating your litigation position that you've been able to develop here, but why would you say "any asset controlled by any affiliate of mine in this text?"**

**What would you expect somebody to understand that to mean?**

MR. BRODSKY: I'm going to move to strike and I'm going to object to the form.

A You know, if -- if there was a misunderstanding, I'm sure I would have seen it in the joinder when they drafted it, but I didn't. My understanding is that they understood what I was trying to do and I understood what they were trying to do.

**Q (By Mr. Tasca) Do you understand my point that you don't say here joinder if an asset that is pledged is transferred to any affiliate of mine? That's no what you say here, right?**

MR. BRODSKY: I'm going to object to the form. You're arguing with the witness.

MR. TASCA: I'm not arguing with the witness.

**Q (By Mr. Tasca) You can answer the question. That's not what you say here, is it?**

MR. BRODSKY: Same objection.

A Joel, I -- I cannot answer how you take something, and so you're asking me to -- to -- to explain -- you know, to -- but what I know is that we had an agreement in place. I signed the joinder that YSA themselves wrote and it is exactly what I intended it to be.

**Q (By Mr. Tasca) Right, but in this text message -- I'm not talking about the joinder. I'm talking about what the intent of the parties is if the Court concludes that that joinder is ambiguous and we have to go back to the intent. So that's why these questions are very important.**

A Understood.

**Q I don't understand why you would say "any asset" when what you were talking about, what you say you were talking about were only the assets that were pledged in the CPSA, those 17 -- in those 17 entities.**

**Why would you say any asset controlled by any affiliate of mine?**

A I -- I --

MR. BRODSKY: Objection.

**Q (By Mr. Tasca) Would you agree with me that's inartful? That doesn't really convey what you're conveying now?**

A I'm --

MR. BRODSKY: Object to the form. You can answer.

A I don't have an infinite memory of what -- why I chose a specific word in that moment, but I -- it's very clear the lines I was setting, what I was

trying to offer them, what I was responding to, the texts, the emails, the fact that I routinely said I could not add more collateral. The collateral I gave was what I could give them.

MR. TASCA: Did we mark this one yet?

MS. ALBERTO: No. This is going to be 20.

(Deposition Exhibit No. 20 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) So, Marc, this is a text -- excuse me, email exchange from February 18th, the same day as those text messages we were looking at. And is this the text message that -- string that you said you explained your position to YSA or is it somewhere else?**

A What you --

MR. BRODSKY: You said email. I think you just said text message.

**Q (By Mr. Tasca) Excuse me, email string.**

A This is one of the email strings in which we were talking about the -- the -- the joinder or the need for it, yes.

**Q Okay. Are there other email strings where you talk about the joinder, because I don't think we saw any?**

A I have no idea.

**Q Okay. So assuming I'm correct that this is the only email string, is this the email string where you explained to Robert what your intention was with the joinder?**

MR. BRODSKY: Objection to the form.

A When I reference this email -- this email earlier, it was that I was referencing actually the opposite, what Robert was telling me and my understanding of why this joinder was necessary.

**Q (By Mr. Tasca) Okay. So take me through that.**

A Well --

**Q What was Robert telling you and then what did you tell him?**

MR. BRODSKY: Objection to form.

A They were not asking for additional collateral at this point. They're clearly asking for -- they're -- they're discussing the unencumbered entities versus encumbered entities and we had already -- we had already decided on the solution. This text -- this -- this email applies after the text messages, which would have been, you know, around the same time. I'm sure if we dig up phone records, we'll see several phone calls between Robert and I happening kind of in that same

timeframe, before, after, during.

And so we're -- we're kind of coming together with a lot of different ideas here, but we're talking about adding -- adding my universe as mutually responsible for the 17 total assets, the four encumbered -- unencumbered and the 13 unencumbered, because that's what we isolated the problem to get this loan funding done as being.

**Q (By Mr. Tasca) So you understood here that Robert's -- well, strike that.**

**Let's just go to your email here. So your email of 3:28 p.m. that day says, "Robert, the entity list will remain exactly the same. No change to this document at all except to add a joinder that joins any asset controlled by any affiliate of mine," and I won't go through all that again, but you used the exact same language that you used in that text message.**

A Yes.

**Q You -- again, you didn't say here that adds any affiliate of mine if the pledged assets are transferred to that affiliate. That's not what you say, is it?**

MR. BRODSKY: Objection to the form.

A I mean, the -- the best thing I can tell

you is that it was clear enough to end up in the joinder that I eventually signed. So I don't think that at the time there did not seem to be any dispute between the parties on what was happening here.

**Q (By Mr. Tasca) Even though Robert in the prior paragraph is talking about adding additional entities to the list?**

A Correct. We were solving for the same issue that I've already discussed several times and he was trying to add, you know -- add the entity -- the -- the question was, do we add all these entities and do we say that everything is mutually responsible, do we say that it's not mutually responsible, and this is what we came up with.

**Q Well, why would Robert be talking about contribution amounts of the full suite of entities if the concern was just that the existing membership amounts in the -- that was already in the CPSA would be transferred to somebody else?**

A For the same reason --

MR. BRODSKY: Objection to form.

A Oh, sorry.

**Q (By Mr. Tasca) He said -- he stated his objection. You can answer.**

A For the same reason that, you know, they asked a lot of questions about my SREO, about my total holdings, even on the October loan. My understanding was they just -- they wanted to understand the full suite of my -- my ownership. They wanted to understand what I was really worth. They wanted to understand what was going on at a ground level.

And, you know, I think that's why it was very important on the text thread when I said no additional collateral, because I did understand at one point that they were wanting to add more of my deals and more of my ownership percentages. So I do understand that that was something that they were considering, but my view on that was nothing to be alarmed at, because, A, I'm signing what I intended to sign, and B, they were asking for a lot of things to make them feel more comfortable, I mean, which I understood and never -- never argued with or disputed.

**Q All right. Let's mark the February 18 loan documents. I don't -- I haven't given those to you yet.**

MS. ALBERTO: I think you have.

MR. BRODSKY: Oh, you did? Which number

is that?

MR. SHANK: 15.

MR. TASCA: Oh, 15.

**Q (By Mr. Tasca) Okay. So let's flip to the CPSA. Yeah, the joinder in the CPSA, which is -- my copy is not Bates labeled for some reason.**

MR. SHANK: It's just super tiny I think.

MR. TASCA: Oh, is it really tiny? Oh, I see it. Well, I can't read that, but you guys all know what the joinder is.

MS. ALBERTO: Oh, yeah. They're all really tiny.

**Q (By Mr. Tasca) Okay. So let me ask this about the joinder. When the joinder says "any and all guarantor, entities and any other entities of which the undersigned does now own or control or may hereinafter own or control during the term of that certain collateral, pledge and security agreement dated February 18, 2025," can we at least agree that that description of entities encompasses the title owners?**

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) And just for the record, by title owners, I mean the description of the entities that are contained in plaintiff's filings**

**in the Chancery Court action. That's a defined term.**

A Thank you. I did understand that. I don't know. The -- the truthful answer is I don't know. I didn't -- when we signed this, I didn't see where this all would head, where this all was going. I know, you know -- I know that my -- my interpretation of it was anywhere I could -- as I said, anywhere I could hide or -- or hurt their collateral was -- was covered under my -- under my universe, and so I don't know from a legal perspective where the -- where that starts and ends, but I --

**Q Okay.**

A -- know that there was nowhere -- what I was trying to create was there's nowhere for me to hide this stuff.

**Q All right. Well, let me -- let me help you get there. Do you see how guarantor entities is included in the joinder?**

A Yes.

**Q And the guarantor entities I believe is defined in the personal guarantee. If you flip forward, that would be Paragraph 4C.**

A 4C. On the -- on the --

MR. BRODSKY: What happened? What happened to the -- the document went away.

MS. ALBERTO: Because I'm pulling up something else.

A 4C is a rep and warranty, unless I'm on the wrong page.

**Q (By Mr. Tasca) No, you're -- you're there. It's just that the guarantee --**

A Oh, okay. I see.

**Q -- is defined there?**

MR. BRODSKY: Could we get the document back on the screen?

MR. TASCA: Yes. You got it?

MS. ALBERTO: Yeah, I just -- yeah.

**Q (By Mr. Tasca) Okay. So, Marc, if you look at how guarantor entity is defined, it says, "Any entity directly or indirectly controlled or managed by guarantor or directly or indirectly owned by guarantor in whole or in part with respect to which guarantor receives notices in the ordinary course of business."**

**Now, my question is, do the title owners fall within that definition?**

A No. I -- I don't own directly or indirectly, I do not -- Vesta Holdings, myself, nor

Asset Holder own title owners.

**Q So your ownership or partial ownership in an entity that has partial ownership of a title owner, that's not indirect partial ownership in your mind?**

MR. BRODSKY: Object to the form.

A In -- in my understanding, no.

**Q (By Mr. Tasca) Why not? What do you -- what do you understand indirect to mean?**

A I mean, in terms of the -- the -- I mean, all I can give you is my understanding, right?

**Q Sure.**

A And so you have property owners, which are single members, sole purpose entities and they are going to be owned and some of our structures got more and more complicated, but my understanding is, is that the -- intentionally, it's a sole member ownership and that sole member is going to be, in some cases, like, you know, WoodScape, it's WoodScape sole member, and investors invest in a deal called -- in an entity called WoodScape Investors, LLC.

If my fractional ownership is an indirect ownership because it's owned in Vesta Holding's name or Asset Holders, LLC's name, I have an indirect

ownership in WoodScape Investors, LLC.

I do not purport to or tell people that I own WoodScape investor -- or WoodScape -- I think what's called BJ&J WoodScape.

**Q Is that the title owner's name?**

A I believe so in that case.

**Q Okay. So -- so if you own a piece of the company that owns the company that holds the real property, you don't consider that partial indirect ownership?**

A I -- again, I don't know. This is -- look, we're -- we're talking about something that's outside of my area of expertise, but my understanding --

**Q Okay. If you don't know, you can say you don't know.**

A I don't know, but I'm happy to share that my understanding is that, indirectly through Vesta Holdings or Asset Holder, LLC own a fractional ownership in the investor entity and that's where the indirect -- that's what makes it indirect is that it's not me personally, Marc Kulick, that owns that ownership, but I don't know beyond that.

**Q Okay. So you don't know -- you wouldn't say -- your understanding, the way you interpret**

**that, is you wouldn't be considered a partial owner of the title owner in that situation?**

A That's correct.

**Q Okay. That sure wasn't the case when you told MCA after MCA after MCA that you were the owner of those companies, was it?**

MR. BRODSKY: Objection to the form.

MR. TASCA: What's the objection?

MR. BRODSKY: First of all, it assumes facts not in evidence.

MR. TASCA: Oh, I'll connect up. You'll see.

MR. BRODSKY: Okay.

A I don't believe that I ever purported to MCA companies that I was the owner of entity -- of everything in Vesta, nor do I think MCA companies cared about that. I don't think that the -- I don't think that the loan docs are particularly applicable since they're very different documents.

**Q (By Mr. Tasca) Did you tell MCA owners or MCA purchasers that you were the owner of any of the title -- title owners?**

A Not to my recollection. I -- I'm, you know, happy to -- to talk through any emails or correspondences if you want to show me them that we

signed with MCA lenders.

**Q Would that be a false statement to those MCAs if you said that?**

A I have no idea. I mean, MCAs do their -- are supposed to do their own due diligence and their own understanding. My experience with MCA lenders is details didn't matter so much to them and so I -- I don't know.

**Q Based on your understanding that you don't have an indirect partial ownership in the title owners based on your understanding, because that's what you told me, right?**

A Uh-huh.

**Q If you told an MCA lender that you were the owner of a title owner, that would be false, right, at least in your -- according to your interpretation?**

MR. BRODSKY: I'm going to object to the form.

A Look, I -- I'm in no way, shape or form able to tell you if that -- if that is a misrepresentation, if that's whatever that is --

**Q (By Mr. Tasca) I'm asking you -- okay. Let me put it this way: Would that be an accurate statement?**

A Be happy to review -- be happy to review a document --

**Q All right. We'll get to the -- we'll get to the documents. All right. We'll finish out the loans maybe and then maybe we can take an early-ish lunch. That will help us get organized with more documents.**

**So there's no surprises, we're just going to more or less authenticate the remaining loans and I have a few questions about them.**

A Sure.

MR. TASCA: What number are we up to?

THE REPORTER: 21.

MS. ALBERTO: We'll mark each one as its own exhibit looks like.

**Q (By Mr. Tasca) Marc, basically I just want to authenticate these documents, which means just tell me that they are true and correct copies of the various subsequent loans if you agree that they are.**

(Deposition Exhibit No. 21 was marked for identification and made part of the record.)

(Deposition Exhibit No. 22 was marked for identification and made part of the record.)

(Deposition Exhibit No. 23 was marked for

identification and made part of the record.)

(Deposition Exhibit No. 24 was marked for identification and made part of the record.)

(Deposition Exhibit No. 25 was marked for identification and made part of the record.)

A Would you like me to do that on an individual basis or as a whole?

**Q (By Mr. Tasca) You can do it as a whole I think.**

MR. SHANK: For the record, can we do which ones are which date? All mine are -- all mine are unmarked.

MR. TASCA: Yeah, so Exhibit 22 is the 4-9-25 loan. Exhibit 21 is the 3-19-25 loan. Exhibit -- sorry, did I mess that up already?

MR. SHANK: Nope, I think you got it.

MR. TASCA: Okay. exhibit 23 is the 6-19 loan. Exhibit 24 is the 7-16 loan. Exhibit 25 is the 7-31 loan.

MR. SHANK: Thanks.

A Yes, I can authenticate that these are what I believe to be the set of loan documents.

**Q (By Mr. Tasca) Okay. Great.**

A Ranging from March to July.

**Q Okay. So, Marc, obviously we're here**

**because there's a dispute over whether YSA had the right to take mortgages pursuant to those loan documents, but aside from that, would you agree with me that the loans are otherwise valid and enforceable?**

MR. BRODSKY: Objection to the form.

A I think there's a question on the enforceability of the loan documents.

**Q (By Mr. Tasca) Why?**

MR. BRODSKY: Objection to the form.

A The July 31st loan would have an interest rate on an annual basis larger than the entirety of the amount in the US Treasury.

**Q (By Mr. Tasca) So is -- is that the only loan that you think may not be enforceable?**

MR. BRODSKY: Objection to form.

A I don't know what is enforceable and what's not. Efraim and I have had that same conversation several different times and I know that there's a significant disagreement there, but I view that as not my job to decide. Several of the loans have interest rates that if taken per the docs would be over a million percent per year, and yeah, I -- I don't know the enforceability of that or not.

The documents do have specific -- each

loan doc does have specific treatment of usury and so I think there's -- you know, I think there's reasons to question, but I -- I don't think it's for me to answer that question.

**Q (By Mr. Tasca) So is it only the July 31st, 2025, loan that you think may or may not be enforceable? That's the only one you have a question about?**

A That is not what I said --

MR. BRODSKY: Objection to the form. You can answer.

A That's not what I said. There were two other --

**Q (By Mr. Tasca) Could you tell me which loans you think may not be enforceable and which loans you think are enforceable?**

MR. BRODSKY: Same objection.

A I don't believe that that's a -- something for me to decide.

**Q (By Mr. Tasca) Okay. So is the only reason that you think any of these loans might be unenforceable is because of the interest rate or is there other problems with them?**

MR. BRODSKY: I'm going to object to the form.

A I don't know to the extent that there are other problems. I'm also not a lawyer. I do know that there are -- you know, that there are several different -- you know, several different places where we have disagreements on the docs. Whether they affect -- affect the enforceability, I don't know. So the question is I believe there's a question -- there's at least a question on the enforceability of the battery of loan docs, but I -- I understand that we're in -- you know, we're in a dispute and this is how disputes are settled.

**Q (By Mr. Tasca) Prior to this litigation, did you ever express to YSA that you thought any of these loans were unenforceable?**

A There was -- Efraim and I were very largely on good terms, even if you, you know, hear us talk today. That -- that -- that comes out. Throughout most of the entirety of our conversations, we didn't get into things like that.

There was one evening where he was particularly frustrated and I was particularly frustrated and I brought up my feeling that there might have been an enforceability issue and his response was, "You do not want to go there. Do not push me." It was a phone call, so I guess that

would be the only time to my memory where we kind of broke that wall and brought up the dispute prior to the dispute actually happening.

**Q So that was one conversation that was prior to litigation being initiated?**

A That is correct, yes.

**Q Okay. But you did satisfy several of the loans; did you not?**

A Yes, I did.

**Q During that period, did you ever complain that they were unenforceable?**

A No, no, I think my -- my view was -- you know, I think I made offers and particularly I think we'll probably end up going through some of those emails and I felt like it was my obligation to follow through with the offers I made and I made every attempt to do so.

**Q When you had the discussion with Efraim about enforceability, the one discussion you had, why in your mind at that time were you questioning the enforceability?**

A Efraim and I -- I mean, I think, again, my memory of that night was that it was an unexpectedly tense conversation. A lot of our conversation were very gentile. We're very kind -- you know, kind to

each other and, you know, look it, I looked at Efraim as a lifeline and I had -- as we discussed previously, had hopes that he would come in in a larger -- in a larger vicinity.

I was not looking to start fights with him, but for whatever -- and I can't remember what led up to the particulars of that conversation, so I think, you know, the conversation went south, and while it was going south, I mentioned my concerns and, again, his response was, "You don't want to go there."

**Q Right, but my question is what were your concerns based on specifically? What did you think might have been problematic about whatever loan you were talking about?**

A I -- my two -- I guess in that particular conversation, my two main concerns were -- were the -- were the interest rates and usury concept. And then I -- I felt like -- I felt like some of our workouts may not have been fully enforceable as well and, you know, felt like there was a -- kind of impending threat throughout everything of not only are we not going to do business with you again, but we might, you know, sue you and Efraim made multiple references to how bad a lawsuit would be for me, how

much he could, you know, ruin my company and things like that.

There were -- there were -- that was said multiple times and so, you know, I think that created a fear for me that, you know, hey, I really have to just get through this, but again, I also looked at him as a -- as a partner and savior and, you know, I -- I can't, you know -- can't pretend that I wasn't a willing participant in the loans. I was, but I definitely had questions about the enforceability and about the collection methods.

**Q Okay. So an enforceability was based exclusively on interest rate problems?**

A Well --

**Q Or --**

MR. BRODSKY: I'm going to object to the form.

A At that point, Efraim had not yet taken any actions on the defaults. Right? I was unaware -- you know, at that point, he hadn't -- he hadn't started to use some of those -- some of those remedies. And so at that point, the only point of contention we would have had would have been -- would have been, you know, rates, structures, things like that.

**Q (By Mr. Tasca) Right. Okay. Rates, and I'm just -- I don't want to prolong things, but you keep saying things that I just need to understand.**

A Well --

**Q The interest rate you thought may have been problematic. Was there some other term of the loan -- I'm not talking about workouts outside the loan documents. I'm talking about the enforceability of the loan documents that you just authenticated.**

A Yeah, I -- and what I've said is, I had my particular concerns which I voiced. I don't know what else could have -- what else would be or -- or is not enforceable. I quite -- I'm not an expert on that.

**Q Okay. But your concerns specifically, Marc's concerns, was that limited to the interest rate or was there some other term in there that was problematic to you?**

A No --

MR. BRODSKY: Objection to --

A -- my particular --

MR. BRODSKY: You can answer.

A My particular concern would have been -- would have been the interest rate and --

**Q Okay.**

A -- and fees.

MS. ALBERTO: 26.

(Deposition Exhibit No. 26 was marked for identification and made part of the record.)

MR. BRODSKY: Hey, Joel, I thought we weren't getting into the interest rates? That's why you told Miley not to answer questions. Why are you getting into it now?

MR. TASCA: We're done and it's over. You missed your chance to cut me off.

MR. BRODSKY: We'll talk about it later I'm sure.

**Q (By Mr. Tasca) By the way, Marc, did you -- did you say you had some problem with collection methods or -- or did -- I'm just trying to see if I misunderstood your testimony.**

A The comment of collection methods was something I mentioned as being post -- post the relationship souring.

**Q Okay.**

A My point is, is that in the conversation referenced on that phone call with Efraim, that was my one -- that was my main -- my main concern.

**Q Right.**

A But that's not a limiting concern of the enforceability of the documents.

**Q Okay. You just opened this back up. So if it's not limited to that concern?**

MR. BRODSKY: Well, now -- now we're -- I guess I just want to understand, Joel, your position. Is it relevant or is it not relevant?

MR. TASCA: Well, you asked a lot of questions about it, Ben, so you opened the door.

MR. BRODSKY: But you -- but you instructed the witness not to answer and were adamant it's not relevant. That's why I'm a little confused as to why you're getting into it now.

MR. TASCA: All right. That's --

MR. BRODSKY: Is it relevant for you and not for me?

MR. TASCA: That's fine, as long as you stipulate that I'm not going to see the word usury on your papers --

MR. BRODSKY: I'm not stipulating to anything. I'm just asking your position.

MR. TASCA: I think the two sides are dramatically different positions on this, but -- all right. We'll -- we'll move on and we may come back to that.

**Q (By Mr. Tasca) Take a look at what we've marked as --**
MS. ALBERTO: 26.
**Q (Mr. Tasca) This appears to be an email between you and representatives -- email string between you and representatives of YSA and it looks like essentially you bounced a check; is that right?**
A Yes, that is correct.
**Q Okay. Were there other occasions when you bounced checks to YSA or other lenders?**
A I have bounced checks to other lenders. I believe this was the only instance with a bounced check with YSA.
**Q Were there occasions when you initiated ACH transfers to YSA or other lenders without the money to be transferred actually being in your account?**
A Yes, my previous banking relationship, that was a service that they offered us. It was essentially a line of credit that they extended to us.
**Q Okay. And were there times when the lender didn't get paid because the bank wouldn't clear it?**
A No.

**Q That never happened?**

A I guess let me retract that. It never happened while the bank had that policy in place. At the end of -- in -- in the last short-term loan, Efraim and I did together, it actually -- we tried to initiate it and we found out the next day that the bank's new ownership, our bank had sold, and the bank's new ownership was no longer honoring that line of credit, so it did happen the last ACH transaction we tried to do.

**Q And you actually have a conviction for check kiting; is that right?**

MR. BRODSKY: Objection to the form.

A In -- in 2011, I had a bounced check to Dollar General for $11. No, I was not convicted.

**Q (By Mr. Tasca) You were not convicted of check kiting?**

A I don't believe so. I don't believe so, but I mean, it was 2011 and it was an $11 check, so I -- if I was -- if you have differing information, I -- I -- my memory was that when I paid it off and made restitution, that went away, but if -- you know, that was a long time ago, so I don't -- I guess I don't remember exactly.

**Q Aside from that, have you been convicted**

**of any crimes?**

MR. BRODSKY: Objection to the form.

A No, I have not.

**Q (By Mr. Tasca) Going back to the YSA loans, what were you using the proceeds of the YSA loans for? And if that differed with each one, can you -- can you take me through that?**

A Well, in any given day, we have a lot of cash needs and I think that the best example of this is -- is the -- you know, it's not the only example, but I think it's the best example, is the October loan, the first loan was made -- when I initially come to Efraim for money, it was to help me put an earnest money deposit down on a deal that ultimately never closed called Park 1010.

It took so long to negotiate the docs and get through that transaction that by the time Efraim had been ready to fund, I had already funded the deposit. And so when Efraim made that funding to me, it was -- it was in a sense to repay the money that I had already put up into escrow. So at that point, you know, the use was met on my end prior to the loan being initiated, and so at that point, it's just repaying me and freeing me up to use the money elsewhere as I -- as I saw fit.

Many of the loans were just working capital loans and didn't have a described use, and you know, that is partially because of the amount of urgency that was in, you know, any one of these. If he didn't fund on the day that I had asked him to, that use might change and we're kind of -- you know, 2025 was a -- was a -- was a tough year and we were doing -- you know, kind of fighting a number of battles on a number of fronts.

**Q Would it be fair to say that the proceeds from the YSA loans went toward the management and operation of the Vesta real properties?**

MR. BRODSKY: Objection to the form.

A I don't know exactly -- because I don't know how you're using those terms, would you define other obligations as -- as operations? You know, I would say that it's fair to say that all the money that YSA gave me went somewhere in the Vesta -- in the expanse of the Vesta universe to plug some hole that existed.

**Q (By Mr. Tasca) Right. And they were holes pertaining to the properties, correct?**

A Sometimes they were holes pertaining to the management company. Sometimes they were holes pertaining to the properties. Sometimes they were

holes -- you know, sometimes I ended up, you know -- you know, using them to cover -- you know, cover obligations that were pending from the night before. Again, it just depends on the amount of pain that I had to go through if, you know, we went from one day to the next day to the next day. Those uses change on a daily basis.

**Q Right, but you're in the business and Vesta is in the business of operating these properties, right?**

A Uh-huh.

**Q So when you're using money and plugging holes, you're not doing that for you personally, are you?**

A No, certainly not doing it for me personally.

**Q You're doing it for the -- the -- the Vesta universe, which ultimately is about keeping those properties running; is that fair?**

A Yes, although -- although, no, I mean, some -- there are things that -- there were cash needs that superceded -- you know, there weren't cash needs that would supersede, you know, a hammer swing on an asset and there were times that we've had to make, you know, those decisions, but yes, I

mean --

**Q Like -- okay. Like -- like what? What do you mean by that?**

A I mean, servicing -- you know, servicing -- servicing loans.

**Q And would that -- would those have been loans that were themselves used to assist in the operation of Vesta and its properties?**

A Yeah, everything ultimately goes back to the operations of the properties, that is true.

MR. SHANK: Joel, how we doing on time? If you got a ways to go, I probably need to take a quick break.

MR. TASCA: Yeah, I mean, just really one -- one other question.

**Q (By Mr. Tasca) With respect to the other sort of investors that -- that you had in -- at any level, did -- did any of them ever complain to you about the YSA loans, say -- say you shouldn't have gotten them?**

A My investors didn't know about the YSA loans.

**Q Okay. So if they didn't know about them, they didn't complain about them?**

A I mean, the YSA loans were done between

Vesta Holdings, Asset Holder, LLC and YSA, yeah.

**Q Okay.**

MR. TASCA: All right. I think we can -- we can break for now. I don't know if our lunch is here yet, but...

THE VIDEOGRAPHER: Off the record. The time is 12:02.

(A recess was taken from 12:02 p.m. to 12:50 p.m.)

THE VIDEOGRAPHER: Back on the record. The time is 12:50.

**Q (By Mr. Tasca) Marc, prior to YSA obtaining its second mortgages of the property at issue here, what prospects for sale were there for the various properties that were mortgaged?**

MR. BRODSKY: I'm going to object to the form.

A I don't -- we've been trying to get deals sold throughout '25 that heated up at the end of the year, so I guess that -- I found out about the YSA mortgages on November the 17th. At that time, I think we had three deals that were under contract.

At this point, the YSA second mortgages are delaying three transactional closes or blocking three transactional closes, plus a fourth that was already damaged and we're trying to -- trying to

hold onto in some way, shape or form. The dates on those vary from, like, you know, mid January to -- to the start of February.

**Q (By Mr. Tasca) So what were the three deals that were under contract at that time?**

A We were under contract on a deal called -- you know, I also -- I don't know -- I don't want to misspeak, so it would have been around the same time as the YSA second mortgages. I'm not a hundred percent sure on the actual dates on those PSAs off the top of my head, but Lofts at North Penn is scheduled to close. That has a close date of -- of it had a close date of December 19th. That had to be pushed back and buyer and seller agreed to push back to January 31st.

Muntage was supposed to close November, and at present, the buyer -- it's a complicated situation. We -- we're hoping to save the buyer. We don't have a set close date on that. We have a refinance of Village Creek Apartments, Village Creek on 67th, and that refinance is slated to close by February 1. It could close earlier if -- you know, refinances are a little bit different because they basically close whenever the lender is ready. In this case, it's whenever the lender is ready and we

have clean title. It might -- you know, might be prepared to close earlier, but it's definitely going to close by February 1st.

**Q Before you go on to the next one, just I missed it. What was the property for that one?**

A It's called Village Creek on 67th. Eaton Place has been on -- in and out of contract. We're trying to work with a new potential buyer on that and then we're trying to do -- we're in the process of an equity recapitalization that was supposed to close last week that can't close on Villas at Midtown, which has one of the second mortgages on it and that is the current transactional.

**Q All right. Let's unpack a little bit of that. So tell a dumb guy who doesn't know that much about real estate what an equity recap means exactly.**

A So I own Villas at Midtown in a partnership. That partnership cannot meet the obligations to fund the deal any further and so we're in a position where we either give the keys back to the lender, sell it and lose all investor equity, or alternatively, I find partners who will come in, bring the amount of money that's necessary to right the ship and hold on to it in the long term

and, you know, hopefully realize the success that we should be realizing with it if it was properly capitalized, and so I've isolated new -- a new ownership group that wants to take possession of it pending clean title.

**Q Okay. Who -- and who owns that?**

A It's a -- it's a syndicated group, so no investor would own more than 25 percent.

**Q And has this syndicated group committed to making this investment?**

A On the recap, yes, but recaps are a little bit less formal than like -- than a sale. So that one, like, on my -- you know, on my -- if you're asking me in order of importance that the second mortgages would be damaging, it's still very damaging to me obviously. It makes me look terrible and we can't -- and we can't actually get the refinance done, but I have -- you know, I kind of have a lot of control over that group and so I'm just right now preaching patience and, you know, our plan is to get the seconds lifted and closed, and as of right now, they're sticking by that and I don't see an issue -- you know, I don't -- I don't see them running for the hills between now and our court date on the 15th.

**Q Okay. You said Eaton Place is in and out of agreements of sale or maybe you didn't put it quite that way, you can correct me, but what -- what's the status right now?**

A We have a buyer selected. We had a buyer selected. The buyer -- it's an old building. It was built in 1880 something, and as such, it has historic preservation elements to it. And -- and so that's hard for some buyers to grasp, so we have a local -- we have a local buyer that's now signed undersigned LOI. We signed an access agreement, which gives them the right to start due diligence, and I think we should have a signed purchase and sale agreement, you know, probably in the next couple of days.

**Q But that assumes they get satisfied under due diligence?**

A Correct, yes.

**Q And -- and Muntage, we're going to talk about that in a little bit more detail, but you -- the buyer that you had that wanted a closing by -- by that last week in November is still potentially in play?**

A So from what we were told initially, no. Muntage is an odd example, because if you go on a

caprate basis and an NOI and caprate basis, Muntage is worth $6 million and there's 12.7 million of senior debt on it. We were, quite frankly, terrified that we weren't going to find a buyer.

The buyer that was under contract is doing a debt assumption. So they don't come to the table with any new equity. They assume the debt and they have a deal worked out with that lender.

From what we understand and from what we know, they walked away after we weren't able to close. The lender is trying to get them back to the table, because the lender's other option is -- is, you know, a foreclosure lawsuit with us on a deal that is -- you know, it's not like -- not like we managed it badly. It's not like -- you know, the lender knows that and, you know, the lender would love to have someone just step in and put some money into it and do what they need to do. So the lender is trying very hard to keep that sale together.

**Q And -- and the buyer would be interested in an underwater property like that for what -- like, the -- the debt goes down if the buyer comes in?**

A My understanding is that this lender has -- this -- this buyer was found by the lender.

My understanding is they have other loans together and there might be some -- there might be some benefit to them in their other holdings with the same lender. That's my understanding.

**Q All right. The Lofts deal fell apart because of the receivership, right?**

A No.

**Q No?**

A There's no -- I know that Efraim thought that. No, there's no receiver in place. We still own the property and the Lofts deal is still under contract.

**Q When is that supposed to close?**

A The scheduled close date is July -- is January 31st. Sorry, I misspoke, January 31st.

**Q Right, and isn't it the case that a receiver was appointed, but just the implementation of that receiver has been stayed?**

MR. BRODSKY: I'm going to object to the form.

A Yes, per the loan documents, a receiver was appointed and -- and we -- we retain control post appointment.

**Q (By Mr. Tasca) Okay. Other than the properties you mentioned, are there any others that**

**you are actively seeking to sell or actively marketing?**

A Yes, we're trying to sell Montgomery Apartments. I was told we have a potential buyer, but I actually -- it's on my list of things to do to follow up on today after we get done here. So it's in its infancy in terms of that transaction.

We've been trying to sell Woodland Oaks Apartments and there may be a potential buyer on that. There's somebody that's toured twice. Right now, we're awaiting an LOI if it comes. It may or may not.

I'm trying to think. There -- there may -- I mean, we're -- we're very interested in transactions right now, so there may be some -- some other transactions to -- to happen, but I think right now, that covers what I'm -- what I'm currently working on.

**Q Right. Okay. And Montgomery and Woodland Oaks sounds like hasn't progressed --**

A Not yet.

**Q -- very far yet? Okay. Let's talk a little bit about the Muntage sale.**

MR. TASCA: 22? No.

MS. ALBERTO: No, 27.

MR. SHANK: 27.
(Deposition Exhibit No. 27 was marked for identification and made part of the record.)
**Q (By Mr. Tasca) Marc, is this a declaration you submitted in support of your -- I believe it was the motion for expedited relief in the case we're here here about today?**
MR. BRODSKY: Will you put it up on the screen?
MS. ALBERTO: Yeah.
A Yes.
**Q (By Mr. Tasca) Okay. In this declaration, you talk about the need to have YSA -- the YSA second mortgage removed from the property so the sale on the property could close by 11-6-25 or else the transaction wouldn't close, correct?**
A That's correct.
**Q Okay. In Paragraph 12, you say here, "All other conditions in the Alta commitment would be able to be met prior to closing" --**
A Yes.
**Q -- meaning all others besides the second mortgage issue?**
A Yes.
**Q The YSA mortgage. Okay. All right. And**

**you understand you made that statement under penalty of perjury, correct?**

A Yes.

MR. TASCA: The next two.

MS. ALBERTO: 28.

(Deposition Exhibit No. 28 was marked for identification and made part of the record.)

MS. ALBERTO: 29.

(Deposition Exhibit No. 29 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) So prior to you doing your own declaration, which was marked as Exhibit 27, did you and your counsel try to get a debt declaration directly from the title company?**

A Yes, we did.

**Q Okay. And it looks like on Exhibit 28, this is your counsel, Michael Fisher, sending a draft affidavit to Tamie Semler at the title company, correct?**

A Yes, that's what it looks like.

MR. BRODSKY: Could you put it on the screen, please?

MS. ALBERTO: It just takes a little while.

**Q (By Mr. Tasca) And you'll see here in**

**Paragraph 10 of the draft declaration that she was asked to sign, it says the same thing as your Paragraph 12 basically, right, (As read) All other conditions listed in the Alta commitment would be able to be completed by Monday, November 26, 2005?**

A That is correct.

**Q All right. And then if you look at Paragraph 29 -- I mean, not Paragraph 29, Exhibit 29 --**

MR. BRODSKY: That a new exhibit?

MS. ALBERTO: Yep.

**Q (By Mr. Tasca) And in this draft declaration, that language is removed, isn't it; "All other conditions listed in the Alta Commitment would be able to be completed by Monday, November 26, 2025?" It's not in there?**

A That's correct.

**Q Okay. And at that point, you and your counsel abandoned trying to get a declaration from the title company and had you do one instead in which that language was in reinserted, correct?**

MR. BRODSKY: Objection to the form.

A Correct.

**Q (By Mr. Tasca) Now, just because I want to speed things along, and we'll get the document**

**out if we have to, but in one of your submissions in support of expedited treatment of this matter, you submitted the title commitment itself from the title company that Tamie Semler works for.**

**Do you recall that?**

A I don't specifically recall that, but I -- I don't -- I mean, I -- I understand where your line of questioning is going so we can happily discuss the -- the liens on -- the mechanics liens on the property.

**Q Sure. You did anticipate where I was going. So there all -- there were -- in addition to the second mortgage, there were mechanic liens on the property?**

A Uh-huh.

**Q There were unpaid -- I think there were ad valorem taxes, correct?**

A No, taxes are paid by the lender, not by -- not by borrower.

**Q Okay. So there was just -- there was the mechanics liens on the property. Is that why Tamie Semler wouldn't sign the --**

MR. BRODSKY: Object to the form.

**Q (By Mr. Tasca) -- sign the declaration with the language that you wanted?**

A We don't know why Tamie did not sign. Actually, I think you're missing some email -- I think you didn't include some emails here. Tamie was -- I foresaw the issue, not Tamie, that we had mechanics liens and when -- I wanted to make sure that what we signed was perfectly honest.

We were -- we are -- we would have been and remain able to pay off those mechanics liens as soon as the close is viable. It doesn't make sense for us to pay off those mechanics liens while we can't -- while we can't close the asset.

**Q Right. How much are those mechanics liens total?**

A In the vicinity -- I don't have the number in front of me, but it's going to be in the vicinity of 125- to $150,000.

**Q Right, and they're still on there --**

A Today, yes.

**Q -- as of --**

A They will be on there until -- typically what happened -- there's two different ways to handle mechanics liens at close. One is to pay them off via title, but in this instance, that won't work because there's not going to be cash flowing to the borrower, to us, so we'll pay it off in the day or

two leading up to close and -- and that will -- that will effectuate close. That was our game plan and that's what we referenced in my declaration.

**Q Excuse me. Did it make you uncomfortable at all to send something to the Court, make a statement about what the title company and what the -- what the commitments could be satisfied when the title company representative herself wasn't willing to sign that?**

A No --

MR. BRODSKY: I'm going to object to the form.

A Not -- not at all. Tamie Semler has no -- no -- no ownership in Vesta, no -- no -- no insight into the entity and, you know, I can jump up and down and side to side and tell her that I'm going to pay off these mechanics liens, but she can't write a declaration saying that she knows for a fact the mechanics liens would be paid off.

In my declaration, we did not say that all -- that -- that this was the only impediment to closing. We simply said that all other closing conditions in the Alta commitment would be able to be met, which is entirely true.

**Q Right, but she wasn't willing to say that?**

A No.

**Q But you were?**

A Yes.

**Q In your declaration, you also discussed that the manager of Muntage Best Living is in the process of closing on the proposed sale of Muntage with Greenlite Holdings, LLC, right?**

A Are you referencing section 6?

**Q Yes. You controlled the manager, correct? JV I think you define --**

A In -- in Muntage, there is major decision approval rights to another group.

**Q Right. So Muntage Holdings, LLC is where that -- those approval rights exist, right?**

A I don't have the org chart in front of me. I know that my partner in the group IS -- in the deal is a group called SMB and that they have major decision approval rights. I can't off the top of my head tell you the structure of the org chart on this one.

**Q Did you get permission from SMB Equity to make this sale -- or enter into this agreement of sale in an attempt to sale Muntage --**

A Yes.

**Q -- sell Muntage?**

A Absolutely.

**Q Okay. Is that documented anywhere?**

A No. I -- there might be an email. I'm very close to that equity partner. We have three other deals together, so they've been apprised the whole way. I don't know if there's an email, written communication about it, but they definitely consented to the sale.

**Q Okay. So that -- that's -- you would just do it either by email or by phone, there wouldn't be any sort of formal vote?**

A Some -- some -- different LLC agreements have different rules on that. In theirs, there is no formal process for it. There are deals, I've owned JVs before, that had a more formal process.

**Q And with respect to the other deals that you mentioned earlier that are in -- in prospect that we talked about, did you get any and all necessary approvals from other members, investors as needed under the operating agreements?**

A Yes.

**Q Is that documented anywhere?**

A The refinance of Village Creek on 67th certainly is, because my partner is signing on the -- on the loan, so that's certainly documented.

The Lofts at North Penn sale is actually the same equity partner as Muntage and I actually -- I know of an email that exists where they certified that my loan balance is accurate and will be paid in front of any investor distributions, which I believe also has their -- I mean, obviously talks about the sale. So, yes, I've -- you know, there is -- there is proof that everyone has signed off on sales that is necessary to.

**Q And is this proof that you got, is it in connection with your sort of newfound focus on complying with your operating agreements?**

MR. BRODSKY: Objection to the form.

A No, I -- I've never -- never sold a deal improperly or never sold a deal without -- without approval that's necessary to get.

**Q (By Mr. Tasca) How about have you given second mortgages without getting approval?**

A I have -- I have never given a second mortgage without lender approval. I have without -- without investor approval.

**Q When you were supposed to get it?**

A I think that -- I have a -- I for awhile believed that I had greater rights of authority, and as part of what you just referenced, I do recognize

that that in some cases I overstepped my authority.

**Q Right, and -- and you didn't make a change in your view on that until I think you said -- and I don't want to put words in your mouth, but maybe sometime between August 2025 and the present, right? Is that about right?**

A Yeah, I mean, look, I'm not -- 2025 was a very rough year for me, as I've -- I'm always a believer in taking responsibility and I think I -- as I was dealing with what was going on around me, one of the questions was understanding my authority in greater detail and getting a better feel for -- for corporate governance and the expectations around me.

**Q Right, and back in February of 2025 when you gave the joinder to YSA, you were still in that sort of mode where you were overestimating your own authority; is that -- is that fair?**

MR. BRODSKY: Objection to the form.

A Yes, I think -- I think that in -- in early '25 and -- and even later, I had made mistakes in -- in terms of understanding my authority for sure.

**Q (By Mr. Tasca) And -- and those YSA loans that you got, we already talked about how, you know,**

**they ultimately went to the benefit of the property and I think you also testified that none of the investors even knew about those YSA loans.**

**Is that all correct?**

A You know, I explained to you that -- that the uses of those funds would have -- would have varied greatly, but you know, you -- your -- if I remember correctly, the ultimate point was that some point down the -- down the chain, something had originated with benefiting the properties and that's certainly true.

And in terms -- what was the second part of that question? I'm sorry.

**Q (By Mr. Tasca) I don't remember, but that that's fine. We can move on.**

**You know, when the -- when the properties are benefited by funds, that redounds to the benefit of not only you, but the other investors that you have; is that fair?**

A Yes, yes.

MR. TASCA: More of a housekeeping thing here. Try to save paper again.

**Q (By Mr. Tasca) You sent YSA, I believe over the summer, a number of the operating agreements for the various Vesta entities. Do you**

**recall that?**

A It was done by my team, but I absolutely know that that was part of the due diligence process.

**Q Okay. And just sort of to authenticate those without getting every one of them out because they're so voluminous, I mean, at the time, was it your understanding that your team sent to YSA true and correct copies of the up to date, valid, operating agreements for those entities?**

A As a -- as a general statement, yes. My -- yes, that is my understanding, although without seeing them, I can't authenticate that.

**Q Did you tell Robert Miley of YSA in November of this year in a discussion of the Thrive Argenta property that if you agreed to let it, YSA could file a second mortgage on the property?**

A Robert directly, no. Robert and I had a conversation, which we were trying to figure out a confines of a settlement and what that would look like. And Efraim made it clear through Robert that any settlement would involve deeds in lieu of foreclosure, and I said we absolutely cannot do that.

I said we could go to lenders for

approval. When I look at second mortgages, and this is a mistake on my end, I've always looked at lender approval as the central focus and tenant of a second mortgage, and it wasn't until recently that I learned that it -- that it was the -- actually investors who you need approval from.

And so my conversation with Robert was us, not as lawyers, but as -- from a business perspective trying to figure out a structure in place that would settle this dis -- settle this dispute in an amicable way. And one of things I had thought about was, hey, I've got this closing, I'm pretty sure that we can get lender consent for this thing and we can move forward with a second mortgage that wouldn't put me in violation of my senior loan documents.

**Q Right. So you did have that conversation with him, that you would be able to give him the second mortgage on that?**

A Pending -- pending lender consent.

**Q Well, didn't you tell him actually that if you agreed to -- to let it, YSA could file a second mortgage on the property provided that it did so after the prospective buyer pulled title?**

A I did say that we were much more likely to

get approval post title, post title being pulled, yes.

**Q And was that because the -- the prospective buyer wouldn't see the second mortgage on the title?**

A No, it's because -- well, I don't know -- I was thinking of it in terms of palatability to my senior lenders, not to a prospective buyer, because for -- in that instance, the senior lender is what we really care about. And so the idea was for Thrive Argenta, I had -- I had made loans to that asset. Those loans were going to get paid out first and I didn't mind as long as the lender consented putting that -- putting a second on there.

And the thought process was understanding lenders, which is part of my job, I figured that if you did it towards the end of the transaction, they would be much more likely to consent than if you did it at the start.

**Q So that's an area you would have -- you would have told the senior lender about the mortgage?**

A That is correct.

**Q And asked for permission?**

A That is correct.

**Q In the past, though -- we're going to look at some documents -- you had given second mortgages or you were willing to give second mortgages without seeking the permission of the lender; is that true?**

MR. BRODSKY: Objection to form.

A All -- any second mortgages that I've ever granted have had approval from the senior lender, but yes, it's true that I had discussions that never came to fruition.

**Q (By Mr. Tasca) Right, and did you also get MCA loans where you didn't tell the senior lender about them?**

A Yes -- well, I have many senior lenders. Some of my senior lenders did know about my MCA exposure. Some did not.

**Q All right. We're -- we' re going to get into that in more detail. Again, just to sort of move things along here, I mean, there are at least some title owners that your company as manager has the ability to take action like give a second mortgage without the consent of the other members; isn't that right?**

A Joel, I -- I at one point would have said the same thing. I -- I've been told that that is not the case. I am -- remain to this day confused

on what approvals investors and what thresholds I would need to file a second mortgage.

One thing I am not confused about is it definitively needs lender, every single second mortgage would need senior lender approval, but I don't know the ins and outs of operating agreements and would be happy to look at that with you on a deal-by-deal basis to see if you think there are some that I have the authority on.

**Q Right, and I -- I'm going to put the senior lender issue -- the issue of approval by the senior lender aside.**

**Would you agree with me that the operating agreements govern whether you or your entity as manager of a particular title owner has the authority to give a second mortgage, again, leaving aside the issue of getting approval from the senior lender?**

A I'm not sure we can put that aside, though, because I'm -- I'm quite sure that under -- my obligations to investors would be to not put the loan into default, so I'm not sure we can strip that out from each other, but as I said, I am in the process of understanding all of my operating agreements to the fullest extent. I -- I -- I don't

know if you have any that you're going to show me and we could look at, but I would be happy to look at some, because this actually to this day remains a point of confusion for me.

**Q Yeah, and again, because there's a lot to cover here, and we'll get out some, but just one example, Woodland Manor best Living, LLC, for example, putting aside restrictions based on the senior lender, I didn't see anything in there that prohibited the manager from giving a second mortgage.**

**Is that possible if we looked at the OA?**

MR. BRODSKY: Objection to the form.

A It's certainly possible.

**Q (By Mr. Tasca) All right. We have all the OAs, so I don't think we necessarily need to go through all 29 of them just because we'll lose our sanity.**

**Have you ever obtained, say, prior to August of 2025, did you ever obtain approval of the members for anything of the type -- of the title owners for anything?**

A All of the -- all of --

MR. BRODSKY: Go ahead. Sorry. You can answer now.

A You mean all of the members or -- or partners?
**Q (By Mr. Tasca) Either one.**
A Yes, absolutely obtained consent from partners on J -- on deals with JVs acquired it. I cannot think of a time where we've ever held a membership -- a vote of the members or anything like that.
**Q Even if the OA might have required it?**
A Even if the OA might have required it. Although, I'm not aware of any times -- I'm also not aware of what I would have.
**Q Now, your -- your position in this case is that none of the plaintiffs to this action, you, Vesta Holdings, LLC, Asset Holder, LLC, own the Vesta properties on which YSA obtained the second mortgages, right?**
MR. BRODSKY: Object to form.
A I mean, I certainly know that Vesta Holdings and Asset Holder have no ownership of the -- of the -- of the title owners. In terms of me, I don't believe so. I know -- I don't believe so. I could be wrong and I've said that I'm not a lawyer to my understanding.
**Q (By Mr. Tasca) Right, there's the issue**

**of whether you are indirectly a partial owner that we talked about earlier, and I understand you don't really have an answer on that, but that is what it is and we'll have to battle that out in court.**

A Understand.

**Q But your -- your position is that the title owners are the owners of the those properties, right?**

A Yes, legally speaking.

**Q So who -- who authorized you and Asset Holder, LLC and Vesta Holdings to bring this action on behalf of the title owners?**

A In my understanding of my obligations to my investors, it's to protect the entities and that I certainly have an obligation to do so when I accept investor money. And it certainly falls within my fiduciary duty to my investors to clear up the title that was -- that was slandered by -- by YSA's second mortgages.

**Q Right, and don't some of the OAs, though, require you to get permission to bring litigation? And if you don't know, you don't know. I just ask you, are you aware of that?**

MR. BRODSKY: Objection to the form.

A I'm certainly not aware of that, but

again, I would say that as a fiduciary, it's an obligation no matter what.

**Q (By Mr. Tasca) Right, but some of the OAs require you to get approval of the members before you do so?**

MR. BRODSKY: Objection to the form.

**Q (By Mr. Tasca) Are you aware of that?**

A I'm not.

**Q So -- so -- so I guess getting back to my question and I think maybe you -- you answered it. Like, you did it on your own? You made the decision on behalf of yourself and Vesta Holdings and Asset Holder to bring this action; is that fair?**

A I certainly consulted with equity partners of mine, stakeholders that -- that, you know, were going to find out or did know and I certainly consulted with lenders. So I -- I don't think fair to characterize on my own, but I certainly didn't hold any -- any -- any votes.

**Q Why didn't the title owners bring this action in their own name?**

MR. BRODSKY: I'm going to object. That's -- and I'm also going to instruct the witness not to answer to the extent that requires you to disclose attorney-client communications. I also

think that's a work product question, so...

**Q (By Mr. Tasca) Do you have an understanding, not based on anything that you've discussed with your counsel, as to why the title owners themselves who are the owners of the property didn't bring this action?**

MR. BRODSKY: Same instruction not to answer if it requires you to disclose our communications. Are you able to answer without that disclosure?

THE WITNESS: Give me a second to consider that. Ben, I don't know. I definitely can answer the question, but I don't know if that would -- I don't know if that would --

MR. BRODSKY: I'm going to --

THE WITNESS: Okay. Fair.

MR. BRODSKY: What I want to avoid is you disclosing our conversations.

THE WITNESS: Okay.

MR. BRODSKY: So if you're not able to answer, you're not able to answer.

THE WITNESS: I'm assuming it's your instruction to err on the side of caution there?

MR. BRODSKY: I don't want you to waive the privilege there, so...

THE WITNESS: Okay. Understood.

**Q (By Mr. Tasca) So -- so you don't have any reason for why the title owners themselves didn't bring this action that wouldn't require you to disclose attorney-client communications?**

A The answer is I don't know. I have a response. I don't know if it would violate attorney-client privilege, and under instruction of counsel, I'm going to listen.

**Q Did you notify the senior mortgage holders on the various properties on which YSA has second mortgages about this action or the Delaware Superior Court action?**

A Yes, I did.

**Q You notified every one of them?**

A No, the -- the lender that we were -- the lender that -- that you mentioned earlier, I have no current communication with.

**Q Which lender, sorry?**

A On the -- the lender that you had referenced earlier on Lofts at North Penn, I have no current communication with them so I did not notify them.

**Q That's Cohen, right?**

A Correct, I have no -- yeah, the -- since

we have no means of communication, they were not notified.

**Q But all other 28 senior lenders you notified?**

A Yes.

**Q And did they -- what did they say?**

A My seniors have handled this in different ways.

**Q Okay.**

A We've got acceleration notices from one lender that listed an improper second mortgages as a full recourse trigger.

We have another lender who asked for a one-page white -- white page that they could send to their committee in case their committee heard about it through the grapevine or -- or any -- or saw it in the news or anything like that, which we complied with.

We disclosed it to our -- to our agency lenders. They're -- they've kind of not mentioned it and we've tried a couple of times to see if they have any feelings about it, but as of right now, we haven't gotten acceleration notices, but they might happen or they might hold us accountable at some point.

A I do think that most of the senior loan docs give us 30 to 60 days to clean up title once we're made aware of a -- of a -- I don't know the word -- the correct word for it, but once we're made aware of a blemish to the title, I believe all the senior loan docs do grant us some sort of timeframe to clean it up.

**Q Right, but so at this point, those senior lender hasn't imposed recourse liability --**

A At -- at least one has, although they're giving us -- they're giving us time to work it out.

**Q Which one?**

A Bayview.

**Q Okay. And what property are they on?**

A They're on -- oh, gosh. Bryan Hill, Springdale Village and Summer Oaks.

**Q So apologize if I asked this, but did you get any formal authorization from the title owners to bring this litigation on their behalf?**

MR. BRODSKY: Objection to the form.

A Some of the -- some of -- some of the deals I would say yes and some of the deals I would say no.

**Q (By Mr. Tasca) Okay. So for at least some of the title owners, you didn't get**

**authorization to bring this litigation on their behalf?**

A No, I --

MR. BRODSKY: Objection to the form.

A No, I did not.

**Q (By Mr. Tasca) So what makes you think you're authorized to do that?**

MR. BRODSKY: Objection to the form.

A I believe it's my obligation under fiduciary duties --

**Q (By Mr. Tasca) Okay.**

A -- at the very minimum.

**Q And would those same obligations extend to getting financing to help the title owner a and provide a second mortgage on that title owner's property?**

MR. BRODSKY: Objection to the form.

**Q (By mr. Tasca) What's the distinction, Marc, between --**

A Sure.

**Q -- you bringing this action without authorization and you getting second mortgages without authorization? Is there any distinction?**

MR. BRODSKY: Objection to the form.

A I believe that my obligation to the

investors is to act in their best interest and if I -- if I thought that financing, that bringing capital in in the use of a second mortgage was both done through correct lender approval and was in the betterment of the deal, I agree with you. I think it -- I -- I don't -- I don't think it's a -- I do think -- it -- it could be an investor best interest. I definitively know that bringing this action was an investor best interest.

**Q (By Mr. Tasca) Right. So if I understand you, as long as an action is in the best interest of the title owner, you feel like it's an action that you should take?**

MR. BRODSKY: Objection to the form.

A I think the point of having good lawyers is to -- I think from a business perspective. That's exactly my understanding and I think the point of having good lawyers is to -- is to help business people understand where their -- where their obligations from a legal perspective and from a document perspective start and end.

**Q (By Mr. Tasca) And you feel like you're authorized to take those actions on behalf of the title owner?**

MR. BRODSKY: Objection to the form.

A I don't think you can speak in generalities about actions I'm allowed to take. I believe that there is absolutely zero -- I believe that I am fully, fully not only able to but obligated to take this action and I believe that other actions are defensible or acceptable, but I would need -- you know, and judging from the particular action, I would need to understand the specifics of the OA, work through with my attorneys and figure out the best way through corporate governance to achieve what I'm trying to achieve.

**Q (By Mr. Tasca) So you'll consult your attorneys -- did you consult your attorneys when you were offering second mortgages to other lenders or did you just feel you were authorized --**

MR. BRODSKY: I'm going to --

**Q (By Mr. Tasca) -- to do that by --**

MR. BRODSKY: I'm going to --

MR. TASCA: Let me just finish the question.

**Q (By Mr. Tasca) Did you just feel you were authorized to do that by way of your -- what you feel like is your fiduciary obligation to the title owners?**

MR. BRODSKY: I'm going to object to the

form.

A Again, when it came to second mortgages, I viewed my senior lenders as the main decision-makers. That might have been incorrect and improper.

**Q (By Mr. Tasca) Okay. So you believe that your actions in giving or offering second mortgages in some circumstances, depending on what the operating agreement said, was improper?**

A Yes --

MR. BRODSKY: Objection to the form.

A Yes, yes, potentially.

**Q (By Mr. Tasca) And you don't believe that your bringing this litigation on behalf of some of the title owners without authorization was improper?**

MR. BRODSKY: Objection to the form.

A No, I believe it is beyond not improper. I believe it is my distinct obligation.

**Q (By Mr. Tasca) Even if there was a clause in the operating agreement that required you to get --**

MR. BRODSKY: Objection --

**Q (By Mr. Tasca) -- approval first?**

MR. BRODSKY: Object to the form. We've covered this now six times.

THE WITNESS: Do I respond?

MR. BRODSKY: One last time.

A Now I've dropped the question, I'm sorry. You were asking if I -- if I had -- if I -- if I -- without having approval, if I have --

**Q (By Mr. Tasca) Do you feel like that's an unauthorized action?**

A No, I do not.

**Q Okay. So you feel like you're authorized to do that, but when you were offering second mortgages, giving second mortgages, in some cases, that was unauthorized?**

A Yes, I believe there --

MR. BRODSKY: Objection.

A -- is a big distinction between protecting unauthorized blemishes to title that act in strict -- act strictly against the second mortgage and put our properties in jeopardy. I believe that it's strictly my responsibility to fight.

**Q (By Mr. Tasca) And when you were offering second mortgages or obtaining second mortgages for the title owners, did any of your investors or partners complain that they didn't like what you were doing?**

A I certainly have had people complain that

they didn't like what I was doing before. That certainly has happened. And --

**Q Did -- go ahead.**

A -- and I -- and, you know, I tried to learn what -- what I can and can't do and I'm -- I'm trying to, you know, be the best real estate sponsor I can be.

**Q And did they ever -- any of those people complained ever step in and prevent you from doing any of the things you did with respect to offering second mortgages or giving second mortgages or getting MCA loans?**

A Not to my recollection or not to my understanding.

**Q Okay. And, again, all of the proceeds of all of the loans, those loans, whether they were MCAs, second mortgage loans, they were used for the benefit of the properties ultimately as we discussed earlier?**

A For the benefit of the companies, yes.

**Q Right, the companies which were on the properties, correct?**

A Yes.

MR. SHANK: Joel, this a good time for a break?

MR. BRODSKY: We've been going about -- yeah, Andy, I was --

MR. TASCA: Sure.

MR. BRODSKY: Take a little comfort break.

THE VIDEOGRAPHER: Okay. Off the record. The time is 1:41.

(A recess was taken from 1:41 p.m. to 1:57 p.m.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 1:57.

(Deposition Exhibit No. was marked for identification and made part of the record.)

(Deposition Exhibit No. was marked for identification and made part of the record.)

MR. BRODSKY: Are we looking at an exhibit now?

MR. TASCA: Yeah, we --

MR. BRODSKY: Can ya'll hear me?

MR. TASCA: We will in a second.

MR. BRODSKY: Okay. I didn't know what the witness was looking at.

MR. TASCA: Okay. Ben, by the way, the authority is Chancery Court Rule 30D for not talking to your client about the substance of his testimony during breaks. So I'll let you review that, and when I come back from the next break I'm going to

ask him about those conversations, and you can do what you want to do at that point.

MR. BRODSKY: Okay.

**Q (By Mr. Tasca) The other question I'll ask, and I'm not saying this is happening, but Marc, are you getting any sort of signals from your lawyer looking at the Zoom? I'm at a disadvantage here. I don't know what you're looking.**

A No, I spent the majority of my time looking at you.

**Q Okay. But I see you looking at the screen sometime. Are you being influenced at all by anything, expressions your attorney is making?**

A No.

**Q Okay. All right. We're looking at Exhibits 30 and 31.**

MR. TASCA: You got them marked?

MS. ALBERTO: Yeah, I mean, I have them all tiered.

**Q (By Mr. Tasca) Okay. Marc, I'm not totally sure about this, but so take a look at these Exhibits 30 and 31, and our understanding is that these may somewhere reflect certain loans that you made to the properties, but I'm not sure.**

**So you -- why don't you tell me?**

A These are -- these are very different timeframes. This is -- this is an early spreadsheet that is probably three generations old for us trying to get fair market value in full -- kind of full capital stack analysis done throughout our portfolio. That was the email sent to Efraim on --

**Q You're -- you're looking at --**

A 31.

**Q 31?**

A That's -- yeah, that's 31. And then --

**Q And then I guess before we leave 31, just -- because I'm not so interested in the overall reason for this communication. I'm just more -- I'm just trying to understand the -- the loans that you made to the properties.**

**Is there a column here that identifies those?**

A The -- the print is actually rather -- rather small.

**Q It is -- it is rather small. I agree with you. And let me -- let me tell you what I think it might be. Where it says Vesta loan to property --**

A Yeah, where is that.

**Q That's sort of like about in the middle --**

A Vesta loan to property, yes, that was --

so this spreadsheet was actually done with an investor of mine and this was his format. And basically we spent a number of -- of hours on the phone and -- and on Zooms creating this. There were placeholders, so you'll actually see a lot of round numbers on those Vesta loans.

We were trying to get to the right numbers and then the idea was we would circle back and get everything kind of in definitive shape. By the time we did that, we switched to a much more, I would say, user friendly and easier to digest format than this.

This was also riddled with errors in terms of cell -- cell population, but yes, the -- the Vesta loans was -- was a -- that -- that's -- that is what those are. Those are -- you know, those are loans from Vesta Holdings, Vesta Capital, Vesta -- to the properties.

**Q Okay. And, you know, there's been talk about loans that you made. When you say that, do you really mean, like, the Vesta loans? Like, there's not, like, a tranche of Marc Kulick loans and also a tranche of Vesta loans?**

A That is correct.

**Q Okay. It's just one and the same?**

A It's one and the same, that is correct, yes.

**Q All right. And -- and so is this -- is this document accurate -- well, you just said it wasn't accurate, but was it created around 2-25 --**

A It -- it was --

**Q -- February 2025?**

A No, it was created in I believe November and December of '24 and we kept using it and trying to perfect it into '25. My belief, and this is not -- I could be wrong on this, but my belief is that somewhere around April or May, we transitioned to a much cleaner format.

**Q Okay. Now, the other document, Exhibit 30, is this any more or less accurate as to -- as to loans? And, again, I'm guessing here, but maybe it's that Vesta loan balance column?**

A Uh-huh, yeah, so this was, again, for settlement purposes and what I was trying to show here was that we had a number of deals that were -- that were under contract -- that were either approaching contract. As you'll see, multiple deals have fallen out and some deals are kind of still hanging around and it -- it's definitely -- it's part of our business is dealing with ups and downs

of -- of the sales processes, but -- but, yeah, this is -- you know, you'll see two line items that I thought were particularly important for my business with Efraim, which was one was a Vesta loan balance and the other was my personal investment amount.

**Q Right. Okay. So your personal investment amount, would that be like your capital contributions?**

A Yes, that would be the -- that was the -- the assumption of what I would get back from these deals.

**Q That -- so that's your equity?**

A Correct.

**Q Okay. That's what you would get back in equity and then the Vesta loan balance is -- is that the total amount that you loaned or the total amount that you had expected to get back out of these deals?**

A That is the total amount loaned, not the total amount I'm expecting to get back.

**Q Okay. And is -- is this column more accurate than the one we were looking at in Exhibit 30?**

A Yeah, yeah this is --

**Q Or 31, rather.**

A Yeah, this -- yeah, is much newer, yeah.
**Q Okay.**
A In total right now, there's about $37 million of ancillary financing that sits, you know, in the -- the Vesta entities to the properties.
**Q Right, and just eye-balling this without adding it up, it doesn't look like this adds up to 37 million?**
A No, but this is only a small portion of the properties.
**Q Okay. So -- all right So what you're saying is that there's about 37 million that you've loaned personally. Who are you loaning that money to?**
A To -- to -- to properties that need it.
**Q Okay. And when you say "properties that need it," like, is it -- are you making a loan to the -- the title owner or -- like, I'm just trying to understand how you're kind of booking it.**
A It's -- it's booked -- there's a lot of -- our senior lenders are funny. They want us to support the deal if it needs it, but they have limitations on how we support the deal. We're not supposed to have -- they're not -- they don't want us to endanger their collateral, so I can't file a

UCC for my debt, anything like that.

So right now, our loans just sit on the -- on the GLs, on the general ledgers, and then they're notated on the balance sheet like a trade payable or like equity is or like senior debt is. It would be found on the balance sheet of each individual asset.

**Q Okay. And when you say "each individual asset," would that be the -- the GL of the title owner or --**

A There's no bifurcation of -- of the GLs, right? There's not a separate general ledger for WoodScape Investors, LLC, or for BJJ WoodScape, because quite frankly, GLs don't exist on an entity level. They exist for the op -- for the OpCo and the -- the OpCo is the property.

**Q Okay. So if you had to say who Vesta -- I guess this is Vesta Holdings who -- go ahead.**

A Yeah.

MR. BRODSKY: Well, hold on. Wait for the question. Listen to the question.

THE WITNESS: Sure, sure.

**Q (By Mr. Tasca) Yeah, yeah, it wasn't a very good question.**

**If you were to say who the actual lender is who made these loans, would it be Vesta Holdings,**

**Vesta Realty? I'm just trying to understand that piece of it first.**

A Most accurately would be me through some entity, whether it be Vesta Holdings, Vesta Capital. Those are the two main. Those are the two main entities that are used.

**Q Okay. So it's either Vesta Holding, Vesta Capital, I mean, I know you're -- you personally are ultimately funding it, but it's through one of those entities, but it's not clearly booked one way or the other?**

A That is correct.

**Q Okay. And then in terms of -- if I had to ask you, okay, who -- who is the borrower, who would you say would be the borrower?**

MR. BRODSKY: Objection to the form.

A The investor entities would be the borrower.

**Q (By Mr. Tasca) And the investor entities would be the -- like, the intermediate holding companies above the title owner level?**

A Yes, that is correct.

**Q Okay. But if we look at the books, would it reflect that or -- or not really?**

A If you look at the books --

MR. BRODSKY: Object to the form. You can answer.

A If you look at the books, it's not going to tell you the entity level of which we're operating, because again, GLs don't exist for BJJ WoodScape and GLs don't exist for WoodScape Investors, LLC. The only thing that -- that GLs exist for is here's what's coming into the bank account and here's what's coming out of the bank account.

**Q (By Mr. Tasca) And then I presume that those loan proceeds that are the result of loans that -- that I assume you made over time are just used where they're needed on any of the properties -- for any of the properties?**

A I think there were three different questions in there, but yes, I believe that they were -- they were --

**Q Sorry.**

A No, it's okay. I just want to make sure I get everything correct here.

Yes, they were made over a long period of time. I think the first loans that were made would have been 2022, and yes, they went to a variety of different properties.

**Q And do you regard these loans as being ahead in priority to the YSA loans?**

MR. BRODSKY: Objection to the form.

A No, these are not separate from the YSA loans. The YSA loans were in -- would have been accounted in the -- in these loans, in these loan proceeds.

**Q (By Mr. Tasca) Wait. I'm not sure I follow you.**

A Do you mind if I go back to one of your previous exhibits?

**Q Go ahead. Go ahead.**

A So if you go back to Exhibit 10, which is just a random loan agreement between us and YSA, the reason I picked the January 21st --

**Q Sure.**

A -- the money is going to go into -- the money was wired into a Vesta Holdings bank account. Vesta Holdings then is the conduit and sends that money elsewhere throughout the portfolio. So on the balance sheets of the properties that would have gotten a loan from YSA, it would have been YSA to Vesta Holdings, Vesta Holdings has a loan with YSA and Vesta Holdings makes a loan to whichever property.

**Q So are you saying that the 37 million that -- that you loaned personally through one or more of the Vesta entities includes loan proceeds from the YSA loans? Is that -- I just want to make sure I'm following you.**

A Yes.

**Q Okay. How much of that 37 million includes YSA loan proceeds, if that's a determination that's -- that's possible to make?**

A So the -- the way that we book it is interest is Vesta Holding's responsibility, so as to not hurt the properties. So if I'm taking a high interest loan, I'm taking that interest on myself and the principal is what goes on the books. So if -- if Muntage got $300,000 from a loan from YSA, went from YSA to Vesta Holdings, it would go from Vesta Holdings to Muntage and Muntage would pay it back from Muntage to Vesta Holdings, and in theory, in a perfect world, it would go from then Vesta Holdings to -- back to YSA, which was what was supposed to happen.

**Q Okay. And -- and the -- but my question was, is it possible to make an allocation of how much of the 37 million is YSA funds? All of it or is it -- like, what portion of that --**

A No, it would -- it would just be YSA's principal, which I believe would be seven -- well, at this point, YSA -- there's a dispute, right, on this? So at this point, none of that -- none of that balance would be allocated to YSA because anything above where we're at now is interest and that's going to be on Vesta Holding's books.

**Q So whatever the interest is would be amounts that Vesta Holdings would continue to owe to YSA, but the principal is given to the investor level company, which is owed back to Vesta and that principal then would be for repayment of principal to YSA.**

**Am I following?**

A I believe so. I believe so, yes.

**Q Okay. Now, the loans that you made through one or more of the Vesta entities, are they -- are they documented?**

A By and large, no. The -- well, all of them are documented through general ledgers and through -- through general ledgers and through balance sheets, but in terms of a loan document, no.

**Q Okay. Do they have a maturity date?**

A No, I'm not -- that would -- I have no interest in defaulting my own properties or setting

maturity date, because quite frankly, it's a -- you know, who knows when they'll have the liquidity to pay it back.

**Q Right, and I assume that you don't charge your own entities interest on those loans, right?**

A No.

**Q Okay. And -- and it sounds like those loans are more for just general operations as opposed to, like, purchasing new capital assets; is that fair, or is it a mix?**

A No --

MR. BRODSKY: Objection to form.

A Early on, we used to take on loans for buying new assets. Each dial requires earnest money, and I actually had a particular lender who used to do all my earnest money loans and their family office hit hard times and they got out of that business, which was actually what precipitated me to reaching out to Efraim in the first place, because when I was doing that Park 1010 earnest money loan was the first time that those guys had ever said no to me.

**Q (By Mr. Tasca) And you kind of anticipated my next question. Like, was -- did there come a time when members in any of the**

**entities, intermediate entities or the title owners, to the extent they had multiple members, stop making their capital calls?**

A We don't -- we've only done two capital calls --

**Q Okay.**

A -- in the entirety of -- of -- of Vesta's existence. We've done -- actually, I've brought in capital at my own expense rather than do capital calls. In any capital call, though, you're going to have people that fund and people that don't fund, which is why operating agreements have the -- the dilution for non-funders. It's supposed to be kind of punitive.

**Q Right, and did that happen here with any of the companies where a member's interest was diluted because they didn't make one -- one of those two or two of those two capital calls?**

A Yes, on -- on the capital -- on the -- on the -- thy OKC3 capital call, not everybody funded. That is accurate.

**Q Okay. Any others?**

A No.

**Q Only the OKC3?**

A Right, the other capital call is ongoing.

**Q Okay. And then once that dilution occurs, it's kind of by definition what dilution is, that that member's interest gets smaller and everybody else's gets bigger?**

A No, not -- so if -- if I do a capital call and there's three people involved, person A, person B and person C, person A funds. There -- there's no dilution. Person B does not fund. They are -- they are going to be diluted.

**Q Right.**

A Let's say person C funded the first round, but then wanted some piece of person two's unfunded amount. They could do so at a one-and-a-half X to two-X dilution depending on the operating agreement.

**Q Okay. And that's all laid out in the operating agreement how that works?**

A (Nods head in the affirmative.)

**Q But and that -- that dilution has happened, but only with one entity of all the entities that you have?**

A Correct.

**Q I saw some emails where you were complaining that investors wouldn't put up money. Is that something different from not making their capital calls?**

A Well, if you -- if -- I don't know if it's one of the emails you have presented. I'd be happy to go through it, because it depends --

**Q Not yet, but there -- there are a couple, yes.**

A Okay. Because I'll be able to speak --

**Q Okay.**

A -- more intelligently --

**Q Fair --**

A -- about those specifics.

**Q Fair enough. Do you know if any of the members of either the title owners or the intermediate companies have, like, written off their interest?**

A In terms of mentally, some of them might have. I wouldn't know. In terms of via email, yes, one person -- one person has sent us notice that they basically abandoned their positions and they abandoned the position in one deal that quite frankly I was dumbfounded and one deal I kind of understood.

**Q And who was that?**

A It's -- it was an investor of a -- of one of my syndicator friends. I actually don't know his name off the top of my head.

**Q And what entity did that involve? I'm sorry if you said it already.**

A It was Riverpark at Kensington.

**Q Uh-huh.**

A And then 727 Classen.

**Q Same person?**

A Yeah, yeah, he was an investor in both and he sent us a notice that he was -- that he was writing off -- for tax purposes, he was abandoning both of his positions.

**Q Okay. How much did he own of each of those?**

A Small amounts. Would have been 50,000 each I assume.

**Q Okay. And he's the only one who's done that at this point?**

A Correct.

**Q All right. Just another sort of authentication thing without getting into a whole lot of paper. There are senior lenders on all the properties on which YSA currently has mortgages; is that fair?**

A Yes.

**Q Okay. And they all have mortgages that have been recorded, correct?**

A The seniors all have mortgages that have been recorded?

**Q Yes.**

A Yes.

**Q Okay. And if we were to obtain those mortgages from the public record, you would agree with me that they would be true and accurate versions of those mortgages?**

MR. BRODSKY: Objection to the form.

A I would assume so. I have no reason to believe otherwise.

**Q (By Mr. Tasca) No reason to believe otherwise. Okay. And did you personally sign all of those first mortgages?**

A To the best of my knowledge, yes, but I don't know.

**Q Okay. So but whatever they say, they say, and you have no reason to doubt what they say?**

A Yeah, absolutely.

**Q Okay.**

MR. TASCA: 28?

THE REPORTER: 32.

MS. ALBERTO: 32. Do you want me to mark them simultaneously?

MR. TASCA: Sure.

MS. ALBERTO: 32, 33.

MR. TASCA: 32, 33.

(Deposition Exhibit No. 32 was marked for identification and made part of the record.)

(Deposition Exhibit No. 33 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. Take a look at Exhibit 32, Marc, and I'll just say -- I'll represent to you that Exhibit 32 and 33 are versions of your -- of Vesta Capital's website or certain pages of Vesta Capital's website that we got from the Wayback Machine from February of 2025.**

**Are you familiar with the Wayback Machine?**

A No.

**Q Okay. It's a -- some kind of a computer program that allows you to capture what a website looked like in the past on a particular day. So this is -- what the Wayback Machine is telling us, that the Vesta Capital webpages reflected looked like in February of 2025.**

**In looking at the front page of Exhibit 32, I don't want to pick the portfolio fight with you again, but would you agree with me that that says real estate investment portfolio?**

A Yes.

**Q And would you agree with me that the portfolio as used here is talking about the real properties?**

MR. BRODSKY: Objection to the form.

A No.

**Q (By Mr. Tasca) No, you would not agree?**

A The line under it, Vesta Capital is a fully integrated real estate investment firm. Fully integrated means that we handle everything from investment management to property management to asset management. So I think that covers actually the broad spectrum of -- of what we do for our portfolio --

**Q Including --**

A -- and how it is that worked.

**Q -- including the real property?**

A Yes.

**Q Okay. And if you flip back two pages, you'll see there the various properties listed.**

A Uh-huh.

**Q Okay. So would you agree with me that this is Vesta Capital holding these properties out as the Vesta properties? Is that a fair characterization?**

A These are all properties managed by Vesta

Realty, which I believe it says. I believe this is actually the Vesta Realty -- I believe this comes from the Vesta Realty portion of the website, but yes.

**Q Okay. Okay. Then on Exhibit 33, this is your bio, right?**

A Yes.

**Q In the second sentence says, under his leadership, Marc "oversees all aspects of the businesses, including asset management, operations and acquisitions."**

**Is that an accurate statement?**

A Yes, it is.

**Q Okay. And this is either Vesta Capital or Vesta Realty on its website telling the world that, correct?**

A Yes.

**Q While we're getting that exhibit out, can you tell me, Marc, what MCAs you currently have outstanding? When I say you, I mean you and the various Vesta companies.**

A I'm not sure I would be able to do that off -- from memory. There's -- MCA companies use different -- same funders will operate under different monikers or names. There are a couple

that got refinanced. I don't know that with a high degree of certainty I could nail the correct names and the correct -- and the correct current outstanding MCAs.

**Q Is it, like, more than 10, less than 10?**

A It would -- it would be less than 10.

**Q Okay. Sorry, you said less -- less -- less than 10 companies or less than 10 MCAs -- because I assume you could get multiple through the same company? Maybe not. I'm not sure.**

A Most of the time, if they did that, they do it as an add on or a refinance. Add ons are better for the borrower, and refinances are less good for the borrower. So, no, most of the time, it would be one -- one -- one loan position per. There was one group that did multiple different loan positions.

**Q Okay. Less than 10 --**

A Lenders.

**Q -- lenders. And -- and for each lender, there were -- there would be an MCA and then possibly there could be an add on to that?**

A That -- that is correct.

**Q Okay. And -- and let me see if I can help you out here, because I think not too terribly long**

**ago, you -- you sent some information and I'll list what you -- what you had and the amounts and then we can add to it or subtract from it as you see fit.**

**LendSpark for about 200,000?**

A That's no longer.

**Q That's paid off?**

A Correct.

**Q T -- TVT?**

A Ongoing.

**Q Is that about 600,000?**

A It's less now. We've made multiple payments.

**Q How much do you think it is now?**

A Difficult to say. I'd estimate 480,000 to 500,000.

**Q Back'd?**

A Back'd as -- Back'd is current -- what was the balance as of the last --

**Q Six hundred K.**

A We've paid 150,000 since then.

**Q So 450?**

A Yeah.

**Q American?**

A American is active, but they're not currently collecting payments.

**Q Is that balance on that about 1 million?**
A It's less. We paid -- we got them down to 800,000 and they agreed to hold off on us and let me try and get my feet underneath me.
**Q Okay. Swiss Funding?**
A Paid off.
**Q Apollo?**
A I actually -- oh, we demanded arbitration with Apollo and we've never heard back. I don't -- or at least I don't know where that demand stands.
**Q All right. Leaving aside arbitration, and whether they're pursuing it or not, is there still a balance?**
A Yes, there's still a balance.
**Q 150K?**
A It's somewhere in the 100- to 150,000 range. I forget where it was when we left it.
**Q Capital Assist?**
A Capital Assist is the one group that does different loans off of their -- off of their -- like, has three different -- had at one point three different loans. We have two active positions with them.
**Q Okay. So they actually do do --**
A They're -- they're the one that does

multiple, yes.
**Q And you said two or three?**
A Right now, there's two.
**Q Okay. And how much is each?**
A I believe my total balance with Capital Assist is something in the vicinity of 1.25.
**Q Okay. Previously you said 1.5, so that's gone down a little bit?**
A Yes, we've been paying them.
**Q Who am I missing, if any?**
A Trying to think. What day was that as of?
**Q I don't have that in front of me.**
A I think there was an additional advance taken from Dover Capital.
**Q When was that?**
A I had two advances given to me from Dover. One was -- geez, I think late September, maybe early October, I don't know, and the other would have been October 31st.
**Q And what's the total balance there?**
A We've been paying it. We're probably -- I would say we're 200 -- somewhere between 200 and 300.
**Q Okay. So the September one is paid off and now the October one is a new one?**

A Correct.
**Q But you produced in this litigation all of the M -- MCA agreements that you have, including ones that have been paid off and ones that may be currently still alive; is that fair?**
A To the -- to the best of my knowledge, I turned over my emails to the appropriate channels and then they ran those searches.
**Q Okay. You didn't produce, though, the various communications that you had with MCAs or, like, bank statements or other submissions you made to them to get the MCAs; is that right? It was just the agreements or is that a question for your counsel?**
A That would be a question for counsel. Although MCA lenders don't typically rely on bank statements, they do live access, which there's no way to replicate that automatic discovery.
**Q What does that mean, live access? They get right into your systems to see how you're doing?**
A Correct. They have -- during the course of the loans, they require to maintain full access to your bank accounts.
**Q But to get the loan at the outset, don't you give them some submission?**

A You usually fill out an application and then when they get to the underwriting stage, they ask you for a bank login and you can do that one of two ways. You can either give them access to your bank account or you can go through a third-party system called Plaid. Plaid did not work on our system, so we would just give them access to our systems.

**Q Okay. So they -- they -- they take the application, then they do the underwriting based on the information through Plaid or direct access?**

A Correct.

**Q And then they decide whether to grant it. Okay.**

MS. ALBERTO: 34.

MR. TASCA: Okay. We're going to mark 34.

MS. ALBERTO: Thank you.

(Deposition Exhibit No. 34 was marked for identification and made part of the record.)

MR. SHANK: Thank you.

MS. ALBERTO: You're welcome.

**Q (By Mr. Tasca) Okay. Do you recognize Exhibit 34?**

A Yes, I do.

**Q Okay. What is 34?**

A It is the first MCA agreement that I ever signed. It's two parts, one with LendSpark and one with Back'd.

**Q Okay. So this was the very first MCA that you or any of the companies you're affiliated with got?**

A Yes.

**Q Yeah, I was going to ask you that. Why is there a separate MCA purchaser's agreement attached to this? Like, are they -- I just didn't get how this worked. Is that a separate MCA or is it part of the same one?**

A Quite frankly, I don't know. You'll see on page -- where is it -- I just flipped through it on accident and thought it was interesting myself.

The gentleman that signed this on Page 24, which is Kulick 002540, is a man named Salman Vakil. Salman represented himself as the decision-maker at LendSpark, but he said that to get approval for the amount that I wanted, he had to split the note between a receivable purchase with LendSpark and a traditional loan through another company that he purported to control called Back'd or Austin Real Estate Finance. It turns out he controlled neither company.

**Q So what happened with this one?**

A Both of these were -- were fully paid off. In -- I refinanced -- I don't know how Salman did this. This is one of those examples of where I'm going to lose track. We refinanced -- we did one refinance in November of 2024 and then we did another refinance in, I believe, January of 2025, and I don't know if Salman did it through Back'd or through LendSpark.

My assumption is because the Back'd balance was higher, he did it as we -- as we reviewed this. My assumption is at least one of the refinances went to Back'd and one of the refinances went to LendSpark.

**Q Okay. And -- and the way this worked is the loan amount was a million dollars and then they take an origination fee and then you get 970,000? When I say you, I mean the borrower, Vesta Realty LLC, right?**

A That is correct.

**Q And I think I asked you about this and I won't keep asking you, but just because I don't remember if I asked. You said you didn't tell the senior lenders about these loans, these MCAs?**

A Initially we did not. We started telling

seniors as the MCAs became more problematic.

**Q When -- when roughly did that occur?**

A To my memory, the first time I disclosed MCA to a senior lender would have been somewhere in the February-March 2025 timeframe.

**Q Okay. And from that point forward, were you disclosing them all?**

A I wouldn't say all, but -- but yes, I was disclosing them.

**Q And what was their reaction to that?**

A Most of them didn't care. Fannie Mae had an interesting reaction in -- in -- in August because they back-filed a lawsuit against us and Fannie's attorneys asked us for a lot of backup on, you know, what we had signed and why -- why we thought it was okay and we gave them that and we never heard -- we still to this day haven't -- they haven't used that against us in any way, shape or form.

So I don't know if they're -- it was one of those things that -- to my understanding today, this is probably not something we should have signed.

**Q Okay. And if you would flip back to 2542, there's a bunch of other entities that are added on**

**here as borrowers. Do you see that?**
A Yes.
**Q And you signed for all of them as owner. Do you see that?**
A I believe I signed this as Vesta Realty's owner.
**Q Okay. So you're not saying you're owner of the companies listed above that, only of Vesta Realty?**
A Correct.
**Q Okay. And the -- going back to the LendSpark piece of the agreement, there is a -- there's Paragraph 11, this is on page 2524, and it says security interest.**
A I've read it.
**Q Okay. And that includes a definition of collateral.**
A Yes.
**Q Now, had that collateral been pledged already to any other lender when you entered into this?**
A No, as this was my first MCA loan.
**Q Okay. So you don't -- your opinion is that this collateral wasn't pledged pursuant to any of your senior mortgage loans?**

A Oh, no, you are correct.

**Q Okay.**

A I thought you -- I apologize. I thought you meant two.

**Q So that would be double pledged, so to speak, of that collateral?**

A Yeah, our -- my understanding initially of MCA loans was that they were more -- that they violated less -- that they violated our senior loan documents at least less than many other financing out there in the world, in the marketplace.

**Q That was your understanding then?**

A Yes.

**Q Has that changed?**

A I don't know. Look, I mean, none of my lenders have included MCA loans in an acceleration notice or none of my lenders have -- have considered MCA loans in a -- in a foreclosure notice. So I -- I -- I still think that that -- I still think that's likely accurate.

The question is, is it less -- you know, I think that there's a question obviously if they're less against the senior loan docs or if they're not a violation, but I do believe that they are likely a violation of the senior loan docs.

**Q Right. It's just that some of the senior lenders might not care or take action based on it?**

A (Nods head in the affirmative.)

**Q And then if you flip to Paragraph 13, location of collateral transactions involving the collateral, and then you go down to Sub iv, "Borrower shall not pledge, mortgage, encumber or otherwise permit the collateral to be subject to any lien, security interest, encumbrance or charge other than the security interest provided for in this agreement."**

**So did you understand that to mean that whatever collateral was being pledged under this agreement, you couldn't pledge it again to someone else?**

A Yes, there are several times in the document including in the no stacking provision.

**Q Right.**

A That was my understanding.

**Q Right, and the no stacking provision was what I was going to point out next. That's on page 2541, which is, in my view, a little redundant of the section I just read, but in any event, it's here.**

**Now, all these entities that are listed**

**here that are listed as borrowers starting on 2542, I mean, did these entities have revenue?**

A I couldn't help but smile. No, they did not.

**Q Or any expectation of revenue?**

A No, they did not.

**Q So I mean, what was really being pledged here?**

MR. BRODSKY: I'm going to object to the form.

A I -- I couldn't answer that. This was a heavy negotiation, so I was actually negotiating this when I first met Efraim. This was the other financing -- this was what I ultimately took instead of Efraim's loan in April of 2024. And when I met Efraim, that night that I called him and first introduced myself to him, it was because I thought this was going to -- because we were -- we were -- we drew a firm line in the sand that we would not make the title owners borrowers. I thought this was going to go away, and the next day, they came back to us and said that they were fine. I don't know how they got comfortable with that, but they did.

**Q Okay. So -- so basically, I mean, to answer my question, you basically didn't pledge**

**anything under this particular agreement with these particular entities; is that fair?**

A I would agree based on -- based on my understanding, yes.

**Q Okay. Let's go to the next one.**

MR. SHANK: Joel, is this a good spot for a quick comfort?

MR. TASCA: Yeah, sure.

THE VIDEOGRAPHER: Okay. Off the record. The time is 2:46.

(A recess was taken from 2:46 p.m. to 2:58 p.m.)

THE VIDEOGRAPHER: Back on the record. The time is 2:58.

MS. ALBERTO: 35.

**Q (By Mr. Tasca) 35. Okay. I'm going to show you 35.**

MR. SHANK: Thank you.

(Deposition Exhibit No. 35 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) I'm going to be honest, the cover email is not really what I wanted to ask you about. If you -- if you flip back to 12779 and to get through some of this, Marc, I might just kind of like lead you a little bit, but I'm not doing it to affect testimony. You can tell me if I'm wrong,**

**but I just want to try to get through this.**

**This is a LendSpark MCA dated 11-4-24, correct?**

A Yes, this is -- this appears to be the refinance --

**Q Okay.**

A -- that I mentioned earlier.

**Q Okay. So in between the April LendSpark MCA and this one, had you gotten any other MCA loans? We didn't see any in the interim, but...**

A No, I do not believe so.

**Q Okay. All right. Now, this one is for 900,000, correct?**

A That's what it appears to be, yes.

**Q Okay. And by this time, because this is dated November 4th, 2024, you had executed the 10-8-24 loan with YSA?**

A That is correct.

**Q Okay. And you -- I think you testified earlier, but you tell me if I'm wrong, you didn't notify YSA at the time about this MCA, correct?**

A I don't -- I don't believe I notified MCA -- YSA. There were a few times where I was looking for additional financing where I had mentioned to Efraim that I was looking for

additional financing. And I think by obviously the more Efraim got to know me, I'm sure he knew I was chasing financing every day and by the June due diligence, obviously he knew about the MCAs as evidenced by the due diligence request, but at this time, I don't know if I -- I don't remember notifying him of this.

**Q Okay. Right, and I was -- I just meant this one. I know that later on, you did make some statements to Efraim about them.**

**All right. So basically this one seems to have the same terms on security and a prohibition on further pledging, I'm paraphrasing, but we looked at those in the last one, just to move this one along. And this also has that same Austin business finance MCA, right, that's attached to it, which again, I think you called that Back'd, right?**

A Yeah, Austin Business Financing is also known as Back'd, B-A-C-K, apostrophe D.

**Q Right. Okay. And then on both the LendSpark ones and the Austin one, there are a number of signatories, right? Get there.**

MS. ALBERTO: Okay. 12810.

**Q (By Mr. Tasca) Oh, yeah, it's 12810.**

A 12810. Okay.

**Q Okay. And this -- on 12810, you're signing on behalf of all these entities and you're representing that you are the owner; is that right?**

A No, they actually fill these out and I did not -- did not realize -- actually, I didn't realize that they did this until an earlier line of questioning of yours when it occurred to me that it's likely you were referencing the things that they fill out.

**Q Okay. But you signed without --**

A Yeah, I didn't pay any attention. I mean, these are all DocuSigns. I'm charging through these signing as fast as I possibly can.

**Q Right. So you didn't change that? You didn't bring it to LendSpark's attention that, hey, I'm not actually the owner of some of these entities?**

A Yeah, they certainly know that. I mean, during -- during our initial discussions, I made that very, very clear. They looked at operating agreements. There's no chance that they didn't know that.

**Q And I forget if I asked you this. Did -- did you get the consent of other members of these entities to get these MCAs, the LendSpark ones we've**

**been looking at?**

A No, I did not.

**Q I mean, is this a case where you felt like you didn't need -- at that -- at that time, did you feel like you didn't need to get consents because you felt like this was in the best interest of those entities?**

MR. BRODSKY: Objection to the form.

A You know, certainly that was part of it and then also just believe that I had the authority to -- this was something that at a time where I really believed that I had the authority to sign this.

**Q Right, and you feel you no longer have that authority?**

A Knowing what I know now, I would not sign this again.

**Q Okay. All right. Can we see 23283?**

MR. SHANK: Thank you. I'm sorry.

MS. ALBERTO: No problem. 36.

**Q (By Mr. Tasca) 22 -- Exhibit 36 is a single page Bates stamped 22283.**

(Deposition Exhibit No. 36 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) We don't have to dwell on**

**this too long. It looks like a one-page application to fast dated 11-6-24. I assume this is for an MCA?**

A Yes.

**Q Did this result in an MCA or not?**

A No, it did not.

**Q Okay. Okay. The next one -- oh, this is --**

MS. ALBERTO: Yeah, because --

MR. TASCA: Did you get that copy? I can come back to it.

MS. ALBERTO: Oh, you want the blue one?

MR. TASCA: Yeah.

MS. ALBERTO: Is it a different --

(Sotto voce conversation.)

MR. TASCA: I might have it here. Sorry, guys. This will just take a second. See if it's in here.

MS. ALBERTO: Okay.

MR. TASCA: And in the meantime, can you get me that one, 22283?

MS. ALBERTO: Oh, that's the same one we just had. This is 22283. Yeah, that's the one we actually just had.

MR. TASCA: Oh, I think I screwed up then.

**Q (By Mr. Tasca) Okay. Let me just ask you**

**this.**

A Sure.

**Q Since we don't have a document right in front of us, we saw another kind of one-page application to Shoreline dated February 24th, '25. It looked like it was just an application, so my question for you is did that result in -- first of all, did you fill out an application for Shoreline that you recall?**

A Shoreline would have been the borrower, not the -- not the finance company.

**Q Oh, okay. Was Shoreline one of your companies?**

A Yes.

**Q Okay. Who --**

A We were in the middle of a refinance, yes, but no, it did not come to fruition.

**Q Okay. So that one didn't happen. Next one Hilary is getting. I just want to go in order here so we can relax a minute.**

MR. TASCA: Go off the record.

THE VIDEOGRAPHER: Go off the record. Okay. The time is 3:09.

(A recess was taken from 3:09 p.m. to 3:11 p.m.)

THE VIDEOGRAPHER: Back on the record.

The time is 3:11.

**Q (By Mr. Tasca) All right. We're up to Exhibit 37.**

(Deposition Exhibit No. 37 was marked for identification and made part of the record.)

THE WITNESS: Sorry, I got confused.

MS. ALBERTO: You're okay.

**Q (By Mr. Tasca) So, Marc, Exhibit 37 appears to be a one-page application to Harper Advance I presume for an MCA and I presume you didn't get it?**

A No, Harper Advance is more complicated.

**Q Okay. Tell me about it.**

A DH at harperadvance.com, the guy's name was Dovi, he was my conduit into the MCA world. He brokered the initial transaction. He charged me obscene brokerage fees, but several different times, he did similar loans to YSA that were not MCA, short term, you know, two week, three week paybacks and he had me fill this out just for -- just for his books and records.

**Q Okay. So Harper Advance was not an MCA. It was kind of like he was kind of like a hard money lender and he did make you some loans?**

A Harper advance is an MCA lender.

**Q Okay.**

A They do not loan to Jews.

**Q Okay.**

A Many firms will not lend -- many Jewish people will not lend money to other Jewish people. That's why a Heter Iska is used when Jews lend to other jews. It's a halachically available way to lend. Dovi does not do loans to Jews. The closer we got, though, he did -- he would say to help me. I would say because he saw the amount of money, did some short-term float type lending with me, but it was not MCA related. It was just more of, you know, a personal loan.

**Q Okay. So Dovi does -- Dovi does MCAs, but he didn't give you an MCA. He gave you short-term loans. Were those -- did you give mortgage -- mortgages for those loans?**

A No, they were totally unsecured.

**Q Okay.**

MS. ALBERTO: And then that one you can actually go back to Exhibit 35, because that covers that one.

**Q (By Mr. Tasca) Okay. Yeah, so go back to Exhibit 35. So this appears to be an MCA from TVT dated 4-21-25 for a million dollars; is that right?**

A That is correct.
**Q Now, at this point, were Lend -- LendSpark loans, MCAs paid off?**
A No, they were not.
**Q Okay. Did you tell LendSpark about this one from TVT?**
A Salman Vakil -- Dovi Harper -- Dovi from Harper's and Salman Vakil from LendSpark were the ones who originated the loan through TVT. TVT was another one of Salman's business ventures that he claimed to have owned.
**Q Okay. So that was related to LendSpark?**
A And related to Back'd, yes.
**Q And related to Back'd, and so he -- he knew about the LendSpark loan that you had?**
A Correct.
**Q Okay. Did -- did you notify YSA contemporaneously with the TVT loan that you were getting this MCA?**
A I am actually not sure. This would have been right around -- so this -- April was a shift in our business, so this would have been right around the time where I was telling Efraim about other financing I was taking. I don't know if this was the first one I discussed with him or not.

**Q Okay. Now, if you flip back to Page 12847, there is an addendum here, which many entities are listed, including some of what we've been calling the title owners, right?**

A That is correct.

**Q And did you get approval from any of these entities to get this MCA or did you just get it?**

A TVT did something that other MCA lenders do, which is they use a program that I believe is called Clear and Clear tells them other entities that I'm affiliated with. It's kind of like they say, "Oh, Clear says that you also are involved with this entity, so we're throwing this entity on there," and that's what they did by this point in time. I just -- I just signed.

**Q You just signed without talking to anybody else affiliated with any of these entities that are listed?**

A There were -- there were a couple of key decision-makers that I -- that I was telling about my MCA exposure at this -- at this point. I would -- I would say that some of the key decision-makers knew, but individual investors would not know.

**Q Who were those key decision-makers that**

**you knew?**

A Different in different deals.

**Q Can you -- can you give me a list of who they were, I mean for, like, this one in particular.**

A I mean, for this one in particular, I -- I spoke to my -- the gentleman that signs on all the loans with me, Alex Zepperman (Phonetic). He knew that I was doing MCA financing. The gentleman -- the -- the group SMB that I owned -- that I've owned a couple of deals with, they knew that we were doing MCA financing. Then some of just individual investors that I'm closer with that I was talking to about how I was handling the stress of work and what I was doing knew as well. Giving their names would be difficult.

**Q And none of them objected to you doing this, getting this MCA?**

A I wouldn't say that. There were some objections, but nobody stopped it.

**Q Okay. Some objections, no one stopped it and the proceeds of this MCA from TVT went to benefit ultimately the properties in the Vesta portfolio, right?**

A Yes.

**Q So keeping score here, the MCAs that we've**

**looked at so far, the two LendSpark, the TVT, have they been satisfied? It looks like the TVT maybe -- maybe not. That's still outstanding?**

A TVT and Austin Real Estate Finance are still outstanding. LendSpark has been satisfied.

**Q Right, Back'd?**

A Austin, yeah, they -- they -- I -- they call themselves two different things.

**Q All right. And so far, are you in litigation or arbitration with any of the entities we've looked at so far?**

MR. BRODSKY: Are you asking as of the date of the documents or as of today's date?

MR. TASCA: As of today's date.

A Yes.

**Q (By Mr. Tasca) Which ones?**

A Back'd.

**Q Only Back'd?**

A Only Back'd, that we've -- that we've discussed so far, yes, only Back'd. We have a settlement in place and we're current on our settlement.

**Q Okay. So you settled that one?**

A (Nods head in the affirmative.) Correct.

**Q And you're making payments pursuant to a**

**settlement?**

A That is correct.

**Q Okay. And was that in arbitration?**

A No, there was no arbitration.

**Q It was -- it was pre-arbitration settlement?**

A Correct. They filed a lawsuit.

**Q They filed a lawsuit?**

A Yeah, arbitration was not an option in that document.

**Q Okay.**

MS. ALBERTO: This will be 38.

MR. SHANK: Thank you.

THE WITNESS: Thank you.

(Deposition Exhibit No. 38 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. Exhibit 38 appears to be an MCA entered into with Coldwater Capital; is that right? It's dated 4-23-25.**

A Yes.

**Q And this was just two days after the TVT one?**

A Yes.

**Q Is Coldwater Capital affiliated with those same guys from TVT and LendSpark or not?**

A No, they are not. They were affiliated with the same guy who brokered the Dovi -- Dov Hershberg, dhharpersadvance.com.

**Q Okay. So did -- did LendSpark and Back'd know -- and TVT, did they know about this Coldwater Capital one?**

A I -- to my understanding that they did, but I don't know for sure. TVT was supposed to fund two-and-a-half million dollars and ultimately funded one million and they funded three weeks later than they were supposed to. In the interim, we were searching financing and Dovi came up with Coldwater Capital.

**Q Okay. And at the time you got the Coldwater Capital one, the LendSpark one and the TVT one were -- still hadn't been paid off yet, right?**

A That is correct. We actually paid off Coldwater Capital -- we returned Coldwater Capital's money to them within two days and nullified the contract.

**Q Okay. But didn't getting this Coldwater Capital MCA violate the anti-stacking provisions in the other MCAs?**

A Yes, it did. The truth is those stacking provisions are meaningless.

**Q Did you tell Coldwater about the LendSpark and TVT MCAs when you got it?**

A Yes, definitively they knew. All MCA lenders know about each other. That's why I -- I -- I assume my attorneys didn't love me saying that the -- that was meaningless.

The reason I say that is because MCA lenders all know about each other. They all demand to see -- they have realtime access to the banks, so they'll track who you're wiring money out to. They'll say, "Oh, I see you paid Coldwater Capital today." They all know about each other. It's a very small industry.

**Q All right. The borrowers of Coldwater Creek are Vesta Realty, LLC, Barcelona Best Living, LLC, Alona Best Living, LLC and AV23 East Owner, LLC.**

**So you got some -- some of the title owners there, right?**

A This one I'm not super well in the know of. Again, we did pay this off. We did actually return the capital to this guy. Also, he didn't -- I've never actually seen someone do the sellers like that, but yes, he did include entities that are title owners.

**Q And you didn't get permission from -- from anybody else at AV23 East Owner, LLC to enter into this?**

A No.

**Q Did any member or investor in AV23 East Owner, LLC ever complain that you entered into this MCA on its behalf?**

A No, but again, this MCA was paid within -- was returned within two days, so this was -- this was actually not one that would have ever been notified to anybody.

**Q So -- so you didn't use the loan proceeds, you just returned them immediately?**

A No, Dovi did not like the guy we got into business with and instructed me to send it back and he would find other financing for me.

**Q Okay. So you got the money, didn't use it, gave it back?**

A (Nods head in the affirmative.)

**Q All right.**

MS. ALBERTO: This is going to be 39.

(Deposition Exhibit No. 39 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. Exhibit 39 appears to be an MCA with BH Capital Group dated 5-22-25.**

**Does that look right?**

A Yes, it does.

**Q Okay. This one was quite a bit bigger. It's two and a half million?**

A That is correct.

**Q And what other MCAs were still outstanding at the time of this one. We know that the -- the Back'd one was, right?**

A Yeah, this was meant to replace Coldwater.

**Q Was the LendSpark one still outstanding?**

A Yes.

**Q Okay. Did BH Capital Group have any affiliation with Back'd or LendSpark?**

A They were introduced to me by the same guy, but other than that, none that I know of.

**Q Okay. Did LendSpark or Back'd know that you were getting the BH Capital Group one?**

A Yes.

**Q Right, and that would have violated the anti-stacking provision in those agreements, right?**

MR. BRODSKY: Objection to the form. You can answer.

A Yes, they knew about it, so they didn't default me, but yes.

**Q (By Mr. Tasca) And at this point, I mean,**

**you're triple pledging the same assets, right?**

MR. BRODSKY: Objection to the form.

A Interestingly enough, the way that this contract is -- is set up, Vesta Holdings is the borrower and none of the other entities are actually pledged. The only -- the only financing -- the only entity that this contract gives the pledges on is Vesta Holdings, LLC and Vesta Holdings is -- does not have revenue.

**Q (By Mr. Tasca) So, again, like with the LendSpark one, you were -- you're essentially pledging nothing?**

A That is correct.

**Q But what about this performance guarantee starting at 5357? Aren't these entities pledging their assets?**

MR. BRODSKY: Objection to the form.

A It's my belief that they were not, but let me reread it and make sure. They're only -- they're only guaranteeing the performance.

**Q (By Mr. Tasca) Okay. So they -- they -- your understanding is they were not pledging their assets?**

A That is correct.

**Q Only guaranteeing performance?**

A That is correct. And -- and when I signed this, my understanding was this did not require any sort of approval from anyone because of that.

**Q No approval from other members, no approval from banks?**

A Correct, because we weren't pledging anything.

**Q Did BH Capital Group understand you weren't pledging anything?**

MR. BRODSKY: Objection to the form.

A It's a difficult question for me to answer. I don't know. It was made clear to them that Vesta Holdings was not -- they -- they were one of those groups that was certain that Vesta Holdings was a parent entity. So they felt like they got what they bargained and for and I actually told them multiple times that that wasn't how we were set up and this is how they set up the documents, so I was not unhappy with that.

**Q (By Mr. Tasca) So -- so Vesta Holdings doesn't earn any revenue, so when you -- I'm assuming that you've paid this back at least in part to BH Capital Group?**

A Yes.

**Q Where is the revenue coming from to pay**

**them back?**

A It came -- it came -- it was -- it was booked as a loan to Vesta Holdings, similar to -- similar to how YSA would have been booked.

**Q Right, but then when Vesta Holdings pays the money back, what does it take the money from the property -- the revenue generating entities to pay it back?**

A From the properties that benefited from the loan.

**Q Okay. And all these properties did benefit from the loan, the ones that are signed -- signed as guarantors?**

A Yeah, they put --

MR. BRODSKY: Objection to the form.

THE WITNESS: Sorry, Ben.

A They put a lot of entities in there.

**Q (By Mr. Tasca) Okay. And there's also representation in here that this MCA doesn't conflict with any other agreements that would prohibit you from pledging future receivables, but your view is because you were pledging nothing, you didn't violate that?**

A Correct.

**Q And there's also a paragraph in here that**

**represents that the signer has authority to sign on behalf of all of the entities, both the guarantors and the borrower. So you made that representation that you could sign on behalf of all of these entities listed on 5358 all the way to the end of this document?**

A Yes, I wasn't -- there was no -- they weren't pledging any collateral or anything additional, so I -- I didn't see a problem.

**Q Okay. Again, on here you are making the representation that you own these entities, including Lakeside Best Living, Bartlesville Best Living, Thrive Argenta, Owner, LLC, Tuscan Village Living, LLC, Barcelona Best Living, LLC, AV -- well, Villas at Midtown Best Living, LLC?**

A They -- they filled that -- they filled that in. We did not make any -- you know, we -- we did not make any sort of representation that we owned those. They -- that -- that's how -- I think MCAs are very much wash, rinse, repeat with these documents and they're used to filling out somebody as their borrower, as their owner. I don't think -- I think what they really care about is the bank account -- is the bank accounts, but...

**Q But this is the second time you're seeing**

**this, that the MCA is putting you in as owner of all these entities and you didn't object to that in any way?**

MR. BRODSKY: Objection to form.

A My view was we shared the correct documents with them, and if they put me as owner, I don't really care what they put me at.

**Q (By Mr. Tasca) Okay.**

A I --

**Q You signed that knowing it wasn't true?**

A I signed it --

MR. BRODSKY: Objection.

A I guess I signed it knowing that I -- I did my part in showing them and I didn't care. I just didn't -- I didn't really think it matter how they were identifying me.

MS. ALBERTO: I'll need to get them copied.

MR. TASCA: Sorry.

MS. ALBERTO: This one?

MR. TASCA: This one.

MS. ALBERTO: Yeah, there you go. This is going to be 40. Are we to 40?

THE REPORTER: (Nods head in the affirmative.)

(Deposition Exhibit No. 40 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. This appears to be an MCA with American Funding dated 5-23-25. Does that sound right?**

A That sounds right.

**Q Okay. And this was the very next day after the BH Capital Group MCA; is that right?**

A Yes.

**Q Did you tell American Funding that you had a LendSpark MCA, a TVT MCA and a BH Capital Group MCA at this point?**

A Yes.

**Q You did tell them that?**

A Yes.

**Q Did you tell BH Capital Group, TVT and -- and/or LendSpark that you were getting this American Funding loan?**

A BH Capital Group certainly knew. I do not believe that I told anybody at LendSpark and -- and TVT.

**Q Right. Again, so that would violate the anti-stacking provision of those agreements, those prior MCAs, right?**

A Sure, yes.

**Q Did you tell the senior mortgage lenders about this American Funding MCA?**

A Based on the reception I had gotten from telling people about previous MCAs, it didn't seem that it was -- it didn't -- it didn't seem like anyone was paying -- that anyone cared to know more.

**Q Did you make a representation to this American Funding MCA that it doesn't conflict with any other agreements that would prohibit you from pledging future receivables?**

A Yeah.

**Q And that's just false, isn't it?**

A I mean, yeah, but American Funding found me. I didn't reach out to them. They found me because my information was shopped between MCA lenders. And their direct quote was, "We know that you're taking funding from BH Capital Group."

So I mean, it's how these guys operate. They buy -- they buy people's information. They know you're hunting for cash and that's how -- you know, if they're getting the -- if they're getting the information, you know -- and they all say the same thing, right, which is you treat us well, we'll -- you won't need to go to anyone else for funding because we'll take good care of you.

**Q Okay. 20 -- Kulick 2416, there's a provision 13E, which you represented -- you as the signer -- seller and the person signing this agreement on behalf of seller have full power and authority to incur and perform the obligations under this agreement, all of which have been dully authorized.**

A I see that.

**Q Okay. And then starting on 2421, you sign on behalf of a number of entities again as owner, correct?**

A Yeah, I saw that.

**Q And did you get permissions from any of these other entities to sign this on their behalf?**

A No, what they're doing is they just start tacking on -- like, they see what somebody else had -- you know, what entities we used in the past and they just kept adding on.

**Q Okay. Now, is it your understanding that these entities starting on 2421 are -- are at this point not just guaranteeing, but are pledging their assets?**

A Yeah, in this one, there was no -- they didn't make the same mistake as the -- as the other ones, as BH did, but you know, my view and my

understanding was that this is not a collateralized loan, that I'm selling a future receivable, which I -- I thought I had -- which I thought was more palatable and more within the confines of my authority.

**Q But at this point, some of these entities are the title owner or the -- right, title owners?**

A Yes, by this point, I felt like -- they -- they -- not -- nobody was listening to me anymore in the MCA world. They all just they used that -- they used that program. That program told them which entities and when I would say, oh, I want to -- you know, they didn't care. I just decided that it was better to, you know, handle that on my end.

**Q Right, but hadn't the assets of the title owners, the same assets that are being pledged in this MCA been pledged already to the senior lender?**

A At the time. So the -- the con -- the conflicting pledge between the senior lender and MCAs is something that I only learned probably within the last two months, which is the assignment of rent function. There's actually not -- it's not like a mortgage pledge. Right? There's no mortgage. There's no -- what I learned was that it's actually the assignment of rents that --

because I felt like, as long as I'm paying the senior mortgage, what does it matter if we sell the rest of the proceeds at a discount. It doesn't -- what -- how does it affect the senior?

And it was then that I was told that basically, we -- you know, basically we hold those rents in trust on the senior's behalf, so this would have required their signature.

**Q Right. So -- and I understand you're saying it wasn't intentional, but you now understand that you made a double pledge when you signed this agreement?**

A Yes.

**Q Sorry. I think I -- I asked you this, but these various entities, you said you just signed, you didn't get permissions from other members or --**

A For the most part, no.

**Q Okay. And, again, money was used to benefit the properties ultimately?**

A Correct.

**Q Oh, and I see this has this Heter Iska thing at the back --**

A Heter Iska.

**Q -- I probably butchered the pronunciation.**

**Has -- has this -- this American Funding**

**one has not been satisfied because you mentioned earlier there's still 800,000 outstanding?**

A They did a refinance in July.

**Q Okay. And maybe -- we might come across that. Okay. So that's that one.**

MS. ALBERTO: Yeah, we might need to take a quick break or a little break.

MR. TASCA: Well, let's -- let me keep moving -- I think do you need to --

MS. ALBERTO: About the cutoff. She's been in there feverishly copying, so I just checked in and...

MR. TASCA: So she doesn't have that one either?

MS. ALBERTO: No.

MR. TASCA: How about these? Do we have these?

MS. ALBERTO: I've been told that we have this one and that one. The rest is being copied.

MR. TASCA: Okay. Do you want to get those? I'll just go through them.

MS. ALBERTO: Okay. We're going to mark this as 41?

MR. TASCA: Yes.

MS. ALBERTO: Okay.

(Deposition Exhibit No. 41 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) I was trying to go roughly in chron order, but we're jumping around a little bit here because we're getting those documents copied. This, we fast forward to -- well, we don't fast forward all that much -- to June 17th, 2025.**

**What's going on here?**

A So --

**Q And this seems to be a text message between you and someone named Joey from American. Is that the same American we were looking at?**

A Yes.

**Q Okay. What's -- what's happening here?**

A Exactly what the text message says. We were trying -- they -- they wanted to -- they wanted to find a deal that they could do a second mortgage on. Similar to everybody, right? I mean, this is -- for -- for a long time, I said no to second mortgages.

In '25, I started to try to get lender approval, and so on the second page here, you'll see me tell Joey that I had to fight like crazy to convince a lender to accept it, to accept the second. And we never got this done because they

didn't like the property that I had the authority to put a second mortgage on from the lender, so this never happened.

**Q Right. So this was Joey from American discussing a loan outside of the MCA, a different loan?**

A (Nods head in the affirmative.)

**Q And you suggest here that second mortgages be signed and that those second mortgages would have been on the Jenks Best Living property; is that right? Ridge and Jenks?**

MR. BRODSKY: Can you scroll down?

A I -- I think we were just -- I think we were just talking specifically about Ridge, because Ridge is where I got the approval.

**Q (By Mr. Tasca) What approval did you get? From the lender?**

A Yeah, from the lender.

**Q Okay. So you got approval from the lender to give a second mortgage. Did you get approval from any other stakeholder within the ridge structure?**

A No, the Ridge, I am the only -- so -- so the Ridge, I -- was one of those deals where I thought I was a hundred percent sole decision-maker

and it was only probably within the last month that reviewing the operating agreements of my previous -- of the attorney that -- that drafted that OA did I realize that he actually had placed a lot of limitations on me. I would be quite sure that I'm not able to from a -- from a investor -- that I would need settler investor approvals.

**Q But at this point, you believed that you did have the authority to give a second mortgage on Ridge?**

A Yes, as long -- when the lender consented, yes.

**Q When the lender consented. If the lender consented, why did you say, "My idea is that we sign second mortgages and send them to title, title holds the mortgages in escrow and only records them in the event of an uncured default?" If the lender knew about it, why couldn't you just record it?**

A It's -- my belief is that's still a cleaner way.

**Q I mean, what makes that cleaner?**

A For instance, we don't know -- there's a lot of how these -- how lenders work behind the scenes isn't clear to me. It's -- isn't clear -- you know, there's stuff that happens with their

committees.

MR. SHANK: Bless you.

A Thank you. My view is I had gotten permission from the correct source and, you know, their -- their ask was, you know, as much as you can, if you can get them to accept doing it only if you default, that would be better for us.

I don't know if that helps with their committee or if that helps with their decision making or if it just keeps the books clean. That's not a question I -- I know the answer to.

**Q (By Mr. Tasca) Okay. So that was something that the senior lender said would be better to do?**

A Yes.

**Q Okay.**

MR. TASCA: All right. I think we may be out of documents for the moment, so let's just take 10 if we could.

THE VIDEOGRAPHER: Okay. Off the record. The time is 3:50.

(A recess was taken from 3:50 p.m. to 4:15 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:15.

**Q (By Mr. Tasca) All right. So showing you**

**Marc what's been marked as Exhibit 42.**

(Deposition Exhibit No. 42 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) This is a UCC filed against Vesta Holdings by B&SK Consultants, LLC. What's that, B&SK Consultants, LLC?**

A They're a mortgage lender, personal mortgage. I have a -- they gave me a loan that is secured by a second mortgage on my personal residence. I did not realize they filed a UCC on Vesta Holdings as well.

**Q You didn't authorize them to do that?**

A The -- what I thought the loan was secured by was -- which it definitively is, is the second mortgage that's on my personal residence. I will need -- actually, after this, I'll pull up -- after we leave here, I'll pull up the loan docs. I didn't realize that they filed on Vesta Holdings as well.

**Q All right. Then there's an Exhibit A attached to it, UCC financing statement, and again, because Vesta Holdings doesn't have anything, right, this doesn't really pledge anything? Would you agree?**

A Yeah, yes, I would agree to that.

**Q All right. So the next exhibit?**

MS. ALBERTO: That one?

MR. TASCA: Yeah, and this is 46.

THE REPORTER: 43.

MS. ALBERTO: Oh, 43.

(Deposition Exhibit No. 43 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) All right. Marc, let me show you what has been marked as Exhibit 43. And this is a June email -- June 3rd, 2025, email from David Ruttenberg to you forwarding -- forwarding an email -- June 6th email from Dave Ruttenberg to you forwarding an email he previously sent to you and Jeffrey Karsh and --**

MR. BRODSKY: Can we see the exhibit, please?

**Q (By Mr. Tasca) There is a -- it talks about a $5 million loan opportunity you were invited to participate alongside us. What's being discussed here and who -- who wrote that, this is a $5 million loan opportunity?**

A David Ruttenberg was trying to raise $5 million of preferred equity for me. It didn't end up happening.

**Q Okay. And WoodScape Apartments was going to serve as security for it?**

A The -- the funding would have been on -- it would have been preferred equity on WoodScape.

**Q Okay. And it says here -- David says, "Marc has the authority to unilaterally take this loan as manager of the LLCs we will lend to: The property owner LLC and the investor LLC that is the single member of the property owner LLC."**

**So did -- did -- was David correct in saying that, that you had the authority to take on this -- make -- take on this loan on behalf of those entities?**

MR. BRODSKY: Object to the form.

A David was represented by counsel and I sent him all of our org docs and his idea was to structure -- structured financing to get me out of the malaise of -- of all of the short-term financing and loans I was taking. My -- my belief is that I would have the authority to take preferred equity on WoodScape knowing the docs like I do. I would still believe that to be the case, but I would have to go over that in depth.

**Q (By Mr. Tasca) Right, and then you're also referred here as property owner, operator and manager. Is that an accurate statement?**

A That's -- that's -- I mean, those are

David's words, not mine, but yes.

**Q Okay.**

A He also lists Vesta Capital, which has nothing to do with WoodScape at all.

**Q All right. And this deal was never consummated, right?**

A Correct.

**Q All right. Let's go to 5588.**

MS. ALBERTO: This is Exhibit 44.

(Deposition Exhibit No. 44 was marked for identification and made part of the record.)

MR. TASCA: This is way more than what we needed.

**Q (By Mr. Tasca) All right. Flip back to Page 5588 --**

MR. BRODSKY: Can you put it on the screen, please?

**Q (By Mr. Tasca) -- On Exhibit 4 (sic). All right. And this looks like a $4 million BH Capital Group MCA dated June 10th, 2025. Is this the refinance I think you mentioned earlier?**

A Correct. We did several refis with BH.

**Q Right. Okay. And what other -- what other MCAs were outstanding at the time you got this?**

A I mean, all the same ones that would have been outstanding. So BH Capital Group had initially offered to fund multiple different tranches and so this was just a continuation of their funding agreement with me.

**Q Okay. And then on this one like the last one, you've got all of these entities, including several of the title owners signing as -- well, you signing on their behalf as owner and their assets are being pledged under this BH Capital Group agreement; is that correct?**

A That's correct.

**Q Okay. Would you agree with me that that's double pledging of these assets?**

A Yes.

**Q All right.**

A Although, again, on this one, he -- the contract is going to have the same fault as all the BH contracts. It's just Vesta Holdings.

**Q Well, they didn't just sign as guarantor, they signed as borrower on this one, didn't they?**

A No, all the BH contracts read the same way.

**Q All right. Fair enough. They speak for themselves. All right. Let's take a look at these**

**three?**

MS. ALBERTO: 45.

(Sotto voce conversation.)

(Deposition Exhibit No. 45 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) Okay. What -- what are these documents here that we're looking at on Exhibit 45? I'll tell you while you're looking, they appear to me to be three separate mortgages, assignments of leases, and rents and security agreements dated June 13, 2025, given to Toval Ventures, LLC to secure a $3,375,000 loan.**

**Is it -- the fact that these three mortgages are all securing the same $3,375,000 loan, not separate -- like, three 375 for each mortgage?**

A Correct.

**Q Okay. The first --**

A And yeah, these are the -- this is the -- the second mortgage transaction that I referenced earlier.

**Q Right.**

A We had -- we had -- we have permission from all three of these lenders. Two of the loans are actually with the same lender and the third is with our -- our bank.

**Q Okay. And with all these permissions that you're mentioning from the senior lenders, we didn't see any documentation of that. Was there -- is there documentation of it?**

A No, there -- there's -- there's two different ways for senior lender to approve. One is just saying, we're not going to put you in default, we're okay with it, do what you gotta do.

The second is an intercreditor agreement and we've had offers from lenders to do intercreditor agreements, but typically they're less palatable to the -- to the borrower -- to the -- to the lenders. Let me rephrase that.

The senior lenders have offered to do intercreditor agreements, but they're less palatable to the junior lenders, because an intercreditor agreement basically says, as a senior lender, we take all priority. You're kind of -- your -- your collateral is secured, but only insofar as we let it.

So, you know, when I was -- for instance, in the lead up to this loan, I was really trying to get permission from -- from anybody to do a second mortgage and the first one that gave permission was Putnam Green.

That lender is our -- is actually our bank, First United Bank & Trust, and I was in a meeting with three of the head guys there and I just said, "Hey, you know, would a second mortgage be palatable to you?" And they said, "Sure, if you're not asking us to sign an intercreditor agreement or something like that, we don't -- we don't mind."

**Q Okay. So it was an oral discussion and that was it?**

A Yeah.

**Q And you didn't ask for anything in writing from them?**

A No, didn't need anything in writing. All I needed to know is that they weren't going to hold me in default.

**Q Okay. That applies to all three of these mortgages, which were then recorded, right?**

A Yeah, the other two were with a different lender, and that's correct.

**Q So the other -- the other lender on the other two, who -- who was that lender?**

A It's SG Capital.

**Q Okay. And SG Capital, again, it was an oral discussion?**

A I called them immediately when I left the

meeting with my bank and said, "Hey, I just got approval to do a second mortgage, would you guys do the same thing?" They said yes.

**Q Okay. And you -- what did you use the loan proceeds for here?**

A Toval Ventures was actually an unsecured -- an unsecured lender of mine. So what they did was -- and I think there's somewhere in the documents where it says this, but they basically rolled several of my balances into a -- into this loan and I ended up with about $800,000 of cash.

**Q So this was cash that went to you personally?**

A No, no.

**Q You signed the Ridge Best Living, LLC one as CEO and owner. Was that another instance of someone else populating that or...**

A Yeah, I've got -- that's -- I mean, I've got my -- let's see here. I was actually looking at how these were signed. I've got Putnam Green as authorized signer, which is correct. Louis Investments as manager of mortgagers, which is correct, and Auerbach-Vesta, LLC as authorized, signer that makes sense.

Oh, I -- yeah, I guess that is -- as you

can tell, that is Camille's handwriting. Camille just didn't realize that I'm -- she -- I don't think she understood what she was signing here on my behalf. Louis Investments, I am the owner of. I think she just signed that incorrectly.

Actually, if you follow to the next -- to the signature pages, it's actually correct. Ridge Best Living, LLC is authorized signer.

**Q Right, but there is at least one place where it says CEO owner --**

A Yeah, that was that -- yeah, that -- Camille just -- that was just --

**Q And the same the Woodland Manors Best Living, LLC, right?**

A I was just about to go to that. Yeah, she seems to have done the same thing here.

**Q And these mortgages were recorded, right?**

A Yes.

**Q Okay. So the -- the world is being told here that you are a CEO, owner on behalf of those entities --**

A I mean, there is no CEO of those entities, so I mean, it's a mistake -- that's just a mistake --

MR. BRODSKY: Form.

A -- there's no other way to say.

MR. BRODSKY: Madam court reporter, I tried to object to the form on that question. The witness jumped in a little fast.

**Q (By Mr. Tasca) Okay. And then the next one is the -- the next BH Capital refinance, right?**

MS. ALBERTO: This is 46.

(Deposition Exhibit No. 46 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) And, again, you have a representation in here that you have authority to sign on everyone's behalf and go through all the signatures and you signed as owner on their behalf?**

A This document was the same document as you -- as Exhibit 44.

**Q Oh, I thought this was a -- oh, sorry. It's because we're jumping around out of order. Apologize. So we're up to --**

MS. ALBERTO: I think you just referenced it twice in your outline, yeah.

MR. TASCA: Yeah, maybe I did. Sorry about that, Marc.

THE WITNESS: No problem.

MR. TASCA: How about this one?

MS. ALBERTO: We did that one?

MR. TASCA: We did. We did.

**Q (By Mr. Tasca) All right. We don't necessarily need to mark it, but you did get a BH Capital Group MCA on July 10th, 2025, right, which was a re -- I assume another refinance? That one for 3,350,000.**

A That sounds right. It seems like on -- on Exhibit 44, you have all of the BH Capital.

**Q They're all -- they're all there. Okay. Fair enough. So as long as those are all what they purport to be and you can tell me, then we can just skip the BH Capital Group stuff.**

**All right. This is 47?**

MS. ALBERTO: Yes.

(Deposition Exhibit No. 47 was marked for identification and made part of the record.)

MR. BRODSKY: Can you put it up on the screen, please?

**Q (By Mr. Tasca) All right. If you could flip back to Page 6776 of Exhibit 47.**

MR. BRODSKY: Can somebody put it on the screen, please?

**Q (By Mr. Tasca) All right. Is this an MCA that you got from Ocean Funding on July 10, 20 -- 2025?**

A Yes.
**Q And this one is -- is it $2 million?**
A Yes.
**Q Okay. And there's a representation in here that you have authority to sign on everyone's behalf and then on 6785 you do sign on behalf of a number of entities.**
**Do you see that?**
A Yes.
**Q Did the senior lenders on these properties know about this loan?**
A Actually, they have four of the same -- again, when they use these additional entities, these aren't -- these don't come from us. So they just -- they just errantly put Thrive Argenta owner, Argenta's Best Living, Argenta's Best Living Investors, and Argenta, LLC, are all the same -- are all the same structured entities and two of those entities I think no longer exist when they were rolled up. So -- and Briarwood's Best Living was sold in 2022. Spring Valley was sold in 2023.
So they just -- I mean, that's why -- this is actually why I never paid much attention to these additional entity exhibits, because they would just throw stuff against a wall.

**Q All right. So none of those entities exist anymore, is what you're saying?**

A Correct.

**Q So, again, you were pledging nothing to get this MCA loan?**

MR. BRODSKY: Objection to the form.

A I would agree with that.

MS. ALBERTO: 48.

(Deposition Exhibit No. 48 was marked for identification and made part of the record.)

**Q (By Mr. Tasca) So 48 is an email string from July of 2025, and to kind of cut through this, it looks like you're proposing to try to get a loan, right?**

A Yes and no. This is a -- this was a little more complicated than that, but yes.

**Q Okay. You mention a mortgage here, so you were proposing that a mortgage be part of this deal?**

MR. BRODSKY: Objection to the form.

A No, they -- they proposed the mortgage.

**Q (By Mr. Tasca) Okay. And did this deal ever go through?**

A No, it did not.

**Q What properties did this deal involve?**

A It -- it didn't happen.

**Q Right. I see a reference to Woodland Oaks Best Living?**

A Correct. Mike Shabsels was trying to buy a property from us that he never bought and he couldn't go up on price. So what he said is, "I can give you a loan in lieu of going up on price and the loan would be at, like, two percent annual interest," and we lost it over the negotiations.

MS. ALBERTO: 49.

(Deposition Exhibit No. 49 was marked for identification and made part of the record.)

MR. TASCA: What about this one?

A What the fuck? This can't be real.

**Q (By Mr. Tasca) What's the matter?**

A This can't be real.

MR. BRODSKY: Hold on. Hold on. Can I see what the document is, please? Can someone put it on the screen for me, please?

A Oh, okay this was never filed. Sorry. Okay I'm with you.

**Q (By Mr. Tasca) All right. So --**

MR. TASCA: Do we have all three? You don't have these?

MS. ALBERTO: They might be mixed in here.

**Q (By Mr. Tasca) All right. So Exhibit 49,**

**Marc, is one of three separate second mortgages, assignments of leases and rents, security agreements and fixture filings dated 7-25-25 in favor of Damis and we're only looking at the one mortgage here, the Fairfax Best Living, but would you agree with me that there's also Woodland Oaks Best Living, LLC, and BJ WooodScape Oklahoma City mortgage?**

A These were -- that's what these documents are, but they were never recorded.

**Q Right, but they were signed, right?**

A Yes, we got -- the -- the deal with Damis fell apart. Damis was supposed to be the buyer of Tuscany Village and that's what this was tied to.

**Q Right. Okay. But you -- the money here that was paid, the $1.5 million that these three mortgages were securing, that was actually loaned?**

A No, what ended up happening was Damis ended up doing a loan against my personal home to give me excess cash and we scrapped this and we never moved forward with the Tuscany Village purchase.

**Q Okay. So these were signed but never --**

A Correct.

**Q -- the loan was never made?**

A Correct. They did make a loan that was

done to make a mortgage against two of my personal homes.

**Q Right. Okay. And I believe there is a -- but there was a -- again, because we've -- to save time, there appears to be a second mortgage dated July 25th, 2025 in which you and Alicia are giving a mortgage to Damis?**

A Yes, on our personal homes, yes.

**Q To secure a $1.5 million loan secured by Lot 3, Aventino.**

A Yes.

**Q What's that?**

A That's a home that Alicia and I own in Kansas City.

**Q Okay. Did you tell YSA you were doing that?**

A I don't know.

MR. BRODSKY: Object.

**Q (By Mr. Tasca) And I realize that the money was never lent, but those three mortgages we were talking about for Fairfax, Woodland Oaks and BJ WoodScape, did you speak with any of the other members or -- or stakeholders in those entities to -- before you signed those mortgages?**

A We were actively in negotiations with the

Fairfax and Woodland Oaks lender. They had -- they were working on getting approval for us to do a second mortgage, but then they tied it to wanting a -- to wanting a -- the money to be used to pay down their mortgage principal, but no, I did not speak to any of my investors.

**Q Okay. But signed for those entities nonetheless?**

A Correct.

**Q All right. Then there was another -- I think we talked about this, another BH Capital Group MCA dated July 28th, 2025?**

A Correct.

**Q Does that sound right?**

A I don't remember off the top of my head, but I'm okay with that.

**Q And then there was another one on August 6, 2025?**

A Yes, and we've already discussed that one.

**Q The August 6th one, did we? Okay. All right. In all of those, you were pledging nothing essentially to get the money pursuant to the MCA loan?**

MR. BRODSKY: Objection to the form.

MR. TASCA: All right.

(Sotto Voce conversation.)

MS. ALBERTO: We're waiting on more exhibits, which I'm also including since you asked for all three of them, that is what's being printed.

MR. TASCA: Okay.

**Q (By Mr. Tasca) Did you also make a -- get a loan from Low Tour (Phonetic) and sign a mortgage?**

A Yes.

**Q And that was recorded, wasn't it?**

A Yes, it was.

**Q Did you get permission from the senior lender to get that mortgage loan?**

A Yes, I did.

**Q Okay. Is there any documentation of that permission?**

A No, similar.

MR. BRODSKY: Doing all right, Marc?

THE WITNESS: Yeah.

MR. TASCA: All right. Well, we're in luck, because I think the Court just granted our motion to continue the hearing. So we can -- we can end this so Marc can get home and we can finish this deposition up another day.

MR. BRODSKY: Can you forward that to me just so I can look at it, because I don't have a

copy?

MR. TASCA: Yeah, I can and I'm going half cocked here too. I just saw an email, so --

UNIDENTIFIED SPEAKER: Ben, I can forward it to you right now. I'm at my computer.

MR. TASCA: All right. Since we're out of documents, my suggestion is we just -- we just end it and, Marc, I promise I'm trying to move quickly. I only need a couple more hours maybe with you when we can.

THE WITNESS: Okay.

MR. TASCA: So we'll -- we'll set that up so, you know, assuming Ben -- Ben is okay with that.

MR. BRODSKY: Well, first let me just look at this document.

MR. TASCA: Yeah, yeah, yeah, sure. We can go off the record I think.

THE VIDEOGRAPHER: Off the record. The time is 4:48.

(A recess was taken from 4:48 p.m. to 4:53 p.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:53.

MR. BRODSKY: So we're not going to trial January 15th, so we will agree to suspend Marc's deposition.

I think we should agree to some reasonable additional amount of time. I understand you guys have to get some more documents, but we can meet and confer on that after we get a sense of what that document production is going to look like.

MR. TASCA: Yep, that makes sense. Appreciate that.

MR. BRODSKY: All righty. We'll be in touch. Marc, I'll give you a buzz as you're walking out.

THE WITNESS: Okay.

MR. TASCA: So just -- officially, we'll leave the deposition open and we'll meet and confer and come up with an agreement on how we're going to proceed to its conclusion.

MR. BRODSKY: Yep.

MR. TASCA: We can go off.

THE VIDEOGRAPHER: Okay. We're off the record. The time is 4:54.

(Deposition suspended at 4:53 p.m.)

JURAT

STATE OF OKLAHOMA

SS

COUNTY OF TULSA

I, MARC KULICK, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place, except for the corrections noted.

_______________________

Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, MARC KULICK, on this ______ day of ______________, 2025.

_________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES: ____

# ERRATA SHEET

REPORTED BY: SHANNON S. HARWOOD, CSR, RPR, CRR

DATE OF DEPOSITION TAKEN: DECEMBER 30, 2025

JOB FILE NO. 178707

| PAGE | LINE | IS | SHOULD BE |
|---|---|---|---|
| | | | |

C E R T I F I C A T E

STATE OF OKLAHOMA )
COUNTY OF TULSA )

I, Shannon S. Harwood, a Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that the foregoing is a true and correct transcription of my shorthand notes of proceedings had in Case No. N25C-10-309 heard on the 30th day of December, 2025, and is only valid with my stamped seal and my original signature.

I further certify that I am not related to nor attorney for either of said parties nor otherwise interested in said action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 8th day of January, 2026.

Shannon S. Harwood, CSR, RPR, CRR

**WORD INDEX**

< $ >
**$1.5** 243:*15* 244:*9*
**$11** 117:*15, 19*
**$150,000** 134:*16*
**$2** 240:*2*
**$22** 89:*3*
**$25,000** 52:*1*
**$3,375,000** 233:*12, 14*
**$300,000** 171:*15*
**$336,000** 85:*9* 86:*11*
**$37** 166:*3*
**$4** 231:*19*
**$5** 229:*17, 19, 21*
**$50,000** 35:*7*
**$6** 127:*2*
**$800,000** 236:*11*
**$850,000** 55:*15*

< 0 >
**002540** 188:*17*

< 1 >
**1** 1:*6* 12:*18* 14:*7, 12* 68:*5* 123:*22* 184:*1*
**1,1** 38:*24*
**1.1** 38:*21*
**1.25** 57:*6* 185:*6*
**1.5** 57:*2, 4* 185:*7*
**1/13/25** 3:*10*
**1/21/25** 3:*10*
**1/24/25** 3:*10*
**1/30/25** 3:*10*
**1:41** 160:*6, 7*
**1:57** 160:*7, 9*
**10** 3:*10* 51:*10* 53:*17, 19* 54:*2* 73:*16* 132:*1* 170:*13* 182:*5, 6, 8, 18* 227:*19* 239:*24*
**10/11/24** 4:*17*
**10/2/24** 3:*8*
**10/5/25** 5:*7*
**10:20** 72:*21, 22*
**10:52** 72:*22, 24*
**100** 184:*16*
**1010** 118:*15* 173:*20*
**10188** 29:*18*
**10226** 29:*18*
**105** 3:*24* 4:*2*
**106** 4:*3, 4, 5*
**10-8-24** 196:*17*
**10845** 2:*10*
**10-day** 52:*2*
**10th** 54:*25* 55:*12* 231:*20* 239:*4*
**11** 3:*10* 54:*5* 191:*13*
**11/20/25** 4:*6*
**11/5/25** 4:*10*
**11/6/24** 4:*17*
**110** 6:*8*
**1113** 80:*22*
**1114** 80:*22*
**114** 4:*6*
**11-4-24** 196:*2*
**11-6-24** 200:*2*
**11-6-25** 130:*15*
**12** 3:*10* 54:*7* 130:*18* 132:*3*
**12.7** 127:*2*
**12/18/24** 5:*2*
**12:02** 122:*7, 8*
**12:50** 122:*8, 10*
**125** 134:*16*
**12779** 195:*22*
**12810** 197:*23, 24, 25* 198:*1*
**12847** 205:*2*
**13** 3:*10* 54:*9* 95:*6* 193:*4* 233:*11*
**130** 4:*6*
**131** 4:*6, 10*
**13E** 220:*2*
**14** 3:*10* 55:*8, 9*
**1429** 41:*7*
**1434** 28:*3*
**1442** 30:*20*
**1443** 38:*24*
**15** 3:*10* 56:*24* 98:*2, 3*
**150,000** 183:*20* 184:*16*
**150K** 184:*15*
**15th** 125:*25* 247:*24*
**16** 3:*10* 23:*20* 58:*22, 23, 25* 89:*11*
**160** 4:*10, 13*
**17** 3:*10* 56:*12* 57:*11* 59:*9, 24* 61:*2* 74:*1* 78:*7, 11, 14, 15* 92:*11* 95:*5*
**178707** 250:*4*
**179** 4:*14*
**17th** 122:*20* 224:*7*
**18** 3:*20* 57:*10* 80:*22, 23* 85:*3* 97:*21* 98:*19*
**187** 4:*17*
**1880** 126:*7*
**18th** 56:*14, 21* 57:*2, 14* 58:*1* 93:*11*
**19** 3:*6, 20* 85:*2, 3, 4, 5*
**19:45:29** 63:*11*
**195** 4:*17*
**199** 4:*17*
**19th** 123:*13*
**1st** 124:*3*

< 2 >
**2** 3:*6* 19:*16, 17, 20* 68:*5*
**2/10/25** 3:*10*
**2/18/25** 3:*10, 23*
**2/2/25** 4:*13*
**2/4/25** 3:*10*
**2:46** 195:*10, 11*
**2:58** 195:*11, 13*
**20** 3:*23* 4:*10* 93:*6, 7* 220:*1* 239:*24*
**200** 2:*4* 185:*22*
**200,000** 183:*4*
**2005** 132:*5*
**2011** 117:*14, 19*
**2017** 15:*4*
**202** 4:*21*
**2022** 169:*24* 240:*21*
**2023** 240:*21*
**2024** 21:*13* 22:*6* 52:*12* 189:*6* 194:*15* 196:*16*
**2025** 1:*11* 4:*10* 6:*7* 7:*4* 14:*21* 54:*15, 16, 25* 57:*10* 98:*19* 108:*6* 119:*7* 132:*16* 139:*5, 7, 15* 146:*20* 164:*7* 179:*12, 20* 189:*7* 190:*5* 224:*7* 229:*9* 231:*20* 233:*11* 239:*4, 25* 241:*12* 244:*6* 245:*12, 18* 249:*18* 250:*3* 251:*10*
**2025,02,18** 63:*11*
**2025-1319-MTZ** 1:*5*
**2026** 251:*16*
**208** 4:*22*
**21** 3:*7, 24* 105:*13, 21* 106:*14*
**211** 4:*22*
**21-24** 54:*1*
**218** 5:*2*
**21st** 2:*4* 53:*14* 54:*14* 170:*15*
**22** 4:*2* 105:*23* 106:*13* 129:*24* 199:*21*
**2200** 1:*17*
**22283** 199:*22* 200:*20, 22*
**224** 5:*2*
**2-25** 164:*5*
**22587** 85:*9*
**228** 5:*2*
**229** 5:*2*
**22-CV-00392-JFCDL** 34:*25*

**23** 4:3 105:25 106:17
**231** 5:7
**23283** 199:18
**233** 5:7
**238** 5:10
**239** 5:10
**24** 4:4 68:4 106:2, 18 164:9 188:16
**241** 5:10
**2416** 220:1
**242** 5:14
**2421** 220:9, 20
**24th** 22:6 54:15 201:5
**25** 4:5 68:4 106:4, 18 122:18 125:8 139:21 164:10 201:5 224:21
**25,000** 52:3
**2524** 191:13
**2541** 193:22
**2542** 190:24 194:1
**25th** 244:6
**26** 4:6 114:3, 4 116:3 132:5, 16
**266** 89:12
**27** 4:6 129:25 130:1, 2 131:12
**2727** 2:4
**28** 4:6 131:5, 6, 16 152:3 178:21
**28th** 45:15 245:12
**29** 3:8 4:10 52:16 131:8, 9 132:8, 9 146:17

**< 3 >**
**3** 3:7 16:21 21:17, 18 22:12 52:15 244:10
**3,350,000** 239:6
**3.5** 34:23
**3/19/25** 3:24
**3:09** 201:23, 24
**3:11** 201:24 202:1
**3:28** 95:12
**3:50** 227:21, 22
**30** 1:11 4:10 6:7 153:2 161:16, 22 164:15 165:23 250:3
**300** 185:23
**305.303.5054** 1:18
**30D** 160:22
**30th** 7:3 54:15 251:9
**31** 4:13 161:16, 22 162:8, 9, 10, 11 165:25
**3-19-25** 106:14
**31st** 107:11 108:6 123:15 128:15 185:19
**32** 3:9 4:14 178:22, 23 179:1, 2, 3, 8, 9, 22
**33** 4:14 179:1, 2, 5, 9 181:5
**33130** 1:18
**336,000** 86:1
**337** 41:18, 22
**338** 41:18, 22, 23
**34** 4:17 20:4 26:10 187:15, 16, 18, 23, 25
**3437** 25:14
**3438** 26:11
**3439** 26:14
**3440** 26:15
**3441** 26:15
**3448** 25:14
**35** 4:17 195:14, 15, 16, 18 203:21, 24
**36** 4:17 199:20, 21, 23
**37** 4:21 166:8, 12 171:1, 7, 24 202:3, 4, 8
**375** 233:15
**38** 4:22 208:12, 15, 17
**39** 4:22 211:21, 22, 24
**3rd** 229:9

**< 4 >**
**4** 22:20 25:4, 5 28:3 29:15 30:18 59:9 231:18
**4.3** 35:4
**4.5** 39:23 40:15
**4.6** 35:16
**4/23/25** 4:22
**4/4/25** 4:21
**4/9/25** 4:2
**4:15** 227:22, 24
**4:48** 247:19, 20
**4:53** 247:20, 22 248:20
**4:54** 248:19
**40** 5:2 217:23 218:1
**41** 5:2 223:23 224:1
**42** 5:2 228:1, 2
**4-21-25** 203:25
**4-23-25** 208:19
**43** 5:2 229:3, 4, 5, 8
**44** 1:17 5:7 231:9, 10 238:15 239:8
**45** 5:7 233:2, 4, 8
**450** 183:21
**46** 5:10 229:2 238:7, 8
**47** 5:10 239:13, 15, 20
**48** 5:10 241:8, 9, 11
**480,000** 183:14
**49** 5:14 242:9, 10, 25
**4-9-25** 106:14
**4C** 99:24, 25 100:5
**4th** 53:5 54:16 55:7 196:16

**< 5 >**
**5** 25:10, 11, 18 27:14, 21
**5.2** 37:24
**5/22/25** 4:22
**5/23/25** 5:2
**50,000** 177:13
**500,000** 183:15
**51** 3:10
**5-22-25** 211:25
**5-23-25** 218:4
**53** 3:10
**5357** 213:15
**5358** 216:5
**54** 3:10
**55** 3:10
**5588** 231:8, 15
**57** 3:10
**58** 3:10
**5-9-2025** 42:17
**5C** 42:11

**< 6 >**
**6** 3:8 29:17, 19 136:8 245:18
**6/18/25** 5:10
**6/19/25** 4:3
**6/23/25** 3:20 5:7
**6/6/25** 5:2
**60** 33:25 153:2
**600** 2:11
**600,000** 183:10
**6-19** 106:17
**64** 68:4
**65** 68:4
**65418** 34:1
**6776** 239:20
**6785** 240:6
**67th** 123:21 124:6 137:23
**6th** 229:11 245:20

**< 7 >**
**7** 3:9 32:18, 19
**7.5** 40:23
**7/16/25** 4:4
**7/23/25** 5:10
**7/25/25** 5:14

**7/31/25** 4:*5*
**702.792.3773** 2:*12*
**7-16** 106:*18*
**7-25-25** 243:*3*
**727** 177:*5*
**7-31** 106:*19*
**74114** 2:*5*
**78** 3:*10*

**< 8 >**
**8** 3:*3* 41:*8*, *9* 52:*12* 78:*21* 79:*24*
**8/21/25** 3:*10*
**8/6/25** 4:*6*
**8/7/25** 5:*10*
**8:17** 1:*11* 7:*4*
**80** 3:*20*
**800,000** 184:*3* 223:*2*
**844** 78:*5*
**8448** 72:*2* 78:*5*
**8449** 72:*2* 78:*5*
**85** 3:*20*
**89135** 2:*11*
**8th** 23:*14* 25:*3* 28:*16* 30:*2* 51:*4*, *24* 251:*16*

**< 9 >**
**9** 3:*10* 51:*11*, *12*, *16*
**9/29/25** 3:*20*
**9/8/25** 4:*17*
**9:26** 50:*11*, *12*
**9:46** 50:*12*, *14*
**900,000** 196:*13*
**918.747.8900** 2:*5*
**93** 3:*23*
**9557** 14:*8* 15:*1*
**9570** 14:*8*
**970,000** 189:*17*
**9924** 22:*20*
**9-9-24** 22:*24*

**< A >**
**A.M** 1:*11* 50:*12* 72:*22*
**abandoned** 132:*19* 176:*18*, *19*
**abandoning** 177:*9*
**ABC** 62:*24*
**ability** 9:*19* 60:*7* 68:*17* 144:*20*
**able** 13:*12*, *17* 14:*1* 79:*16* 90:*21* 104:*21* 127:*10* 130:*20* 132:*5*, *15* 134:*8* 135:*23* 142:*18* 150:*9*, *20*, *21* 156:*4* 176:*6* 181:*22* 226:*6*
**abscond** 63:*14*
**absolutely** 54:*22* 83:*11*, *13* 84:*25* 137:*1* 141:*2*, *23* 147:*4* 156:*3* 178:*19*
**acceleration** 38:*3* 152:*10*, *23* 192:*16*
**accept** 148:*16* 224:*24* 227:*6*
**acceptable** 156:*6*
**access** 126:*11* 186:*17*, *19*, *22* 187:*4*, *7*, *11* 210:*9*
**accessible** 43:*1*
**accident** 188:*15*
**accomplish** 61:*21*
**account** 116:*17* 169:*9*, *10* 170:*18* 187:*5* 216:*24*
**accountable** 152:*24*
**accounted** 170:*6*
**accounts** 186:*23* 216:*24*
**accretive** 82:*10*
**accurate** 34:*19* 44:*8* 45:*25* 104:*24* 138:*4* 164:*4*, *5*, *15* 165:*22* 174:*21* 178:*7* 181:*12* 192:*20* 230:*24*
**accurately** 8:*25* 9:*20* 168:*3*
**ACH** 116:*15* 117:*9*
**achieve** 73:*3* 156:*11*
**acquire** 31:*9* 39:*7*
**acquired** 147:*5*
**acquisitions** 181:*11*
**act** 40:*17* 155:*1* 158:*16*, *17*
**action** 8:*19* 35:*21*, *25* 36:*4* 38:*7* 73:*5* 99:*1* 144:*20* 147:*14* 148:*11* 149:*13*, *21* 150:*6* 151:*4*, *12*, *13* 154:*21* 155:*9*, *11*, *12* 156:*5*, *8* 158:*7* 193:*2* 251:*14*
**actions** 112:*19* 155:*23* 156:*2*, *6* 157:*7*
**active** 183:*24* 184:*22*
**actively** 129:*1* 244:*25*
**actual** 46:*19* 123:*10* 167:*24*
**ad** 133:*16*
**adamant** 115:*12*
**add** 39:*19* 59:*21* 61:*6* 69:*21*, *24* 78:*17* 93:*3* 95:*14* 96:*11*, *12* 97:*12* 182:*12*, *22* 183:*3*
**added** 52:*2* 69:*17* 72:*9*, *15* 190:*25*
**addendum** 205:*2*
**adding** 66:*3* 95:*4* 96:*7* 166:*7* 220:*18*
**addition** 27:*20* 133:*12*
**additional** 52:*1*, *2* 57:*20*, *23* 58:*3* 63:*24* 66:*3* 94:*16* 96:*7* 97:*11* 185:*13* 196:*24* 197:*1* 216:*9* 240:*13*, *24* 248:*2*
**addressed** 76:*18*
**adds** 95:*21* 166:*7*
**adjective** 82:*13*
**admit** 53:*23*
**Advance** 4:*21* 185:*13* 202:*10*, *12*, *22*, *25*
**advances** 185:*16*
**affect** 9:*19* 109:*6* 195:*25* 222:*4*
**affidavit** 131:*18*
**affiliate** 47:*13*, *16* 69:*14*, *16* 89:*14*, *23* 90:*9*, *22* 91:*11* 92:*14* 95:*15*, *21*, *22*
**affiliated** 12:*1* 188:*5* 205:*11*, *17* 208:*24* 209:*1*
**affiliates** 46:*11* 47:*1*, *4*, *7* 48:*16* 89:*22*
**affiliation** 16:*14* 212:*13*
**affirmative** 175:*17* 193:*3* 207:*24* 211:*19* 217:*25* 225:*7*
**agency** 152:*19*
**ago** 117:*23* 183:*1*
**agree** 10:*2* 17:*6* 41:*2* 44:*24* 47:*24* 92:*17* 98:*19* 105:*19* 107:*3* 145:*13* 155:*5* 162:*20* 178:*6* 179:*23* 180:*1*, *6*, *21* 195:*3* 228:*23*, *24* 232:*13* 241:*7* 243:*5* 247:*24* 248:*1*
**agreed** 6:*2* 66:*18* 68:*20* 123:*14* 141:*16* 142:*22* 184:*3*

**agreement** 6:5 28:8 38:6 40:24 65:8, 9 86:10 90:11, 13 91:23 98:18 126:11, 14 136:22 157:9, 20 170:14 175:14, 16 188:1, 9 191:12 193:11, 14 195:1 220:4, 6 222:12 232:5, 11 234:9, 17 235:6 248:14
**agreements** 17:9 18:7, 14 126:2 137:12, 20 138:12 140:25 141:10 145:6, 14, 25 174:12 186:3, 13 198:21 212:20 215:20 218:23 219:9 226:2 233:11 234:11, 15 243:2
**ahead** 15:16 21:8 23:20 34:14 60:2 146:24 159:3 167:17 170:2, 12
**AJ** 3:8 11:6 26:20, 22 30:9
**AJ's** 30:7
**alarmed** 97:16
**albeit** 42:12
**Alberta** 2:15
**Alberto** 7:20, 24, 25 13:7, 14, 25 14:9 32:14, 17 41:14, 18, 22 42:3, 8 51:11, 15 53:8, 13, 16, 18, 22, 25 54:2 55:2, 5, 8 58:12, 17, 19, 22 72:7, 9, 14 78:6, 8, 10, 14 79:22 80:25 93:6 97:24 98:11 100:3, 14 105:14 114:3 116:3 129:25 130:10 131:5, 8, 23 132:11 161:18 178:23 179:1 187:15, 17, 21 195:14 197:23 199:20 200:8, 11, 13, 18, 21 202:7 203:20 208:12 211:21 217:17, 20, 22 223:6, 10, 15, 18, 22, 25 229:1, 4 231:9 233:2 238:7, 19, 25 239:14 241:8 242:9, 24 246:2
**alert** 35:7
**Alex** 206:7
**Alicia** 244:6, 13
**alive** 186:5
**allocated** 172:5
**allocation** 171:23
**allow** 13:9
**allowed** 52:7 156:2
**allows** 179:16
**Alona** 210:16
**alongside** 229:18
**Alta** 130:19 132:4, 14 135:23
**alter** 60:20
**alternatively** 124:23
**ambiguous** 92:4
**ameliorated** 74:13
**amended** 3:6 20:3
**American** 5:2 183:23, 24 218:4, 10, 17 219:2, 8, 13 222:25 224:11, 12 225:4
**amicable** 142:11
**amount** 35:5, 11 44:14, 16 51:23 56:15 57:5 73:16, 25 74:2 75:5 107:13 119:3 120:4 124:24 165:5, 7, 16, 19, 20 175:13 188:20 189:16 203:10 248:2
**amounts** 35:24 43:12 96:17, 19 172:9 177:13 183:2
**analysis** 162:5
**ancillary** 166:4
**and/or** 30:21 48:25 49:17 218:17
**Andrew** 2:3 7:10
**Andy** 160:2
**annual** 86:9 107:12 242:7
**answer** 8:25 12:4, 5 16:12 21:10 31:14 45:3 46:16 47:18 50:3, 21, 24 59:19 62:15 64:13 67:4, 18 69:12 70:12 81:24 83:25 86:19, 24 91:17, 20 92:22 96:25 99:4 108:4, 11 113:23 114:8 115:11 146:25 148:3 149:24 150:8, 9, 12, 21 151:6 169:2 194:11, 25 212:22 214:12 227:11
**answered** 149:10
**answering** 47:4
**answers** 9:11 15:8, 11, 18, 20
**anticipate** 133:11
**anticipated** 173:24
**anti-stacking** 209:22 212:20 218:23
**anybody** 7:18 16:7 205:16 211:2, 11 218:20 234:23
**anymore** 60:13 77:4, 7 221:9 241:2
**apart** 128:5 243:12
**apartment** 9:23
**Apartments** 123:20 129:4, 9 229:24
**Apollo** 184:7, 9
**apologize** 153:17 192:3 238:18
**apostrophe** 197:19
**appear** 54:14 55:11 233:9
**APPEARANCES** 1:14, 23 2:1
**appears** 28:6 32:22 41:11 54:17 116:4 196:4, 14 202:9 203:24 208:17 211:24 218:3 244:5
**applicable** 37:5 39:6 78:2 103:18
**application** 4:17, 21, 22 5:2, 10 187:1, 10 200:1 201:5, 6, 8 202:9
**applies** 94:21 235:16
**appointed** 128:17, 22
**appointment** 128:23
**appreciate** 60:24 64:23 248:7
**apprised** 137:5
**approach** 64:17
**approached** 21:13, 15 22:8
**approaching** 164:22
**appropriate** 17:13 186:7
**approval** 16:22 17:1, 14 136:12, 14, 18 138:16, 18, 20, 21 142:1, 3, 6 143:1 144:7 145:5, 11, 17

146:20 149:4 155:4 157:23 158:5 188:19 205:6 214:3, 4, 5 224:22 225:15, 16, 19, 20 236:2 245:2
**approvals** 137:19 145:1 226:7
**approve** 234:6
**approximately** 7:4
**April** 22:6 69:20 164:12 194:15 196:8 204:21
**arbitration** 184:8, 11 207:10 208:3, 4, 9
**area** 102:13 143:20
**Argenta** 141:16 143:11 216:13 240:15, 17
**Argenta's** 240:16
**argue** 64:8, 9, 12, 24 84:14
**argued** 97:19
**arguing** 91:14, 15
**argumentative** 64:18
**Arkansas** 9:24 10:8
**articulate** 69:5
**articulated** 63:19 66:6 75:13
**articulating** 90:20
**articulation** 73:2
**ashank@ellerdetrich.com** 2:6
**aside** 69:3 107:3 117:25 145:12, 17, 19 146:8 184:11
**asked** 15:9 34:17 70:10, 14 97:2 115:8 119:5 132:2 143:24 152:13 153:17 189:21, 23 190:14 198:23 222:14 246:3
**asking** 13:3 18:24 21:21 48:20 57:13 67:6 73:22 88:9 91:21 94:16, 17 97:17 104:23 115:21 125:14 158:4 189:22 207:12 235:6
**aspects** 181:9
**ASSET** 1:3 10:12, 24 11:1, 18 12:7, 9 30:14 31:3, 7, 18, 21 32:1 33:16, 18, 21 34:2, 8 39:14, 16 56:5 69:14, 16 74:12, 18 75:10 76:12 89:13, 23, 24 90:2, 8, 22 91:10 92:9, 13 95:15 101:1, 25 102:19 120:24 122:1 134:11 143:12 147:15, 20 148:10 149:12 167:6, 8 180:11 181:10
**asset-by-asset** 85:16
**assets** 40:12 90:3, 4 92:10 95:5, 21 173:9, 14 213:1, 16, 23 220:22 221:15, 16 232:9, 14
**assignment** 221:21, 25
**assignments** 233:10 243:2
**assist** 121:7 184:18, 19 185:6
**associate** 8:4 24:22
**assume** 20:20, 24 127:7 169:13 173:4 177:14 178:10 182:9 200:2 210:5 239:5
**assumed** 40:6
**assumes** 103:9 126:16
**assuming** 94:1 150:22 214:22 247:13
**assumption** 127:6 165:10 189:10, 12
**attached** 15:7 78:18 188:9 197:16 228:20
**attempt** 110:17 136:23
**attention** 198:11, 15 240:23
**attorney** 20:13 21:3 27:2 35:16, 18 36:11, 16 161:13 226:3 251:13
**attorney-client** 149:25 151:5, 8
**attorneys** 6:4 8:23 17:22 156:9, 13 190:14 210:5
**Auerbach-Vesta** 236:23
**August** 18:25 19:1, 7 139:5 146:20 190:12 245:18, 20
**Austin** 188:23 197:15, 18, 21 207:4, 7
**authenticate** 54:13 105:9, 17 106:21 141:5, 13
**authenticated** 113:10
**authentication** 177:19
**authority** 19:3 138:24 139:1, 11, 18, 22 145:9, 16 160:22 199:10, 12, 15 216:1 220:5 221:5 225:1 226:9 230:4, 9, 18 238:11 240:5
**authorization** 153:18 154:1, 22, 23 157:15
**authorize** 228:12
**authorized** 49:5 148:10 154:7 155:23 156:15, 22 158:9 220:7 236:21, 23 237:8
**automatic** 186:18
**AV** 216:14
**AV23** 210:16 211:2, 5
**available** 77:16 203:7
**Aventino** 244:10
**Avenue** 6:8
**avoid** 150:17
**awaiting** 129:11
**aware** 147:11, 12 148:23, 25 149:7 153:3, 5
**awhile** 9:2 18:20 74:24 138:23

**< B >**
**B&SK** 228:5, 6
**back** 11:24 26:10 29:15 30:18 38:20 47:22, 23 50:5, 13 51:3 52:12, 25 54:20 56:15 59:19 68:2, 3 69:23 72:23 84:5 89:11 92:5 100:12 115:3, 24 118:4 121:9 122:9 123:14, 15 124:22 127:11 139:15 149:9 160:8, 25 163:8 165:10, 14, 17, 20 170:10, 13 171:18, 20 172:11 173:3 180:18 184:9 190:24 191:11 194:21 195:12, 22

200:*10* 201:*25* 203:*21*, *23* 205:*1* 211:*15*, *18* 214:*22* 215:*1*, *6*, *8* 222:*22* 227:*23* 231:*14* 239:*20* 247:*21*
**B-A-C-K** 197:*19*
**Back'd** 183:*16*, *17* 188:*3*, *23* 189:*8*, *10*, *13* 197:*17*, *19* 204:*13*, *14* 207:*6*, *17*, *18*, *19*, *20* 209:*4* 212:*8*, *13*, *16*
**back-filed** 190:*13*
**backtracking** 44:*12*
**backup** 190:*14*
**bad** 76:*16* 111:*25*
**badly** 127:*15*
**balance** 57:*4* 138:*4* 164:*17* 165:*4*, *15* 167:*4*, *6* 170:*21* 172:*5*, *22* 183:*18* 184:*1*, *13*, *14* 185:*5*, *20* 189:*11*
**balances** 236:*10*
**bank** 116:*23* 117:*3*, *7* 169:*8*, *9* 170:*18* 186:*11*, *16*, *23* 187:*3*, *5* 216:*23*, *24* 233:*25* 235:*2* 236:*1*
**banking** 116:*18*
**banks** 210:*9* 214:*5*
**bank's** 117:*7*, *8*
**Barcelona** 47:*15* 210:*15* 216:*14*
**bargained** 214:*16*
**Bartlesville** 216:*12*
**base** 33:*14*
**based** 22:*7*, *10* 104:*9*, *11* 111:*13* 112:*12* 146:*8* 150:*3* 187:*10* 193:*2* 195:*3* 219:*3*
**basically** 8:*23* 13:*19* 81:*14* 105:*16* 123:*24* 132:*3* 163:*3* 176:*18* 194:*24*, *25* 197:*11* 222:*6* 234:*17* 236:*9*
**basis** 49:*12* 67:*5*, *10* 85:*16* 106:*7* 107:*12* 120:*7* 127:*1* 145:*8*
**Bate** 42:*9*
**Bates** 14:*5* 22:*20* 23:*21* 25:*13* 28:*4* 30:*19*, *20* 41:*7*, *17* 78:*5* 89:*12* 98:*6* 199:*22*
**bathroom** 9:*3*
**battery** 109:*9*
**battle** 148:*4*
**battles** 119:*9*
**Bayview** 153:*13*
**bbrodsky@bfwlegal.com** 1:*19*
**bear** 37:*20*
**began** 18:*16*
**BEGINNING** 1:*11*
**BEHALF** 1:*10*, *15* 2:*8* 34:*7* 49:*5* 148:*12* 149:*12* 153:*19* 154:*2* 155:*23* 157:*14* 198:*2* 211:*7* 216:*2*, *4* 220:*4*, *10*, *14* 222:*7* 230:*10* 232:*9* 237:*4*, *20* 238:*12*, *13* 240:*6*
**belief** 32:*2* 46:*3*, *7*, *8* 164:*10*, *11* 213:*18* 226:*19* 230:*17*
**believe** 7:*16* 24:*17* 32:*7*, *10* 38:*15* 45:*10* 47:*19* 57:*19* 99:*22* 102:*6* 103:*14* 106:*22* 108:*18* 109:*7* 116:*12* 117:*18* 130:*6* 138:*5* 140:*23* 147:*22* 153:*5* 154:*9*, *25* 156:*3*, *5* 157:*6*, *13*, *17*, *18* 158:*13*, *18* 164:*8* 169:*17* 172:*2*, *15* 178:*11*, *12* 181:*1*, *2* 185:*5* 189:*7* 191:*5* 192:*24* 196:*11*, *22* 199:*10* 205:*9* 218:*20* 230:*20* 244:*3*
**believed** 66:*23* 138:*24* 199:*12* 226:*8*
**believer** 139:*9*
**belongs** 62:*7*
**Ben** 7:*12* 12:*24* 13:*15* 41:*15* 115:*9* 150:*12* 160:*21* 215:*16* 247:*4*, *13*
**benefit** 40:*1*, *7*, *18* 128:*3* 140:*1*, *17* 159:*18*, *20* 206:*22* 215:*12* 222:*19*
**benefited** 140:*17* 215:*9*
**benefiting** 140:*10*
**Benjamin** 1:*16*
**Berney** 2:*15* 7:*17*, *23*
**best** 18:*20*, *22* 19:*14* 47:*15* 95:*25* 118:*9*, *11* 136:*5* 146:*7* 155:*1*, *7*, *9*, *11* 156:*10* 159:*6* 178:*15* 186:*6* 199:*6* 210:*15*, *16* 216:*12*, *14*, *15* 225:*10* 236:*15* 237:*8*, *13* 240:*16*, *20* 242:*2* 243:*5*, *6*
**better** 18:*10* 71:*15* 139:*12* 182:*13* 221:*14* 227:*7*, *14*
**betterment** 155:*5*
**beyond** 102:*23* 157:*17*
**BH** 4:*22* 5:*10* 211:*25* 212:*12*, *17* 214:*8*, *23* 218:*8*, *11*, *16*, *19* 219:*17* 220:*25* 231:*19*, *22* 232:*2*, *10*, *19*, *22* 238:*6* 239:*3*, *8*, *12* 245:*11*
**bifurcated** 86:*14*
**bifurcation** 85:*25* 167:*10*
**big** 158:*15*
**bigger** 175:*4* 212:*3*
**biggest** 41:*12*
**billion** 81:*16*
**bills** 85:*25*
**bio** 181:*6*
**Biography** 4:*16*
**bit** 13:*1* 39:*23* 54:*24* 86:*18* 123:*23* 124:*14* 125:*12* 126:*20* 129:*23* 185:*8* 195:*24* 212:*3* 224:*5*
**BJ** 243:*7* 244:*21*
**BJ&J** 102:*4*
**BJJ** 167:*12* 169:*5*
**blemish** 153:*5*
**blemishes** 158:*16*
**Bless** 227:*2*
**blind** 77:*18*
**blocking** 122:*23*
**blue** 15:*8*, *11*, *21* 30:*5*, *7* 200:*11*
**bold** 26:*11* 27:*8*
**book** 171:*10*
**booked** 166:*20* 168:*10* 215:*3*, *4*
**booking** 166:*19*
**books** 168:*23*, *25* 169:*3* 171:*14* 172:*7* 202:*20*

227:*10*
**borrow** 74:*24*
**borrower** 30:*11, 13, 23* 34:*7, 19* 35:*6, 8* 38:*2* 39:*6* 40:*3, 6, 16* 133:*19* 134:*25* 168:*14, 15, 18* 182:*13, 14* 189:*18* 193:*7* 201:*10* 213:*5* 216:*3, 22* 232:*21* 234:*12*
**borrower/pledgor** 39:*25*
**borrowers** 191:*1* 194:*1, 20* 210:*14*
**bottom** 23:*21* 81:*11*
**bought** 242:*4*
**bounced** 116:*7, 10, 11, 12* 117:*14*
**Bradley** 16:*21*
**breach** 35:*13*
**break** 9:*3, 4* 50:*8, 15* 72:*17* 121:*13* 122:*4* 159:*25* 160:*4, 25* 223:*7*
**breaks** 9:*3* 160:*24*
**Briarwood's** 240:*20*
**bring** 63:*12* 124:*24* 148:*11, 21* 149:*13, 20* 150:*6* 151:*4* 153:*19* 154:*1* 198:*15*
**bringing** 154:*21* 155:*2, 8* 157:*14*
**brings** 58:*12* 65:*23*
**broad** 180:*12*
**Brodsky** 1:*16* 7:*12, 19, 22* 12:*3, 20* 13:*16, 20* 14:*4* 16:*11* 17:*2, 7* 19:*13* 21:*6, 8* 25:*13* 27:*10* 31:*11* 32:*24* 33:*4, 8, 23* 34:*15* 36:*7, 22* 37:*13* 38:*13* 39:*12* 40:*9* 41:*3, 17, 20* 42:*22* 43:*8* 44:*1* 45:*1, 9* 46:*4, 13, 16* 47:*2, 8, 17* 48:*18* 49:*2, 19* 50:*20, 25* 51:*13* 52:*10, 17* 53:*6* 60:*1* 61:*4, 12* 62:*14* 63:*22* 64:*7, 11, 17, 22* 65:*2, 11, 19* 66:*11* 67:*3, 12, 16, 20* 69:*6* 70:*2* 71:*5, 12, 21, 24* 72:*7* 73:*19* 74:*15, 22* 75:*2, 15, 19* 76:*6, 25* 77:*8* 78:*8* 79:*3, 6, 11, 13, 20, 25* 80:*3, 25* 81:*23* 83:*23, 25* 84:*10, 17* 87:*7* 88:*1, 12, 15* 89:*17* 91:*1, 13, 19* 92:*16, 21* 93:*16* 94:*5, 15* 95:*24* 96:*22* 97:*25* 98:*22* 100:*1, 11* 101:*6* 103:*7, 9, 13* 104:*18* 107:*6, 10, 16* 108:*10, 17, 24* 112:*16* 113:*21, 23* 114:*6, 12* 115:*5, 10, 15, 20* 117:*13* 118:*2* 119:*13* 122:*15* 128:*19* 130:*8* 131:*21* 132:*10, 22* 133:*23* 135:*11* 138:*13* 139:*19* 144:*5* 146:*13, 24* 147:*18* 148:*24* 149:*6, 22* 150:*7, 15, 17, 20, 24* 153:*20* 154:*4, 8, 17, 24* 155:*14, 25* 156:*16, 18, 25* 157:*11, 16, 22, 24* 158:*2, 14* 160:*1, 4, 14, 17, 19* 161:*3* 167:*19* 168:*16* 169:*1* 170:*3* 173:*12* 178:*9* 180:*4* 194:*9* 199:*8* 207:*12* 212:*21* 213:*2, 17* 214:*10* 215:*15* 217:*4, 12* 225:*12* 229:*14* 230:*12* 231:*16* 237:*25* 238:*2* 239:*17, 21* 241:*6, 19* 242:*16* 244:*18* 245:*24* 246:*17, 24* 247:*14, 23* 248:*8, 16*
**broke** 110:*2*
**brokerage** 202:*17*
**brokered** 202:*16* 209:*2*
**brother** 24:*1*
**brought** 8:*19* 109:*22* 110:*2* 174:*8*
**Bryan** 153:*15*
**building** 126:*6*
**built** 84:*3* 126:*7*
**bunch** 190:*25*
**Business** 4:*17* 9:*22* 17:*23* 22:*12* 31:*16* 32:*11* 37:*3* 82:*19* 100:*21* 111:*23* 120:*8, 9* 142:*8* 155:*16, 19* 164:*25* 165:*3* 173:*18* 197:*15, 18* 204:*10, 22* 211:*15*
**businesses** 181:*10*
**butchered** 222:*24*
**buy** 219:*19* 242:*3*
**buyer** 123:*14, 17, 18* 124:*8* 126:*5, 6, 10, 21* 127:*4, 5, 20, 22, 25* 129:*4, 9* 142:*24* 143:*4, 8* 243:*12*
**buyers** 126:*9*
**buying** 173:*14*
**buzz** 248:*9*

**< C >**

**call** 8:*15, 18* 16:*7* 52:*20* 68:*8, 9* 109:*25* 114:*23* 174:*10, 20, 25* 175:*5* 207:*8*
**called** 45:*20* 86:*10* 101:*21* 102:*4* 118:*15* 123:*6* 124:*6* 136:*17* 187:*6* 188:*23* 194:*16* 197:*17* 205:*10* 235:*25*
**calling** 205:*4*
**calls** 27:*16, 22* 66:*16* 94:*24* 174:*3, 5, 10, 18* 175:*25*
**Camille** 237:*1, 12*
**Camille's** 237:*1*
**capacity** 39:*7*
**Capital** 4:*14, 22* 5:*10* 45:*14, 15* 59:*13* 119:*2* 155:*3* 162:*5* 163:*17* 165:*7* 168:*4, 8* 173:*9* 174:*3, 4, 9, 10, 18, 19, 20, 25* 175:*5, 25* 179:*19* 180:*7, 22* 181:*14* 184:*18, 19* 185:*5, 14* 208:*18, 24* 209:*6, 13, 15, 18, 22* 210:*11, 22* 211:*25* 212:*12, 17* 214:*8, 23* 218:*8, 11, 16, 19* 219:*17* 231:*3, 19* 232:*2, 10* 235:*22, 23* 238:*6* 239:*4, 8, 12* 245:*11*
**capitalized** 125:*3*
**Capital's** 179:*10, 11* 209:*18*
**caprate** 127:*1*
**caps** 26:*12* 27:*9*
**capture** 179:*16*

**care** 143:*10* 190:*11* 193:*2* 216:*23* 217:*7*, *14* 219:*25* 221:*13*
**cared** 103:*17* 219:*6*
**Case** 1:*5* 10:*11* 20:*8*, *18*, *25* 34:*24* 51:*1* 57:*17* 73:*8* 87:*25* 102:*6* 103:*4* 123:*25* 128:*16* 130:*7* 144:*25* 147:*13* 152:*15* 199:*3* 230:*20* 251:*9*
**cases** 49:*5* 101:*19* 139:*1* 158:*11*
**cash** 78:*22* 80:*6* 118:*9* 120:*21*, *23* 134:*24* 219:*20* 236:*11*, *12* 243:*19*
**casualty** 85:*18*, *21*
**catchall** 33:*20*
**cause** 18:*17*, *21*, *25* 35:*12*
**caution** 150:*23*
**cell** 163:*14*
**Central** 7:*5* 73:*9* 142:*3*
**CEO** 4:*14* 236:*16* 237:*10*, *20*, *22*
**certain** 56:*4*, *8* 98:*18* 161:*23* 179:*10* 214:*14*
**certainly** 57:*22* 68:*23* 75:*6* 76:*8*, *9*, *11*, *17* 90:*2* 120:*15* 137:*24*, *25* 140:*11* 146:*14* 147:*19* 148:*15*, *16*, *25* 149:*14*, *16*, *18* 158:*25* 159:*2* 198:*18* 199:*9* 218:*19*
**certainty** 182:*2*
**certified** 138:*3* 251:*5*
**certify** 251:*7*, *12*
**cetera** 44:*10* 87:*12*
**chain** 3:*23* 63:*6* 140:*9*
**chance** 14:*12* 26:*7* 36:*15* 69:*8* 114:*11* 198:*21*
**CHANCERY** 1:*1* 99:*1* 160:*22*
**change** 18:*5* 19:*4* 62:*1* 95:*13* 119:*6* 120:*6* 139:*2* 198:*14*
**changed** 192:*14*
**channels** 186:*7*
**characterization** 67:*7* 180:*24*
**characterize** 149:*18*
**charge** 173:*4* 193:*9*
**charged** 202:*16*
**charging** 198:*12*
**chart** 12:*16* 15:*10* 33:*9* 44:*18* 45:*13* 78:*18* 136:*15*, *19*
**charts** 3:*9* 32:*4*, *22* 33:*4*, *5*, *10*, *12*, *17* 80:*17*
**chasing** 77:*20* 197:*3*
**chat** 12:*22* 13:*21* 79:*16*
**check** 116:*7*, *13* 117:*12*, *14*, *17*, *19*
**checked** 223:*11*
**checks** 116:*10*, *11*
**chief** 15:*5*
**choice** 31:*17*
**Choni** 81:*13*
**chose** 92:*24*
**chron** 224:*4*
**circle** 163:*8*
**circumstance** 40:*19*, *20*
**circumstances** 157:*8*
**City** 243:*7* 244:*14*
**Civil** 6:*6*
**claimed** 204:*11*
**claims** 39:*5*
**clarification** 38:*24*
**clarified** 62:*17*
**clarity** 18:*11*
**Classen** 177:*5*
**clause** 157:*19*
**clauses** 20:*13* 21:*3*
**clean** 124:*1* 125:*5* 153:*2*, *7* 227:*10*
**cleaner** 164:*13* 226:*20*, *21*
**clear** 9:*17* 17:*11* 44:*11* 50:*23* 63:*7* 65:*25* 69:*22* 92:*25* 96:*1* 116:*24* 141:*21* 148:*17* 198:*20* 205:*10*, *12* 214:*12* 226:*24*
**clearly** 66:*3* 90:*18* 94:*17* 168:*10*
**client** 160:*23*
**clients** 7:*14*
**close** 123:*12*, *13*, *16*, *19*, *21*, *22*, *24* 124:*2*, *3*, *11* 127:*11* 128:*13*, *14* 130:*15*, *16* 134:*9*, *11*, *22* 135:*1*, *2* 137:*4*
**closed** 118:*15* 125:*21*
**closer** 79:*16* 203:*8* 206:*12*
**closes** 122:*23*, *24*
**closing** 126:*21* 130:*20* 135:*22* 136:*6* 142:*12*
**cocked** 247:*3*
**coffee** 9:*4*
**Cohen** 3:*22* 151:*24*
**Coldwater** 4:*22* 208:*18*, *24* 209:*5*, *12*, *15*, *18*, *21* 210:*1*, *11*, *14* 212:*9*
**collateral** 24:*12* 26:*25* 28:*7* 30:*13* 31:*19* 36:*1*, *2*, *5*, *6*, *9*, *21*, *23* 37:*9*, *10* 38:*8*, *17* 39:*2*, *5* 40:*2*, *8*, *13* 57:*12*, *21*, *23* 58:*3* 60:*15*, *21*, *22*, *23* 61:*23* 62:*2*, *3*, *7*, *12*, *25* 63:*5*, *7*, *11*, *15*, *18*, *24* 64:*1*, *3*, *5* 65:*5*, *8*, *15*, *16*, *24*, *25* 66:*4*, *7*, *8* 68:*13* 69:*21* 70:*8* 73:*17*, *24* 74:*1* 76:*16* 77:*13*, *18*, *19* 90:*11*, *12*, *14* 93:*3* 94:*17* 97:*11* 98:*18* 99:*10* 166:*25* 191:*17*, *19*, *24* 192:*6* 193:*5*, *6*, *8*, *13* 216:*8* 234:*19*
**collateralized** 221:*1*
**collateral's** 38:*8*
**collect** 35:*23* 40:*1* 77:*4*
**collecting** 40:*7* 183:*25*
**collection** 112:*11* 114:*16*, *18*
**collectively** 32:*16*
**Column** 16:*21* 43:*11* 162:*16* 164:*17* 165:*21*
**co-manager** 49:*13*
**come** 21:*12* 40:*11* 47:*22*, *23* 50:*5* 51:*3* 54:*20* 111:*3* 115:*24* 118:*13* 124:*24*

127:6 160:25 173:25 200:10 201:17 223:4 240:14 248:14
**comes** 86:8 109:17 127:22 129:11 181:2
**comfort** 160:4 195:7
**comfortable** 36:11 37:5, 7 47:12 69:10 88:5, 19 97:18 194:23
**coming** 52:25 58:15 88:7 95:2 169:8, 9 214:25
**comment** 36:15 64:23 114:18
**commented** 26:24
**comments** 26:17, 22 27:9
**COMMISSION** 249:23
**commitment** 130:19 132:4, 14 133:3 135:23
**commitments** 135:7
**committed** 125:9
**committee** 152:15 227:9
**committees** 227:1
**committing** 77:24
**common** 22:15
**communication** 137:7 151:18, 22 152:1 162:13
**communications** 81:7 149:25 150:9 151:5 186:10
**companies** 10:8 12:1 33:6 47:1 74:13 103:6, 15, 16 159:20, 21 168:21 174:16 176:13 181:21, 23 182:8 188:5 191:8 201:13
**company** 10:21 11:10 12:6 45:8 62:21, 23, 24 102:8 112:1 119:24 131:14, 19 132:20 133:4 135:6, 8 144:19 172:11 182:10 188:22, 25 201:11
**compilation** 28:4 53:9
**complain** 110:10 121:18, 24 158:23, 25 211:6
**complained** 159:9
**complaining** 175:23
**complaint** 3:6 20:3
**complete** 43:18, 21 45:21
**completed** 132:5, 15
**completely** 11:15 49:9
**complexes** 9:24
**complicated** 86:21 101:16 123:17 202:12 241:16
**complied** 46:1 152:17
**complying** 138:12
**computer** 179:15 247:5
**con** 221:18
**concept** 111:18
**concepts** 60:17
**concern** 60:12 61:23 66:19, 20, 21, 22 68:14 75:13 76:1, 8, 11, 17 77:17 96:18 113:24 114:24 115:1, 4
**concerned** 74:11 76:4
**concerns** 65:23 111:9, 13, 17 113:12, 16, 17
**concludes** 92:4
**conclusion** 248:15
**conditions** 130:19 132:4, 14 135:23
**conduct** 22:15
**conduit** 170:19 202:15
**confer** 248:4, 13
**confession** 28:11, 21
**confines** 141:20 221:4
**confirm** 23:19 28:6
**confirmation** 32:22
**conflict** 215:20 219:8
**conflicting** 221:19
**confused** 115:13 144:25 145:3 202:6
**confusion** 146:4
**connect** 103:11
**connection** 57:10 138:11
**connotation** 16:6
**consecutive** 28:5
**consent** 65:7 142:13, 20 143:18 144:21 147:4 198:24
**consented** 137:8 143:13 226:11, 13, 14
**consents** 199:5
**consequences** 37:7
**consider** 43:25 46:9, 12 102:9 150:11
**consideration** 37:18
**considered** 103:1 192:17
**considering** 97:15
**consistent** 18:3
**consistently** 27:18
**constitute** 44:24
**construction** 78:24
**consult** 156:12, 13
**Consultants** 228:5, 6
**consulted** 149:14, 17
**consummated** 231:6
**contained** 98:25
**contains** 39:2
**contemplation** 37:9
**contemporaneously** 204:18
**contention** 112:23
**context** 26:16 80:13, 15 82:4
**continuation** 29:24 232:4
**continue** 172:9 246:21
**continued** 1:23 2:1
**contract** 37:4 86:12 122:21 123:5, 6 124:7 127:5 128:12 164:21, 22 209:20 213:4, 7 232:18
**contracts** 37:2 232:19, 22
**contribution** 59:13 96:17
**contributions** 165:8
**control** 11:11 19:10 21:4 48:8, 15, 25 49:17, 24 50:2 68:16 71:11, 19 77:12 98:16, 17 125:19 128:22 188:23
**controlled** 10:21 35:9 48:1 69:14, 16 89:14, 23 90:8,

22 92:13 95:15 100:17 136:9 188:24
**controls** 20:15
**conversation** 69:3, 4 107:19 110:4, 24 111:7, 8, 17 114:22 141:19 142:7, 17 200:14 233:3 246:1
**conversations** 50:16 60:3 65:22 66:25 68:6 82:18 109:19 150:18 161:1
**conversion** 77:25
**convey** 63:14 92:18
**conveying** 60:15 92:19
**convicted** 117:15, 16, 25
**conviction** 117:11
**convince** 224:24
**copied** 217:18 223:19 224:6
**copies** 13:1 14:3 37:22 55:12 105:18 141:9
**copy** 41:13 59:11 72:12 79:14 98:6 200:9 247:1
**copying** 41:11 223:11
**corporate** 12:8 139:13 156:10
**corporations** 10:4
**correct** 10:14, 23 11:12 12:15 14:23 18:2 21:1, 5 22:22 23:10, 12, 14 26:5, 8, 17, 23 30:2, 3, 22 31:24 32:6 33:24 34:4, 9, 10, 12 36:17 39:21 40:18 45:21 51:5, 8 52:4, 13, 14, 23 55:12, 16 56:1, 11, 16 57:3, 8 59:6, 7 61:3 62:16 63:1 71:23 74:3, 9 80:9 81:10 83:18 94:1 96:9 103:3 105:18 110:6 116:8 119:22 126:3, 18 130:16, 17 131:2, 19 132:6, 17, 21, 23 133:17 136:9 140:4 141:9 143:23, 25 151:25 153:4 155:4 159:22 163:24 164:1 165:13 168:12, 22 169:21 175:21 177:17, 25 181:16 182:2, 3, 23 183:7 186:1, 21 187:12 189:20 191:10 192:1 196:3, 13, 18, 21 204:1, 16 205:5 207:24 208:2, 7 209:17 212:5 213:13, 24 214:1, 6 215:24 217:5 220:11 222:20 227:4 230:8 231:7, 22 232:11, 12 233:16 235:19 236:21, 23 237:7 241:3 242:3 243:23, 25 245:9, 13 249:8 251:7
**corrections** 249:9
**correctly** 140:8
**correspondences** 103:25
**cosponsor** 44:9
**counsel** 8:18 26:7 28:24 29:5 50:6, 16 55:17, 21 131:13, 17 132:19 150:4 151:9 186:14, 15 230:13
**countless** 81:6
**COUNTY** 249:4 251:3
**couple** 126:15 152:21 176:4 181:25 205:19 206:10 247:9
**course** 22:15 32:11 100:21 186:21
**COURT** 1:1 9:14 67:15 92:4 99:1 125:24 135:5 148:4 151:13 160:22 238:2 246:20
**covenants** 35:3, 4
**cover** 87:24 120:2 146:6 195:21
**covered** 34:3 43:11, 13 99:10 157:25
**covering** 57:18
**covers** 129:17 180:11 203:21
**CPSA** 30:19 34:6, 12 36:13 38:23 39:16 56:2 66:9 84:8, 13 92:11 96:19 98:5
**crazy** 224:23
**create** 99:16
**created** 62:5 112:5 164:5, 8
**creating** 163:4
**credit** 116:20 117:9
**Creek** 123:20 124:6 137:23 210:15
**crimes** 118:1
**CRR** 1:22 6:9 250:2 251:23
**CSR** 1:22 6:9 250:2 251:23
**current** 43:11 86:11 124:13 151:18, 22 182:3 183:17 207:21
**currently** 66:8 129:18 177:21 181:19 183:25 186:5
**cut** 23:3 114:11 241:12
**cutoff** 223:10

**< D >**
**daily** 120:7
**damaged** 122:25
**damaging** 125:15, 16
**Damis** 5:14 243:3, 11, 12, 17 244:7
**date** 19:6 22:22 23:15, 18 42:16 106:11 123:12, 13, 19 125:25 128:14 141:9 172:23 173:1 207:13, 14 250:3
**dated** 98:19 196:2, 16 200:2 201:5 203:25 208:19 211:25 218:4 231:20 233:11 243:3 244:5 245:12
**dates** 123:1, 10
**Dave** 229:11
**David** 5:2 22:4 229:10, 21 230:3, 8, 13
**David's** 231:1
**day** 27:5 93:11 95:12 117:6 118:8 119:5 120:5, 6 134:25 144:25 146:3 179:17 185:11 190:17 194:21 197:3 218:7 246:23 249:18 251:9, 16
**days** 27:6 56:16 73:17 126:15

153:2 208:21 209:19 211:9
**day-to-day** 49:8
**deal** 49:9 74:25 77:13 101:21 118:14 123:6 124:20 127:8, 13 128:5, 11 136:17 138:14, 15 155:5 166:22, 23 176:19, 20 224:17 231:5 241:18, 21, 24 243:11
**deal-by-deal** 49:12 145:8
**dealing** 139:10 164:25
**dealings** 22:16
**deals** 11:2 33:15 36:10, 13 37:6 86:5, 7, 8 97:13 122:17, 21 123:5 137:5, 14, 16 147:5 153:22 164:20, 22, 23 165:11, 18 206:2, 10 225:24
**debt** 35:7, 12 77:15 81:16 82:2 127:3, 6, 7, 22 131:13 167:1, 5
**DECEMBER** 1:11 6:7 7:3 123:13 164:9 250:3 251:10
**decide** 107:21 108:19 187:13
**decided** 94:20 221:13
**decision** 16:17, 20, 22, 24 17:6, 12, 13, 18 136:11, 18 149:11 227:9
**decision-maker** 18:2 19:12 188:18 225:25
**decision-makers** 157:4 205:20, 23, 25
**decisions** 17:1, 18 120:25
**Declaration** 4:6 130:5, 13 131:12, 13 132:1, 13, 19 133:24 135:3, 18, 20 136:4
**deeds** 141:22
**deems** 35:19
**deeper** 18:13 19:2
**default** 37:24, 25 38:12 40:5 145:22 212:24 226:17 227:7 234:7 235:15
**defaulting** 172:25
**defaults** 112:19
**Defendant** 1:7, 10 2:8 7:9
**defensible** 156:6
**define** 45:11 47:3 119:15 136:10
**defined** 39:16 99:1, 23 100:10, 16
**definitely** 112:10 124:2 137:7 150:12 164:24
**definition** 38:25 39:2 100:23 175:2 191:16
**definitive** 163:9
**definitively** 145:4 155:8 210:3 228:14
**degree** 182:2
**DELAWARE** 1:1 6:6 41:1 50:23 151:12
**delaying** 122:23
**deliverable** 42:19
**delivered** 42:20, 24
**demand** 38:1 184:10 210:8
**demanded** 184:8
**depending** 157:8 175:14
**depends** 120:4 176:3
**deposes** 8:11
**deposit** 118:14, 19
**DEPOSITION** 1:9 6:4 7:2 8:20 12:18 19:17 21:18 25:5, 11 29:19 32:19 41:9 51:16 53:19 54:5, 7, 9 55:9 56:24 58:23 65:4 70:14 78:11 80:23 85:5 93:7 105:21, 23, 25 106:2, 4 114:4 130:2 131:6, 9 160:10, 12 179:3, 5 187:18 195:18 199:23 202:4 208:15 211:22 218:1 224:1 228:2 229:5 231:10 233:4 238:8 239:15 241:9 242:10 246:23 247:25 248:13, 20 249:6 250:3
**depositions** 73:9, 10
**depth** 230:21
**describe** 86:20, 21, 25 87:10, 17 88:23 89:4
**described** 61:13 62:10 66:9 67:1 70:5 82:7 119:2
**describes** 56:4, 8
**describing** 69:10 84:2 88:6
**Description** 3:5 4:1 5:1 98:20, 24
**designated** 68:19
**despite** 77:15
**detail** 78:17 126:20 139:12
144:17
**details** 104:7
**determination** 171:9
**DETRICH** 2:3
**Detweiler** 2:16 8:3 24:23
**develop** 90:21
**developed** 60:12
**development** 17:23
**DH** 202:14
**dhharpersadvance.com** 209:3
**dial** 173:14
**differed** 118:6
**differences** 49:14
**different** 30:25 33:15 49:13 86:19, 24 87:11, 21 89:8, 9, 10 90:15, 16 95:3 103:19 107:19 109:4 115:23 123:23 134:21 137:12, 13 152:7 162:1 169:16, 25 175:24 181:24, 25 182:16 184:20, 21, 22 200:13 202:17 206:2 207:8 225:5 232:3 234:6 235:18
**differing** 117:20
**difficult** 15:22 183:14 206:15 214:11
**dig** 94:23
**digest** 163:11
**diligence** 14:19 104:5 126:12, 17 141:3 197:4, 5
**diluted** 174:17 175:9
**dilution** 174:13 175:1, 2, 8, 14, 18
**Direct** 3:3 8:13 45:12 187:11 219:16

**direction** 15:*25* 16:*1*
**directive** 46:*1*
**directly** 18:*21* 35:9 37:*5* 43:*6* 44:*13* 45:*22* 47:*25* 48:*7*, *15*, *25* 49:*17* 100:*17*, *18*, *24* 131:*14* 141:*18*
**dis** 142:*10*
**disadvantage** 161:*7*
**disagree** 45:*6*
**disagreement** 107:*20*
**disagreements** 109:*5*
**disclose** 149:*25* 150:*8* 151:*5*
**disclosed** 34:*22* 35:*1* 152:*19* 190:*3*
**disclosing** 150:*18* 190:*7*, *9*
**disclosure** 150:*10*
**discount** 222:*3*
**discovery** 186:*18*
**discretion** 35:*20*
**discuss** 24:*21* 28:*20* 30:*24* 80:*11* 133:*8*
**discussed** 63:*16* 75:*21* 96:*10* 111:*2* 136:*4* 150:*4* 159:*18* 204:*25* 207:*20* 229:*18* 245:*19*
**discussing** 60:*6* 75:*21* 84:*21* 94:*18* 225:*5*
**discussion** 70:*18* 110:*18*, *19* 141:*15* 235:*8*, *24*
**discussions** 27:*14* 144:*8* 198:*19*
**dispute** 96:*4* 107:*1* 109:*11* 110:*2*, *3* 142:*11* 172:*3*
**disputed** 97:*20*
**disputes** 109:*11*
**distinct** 85:*20* 157:*18*
**distinction** 154:*18*, *23* 158:*15*
**distributed** 56:*22*
**distribution** 40:*11*
**distributions** 40:*12*, *21* 138:*5*
**dive** 18:*13* 19:*2* 49:*11*
**Diveroli** 2:*16* 3:*10* 4:*6* 7:*17* 21:*15* 22:*1*, *8* 24:*10*, *16*, *19* 59:*5*
**diving** 18:*6*
**doc** 108:*1*
**docs** 55:*23* 66:*18* 103:*18* 107:*22* 109:*5*, *9* 118:*16* 153:*2*, *6* 192:*23*, *25* 228:*17* 230:*14*, *19*
**document** 3:*7* 13:*10* 15:*7* 20:*1* 25:*22* 29:*22*, *23* 31:*6* 34:*7*, *18* 38:*22* 45:*18*, *20* 56:*22* 72:*18* 87:*5*, *8* 88:*10* 89:*1* 95:*14* 100:*2*, *11* 105:*2* 132:*25* 155:*21* 164:*4*, *14* 172:*22* 193:*17* 201:*3* 208:*10* 216:*6* 238:*14* 242:*17* 247:*15* 248:*5*
**documentation** 31:*25* 234:*3*, *4* 246:*14*
**documented** 58:*5* 137:*2*, *22*, *25* 172:*18*, *20*
**documents** 3:*10*, *24* 4:*2*, *3*, *4*, *5* 12:*24* 13:*5*, *18* 23:*19* 25:*3* 26:*3*, *8* 28:*4*, *10*, *16*, *20*, *25* 29:*6*, *9*, *16*, *25* 30:*19* 34:*6* 36:*9* 42:*18*, *24* 52:*1* 54:*15*, *16*, *18* 55:*13*, *18* 60:*11* 97:*22* 103:*19* 105:*4*, *7*, *17* 106:*22* 107:*3*, *8*, *25* 113:*8*, *9* 115:*2* 128:*21* 142:*16* 144:*2* 192:*10* 207:*13* 214:*18* 216:*21* 217:*6* 224:*5* 227:*18* 233:*7* 236:*9* 243:*8* 247:*7* 248:*3*
**DocuSigns** 198:*12*
**doing** 32:*8*, *17* 35:*22* 62:*1* 68:*17* 74:*23* 90:*19* 119:*8* 120:*13*, *15*, *17* 121:*11* 127:*5* 131:*11* 158:*24* 159:*1*, *9* 173:*20* 186:*20* 195:*24* 206:*8*, *10*, *14*, *16* 220:*15* 227:*6* 243:*18* 244:*15* 246:*17*
**Dollar** 117:*15*
**dollars** 189:*16* 203:*25* 209:*9*
**door** 115:*9*
**double** 73:*16* 192:*5* 222:*11* 232:*14*
**doubt** 23:*8* 178:*18*
**Dov** 209:*2*
**Dover** 185:*14*, *16*
**Dovi** 202:*15* 203:*8*, *14* 204:*7* 209:*2*, *12* 211:*14*
**download** 13:*21*
**downs** 164:*25*
**downsize** 49:*22*
**downstream** 44:*17*
**draft** 73:*12* 131:*18* 132:*1*, *12*
**drafted** 73:*7*, *11* 90:*17* 91:*5* 226:*3*
**drag** 13:*9*
**dramatically** 115:*23*
**drew** 194:*19*
**Drive** 2:*10*
**drop** 13:*9*
**dropped** 158:*3*
**drowning** 81:*14*
**due** 14:*18* 35:*24* 38:*3* 51:*5* 104:*5* 126:*12*, *17* 141:*3* 197:*3*, *5*
**dully** 220:*6*
**duly** 8:*11*
**dumb** 124:*15*
**dumbfounded** 176:*20*
**duties** 154:*10*
**duty** 148:*17*
**dwell** 199:*25*

< E >
**earlier** 36:*16* 42:*18* 56:*4* 70:*11* 80:*11* 94:*7* 123:*22* 124:*2* 137:*17* 148:*2* 151:*17*, *21* 159:*19* 196:*7*, *20* 198:*6* 223:*2* 231:*21* 233:*20*
**early** 139:*21* 162:*2* 173:*13* 185:*17*
**early-ish** 105:*5*
**earn** 214:*21*
**earnest** 118:*14* 173:*14*, *16*, *20*
**ease** 70:*18*
**easier** 59:*12* 163:*11*
**easiest** 23:*1*

**East** 2:4 210:16 211:2, 5
**Eaton** 124:6 126:1
**edited** 21:24
**effect** 18:17, 21, 25
**effects** 68:22
**effectuate** 135:2
**efficient** 58:14
**Efraim** 2:15 3:10 4:6 7:16, 22 21:15 22:1, 3, 8, 12, 17, 22 23:24, 25 34:25 35:2 52:3, 19 58:9 59:5 78:16 107:18 109:15 110:18, 22 111:2, 24 112:18 114:23 117:5 118:13, 17, 19 128:9 141:21 162:6 165:4 173:19 194:13, 16 196:25 197:2, 10 204:23
**Efraim's** 24:14 194:15
**eight** 56:16
**either** 11:9, 14, 21 26:20, 21 44:13 124:21 137:10 147:3 164:21 168:7 176:12 181:14 187:4 223:14 251:13
**elaborate** 65:13, 14 67:1, 8
**electronic** 12:21
**elects** 39:24
**elements** 126:8
**Elgin** 6:8
**ELLER** 2:3
**else's** 175:4
**email** 3:8, 10, 20, 23 4:6, 10, 13, 17 5:2, 7, 10 14:18, 25 15:1, 6 25:23 26:1 27:13 29:24 51:9, 10, 20, 22 57:21 60:5 65:23 66:21, 24 68:7, 10 78:16 79:8 81:3, 13, 25 85:7 93:10, 16, 18, 19, 22 94:2, 6, 21 95:11, 12 116:4, 5 134:2 137:3, 6, 10 138:3 162:6 176:16 195:21 229:9, 11, 12 241:11 247:3
**emails** 27:20 57:17 66:14 75:13 81:6 93:2 103:24 110:15 134:3 175:22 176:2 186:7
**employee** 15:3
**encompasses** 98:20
**encumber** 193:7
**encumbered** 60:8 94:19 95:6
**encumbrance** 193:9
**endanger** 166:25
**ended** 53:3 90:6 120:1 236:11 243:17, 18
**ends** 99:12
**enforce** 35:23 38:2 40:2
**enforceability** 107:8, 24 109:6, 9, 23 110:19, 21 112:11, 12 113:9 115:2
**enforceable** 40:14 107:5, 15, 17 108:7, 15, 16 111:20 113:14
**enforced** 40:25
**engaged** 22:12
**enter** 136:22 211:2
**entered** 191:20 208:18 211:6
**entire** 83:7 84:8 86:13
**entirely** 11:11 135:24
**entirety** 82:23 107:12 109:18 174:7 249:7
**entities** 11:17 16:3, 5, 8, 9, 10, 13 18:16 19:11 20:14 21:3 30:25 31:10 32:5, 23 33:10, 19, 21 44:17 45:22 46:9, 19 47:25 56:12 57:11 59:9, 12, 24 60:13 61:2, 24 62:11, 12 71:11, 19 74:2 75:12 83:18 87:12 89:5 92:12 94:19 96:8, 13, 17 98:15, 20, 25 99:19, 22 101:14 140:25 141:10 148:14 166:5 168:6, 10, 17, 19 171:3 172:17 173:5 174:1 175:20 190:25 193:25 194:2 195:2 198:2, 17, 25 199:7 205:3, 7, 10, 17 207:10 210:24 213:5, 15 215:7, 17 216:2, 5, 11 217:2 220:10, 14, 17, 20 221:6, 12 222:15 230:11 232:7 237:21, 22 240:7, 13, 18, 19 241:1 244:23 245:7
**entity** 3:6 20:2 35:8 39:9 44:23 45:14 46:20 48:2, 4 49:22 65:7 70:7 74:20 95:13 96:11 100:16, 17 101:3, 21 102:20 103:15 135:15 145:14 167:13 168:4 169:4 175:19 177:1 205:13 213:7 214:15 240:24
**equity** 39:8 43:11 124:10, 16, 23 127:7 136:21 137:4 138:2 149:14 165:12, 15 167:5 229:22 230:2, 18
**err** 150:23
**errantly** 240:15
**ERRATA** 250:1
**errors** 163:13
**escrow** 118:21 226:16
**escrowed** 86:6
**Esq** 1:16
**essentially** 54:13 116:7, 20 213:11 245:22
**estate** 4:14 42:25 43:5 45:22 80:19 81:16, 19 82:13, 14, 17, 19, 20, 22 83:1, 2, 4, 6, 9, 13, 16, 17, 21 84:9, 16, 24, 25 87:6 89:1 124:16 159:6 179:24 180:8 188:24 207:4
**estimate** 183:14
**et** 44:10 87:12
**evening** 109:20
**event** 37:25 38:12 40:5 193:23 226:17
**events** 40:21
**eventually** 96:2
**everybody** 8:6 174:20 175:3 224:18
**everyone's** 238:12 240:5
**evidence** 58:10 69:18 103:10

**evidenced** 90:*14* 197:*5*
**exact** 23:*15* 59:*15* 82:*6* 87:*14* 95:*17*
**exactly** 18:*17* 68:*23* 69:*9*, *11* 70:*19* 75:*20*, *22* 76:*20* 88:*5* 90:*5* 91:*24* 95:*13* 117:*24* 119:*14* 124:*17* 155:*17* 224:*15*
**Examination** 3:*3* 8:*13*
**example** 11:*10* 16:*21* 33:*25* 47:*15* 62:*20* 118:*9*, *10*, *11* 126:*25* 146:*7*, *8*
**examples** 189:*4*
**Excel** 41:*23* 42:*8*
**excess** 35:*7* 243:*19*
**exchange** 24:*5* 27:*13* 59:*1*, *4* 93:*10*
**exchanges** 19:*1* 59:*3*
**exclusively** 112:*13*
**Excuse** 21:*7* 93:*10*, *18* 135:*4*
**executed** 196:*16*
**exercise** 35:*17* 38:*4* 39:*25*
**Exhibit** 3:*5* 4:*1* 5:*1* 12:*18* 14:*7*, *12* 19:*16*, *17*, *19* 21:*17*, *18* 25:*4*, *5*, *10*, *11*, *18* 27:*13*, *21* 28:*2* 29:*17*, *19* 30:*18* 32:*18*, *19* 41:*8*, *9* 51:*10*, *11*, *12*, *16* 52:*15* 53:*9*, *19* 54:*2*, *5*, *7*, *9* 55:*9* 56:*24* 58:*23*, *25* 62:*18* 63:*10* 78:*4*, *11*, *13*, *15* 79:*10* 80:*21*, *23* 85:*1*, *5* 89:*11* 93:*7* 105:*15*, *21*, *23*, *25* 106:*2*, *4*, *13*, *14*, *15*, *17*, *18* 114:*4* 130:*2* 131:*6*, *9*, *12*, *16* 132:*8*, *10* 160:*10*, *12*, *14* 164:*14* 165:*22* 170:*13* 179:*3*, *5*, *8*, *9*, *21* 181:*5*, *18* 187:*18*, *23* 195:*18* 199:*21*, *23* 202:*3*, *4*, *8* 203:*21*, *24* 208:*15*, *17* 211:*22*, *24* 218:*1* 224:*1* 228:*1*, *2*, *19*, *25* 229:*5*, *8*, *14* 231:*9*, *10*, *18* 233:*4*, *8* 238:*8*, *15* 239:*8*, *15*, *20* 241:*9* 242:*10*, *25*
**EXHIBITS** 3:*4* 161:*16*, *22* 170:*11* 240:*24* 246:*3*
**exist** 75:*4*, *5* 77:*3*, *6*, *7* 136:*14* 167:*13*, *14* 169:*5*, *6*, *8* 240:*19* 241:*2*
**existed** 119:*20*
**existence** 174:*8*
**existing** 96:*18*
**exists** 38:*1* 138:*3*
**expanded** 37:*10* 63:*8*
**expanding** 59:*10* 68:*12*
**expanse** 119:*19*
**expansion** 84:*14*, *15*
**expansive** 61:*24* 62:*3* 87:*23*
**expansiveness** 68:*15* 80:*12*
**expect** 90:*24*
**expectation** 194:*5*
**expectations** 139:*13*
**expected** 165:*17*
**expecting** 165:*20*
**expedited** 130:*6* 133:*2*
**expense** 174:*9*
**expensive** 24:*13*
**experience** 104:*6*
**expert** 85:*18* 113:*14*
**expertise** 102:*13*
**EXPIRES** 249:*23*
**explain** 44:*3* 91:*22*
**explained** 64:*3* 93:*13* 94:*3* 140:*5*
**explanation** 60:*25* 65:*3*
**explicit** 69:*22*
**exposure** 144:*15* 205:*21*
**express** 57:*9* 109:*13*
**expressed** 73:*4*
**expressions** 161:*13*
**extend** 154:*13*
**extended** 116:*20*
**extends** 20:*13* 21:*2*
**extension** 51:*23*
**extent** 68:*11* 109:*1* 145:*25* 149:*24* 174:*2*
**eye-balling** 166:*6*
**eyes** 23:*3*

**< F >**
**fact** 44:*13* 74:*13* 93:*2* 135:*18* 233:*13*
**facts** 103:*10*
**fair** 10:*9*, *10* 11:*22* 15:*12* 16:*8* 19:*10* 20:*21* 21:*16* 22:*7*, *10* 25:*25* 29:*11* 48:*6* 49:*16* 53:*1* 57:*24* 119:*10*, *17* 120:*19* 139:*18* 140:*19* 149:*13*, *17* 150:*16* 162:*4* 173:*10* 176:*9*, *11* 177:*22* 180:*23* 186:*5* 195:*2* 232:*24* 239:*10*
**Fairfax** 62:*21*, *23* 63:*2* 243:*5* 244:*21* 245:*1*
**fall** 100:*23*
**fallen** 164:*23*
**falls** 148:*16*
**false** 104:*2*, *15* 219:*12*
**familiar** 14:*16* 25:*22* 179:*13*
**family** 12:*8* 16:*8* 173:*17*
**Fannie** 190:*11*
**Fannie's** 190:*14*
**far** 81:*17* 129:*22* 207:*1*, *9*, *11*, *20*
**Fast** 4:*17* 22:*19* 89:*6* 198:*13* 200:*2* 224:*6*, *7* 238:*4*
**fault** 232:*18*
**favor** 5:*14* 47:*3* 243:*3*
**fear** 112:*5*
**February** 53:*5* 54:*16*, *25* 55:*7*, *12* 56:*14*, *21* 57:*2*, *10*, *14* 58:*1* 93:*11* 97:*21* 98:*19* 123:*3*, *22* 124:*3* 139:*15* 164:*7* 179:*12*, *20* 201:*5*
**February-March** 190:*5*
**fee** 57:*7* 189:*17*
**feel** 24:*8* 47:*10*, *12* 55:*25* 97:*18* 139:*12* 155:*12*, *22* 156:*15*, *21*, *23* 158:*6*, *9* 199:*5*, *14*
**feeling** 109:*22*
**feelings** 152:*22*

**fees** 114:2 202:17
**feet** 184:4
**fell** 128:5 243:12
**felt** 88:18 110:15 111:19, 21 199:3, 6 214:15 221:8 222:1
**feverishly** 223:11
**fiduciary** 148:17 149:1 154:10 156:23
**fight** 158:19 179:22 224:23
**fighting** 119:8
**fights** 111:5
**figure** 141:19 142:9 156:10
**figured** 143:16
**file** 38:14 141:17 142:22 145:2 166:25 250:4
**filed** 74:14, 21 208:7, 8 228:4, 10, 18 242:19
**filing** 5:2 35:21 76:2 77:2
**filings** 98:25 243:3
**fill** 187:1 198:4, 9 201:8 202:20
**filled** 216:16
**filling** 216:21
**final** 28:16, 24 29:5
**finalized** 36:16
**Finance** 188:24 197:15 201:11 207:4
**Financial** 4:20
**financing** 21:13, 15 86:9, 11 154:14 155:2 166:4 192:10 194:14 196:24 197:1, 3, 18 204:24 206:8, 11 209:12 211:16 213:6 228:20 230:15, 16
**find** 43:3 82:8 124:23 127:4 149:16 211:16 224:17
**fine** 9:8 80:5 115:17 140:15 194:22
**finish** 29:9 88:12, 13 105:4 156:19 246:22
**firm** 180:8 194:19
**firms** 203:4
**first** 8:11 14:25 22:2 23:13 25:16 26:4 29:16 30:12 40:23 42:12 49:20 51:4 56:3 60:9 73:20 79:20 103:9 118:12 143:12 157:23 168:2 169:23 173:19, 21 175:11 178:14 188:1, 4 190:3 191:22 194:13, 16 201:7 204:25 233:17 234:24 235:2 247:14
**Fisher** 4:9, 10 131:17
**fit** 12:8 118:25 183:3
**five** 66:6
**fix** 66:19, 22
**fixed** 80:20
**fixture** 243:3
**flagged** 37:22
**Flagler** 1:17
**flat** 42:4
**flip** 20:4 23:20 26:10 41:6 52:15, 16 98:4 99:23 180:18 190:24 193:4 195:22 205:1 231:14 239:20
**flipped** 188:14
**flipping** 35:15
**float** 203:11
**flooring** 78:23
**Florida** 1:18
**flowing** 134:24
**focus** 14:24 29:22 40:24 42:1 138:11 142:3
**follow** 62:12 110:16 129:6 170:9 237:6
**following** 171:5 172:14
**follows** 8:12
**foreclosure** 127:13 141:23 192:18
**foregoing** 249:6 251:7
**foresaw** 134:4
**forget** 184:17 198:23
**form** 12:3 16:12 17:2, 7 19:13 27:10 31:12 32:24 33:23 36:7, 22 37:14 38:13 39:12 40:9 41:3 42:12, 22 43:8 44:2 45:2, 6, 9 46:5, 14 47:2, 17 48:19 49:3, 19 52:10 53:6 60:1 61:4, 12 62:15 63:22 64:7, 20 65:11, 20 66:12 67:4, 9, 10 69:7 70:3 71:6, 12, 24 73:19 74:15, 22 75:2, 15, 19 76:7, 25 77:9 79:3 84:10 87:7 88:2 89:18 91:2, 14 92:21 94:5, 15 95:24 96:22 98:22 101:6 103:7 104:19, 20 107:6, 10, 16 108:10, 25 112:17 117:13 118:2 119:13 122:16 123:1 128:20 132:22 133:23 135:12 138:13 139:19 144:5 146:13 147:18 148:24 149:6 153:20 154:4, 8, 17, 24 155:14, 25 157:1, 11, 16, 24 168:16 169:1 170:3 173:12 178:9 180:4 190:19 194:10 199:8 212:21 213:2, 17 214:10 215:15 217:4 230:12 237:25 238:3 241:6, 19 245:24
**formal** 125:12 137:11, 14, 15 153:18
**format** 163:2, 11 164:13
**formed** 31:7
**forward** 22:19 24:1 99:24 142:14 190:6 224:6, 7 243:20 246:24 247:4
**forwarding** 229:10, 12
**FOTIU-WORROWICZ** 1:16
**found** 117:6 122:19 127:25 167:6 219:13, 14
**foundation** 57:11
**Founder** 4:14
**four** 28:20 30:24 31:10, 20 33:14 95:6 240:12
**fourth** 122:24
**fractional** 101:23 102:19

**frankly** 127:3 167:13 173:1 176:20 188:13
**fraud** 77:24
**freeing** 118:24
**friend** 76:15
**friendly** 163:11
**friends** 176:24
**front** 134:15 136:15 138:5 179:21 185:12 201:4
**fronts** 119:9
**fruition** 144:9 201:17
**frustrated** 67:21 109:21, 22
**fuck** 242:13
**full** 96:17 97:5 152:12 162:4 186:22 220:4 249:7
**fullest** 145:25
**fully** 111:20 156:4 180:8 189:2
**function** 221:22
**fund** 118:18 119:5 124:20 174:11 175:8 209:8 232:3
**funded** 118:18 174:20 175:11 209:9, 10
**funders** 181:24
**Funding** 5:2 57:5 81:15 82:9, 25 95:8 118:19 168:9 184:5 218:4, 10, 18 219:2, 8, 13, 17, 25 222:25 230:1 232:4 239:24
**funds** 140:6, 17 171:24 175:7
**funny** 166:21
**further** 62:16 90:14 124:20 197:13 251:12
**future** 37:9, 18 39:7 69:20 90:14 215:21 219:10 221:2

**< G >**
**GableGotwals** 6:8
**game** 135:2
**geez** 185:17
**general** 14:17 43:4 85:21 117:15 141:11 167:3, 11 172:20, 21 173:8
**generalities** 156:2
**generally** 10:7 21:22 25:21 28:5
**generating** 215:7
**generations** 162:3
**gentile** 110:25
**gentleman** 188:16 206:6, 8
**getting** 13:5 16:2 24:3 53:4 56:21 57:20 114:7, 9 115:13 138:18 139:12 141:6 145:17 149:9 154:14, 22 159:12 161:6 177:19 181:18 201:19 204:19 206:17 209:21 212:17 218:17 219:21 224:5 245:2
**give** 9:12 37:15 55:4 65:7 72:5 90:13, 16 93:4 101:11 124:21 142:18 144:3, 20 145:16 150:11 153:2 186:25 187:4, 7 203:15, 16 206:3 225:20 226:9 242:6 243:19 248:9
**given** 8:20 31:9 87:23 97:22 118:8 138:17, 19 144:2 172:10 185:16 233:11 249:8
**gives** 126:12 213:7
**giving** 9:11 51:23 64:13 146:10 153:11 157:7 158:11 159:11 206:14 244:6
**GL** 167:8
**globally** 82:1
**GLs** 167:3, 10, 13 169:5, 6, 7
**go** 12:16 13:10 15:16 21:8 26:11 29:15 30:18, 19 34:14 37:23 38:20 40:22 41:5, 7 54:25 56:2 60:1 63:9 87:15, 20 88:15 89:7, 11, 12 92:5 95:11, 16 109:24 111:10 120:5 121:12 124:4 126:25 141:25 146:16, 24 159:3 167:17 170:10, 12, 13, 17 171:16, 19 176:3 187:5 193:6 194:21 195:5 201:19, 21, 22 203:21, 23 217:22 219:24 223:21 224:3 230:20 231:8 237:15 238:12 241:22 242:5 247:17 248:17
**goes** 30:24 121:9 127:22 171:14
**going** 9:2 10:5, 6 11:24 13:17 16:7, 11 19:21 20:8 21:23 23:18 25:7 29:14 30:7 31:11 37:13, 14 39:22 42:3 44:1 45:1 46:4, 13 47:8, 21, 23 48:18 49:2 50:6, 24 54:11, 24 58:11 60:3 62:14 63:7 65:19 66:11, 24 67:3 69:6, 23 70:2 72:5 76:6 77:8 83:23 88:1 89:8, 17 91:1, 2, 13 93:6 97:7 99:6 101:15, 18 104:18 105:8 108:24 110:14 111:9, 23 112:16 115:18 118:4 122:15 124:2 126:19 127:4 128:19 133:8, 12 134:15, 24 135:11, 16 139:10 143:12 144:1, 16 145:10 146:1 149:16, 22, 23 150:15 151:9 156:16, 18, 25 160:1, 25 169:3 170:17 172:7 174:10 175:9 187:16 188:8 189:5 191:11 193:21 194:9, 18, 21 195:15, 20 211:21 217:23 223:22 224:8 229:24 232:18 234:7 235:14 242:6 247:2, 23 248:5, 14
**good** 9:11 24:1 67:14 109:16 155:15, 18 159:24 167:23 182:14 195:6 219:25
**gosh** 153:15
**gotta** 66:16 234:8
**gotten** 17:8 18:10 121:20 152:23 170:22

196:9 219:3 227:3
**govern** 145:14
**governance** 139:13 156:11
**governed** 40:25
**grace** 52:2
**grant** 153:6 187:13
**granted** 144:7 246:20
**granting** 36:11
**grapevine** 152:16
**grasp** 126:9
**Great** 23:25 90:19 106:23
**greater** 56:15 73:25 74:2 138:24 139:12
**greatly** 140:7
**Green** 234:25 236:20
**GREENBERGTRAURIG** 2:10
**Greenlite** 136:7
**Griffith** 2:10
**ground** 57:18 97:8
**Group** 4:24 5:10 86:10 125:4, 7, 9, 19 136:12, 16, 17 182:16 184:19 206:9 211:25 212:12, 17 214:8, 23 218:8, 11, 16, 19 219:17 231:20 232:2, 10 239:4, 12 245:11
**groups** 214:14
**guarantee** 28:8 41:6, 7 99:23 100:8 213:14
**guaranteeing** 213:20, 25 220:21
**guarantor** 35:8, 9 39:13 45:24 98:15 99:19, 22 100:16, 18, 19, 20 232:20
**guarantors** 215:13 216:2
**guard** 60:14
**Gubin** 3:20 81:4
**guess** 15:19 43:4 109:25 111:16 115:6 117:2, 24 122:19 149:9 162:11 167:17 217:13 236:25
**guessing** 164:16
**guidelines** 49:7
**guy** 124:15 209:2 210:22 211:14 212:15
**guys** 7:17 59:16 98:9 173:21 200:16 208:25 219:18 235:3 236:2 248:2
**guy's** 202:14

**< H >**
**halachically** 203:7
**half** 12:25 212:4 247:2
**hammer** 120:23
**hand** 251:15
**handle** 134:22 180:9 221:14
**handled** 152:7
**handling** 206:13
**handwriting** 237:1
**hanging** 164:24
**Hannah** 22:4
**happen** 12:21 77:12 117:9 129:16 152:24 171:21 174:15 201:18 241:25
**happened** 100:1, 2 117:1, 3 134:21 159:2 175:19 189:1 225:3
**happening** 62:6 65:22 94:25 96:4 110:3 161:5 224:14 229:23 243:17
**happens** 49:24 226:25
**happily** 133:8
**happy** 51:1 102:17 103:24 105:1 145:7 146:2 176:2
**hard** 9:14 26:18, 19 27:16 43:9 72:12 86:21 89:6 126:9 127:19 173:17 202:23
**Harper** 4:21 202:9, 12, 22, 25 204:7
**harperadvance.com** 202:14
**Harper's** 204:8
**Harwood** 1:22 6:9 250:2 251:5, 23
**head** 9:13 99:6 123:11 136:19 175:17 176:25 193:3 207:24 211:19 217:24 225:7 235:3 245:15
**hear** 13:16 109:16 160:17
**heard** 152:15 184:9 190:17 251:9
**hearing** 246:21
**heated** 122:18
**heavy** 194:12
**held** 16:7 147:6
**Hello** 81:11
**help** 82:10 99:18 105:6 118:13 154:14 155:18 182:24 194:3 203:9
**helpful** 87:19
**helps** 227:8, 9
**hereinafter** 98:17
**hereto** 6:3
**hereunto** 251:15
**Hershberg** 209:3
**Heter** 203:6 222:21, 23
**Hey** 7:17 22:3 87:20 112:5 114:6 142:12 198:15 235:4 236:1
**Hi** 21:6
**hide** 61:22 99:9, 17
**hiding** 60:22
**high** 171:12 182:1
**higher** 189:11
**highlighted** 37:22
**Hilario** 7:19, 24
**Hilary** 2:15 7:25 13:6, 24 41:13 201:19
**Hill** 153:15
**hills** 125:24
**historic** 126:8
**hit** 173:17
**hold** 10:5 41:13 123:1 124:25 149:19 152:24 167:19 184:3 222:6 235:14 242:16
**HOLDER** 1:3 10:12, 24 11:1, 19 12:7, 9 30:14 31:3, 7, 18, 21 32:1 33:16, 18 34:8 39:8, 14, 17 56:5 74:12, 19 75:10 101:1 102:19 122:1 147:15, 20 148:11 149:13
**Holders** 101:25 151:10
**Holder's** 33:21 34:3
**holding** 33:6 62:21, 23 168:7, 20 180:22
**HOLDINGS** 1:3 10:12, 15, 17, 20

11:24 34:8 39:14, 17 48:15, 20, 25 56:9 62:20, 22 64:4 68:15 74:18 75:10 87:1 88:23 97:3 100:25 102:19 122:1 128:3 136:7, 13 147:15, 20 148:11 149:12 163:17 167:17, 25 168:4 170:18, 19, 23, 24 171:16, 17, 18, 20 172:9 213:4, 8 214:13, 14, 20 215:3, 5 228:5, 11, 18, 21 232:19
**Holding's** 101:24 171:11 172:7
**holds** 30:14, 23 76:2, 3 102:8 226:15
**holdup** 19:22
**hole** 119:19
**holes** 119:22, 23, 24 120:1, 13
**home** 243:18 244:13 246:22
**homes** 244:2, 8
**honest** 87:17 134:6 195:20
**honestly** 88:3
**honoring** 117:8
**Hope** 22:5
**hopefully** 125:1
**hopes** 111:3
**hoping** 123:18
**hour** 50:7
**hours** 163:3 247:9
**housed** 11:3
**housekeeping** 140:21
**Howard** 22:5
**huh-uh** 9:13
**hundred** 16:16, 23 17:5, 13, 17 18:1 19:12 32:3 123:9 183:19 225:25
**hunting** 219:20
**hurry** 29:8
**hurt** 62:2 63:15 99:9 171:12

**< I >**
**idea** 63:13 71:13 89:13 93:25 104:4 143:10 163:8 226:14 230:14
**ideas** 95:3
**identical** 55:23
**identification** 12:19 19:18 21:19 25:6, 12 29:20 32:20 41:10 51:17 53:20 54:6, 8, 10 55:10 56:25 58:24 78:12 80:24 85:6 93:8 105:22, 24 106:1, 3, 5 114:5 130:3 131:7, 10 160:11, 13 179:4, 6 187:19 195:19 199:24 202:5 208:16 211:23 218:2 224:2 228:3 229:6 231:11 233:5 238:9 239:16 241:10 242:11
**identifies** 162:16
**identify** 7:14 14:16 82:19
**identifying** 217:16
**identity** 30:11
**immediately** 211:13 235:25
**impediment** 135:21
**impending** 111:22
**implementation** 128:17
**importance** 125:14
**important** 92:6 97:10 165:3
**imposed** 153:9
**improper** 152:11 157:5, 9, 15, 17
**improperly** 138:15
**inappropriate** 67:13
**inartful** 92:18
**include** 35:24 43:5 59:13 83:20 84:3, 9, 16 89:1 134:3 210:24
**included** 28:14 59:9 83:9 99:20 192:16
**includes** 39:5 87:1, 2 171:3, 8 191:16
**including** 26:25 35:10, 21 38:7 69:20 180:14, 16 181:10 186:3 193:17 205:3 216:12 232:7 246:3
**inclusive** 43:15
**incomprehensible** 9:8
**incorrect** 157:4
**incorrectly** 237:5
**increase** 60:20
**incur** 220:5
**INDEX** 3:1
**indirect** 44:25 45:7, 12 46:25 101:4, 9, 23, 25 102:9, 21 104:10
**indirectly** 35:9 43:6, 21 44:14 45:23 48:1, 7, 15, 25 49:17 100:17, 18, 25 102:18 148:1
**individual** 48:4 106:7 167:6, 7 205:23 206:11
**individually** 20:14
**industry** 210:13
**infancy** 129:7
**infinite** 92:23
**influenced** 161:12
**information** 30:21 45:25 48:5 117:20 183:1 187:11 219:15, 19, 22
**initial** 42:21 52:11 198:19 202:16
**initially** 22:8 118:12 126:24 189:25 192:7 232:2
**initiate** 117:6
**initiated** 110:5 116:14 118:23
**input** 15:25 16:1, 25
**ins** 18:8 76:10 145:6
**insight** 135:14
**insofar** 234:19
**instance** 89:3 116:12 134:23 143:9 226:22 234:21 236:16
**instruct** 50:24 149:23
**instructed** 115:11 211:15
**instructing** 50:20
**instruction** 150:7, 23 151:8
**insurance** 85:10, 11, 14, 15, 17, 18, 19, 20, 22 86:2, 4, 9, 14
**integrated** 180:8, 9
**intelligently** 176:8
**intend** 88:25
**intended** 66:1 70:20 88:20 90:2, 13, 16 91:25 97:16
**intent** 87:5 92:3, 5

**intention** 66:3 94:3
**intentional** 222:10
**intentionally** 38:18 101:17
**interacting** 27:18
**intercompany** 76:4
**intercreditor** 234:9, 11, 15, 16 235:6
**interest** 24:13, 15 26:25 30:15, 23, 24 31:16 33:21 34:3 35:20, 23 36:10 39:1, 16 44:22 45:14 56:9 57:20 62:21, 23 63:2 68:12 70:6 74:14, 20 75:9, 11 76:1, 5 77:3, 6 84:6 107:11, 22 108:22 111:18 112:13 113:5, 17, 25 114:7 155:1, 8, 9, 11 171:11, 13 172:6, 8, 25 173:5 174:16 175:3 176:14 191:14 193:9, 10 199:6 242:8
**interested** 47:6 127:20 129:14 162:12 251:14
**interesting** 188:15 190:12
**Interestingly** 213:3
**interests** 31:4, 10, 18, 20 32:1 36:12 37:6 40:11 56:5 62:9 71:18 74:12, 19 87:1
**interim** 196:10 209:11
**intermediate** 33:6 47:1 168:20 174:1 176:13
**internally** 65:15
**interpret** 102:25
**interpretation** 73:1 99:8 104:17
**introduced** 194:17 212:14
**invest** 101:20
**investing** 49:23
**investment** 4:14 11:8 14:19 15:5 48:13 125:10 165:5, 6 179:24 180:8, 10
**INVESTMENTS** 1:6 8:19 10:18, 22 11:2, 4, 22 12:10 43:11 236:22 237:4
**investor** 33:19, 20 102:3, 20 124:22 125:8 138:5, 21 148:16 155:7, 9 163:2 168:17, 19 172:10 176:23 177:7 211:5 226:6, 7 230:6
**Investors** 45:15, 16 61:25 101:20, 22 102:1 121:17, 21 137:19 140:3, 18 142:6 145:1, 21 148:14, 17 155:1 158:22 167:12 169:7 175:23 205:23 206:12 240:17 245:6
**invited** 229:17
**involve** 141:22 177:1 241:24
**involved** 59:5 175:6 205:12
**involving** 24:18 81:3 193:5
**IPFS** 86:10, 11
**irrevocable** 35:18
**Iska** 203:6 222:21, 23
**isolate** 49:12
**isolated** 95:7 125:3
**issue** 20:8 77:22 87:24 96:10 109:23 122:13 125:23 130:23 134:4 145:11, 17 147:25
**issues** 10:3 24:14 72:18
**Item** 78:21 79:23
**items** 165:2
**its** 12:12 35:19, 20, 23 39:7, 9, 19 66:13 75:11 105:14 121:8 122:12 129:7 181:15 211:7 248:15 249:7
**IV** 39:4 193:6

< J >

**January** 51:5, 24 53:4, 14 54:14, 15 56:20 123:2, 15 128:15 170:15 189:7 247:24 251:16
**Jeffrey** 229:13
**Jenks** 225:10, 11
**jeopardy** 158:18
**jerk** 9:16
**Jewish** 203:4, 5
**Jews** 203:2, 6, 7, 8
**Jim** 2:16
**Jindal** 3:8 26:2, 22 27:4, 14 29:5 30:21
**Jindal's** 30:5
**job** 8:24 23:25 90:19 107:21 143:16 250:4
**Joel** 2:9 7:8, 13 8:18 12:20 34:15 91:20 114:6 115:6 121:11 144:23 159:24 195:6
**joel.tasca@gtlaw.com** 2:12
**Joey** 224:11, 23 225:4
**joinder** 20:5, 13 21:2 59:21 60:9, 10, 19, 20 61:6 62:5 63:13 68:20 69:9, 14, 24 70:19 73:1 75:22 76:19 88:6, 20 89:13, 21, 22 90:6, 17 91:5, 10, 23 92:2, 4 93:20, 23 94:4, 9 95:14 96:2 98:5, 10, 14 99:20 139:16
**joining** 90:7, 9
**joins** 95:15
**joint** 61:18
**Jon** 7:17
**Jonathan** 2:15 7:23
**judging** 156:7
**judgment** 28:11, 21 47:13
**July** 106:24 107:11 108:6 128:14 223:3 239:4, 24 241:12 244:6 245:12
**jumbo** 42:12
**jump** 135:15
**jumped** 238:4
**jumping** 39:22 224:4 238:17
**June** 197:3 224:7 229:9, 11 231:20 233:11
**junior** 234:16
**JURAT** 249:1
**JV** 136:10
**JVs** 137:15 147:5

< K >

**Kansas** 9:24 10:8 244:14
**Karsh** 229:13

**keep** 59:20, 22 61:1 63:13 113:3 127:19 189:22 223:8
**keeping** 59:23 120:18 206:25
**keeps** 227:10
**Kensington** 177:3
**kept** 42:25 164:9 220:18
**Kerry** 2:9
**kerry.kleiman@gtlaw.com** 2:13
**key** 205:19, 22, 25
**keys** 124:21
**kind** 22:19 29:15 52:3 85:11, 19 94:25 95:2 110:1, 25 111:21 119:6, 8 125:18 152:20 162:4 163:9 164:23 166:19 173:23 174:13 175:2 176:20 179:15 195:23 201:4 202:23 205:11 234:18 241:12
**kindly** 78:9
**kiting** 117:12, 17
**Kleiman** 2:9
**knew** 140:3 197:2, 4 204:15 205:23 206:1, 7, 10, 14 210:3 212:23 218:19 226:17
**know** 7:23 8:2 9:4, 6 10:3, 25 11:6 12:23 13:3 14:15 15:17 16:19 17:9 18:11, 17, 18 19:3, 23 20:9 21:14 23:3, 15, 20 24:12 25:20 31:13, 14 34:24, 25 41:16 42:14 43:9 45:3, 12, 13 47:11, 18, 20 50:2, 3 60:17 61:15 63:3, 4 66:14 68:7 73:8, 10 75:7 76:9, 10, 12, 14, 15 77:10 80:1, 10 82:8, 18 86:13 87:16, 18 88:3, 4, 5 89:9 90:1, 8 91:3, 22 94:23 96:11 97:1, 9 98:10 99:4, 5, 7, 11, 15 101:19 102:11, 15, 16, 17, 23, 24 103:24 104:8 107:17, 19, 24 108:2 109:1, 2, 3, 4, 7, 10, 16 110:13, 25 111:1, 8, 21, 24 112:1, 4, 5, 8, 20, 24 113:12 117:23 118:10, 22 119:3, 4, 6, 8, 14, 15, 16 120:1, 2, 5, 22, 23, 25 121:4, 21, 23 122:4 123:2, 7, 22 124:1, 15 125:1, 13, 18, 20, 23 126:14 127:10, 13, 14, 15, 16 128:9 134:1 135:15 136:16 137:6 138:3, 7 139:25 140:5, 7, 16 141:3 143:6 144:14 145:6 146:1 147:19, 22 148:22 149:15, 16 150:12, 13, 14 151:6, 7 153:3 155:8 156:7 159:4, 6 160:19 161:8 163:16, 19 165:2 166:4 168:8 173:2 176:1, 11, 16, 24 178:16 182:1 184:10 185:18 188:13 189:3, 8 190:15, 20 192:15, 21 194:22 197:2, 6, 9 198:18, 21 199:9, 16 202:19 203:12 204:24 205:24 209:5, 8 210:4, 8, 12, 20 212:7, 15, 16 214:12 216:17 219:6, 16, 20, 21, 22 220:17, 25 221:13, 14 222:6 226:22, 25 227:4, 5, 8, 11 234:21 235:4, 14 240:11 244:17 247:13
**knowing** 45:11 199:16 217:10, 13 230:19
**knowledge** 74:17 178:15 186:6
**known** 197:19
**knows** 127:16 135:18 173:2
**KULICK** 1:3, 9 3:19, 23 4:6, 12, 13, 14, 17 5:7, 10 6:4 7:3 8:10 14:8 20:14 25:14 28:7 29:18 31:22 47:16 80:22 81:12 89:12 102:22 163:22 188:17 220:1 249:5, 17
**Kulick's** 32:22

**< L >**
**label** 14:5 41:17
**labeled** 78:5 98:6
**labels** 23:21 25:13
**lack** 60:7
**laid** 175:15
**Lakeside** 216:12
**land** 52:20
**Langlois** 2:16
**language** 26:7 27:1, 2 65:8, 9 95:17 132:13, 21 133:25
**large** 172:19
**largely** 109:16
**larger** 14:19 68:11 107:12 111:4
**Las** 2:11
**late** 51:7 52:5, 8 185:17
**law** 50:23
**laws** 41:1
**lawsuit** 111:25 127:13 190:13 208:7, 8
**lawyer** 26:2, 3 31:14 76:11 109:2 147:24 161:6
**lawyers** 37:2 73:6, 11 142:8 155:15, 18
**lay** 42:4
**layers** 86:3, 5
**lead** 44:19 57:25 195:24 234:22
**leadership** 181:9
**leading** 135:1
**lead-up** 31:5
**learn** 159:5
**learned** 142:5 221:20, 24
**leases** 233:10 243:2
**leave** 162:11 228:17 248:13
**leaving** 145:16 184:11
**led** 111:7
**ledger** 167:11
**ledgers** 167:3 172:20, 21
**left** 35:2 77:19 184:17 235:25
**legal** 31:15 99:11 155:20
**legally** 31:13 148:9

**lend** 74:24 203:4, 5, 6, 8 204:2 230:5
**lender** 35:7, 18, 24 38:1, 5 39:24 40:1, 7, 18 75:5 104:14 116:23 123:24, 25 124:22 127:8, 11, 16, 18, 24, 25 128:4 133:18 138:20 142:2, 13, 20 143:9, 13, 21 144:4, 7, 12 145:4, 5, 11, 12, 18 146:9 151:16, 17, 19, 20 152:11, 13 153:9 155:4 167:24 173:15 182:20 190:4 191:20 202:24, 25 221:17, 19 224:21, 24 225:2, 17, 18, 19 226:11, 13, 17 227:13 228:7 233:24 234:6, 17 235:1, 19, 20, 21 236:7 245:1 246:12
**lenders** 24:11 43:13 104:1, 6 116:10, 11, 15 141:25 143:8, 16 144:13, 14 149:17 152:3, 20 156:14 157:3 166:21 177:20 182:19, 20 186:16 189:24 192:16, 17 193:2 205:8 210:4, 8 219:1, 16 226:23 233:23 234:2, 10, 13, 14, 16 240:10
**lender's** 127:12
**lending** 203:11
**LendSpark** 183:4 188:2, 19, 21 189:9, 14 191:12 196:2, 8 197:21 198:25 204:2, 5, 8, 12, 15 207:1, 5 208:25 209:4, 15 210:1 212:10, 13, 16 213:11 218:11, 17, 20
**LendSpark's** 198:15
**lengthy** 21:21
**lent** 86:13 244:20
**level** 33:14 85:10 97:8 121:18 167:14 168:21 169:4 172:11
**liability** 85:22 153:9
**lien** 193:9
**liens** 60:13 133:9, 13, 21 134:5, 8, 10, 12, 22 135:17, 19
**lieu** 141:22 242:6
**lifeline** 111:2
**lifted** 125:21
**limitations** 17:10 18:8 166:23 226:5
**limited** 35:21, 25 38:7 113:17 115:4
**limiting** 115:1
**line** 14:15 25:21 75:4 76:3 88:7 116:20 117:9 133:7 165:2 180:7 194:19 198:6 250:5
**Lines** 68:4, 5 92:25
**liquidated** 40:13
**liquidating** 60:16
**liquidation** 40:21
**liquidity** 173:2
**list** 42:2 43:18, 21 44:8 70:25 95:13 96:8 129:5 183:1 206:3
**listed** 16:5, 9 32:5, 25 44:15 47:25 62:11 132:4, 14 152:11 180:19 191:8 193:25 194:1 205:3, 18 216:5
**listen** 151:9 167:20
**listening** 221:9
**lists** 231:3
**litigation** 18:15 34:22 35:1 46:21 73:4, 7, 13 90:20 109:12 110:5 148:21 153:19 154:1 157:14 186:2 207:10
**little** 9:14 12:24 13:1 28:9 39:23 54:24 79:16 115:12 123:23 124:14 125:11 126:20 129:23 131:23 160:4 185:8 193:22 195:24 223:7 224:4 238:4 241:16
**live** 186:17, 19
**Living** 47:15 136:5 146:7 210:15, 16 216:12, 13, 14, 15 225:10 236:15 237:8, 14 240:16, 20 242:2 243:5, 6
**LLC** 1:3, 6 10:12, 15, 16 11:25 30:14 34:8, 9 45:15, 16 47:15 56:5, 9 62:21, 23 101:22 102:1, 19 122:1 136:7, 13 137:12 146:7 147:15 148:11 167:12 169:7 189:19 210:15, 16, 17 211:2, 6 213:8 216:13, 14, 15 228:5, 6 230:6, 7 233:12 236:15, 23 237:8, 14 240:17 243:6
**LLCs** 56:6, 10 87:2 230:5
**LLC's** 101:25
**loan** 3:10, 24 4:2, 3, 4, 5 23:13, 25 24:9, 15 25:3 26:3, 4, 8 28:10, 16, 21 30:2, 19 31:6, 8 42:21 51:5, 24 52:1, 12, 22 53:1, 5 54:15, 16, 18, 21, 23 55:1, 12, 15, 17 56:3, 15, 19, 20, 22 57:1, 2, 10, 14 58:1 63:24 66:4, 18 69:21 73:16, 25 74:2 88:22 95:8 97:3, 22 103:18 106:14, 18, 19, 22 107:2, 8, 11, 15 108:1, 6 109:9 111:14 113:7, 8, 9 117:4 118:12, 23 128:21 137:25 138:4 142:15 145:22 153:1, 6 162:22, 25 164:17 165:4, 15 166:17 169:12 170:6, 14, 22, 23, 24 171:3, 8, 13, 15 172:22 173:21 182:15, 16 186:24 188:22 189:16 191:22 192:9, 23, 25 194:15 196:17 203:2, 13 204:9, 15, 18 211:12 215:3, 10, 12 218:18 221:2 225:5, 6 228:8, 13, 17 229:17, 20 230:5, 10 233:12, 14 234:22 236:5, 11 240:11 241:5, 13 242:6, 7 243:18, 24, 25

244:9 245:23 246:7, 12
**loaned** 73:16 165:16, 19 166:13 171:2 243:16
**loaning** 166:13
**loans** 22:21 23:1 24:12 52:6, 13 53:4, 23 54:12, 19 58:15 69:20 74:5 90:16 105:5, 9, 19 107:4, 21 108:15, 16, 21 109:14 110:8 112:9 118:5, 6 119:1, 2, 11 121:5, 7, 19, 22, 25 128:1 139:24 140:3 143:11, 12 144:11 159:12, 16, 17 161:23 162:14 163:6, 15, 17, 20, 21, 22, 23 164:16 167:2, 25 169:12, 23 170:1, 2, 5, 6 171:4 172:16 173:5, 8, 13, 16 184:20, 22 186:22 189:24 191:25 192:8, 16, 18 196:10 202:18, 24 203:8, 16, 17 204:3 206:7 230:17 233:23
**local** 126:10
**location** 193:5
**Lofts** 123:11 128:5, 11 138:1 151:21
**logical** 73:18, 23
**login** 187:3
**LOI** 126:11 129:11
**long** 24:1 35:5 82:10 115:17 117:23 118:16 124:25 143:13 155:11 169:22 182:25 200:1 222:1 224:19 226:11 239:10
**longer** 56:19 117:8 183:5 199:14 240:19
**look** 14:12 15:11, 13, 16 19:23 23:18 25:2, 8, 9, 15 28:1 29:17 37:19 39:4 45:18 51:1 66:24 72:1 78:3 85:1 90:19 100:16 102:12 104:20 111:1 116:1 125:16 132:7 139:7 141:20 142:1 144:1 145:7 146:2 161:21 166:7 168:23, 25 169:3 179:7 192:15 212:1 232:25 246:25 247:14 248:5
**looked** 45:13 56:4 111:1 112:7 142:2 146:12 179:17, 19 197:13 198:20 201:6 207:1, 11
**looking** 14:13 15:19 16:21 24:1 27:13, 21 33:7 34:23 37:23 51:9 72:12 79:10 93:12 111:5 160:14, 20 161:7, 8, 10, 11, 15 162:7 165:22 179:21 196:24, 25 199:1 224:12 233:7, 8 236:19 243:4
**looks** 28:18 41:20 43:12, 17 105:15 116:6 131:16, 20 200:1 207:2 231:19 241:13
**lose** 124:22 146:17 189:5
**losing** 23:3 60:16, 22
**loss** 77:13
**lost** 41:12 242:8
**lot** 24:19 37:3 49:14 57:14, 18 80:13 87:21 95:3 97:2, 17 110:24 115:8 118:8 125:19 146:5 163:5 166:20 177:20 190:14 215:17 226:4, 23 244:10
**lots** 61:24, 25
**Louis** 10:18, 21 11:4, 10, 15, 22 236:21 237:4
**love** 127:17 210:5
**Low** 246:7
**luck** 67:14 246:20
**lunch** 105:6 122:4

**< M >**
**Machine** 179:12, 13, 18
**Madam** 238:2
**Mae** 190:11
**main** 16:20 111:17 114:24 157:3 168:5
**maintain** 186:22
**maintaining** 80:3
**major** 16:22 17:1, 11, 13, 18 136:11, 17
**majority** 161:9
**maker** 16:17, 20, 24 17:6, 18
**making** 44:19 47:12 125:10 161:13 166:17 174:2 175:24 207:25 216:10 227:10
**malaise** 230:16
**man** 22:25 188:17
**manage** 10:8 48:8, 15 49:1, 18
**managed** 11:21 48:1 100:18 127:15 180:25
**management** 49:8, 25 119:11, 24 180:10, 11 181:10
**manager** 11:14, 16 16:16, 23 17:5, 10, 18 18:1 19:12 48:9 49:12, 13 136:5, 9 144:19 145:15 146:10 230:5, 24 236:22
**managers** 49:24
**managing** 9:23
**manner** 78:1
**Manor** 146:7
**Manors** 237:13
**Maranda** 15:1, 2, 3
**Maranda's** 15:17
**MARC** 1:3, 9 3:10, 23 4:6, 10, 13, 14, 17 5:7, 10 6:4 7:3 8:10, 15 9:22 14:11 16:16, 20, 23 17:5, 17 18:1 19:11 21:8 22:3 31:22 33:12 37:15 47:16 50:15 54:13 68:8 72:25 78:16 80:8 81:2, 12 88:10 89:14 93:9 100:15 102:22 105:16 106:25 114:14 122:11 130:4 154:19 161:5, 20 163:22 179:8 181:9, 19 195:23 202:8 228:1 229:7 230:4 238:22 243:1 246:17, 22

247:8 248:9 249:5, 17
**March** 106:24
**Marc's** 62:6 113:17 247:24
**mark** 19:15 25:3, 7, 10 29:17 32:15 41:8 54:2 58:19 78:4 93:5 97:21 105:14 178:23 187:16 223:22 239:3
**marked** 12:18 14:8 19:17 21:17, 18 25:5, 11 28:2 29:19 32:19 41:9 42:6 51:16 53:19 54:5, 7, 9 55:9 56:24 58:23 78:4, 11 80:23 85:5 93:7 105:21, 23, 25 106:2, 4 114:4 116:2 130:2 131:6, 9, 12 160:10, 12 161:17 179:3, 5 187:18 195:18 199:23 202:4 208:15 211:22 218:1 224:1 228:1, 2 229:5, 8 231:10 233:4 238:8 239:15 241:9 242:10
**market** 24:11 162:4
**marketing** 129:2
**marketplace** 192:11
**master** 85:13
**matter** 20:3 63:4 104:7 133:2 149:2 217:15 222:2 242:14
**matters** 80:14
**maturity** 172:23 173:1
**MCA** 103:5, 15, 16, 20, 21 104:1, 6, 14 144:11, 14 159:12 181:23 182:21 186:3, 16 188:1, 4, 9, 11 190:4 191:22 192:8, 16, 18 196:2, 9, 21, 23 197:16 200:2, 4 202:10, 15, 18, 22, 25 203:12, 15, 24 204:19 205:7, 8, 21 206:8, 11, 17, 21 208:18 209:22 210:3, 7 211:7, 8, 25 215:19 217:1 218:4, 8, 11, 12 219:2, 8, 15 221:10, 17 225:5 231:20 239:4, 23 241:5 245:12, 22
**MCAs** 104:3, 4 159:17 181:19 182:4, 8 186:10, 12 189:24 190:1 197:4 198:25 203:14 204:3 206:25 209:23 210:2 212:6 216:20 218:24 219:4 221:20 231:24
**mean** 11:17 21:2 29:11 33:8 37:1 38:11 39:11 40:4 44:3 70:13 73:6 81:23 82:3 84:1 87:3, 8 90:1, 25 95:25 97:18 98:24 101:9, 10 104:4 110:22 117:19 120:20 121:1, 3, 4, 14, 25 129:14 132:8 133:7 138:6 139:7 141:7 144:18 147:1, 19 161:18 163:21 168:8 181:20 186:19 189:18 192:15 193:12 194:2, 7, 24 198:11, 18 199:3 206:4, 5 212:25 219:13, 18 224:18 226:21 230:25 232:1 236:18 237:22, 23 240:22
**meaning** 82:6 130:22
**meaningful** 76:18
**meaningless** 209:25 210:6
**means** 22:13 62:3 63:15 70:5 87:9 105:17 124:16 152:1 180:9
**meant** 12:23 27:3 38:18 64:2 73:2 76:20 89:16 192:4 197:8 212:9
**mechanic** 133:13
**mechanics** 133:9, 21 134:5, 8, 10, 12, 22 135:17, 19
**mechanism** 82:9
**medications** 9:18
**meet** 124:19 248:3, 13
**meeting** 235:3 236:1
**member** 11:3, 5, 9, 16 12:14 39:7 45:16 101:17, 18, 20 211:5 230:7
**members** 10:16, 25 34:1 101:14 137:19 144:21 146:21 147:1, 7 149:4 173:25 174:2 176:12 198:24 214:4 222:16 244:23
**member's** 174:16 175:3
**membership** 24:13 30:15, 24 31:4, 16, 17 36:10, 12 37:6 39:15 40:11 56:4, 9 62:21, 23 63:2 70:6 71:18 75:11 77:3, 6 84:6 87:1 96:18 147:7
**memory** 92:23 110:1, 23 117:21 181:23 190:3
**mensch** 24:4
**mentally** 176:15
**mention** 13:4 241:17
**mentioned** 111:9 114:19 128:25 137:17 151:17 152:20 196:7, 25 223:1 231:21
**mentioning** 234:2
**mess** 106:15
**message** 3:10 5:2 23:11 62:17 63:6, 10 66:2 69:23 92:2 93:12, 17 95:18 224:10, 15
**messages** 22:11 27:17, 24 57:15 84:12 93:11 94:22
**met** 118:22 130:20 135:24 194:13, 15
**method** 66:19
**methods** 112:11 114:16, 18
**Miami** 1:18
**Michael** 4:6, 10 5:10 131:17
**mid** 123:2
**middle** 23:23 162:24 201:16
**Midtown** 124:12, 18 216:15
**Mike** 242:3
**Miley** 2:15 7:23 8:2 58:9 59:5 60:6 84:18, 20 114:8 141:14

**million** 57:3, 5 89:3 107:23 127:2 166:4, 8, 12 171:1, 7, 24 184:1 189:16 203:25 209:9, 10 212:4 229:17, 19, 22 231:19 240:2 243:15 244:9
**mind** 36:19 65:25 72:8 101:5 110:20 143:13 170:10 235:7
**minds** 41:12
**mine** 15:3 69:15 76:15 89:14, 23 90:9, 22 91:11 92:14 95:16, 21 106:11 149:15 163:2 231:1 236:7
**minimum** 43:12 154:12
**minute** 23:19 201:20
**misrepresentation** 104:22
**missed** 114:11 124:5
**missing** 134:2 185:10
**misspeak** 123:8
**misspoke** 128:15
**mistake** 142:2 220:24 237:23, 24
**mistakes** 139:21
**misunderstanding** 91:4
**misunderstood** 114:17
**mix** 173:10
**mixed** 242:24
**mode** 139:17
**Moishe** 3:20 81:4
**moment** 92:24 227:18
**Monday** 132:5, 15
**money** 23:1, 4 29:9 57:13 74:24 77:15, 20 81:8 85:8 87:15 89:5 116:16 118:13, 14, 20, 24 119:17 120:12 124:24 127:17 148:16 166:13 170:17, 18, 20 173:15, 16, 21 175:23 202:23 203:5, 10 209:19 210:10 211:17 215:6 222:18 243:14 244:20 245:4, 22
**monikers** 181:25
**Montgomery** 129:3, 19
**month** 226:1
**monthly** 86:6
**months** 221:21
**Morales** 15:2, 3
**mortgage** 5:14 86:7 130:14, 23, 25 133:13 138:20 141:17 142:4, 14, 19, 23 143:4, 22 144:21 145:2, 5, 16 146:11 151:10 154:15 155:3 158:17 159:17 191:25 193:7 203:16 219:1 221:23, 24 222:2 224:17 225:2, 20 226:9 228:7, 8, 9, 15 233:15, 19 234:24 235:4 236:2 241:17, 18, 20 243:4, 7 244:1, 5, 7 245:3, 5 246:7, 12
**mortgaged** 122:14
**mortgagers** 236:22
**mortgages** 107:2 122:12, 20, 22 123:9 124:12 125:15 138:18 142:1 144:2, 3, 6 147:17 148:19 151:12 152:11 154:22 156:14 157:2, 7 158:11, 21 159:11 177:21, 24 178:1, 6, 8, 14 203:17 224:20 225:8, 9 226:15, 16 233:9, 14 235:17 237:17 243:1, 16 244:20, 24
**motion** 130:6 246:21
**motives** 73:21
**mouth** 64:21, 23 139:4
**Move** 67:4, 5, 10, 12 91:1 115:24 140:15 142:14 144:18 197:14 247:8
**moved** 62:10 243:20
**moving** 223:9
**muddled** 46:7
**multifamily** 84:3
**multiple** 60:3 65:21 68:6 86:5 111:24 112:4 164:22 174:2 182:9, 16 183:11 185:1 214:17 232:3
**Muntage** 123:16 126:19, 25 127:1 129:23 136:5, 6, 11, 13, 23, 25 138:2 171:15, 17, 18
**mutually** 95:5 96:13, 14

< N >
**N25C-10-309** 251:9
**nail** 182:2
**name** 22:3 35:10 81:12 101:24, 25 102:5 149:21 176:25 202:14
**named** 81:3 188:17 224:11
**names** 7:7 48:3 59:12 181:25 182:2 206:14
**native** 41:23
**nature** 80:1
**necessarily** 14:14 45:6 146:16 239:3
**necessary** 35:19, 22 38:16 55:25 94:9 124:24 137:19 138:9, 16
**need** 9:3 19:22 59:15 72:15 80:19, 20 86:1 93:21 113:3 121:12 127:18 130:13 142:6 145:2, 5 146:16 156:7, 8 166:15, 17 199:4, 5 217:17 219:24 223:6, 9 226:7 228:16 235:13 239:3 247:9
**needed** 18:11 78:22 80:7 85:9 86:3, 10 137:20 169:14 231:13 235:14
**needing** 73:17
**needs** 63:11, 18 64:1 65:5, 17 66:7 86:13 87:11, 15, 20 118:9 120:22, 23 145:4 166:22
**negotiate** 118:16
**negotiating** 26:3 30:1 194:12
**negotiation** 27:19 57:24 69:11 194:12
**negotiations** 22:13 24:4 31:6,

8 57:15 69:20 90:15 242:8 244:25
**neither** 188:24
**net** 57:5
**Nevada** 2:11
**never** 97:19 117:1, 2 118:15 138:14, 15, 19 144:8 184:9 190:17 210:23 224:25 225:3 231:5 240:23 242:4, 19 243:9, 20, 22, 24 244:20
**New** 41:21 117:7, 8 124:8 125:3 127:7 132:10 173:9, 14 185:25
**newer** 166:1
**newfound** 138:11
**news** 152:17
**night** 72:10, 15 110:23 120:3 194:16
**nods** 9:13 175:17 193:3 207:24 211:19 217:24 225:7
**NOI** 127:1
**non-funders** 174:13
**Nope** 106:16
**normal** 32:11
**North** 6:8 123:11 138:1 151:21
**Notary** 249:16, 22
**notated** 167:4
**note** 28:7 188:20
**noted** 249:10
**notes** 251:8
**notice** 6:5 38:1 176:17 177:8 192:17, 18
**notices** 100:20 152:10, 23
**notified** 151:15 152:2, 4 196:22 211:11
**notify** 151:10, 22 196:21 204:17
**notifying** 197:7
**notion** 74:10
**November** 4:10 122:20 123:16 126:22 132:5, 16 141:15 164:8 189:6 196:16
**nullified** 209:19
**number** 16:3, 4, 16 22:4 34:24 42:9 58:21 87:11 97:25 105:12 119:8, 9 134:14 140:24 163:3 164:20 197:22 220:10 240:7
**numbering** 42:7
**numbers** 28:5 59:15 163:6, 7

**< O >**
**OA** 146:12 147:9, 10 156:9 226:3
**Oaks** 129:8, 20 153:16 242:1 243:6 244:21 245:1
**OAs** 19:2 146:16 148:20 149:3
**oath** 249:5
**object** 16:11 31:11 32:24 37:14, 15 44:1 45:1 46:4, 13 47:9 48:18 49:2 62:14 64:19, 20 65:19 66:11 67:9, 10 69:6 70:2 76:6 77:8 83:23 88:1 89:17 91:2, 13 92:21 101:6 104:18 108:24 112:16 122:15 128:19 133:23 135:11 147:18 149:22 156:25 157:24 169:1 194:9 217:2 230:12 238:3 244:18
**objected** 206:16
**Objection** 12:3 17:2, 7 19:13 33:2, 23 36:7, 22 37:13 38:13 39:12 40:9 41:3 42:22 43:8 45:9 47:2, 17 49:19 52:10 53:6 60:1 61:4, 12 63:22 64:7 65:2, 11 71:5, 12, 21, 24 72:19 73:19 74:15, 22 75:2, 15, 19 76:25 79:3, 5, 17, 19 80:1, 4 84:10 87:7 91:19 92:16 94:5, 15 95:24 96:22, 25 98:22 103:7, 8 107:6, 10, 16 108:10, 17 113:21 117:13 118:2 119:13 132:22 138:13 139:19 144:5 146:13 148:24 149:6 153:20 154:4, 8, 17, 24 155:14, 25 157:11, 16, 22 158:14 168:16 170:3 173:12 178:9 180:4 199:8 212:21 213:2, 17 214:10 215:15 217:4, 12 241:6, 19 245:24
**objectionable** 79:19
**objections** 64:21 206:19, 20
**obligated** 156:5
**obligation** 35:13 110:15 148:15 149:2 154:9, 25 156:23 157:18
**obligations** 18:9 38:3 90:7, 10 119:16 120:3 124:20 145:21 148:13 154:13 155:20 220:5
**obscene** 202:17
**obtain** 146:20 178:5
**obtained** 146:19 147:4, 16
**obtaining** 122:12 158:21
**obviously** 14:3 78:17 106:25 125:16 138:6 192:22 197:1, 4
**occasions** 116:9, 14
**occur** 18:14 24:5 190:2
**occurred** 198:7
**occurring** 14:21
**occurs** 175:1
**Ocean** 239:24
**October** 23:14 24:17 25:3 28:16 30:2 51:4, 24 52:12 55:24 97:3 118:11 185:18, 19, 25
**odd** 126:25
**offer** 54:21 93:1
**offered** 63:23 90:15 116:19 232:3 234:14
**offering** 156:14 157:7 158:10, 20 159:10
**offers** 110:13, 16 234:10
**office** 173:17
**officer** 15:5
**offices** 6:7
**officially** 248:12
**Oh** 13:17 20:22, 24 27:7 55:4, 5 96:23 97:25 98:3, 8, 11 100:9

103:11 153:15 184:8 192:1 197:24 200:6, 11, 21, 24 201:12 205:12 210:11 221:12 222:21 229:4 236:25 238:16 242:19
**Okay** 7:25 8:5, 6, 22 9:22 10:2, 15, 20, 24 11:4, 7, 21, 24 12:7, 11, 16 13:15 14:4, 11, 14, 24 15:6, 24 16:2, 15 17:4, 24 19:7, 25 20:4, 7, 12, 18, 20 21:10, 16 22:2, 5, 10, 19, 24 23:5, 8, 13 24:8, 16 25:2, 19, 25 26:6, 21 27:12, 20 28:1, 14 29:4, 8, 11, 14 30:4, 9, 18 31:3, 7, 9, 25 32:4, 9 33:16 34:5, 21 35:3, 15 37:15, 23 38:17 39:4, 18, 22 40:22 41:5, 7 42:10, 18 43:2, 19, 24 44:11 45:5 46:9, 23 47:14, 22 48:6, 24 49:16 50:4, 19 51:3, 7, 9, 22 53:3, 16, 25 54:11, 19, 23 55:11, 15, 20 56:2, 14, 18 58:13, 18 59:4 61:5 62:19 67:14, 16 69:3 70:17 72:1 73:13 74:10 78:15 79:11, 18, 25 80:3, 21 81:11 83:4 84:23 85:1, 23 93:22 94:1, 10 98:4, 13 99:14 100:9, 15 102:7, 15, 24 103:4, 13 104:23 106:17, 23, 25 108:20 110:7 112:12 113:1, 16 114:1, 21 115:3 116:9, 22 121:2, 23 122:2 125:6 126:1 128:24 129:19, 22 130:12, 18, 25 131:16 132:18 133:20 137:2, 9 141:5 150:16, 19 151:1 152:9 153:14, 24 154:11 157:6 158:9 159:15 160:5, 8, 19, 21 161:3, 11, 15, 20 163:19, 25 164:14 165:6, 14, 21 166:2, 11, 16 167:7, 16 168:7, 13, 14, 23 169:20 171:7, 22 172:16, 23 173:7 174:6, 22 175:1, 15 176:6, 7 177:11, 15, 24 178:5, 13, 17, 20 179:7, 15 180:18, 21 181:5, 14 182:7, 18, 24 184:5, 24 185:4, 7, 24 186:9 187:9, 14, 16, 22, 25 188:4 189:15 190:6, 16, 24 191:7, 11, 16, 23 192:2 194:24 195:5, 9, 15 196:6, 8, 12, 15, 19 197:8, 20, 23, 25 198:1, 10 199:18 200:6, 18, 25 201:12, 15, 18, 23 202:7, 13, 22 203:1, 3, 14, 19, 23 204:5, 12, 17 205:1 206:20 207:23 208:3, 11, 17 209:4, 14, 21 211:17, 24 212:3, 12, 16 213:21 215:11, 18 216:10 217:8 218:3, 7 220:1, 9, 19 222:18 223:4, 5, 20, 22, 25 224:14 225:19 227:12, 16, 20 229:24 230:3 231:2, 23 232:6, 13 233:6, 17 234:1, 8 235:8, 16, 23 236:4 237:19 238:5 239:9 240:4 241:17, 21 242:19, 20 243:14, 22 244:3, 15 245:7, 16, 20 246:5, 14 247:11, 13 248:11, 18
**OKC3** 174:20, 24
**OKLAHOMA** 1:12 2:5 6:9 9:24 10:8 243:7 249:2, 17 251:1, 6
**old** 126:6 162:3
**once** 40:5 53:21 153:2, 4 175:1
**one-and-a-half** 175:13
**one-page** 152:14 200:1 201:4 202:9
**onerous** 68:18, 19
**ones** 16:19, 22 33:7 106:11 186:4 197:21 198:25 204:9 207:16 215:12 220:25 232:1
**ongoing** 57:24 174:25 183:9
**ons** 182:12
**op** 167:14
**OpCo** 167:14, 15
**open** 248:13
**opened** 115:3, 9
**operate** 44:9 181:24 219:18
**operating** 9:23 17:9 18:7, 14 120:9 137:20 138:12 140:24 141:10 145:6, 13, 24 157:9, 20 169:5 174:12 175:14, 16 198:20 226:2
**operation** 24:18 119:12 121:8
**operations** 119:16 121:10 173:8 181:10
**operator** 230:23
**opinion** 66:22 90:18 191:23
**opportunity** 229:17, 20
**opposed** 9:12 173:9
**opposite** 94:8
**option** 127:12 208:9
**oral** 235:8, 24
**order** 25:9 125:14 201:19 224:4 238:17
**ordinary** 100:20
**org** 32:4, 22 33:4, 5, 9, 10, 12, 17 44:17 45:13 136:15, 19 230:14
**Organizational** 3:9 33:13, 14 45:17 80:17
**organized** 105:6
**original** 251:11
**originated** 140:10 204:9
**origination** 189:17
**outline** 238:20
**outs** 18:8 145:6
**outset** 186:24
**outside** 49:22 50:1 77:11 84:7 102:13 113:7 225:5
**outstanding** 35:6 74:4 78:21 80:6 181:20 182:4

207:3, 5 212:6, 10 223:2 231:24 232:2
**overall** 162:12
**overestimating** 139:17
**oversees** 181:9
**overstepped** 139:1
**owe** 89:5 172:9
**owed** 35:11 40:2, 8 89:3 172:11
**owned** 10:17, 19, 21 36:1, 6, 20 43:6, 20 45:22 46:10 62:20 100:18 101:15, 24 137:15 204:11 206:9 216:19
**owner** 33:5 49:6, 22 101:4 103:1, 2, 5, 15, 21 104:15 145:15 148:1 154:14 155:12, 24 166:18 167:9 168:21 191:3, 6, 7 198:3, 16 210:16 211:2, 6 216:13, 22 217:1, 6 220:10 221:7 230:6, 7, 23 232:9 236:16 237:4, 10, 20 238:13 240:15
**owners** 46:22, 24 48:23, 24 49:1, 18 50:2 80:16 98:21, 24 100:22 101:1, 13 103:20, 22 104:11 144:19 146:22 147:21 148:7, 12 149:20 150:5 151:3 153:18, 25 156:24 157:15 158:22 174:1 176:12 194:20 205:4 210:19, 25 221:7, 16 232:8
**owner's** 102:5 154:15
**ownership** 44:18, 25 45:7, 14 46:19, 25 48:10, 11 84:21 97:5, 13 101:2, 3, 4, 18, 23, 24 102:1, 10, 20, 23 104:10 117:7, 8 125:4 135:14 147:20
**owns** 20:14 36:23 44:23 45:8 46:20 48:21 76:15 102:8, 22 125:6

< P >
**p.m** 95:12 122:8 160:7 195:11 201:24 227:22 247:20 248:20
**package** 28:10
**packet** 28:15
**page** 1:23 3:2, 5 4:1 5:1 14:25 21:23 22:2, 20 23:23 30:10, 20 38:24 41:7 52:15, 16 56:3 62:17 63:9 66:23 68:4 79:21, 23 85:9 89:12 100:6 152:14 179:21 188:14, 16 191:13 193:21 199:22 205:1 224:22 231:15 239:20 250:5
**Pages** 4:16 26:10 42:1, 2 179:11 180:18 237:7
**paid** 56:20 74:7 80:20 116:23 117:21 133:18 135:19 138:4 143:12 183:6, 20 184:2, 6 185:24 186:4 189:2 204:3 209:16, 17 210:11 211:8 214:22 240:23 243:15
**pain** 120:4
**palatability** 143:7
**palatable** 221:4 234:12, 15 235:5
**paper** 28:9 140:22 177:20
**papers** 73:5 115:19
**Paragraph** 20:4 22:12 46:1 59:11 96:7 99:24 130:18 132:1, 3, 8 191:13 193:4 215:25
**Paralegal** 2:15 8:1 12:20
**paraphrasing** 197:13
**parent** 11:25 12:6, 13 214:15
**Park** 118:15 173:20
**Parker** 2:16 8:3 24:22
**part** 12:19 19:18 21:19 25:6, 12 28:9 29:20 32:20 35:16 36:4, 13 38:4 39:4 41:10 44:14, 25 49:18 51:17 53:20 54:6, 8, 10 55:10 56:25 57:16 58:9, 24 62:7 78:12 80:24 85:6 93:8 100:19 105:22, 24 106:1, 3, 5 114:5 130:3 131:7, 10 138:25 140:12 141:3 143:16 160:11, 13 164:25 179:4, 6 187:19 188:11 195:19 199:9, 24 202:5 208:16 211:23 214:22 217:14 218:2 222:17 224:2 228:3 229:6 231:11 233:5 238:9 239:16 241:10, 18 242:11
**partial** 44:25 45:7 101:2, 3, 4 102:9 103:1 104:10 148:1
**partially** 43:20 119:3
**participant** 112:9
**participate** 229:18
**particular** 11:19 36:10 37:6 80:15 111:16 113:12, 22, 24 145:15 156:8 173:15 179:17 195:1, 2 206:4, 5
**particularly** 103:18 109:21 110:13 165:3
**particulars** 111:7
**parties** 6:3 7:6 92:3 96:4 251:13
**partly** 43:7 45:23
**partner** 39:8 112:7 136:16 137:4, 24 138:2
**partners** 124:23 147:2, 5 149:14 158:23
**partnership** 124:19
**parts** 78:23 188:2
**party** 35:11 63:2
**patience** 125:20
**pay** 51:24, 25 77:16 86:8 134:8, 10, 22, 25 135:17 171:17 173:3 198:11 210:21 214:25 215:7 245:4
**payable** 167:4
**paybacks** 202:19
**paying** 85:25 185:9, 21 219:6 222:1

**payment** 38:2 51:7 86:7
**payments** 40:2, 7 51:4 52:6, 7 183:12, 25 207:25
**payoff** 35:5
**pays** 215:5
**PD** 7:19, 24 8:3
**peace** 24:14
**Peak** 2:10
**penalty** 131:1
**pending** 120:3 125:5 142:20
**Penn** 123:11 138:1 151:21
**people** 17:23 41:12 60:15 81:8 82:17 86:22 87:13 102:2 155:19 158:25 159:8 174:11 175:6 203:5 219:4
**people's** 219:19
**perceived** 66:2
**percent** 16:16, 23 17:5, 13, 17 18:1 19:12 32:3 107:23 123:10 125:8 225:25 242:7
**percentages** 97:13
**perfect** 164:10 171:19
**perfectly** 134:6
**perform** 220:5
**performance** 213:14, 20, 25
**period** 27:19 52:2 66:17 110:10 169:22
**perjury** 131:2
**permission** 70:11, 15 136:21 143:24 144:4 148:21 211:1 227:4 233:22 234:23, 24 246:11, 15
**permissions** 220:13 222:16 234:1
**permit** 193:8
**person** 47:11 81:15 175:6, 7, 8, 11, 12 176:17 177:6 220:3
**personal** 11:2 12:9 36:1, 5, 20, 24 38:9 48:13 99:23 165:5, 6 203:13 228:7, 9, 15 243:18 244:1, 8
**personally** 11:5 12:14 31:23 89:3 102:22 120:13, 16 166:13 168:8 171:2 178:13 236:13
**perspective** 31:15, 16 37:4 49:9, 25 99:12 142:9 155:16, 20, 21
**pertained** 36:12
**pertaining** 119:22, 23, 25
**phone** 27:16, 21 57:22 66:16, 25 68:6, 8, 9, 22 73:3 94:24 109:25 114:23 137:10 163:4
**Phonetic** 206:7 246:7
**phrase** 38:11 39:10, 19
**pick** 179:22
**picked** 170:15
**picks** 26:14
**piece** 44:23 45:7, 8 102:7 168:2 175:12 191:12
**place** 49:7 76:3 91:23 117:3 124:7 126:1 128:10 142:10
173:19 207:21 237:9 249:9
**placed** 226:4
**placeholders** 163:5
**places** 75:4 87:21 109:4
**Plaid** 187:6, 11
**Plaintiffs** 1:4, 15 7:11, 13 10:11 20:21, 25 147:14
**plaintiff's** 98:25
**plan** 56:17 125:21 135:2
**planning** 73:12
**play** 88:17 126:23
**please** 7:6 8:17 15:6 59:11 67:22 72:8 81:1 131:22 229:15 231:17 239:18, 22 242:17, 18
**pledge** 28:8 34:8 38:19 84:5 90:10, 12 98:18 193:7, 14 194:25 221:19, 23 222:11 228:22
**pledged** 36:13 37:6 38:18 40:2, 14 91:11 92:11 95:21 191:19, 24 192:5 193:13 194:7 213:6 221:16, 17 232:10
**pledges** 213:7
**pledging** 39:15 197:13 213:1, 12, 15, 22 214:6, 9 215:21, 22 216:8 219:10 220:21 232:14 241:4 245:21
**pledgor** 34:18 35:6 38:2 39:6, 13 40:3, 6, 17
**PLLC** 1:16
**plug** 119:19
**plugging** 120:12
**plus** 28:21 122:24
**point** 15:5 22:21 24:8 32:6 57:12 74:8 91:9 94:17 97:12 112:18, 20, 22 114:22 118:22, 23 122:22 132:18 140:8, 9 144:23 146:4 152:25 153:8 155:15, 18 161:2 172:3, 4 177:16 184:21 190:6 193:21 204:2 205:14, 21 212:25 218:12 220:21 221:6, 8 226:8
**policy** 86:4, 5 117:3
**populating** 236:17
**population** 163:14
**portfolio** 4:14 43:25 44:4, 6 59:10, 21 61:6, 10, 19, 23, 24 62:4 69:25 70:1, 9, 16, 22, 24 71:1, 3, 9, 10, 13, 20 78:23, 25 79:7, 21 80:8, 9, 10 81:16, 18 82:3, 4, 6, 8, 11, 14, 15, 22 83:5, 15, 21 84:2, 8, 16, 21 85:10, 13, 14 86:14, 16, 18, 22 87:9, 13, 19, 23 88:5, 18, 21 89:2, 4, 8 162:6 170:20 179:22, 24 180:2, 13 206:23
**portion** 29:22 166:9 171:25 181:3
**position** 20:18, 20, 25 39:18 76:16 90:20 93:14 115:7, 21 124:21 147:13 148:6 176:19 182:15

**positions** 115:23 176:18 177:10 182:17 184:22
**possession** 125:4
**possible** 13:20 37:8 146:12, 14 171:9, 23
**possibly** 9:1 182:22 198:13
**post** 114:19 128:23 143:1
**potential** 14:19 88:22 124:8 129:4, 9
**potentially** 24:22 126:22 157:12
**power** 18:9 20:13 21:3 27:1 35:15, 18 36:11, 15 220:4
**practical** 31:15
**preaching** 125:20
**pre-arbitration** 208:5
**precipitated** 173:18
**preferred** 229:22 230:2, 18
**premium** 86:9
**prepared** 15:20 124:2
**PRESENT** 2:15 7:6 8:1 123:17 139:5
**presented** 176:2
**preservation** 126:8
**preserving** 79:17
**pressure** 29:12
**presume** 30:20 169:11 202:10
**pretend** 112:8
**pretty** 142:13
**prevent** 29:4 55:20 159:9
**previous** 116:18 170:11 219:4 226:2
**previously** 45:13 59:9 111:3 185:7 229:12
**price** 242:5, 6
**principal** 57:4 171:14 172:2, 10, 12 245:5
**print** 13:1 162:18
**printed** 246:4
**prior** 59:14 96:7 109:12 110:2, 5 118:22 122:11 130:20 131:11 146:19 218:24
**priority** 30:13 170:2 234:18
**privilege** 150:25 151:8
**privileged** 50:22
**Probably** 9:2 110:14 121:12 126:14 162:3 185:21 190:22 221:20 222:24 226:1
**problem** 79:15 95:8 114:15 199:20 216:9 238:23
**problematic** 111:14 113:6, 19 190:1
**problems** 75:21 108:23 109:2 112:13
**Procedures** 6:7
**proceed** 248:15
**proceedings** 251:8
**proceeds** 118:5 119:10 159:15 169:12 170:7 171:3, 8 206:21 211:12 222:3 236:5
**process** 19:5 124:9 136:6 137:14, 15 141:4 143:15 145:24
**processes** 165:1
**produce** 186:9
**produced** 42:9 186:2
**product** 150:1
**production** 81:7 248:5
**professional** 67:22 82:20 83:14
**program** 179:16 205:9 221:11
**progressed** 129:20
**prohibit** 215:21 219:9
**prohibited** 146:10
**prohibition** 197:12
**prolong** 113:2
**promise** 247:8
**promissory** 28:7
**prompt** 9:15 19:21
**pronunciation** 222:24
**proof** 138:8, 10
**properly** 47:5 68:14 125:2
**properties** 10:6, 7 42:2 43:16, 17, 18, 20, 24 44:7, 9, 15, 22 46:10 48:4, 8, 10, 11, 16, 17 70:25 71:3, 9 79:1 80:9 82:2 84:4 87:2, 12 119:12, 22, 25 120:10, 19 121:8, 10 122:14 128:25 140:10, 16 147:16 148:7 151:11 158:18 159:18, 22 161:24 162:15 163:18 166:5, 10, 15, 16 169:15, 25 170:21 171:12 172:25 177:21 180:3, 19, 22, 23, 25 206:22 215:9, 11 222:19 240:10 241:24
**property** 36:1, 5, 20, 24 37:11 38:9 39:9, 11, 19 44:23 45:8 46:20 48:7, 9 49:23, 24 50:2 84:4 85:18, 21 86:17 87:24 89:25 90:3 101:13 102:9 122:12 124:5 127:21 128:11 130:14, 15 133:10, 14, 21 140:1 141:16, 17 142:23 150:5 153:14 154:16 162:22, 25 167:15 170:25 180:10, 16 215:7 225:1, 10 230:6, 7, 23 242:4
**propose** 60:9
**proposed** 60:19 136:6 241:20
**proposing** 69:16 241:13, 18
**propounded** 8:12
**prospect** 137:17
**prospective** 142:24 143:4, 8
**prospects** 122:13
**prosperous** 24:2
**protect** 35:20, 22 38:17 77:24 78:1 148:14
**protected** 68:14 74:21 75:9
**protecting** 158:15
**provide** 35:10 45:25 154:15
**provided** 42:11 142:23 193:10
**provision** 35:16, 17 193:17, 20 212:20 218:23 220:2
**provisions** 27:2

209:22, 25
**PSAs** 123:10
**public** 178:6 249:16, 22
**pull** 55:2 228:16, 17
**pulled** 142:24 143:1
**pulling** 100:3
**punitive** 174:14
**purchase** 126:13 188:21 243:21
**purchasers** 103:21
**purchaser's** 188:9
**purchasing** 173:9
**purport** 50:1 102:2 239:11
**purported** 103:14 188:23
**purpose** 35:12 60:10 101:14
**purposes** 164:19 177:9
**pursuant** 6:5 42:11 107:2 191:24 207:25 245:22
**pursuing** 184:12
**push** 109:25 123:14
**pushed** 123:14
**put** 12:21 13:18, 20 31:18 37:2 51:13 52:17 72:13 78:9 79:15 81:1 104:24 118:13, 21 126:2 127:17 130:8 131:21 139:4 142:15 145:10, 19, 21 158:18 175:23 215:14, 17 217:6, 7 225:2 231:16 234:7 239:17, 21 240:15 242:17
**Putnam** 234:25 236:20
**putting** 72:8 143:14 146:8 217:1

**< Q >**
**qualification** 27:3
**qualifications** 16:24
**question** 9:5, 6 20:22 26:15 34:16 38:10 43:4, 19 44:19 45:4 46:24 47:5, 19 48:14 50:3 60:25 63:18 66:8 67:6, 13, 19, 23, 25 68:1, 4 75:6, 9 76:23 79:19 81:21 82:13, 21 89:20 91:18 96:12 100:22 107:7 108:3, 4, 8 109:7, 8 111:12 121:15 140:13 149:10 150:1, 13 156:20 158:3 161:4 167:20, 23 171:22 173:24 186:13, 15 192:21, 22 194:25 201:7 214:11 227:11 238:3
**questioning** 88:7 110:20 133:8 198:7
**questions** 8:12, 24 9:8 15:9 54:12 56:23 92:6 97:2 105:10 112:10 114:8 115:9 139:11 169:17
**quick** 72:17 121:13 195:7 223:7
**quickly** 247:8
**quite** 86:18 113:14 126:3 127:3 145:20 167:13 173:1 176:19 188:13 212:3 226:5
**quote** 219:16

**< R >**
**raise** 229:21
**ran** 186:8
**random** 170:14
**range** 184:17
**Ranging** 106:24
**rate** 24:15 26:25 107:12 108:22 112:13 113:5, 18, 25
**rates** 107:22 111:18 112:24 113:1 114:7
**reach** 219:14
**reaching** 173:19
**reaction** 190:10, 12
**read** 14:15 22:25 25:21 30:12 35:5 37:25 46:2 68:1, 3 79:15, 16 82:12 98:9 132:3 191:15 193:23 232:22 249:6
**reading** 41:20
**ready** 118:18 123:24, 25
**real** 4:14 36:1, 5, 20, 24 37:10 38:9 42:25 43:5 45:21 46:20 71:9 79:1 80:9, 19 81:16, 19 82:13, 14, 17, 19, 20, 22, 25 83:2, 4, 5, 9, 13, 16, 17, 21 84:4, 9, 16, 24, 25 86:16 87:6, 24 89:1, 25 90:2 102:8 119:12 124:16 159:6 179:24 180:2, 8, 16 188:23 207:4 242:13, 15
**realize** 20:22 21:21 45:19 125:1 198:5 226:4 228:10, 18 237:2 244:19
**realizing** 125:2
**Really** 29:21 41:25 64:2 92:18 97:6 98:8, 12 112:5 121:14 143:10 148:3 163:21 168:24 194:7 195:21 199:12 216:23 217:7, 15 228:22 234:22
**realm** 84:21
**realtime** 210:9
**Realty** 168:1 181:1, 2, 3, 15 189:18 191:9 210:15
**Realty's** 191:5
**reason** 23:8 70:10 96:21 97:1 98:6 108:21 151:3 162:13 170:15 178:10, 12, 18 210:7
**reasonable** 248:1
**reasons** 108:3
**recall** 28:12 51:10 133:5, 6 141:1 201:9
**recap** 124:16 125:11
**recapitalization** 124:10
**recaps** 125:11
**receivable** 188:21 221:2
**receivables** 215:21 219:10
**receive** 31:3
**receiver** 128:10, 17, 18, 21
**receivership** 128:6
**receives** 100:20
**reception** 219:3
**recess** 50:12 72:22 122:8

160:7 195:11 201:24 227:22 247:20
**recital** 30:20 32:5 33:1 56:3, 8 62:10
**Recitals** 59:23 63:19 66:9
**recognize** 19:19 21:20 29:23 51:19 138:25 187:22
**recollection** 28:22 42:23 103:23 159:13
**reconcile** 89:15
**record** 7:2, 7, 15 9:17 12:19 19:18 21:19 25:6, 12 29:20 32:20 41:10 50:10, 14 51:17 53:20 54:6, 8, 10 55:10 56:25 58:24 66:20 72:20, 23 73:13 78:12 80:24 85:6 93:8 98:23 105:22, 24 106:1, 3, 5, 10 114:5 122:6, 9 130:3 131:7, 10 160:5, 9, 11, 13 178:6 179:4, 6 187:19 195:9, 12, 19 199:24 201:21, 22, 25 202:5 208:16 211:23 218:2 224:2 226:18 227:20, 24 228:3 229:6 231:11 233:5 238:9 239:16 241:10 242:11 247:17, 18, 22 248:19
**RECORDED** 1:9 177:25 178:2 235:17 237:17 243:9 246:9
**records** 94:24 202:21 226:16
**recourse** 152:12 153:9
**redounds** 140:17
**redundant** 193:22
**refer** 10:6 44:6 70:15 71:10
**reference** 82:16 94:6 242:1
**referenced** 82:1 114:23 135:3 138:25 151:21 233:19 238:19
**references** 20:5 68:8 111:25
**referencing** 94:7 136:8 198:8
**referred** 81:12 230:23
**referring** 20:9 44:6 46:21 71:2 79:6 84:17
**refinance** 123:20, 21 125:18 137:23 182:12 189:6, 7 196:5 201:16 223:3 231:21 238:6 239:5
**refinanced** 182:1 189:3, 5
**refinances** 123:23 182:13 189:13
**refis** 231:22
**reflect** 51:22 161:23 168:24
**reflected** 22:11 60:11 179:19
**regard** 170:1
**regardless** 75:10
**regards** 11:17 88:14, 16
**reinserted** 132:21
**relate** 84:5
**related** 18:21 203:12 204:12, 13, 14 251:12
**relationship** 24:2
114:20 116:18
**relax** 201:20
**relevant** 115:7, 12, 15
**relief** 130:6
**rely** 186:16
**remain** 63:12, 18 64:2 65:6, 17 66:7 86:11 95:13 134:8 144:25
**remaining** 105:9
**remains** 35:5 65:16 146:3
**remedies** 37:24 38:5 112:22
**remember** 23:6 24:6 32:8 57:16 66:16 111:6 117:24 140:8, 14 189:23 197:6 245:15
**remind** 67:23
**removed** 130:14 132:13
**rent** 221:22
**rents** 221:25 222:7 233:10 243:2
**REO** 41:15
**rep** 34:23 100:5
**repay** 118:20
**repaying** 118:24
**repayment** 172:12
**repeat** 34:15 216:20
**rephrase** 9:7, 10 33:3 46:17 234:13
**replace** 212:9
**replicate** 186:18
**reply** 8:12
**REPORTED** 1:22 250:2
**reporter** 9:14 68:3 85:3 105:13 178:22 217:24 229:3 238:2 251:6
**represent** 23:17 179:9
**representation** 215:19 216:3, 11, 18 219:7 238:11 240:4
**representative** 8:3 26:22 49:5 135:8
**representatives** 26:2 116:5, 6
**represented** 76:2 188:18 220:2 230:13
**representing** 17:25 198:3
**represents** 216:1
**reps** 27:1 34:11, 17
**request** 80:7 81:14 197:5
**requested** 68:3
**requesting** 82:25
**requests** 78:22
**require** 30:12 148:21 149:4 151:4 186:22 214:2
**required** 43:13 51:24, 25 147:9, 10 157:20 222:8
**requires** 149:24 150:8 173:14
**reread** 213:19
**residence** 228:10, 15
**respect** 100:19 121:16 137:16 159:10
**respective** 6:3
**respects** 40:25
**respond** 24:2 158:1
**responded** 15:10
**responding** 26:19 65:13 93:1
**response** 63:17 65:6 66:7 109:24 111:10 151:7

**responses** 16:3, 4 17:3
**responsibility** 139:9 158:19 171:11
**responsible** 81:15 95:5 96:14, 15
**rest** 59:10 222:3 223:19
**restitution** 117:22
**restrictions** 49:7 146:8
**restructuring** 24:18
**result** 37:21 169:12 200:4 201:7
**retain** 128:22
**retract** 117:2
**return** 210:22
**returned** 209:18 211:9, 13
**revenue** 194:2, 5 213:9 214:21, 25 215:7
**reversed** 75:25
**review** 26:7 28:24 29:5 34:13 36:15 49:21 55:17, 21 69:8 105:1 160:24
**reviewed** 57:16 189:12
**reviewing** 226:2
**riddled** 163:13
**Ridge** 225:11, 14, 15, 21, 23, 24 226:10 236:15 237:7
**right** 8:16 10:13 11:9 14:10, 22 19:1, 15 21:12 23:11, 16, 17 26:6 28:1 29:9, 14 30:23 33:11 34:14 36:14 38:25 39:2 40:16 42:4 43:3, 4 44:21 47:20, 21 48:14 50:4 51:2 54:20 56:6, 12 57:2 61:2 62:8, 22 71:2 72:13 74:14 77:12 78:3 81:2, 4, 9, 19 83:15 86:6, 15 87:4 89:4 91:12 92:1 97:21 99:18 101:11 104:12, 16 105:3, 4 107:2 111:12 112:19 113:1 114:25 115:14, 24 116:7 117:12 119:21 120:8, 10 122:3 124:14, 25 125:20, 22 126:4, 12 128:5, 6, 16 129:10, 15, 17, 19 130:25 132:3, 7 134:12, 17 135:25 136:7, 13, 14 139:2, 5, 6, 15 142:17 144:10, 16, 22 145:10 146:15 147:17, 25 148:8, 20 149:3 151:24 152:22 153:8 155:10 159:21 161:15 163:7 164:3 165:6 166:3, 6, 11 167:2, 11 172:3 173:4, 5 174:15, 25 175:10 177:18 181:6 184:11 185:3 186:12, 20 189:19 193:1, 18, 20 196:12 197:8, 11, 16, 17, 20, 22 198:3, 14 199:14, 18 201:3 202:2 203:25 204:21, 22 205:4 206:23 207:6, 9 208:19 209:16 210:14, 19 211:20 212:1, 8, 19, 20 213:1 215:5 218:5, 6, 8, 22, 24 219:23 221:7, 15, 23 222:9 224:18 225:4, 11 227:17, 25 228:19, 21, 25 229:7 230:22 231:5, 6, 8, 14, 19, 23 232:16, 24, 25 233:21 235:17 237:9, 14, 17 238:6 239:2, 4, 7, 13, 19, 23 241:1, 14 242:1, 21, 25 243:10, 14 244:3 245:10, 14, 21, 25 246:17, 19 247:5, 6
**rights** 16:22 17:1, 12, 14 35:23 38:5, 11 39:25 136:12, 14, 18 138:24
**righty** 248:8
**rinse** 216:20
**Riverpark** 177:3
**robbed** 77:18
**Robert** 2:15 7:23 8:2 58:9 59:5, 8 60:6 65:6, 23 68:7, 22 69:4 73:3 88:18 94:3, 8, 13, 25 95:12 96:6, 16 141:14, 18, 21 142:7
**Robert's** 63:18 95:10
**ROFO** 28:9 41:7
**role** 40:6
**roles** 75:25
**rolled** 236:10 240:20
**Romanette** 39:4
**roofers** 78:24
**roofs** 80:20
**room** 8:1
**rough** 139:8
**roughly** 190:2 224:3
**round** 163:5 175:11
**routinely** 42:24 93:2
**RPR** 1:22 6:9 250:2 251:23
**ruin** 112:1
**rule** 89:6 160:22
**Rules** 6:6 76:10 137:13
**run** 18:22
**running** 120:19 125:24
**runs** 85:24
**rushing** 19:20
**Ruttenberg** 5:6 22:4 229:10, 11, 21

**< S >**
**sale** 122:13 125:12 126:2, 14 127:19 129:23 130:15 136:6, 22, 23 137:8 138:1, 7
**sales** 138:8 165:1
**Salman** 188:17, 18 189:3, 8 204:7, 8
**Salman's** 204:10
**sand** 75:4 194:19
**sanity** 146:18
**satisfied** 63:13 126:16 135:7 207:2, 5 223:1
**satisfy** 110:7
**save** 28:9 123:18 140:22 244:4
**savior** 112:7
**saw** 36:16 42:18 93:24 118:25 152:16 175:22 201:4 203:10 220:12 247:3
**saying** 13:23 17:15 23:6 62:6, 9, 13, 20, 25 63:17, 20, 21, 23 64:1 65:7 66:25 69:9

80:18 90:5 113:3 135:18 161:5 166:12 171:1 191:7 210:5 222:10 230:9 234:7 241:2
**says** 8:11 15:6 17:5 20:12 22:3 23:25 30:9, 11, 22 34:1 35:5, 17 37:24 39:24 40:18 59:8 75:4, 23 76:20 81:11 87:20 88:20 95:12 98:14 100:16 132:2 162:22 179:24 181:1, 8 191:14 205:12 224:15 230:3 234:17 236:9 237:10
**scan** 72:15
**scenario** 65:14 67:1, 8 69:5 70:5
**scenes** 62:1 226:24
**schedule** 45:21
**scheduled** 123:12 128:14
**scope** 60:21
**score** 206:25
**scrambling** 13:1
**scrapped** 243:19
**screen** 13:8, 11 14:10 51:14 52:18 72:8, 12, 13 78:9 81:1 100:12 130:9 131:22 161:11 231:17 239:18, 22 242:18
**screwed** 200:24
**scroll** 225:12
**scrolled** 79:13
**seal** 251:11, 16
**searches** 186:8
**searching** 209:12
**second** 5:14 11:25 20:12 37:15, 20 72:6 79:22, 23 122:12, 22 123:9 124:12 125:14 130:14, 22 133:13 138:18, 19 140:12 141:17 142:1, 3, 14, 19, 22 143:4, 14 144:2, 3, 6, 20 145:2, 4, 16 146:10 147:16 148:19 150:11 151:11 152:11 154:15, 22 155:3 156:14 157:2, 7 158:10, 11, 17, 21 159:11, 17 160:18 181:8 200:16 216:25 224:17, 19, 22, 25 225:2, 8, 9, 20 226:9, 15 228:9, 14 233:19 234:9, 23 235:4 236:2 243:1 244:5 245:3
**seconds** 125:21
**Section** 37:24 38:21 39:23, 24 40:15, 22 42:11 136:8 193:23
**secure** 35:20 233:12 244:9
**secured** 76:1 77:21 228:9, 13 234:19 244:9
**securing** 233:14 243:16
**securities** 13:8
**security** 14:1 28:8 39:1 60:18 90:10, 12 98:18 191:14 193:9, 10 197:12 229:25 233:10 243:2
**see** 7:19, 22 13:13, 18 15:7 16:17 20:5, 16 23:22 26:11 30:16 31:1 38:25 59:17 61:8 78:19 79:11, 14, 20 94:24 98:9 99:5, 19 100:9 103:12 114:17 115:18 125:23 131:25 143:4 145:8 146:9 152:21 161:11 163:5 164:22 165:2 180:19 182:24 183:3 186:20 188:13 191:1, 4 196:10 199:18 200:16 210:9, 11 216:9 220:8, 16 222:21 224:22 229:14 234:3 236:19 240:8 242:1, 17
**seeing** 141:13 216:25
**seeking** 85:8 129:1 144:4
**seen** 91:4 210:23
**selected** 36:12 126:5, 6
**sell** 62:2 124:22 129:1, 3, 8 136:25 222:2
**seller** 123:14 220:3, 4
**sellers** 210:23
**selling** 60:15, 23 221:2
**Semler** 5:9 131:18 133:4, 22 135:13
**send** 50:25 59:11 135:5 152:14 211:15 226:15
**sending** 131:17
**sends** 170:19
**senior** 77:14 127:3 142:15 143:8, 9, 21 144:7, 11, 13, 14 145:5, 11, 12, 17 146:9 151:10 152:3 153:1, 6, 8 157:3 166:21 167:5 177:20 189:24 190:4 191:25 192:9, 23, 25 193:1 219:1 221:17, 19 222:2, 4 227:13 234:2, 6, 14, 17 240:10 246:11
**seniors** 152:7 178:1 190:1
**senior's** 222:7
**sense** 24:19 73:15 75:16, 18, 20 118:20 134:9 236:24 248:4, 6
**sensible** 66:21
**sent** 17:25 19:8 140:23 141:8 162:6 176:17 177:8 183:1 229:12 230:14
**sentence** 20:12 39:24 40:24 82:12 181:8
**separate** 54:4 84:6 167:11 170:4 188:9, 11 233:9, 15 243:1
**Separately** 22:25 49:10
**separation** 10:4
**September** 185:17, 24
**series** 8:24 9:23 22:11 54:17
**serve** 62:24 64:5 70:8 229:25
**service** 82:20 116:19
**servicing** 121:4, 5
**set** 11:6 106:22 123:19 213:4 214:17, 18 247:12 251:15
**setting** 92:25 172:25
**settle** 142:10
**settled** 109:11 207:23

**settlement** 141:20, 22 164:19 207:21, 22 208:1, 6
**settler** 226:7
**seven** 172:2
**SG** 235:22, 23
**Shabsels** 5:13 242:3
**shakes** 9:13
**Shank** 2:3 7:10 42:6 50:6, 9 67:7 72:19 98:2, 7 106:10, 16, 20 121:11 130:1 159:24 187:20 195:6, 17 199:19 208:13 227:2
**Shannon** 1:22 6:9 250:2 251:5, 23
**shape** 76:17 104:20 123:1 163:9 190:18
**share** 13:7, 8, 10 102:17
**shared** 217:5
**shareholder** 39:8
**sharing** 14:9
**sharking** 24:9
**sheet** 167:4, 6 250:1
**sheets** 170:21 172:22
**shift** 204:21
**ship** 124:25
**shoes** 75:25
**shop** 18:22
**shopped** 219:15
**Shoreline** 201:5, 8, 10, 12
**short** 52:21 202:18
**shortfalls** 81:15
**shorthand** 10:3 16:6 251:5, 8
**short-term** 52:22 117:4 203:11, 15 230:16
**shout** 7:17
**show** 12:25 21:16 58:11 60:5 87:13 103:25 146:1 164:19 195:16 229:8
**showing** 41:23 217:14 227:25
**shut** 64:20, 23
**sic** 231:18
**side** 29:12 57:9 135:16 150:23
**sides** 115:22
**sign** 70:20 76:21 97:17 132:2 133:22, 24 134:1 135:9 178:13 199:12, 16 216:1, 4 220:9, 14 226:14 232:20 235:6 238:12 240:5, 6 246:7
**signals** 161:6
**signatories** 197:22
**signature** 222:8 237:7 249:13 251:11
**signatures** 238:13
**signed** 28:25 29:6 34:5, 7 36:9 55:18, 21 60:20 76:20 90:18 91:23 96:2 99:5 104:1 126:10, 11, 13 134:6 138:8 188:2, 16 190:15, 23 191:3, 5 198:10 205:15, 16 214:1 215:12, 13 217:10, 11, 13 222:11, 15 225:9 232:21 236:15, 20 237:5 238:13 243:10, 22 244:24 245:7
**signer** 216:1 220:3 236:21, 24 237:8
**significant** 107:20
**signing** 97:16 137:24 198:2, 13 220:3 232:8, 9 237:3
**signs** 206:6
**similar** 202:18 215:3, 4 224:18 246:16
**simple** 44:18
**simply** 135:22
**simultaneously** 178:24
**single** 101:14 145:4 199:22 230:7
**sit** 33:18 167:2
**sits** 166:4
**situation** 65:14 103:2 123:18
**six** 157:25 183:19
**skip** 239:12
**slandered** 148:18
**slated** 123:21
**slow** 54:24
**small** 162:19, 20 166:9 177:13 210:13
**smaller** 175:3
**SMB** 16:21 136:17, 21 206:9
**smile** 194:3
**snafu** 12:24
**sold** 63:1 77:13 117:7 122:18 138:14, 15 240:21
**sole** 16:17, 24 17:5, 18 18:1 19:12 30:12 35:19 101:14, 17, 18, 20 225:25
**solely** 10:17, 18
**solicitation** 88:22
**solidified** 83:1
**solution** 94:21
**solve** 75:22 77:21 87:10, 19
**solving** 77:21 96:9
**somebody** 11:15 15:22, 24 16:25 64:4 76:15 81:3 88:23 90:24 96:20 129:10 216:21 220:16 239:21
**soon** 58:12 134:9
**sorry** 21:8 34:16 37:16 51:12 55:5 59:2 63:23 72:12 83:24 96:23 106:15 128:15 140:13 146:24 151:19 158:3 169:19 177:2 182:7 199:19 200:15 202:6 215:16 217:19 222:14 238:16, 21 242:19
**sort** 12:8 19:2 26:11 28:4 33:20 76:14 121:17 137:11 138:11 139:17 141:5 144:17 153:6 161:6 162:24 177:18 214:3 216:18
**Sotto** 200:14 233:3 246:1
**sound** 47:20 218:5 245:14
**sounds** 23:16 129:20 173:7 218:6 239:7
**source** 29:12 227:4
**souring** 114:20
**south** 111:8, 9
**speak** 73:13, 20 156:1 176:6 192:6 232:24 244:22 245:6
**SPEAKER** 247:4
**speaking** 64:21 148:9

**specific** 54:12 92:24 107:25 108:1
**specifically** 24:6 32:8 84:18, 20 87:5 111:13 113:16 133:6 225:14
**specifics** 156:9 176:10
**spectrum** 180:12
**speed** 132:25
**spent** 161:9 163:3
**split** 188:20
**spoke** 206:6
**sponsor** 18:20 44:9, 12 159:6
**sponsors** 42:25
**spot** 195:6
**spreadsheet** 162:2 163:1
**Spring** 240:21
**Springdale** 153:16
**spun** 89:15
**SREO** 42:11, 12, 15, 19 43:3, 5 47:25 48:2, 3 97:2
**SREOs** 42:24
**SS** 249:3
**stack** 162:5
**stacking** 193:17, 20 209:24
**stage** 187:2
**stakeholder** 225:21
**stakeholders** 149:15 244:23
**stamped** 63:10 199:22 251:10
**Standard** 7:5
**stands** 184:10
**start** 53:13 111:5 123:3 126:12 143:19 155:21 220:15
**started** 14:13 70:14 112:21 189:25 224:21
**starting** 78:17 194:1 213:15 220:9, 20
**starts** 99:12
**STATE** 1:1 7:6 41:1 249:2, 5, 16 251:1, 6
**stated** 96:24
**statement** 15:8 19:11 69:15 104:2, 25 131:1 135:6 141:11 181:12 228:20 230:24
**statements** 18:12 30:5, 6, 7, 8 89:9 186:11, 17 197:10
**status** 126:4
**stayed** 128:18
**step** 127:17 159:9
**steps** 35:19 38:16
**sticking** 34:6 125:22
**stipulate** 115:18
**stipulated** 6:2
**stipulating** 115:20
**STIPULATIONS** 6:1
**stop** 60:21 62:5 174:2
**stopped** 206:19, 20
**Street** 1:17 2:4
**stress** 206:13
**strict** 158:17
**strictly** 84:12 158:17, 19
**strike** 67:4, 5, 11, 13 89:19 91:1 95:10
**string** 3:8, 10, 20 4:6, 10, 13, 17 5:2, 7, 10 26:1 81:3 93:13, 18 94:2 116:5 241:11
**strings** 93:19, 22
**strip** 145:22
**structure** 33:14 44:18 46:19 48:10 136:19 142:9 225:22 230:15
**structured** 49:10, 15 230:15 240:18
**structures** 84:22 101:15 112:24
**structuring** 76:14
**struggling** 82:7
**stuff** 19:23 99:17 226:25 239:12 240:25
**Sub** 193:6
**subject** 27:3 32:21 193:8
**subjected** 24:9
**submission** 186:25
**submissions** 133:1 186:11
**submitted** 45:18 130:5 133:3
**Subscribed** 249:15
**subsequent** 42:19 58:15 105:19
**substance** 160:23
**substitute** 82:5
**subtract** 183:3
**success** 125:1
**sue** 111:24
**suggest** 59:20 60:25 61:1 225:8
**suggestion** 247:7
**Suite** 1:17 2:4, 11 96:17 97:5
**summary** 35:10, 11
**summer** 14:21 140:24 153:16
**super** 98:7 210:20
**superceded** 120:22
**Superior** 151:12
**supersede** 120:23
**supplied** 30:22 32:4
**support** 130:5 133:2 166:22, 23
**supposed** 104:5 123:16 124:10 128:13 138:22 166:24 171:21 174:13 209:8, 11 243:12
**Sure** 7:16, 21 8:22 9:16 14:6 15:14 23:6 24:7 32:3 34:17 37:16 42:5 46:18 47:4 50:8, 9 51:15 61:17, 21, 25 69:19 72:9 78:10 79:12 91:4 94:23 101:12 103:4 105:11 114:13 123:10 133:11 134:5 139:23 142:13 145:19, 20, 22 154:20 160:3 161:21, 24 167:21 169:20 170:8, 16 171:5 178:25 181:22 182:10 195:8 197:2 201:2 204:20 209:8 213:19 218:25 226:5 235:5 247:16
**surprises** 105:8
**suspend** 247:24
**suspended** 248:20
**swear** 8:7
**swing** 120:24
**Swiss** 184:5
**switched** 163:10
**sworn** 8:8, 11 249:15
**syndicated** 125:7, 9
**syndicator** 176:24
**system** 85:15 187:6, 7
**systems** 186:20 187:8

< T >
**table** 127:6, 12
**tacking** 220:16
**take** 9:3, 14 15:8, 13, 16 19:20

24:11, 12 25:2, 15 35:18 38:16 47:14 50:8 72:1, 17 76:12 78:3 91:20 94:10 105:5 107:2 116:1 118:7 121:12 125:4 144:20 155:13, 23 156:2, 5 160:4 161:21 173:13 179:7 187:9 189:17 193:2 200:16 215:6 219:25 223:6 227:18 230:4, 9, 10, 18 232:25 234:18
**TAKEN** 1:10 6:5 7:2 9:18 35:8 50:12 57:7 72:22 81:17 107:22 112:18 122:8 160:7 185:14 195:11 201:24 227:22 247:20 250:3
**takes** 131:23
**talk** 20:8 50:19 70:24 71:9, 10 80:21 82:15 84:8 85:9 93:23 103:24 109:17 114:12 126:19 129:22 130:13 163:19
**talked** 8:22 67:2 80:11 137:18 139:25 148:2 245:11
**talking** 11:18 23:20 27:22 30:11 44:21 52:21 59:1, 23 61:2, 11, 14, 16, 19 65:8 70:4 71:3, 16 72:25 78:25 79:1 80:8, 15, 16, 17 81:19, 22, 25 82:14, 16, 22, 23 83:1, 2, 5, 7, 16, 19 84:13, 24, 25 85:11, 23 86:16 87:6, 9 88:11, 21 89:10, 24 90:3, 4 92:2, 3, 9, 10 93:20 95:4 96:7, 16 102:12 111:15 113:7, 8 160:22 180:2 205:16 206:12 225:14 244:21
**talks** 70:22 138:6 229:16
**Tamie** 5:7 131:18 133:4, 21 134:1, 3, 4 135:13
**Tasca** 2:9 3:3 7:8, 16, 21, 25 8:14 12:5, 23 13:12, 15, 17, 22 14:2, 6, 7, 11 16:15 17:4, 15 19:15, 19 21:7, 10, 20 25:7, 14, 15 27:12 29:21 32:13, 15, 18, 21, 25 33:2, 7, 11, 25 34:17, 21 36:14, 25 37:20 38:20 39:18 40:16 41:5, 11, 15, 25 42:10 43:2, 14 44:5 45:5 46:6, 18 47:6, 14, 21 48:22 50:4, 8, 15, 22 51:2, 3, 12, 19 52:11, 19 53:7, 11, 15, 17, 21, 24 54:1, 3, 11 55:4, 6, 11 57:1 58:13, 18, 21, 25 60:24 61:5, 15 62:19 63:25 64:9, 15, 19, 25 65:3, 12 66:5, 13 67:5, 9, 14, 18, 25 68:1, 21 69:13 70:4 71:8, 17, 22 72:1, 3, 5, 11, 16, 25 73:22 74:18, 23 75:8, 16, 24 76:22 77:1, 23 78:13, 15 79:5, 9, 12, 18, 23 80:2, 5, 6 81:2 82:11 84:7, 11, 19, 23 85:4, 7 87:22 88:9, 25 89:19 91:9, 15, 17 92:1, 17 93:5, 9, 18 94:10 95:9 96:6, 24 98:3, 4, 8, 13, 23 100:7, 13, 15 101:8 103:8, 11, 20 104:23 105:12, 16 106:8, 13, 17, 23 107:9, 14 108:5, 14, 20 109:12 113:1 114:10, 14 115:8, 14, 17, 22 116:1, 4 117:16 118:4 119:21 121:14, 16 122:3, 11 123:4 128:24 129:24 130:4, 12 131:4, 11, 25 132:12, 24 133:24 138:17 139:24 140:14, 21, 23 144:10 146:15 147:3, 25 149:3, 7 150:2 151:2 153:24 154:6, 11, 18 155:10, 22 156:12, 17, 19, 21 157:6, 13, 19, 23 158:6, 20 160:3, 16, 18, 21 161:4, 17, 20 167:22 168:19 169:11 170:8 173:23 178:12, 21, 25 179:2, 7 180:6 187:16, 22 195:8, 15, 20 197:24 199:21, 25 200:9, 12, 15, 19, 24, 25 201:21 202:2, 8 203:23 207:14, 16 208:17 211:24 212:25 213:10, 21 214:20 215:18 217:8, 19, 21 218:3 223:8, 13, 16, 20, 24 224:3 225:16 227:12, 17, 25 228:4 229:2, 7, 16 230:22 231:12, 14, 18 233:6 238:5, 10, 21, 24 239:1, 2, 19, 23 241:11, 21 242:12, 14, 21, 22, 25 244:19 245:25 246:5, 6, 19 247:2, 6, 12, 16 248:6, 12, 17
**task** 68:18, 19
**tax** 177:9
**taxes** 133:17, 18
**team** 15:18, 23, 24 17:11, 23 27:15 43:10 141:2, 8
**teams** 17:3
**tedious** 59:15
**tell** 9:9 10:16 14:5 21:22, 24 24:16 25:21 42:13 64:9 73:11 94:14 95:25 102:2 103:20 104:21 105:18 108:14 124:15 135:16 136:19 141:14 142:21 144:11 161:25 162:21 169:4 181:19 189:23 195:25 196:20 202:13 204:5 210:1 218:10, 14, 16 219:1 224:23 233:8 237:1 239:11 244:15
**telling** 63:25 65:10, 12 94:8, 13 179:18 181:15

189:25 204:23 205:20 219:4
**tells** 205:10
**tenant** 142:3
**tense** 110:24
**term** 52:21 56:19 82:10 98:17 99:2 113:6, 18 124:25 202:19
**terms** 13:5 17:11 26:3, 24 27:22 29:16 38:11 49:21 101:10 109:16 119:15 129:7 139:22 140:12 143:7 147:21 163:13 168:13 172:22 176:15, 16 197:12
**terrible** 125:16
**terribly** 182:25
**terrified** 127:4
**testified** 76:22 140:2 196:19
**testify** 9:19 66:1 74:16
**testimony** 34:2 50:17 65:17, 18, 21 69:1, 2 84:24 114:17 160:23 195:25 249:8
**Text** 3:7, 10 5:2 21:25 22:5, 11, 13, 20 23:11 27:17, 24 57:15, 22 58:8, 25 59:3, 4 62:17 63:6, 10 68:11 69:23 71:14 84:12, 18, 20 88:18 90:23 92:1 93:10, 11, 12, 17 94:21, 22 95:18 97:10 224:10, 15
**texts** 93:2
**Thank** 8:6 32:15 78:6 99:3 187:17, 20 195:17 199:19 208:13, 14 227:3
**Thanks** 24:3 59:15 106:20
**theirs** 137:13
**theme** 73:9
**theory** 73:4 89:15 171:18
**thereof** 37:7
**thing** 73:14 95:25 132:2 140:21 142:14 144:24 145:3 169:7 177:19 219:23 222:22 236:3 237:16
**things** 9:17 10:4 13:1 30:9 49:15, 21 84:6 87:18 88:17 89:10 90:15 97:17 109:19 112:1, 24 113:2, 3 120:21 129:5 132:25 142:11 144:18 159:10 190:21 198:8 207:8
**think** 13:4, 22 17:10, 12 18:10 33:9 36:19 37:2 41:25 43:3 46:20 49:6 54:3 57:23 64:22 67:13 73:7, 15 76:9, 18, 19 77:10, 11, 23 82:5 93:16, 23 96:2 97:9, 24 98:7 102:3 103:16, 17, 18 106:9, 16 107:7, 15 108:2, 3, 6, 15, 16, 21 110:12, 13, 22 111:8, 13 112:4 115:22 118:9, 11 122:3, 21 126:13 129:13, 16 133:16 134:2, 3 136:10 138:23 139:3, 9, 20 140:2 145:8 146:16 147:6 149:10, 17 150:1 153:1 154:6 155:5, 6, 7, 15, 16, 17 156:1 162:21 169:16, 23 180:11 182:25 183:13 185:11, 13, 17 189:21 192:19, 22 196:19 197:1, 17 200:24 216:19, 22, 23 217:15 222:14 223:9 225:13 227:17 231:21 236:8 237:2, 5 238:19 240:19 245:11 246:20 247:17 248:1
**thinking** 143:7
**third** 63:2, 3 233:24
**third-party** 187:5
**thought** 66:2 73:2 109:13 113:5 114:6 128:9 142:12 143:15 155:2 165:3 188:15 190:16 192:3 194:17, 20 221:3 225:25 228:13 238:16
**thread** 3:7 14:18 21:25 25:23 29:24 58:8 65:23 68:7, 11 71:14 97:10
**threat** 111:22
**three** 53:4 122:21, 23, 24 123:4 137:4 162:3 169:16 175:6 184:21 185:2 202:19 209:10 233:1, 9, 13, 15, 23 235:3, 16 242:22 243:1, 15 244:20 246:4
**thresholds** 145:1
**Thrive** 141:15 143:11 216:13 240:15
**throw** 240:25
**throwing** 205:13
**thy** 174:20
**tied** 243:13 245:3
**tiered** 161:19
**time** 7:4, 5 17:25 19:20, 22 21:12, 14 24:21 25:10 29:7, 8, 12 34:20 37:17 43:1, 22 49:20 50:11, 14 53:12 55:22 60:4, 9 63:10 65:22 66:17 72:21, 24 74:5, 25 86:8 89:2 94:23 96:3 110:1, 20 117:23 118:17 121:11 122:7, 10, 20 123:5, 8 141:7 147:6 153:11 158:2 159:24 160:6, 9 161:9 163:9 169:13, 23 173:21, 25 182:11, 14 190:3 195:10, 13 196:15, 21 197:6 199:4, 11 201:23 202:1 204:23 205:15 209:14 212:7 216:25 221:18 224:19 227:21, 24 231:24 244:5 247:19, 22 248:2, 19 249:9
**timeframe** 95:1 153:6 190:5
**timeframes** 162:2
**times** 41:21 52:5 57:21 76:23 96:10 107:19 112:4 116:22 120:24 147:11 152:21 157:25 173:17 193:16

196:23 202:17 214:17
**timing** 18:25
**tiny** 98:7, 8, 12
**title** 30:23 33:5 46:22, 24 48:23, 24 49:1, 6, 18, 21 80:16 98:20, 24 100:22 101:1, 3 102:5 103:2, 22 104:10, 15 124:1 125:5 131:14, 18 132:20 133:3 134:23 135:6, 8 142:24 143:1, 5 144:19 145:15 146:21 147:21 148:7, 12, 18 149:20 150:4 151:3 153:2, 5, 18, 25 154:14, 15 155:12, 24 156:23 157:15 158:16, 22 166:18 167:8 168:21 174:1 176:12 194:20 205:4 210:18, 25 221:7, 15 226:15 232:8
**today** 9:2, 20 10:3 17:17, 20 70:11 109:17 129:6 130:7 134:18 190:21 210:12
**today's** 207:13, 14
**told** 58:2 64:12, 20, 22 81:13 103:5 104:12, 14 114:8 126:24 129:4 143:21 144:24 214:16 218:20 221:11 222:5 223:18 237:19
**tone** 64:13
**top** 14:25 22:3 30:10 123:11 136:18 176:25 245:15
**total** 56:12 95:5 97:3 134:13 165:16, 19, 20 166:3 185:5, 20
**totally** 10:20 77:11 161:21 203:18
**touch** 248:9
**tough** 119:7
**Tour** 246:7
**toured** 129:10
**Toval** 233:11 236:6
**tower** 86:4
**towered** 85:14
**to-wit** 8:12
**track** 60:7, 13 68:17 189:5 210:10
**tracking** 65:24
**tracks** 48:3
**trade** 167:4
**traditional** 188:22
**tranche** 163:22, 23
**tranches** 232:3
**transaction** 117:10 118:17 129:7 130:16 143:17 202:16 233:19
**transactional** 122:23, 24 124:13
**transactions** 37:19 129:15, 16 193:5
**transcription** 249:8 251:8
**transfer** 74:11, 12 76:5
**transferred** 62:22 64:4 65:15 70:7 71:18 74:19 75:11 91:11 95:22 96:20 116:16
**transferring** 32:1
**transfers** 116:15
**transitioned** 164:12
**Treasury** 107:13
**treat** 219:23
**treatment** 108:1 133:2
**trial** 247:23
**tried** 117:5, 10 152:21 159:4 238:3
**trigger** 152:12
**triple** 213:1
**true** 9:25 10:1 17:6 28:15 34:12, 19, 20 41:2 45:21 54:22 55:12 105:18 121:10 135:24 140:11 141:8 144:4, 8 178:7 217:10 249:7 251:7
**trust** 222:7 235:2
**trustee** 40:6
**trustees** 40:1, 17
**truth** 209:24
**truthful** 99:4
**truthfully** 8:25 9:19
**try** 9:7, 10 43:3 58:13 67:22 131:13 140:22 184:4 196:1 224:21 241:13
**trying** 9:15, 16 18:7, 18, 19 60:14 61:21 66:17 67:21 69:21 75:22 81:8 82:8 87:10, 16, 19 88:22 91:7 93:1 96:11 99:16 114:16 122:17, 25 124:8, 9 127:11, 19 129:3, 8, 13 132:19 141:19 142:9 156:11 159:6 162:3, 14 163:7 164:9, 19 166:18 168:1 185:11 224:3, 16 229:21 234:22 242:3 247:8
**Tuesday** 7:3
**TULSA** 1:12 2:5 6:8 249:4 251:3
**turned** 186:7
**turns** 188:24
**Tuscan** 216:13
**Tuscany** 243:13, 20
**TVT** 183:8 203:24 204:6, 9, 18 205:8 206:21 207:1, 2, 4 208:21, 25 209:5, 8, 15 210:2 218:11, 16, 21
**twice** 57:2 129:10 238:20
**two** 20:21, 25 73:9 85:20 88:17 108:12 111:16, 17 115:22 131:4 134:21 135:1 165:2 168:5 174:4, 18 180:18 184:22 185:2, 3, 16 187:4 188:2 192:4 202:19 207:1, 8 208:21 209:19 211:9 212:4 221:21 233:23 234:5 235:18, 21 240:18 242:7 244:1
**two-and-a-half** 209:9
**two's** 175:12
**two-X** 175:14
**type** 60:17 86:2 146:21 203:11
**types** 28:20 85:20
**Typically** 29:7 134:20 186:16 234:11

**< U >**

**UCC** 5:*2* 38:*5* 74:*21* 75:*1*, *3* 76:*2*, *10*, *13* 77:*1*, *5*, *15* 167:*1* 228:*4*, *10*, *20*
**UCCs** 38:*14* 74:*14*, *25*
**uh-huh** 9:*13* 26:*13* 78:*20* 81:*5* 104:*13* 120:*11* 133:*15* 164:*18* 177:*4* 180:*20*
**ultimate** 11:*25* 12:*13* 140:*8*
**ultimately** 26:*8* 53:*3* 60:*11* 118:*14* 120:*18* 121:*9* 140:*1* 159:*18* 168:*9* 194:*14* 206:*22* 209:*9* 222:*19*
**unauthorized** 158:*7*, *12*, *16*
**unaware** 112:*20*
**uncomfortable** 135:*4*
**uncured** 226:*17*
**underlined** 27:*8*
**underneath** 184:*4*
**undersigned** 98:*16* 126:*11* 249:*16*
**understand** 9:*6* 18:*8*, *19* 19:*25* 20:*7* 30:*4* 39:*10* 40:*4* 62:*8* 70:*12* 75:*6*, *8* 76:*8* 86:*23* 88:*24* 90:*25* 91:*9* 92:*8* 97:*5*, *6*, *7*, *11*, *14* 99:*3* 101:*9* 109:*10* 113:*3* 115:*6* 127:*9* 131:*1* 133:*7* 148:*2*, *5* 155:*10*, *19* 156:*8* 162:*14* 166:*19* 168:*1* 193:*12* 214:*8* 222:*9*, *10* 248:*2*
**understanding** 18:*4*, *5*, *10* 19:*3*, *14* 36:*3*, *8*, *23* 38:*14* 39:*15*, *21* 40:*10* 68:*9*, *10*, *12* 73:*8* 75:*1*, *3* 77:*17* 91:*6* 94:*9* 97:*4* 101:*7*, *11*, *16* 102:*14*, *18*, *25* 104:*6*, *9*, *11* 127:*24* 128:*1*, *4* 139:*11*, *22* 141:*8*, *12* 143:*15* 145:*24* 147:*24* 148:*13* 150:*3* 155:*17* 159:*14* 161:*22* 190:*21* 192:*7*, *12* 193:*19* 195:*4* 209:*7* 213:*22* 214:*2* 220:*19* 221:*1*
**Understood** 57:*7* 60:*10* 66:*18* 76:*11*, *17* 86:*15* 88:*19* 91:*6*, *7* 92:*7* 95:*9* 97:*19* 151:*1* 176:*21* 237:*3*
**underwater** 127:*21*
**underwriting** 187:*2*, *10*
**unencumbered** 30:*14* 31:*19* 59:*9* 60:*7* 94:*19* 95:*6*, *7*
**unenforceable** 108:*22* 109:*14* 110:*11*
**unexpectedly** 110:*23*
**unfortunately** 13:*8*, *25*
**unfunded** 175:*12*
**unhappy** 214:*19*
**UNIDENTIFIED** 247:*4*
**unilaterally** 230:*4*
**United** 235:*2*
**universe** 62:*3*, *6* 68:*16* 70:*15* 71:*15* 80:*12*, *19* 82:*5*, *7*, *24* 83:*7*, *18*, *19*, *20* 86:*20*, *25* 95:*4* 99:*11* 119:*19* 120:*18*
**unmarked** 106:*12*
**unpack** 124:*14*
**unpaid** 133:*16*
**unsecured** 203:*18* 236:*7*
**uphold** 90:*10*
**ups** 164:*25*
**upset** 67:*21*
**upstream** 45:*16*
**urgency** 119:*4*
**usage** 82:*4*
**use** 70:*1*, *8*, *11* 71:*8* 80:*11* 82:*12*, *21* 83:*21* 84:*15* 86:*15*, *18*, *19* 87:*3*, *4*, *14*, *22*, *24* 88:*4* 89:*7* 112:*21* 118:*22*, *24* 119:*2*, *6* 155:*3* 181:*23* 205:*9* 211:*12*, *17* 236:*4* 240:*13*
**user** 163:*11*
**uses** 120:*6* 140:*6*
**usually** 187:*1*
**usury** 108:*1* 111:*18* 115:*18*

< V >
**Vakil** 188:*17* 204:*7*, *8*
**valid** 107:*4* 141:*9* 251:*10*
**Valley** 240:*21*
**valorem** 133:*17*
**valuable** 76:*12*
**value** 40:*11* 162:*4*
**variations** 28:*19*
**varied** 140:*7*
**varies** 48:*12*
**variety** 169:*24*
**various** 12:*1* 32:*23* 34:*1* 43:*10* 46:*18* 56:*5*, *10* 105:*19* 122:*14* 140:*25* 151:*11* 180:*19* 181:*21* 186:*10* 222:*15*
**vary** 123:*2*
**Vegas** 2:*11*
**vehicle** 11:*8* 12:*9* 31:*17*
**vendors** 78:*22*, *24* 80:*7*, *19*
**ventures** 204:*10* 233:*12* 236:*6*
**version** 45:*19* 59:*14*
**versions** 12:*21* 178:*8* 179:*9*
**versus** 60:*8* 94:*19*
**VESTA** 1:*3* 3:*6* 4:*14* 10:*6*, *12*, *15*, *17*, *20* 11:*24* 14:*20* 16:*8*, *14* 17:*24* 20:*2* 34:*8* 39:*13*, *17* 41:*15* 48:*14*, *20*, *25* 49:*17*, *23* 56:*9* 62:*20*, *22*, *24* 64:*4* 70:*7*, *15*, *21*, *22* 71:*15* 74:*11*, *18* 75:*10* 80:*12* 82:*24* 83:*18* 100:*25* 101:*24* 102:*18* 103:*16* 119:*12*, *18*, *19* 120:*9*, *18* 121:*8* 122:*1* 135:*14* 140:*25* 147:*15*, *16*, *19* 148:*11* 149:*12* 162:*22*, *25* 163:*6*, *15*, *17*, *21*, *23* 164:*17* 165:*4*, *15* 166:*5* 167:*16*, *17*, *25* 168:*1*, *4*, *7* 170:*18*, *19*, *23*, *24* 171:*3*, *11*, *16*, *17*, *18*, *19* 172:*7*, *9*, *11*, *17* 179:*10*, *11*, *19* 180:*7*, *22*, *23*, *25* 181:*2*, *3*, *14*, *15*, *21*

189:18 191:5, 8 206:22 210:15 213:4, 8 214:13, 14, 20 215:3, 5 228:5, 11, 18, 21 231:3 232:19
**Vesta's** 174:7
**viable** 134:9
**vicinity** 57:6 111:4 134:14, 15 185:6
**VIDEO** 1:9
**Videographer** 2:16 7:1 8:5 50:10, 13 72:20, 23 122:6, 9 160:5, 8 195:9, 12 201:22, 25 227:20, 23 247:18, 21 248:18
**videotaped** 7:2
**view** 47:7 97:15 107:20 110:12 139:3 193:22 215:22 217:5 220:25 227:3
**viewed** 157:3
**Village** 123:20 124:6 137:23 153:16 216:13 243:13, 20
**Villas** 124:11, 18 216:15
**violate** 151:7 209:22 215:23 218:22
**violated** 192:9 212:19
**violation** 142:15 192:24, 25
**voce** 200:14 233:3 246:1
**voice** 64:14
**voiced** 113:12
**voluminous** 141:7
**vote** 137:11 147:7
**votes** 149:19
**vs** 1:5

< W >
**Wait** 167:19 170:8
**waiting** 246:2
**waive** 150:24
**walked** 127:10
**walking** 248:9
**wall** 110:2 240:25
**want** 8:23 13:4 14:15, 24 19:22 40:24 42:1 47:4 50:8, 25 53:8, 9, 22 54:13 55:2 58:14, 19 59:13 61:15 80:1 89:7 103:25 105:17 109:24 111:10 113:2 115:6 123:7 132:24 139:4 150:17, 24 161:2 166:21, 24 169:20 171:4 178:23 179:22 196:1 200:11 201:19 221:12 223:20
**wanted** 29:21 52:22 60:18 68:16 73:14 82:18 97:4, 6, 7 126:21 133:25 134:5 175:12 188:20 195:21 224:16
**wanting** 56:19 97:12 245:3, 4
**wants** 125:4
**warranties** 27:1 34:11, 18
**warranty** 34:23 100:5
**wash** 216:20
**watched** 73:8
**water** 9:4
**way** 14:17 28:18 42:13 66:21 71:15 76:18 87:17, 23 88:23 102:25 104:20, 24 114:14 123:1 126:3 137:6 142:11 156:10, 22 160:21 168:10 171:10 186:18 189:15 190:18 203:7 213:3 216:5 217:3 226:20 231:12 232:23 238:1
**Wayback** 179:12, 13, 18
**ways** 121:12 134:21 152:8 187:4 234:6
**webpage** 70:22
**webpages** 179:19
**website** 70:21 179:10, 11, 16 181:3, 15
**week** 124:11 126:22 202:19
**weeks** 209:10
**welcome** 187:21
**well** 11:14, 18 16:2, 4 17:4 20:21 21:1 22:13 34:6 44:5 45:18 47:6 49:16 54:16 66:25 68:11 73:20 79:18, 25 81:23 83:2 94:12 95:10 96:16 98:9 99:18 111:20 112:14 113:4 115:5, 8 118:8 142:21 143:6 144:13 164:4 167:19 172:2, 19 176:1 206:14 210:20 216:14 219:23 223:8 224:6 228:11, 18 232:8, 20 246:19 247:14
**went** 26:8 53:3 57:25 63:4 100:2 111:8 117:22 119:11, 18 120:5 140:1 169:24 171:16 189:13, 14 206:21 236:12
**we're** 12:25 14:1 20:8 23:18 27:13, 21 29:14 41:23 47:21, 23 49:22 51:9 54:24 56:21 61:13 66:16, 17, 24 79:10 80:15, 16, 17 82:20 85:25 87:16 89:10 90:3 95:2, 4 102:12 105:8 106:25 109:10 110:25 114:10 115:5 119:6 122:25 123:18 124:7, 9, 21 126:19 129:3, 11, 14 130:7 144:1, 16 153:3, 4 161:15 166:23 169:4 172:6 181:18 185:21, 22 187:16 202:2 205:13 207:21 223:22 224:4, 5 233:7 234:7, 8 238:17, 18 243:4 246:2, 19 247:6, 21, 23 248:14, 18
**West** 1:17
**we've** 14:7 18:6, 9, 18, 19 46:20 50:6 56:3 63:15 72:18 116:1 120:24 122:17 129:8 147:6 152:10, 21 157:24 160:1 174:4, 8 183:11, 20 184:9 185:9, 21 198:25 205:3 206:25 207:11, 19 234:10 244:4 245:19
**WHEREOF**

251:*15*
**whichever** 170:*24*
**white** 152:*14*
**wholly** 43:*7* 45:*23*
**whoops** 76:*14*
**willing** 112:*9* 135:*9*, *25* 144:*3*
**Wineberg** 81:*13*
**wired** 170:*18*
**wiring** 210:*10*
**withdraw** 79:*18*
**witness** 8:*7*, *8* 37:*16* 41:*19* 42:*5* 64:*8*, *10*, *12*, *24* 81:*24* 83:*24* 91:*14*, *16* 115:*11* 149:*23* 150:*11*, *16*, *19*, *22* 151:*1* 158:*1* 160:*20* 167:*21* 202:*6* 208:*14* 215:*16* 238:*4*, *23* 246:*18* 247:*11* 248:*11* 249:*13*, *17* 251:*15*
**Woodland** 129:*8*, *19* 146:*7* 237:*13* 242:*1* 243:*6* 244:*21* 245:*1*
**WoodScape** 101:*19*, *20*, *21* 102:*1*, *3*, *4* 167:*12* 169:*6* 229:*24* 230:*2*, *19* 231:*4* 244:*22*
**WooodScape** 243:*7*
**Word** 15:*7* 47:*11* 70:*1*, *8*, *11* 71:*13* 79:*21* 80:*10* 81:*18* 82:*4*, *11*, *21* 83:*21* 84:*1*, *2*, *15* 86:*15*, *18*, *21*, *23* 87:*3*, *19*, *22* 88:*4*, *18*, *24* 89:*2*, *8* 92:*24* 115:*18* 153:*4*
**words** 12:*12* 22:*16* 66:*6* 68:*22*, *23* 71:*22* 80:*13* 139:*4* 231:*1*
**work** 13:*15* 66:*17* 78:*22* 80:*7* 82:*9* 124:*8* 134:*23* 150:*1* 153:*11* 156:*9* 187:*6* 206:*13* 226:*23*
**worked** 52:*7* 127:*8* 180:*15* 188:*11* 189:*15*
**working** 24:*22* 37:*21* 119:*1* 129:*18* 245:*2*
**workouts** 111:*20* 113:*7*
**works** 133:*4* 175:*16*
**world** 171:*19* 181:*15* 192:*11* 202:*15* 221:*10* 237:*19*
**world's** 41:*12*
**worries** 23:*24*
**worth** 97:*6* 127:*2*
**write** 17:*16*, *20* 135:*17*
**writing** 177:*9* 235:*11*, *13*
**written** 66:*20* 137:*7* 176:*13*
**wrong** 30:*22* 100:*6* 147:*23* 164:*11* 195:*25* 196:*20*
**wrote** 70:*19* 91:*24* 229:*19*

**< Y >**
**ya'll** 30:*12* 65:*7* 160:*17*
**Yeah** 10:*1*, *10*, *17* 13:*14*, *25* 14:*18* 17:*21* 18:*24* 20:*24* 23:*22*, *23* 32:*14* 41:*14*, *25* 47:*22* 50:*25* 53:*8*, *15*, *18*, *24* 54:*17* 55:*5*, *6*, *14* 58:*19* 64:*11* 72:*16* 76:*9* 80:*10* 83:*19* 88:*16* 90:*19* 98:*5*, *11* 100:*14* 106:*13* 107:*23* 113:*11* 121:*9*, *14* 122:*1* 130:*10* 139:*7* 146:*5* 151:*25* 160:*2*, *16* 161:*18* 162:*10*, *23* 164:*18* 165:*1*, *24* 166:*1* 167:*18*, *22* 177:*7* 178:*19* 183:*22* 188:*8* 192:*7* 195:*8* 197:*18*, *24* 198:*11*, *18* 200:*8*, *12*, *22* 203:*23* 207:*7* 208:*9* 212:*9* 215:*14* 217:*22* 219:*11*, *13* 220:*12*, *23* 223:*6* 225:*18* 228:*24* 229:*2* 233:*18* 235:*10*, *18* 236:*18*, *25* 237:*11*, *15* 238:*20*, *21* 246:*18* 247:*2*, *16*
**year** 7:*4* 24:*17* 107:*23* 119:*7* 122:*19* 139:*8* 141:*15*
**Yep** 132:*11* 248:*6*, *16*
**yes-or-no** 81:*21*
**Yishai** 3:*20*
**York** 41:*21*
**YSA** 1:*6* 7:*9* 8:*2*, *4*, *18* 15:*9* 17:*25* 18:*15*, *21* 21:*13*, *14* 22:*20*, *22* 23:*14*, *20* 24:*18* 25:*24* 26:*2* 27:*15* 28:*3*, *17*, *22* 32:*5* 38:*11* 41:*22* 51:*22* 52:*6*, *12*, *16*, *22*, *25* 53:*4* 54:*20* 57:*9*, *20* 58:*2* 59:*6* 60:*6*, *12* 62:*7* 66:*1* 68:*12*, *13* 73:*15* 74:*5*, *10*, *16* 84:*5* 90:*13*, *17* 91:*24* 93:*14* 107:*1* 109:*13* 116:*6*, *10*, *13*, *15* 118:*4*, *5* 119:*11*, *18* 121:*19*, *21*, *25* 122:*1*, *11*, *19*, *22* 123:*9* 130:*13*, *14*, *25* 139:*16*, *24* 140:*3*, *23* 141:*8*, *14*, *16* 142:*22* 147:*16* 151:*11* 170:*2*, *4*, *5*, *14*, *22*, *23* 171:*4*, *8*, *15*, *16*, *20*, *24* 172:*3*, *5*, *10*, *13* 177:*21* 196:*17*, *21*, *23* 202:*18* 204:*17* 215:*4* 244:*15*
**YSA's** 14:*19* 24:*22* 26:*2* 60:*22*, *23* 73:*20* 74:*20* 75:*24* 76:*16* 77:*12* 148:*19* 172:*1*

**< Z >**
**Zepperman** 206:*7*
**zero** 76:*13* 156:*3*
**zeroed** 76:*24*
**zeroing** 60:*16*
**Zoom** 1:*16* 2:*9*, *15*, *16* 7:*13*, *14* 13:*9* 21:*6* 161:*7*
**Zooms** 163:*4*

# EXHIBIT 16

LOCAL NEWS

# Tulsa apartment residents face water shut-off over $117,000 unpaid bill

by KRMG March 23, 2026




Fox23

**By Paige Orr, Fox23 News**

TULSA, Okla. — Hundreds of residents at a south Tulsa apartment complex are facing a week without running water after the City of Tulsa posted emergency termination notices

at the property, citing more than $117,000 in unpaid utility bills.

Residents at Riverpark at Kensington, located near 81st Street and South Wheeling Avenue, said they were left in the dark about the mounting debt until city workers arrived Friday afternoon to post notices on buildings.

ADVERTISEMENT

The complex operates as an "all-bills-paid" community, meaning tenants pay their utility costs directly to management as part of their monthly rent.

"It said that we owe just over $117,000," said one resident, who asked to remain anonymous out of fear of retaliation from property management. "If $87,000 wasn't paid before the 25th, it was going to get cut off. I chased the city guy down and he said this is the third time they've come out, and management will not respond to any of their calls or emails."

The City of Tulsa confirmed that the shut-off is scheduled for Wednesday, March 25, if a minimum payment is not received.

According to city officials, the "stickering" process is a last-resort measure used to alert tenants when a landlord has

ignored multiple private warnings.

In a statement, the city noted that the process begins with a letter the day after a bill is due, followed by a second notice ten business days later. When those go unanswered, the city begins posting physical notices at the property to ensure residents can “engage their landlord directly.”

The resident who spoke with our news partners at FOX23 said the lack of transparency is the most frustrating part for those who have consistently paid their rent.

“We pay our bills. Where’s all the money going?” The resident asked. “There are what, 400 units? At the bare minimum, it’s $800 per unit. Where’s the money? That’s the biggest question.”

Vesta Management, the company that operates the complex, told FOX23’s sister station in an email on Friday that they are in contact with the city and “do not anticipate any interruption to resident water service.” However, as of Monday afternoon, the city confirmed the five-figure minimum balance remains unpaid.

The Tulsa Apartment Association (TAA) confirmed that while Vesta is a member in good standing, the association does not oversee the day-to-day financial operations of its members.

“For the tenants with the all-bills-paid situation, I would have them refer to their lease agreement,” said Jennifer Johnson, President of the Tulsa Apartment Association. “There are tenant rights and landlord rights all outlined in that agreement.”

The city is currently preparing contingency measures in the event the deadline passes without payment. Officials said they may deploy a city water truck to the complex on Wednesday to provide residents with access to basic needs.

For those living at the complex, the uncertainty is a heavy burden.

"I don't want our water to get cut off and the elderly and children to go without water," the resident said. "Even if somebody's behind on their rent, they deserve water. That's a human right."

Legal Aid Services of Oklahoma is urging residents in the 74136-zip code who are concerned about their housing status to contact their "Right to Counsel" program for assistance.

## Share This Story

Facebook X LinkedIn

Email COPY LINK

**READ MORE**

POLITICS

**Senate confirms Markwayne Mullin to lead Homeland Security, installing Trump ally at department grappling with shutdown**

by Associated Press March 23, 2026

NATIONAL NEWS

**California jury awards woman a total of nearly $60 million after finding that Bill Cosby sexually assaulted her in 1972**

by Associated Press March 23, 2026



▸ BUSINESS

## US stocks give back some of the rally sparked by Trump's talk of negotiations with Iran

by Associated Press March 23, 2026



▸ SPORTS

## Thunder beat short-handed 76ers 123-103 for 12th straight win

by Associated Press March 23, 2026

▸ NATIONAL NEWS

## Fire out and shelter-in-place order is lifted after oil refinery explosion near Texas coast

by Associated Press March 23, 2026



▸ NATIONAL NEWS

## Abortion pills are gaining ground as a method for ending pregnancies, and opponents are responding

by Associated Press March 23, 2026

### NEWS CATEGORIES

- Breaking News
- Business
- Entertainment
- Local News
- National News
- Oklahoma News
- Politics

Sports

Top Stories

World News

Advertisement

**TOP STORIES**



1 **LeBron moves Philly up, but OKC and Spurs remain NBA favorites, according to books and markets**



2 **Small businesses file lawsuits against Trump's new sweeping tariffs**




3 **Outbreak of diarrhea-causing parasite linked to 4 more states including Oklahoma**




4 **Ford recalls more than half a million Broncos due to engine fire risk**



5 **New US tariffs linked to claims of foreign forced labor dismay and anger trading partners**

ADVERTISEMENT

ZOELLNER
MEDIA GROUP

MIX 96.5
103.3 THE EAGLE
K95.5
DYNAMO

HOMEPAGE

NEWS

PODCASTS

CONTACT US

102.3 KRMG
TULSA'S NEWS & TALK

© 2026 Zoellner Media Group. All Rights Reserved.

Privacy Policy Visitor Agreement

Download on the App Store

GET IT ON Google Play

# EXHIBIT 17

# Progress on apartment trash clean-up, but residents still frustrated








By: Stef Manchen

*Posted 8:02 PM, Jan 09, 2026 and last updated 8:02 PM, Jan 09, 2026*

TULSA, Okla. — Overflowing garbage bins at multiple Vesta Realty properties in Tulsa have left residents frustrated after trash went uncollected for more than two weeks.



KJRH

"How can you not notice?" one resident said. "It's at every bin throughout the complex. There have been a lot of complaints about it."

ADVERTISEMENT




The resident, who asked to remain anonymous, said she first noticed the problem right before Christmas, and it's continued for weeks.

***WATCH: Progress on apartment trash clean-up, but residents still frustrated***



More than two weeks later, trash was still piled up at at least two Vesta Realty properties, including Riverpark Apartments and Woodland Oaks.

"It's a health violation. I know I'm not the only concerned citizen," the resident said.



KJRH

2 News visited both properties to check if conditions had improved since we first reported the issue Tuesday. We found garbage crews collecting as much trash as they could at Riverpark.

Vesta Realty CEO Marc Kulick shared a statement addressing the problem:

> *Vesta understands and appreciates the incredible responsibility we possess for providing quality housing in Oklahoma.*
>
> *We like many real estate firms have faced problems over the last few years and we deal with those problems as quickly and efficiently as possible.*

> *Over the last week I have been notified of a problem surrounding the servicing of our trash at multiple properties. There were several reasons for the issues, and all of those issues have been solved. Prompt trash collection will not be an issue moving forward.*

Marc Kulick, CEO of Vesta Realty

Tulsa City Councilor Anthony Archie said he has been working with Vesta Realty leaders and the trash company to resolve the issue. He said trash is now being picked up in phases.

"They can't pick it all up at one time, because there's so much of it, but every single day they're coming and picking up more and more," Archie said. "It's progress. Progress as promised."

However, the resident remains concerned about the cleanup process.

When 2 News Oklahoma's Stef Manchen explained that management would need to refill bins with overflow trash for daily pickup, she questioned the plan.

"So they should get more bins then to put the rest of the garbage in because again, they're supposed to come twice a week and they've only come the one time," the resident said.

The resident said trash collection occurred Jan. 5, but not once since then at her home.

She's frustrated because trash collection services are included in her rent.

"They're taking money each month out of us, so where is the money going?" the resident said.

Archie said American Waste will empty the bins daily until the issue is completely resolved.

### More from 2 News Oklahoma

**Oklahoma Gubernatorial candidates speak on agricultural views and policies**

**Muskogee family provides meals and clothing to neighbors in need**

**Tulsa Mayor Monroe Nichols posts to social media following sons arrest**

**City of Tulsa says cooling centers available during days of extreme heat**

---

***Stay in touch with us anytime, anywhere --***

- **2 News Oklahoma on your schedule | Download on your TV, watch for free.** How to watch on your streaming device
- **Download our free app for Apple, Android and Kindle devices.**
- **Like us on Facebook**
- **Follow us on Instagram**
- **Watch LIVE 24/7 on YouTube**

Recommended For You

**Marketplace** Sell Your Items - Free to List Visit Full Marketplace




**2019 Leaf Triumph Auto Magic Johnson Ultimate Sports 3/25**

$550

DAVID M. | sellwild.com




**Nintendo Jeopardy 25th Anniversary Edition (NES 1985) Cartri...**

$12

NICOLE L. | sellwild.com

Powered by Sellwild




## SHARE YOUR STORIES WITH US

SCRIPPS NEWS GROUP
© 2026 Scripps Media, Inc
*Give Light and the People Will Find Their Own Way*

# EXHIBIT 18

# SPECIAL WARRANTY DEED

**(Deed-in-lieu of foreclosure)**

UNOFFICIAL COPY

**This deed is exempt from documentary stamps pursuant to 68 Okl.Stat.Ann. §3202(13).**

THIS SPECIAL WARRANTY DEED made this 17th day of June, 2026, between Riverpark Best Living LLC, a Delaware limited liability company ("**Grantor**") and YSA Investments 1, LLC, a Delaware limited liability company ("**Grantee**").

Pursuant to that certain Agreement for Deed and Transfer in Lieu of Foreclosure of even date and in consideration of the promises set forth therein, Grantor does by these presents grant, bargain, and sell unto Grantee, its successors and assigns, all of Grantor's right, title and interest in and to the following described real estate situated in Tulsa County, State of Oklahoma, together with all and singular the improvements thereon and the tenements, hereditaments, fixtures, and appurtenances thereunto belonging (the "**Property**") subject to easements, restrictive covenants and rights-of-way of record, zoning ordinances and prior, valid and superior mortgages and liens of record, including that Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing (the "Mortgage"), granted by Grantor to Grantee, and recorded in the records of the County Clerk of Tulsa County, Oklahoma on October 31st, 2025 as Document Number 2025099691 to wit:

**Legal Description**

Lot One (1), Block Seventeen (17), KENSINGTON BLOCKS 15 AND 17, of the Planned Unit Development 128-B, an Addition in Tulsa County, State of Oklahoma, according to the Plat thereof recorded as Plat No. 4319 on March 23, 1983.

TO HAVE AND TO HOLD the Property forever, free and clear and discharged of and from all former grants, charges, taxes, judgments, mortgages and other liens and encumbrances of whatsoever nature, EXCEPT those described above.

This Special Warranty Deed is tendered in lieu of foreclosure of the Mortgage, and it is the express intent of the parties hereto that the Mortgage shall not merge with this deed, but shall continue in full force and effect as a lien on the Property. The Mortgage shall remain in effect until such Mortgage is affirmatively released by Grantee or merged into an action to foreclose such Mortgage. Grantee may, at any time in its sole discretion, maintain an action to foreclose the Mortgage described above.

This Special Warranty Deed represents an absolute conveyance of all of Grantor's right,

title and interest in and to the Property, including Grantor's equity or right of redemption, and is not intended as a mortgage, security instrument or trust conveyance of any kind.

Grantor, its successors and assigns, do hereby covenant, promise and agree to and with Grantee, at the delivery of this Special Warranty Deed that Grantor is lawfully seized in its own right of an absolute and indefeasible estate of inheritance in fee simple, of and in the Property; that the Property is free, clear and discharged and unencumbered of and from all former and other grants, titles, charges, estates, judgments, taxes, assessments and encumbrances, of whatsoever nature and kind, EXCEPT those described above; and that Grantor will WARRANT AND FOREVER DEFEND the same unto the Grantee, its successors and assigns, against any and all acts, conveyances, liens and encumbrances affecting such Property made or suffered to be made or done by, through or under Grantor.

IN WITNESS WHEREOF, Grantor has executed and delivered this Special Warranty Deed as of the day and year first above written.

UNOFFICIAL COPY

**Riverpark Best Living LLC, a Delaware limited liability company,**

By: ______________________________

Aharon Diveroli, Authorized Representative of
Lender; the Attorney in Fact on behalf of and
Authorized Representative of Riverpark Best Living LLC

**ACKNOWLEDGMENT**

STATE OF FLORIDA )
) ss.
COUNTY OF MIAMI-DADE )

Before me, the undersigned, a Notary Public in and for said County and State, on this 17th day of June, 2026, personally appeared Aharon Diveroli, as authorized representative of YSA Investments 1, LLC, a Delaware limited liability company, the Attorney-in-fact on behalf of, and authorized representative of, Riverpark Best Living LLC, a Delaware limited liability company, to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that he executed the same as his free and voluntary act and deed, for the uses and purposes therein set forth.

WITNESS MY HAND AND SEAL the day and year last above written.

______________________________
NOTARY PUBLIC

My Commission Expires:
12/19/2027

My Commission No.:
HH474601

NOTARY PUBLIC STATE OF FLORIDA
FELIPE MENEZES
Commission # HH 474601
Expires December 19, 2027

# EXHIBIT 19

# SPECIAL WARRANTY DEED

**(Deed-in-lieu of foreclosure)**

**This deed is exempt from documentary stamps pursuant to 68 Okl.Stat.Ann. §3202(13).**

THIS SPECIAL WARRANTY DEED made this 17th day of June, 2026, between A-V Village Creek Owner LLC, a Delaware limited liability company ("**Grantor**") and YSA Investments 1, LLC, a Delaware limited liability company ("**Grantee**").

Pursuant to that certain Agreement for Deed and Transfer in Lieu of Foreclosure of even date and in consideration of the promises set forth therein, Grantor does by these presents grant, bargain, and sell unto Grantee, its successors and assigns, all of Grantor's right, title and interest in and to the following described real estate situated in Tulsa County, State of Oklahoma, together with all and singular the improvements thereon and the tenements, hereditaments, fixtures, and appurtenances thereunto belonging (the "**Property**") subject to easements, restrictive covenants and rights-of-way of record, zoning ordinances and prior, valid and superior mortgages and liens of record, including that Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing (the "Mortgage"), granted by Grantor to Grantee, and recorded in the records of the County Clerk of Tulsa County, Oklahoma on October 31st, 2025 as Document Number 2025099637 to wit:

UNOFFICIAL COPY

**Legal Description**

**TRACT 1:** A tract of land that is part of Lot Two (2), Block Two (2), of BLOCKS 2 & 3 OF SOUTHERN CROSS ADDITION, a Subdivision to the City of Tulsa, Tulsa County, State of Oklahoma, according to the recorded Plat No. 3336, said tract being more particularly described as follows, to-wit: BEGINNING at a point that is the Northwest corner of Block One (1) of Southern Cross Addition; Thence Easterly along a Northerly line of said Block One (1) for 625.00 feet to the Southwest corner of Lot One (1) in Block Two (2) of Blocks 2 and 3 of Southern Cross Addition; Thence Northerly along a deflection angle to the left of 89°52'30" and along the Westerly line of said Lot One (1) for 170.56 feet to the Northwest comer thereof; Thence Westerly along a deflection angle to the left of 90°10'45" and along the Southerly Right-of-Way line of East 67th Street South for 610.31 feet to a point of curve; Thence Westerly, Northwesterly, and Northerly along said Right-of-Way line on a curve to the right with a central angle of 126°00'00" and a radius of 175.00 feet for 384.85 feet to a point of tangency: Thence continuing along said tangency and along said Right-of-Way for 78.06 feet, Thence Northwesterly along a deflection angle to the left of 90°00'03" for 126.97 feet; Thence Southwesterly at a right angle for 132.00 feet; Thence Northwesterly at a right angle for 19.60 feet: Thence Southwesterly at a right angle for 129.60 feet; Thence Westerly along a deflection

angle to the right of 53°63'18" for 55.44 feet; Thence Southerly at a right angle for 43.00 feet, Thence Westerly at a right angle for 32.00 feet; Thence Southwesterly along a deflection angle to the left of 36°06'09" for 189.59 feet; Thence continuing Southwesterly along a deflection angle to the left of 02°52'55" for 68.81 feet; Thence Southerly along a deflection angle to the left of 51°00'56" for 133.00 feet; Thence Southeasterly along a deflection angle to the left of 78°41'30" for 71.39 feet; Thence Easterly along a deflection angle to the left of 11°18'30" for 107.00 feet; Thence Southerly along a deflection angle to the right of 95°32'00" for 95.44 feet; Thence Westerly along a deflection angle to the right of 84°28'00" for 132.80 feet; Thence Southerly at a right angle for 248.00 feet to a point on the most Southerly line of said Block Two (2), said point being 644.98 feet Easterly of the most Southerly Southwest corner of Block Two (2); Thence Easterly at a right angle along said Southerly line for 611.00 feet to the Southwest corner of Block One (1) of Southern Cross Addition; Thence Northerly along a deflection angle to the left of 89°52'30" and along the Westerly line of said Block One (1) for 300.00 feet to the POINT OF BEGINNING of said tract of land.

**TRACT 2 (Tennis Court):** A tract of land that is part of Lot Two (2), Block Two (2), of BLOCKS 2 & 3 OF SOUTHERN CROSS ADDITION, a Subdivision to the City of Tulsa, Tulsa County, State of Oklahoma, according to the recorded Plat No. 3336, said tract being more particularly described as follows, to-wit: COMMENCING at a point that is the Northwest corner of Block One (1), of Southern Cross Addition; Thence Easterly along a Northerly line of said Block One (1) for 625.00 feet to the Southwest corner of Lot One (1) in Block Two (2) of Blocks 2 and 3 of Southern Cross Addition; Thence Northerly along a deflection angle to the left of 89°52'30" and along the Westerly line of said Lot One (1) for 170.56 feet to the Northwest corner thereof, Thence Westerly along a deflection angle to the left of 90°00'45" and along the Southerly Right-of-Way line of East 67th Street South for 610.31 feet to a point of curve: Thence Westerly, Northwesterly, and Northerly along said Right-of-Way line on a curve to the right with a central angle of 126°00'00" and a radius of 175.00 feet for 384.85 feet to a point of tangency; Thence continuing along said tangency and along said Right-of-Way for 78.06 feet to the Point of Beginning of said tract of land; Thence Northwesterly along a deflection angle to the left of 90°00'03" for 126.97 feet; Thence Southwesterly at a right angle for 132.00 feet; Thence Northwesterly at a right angle for 19.60 feet; Thence Southwesterly at a right angle for 129.60 feet; Thence Westerly along a deflection angle to the right of 53°53'18" for 55.44 feet; Thence Southerly at a right angle for 43.00 feet; Thence Westerly at a right angle for 32.00 feet; Thence Southwesterly along a deflection angle to the left of 36°06'09" for 189.59 feet, Thence continuing Southwesterly along a deflection angle to the left of 2°52'55" for 68.81 feet; Thence Northerly along a deflection angle to the right of 128°59'04" for 67.88 feet to a point on the Northwesterly line of Block Two (2); Thence Northeasterly along a deflection angle to the right of 54°59'50" for 0.00 feet to a point of curve; Thence Northeasterly along the Northwesterly line of said Block Two (2) and along a curve to the left with a radius of 1281.28 feet and a central angle of 24°42'19" for 552.47 feet to a point of tangency; Thence Northeasterly along said tangency for 52.63 feet; Thence Southeasterly along a deflection angle to the right of 95°49'14" for 250.44 feet to a point on the Northwesterly Right-of- Way line of Zunis Avenue; Thence Southwesterly along a deflection angle to the right of 90°00'00" for 56.94 feet to the POINT OF BEGINNING of said tract of land.

UNOFFICIAL COPY

TO HAVE AND TO HOLD the Property forever, free and clear and discharged of and

from all former grants, charges, taxes, judgments, mortgages and other liens and encumbrances of whatsoever nature, EXCEPT those described above.

This Special Warranty Deed is tendered in lieu of foreclosure of the Mortgage, and it is the express intent of the parties hereto that the Mortgage shall not merge with this deed, but shall continue in full force and effect as a lien on the Property. The Mortgage shall remain in effect until such Mortgage is affirmatively released by Grantee or merged into an action to foreclose such Mortgage. Grantee may, at any time in its sole discretion, maintain an action to foreclose the Mortgage described above.

This Special Warranty Deed represents an absolute conveyance of all of Grantor's right, title and interest in and to the Property, including Grantor's equity or right of redemption, and is not intended as a mortgage, security instrument or trust conveyance of any kind.

Grantor, its successors and assigns, do hereby covenant, promise and agree to and with Grantee, at the delivery of this Special Warranty Deed that Grantor is lawfully seized in its own right of an absolute and indefeasible estate of inheritance in fee simple, of and in the Property; that the Property is free, clear and discharged and unencumbered of and from all former and other grants, titles, charges, estates, judgments, taxes, assessments and encumbrances, of whatsoever nature and kind, EXCEPT those described above; and that Grantor will WARRANT AND FOREVER DEFEND the same unto the Grantee, its successors and assigns, against any and all acts, conveyances, liens and encumbrances affecting such Property made or suffered to be made or done by, through or under Grantor.

IN WITNESS WHEREOF, Grantor has executed and delivered this Special Warranty Deed as of the day and year first above written.

UNOFFICIAL COPY

*SIGNATURE PAGE TO FOLLOW*

**A-V Village Creek Owner LLC, a Delaware limited liability company,**

By:______________________________

Aharon Diveroli, Authorized Representative of
Lender; the Attorney in Fact on behalf of and
Authorized Representative of A-V Village Creek Owner LLC

**ACKNOWLEDGMENT**

STATE OF FLORIDA )
) ss.
COUNTY OF MIAMI-DADE )

Before me, the undersigned, a Notary Public in and for said County and State, on this 17th day of June, 2026, personally appeared Aharon Diveroli, as authorized representative of YSA Investments 1, LLC, a Delaware limited liability company, the Attorney-in-fact on behalf of, and authorized representative of, A-V Village Creek Owner LLC, a Delaware limited liability company, to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that he executed the same as his free and voluntary act and deed, for the uses and purposes therein set forth.

UNOFFICIAL COPY

WITNESS MY HAND AND SEAL the day and year last above written.

______________________________
NOTARY PUBLIC

My Commission Expires:
12/19/2027

My Commission No.:
HH474601

NOTARY PUBLIC STATE OF FLORIDA
FELIPE MENEZES
Commission # HH 474601
Expires December 19, 2027

# EXHIBIT 20

# AMENDED AND RESTATED OPERATING AGREEMENT OF LOUIS INVESTMENTS, LLC

This Amended and Restated Operating Agreement (as amended, modified or restated from time to time, this "Agreement") of Louis Investments, LLC, a Kansas limited liability company (the "Company"), is entered into effective as of February 1, 2020 (the "Effective Date"), by YSA Investments 1, LLC, a Delaware limited liability company, as the Company's sole member (the "Member"). This Agreement replaces the existing operating agreement of the Company together with any and all amendments, restatements, and modifications thereto.

The Member agrees as follows:

1. **Formation.** The Company is a limited liability company organized under the Kansas Limited Liability Company Act (Kansas Statute §17-7673), as amended from time to time (the "Act"). The Company's Articles of Organization (the "Articles") were filed February 1, 2020, with the Secretary of State of the State of Kansas.

**Name.** The Company's name is Louis Investments, LLC.

2. 3. **Purpose.** The Company's purpose is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities that are necessary or incidental to this purpose.

4. **Office.** The Company's registered office in the State of Kansas is the registered office named in the Articles or another place designated by the Manager from time to time in the manner provided by law. The registered agent for service of process is the registered agent named in the Articles or another person designated by the Manager from time to time in the manner provided by law. As of the Effective Date, the Company's registered office is:

GableGotwals
c/o Jake Krattiger
BOK Park Plaza
5. 499 W. Sheridan Ave., Ste. 2200
Oklahoma City, OK 73102

**Members.**

**(a) Existing Member.** The Member owns 100% of the membership interests in the Company.

6. **(b) Additional Members.** The Company may admit one or more additional members with the Member's consent. Before admission of any additional members to the Company, the Member shall amend this Agreement to make changes as the Member determines necessary to reflect the Company's additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

**Management.**

**(a) Authority; Powers and Duties of Manager.** The business, property and affairs of the Company are managed by one manager ("Manager") appointed by the Member. The Manager possesses all rights and powers possessed by manager under the Act and otherwise by law, subject to the provisions of the Act and this Agreement. Except for situations in which the approval of the Members is expressly required by nonwaivable provisions of the Act, the Manager has full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform all other acts or activities customary or incident to the management of the Company's business. Persons dealing with the Company are entitled to rely exclusively upon the power and authority of the Manager as set forth in this Agreement. No Member other than a Member who is the Manager has any authority to act for or on behalf of the Company. Without otherwise limiting this Section, the Manager is authorized, on the Company's behalf, to approve the Company's merger, consolidation or conversion or the sale of all or substantially all the Company's assets. The Manager may resign at any time in its sole discretion. Manager need not be a resident of the State of Kansas or Member of the Company. Any action taken by the Manager(s), in their capacity as such, is the Company's act and will bind the Company. If at any time the Company has no Manager appointed by the Member, the Member will be deemed to be the Manager.

**(b) Action by Manager.** Except for situations in which the approval of the Members is expressly required by nonwaivable provisions of the Act, (i) no decision or action of the Manager shall require Member approval, and (ii) Manager shall have the unilateral right and authority to take any action on behalf of the Company to bind or commit the Company without requiring any additional authorization or written notice.

**(c) Appointment of Officers; Delegation of Authority.** The Manager may, from time to time, designate one or more officers with titles designated by the Manager to act in the Company's name with authority delegated by the Manager (each such designated person, an "Officer"). Any Officer will act under the Officer's delegated authority until the Officer is removed by the Manager. Any action taken by an Officer designated by the Manager under properly delegated authority will constitute the Company's act and will bind the Company. Persons dealing with the Company are entitled to rely conclusively on an Officer's delegated power and authority and any instrument designating the Officer and the authority delegated to him or her.

**(d) Duties.** Whenever in this Agreement the Manager is permitted or required to make a decision (including a decision that is in such Manager's "discretion" or under a grant of similar authority or latitude), the Manager shall be entitled to consider only such interests and factors as the Manager desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. If the Manager is permitted or required to make a decision in that Manager's "good faith," the Manager shall act under that express standard and is not subject to any other or different standard imposed by this Agreement or any other applicable law.

**(e) Appointment and Term; Successor Manager.** YSA Investments 1 LLC is hereby appointed as the Company's sole Manager as of the Effective Date, and any Manager appointed prior to the Effective Date other than YSA Investments 1 LLC is hereby removed. A Manager will hold office until such Manager resigns, dies, becomes incompetent or otherwise vacates his or her position. If at any time the Company does not have a Manager, the holders of a majority of the membership interest in the Company will appoint a successive Manager; provided, however, that so long as YSA Investments 1 LLC or any entity directly or indirectly controlling, controlled by, or under common control with YSA Investments 1 LLC (any of which, "Affiliate") is a Member, such entity must approve the appointment or removal of a Manager.

**(f) Resignation.** A Manager may resign at any time by giving written notice to the Members. Unless otherwise specified in the notice, the resignation takes effect upon receipt, and the acceptance of the resignation is not necessary to make it effective.

**(g) Removal of Manager.** A Manager may be removed only upon good cause and upon ninety (90) days written notice. Good cause is defined as the criminal conviction of the Manager for any felony or other criminal offense, not including the violation of any traffic law, municipal ordinance, or other non-violent misdemeanors. Upon notice of removal, a Manager shall pay or cause to be repaid, any and all loans or other obligations any entity directly or indirectly owned, controlled or affiliated with the Manager owes to the Company.

**(h) Time Devoted to Business.** A Manager will devote an amount of time to the Company's business as such Manager determines necessary for the efficient carrying on of the Company's business.

**(i) Compensation and Reimbursement.** The Company hereby authorizes Manager, in its sole discretion, to cause the Company to enter into a services agreement with the Manager with respect to the Manager's management of the Company, providing for, among other things, the payment of an annual fee by the Company to the Manager of Fifty-Thousand Dollars. In addition to any fees payable under this Section or otherwise under this Agreement, each Manager is entitled to reimbursement of ordinary and necessary business expenses incurred by such Manager in connection with such Manager's duties to the Company.

**(j) Competing Interests; Related Transactions.** The Manager, Members and their respective Affiliates may have business interests and engage in business activities for his or her own account or for the account of others in addition to those relating to the Company, including business interests and activities in direct competition with the Company. No provision of this Agreement prohibits the Manager or Members from conducting competitive businesses and activities. Neither the Company nor the Members have any rights by this Agreement in any business ventures of a Manager or other Member. The Company may enter into any agreement, arrangement or understanding between the Company and any Member or Manager or any Affiliate of a Member or Manager, or employee or agent of the Company, and no such agreement, arrangement or understanding will be void or unenforceable solely due to it being with such Member, Manager, Affiliate,

employee, or agent. Notwithstanding anything to the contrary in this Agreement, any fees or compensation expressly provided for the Manager or any of its Affiliates under the Services Agreement are expressly approved and ratified by the Members.

7. **Limitation of Liability; Indemnification.**

**(a) Limitation of Liability.** This Agreement does not create or impose any fiduciary duty on any Manager. Furthermore, each of the Members waives all fiduciary duties that, absent waiver, are implied by the applicable law (including the Act), and in doing so, acknowledges and agrees that the Manager's duties and obligations to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of the Manager otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Manager. Except as otherwise required in the Act, the Company's debts, obligations, and liabilities are solely its debts, obligations and liabilities, and the Manager and Member are not and will not be obligated personally for any of the Company's debts, obligations, and liabilities solely by reason of being a Manager, Member, or participating in the Company's management, as applicable. No Manager, by reason of his or her acting as such, shall be obligated personally for any debts, obligations or liabilities of the Company.

**(b) Indemnification.** To the fullest extent permitted by the Act, as currently in effect or as amended, substituted or replaced in the future (but, in the case of any amendment, substitution or replacement, only to the extent that the amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Act permitted the Company to provide before the amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Manager or Officer ("Covered Person") against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "Losses") to which the Covered Person is subject by reason of:

(i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any Affiliate of the foregoing in connection with the Company or the Company's activities; or

(ii) the Covered Person being or acting in connection with the business of the Company as a member, stockholder, Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective Affiliates, or that the Covered Person is or was serving at the Company's request as a member, manager, director, officer, employee or agent of any Person including the Company;

*if* (x) the Covered Person in a manner the Covered Person believed to be in, or not opposed to, the Company's best interests and, with respect to any criminal proceeding, had no reasonable cause to believe his, her or its conduct was unlawful, and (y) the Covered

Person's conduct did not constitute fraud or willful misconduct. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, will not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that the Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

**(c)** **Reimbursement.** The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for the Covered Person's reasonable legal or other expenses (as incurred) in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified under this Section 7, but if it is finally judicially determined that the Covered Person is not entitled to the indemnification under this Section 7, the Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

**(d)** **Entitlement to Indemnity.** Indemnification under this Section **Error! Reference source not found.** is not exclusive of any other rights to indemnification to which those seeking indemnification are entitled under any agreement or otherwise. This Section 7 will continue to afford protection to each Covered Person regardless of whether the applicable Covered Person remains in the position or capacity by which such Covered Person became entitled to indemnification under this Section 7 and will inure to the benefit of the executors, administrators, legatees and distributees of each Covered Person.

**(e)** **Insurance.** To the extent available on commercially reasonable terms and subject to Manager's sole discretion, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Manager(s) determine, but the Company's failure to obtain insurance will not affect the right to indemnification of any Covered Person under this Agreement's indemnification provisions, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then the Covered Person shall, to the extent the recovery is duplicative, reimburse the Company for any amounts previously paid to the Covered Person by the Company in respect of the applicable Losses.

**(f)** **Funding of Indemnification Obligation.** Notwithstanding anything in this Agreement to the contrary, any indemnity by the Company relating to the matters covered in this Section 7 shall be provided out of and to the extent of Company assets only, and no Member (unless a Member otherwise agrees in writing) is personally liable on account of the Company's indemnification obligations or is required to make additional Capital Contributions to help satisfy the Company's indemnification obligations.

**(g)** **Savings Clause.** If all or any part of this Section 7 is invalidated by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold

harmless each Covered Person under this Section 7 to the fullest extent permitted by any applicable portion of this Section 7 that is not invalidated and to the fullest extent permitted by applicable law.

**(h) Amendment.** This Section 7 is a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 7 is in effect, on the other hand, by which the Company and each Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 7 that adversely affects a Covered Person's rights to indemnification for Losses incurred or relating to a state of facts existing before the applicable amendment, modification or repeal will apply in a way that eliminates or reduces the Covered Person's entitlement to indemnification for Losses without the Covered Person's prior written consent.

**(i) Survival.** This Section 7 will survive the Company's dissolution, liquidation, winding up and termination.

**Exculpation**

8. **(a) Standard of Care.** No Manager is or will be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by the Covered Person in good faith reliance on the provisions of this Agreement, so long as the action or omission does not constitute fraud or willful misconduct by the Covered Person.

**(b) Good Faith Reliance.** A Manager is and will be fully protected in relying in good faith upon the Company's records and upon information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, distributions or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) Manager; (ii) one or more of the Company's employees; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by the Company or on its behalf; or (iv) any other Person selected in good faith by the Company or on its behalf, in each case as to matters that the relying
9. Person reasonably believes to be within the other Person's professional or expert competence.

10.

**Term.** The Company's term is perpetual unless the Company is dissolved and
11. terminated in accordance with Section 13.

**Capital Contributions.** The Member agrees to contribute to the Company cash, property or services as determined by the Member.

**Tax Status; Income and Deductions.**

**(a) Tax Status.** As long as the Company has only one member, the Company and the Member intend that the Company be treated as a disregarded entity for federal and all state tax purposes and neither the Company nor the Member will take any action or make any election which is inconsistent with such tax treatment. All provisions of this

Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

**(b) Income and Deductions.** All items of income, gain, loss, deduction and credit of the Company (including, without limitation, items not subject to federal or state income tax) will be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction and credit of the Member.

**Distributions.** The Company shall make distributions, if any, to the Member at the times and in the amounts determined by the Manager in its sole discretion.

**Dissolution; Liquidation.**

**12.**

**(a)** The Company shall dissolve, and its affairs shall be wound up upon the first
**13.** to occur of the following: (i) the written consent of the Member or (ii) any other event or circumstance giving rise to the dissolution of the Company under the Act, unless the Company's existence is continued pursuant to the Act.

**(b)** Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Manager shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

**(c)** In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Member.

**(d)** Upon the completion of the winding up of the Company, the Manager shall
**14.** file Articles of Dissolution in accordance with the Act.

**Miscellaneous.**

**(a) Assignment.** Member shall not sell, assign, pledge, or transfer any portion of its membership interest without the Manager's prior written consent, which may be withheld in Manager's sole discretion.

**(b) Amendments.** Amendments to this Agreement may be made only with the consent of the Member.

**(c) Governing Law.** This Agreement shall be governed by the laws of the State of Kansas (excluding its conflict of laws rules).

**(d) Venue.** The Member and Manager irrevocably and unconditionally (a) agree that any suit, action, or other legal proceeding arising out of or relating to this Agreement or any other agreement, document, or instrument delivered pursuant to, or in

connection with, this Agreement shall be brought and maintained exclusively in a court of competent jurisdiction in the State of Kansas; (b) consent to the jurisdiction of such courts in any such suit, action, or proceeding as applicable; and (c) waive any objection which it or they may have to the laying of venue or jurisdiction of any such suit, action, or proceeding in such courts. With respect to any claim hereunder, whether legal or equitable in nature, no bond or other security of any kind shall be due by either Party if such claim arises.

**(e) Attorney's Fees.** Should any action or proceeding be commenced between the parties hereto or their respective representatives concerning the enforcement or interpretation of any of the provisions of this Agreement or the rights and duties of any person or entity hereunder, solely as between the parties hereto or their successors, the party prevailing in such proceedings shall be entitled to the reasonable attorney's fees and expenses of counsel and court costs incurred by reason of such action.

**(f) Severability.** If any provision of this Agreement is declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

**(g) Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*SIGNATURE PAGE ATTACHED*]

THIS OPERATING AGREEMENT is executed and delivered by the undersigned sole Member and sole Manager as of the Effective Date.

**SOLE MEMBER:**

Aharon Diveroli

Aharon Diveroli, on behalf of:
YSA Investments 1 LLC, a Delaware Limited Liability Company

**SOLE MANAGER:**

Aharon Diveroli

Aharon Diveroli, on behalf of:
YSA Investments 1 LLC, a Delaware Limited Liability Company

# EXHIBIT 21

MEMBERSHIP INTEREST CERTIFICATE

Certificate Number: 1 Number of Membership Units: 100

Louis Investments, LLC

a Kansas Limited Liability Company

This Certifies that YSA Investments 1, LLC, a Delaware limited liability company

is the owner of one hundred Membership Units out of one hundred total existing Membership Units of Louis Investments, LLC, a Kansas Limited Liability Company

(the "Company"), transferable only on the books of the Company by the holder hereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed.

The membership interests represented by this Certificate are subject to all of the terms, conditions, and restrictions set forth in the Operating Agreement of the Company, as may be restated, modified or amended from time to time, which Operating Agreement is on file at the principal office of the Company and incorporated herein by reference.

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by its duly authorized representative this 28th day of January, 2026.

[signature]

Aharon Diveroli, Authorized Representative of YSA Investments, 1, LLC,
Attorney in Fact, on behalf of, Marc
Kulick, Vesta Holdings, LLC, an Oklahoma limited
liability company and the Company

Date: 01\30\2026

State of Florida County of Miami-Dade
The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this 30th day of January, 2026, by
Aharon Diveroli [Name(s) of person(s) signing]
GENE RUOTOLO Notary Public – State of FLORIDA

# EXHIBIT 22

**Scott Schwab**
Secretary of State

Docking Building
915 SW Harrison St
Topeka, KS 66612
(785) 296-4564

# State of Kansas

January 26, 2026

The Office of the Kansas Secretary of State has successfully received and filed a UCC-1 financing statement with the information below. Please find enclosed your stamped request form and any original items submitted as documentation.

**Time of Transaction:** 1/26/2026 2:04:35pm
**Filing Type:** UCC-1 Regular Filing
**Filing Number:** 122068026
**Payment:** $20.00 PREPAID

| Filing # | File Timestamp | Lapse Date | Pages |
|---|---|---|---|
| 122068026 | 1/26/2026 2:04:35pm | 1/26/2031 | 1 |

| Debtor Information | Secured Party Information |
|---|---|
| LOUIS INVESTMENTS, LLC<br>6400 W. 110TH STREET, SUITE 201<br>OVERLAND PARK KS 66211 | YSA HOLDINGS 1 LLC<br>8 THE GREEN #23817<br>DOVER DE 19901 |
| KULICK, MARC<br>4920 E 113TH ST S<br>TULSA OK 74137 | |

[redacted]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

B. E-MAIL CONTACT AT SUBMITTER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

David P. Limekiller, Esq.
GableGotwal
110 N. Elgin, Suite 200, Tulsa, OK 74120

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

**Filed Kansas Secretary of State**
**TimeStamp:** 1/26/2026 14:04:35
**Filing #:** 122068026
**Image #:** 30757238
**Pages:** 1
**Cost:** $20.00

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Louis Investments, LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6400 W. 110th Street, Suite 201 | Overland Park | KS | 66211 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Kulick | Marc | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4920 E 113th St S | Tulsa | OK | 74137 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| YSA Holdings 1 LLC | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 8 The Green #23817 | Dover | DE | 19901 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
100 out of 100 Membership Interests of Louis Investments, LLC, a Kansas Limited Liability Company

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

# EXHIBIT 23

**Scott Schwab**
Secretary of State

Docking Building
915 SW Harrison St
Topeka, KS 66612
(785) 296-4564

# State of Kansas

January 29, 2026

The Office of the Kansas Secretary of State has successfully received and filed a UCC-3 financing statement amendment with the information below. Please find enclosed your stamped request form and any original items submitted as documentation.

**Time of Transaction:** 1/29/2026 3:15:45pm
**Filing Type:** Secured Party Change
**Filing Number:** 122080526
**Payment:** $20.00 PREPAID

| Filing # | File Timestamp | Current Lapse Date | Pages |
|---|---|---|---|
| Original Filing #122068026 | 1/26/2026 2:04:35pm | 1/26/2031 | 1 |
| This Amendment Filing #122080526 | 1/29/2026 3:15:45pm | N/A | 1 |

## Amendment:

| Authorizing Party Information | Filing Action Notes |
|---|---|
| YSA HOLDINGS 1 LLC | This secured party has been removed from this filing: Ysa Holdings 1 LLC and has been replaced by this secured party: Ysa Investments 1, LLC |

| Current Debtor Information | Current Secured Party Information |
|---|---|
| LOUIS INVESTMENTS, LLC<br>6400 W. 110TH STREET, SUITE 201<br>OVERLAND PARK KS 66211 | YSA HOLDINGS 1 LLC<br>8 THE GREEN #23817<br>DOVER DE 19901 |
| KULICK, MARC<br>4920 E 113TH ST S<br>TULSA OK 74137 | YSA INVESTMENTS 1, LLC<br>8 THE GREEN #23817<br>DOVER DE 19901 |

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
David P. Limekiller

B. E-MAIL CONTACT AT SUBMITTER (optional)
dlimekiller@gablelaw.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

GableGotwals
110 N. Elgin Ave., Ste 200
Tulsa, OK 74120

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

**Filed Kansas Secretary of State**
**TimeStamp:** 1/29/2026 15:15:45
**Filing #:** 122068026
**Amendment #:** 122080526
**Image #:** 30758488
**Pages:** 1
**Cost:** $20.00

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
122068026

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Part(y)(ies) authorizing this Termination Statement

3. ☐ ASSIGNMENT: Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9; check ASSIGN Collateral box in Item 8 and describe the affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. PARTY INFORMATION CHANGE:
Check one of these two boxes:
This Change affects ☐ Debtor or ☑ Secured Party of record
AND Check one of these three boxes to:
☑ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME
YSA Holdings 1 LLC

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME
YSA Investments 1, LLC

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 8 The Green #23817 | Dover | DE | 19901 | USA |

8. COLLATERAL CHANGE: Check only one box: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN* collateral
Indicate collateral:
*Check ASSIGN COLLATERAL only if the assignee's power to amend the record is limited to certain collateral and describe the collateral in Section 8

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
YSA Holdings 1 LLC

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA:
To be filed in KS

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 07/01/23)